# No. 25-1563

## IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

————————

### PAUL BRUYEA,

**Plaintiff-Appellee**

v.

### UNITED STATES,

**Defendant-Appellant**

————————

## ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES COURT OF FEDERAL CLAIMS No. 23-766T; JUDGE MATTHEW H. SOLOMSON

————————

## REPLY BRIEF FOR THE UNITED STATES

————————

JACOB EARL CHRISTENSEN      (202) 514-5048
KATHLEEN E. LYON            (202) 307-6370
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

October 14, 2025

# TABLE OF CONTENTS

**Page**

Table of contents.................................................................i
Table of authorities ........................................................ iii
Reply brief for the United States ..........................................1

   A.   Article XXIV(1)'s text precludes Bruyea's claimed
        foreign tax credit against the I.R.C. § 1411 tax.....................1

        1.   Bruyea's interpretation of Article XXIV(1) to
             provide him a foreign tax credit has no
             textual basis...........................................................2

        2.   The government's interpretation of the U.S.
             law limitation is compelled by the Treaty's
             text.......................................................................9

        3.   Bruyea misinterprets Article XXIV(1)'s
             parenthetical language.........................................13

   B.   Article XXIV(4)(b) does not provide a credit independent
        of the Internal Revenue Code's provisions and
        limitations ...........................................................16

        1.   Bruyea erroneously reads Article XXIV(4)(b)
             in isolation while ignoring Article XXIV(6),
             rendering it superfluous.......................................17

        2.   Bruyea's interpretation produces other
             anomalous results.................................................22

        3.   The cases Bruyea relies on are inapposite .........24

   C.   Bruyea misconstrues the extrinsic evidence on which he
        relies ...................................................................25

   D.   Bruyea misconstrues the Treaty's purpose..........................31

Conclusion.......................................................................34

-ii-

**Page**

Certificate of compliance ..........................................................................35

# TABLE OF AUTHORITIES

**Cases:**                                                            **Page(s)**

*Abbott v. Abbott,*
  560 U.S. 1 (2010) ................................................................ 27
*Air France v. Saks,*
  470 U.S. 392 (1985) .......................................................... 27
*Christensen v. United States,*
  168 Fed. Cl. 263 (2023) .......................................... 5, 7, 25
*Clean Air Council v. United States Steel Corp.,*
  4 F.4th 204 (3d Cir. 2021) ............................................ 20
*El Al Israel Airlines v. Tseng,*
  525 U.S. 155 (1999) .......................................................... 27
*Goosen v. Commissioner,*
  136 T.C. 547 (2011) .......................................................... 32
*Haver v. Commissioner,*
  444 F.3d 656 (D.C. Cir. 2006) .................................. 24-25
*Kappus v. Commissioner,*
  337 F.3d 1053 (D.C. Cir. 2003) ................................ 24-25
*Kim v. United States,*
  664 F. Supp. 3d 1062 (C.D. Cal. 2023) .......................... 6
*Kolovrat v. Oregon,*
  366 U.S. 187 (1961) ...................................................... 25-26
*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024) ...................................................... 30-31
*Nat'l Westminster Bank, PLC v. United States,*
  512 F.3d 1347 (Fed. Cir. 2008) ...................................... 31
*O'Connor v. United States,*
  479 U.S. 27 (1986) .................................................... 20, 28
*Sumitomo Shoji Am., Inc. v. Avagliano,*
  457 U.S. 176 (1982) ............................ 14, 21, 26, 30-31
*Toulouse v. Commissioner,*
  157 T.C. 49 (2021) .................................................... 5-6, 33
*United States v. Stuart,*
  489 U.S. 353 (1989) .......................................................... 32
*Valentine v. United States,*
  299 U.S. 5 (1936) .............................................................. 31

**Cases (cont'd):**                                    **Page(s)**

*Water Splash, Inc. v. Menon,*
581 U.S. 271 (2017) .................................................. 19

*Whitney v. Robertson,*
124 U.S. 190 (1888). (*See* Blue Br. 14 n.7.) ................... 25

*Xerox Corp. v. United States,*
41 F.3d 647 (Fed. Cir. 1994).................................... 31, 33

**Statutes:**

Internal Revenue Code (26 U.S.C.):

§ 27 ...............................................2, 4-7, 9, 11, 14, 21
§ 33(a) .................................................................. 14
§ 56 ..................................................................... 15
§ 59(a) ................................................................. 24
§ 72(m)(5)(B) ....................................................... 15
§ 402(e) ............................................................... 15
§ 408(f) ................................................................ 15
§ 531 ................................................................... 15
§ 541 ................................................................... 15
§ 861–865 ............................................................ 11
§ 901(a).............................................2, 4-7, 9, 11, 12,15, 21
§ 901(c) ................................................................. 8
§ 904 ................................................................. 7-8
§ 904(a)..........................................................18-19, 23, 29
§ 904(c) ............................................................... 29
§ 904(d) ............................................................... 23
§ 905 .................................................................... 8
§ 907 .................................................................... 8
§ 908 .................................................................... 8
§ 911 .................................................................... 8
§ 911(a)..............................................................22-23
§ 911(d)(6) ..........................................................22-23
§ 1351 ................................................................. 15
§ 1411 ......................... 1, 3-6, 9-12, 15-16, 25, 27, 30, 33

-v-

**Miscellaneous:**                                      **Page(s)**

78 Fed. Reg. 72394-01, 2013
  WL 6222406 (Dec. 2, 2013)...................................................30
Treas. Reg. (26 C.F.R.) § 1.1411-1(e)...............................30

The Treaty (Income Tax Treaty Between the United
States and Canada) .................................................................1

  Article II(2)(b) ...........................................................3, 15
  Article II(2)(b)(i) ...........................................................15
  Article II(3)(a) ...........................................................3, 15
  Article III(1)(d)...........................................................3, 15
  Article XXIV.....................................1-2, 8, 10-11, 17, 20, 28, 29
  Article XXIV(1) .........................................1-4, 8-18, 23-24, 28, 30
  Article XXIV(2) .....................................................10, 28, 33
  Article XXIV(4) .....................................................................24
  Article XXIV(4)(b)..............................................16-17, 22-23, 25
  Article XXIV(6) .....................................................17-18, 22
  Article XXIV(7) .....................................................................12-13

- 1 -

**REPLY BRIEF FOR THE UNITED STATES**

The United States' opening brief demonstrates the errors in the Court of Federal Claims' ("CFC") ruling below that Article XXIV of the income tax treaty between the United States and Canada allows U.S. citizens residing in Canada to claim a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411, even though the Internal Revenue Code does not authorize such credit. Bruyea rightly concedes (Red Br. 7) that the Code does not allow him to credit foreign taxes paid to Canada against his § 1411 tax liability to the United States, but he argues that either Article XXIV(1) or XXIV(4)(b) of the Treaty independently allows such credit, irrespective of the Code's restrictions on foreign tax credits. Bruyea is wrong on both counts.

## A. Article XXIV(1)'s text precludes Bruyea's claimed foreign tax credit against the I.R.C. § 1411 tax

Article XXIV(1) of the Treaty does not authorize Bruyea's claimed foreign tax credit against his § 1411 tax on net investment income, and the CFC erred in concluding otherwise. Bruyea's defense of the CFC's decision rests on the same atextual interpretation of Article XXIV(1)'s U.S. law limitation to incorporate only the Internal Revenue Code's computational provisions for determining the amount of a foreign tax

- 2 -

credit, while at the same time excluding—without any textual basis—the Code's other provisions and limitations governing foreign tax credits like I.R.C. §§ 27 and 901(a), which confine the foreign tax credit's availability under the Code to Chapter 1 taxes. The fact that the signatories, in subsequent paragraphs of Article XXIV, expressly agreed to certain tax benefits and modifications different from what the Code would otherwise provide is not grounds to distort the plain meaning and broad reach of Article XXIV(1)'s text, which conditions the credit on compliance with the "provisions and … limitations of the law of the United States"—terms that plainly include I.R.C. §§ 27 and 901(a), as every other court to construe such language has concluded. Nor does the government's interpretation render Article XXIV(1)'s parenthetical language meaningless, as Bruyea contends.

### 1. Bruyea's interpretation of Article XXIV(1) to provide him a foreign tax credit has no textual basis

Article XXIV(1) of the Treaty provides in relevant part (Appx565 (emphases added)):

> In the case of the United States, subject to the provisions of paragraphs 4, 5, and 6, double taxation shall be avoided as follows: *In accordance with the provisions and subject to the limitations of the law of the United States* (as it

may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States … as a credit against the *United States tax* on income the appropriate amount of income tax paid or accrued to Canada; …

The parties agree that the term "United States tax" in this provision includes the I.R.C. § 1411 tax on net investment income. *See* Article II(2)(b), (3)(a); Article III(1)(d) (Appx536-538); Red Br. 7.  But the parties also agree—and the text is clear—that the "credit against the United States tax" referenced in this provision is expressly conditioned and is allowable only "[i]n accordance with the provisions and subject to the limitations of the law of the United States."  And the parties further agree that the Internal Revenue Code does not authorize a foreign tax credit against the § 1411 tax on net investment income in Chapter 2A of the Code, which is the relief Bruyea seeks under the Treaty.  (Red Br. 7.)  The parties' disagreement lies in the proper interpretation of Article XXIV(1)'s language restricting the credit "in accordance with the provisions and subject to the limitations of the law of the United States," which the CFC referred to in its opinion as the U.S. law limitation.

- 4 -

Bruyea, like the CFC below, takes the untenable position that the phrase "provisions and … limitations of the law of the United States" in Article XXIV(1) narrowly refers only to the "statutory *computational* rules for determining the proper *quantum* of the … credit." (Red Br. 8–9 (emphases added); *see also id.* 17–19.) Bruyea thus conveniently interprets this text as excluding, or failing to incorporate, all other U.S. statutory provisions in the Internal Revenue Code that govern foreign tax credits, including § 27 and § 901(a), which confine the foreign tax credit to income taxes imposed by Chapter 1 of the Code. Based on his narrow view of the U.S. law limitation, Bruyea maintains that the credit authorized in Article XXIV(1) extends to covered U.S. taxes that are imposed outside of Chapter 1—including the § 1411 tax on net investment income imposed in Chapter 2A—even though such credit is not authorized under the Internal Revenue Code.

Bruyea's narrow interpretation of the U.S. law limitation is incorrect and has been rejected by every court to consider it, save the CFC in this case. The plain text of Article XXIV(1)'s U.S. law limitation broadly incorporates "the provisions and … limitations of the law of the United States" to circumscribe the available credit, and "the law of the

- 5 -

United States" indisputably includes § 27 and § 901(a) of the Internal
Revenue Code—Title 26 of the United States Code—that govern the
availability of foreign tax credits.  There is no textual basis for
excluding these particular Code provisions from the reach of the broad
language that the signatories adopted in circumscribing the available
credit, as Bruyea seeks to do.

The Tax Court, the District Court for the Central District of
California, and the CFC in *Christensen* all correctly rejected the same
(or very similar) argument advanced here by Bruyea.  In *Toulouse v.
Commissioner*, 157 T.C. 49 (2021), the Tax Court construed identical
language in the U.S.-France and U.S.-Italy bilateral treaties to preclude
a treaty-based credit against the § 1411 tax.  The court reasoned that,
by the language's "express terms," "any allowable foreign tax credit
must be determined in accordance with the Code and is limited by the
Code's provision of a credit."  *Id*. at 58.  The taxpayer there argued that
the placement of the § 1411 tax in Chapter 2A of the Code was not a
"limitation" as that term was used in the treaties.  *Id*. at 59–60.  But,
while the taxpayer focused on the term "limitation," she "ignore[d] that
the treaty provisions on which she relie[d] require any foreign tax credit

- 6 -

to be 'in accordance with' [the provisions of] the Code." *Id.* at 60.  Those
treaty provisions "expressly state that any allowable foreign tax credit
is subject to the limitations of U.S. tax laws and must be in accordance
with the Code." *Id.*  The Tax Court thus concluded that, "for petitioner
to prevail on the basis of the provisions she cites, the Code must provide
the credit if one exists," but "[t]here is no provision for any credits
against the section 1411 tax" in the Code.  *Id.*

In *Kim v. United States*, 664 F. Supp. 3d 1062, 1082 (C.D. Cal.
2023), the taxpayer similarly argued that "sections 27 and 901 of the
Code," which confine foreign tax credits under the Code to Chapter 1
taxes, were not "limitations" as that term was used in identical
language in the U.S.-South Korean treaty and that, therefore, a treaty-
based credit against the § 1411 tax was available.  The district court
rejected the argument, agreeing with *Toulouse*'s reasoning (*id.* at 1084):

> [T]he U.S.-S. Kor. treaty at issue here contains identical
> language to the treaty provisions at issue in *Toulouse*,
> stating that foreign tax credits will be imposed 'in
> accordance with' and 'subject to the limitations of' the Code.
> As the *Toulouse* Tax Court found, and as this Court also
> finds, this language unambiguously mandates that any
> allowed foreign tax credit must conform to the statutory
> foreign-tax-credit framework already in place.

- 7 -

And, in *Christensen v. United States*, 168 Fed. Cl. 263, 327–28 (2023), the CFC rejected the taxpayer's argument that the "provisions" and "limitations" of U.S. law referenced in identical language in the U.S.-France treaty incorporated only the computational limits on the amount of the credit set forth in I.R.C. § 904—the same argument Bruyea makes here.  The *Christensen* court held such argument was "belied" by the treaty's text, which "does not expressly refer to I.R.C. § 904."  *Id.*  The court explained that the treaty's "use of both 'limitations' and 'provisions' [was] sufficiently broad to indicate that foreign tax credits allowed by [that provision of the treaty] are subject not only to the 'limitations' of I.R.C. § 904, but also to other 'provisions' and 'limitations' set forth in other provisions of the I.R.C., including I.R.C. §§ 27 and 901(a)."  *Id.* at 328.

Bruyea's argument to the contrary rests entirely on his misreading of the 1984 Technical Explanation issued by the Treasury Department.  (Red Br. 18.)  As we explained (Blue Br. 37–39), the Technical Explanation confirms the government's position that "[t]he … credits allowed by paragraph 1 are subject to the limitations of the Code."  (Appx254.)  Bruyea, like the CFC below, relies on the sentence

that follows: "Thus, as is generally the case under U.S. income tax conventions, provisions *such as* Code section 901(c), 904, 905, 907, 908, and 911 apply *for purposes of* computing the allowable credit under paragraph 1." (Appx254 (emphases added).) But this sentence in the Technical Explanation simply provides a nonexhaustive list of certain limitations that apply in one particular context—*i.e.*, for purposes of computing an otherwise allowable credit; it does not purport to set forth an exhaustive list of all applicable "provisions and … limitations of the law of the United States" within the meaning of Article XXIV(1) that restrict the availability of the credit.[1]

───────────────

[1] In a footnote, Bruyea makes passing reference to a 1981 Joint Committee on Taxation explanation of the then-proposed Treaty (Red Br. 18 n.9), but he badly misquotes it and incorrectly attributes an erroneous conclusion by the CFC below to the Joint Committee. *Compare* Red Br. 18 n.9 (first sentence), *with* CFC Opinion (Appx32 (third paragraph, first sentence)). In its overview of Article XXIV, the Joint Committee said that "[t]he credit is provided … only to the extent permitted under domestic law." (Appx368.) In the next section, addressing the United States's obligations, the Joint Committee also said that "the credit is to be computed in accordance with the provisions of and subject to the limitations of U.S. law." (Appx368.) Both statements confirm, and are fully consistent with, the government's interpretation of the U.S. law limitation. But the CFC pulled these two statements out of context and combined them to conclude that the first statement "means that" the U.S. law limitation is limited to computational provisions in the Code referred to in the second

(continued…)

In sum, Bruyea's narrow view of the U.S. law limitation in Article XXIV(1) lacks a textual basis, conflicts with the decisions of every other court that has construed identical language in other treaties, and should be rejected by this Court as well.

**2. The government's interpretation of the U.S. law limitation is compelled by the Treaty's text**

Article XXIV(1) expressly incorporates the "provisions and … limitations of the law of the United States" to restrict the credit that it authorizes against the "United States tax" on income. Contrary to Bruyea's position, those provisions and limitations of U.S. law include I.R.C. §§ 27 and 901(a), which in turn confine the availability of foreign tax credits to taxes imposed by Chapter 1 of the Internal Revenue Code. Because the § 1411 tax on net investment income is not a Chapter 1 tax, Article XXIV(1) does not authorize any credit against it—even though it is encompassed within the Treaty's definition of "United States tax"— because the allowance of any credit against the § 1411 tax outside of Chapter 1 would not be "[i]n accordance with the provisions and limitations of the law of the United States." Article XXIV(1).

---

statement. (Appx32.) That, however, is not what the Joint Committee said.

- 10 -

Bruyea attacks the government's interpretation as "incoherent" because subsequent paragraphs in Article XXIV, including paragraphs 4 through 6, "broaden the scope of a treaty-based foreign tax credit beyond what is available under the Code." (Red Br. 11.)  According to Bruyea, there is no "principled rationale" for applying the U.S. law limitation to preclude a credit against the § 1411 tax while at the same time permitting broader benefits in subsequent paragraphs.  (Red Br. 12.)

Bruyea's argument is baffling.  The answer to it is in Article XXIV(1)'s text.  The signatories recognized that subsequent paragraphs in Article XXIV included certain benefits and modifications different from what the Code would provide.  That is presumably why they explicitly said that the general provisions for avoiding double taxation in paragraphs 1 and 2 are "subject to the provisions of paragraphs 4, 5, and 6."  Article XXIV(1), (2).  As we explained (Blue Br. 9–10, 26–30), paragraphs 4, 5, and 6 provide special ordering and re-sourcing rules that modify, in certain limited respects, the general rule for avoiding double taxation set out in paragraph 1.  Paragraph 6, for example, treats certain U.S.-source income as foreign-source income arising in

Canada in the case of a U.S. citizen who is also a Canadian resident. And, to the extent that it does so, Article XXIV(1)'s text dictates that the Code's inconsistent provisions for determining the source of income, *see* I.R.C. §§ 861–865, are "subject to" paragraph 6's sourcing rules, and paragraph 6's sourcing rules govern to the extent they are applicable. There is nothing incoherent or unprincipled about this straightforward approach adopted by the signatories and dictated by Article XXIV(1)'s text.

So, recognizing that the provisions of paragraph 1 for avoiding double taxation are "subject to the provisions of paragraphs 4, 5, and 6," what matters here is that nothing in paragraphs 4, 5, or 6 (or any other paragraph) of Article XXIV modifies, or is inconsistent with, the Code's limiting proscription on foreign tax credits to Chapter 1 taxes. Therefore, the general rule established in paragraph 1—which directly incorporates the Code's provisions and limitations, including I.R.C. §§ 27 and 901(a)—applies to preclude the credit against the § 1411 tax in Chapter 2A that is at issue here. There is no textual basis in Article XXIV(1) to conclude otherwise.

Bruyea also argues that Article XXIV(1) authorizes his claimed credit against the § 1411 tax because Article XXIV(7) "would expand the Canada taxes that are creditable to include, say, a British Columbia provincial tax otherwise not creditable under the Code." (Red Br. 14–15.) But paragraph 7 is irrelevant to the availability of a credit in paragraph 1. Bruyea cannot point to anything in the Treaty's text supporting his view that the availability of a foreign tax credit under paragraph 1 somehow depends on the scope of creditable foreign taxes under paragraph 7 or the Code, and nothing in the Treaty or the Code supports that view. As we explained (Blue Br. 41–42), the determination of whether a foreign tax paid to Canada is creditable against United States tax is a separate question from which U.S. taxes a credit may offset. Bruyea's argument improperly conflates the two, positing an "inconsistency" that does not exist. (Red Br. 14.)

In any event, this case does not present the question of whether a British Columbia provincial tax would qualify as a creditable Canada tax under the Article XXIV(7) or the Internal Revenue Code. So this Court need not decide whether the Treaty and the Internal Revenue Code are inconsistent in their treatment of such a tax for purposes of

the foreign tax credit or, if they are inconsistent, whether the Treaty or the Code would prevail. Accordingly, Bruyea's reliance on Article XXIV(7) does not help his case.

### 3. Bruyea misinterprets Article XXIV(1)'s parenthetical language

Article XXIV(1)'s parenthetical language also supports the government's interpretation for the reasons explained in our opening brief. (Blue Br. 30–32.) Again, Article XXIV(1) provides that a credit "against the United States tax on income" shall be allowed "[i]n accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof)." (Appx565.)

Bruyea argues that the parenthetical language guarantees that any future enacted "United States tax" covered by the Treaty must be eligible for a foreign tax credit; otherwise, Bruyea argues, the general principal language has no meaning or effect and would be superfluous. (Red Br. 9–10.) Bruyea is mistaken.

Bruyea's argument starts with the misconception that the term "general principle hereof" in Article XXIV(1) means "the retention of a foreign tax credit to future enacted legislation," citing the 1996

Technical Explanation to the Model Income Tax Treaty as support.
(Red Br. 9.)  More relevant authority, however, is the 1984 Technical
Explanation to the U.S.-Canada Treaty at issue in this case.  *See*
*Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982);
Blue Br. 36–38.  The 1984 Technical Explanation clarifies that the term
"general principle hereof" in Article XXIV(1) means "the general
principle *of paragraph 1*"—that is, Article XXIV(1).  (Appx254
(emphasis added).)

Contrary to Bruyea's argument, Article XXIV(1) has *never*
guaranteed that all United States taxes on income covered by the
Treaty can be offset by a foreign tax credit.  At the Treaty's inception in
1980, the signatories expressly agreed that the "credit against the
United States tax on income" would be subject to the "provisions and …
limitations of the law of the United States."  Article XXIV(1).  And in
1980, as now, U.S. law restricted the foreign tax credit to offset only
Chapter 1 taxes, I.R.C. § 33(a) (1976) (later renumbered as § 27), and
even some Chapter 1 taxes were not eligible to be offset by the credit,
I.R.C. § 901(a) (1976), even though they would have been covered by the

- 15 -

Treaty's definition of "United States tax" on income, *see* Article II(2)(b),

(3)(a); Article III(1)(d). (Appx536-538.)[2]

Therefore, from its inception, Article XXIV(1) has expressly

incorporated the Internal Revenue Code's longstanding statutory

scheme that only Chapter 1 taxes (and not even all of those) are eligible

for a foreign tax credit, and I.R.C. § 1411's enactment in Chapter 2A did

not change that "general principle" of Article XXIV(1) for relieving

double taxation. Far from rendering the "general principle" language

---

[2] The 1976 version of § 901(a), in effect when the Treaty was
signed in 1980, provided in relevant part:

> The [foreign tax] credit shall not be allowed against the tax
> imposed by section 56 (relating to minimum tax for tax
> preferences), against the tax imposed for the taxable year
> under section 72(m)(5)(B) (relating to 10 percent tax on
> premature distributions to owner-employees), against the
> tax imposed by section 402(e) (relating to tax on lump sum
> distributions), against the tax imposed for the taxable year
> by section 408(f) (relating to additional tax on income from
> certain retirement accounts), against the tax imposed by
> section 531 (relating to the tax on accumulated earnings),
> against the additional tax imposed for the taxable year
> under section 1351 (relating to recoveries of foreign
> expropriation losses), or against the personal holding
> company tax imposed by section 541.

I.R.C. § 901(a) (1976). Of these various ineligible taxes, only the
personal holding company tax and the tax on accumulated earnings
were generally excluded from the definition of "United States tax"
under the Treaty. *See* Articles II(2)(b)(i), III(1)(d). (Appx536-538.)

superfluous (Red Br. 10), the government's interpretation gives meaning to the "general principle" language and, indeed, is the only plausible reading of it.

Finally, the fact that Article XXIV(1)'s parenthetical language differs from the double-taxation provision of a tax treaty recently signed by the United States and Croatia (but not yet ratified by the Senate) does not support Bruyea's broad interpretation, as he claims (Red Br. 14 n.7). Whatever the drafters of the Croatia treaty may have intended by the language they chose sheds no light on the meaning intended by the parenthetical in Article XXIV(1) drafted 45 years ago.

———————————————

For the reasons explained above and in our opening brief, Bruyea is not entitled to a credit against his § 1411 tax under Article XXIV(1) of the Treaty.

## B.    Article XXIV(4)(b) does not provide a credit independent of the Internal Revenue Code's provisions and limitations

Bruyea's alternative argument that Article XXIV(4)(b) separately provides a treaty-based credit unrestricted by the Code's provisions and limitations also lacks merit. Bruyea contends that because the U.S. law

limitation in paragraph 1 of Article XXIV is not expressly repeated in

paragraph 4, the credit referenced in paragraph 4(b) is not subject to

the "provisions" and "limitations" of the Code as paragraph 1 requires.

(Red. Br. 20–24.)  The CFC agreed with the government, however, that

the U.S. law limitation in paragraph 1 also applies to paragraph 4

(Appx23 n.19), and the text and context of these provisions confirm that

conclusion is correct.

> ### 1. Bruyea erroneously reads Article XXIV(4)(b) in isolation while ignoring Article XXIV(6), rendering it superfluous

Paragraph 1 of Article XXIV sets forth the general rule for the

allowance of a credit under the Treaty for taxes paid to Canada against

the United States tax on income "[i]n accordance with the provisions

and subject to the limitations of the law of the United States."  This

general rule expressly applies to all U.S. "citizen[s]," Article XXIV(1),

including those who reside outside the United States.  For the subset of

U.S. citizens who are also residents of Canada and whose worldwide

income is consequently taxable by both countries at the same time, the

signatories recognized the need for special rules unique to that situation

to govern the order and priority of taxation between the countries for

certain items of income.  Paragraphs 4 and 5 thus create an ordering

rule for applying the tax credit or deduction allowed by each country to

relieve double taxation.  (*See* Blue Br. 9.)  Contrary to Bruyea's position,

paragraph 1's general rule restricting the availability of a credit in

accordance with the Code establishes the context for "the provisions of

paragraphs 4, 5, and 6," Article XXIV(1), to which paragraph 1 cross-

refers, and continues to apply to the credit referenced in paragraphs

4(b) and 5(c).

We know this was the signatories' understanding, too, because

they provided a re-sourcing rule in paragraph 6.  Paragraph 6 treats

certain U.S.-source items of income as arising in Canada "to the extent

necessary to avoid the double taxation of such income under paragraph

4(b) or paragraph 5(c)." Article XXIV(6).  The signatories' inclusion of

this re-sourcing rule makes sense only if they understood that the credit

referenced in 4(b) was still subject to the Internal Revenue Code's

source-based limitation on foreign tax credits in I.R.C. § 904(a).  (*See*

Blue Br. 4–7 (explaining § 904(a)'s source-based limitation).)  Under

§ 904(a), taxes paid to a foreign country on U.S.-source income cannot

give rise to a foreign tax credit against U.S. tax.  That is because

§ 904(a) limits the foreign tax credit to the proportion of U.S. tax equal to the ratio of the taxpayer's foreign-source income to total income. Consequently, the signatories had to include a special re-sourcing rule in paragraph 6 to treat the taxpayer's U.S.-source income as foreign-source income "to the extent necessary" to give effect to the credit referenced in paragraphs 4(b) and 5(c). Had the signatories instead believed, as Bruyea contends, that paragraph 4(b) provided an independent credit unrestricted by the provisions and limitations of the Internal Revenue Code, then there would have been no reason for them to include paragraph 6 in the Treaty because the source of the income would not have mattered.

The fundamental flaw in Bruyea's interpretation is that it reads paragraph (4)(b) in isolation and completely ignores paragraph 6, rendering it entirely superfluous. *See Water Splash, Inc. v. Menon*, 581 U.S. 271, 277–78 (2017) (rejecting an interpretation of the Hague Service Convention that would render a provision superfluous). The signatories' inclusion of the re-sourcing rule in paragraph 6 shows—unmistakably—that they understood paragraph 1's general rule restricting the foreign tax credit "[i]n accordance with the provisions

and subject to the limitations of the law of the United States" applies to the credit against U.S. income tax referenced in paragraph 4(b). Under this interpretation, the U.S. law limitation in paragraph 1 of Article XXIV establishes the context for the paragraphs that follow in the rest of Article XXIV, including for the credit referenced in paragraph 4(b). *Cf. O'Connor v. United States*, 479 U.S. 27, 30–32 (1986) (reading restrictive language in the first paragraph of an article of an agreement implementing a treaty to apply to subsequent paragraphs of the same article).

Furthermore, as we explained (Blue Br. 29), the placement of the phrase "subject to the provisions of paragraphs 4, 5 and 6" at the beginning of paragraph 1 reinforces the U.S. law limitation's general application throughout Article XXIV. Indeed, the fact that paragraph 1 cross-references paragraph 4 through 6 demonstrates that they are interrelated. Moreover, the term "subject to" may mean either "governed or affected by" or "obedient to," depending on context. *Clean Air Council v. United States Steel Corp.*, 4 F.4th 204, 209 (3d Cir. 2021). And here, as shown, the context of Article XXIV makes quite clear the signatories' understanding that the "provisions" and "limitations"

language of paragraph (1) still applies to the tax credit referenced in paragraphs (4)(b) and (5)(c).  To be sure, paragraphs 4, 5, and 6 modify certain aspects of paragraph 1 as they must for the special ordering and re-sourcing rules to have effect, such that paragraph 6's sourcing rules prevail over the Code's.  But the application of other "provisions" and "limitations" of U.S. law to the credit—including I.R.C. §§ 27 and 901(a)—is unaffected by the rules set forth in paragraphs 4 through 6.

Notably, both the 1981 and 1984 Technical Explanations of the Treaty expressly reject Bruyea's claim that the credit in paragraph 4(b) operates independently of the U.S. law limitation in paragraph 1.  Both explain that paragraph 4(b) provides that "the United States allows as a credit against United States tax, *subject to the rules of paragraph 1*, the income tax paid or accrued to Canada after the Canadian credit for U.S. tax provided by paragraph 4(a)."  1981 Technical Explanation (Appx696); 1984 Technical Explanation (Appx260).  These Technical Explanations are entitled to great weight, *Sumitomo*, 457 U.S. at 184–85, and that is especially so because Canada reviewed and approved both of them at the time (*see* Blue Br. 38).

### 2.    Bruyea's interpretation produces other anomalous results

In addition to rendering Article XXIV(6) superfluous, Bruyea's interpretation produces other anomalous results that are unprecedented in any other U.S. income tax treaty and that were not intended by the signatories.  As one egregious example, under Bruyea's interpretation that the Code's restrictions do not apply in Article XXIV4(b), a U.S. citizen residing in Canada could claim a double tax benefit by electing to *exclude* his "foreign earned income" from U.S. tax under I.R.C. § 911(a), while at the same time claiming a foreign tax *credit* under Article XXIV(4)(b) of the Treaty for the amount of tax paid to Canada on that excluded income.  In other words, not only does the taxpayer avoid paying any U.S. tax on his foreign earned income, as a result of the exclusion allowed under § 911(a), but the taxpayer also gets a treaty-based credit for taxes paid to Canada on that excluded income—a credit the taxpayer can then use to offset U.S. tax imposed on his other income, including unrelated U.S.-source income.  Such a windfall for the taxpayer at the expense of the U.S. Treasury is normally precluded by § 911(d)(6), entitled "denial of double benefits," which disallows a foreign tax credit that is "allocable to or chargeable

against amounts excluded from gross income under subsection (a)." But if, as Bruyea contends, the foreign tax credit in Article XXIV(4)(b) were not subject to the Code's limitations, then § 911(d)(6)'s denial of double tax benefits would not apply, and taxpayers who are U.S. citizens residing in Canada would reap a windfall.

In addition, Bruyea's interpretation would provide U.S. citizens residing in Canada with a far more generous foreign tax credit than that available to U.S. citizens residing in the United States. U.S. citizens residing in the United States are subject to the Code's limitations in claiming a foreign tax credit under Article XXIV(1), but U.S. citizens residing in Canada would not be subject to such limitations under Article XXIV(4)(b) if Bruyea's interpretation were to prevail. Thus, § 904(a)'s source-based limitation, § 904(d)'s rules preventing cross-crediting (*see* Blue Br. 7 n.2), and § 911(d)(6)'s denial of double tax benefits, as just a few examples, would not apply to them. No evidence in the record suggests that the signatories meant to give such preferential treatment to a subset of U.S. citizens.

- 24 -

### 3.    The cases Bruyea relies on are inapposite

Finally, the cases Bruyea relies on are inapposite.  Consistent

with the government's position, the cases he cites each held that the

taxpayer could not obtain a foreign tax credit under the applicable

treaties where the Code did not provide for a credit.  *Haver v.*

*Commissioner*, 444 F.3d 656, 657–58 (D.C. Cir. 2006); *Kappus v.*

*Commissioner*, 337 F.3d 1053, 1060 (D.C. Cir. 2003).  In *Kappus*, the

D.C. Circuit declined to resolve whether the government's

interpretation of Article XXIV(1) and (4) of the U.S.-Canada Treaty—

the same interpretation advanced by the government here—could be

"harmonized" with the foreign-tax-credit limitation under § 59(a).  337

F.3d at 1056.  The court declined to resolve the parties' disagreement

because § 59(a) was adopted after the treaty and, therefore, the statute

would prevail in case of any conflict with the Treaty.  *Id.* at 1056–57.

The D.C. Circuit's exercise of judicial restraint cannot fairly be

characterized as the court's rejection of the government's

interpretation.[3]  (*See* Red Br. 22.)  In *Haver*, the court recognized that

---

[3] Bruyea correctly notes (Red Br. 23 n.12) that the government
does not contend here that the enactment of the net investment income
(continued…)

- 25 -

*Kappus* "left unresolved" whether the government's interpretation of Article XXIV(4)(b) of the U.S.-Canada Treaty was correct, but found that "no analogous" issue arose regarding the U.S.-Germany treaty before it.  444 F.3d. at 659.  Thus, neither case supports Bruyea's position here.

### C.    Bruyea misconstrues the extrinsic evidence on which he relies

Like the CFC, Bruyea (Red Br. 24–27) misconstrues extrinsic evidence beyond the Technical Explanation.  (*See* Blue Br. 43–46.)

**1.**  The Canadian competent authority's July 2023 letter.  First, the Canadian competent authority's July 2023 letter cannot bear the "considerable weight" Bruyea asks this Court to place upon it.  (Red. Br. 26; *see* Appx378.)  The meaning given to treaties "by the departments of government particularly charged with their negotiation and enforcement is given great weight," *Kolovrat v. Oregon*, 366 U.S. 187,

_____

tax in § 1411 in 2010 overrides terms of the Treaty under the "last-in-time" rule, under which a later-enacted statute will prevail over a Treaty provision where the two conflict.  *Whitney v. Robertson*, 124 U.S. 190, 194 (1888).  (*See* Blue Br. 14 n.7.)  He erroneously asserts, however, that the government made that argument on appeal in *Christensen v. United States*, No. 24-1284 (Fed. Cir.), *see* Red Br. 23 n.12, but the government made no such argument in *Christensen* either.

- 26 -

194 (1961); *see also Sumitomo*, 457 U.S. at 185, but Bruyea's reliance on these cases is misplaced.  Bruyea ignores that in both cases the Supreme Court considered the positions of each country's representatives and determined that they agreed about how to interpret the treaty provision at issue—unlike in this case.  *See Kolovrat*, 366 U.S. at 194–95 (finding that the responsible agencies of the United States and Yugoslavia agreed regarding disposition of property under 1881 treaty); *Sumitomo*, 457 U.S. at 183–85 & n.10 (finding that both governments took the "identical" position that a commercial treaty did not protect a U.S. corporation from discrimination suit).  Nothing in *Kolovrat* or *Sumitomo* indicates that where a foreign government agency charged with enforcing a treaty *disagrees* with the Executive Branch's interpretation of a treaty, the foreign executive's position is entitled to *greater* weight than the Executive Branch's position, as Bruyea appears to contend.  (Red. Br. 25.)  The Executive Branch's interpretation is entitled to at least the same weight as Canada's current view.  And, at all events, the Canadian competent authority's position in the July 2023 letter merits little weight where it provides no explanation for its position.  (*See* Blue Br. 45–46.)

Bruyea also repeats (Red Br. 25) the CFC's error of interpreting the Supreme Court's statement in *El Al Israel Airlines v. Tseng*, 525 U.S. 155, 176 (1999), that "'the opinions of our sister signatories, … are entitled to considerable weight" to refer to the foreign executive's interpretation of a treaty.  (Appx33; *see also* Appx6–7; Blue Br. 46.)  The Supreme Court in *El Al* made clear that "sister signatories" referred to the courts of other countries.  525 U.S. at 175–76 (referring to the House of Lords, then the United Kingdom's highest court of appeal); *see also id.* at 159 (syllabus).  The same is true of *Air France v. Saks*, 470 U.S. 392, 404–05 (1985), and *Abbott v. Abbott*, 560 U.S. 1, 16–18 (2010), in which the Court relied on the same principle when examining decisions of foreign courts.  (*See* Red Br. 25.)  Bruyea does not dispute the government's assertion (Blue Br. 46) that there is no relevant international legal consensus regarding the legal question raised here.

Bruyea also erroneously asserts that general notions of "reciprocity" require that where Canada has primary taxing rights and provides a deduction against Canadian taxes for "all United States taxes on income," including the net investment income tax in § 1411, the United States must "in exchange" allow a credit against United

- 28 -

States taxes, including the net investment income tax.  (Red Br. 25–26.)
The United States' and Canada's obligations to relieve double taxation
under the Treaty are governed by the specific terms set forth in Article
XXIV(1) and Article XXIV(2) respectively, not by general notions of
reciprocity.  Nothing in Article XXIV's text requires a 1:1
correspondence between the taxes imposed by Canada (when it has
primary taxing rights) and the United States income tax against which
those taxes must be applied, or vice versa.

Nor does the Supreme Court's decision in *O'Connor*, *supra*, 479
U.S. 27, support that interpretation, as Bruyea claims.  (Red Br. 26.)
Rather, as the Government urges here, the Court's analysis there
focused on the treaty's text and its context.  *Id.* at 31.  Treaties, like
contracts, have nonreciprocal results that depend on the parties'
respective objectives, tradeoffs, and bargaining power during the
negotiations.

Finally, we note that in Bruyea's hypothetical of a U.S. taxpayer
selling Canadian-situs real estate (Red Br. 26 n.13), the taxpayer would
still receive relief from double taxation under Article XXIV(1), which
authorizes a credit, in accordance with the Code, against all income

taxes imposed in Chapter 1, but not against the net investment income
tax in Chapter 2A.  To the extent that foreign income tax on the
investment income were to exceed the Chapter 1 income tax on the
same income in the current year, the excess credit amount would be
eligible under I.R.C. § 904(c) to be applied in 11 additional tax years
until absorbed, providing further relief for any potential double
taxation.

    **2.**  <u>The Letter of Submittal.</u>[4]  Second, Bruyea's assertion that the
Letter of Submittal shows that paragraphs 4 through 6 of Article XXIV
create a "special foreign tax credit regime" (Red Br. 26–27; *see also id*.
at 20) is incorrect.  As explained above, paragraphs 4 and 5 simply
provide an ordering rule for the prioritization of certain income tax and
paragraph 6 provides for re-sourcing as necessary to fit within § 904(a)'s
source-based limitation.  None of those provisions operates
independently of the U.S. law limitation in paragraph 1.

---

[4] The parties and the CFC below mistakenly credited the Letter of
Submittal as originating with the President when it was in fact
submitted to the President by the Department of State.  (Appx588-592.)
The President submitted a Letter of Transmittal to the Senate, along
with the Letter of Submittal and other items.  (Appx588, Appx592-593.)

**3.** <u>Preamble to Regulations.</u>  Bruyea faults the government for not addressing the CFC's conclusion (Appx34) that the preamble to the final regulations for the net investment income tax supports the conclusion that the placement of the § 1411 tax in Chapter 2A does not itself preclude applying a foreign tax credit against U.S. income tax in Article XXIV(1).  (Red Br. 27.)  *See* Net Investment Income Tax, 78 Fed. Reg. 72394-01, 72396, 2013 WL 6222406 (Dec. 2, 2013); Treas. Reg. (26 C.F.R.) § 1.1411-1(e).  The government's position here does not depend on a reading of the regulations because there is no dispute that the Code does not allow a foreign tax credit to offset U.S. taxes imposed outside of Chapter 1.

In any event, Treasury clearly stated that any treaty (such as the U.S.-Canada Treaty here) whose double-taxation provision "refers to the limitations of United States law" would "not provide an independent basis for a credit against the section 1411 tax."  78 Fed. Reg. 72394-01, 72396.  As the agency charged with the negotiation and enforcement of the Treaty, Treasury's interpretation is entitled to deference. *Sumitomo*, 457 U.S. at 184–85.  The CFC's reliance on *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), in refusing to accord such

deference is self-evidently incorrect.  (Appx34.)  *Loper Bright* applies to a challenge to an agency's interpretation of an ambiguous *statute*, which is not at issue here.  603 U.S. at 396–407.  In contrast, *Sumitomo* instructs that Treasury's views are entitled to deference in the interpretation of a treaty that it negotiated and is responsible to enforce, as is the case here.

### D.    Bruyea misconstrues the Treaty's purpose

Against the Treaty's plain text, Bruyea invites the Court to adopt a "liberal" construction that achieves the purported purpose of the Treaty to "avoid[] double taxation."  (Red Br. 4–5.)  But, ultimately, "it is [the Court's] duty to interpret the treaty according to its terms. These must be fairly construed, but [the Court] cannot add or detract from them."  *Xerox Corp. v. United States*, 41 F.3d 647, 652 (Fed. Cir. 1994) (quoting *Valentine v. United States*, 299 U.S. 5, 11 (1936)).  Thus, "[w]hen construing a treaty, '[t]he clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'"  *Nat'l Westminster Bank, PLC v. United States*, 512 F.3d 1347, 1353 (Fed. Cir. 2008) (quoting *Sumitomo*, 457

U.S. at 180 (internal quotation omitted)).  As we have demonstrated, the Treaty's text precludes the credit that Bruyea seeks here, and no contrary reading is "equally plausible" (Red Br. 5 (citing *United States v. Stuart*, 489 U.S. 353, 368 (1989)).

Furthermore, Bruyea misconstrues the Treaty's purpose. According to him, double taxation is an "evil" to be tolerated only when double taxation is "inevitable" and the Treaty therefore should be construed to eliminate it in all other circumstances.  (Red Br. 27.)  The fact of the matter is, however, that double taxation is always avoidable and could without much difficulty be eliminated entirely if that were truly the goal.  But it is not.  Rather, "the fundamental purpose of a tax treaty is to avoid the uncoordinated taxation of an individual's income by two different countries." *Goosen v. Commissioner*, 136 T.C. 547, 568 (2011).  In general, such treaties "seek to avoid double taxation as well as prevent fiscal evasion." *Id*.

The Treaty's introduction here reflects its dual purposes of "the avoidance of double taxation" and "the prevention of fiscal evasion" with respect to taxes on income and capital.  (Appx536.)  Thus, any consideration of the Treaty's purposes must account for both of them.

We have demonstrated in this brief and in our opening brief (Blue Br. 47–49) that the purpose of the Treaty was never to provide absolute protection from double taxation. *See Toulouse*, 157 T.C. at 60. Rather, the Treaty was designed to reduce double taxation through a foreign tax credit that, from its inception, was restricted in accordance with the Code's provisions and limitations, just as the deduction allowed by Canada under the Treaty is restricted by Canada's own domestic law. *See* Article XXIV(1), (2). The inevitable result, as the signatories undoubtedly understood, is that double taxation could occur in those situations where each country's domestic law restricts the Treaty's credit or deduction. Plainly, the signatories—by careful design—agreed to restrictions on the relief they would provide from double taxation and never intended to eliminate all double taxation.

In the end, the Treaty's text is the best evidence of the parties' shared expectations, *Xerox Corp. v. United States*, 41 F.3d at 652, and here it forecloses Bruyea's claim for a refund of the § 1411 tax.

# CONCLUSION

The judgment of the Court of Federal Claims should be reversed and the case remanded with instructions to dismiss the complaint.

Respectfully submitted,

/s/ Kathleen E. Lyon

JACOB EARL CHRISTENSEN          (202) 514-5048
KATHLEEN E. LYON                (202) 307-6370
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

OCTOBER 14, 2025

- 35 -

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  **25-1563**

**Short Case Caption:**  **Bruyea v. US**

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes _6,844_ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: _10/14/2025_

Signature:    **/s/ Kathleen E. Lyon**

Name:    **Kathleen E. Lyon**