# No. 25-1563

## IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

### PAUL BRUYEA,

**Plaintiff-Appellee**

v.

### UNITED STATES,

**Defendant-Appellant**

---

### ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES COURT OF FEDERAL CLAIMS No. 23-766T; JUDGE MATTHEW H. SOLOMSON

---

### APPENDIX

---

JACOB EARL CHRISTENSEN    (202) 514-5048
KATHLEEN E. LYON    (202) 307-6370
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

# TABLE OF CONTENTS

**Document**                                                                    **Page**

Judgment (Doc. 34)...........................................................................Appx1

Reported Opinion and Order (Doc. 31) ...........................................Appx2

Unreported Order (Doc. 33) ...........................................................Appx37

Docket Sheet...................................................................................Appx38

Complaint (Doc. 2).........................................................................Appx44

    Ex. A- Amended Form 1040X for 2015 (Doc. 2-1)................Appx49

    Ex. B- Form 1040 for 2015 (Doc. 2-2).................................Appx57

Bruyea's Motion for Partial Summary Judgment (Doc. 18).......Appx132

    Ex. 1- Memorandum in Support of Motion for Partial
    Summary Judgment (Doc. 18-1) .........................................Appx133

    Ex. 2- U.S.-Canada Tax Treaty (Convention Between the United
    States of America and Canada with Respect to Taxes on Income
    and Capital), as amended to 2007 (Doc. 18-2)
    (excerpts) .............................................................................Appx198

    Ex. 3- 1984 Treasury Dept. Technical Explanation of
    U.S.-Canada Treaty (Doc. 18-3) .........................................Appx218

    Ex. 4- Letter of Submittal of U.S.-Canada Treaty
    (Doc. 18-4) (excerpts)...........................................................Appx326

    Ex. 5- Joint Committee on Taxation Explanation,
    JCS-48-81 (1981) (Doc. 18-5)...............................................Appx329

    Ex. 6- Canada Revenue Agency Letter regarding
    Competent Authority Request dated July 10, 2023
    (Doc. 18-6)............................................................................Appx378

## TABLE OF CONTENTS (cont.)

**Document**                                                      **Page**

Ex. 7- Request for Assistance regarding Application of
U.S.-Canada Convention (Doc. 18-7) ..................................Appx379

Ex. 10- IRS Examination Report dated July 13, 2018
(Doc. 18-10) (excerpts)........................................................Appx467

Ex. 11- Protest Letter dated Aug. 16, 2018
(Doc. 18-11)........................................................................Appx489

Ex. 12- IRS Claim Disallowance dated Sept. 11, 2023
(Doc. 18-12) (excerpts).......................................................Appx532

United States' Cross-Motion for Summary Judgment and Response
to Motion for Partial Summary Judgment (Doc. 20) (excerpts)

Ex. A- U.S.-Canada Tax Treaty (Convention Between the U.S.-
Canada with Respect to Taxes on Income and on Capital), as
amended through 2007 (Doc. 20-2) ...................................Appx536

Ex. B- U.S.-Canada Tax Treaty (Convention Between the U.S.-
Canada with Respect to Taxes on Income and on Capital), as
signed on September 26, 1980, and Protocols 1-4
(Doc. 20-3).........................................................................Appx587

Ex. D- Joint Committee on Taxation Explanation
JCS-48-81 (1981) (Doc. 20-5)............................................Appx672

Ex. E- 1981 Treasury Dept. Technical Explanation (included as
Appendix to Tax Treaties, Hearing before the U.S. Senate
Committee on Foreign Relations, 97th Cong.
(Sept. 24, 1981)) (Doc. 20-6) (excerpts) .............................Appx688

Ex. N- Dirk Suringa, *The Foreign Tax Credit Limitation
Under Section 904,* 6060 T.M. (BNA 2016)
(Doc. 20-15) (excerpts).......................................................Appx766

## TABLE OF CONTENTS (cont.)

**Document**                                                      **Page**

Ex. O- Lori Hellkamp & Alden Dilanni-Morton, *Demystifying The Saving Clause & Re-Sourcing Rules in Treaties*, Tax Notes Federal, vol. 172, Aug. 16, 2021 (Doc. 20-16)..........................................................................Appx770

Ex. P- Kellar & Browne Jr., 6875-2nd T.M., *U.S. Income Tax Treaties—Benefits Provided by a Country to its Own Residents and Citizens* (2019) (Doc. 20-17) (excerpts).......................................................Appx776

Bruyea's Reply to United States' Cross-Motion for Summary Judgment and Response to Motion for Partial Summary Judgment (Doc. 22)....................................................................Appx802

Amended Document, Corrected Brief of the United States in Support of its Cross-Motion for Summary Judgment and Response to Motion for Partial Summary Judgment (Doc. 24) ...............................................................................Appx841

Ex. A- Corrected Protocol No. 5 to U.S.-Canada Income Tax Convention (Doc. 24-1)...............................................Appx901

United States' Reply in Support of its Cross-Motion for Summary Judgement and Response to Motion for Partial Summary Judgment (Doc. 26)....................................................................Appx939

Joint Status Report (Doc. 32)....................................................Appx1096

Notice of Appeal (Doc. 36) ......................................................Appx1098

# In the United States Court of Federal Claims

**No. 23-766 T**
**Filed: January 17, 2025**

```
*************************************
PAUL BRUYEA,                        *
                       Plaintiff,   *
                                    *          JUDGMENT
            v.                      *
                                    *
THE UNITED STATES,                  *
                       Defendant.   *
*************************************
```

Pursuant to the court's Order, filed January 17, 2025, and the parties' joint status report, filed January 16, 2025,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff recover of and from the United States the following amount: For plaintiff's income-tax year ended December 31, 2015, an overpayment of income tax in the amount of $263,462.00, with statutory interest on such overpayment pursuant to section 6611 of the Internal Revenue Code.

Lisa L. Reyes
Clerk of Court

By:   s/ Ashley Reams_____
Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Effective December 1, 2023, the appeals fee is $605.00.

**Appx1**

# In the United States Court of Federal Claims

No. 23-766T

(Filed:  December 5, 2024)

|  |  |
|---|---|
| **PAUL BRUYEA,** | ) |
|  | ) |
|  | ) |
| *Plaintiff,* | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **THE UNITED STATES,** | ) |
|  | ) |
| *Defendant.* | ) |
|  | ) |

*Stuart E. Horwich*, Horwich Law LLP, London, United Kingdom, and *Max Reed*, Polaris Tax Counsel, Vancouver, British Columbia, Canada, for Plaintiff.

*Jason Bergmann*, United States Department of Justice, Tax Division, Washington, D.C., for Defendant.  With him on the briefs were *David I. Pincus*, Chief, Court of Federal Claims Section, *Mary M. Abate*, Assistant Chief, and *David A. Hubbert*, Deputy Assistant Attorney General.

## OPINION AND ORDER

Plaintiff, Mr. Paul Bruyea, claims that he overpaid his 2015 taxes by approximately $263,523, and therefore is entitled to a tax refund of that amount from the United States.  Mr. Bruyea asserts he is owed the claimed refund once a treaty-based foreign tax credit is properly applied against the Net Investment Income Tax ("NIIT") he paid to the United States.  Although Mr. Bruyea acknowledges that the Internal Revenue Code does not by its terms provide for such a foreign tax credit, he argues that a tax treaty between the United States and Canada independently entitles him to the claimed credit and, thus, the refund.  This case turns on the proper interpretation of that tax treaty and how it fits with the text and structure of the Internal Revenue Code.

The interpretative puzzle is complicated but ultimately Mr. Bruyea's approach makes more sense of the relevant legal data.  This Court thus agrees with Mr. Bruyea that he is entitled to the foreign tax credit he claims.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

"All American citizens are subject to U.S. taxes, regardless of where they live or earn their income.  Citizens living and working abroad must therefore report their foreign-source income to the Internal Revenue Service." *Kappus v. Comm'r*, 337 F.3d 1053, 1055 (D.C. Cir. 2003) (citations omitted).  Pursuant to United States law and bilateral tax treaties (where applicable), however, "[U.S.] [t]axes on such income . . . may often be offset . . . by credits for taxes paid to foreign governments[.]" *Id.*

On May 25, 2023, Mr. Bruyea initiated this case by filing a tax refund complaint against Defendant, the United States.  ECF No. 1 ("Compl.").  He seeks a refund of federal income tax paid "for the taxable year ended December 31, 2015." *Id.* ¶ 4.  During that tax year, Mr. Bruyea was a resident of British Columbia, Canada. *Id.* ¶ 10.  He paid nearly $2 million in taxes to Canada, and "claimed a foreign tax credit of $1,398,683 to offset the regular U.S. tax liability[.]" *Id.*  At the time, Mr. Bruyea "did not claim a foreign tax credit to offset the NIIT." *Id.* ¶ 11.

On November 7, 2016, Mr. Bruyea "filed an amended tax return (Form 1040X) with the Internal Revenue Service . . . claiming a refund of $263,523 by virtue of a foreign tax credit that offsets the NIIT[.]" Compl. ¶ 12.  In particular, Mr. Bruyea asserts he is entitled to a foreign tax credit "based on the provisions of Article XXIV" of the Convention between Canada and the United States of America with Respect to Taxes on Income and on Capital ("Canada Tax Treaty" or "Treaty").  Compl. ¶¶ 3, 12.[1]  The IRS rejected the refund claim, concluding that "the Canada Tax Treaty did not provide an independent basis for a foreign tax credit to offset the NIIT and that such a foreign tax credit is not allowed under U.S. statutory foreign tax credit rules." *Id.* ¶ 13.

When Mr. Bruyea failed to convince the IRS, he "invoked the 'Simultaneous Appeal Procedure' pursuant to which he sought the opinions of the U.S. and Canadian competent authorities to resolve a situation in which double taxation is present (*i.e.*[,] Canadian income tax and U.S. NIIT on the same items of income and gain with no foreign tax credit offset available)."  Compl. ¶ 15.  The Canadian tax authority agrees with Mr. Bruyea.  ECF No. 18-6 ("The position of the Canadian competent authority in this regard is that Canada, as the country of source, has the right to tax the gain, while the US,

---

[1] The Treaty — also referred to as a "convention" — was originally signed on September 26, 1980, and subsequently amended via various Protocols between 1983 and 2007.  The parties agree that none of the amendments impact the original Treaty provisions that are at issue in this case.

**Appx3**

as the country which has residual taxation rights, must provide relief in accordance with Article XXIV of the Convention."). Following the IRS's denial of his tax refund claim, Mr. Bruyea filed his complaint in this Court, asserting that "he is entitled to a refund of the NIIT that he paid in the amount of $263,523 for the 2015 tax year." Compl. ¶ 21.

On February 14, 2024, Mr. Bruyea moved for partial summary judgment, arguing that "he is entitled to a foreign tax credit for his 2015 tax year under the terms of [the Canada Tax Treaty]." ECF Nos. 18 at 1; 18-1 (collectively, "Pl. MSJ").[2] The government filed a cross-motion for summary judgment and response in opposition to plaintiff's motion. ECF No. 24 ("Def. MSJ").[3] Each party filed a reply brief. *See* ECF No. 22 ("Pl. Rep."); ECF No. 26 ("Def. Rep.").

On September 19, 2024, this Court held oral argument on the parties' motions. ECF No. 28 ("Tr.").

## II. JURISDICTION

Neither party disputes this Court's jurisdiction to decide this case. Nevertheless, this Court has an independent responsibility to confirm its jurisdiction. *See* Rule 12(h)(3) of the Rules of the United States Court of Federal Claims ("RCFC"). This Court finds that it has jurisdiction pursuant to 28 U.S.C. § 1491(a) and 26 U.S.C. ("I.R.C.") § 7422.[4] *See Christensen v. United States*, 168 Fed. Cl. 263, 297 (2023) (concluding that 26 U.S.C. § 7422(f)(1) "expressly provides an exception to the jurisdictional bar on treaty-based claims" otherwise contained within 28 U.S.C. § 1502).[5]

---

[2] Citations to specific page numbers within electronic filings are to the ECF-stamped page numbers in the header of the filed PDF.

[3] The government initially filed a cross-motion for summary judgment and response in opposition to plaintiff's motion on March 29, 2024. ECF No. 20. The government subsequently moved to file a corrected version of its motion and response, ECF No. 23. This opinion refers only to the government's corrected filing, ECF No. 24.

[4] Title 26 of the United States Code is the Internal Revenue Code, and is often abbreviated or cited as "I.R.C."

[5] "While 28 U.S.C. 1346(a)(1) mentions the Court of Federal Claims in the course of conferring jurisdiction on district courts, it is not the source of the Court of Federal Claims' jurisdiction over tax refund cases; rather, such jurisdiction is based on 28 U.S.C. § 1491, which pre-dated section 1346(a)(1)." *Topsnik v. United States*, 120 Fed. Cl. 282, 286 n.3 (2015) (citing *Ferguson v. United States*, 118 Fed. Cl. 762, 763 n.2 (2014)). In *Gaynor v. United States*, 150 Fed. Cl. 519, 530 (2020), the undersigned wrote that "I.R.C. § 7422(a) provides this Court with jurisdiction (pursuant to the Tucker Act) to decide claims seeking a refund of taxes or penalties the IRS collected." More

3

**Appx4**

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  *Id.* at 250.  "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration."  *Silver State Land LLC v. United States*, 155 Fed. Cl. 209, 212 (2021) (quoting *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003)); *see also Lippmann v. United States*, 127 Fed. Cl. 238, 244 (2016) ("The [RCFC 56] standard also applies when the Court considers cross-motions for summary judgment.").

In this case, both parties seek summary judgment as to liability, which reduces to a legal question regarding the proper interpretation of the Canada Tax Treaty and the I.R.C.  Def. MSJ at 50 (explaining that "the parties have reserved questions regarding the computation of a foreign tax credit until after the Court has resolved the parties' dispute regarding the availability of a foreign tax credit in any amount").  Given the absence of any disputed material fact regarding liability, this Court agrees with the parties that liability may be properly resolved as a matter of law on summary judgment.

## IV.  PRINCIPLES OF TREATY INTERPRETATION

Interpreting a treaty is similar to interpreting a statute or a contract.  Thus, "[t]he interpretation of a treaty, like the interpretation of a statute, *begins* with its text."  *Golan v. Saada*, 596 U.S. 666, 676 (2022) (emphasis added) (quoting *Abbott v. Abbott*, 560 U.S. 1, 10 (2010)).  Courts are further directed to consider a treaty's "text *and structure*," just like we must for a statute or contract.  *Water Splash, Inc. v. Menon*, 581 U.S. 271, 276 (2017)

_____

accurately, however, that statute is a limit on this Court's jurisdiction but is not the source of it.  *See Barnes v. United States*, 2023 WL 4683550, at *1 (Fed. Cl. July 21, 2023) ("To invoke this Court's jurisdiction in a tax refund suit, a plaintiff must comply with 26 U.S.C. § 7422(a)[.]"); *but see Chicago Milwaukee Corp. v. United States*, 40 F.3d 373, 374 (Fed. Cir. 1994) (noting that plaintiff "brought suit under I.R.C. § 7422(a)" and that "Section 7422(a) waives the United States' sovereign immunity from refund suits, . . . provided the taxpayer has previously filed a qualifying administrative refund claim" (internal citation omitted)); *Grigsby v. United States*, 2018 WL 1417398, at *2 (Fed. Cl. Mar. 7, 2018) ("Pursuant to 26 U.S.C. § 7422(a), this Court has jurisdiction to entertain suits for tax refunds.").

Appx5

(emphasis added) (discussing "[t]he text and structure of the Hague Service Convention"); *cf. Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts."). In that regard, courts follow "the maxim that the construction of *any legal document*—like a statute, contract or patent—should try to give meaning to every term in that document; otherwise, a lawyer or court will have erred by reading the chosen words of the document into oblivion." *Advanced Commc'n Design, Inc. v. Premier Retail Networks, Inc.*, 46 F. App'x 964, 980–81 (Fed. Cir. 2002) (emphasis added).[6]

When it comes to a treaty, however, there is a notable difference from other legal instruments: courts are encouraged to consider a treaty's purpose, as well as extrinsic evidence of the intent of the parties to the treaty. In that regard, "[b]ecause a treaty ratified by the United States is 'an agreement among sovereign powers,'" the United States Supreme Court has "also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 441 (2020) (quoting *Medellin v. Texas*, 552 U.S. 491, 507 (2008) (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996))).[7] Particularly "when a treaty provision is ambiguous," courts "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Water Splash*, 581 U.S. at 280 (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988)). Thus, "[t]he practice of treaty signatories counts as evidence of the treaty's proper interpretation, since their conduct generally evinces their understanding of the agreement they signed." *United States v. Stuart*, 489 U.S. 353, 369 (1989). The Supreme Court has also instructed that "[t]he 'opinions of our sister

---

[6] *Cf. Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 68 (D.D.C.) ("plain-meaning analysis . . . end[s] the matter . . . in the interpretation of contracts, judgments, and statutes"), *judgment entered*, 987 F. Supp. 2d 82 (D.D.C. 2013), *and aff'd sub nom. Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015).

[7] *See also Arizona v. Navajo Nation*, 599 U.S. 555, 567 (2023) ("[C]ourts must stay in their proper constitutional lane and interpret the law (here, the treaty) *according to its text and history*[.]" (emphasis added)); *Golan*, 596 U.S. at 679 ("Courts must remain conscious of th[e treaty's] purpose, as well as the [treaty's] other objectives and requirements[.]"); *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) ("As a general matter, a treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent.") (cited with approval in *ZF Auto. US, Inc. v. Luxshare, Ltd.*, 596 U.S. 619, 634 (2022)).

**Appx6**

signatories,' . . . are 'entitled to considerable weight.'" *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999) (quoting *Air France v. Saks*, 470 U.S. 392, 404 (1985)).

There is yet another, meta-principle that applies to treaty interpretation. A tax treaty, in particular, "should generally be 'construe[d] . . . liberally to give effect to the purpose which animates it' and . . . '[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred[.]'" *Stuart*, 489 U.S. at 368 (quoting *Bacardi Corp. of America v. Domenech*, 311 U.S. 150, 163 (1940) (citations omitted)).

Our appellate court, the United States Court of Appeals for the Federal Circuit, has synthesized the Supreme Court's treaty interpretation principles as follows:

> In construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purposes of the treaty. . . . The judicial obligation is to satisfy the intention of both of the signatory parties, in construing the terms of a treaty.
>
> Unless the treaty terms are unclear on their face, or unclear as applied to the situation that has arisen, it should rarely be necessary to rely on extrinsic evidence in order to construe a treaty, for it is rarely possible to reconstruct all of the considerations and compromises that led the signatories to the final document. However, extrinsic material is often helpful in understanding the treaty and its purposes, thus providing an enlightened framework for reviewing its terms. However, "the ultimate question remains what was intended when the language actually employed . . . was chosen, imperfect as that language may be." *Great–West Life Assurance Co. v. United States*, 678 F.2d 180, 188, 230 Ct. Cl. 477 (1982).

*Xerox Corp. v. United States*, 41 F.3d 647, 652–53 (Fed. Cir. 1994) (citations omitted). In short, a Court "must 'examine not only the language, but the entire context of agreement.'" *Nat'l Westminster Bank, PLC v. United States*, 512 F.3d 1347, 1353 (Fed. Cir.

2008) (quoting *Great–West Life,* 678 F.2d at 183).[8]  In *Xerox Corp.,* the Federal Circuit specifically noted that it had "reviewed the [extrinsic] evidence[.]"  41 F.3d at 653.

Although the Supreme Court has often given "great weight" to the Executive Branch's interpretation of the treaty, *Sumitomo,* 457 U.S. at 184–85, more recently the Supreme Court has acknowledged that it has "never provided a full explanation of the basis for our practice of giving weight to the Executive's interpretation of a treaty."  *GE Energy,* 590 U.S. at 444.  And, in any event, binding Federal Circuit authority instructs us that "an agency's position merits less deference 'where an agency and another country disagree on the meaning of a treaty[.]'"  *Nat'l Westminster Bank,* 512 F.3d at 1358 (quoting *Iceland Steamship Co., Eimskip v. U.S. Dep't of the Army,* 201 F.3d 451, 458 (D.C. Cir. 2000)).  Moreover, the Federal Circuit "has declined to defer to Treasury's contemporaneous interpretation where it conflict[s] with the contemporaneous intent of the Senate."  *Id.* (citing *Xerox,* 41 F.3d at 653–57).

"A treaty, when ratified, supersedes prior domestic law to the contrary and is equivalent to an act of Congress."  *Xerox Corp.,* 41 F.3d at 658 (citing *United States v. Lee Yen Tai,* 185 U.S. 213, 220–22 (1902)).[9]  On the other hand, the "tacit abrogation of prior law will not be presumed and, unless it is impossible to do so, treaty and law must stand together in harmony."  *Id.*

Summarizing those interpretive principles is far easier than applying them.  The Court turns next to that task.

---

[8] *See also Nat'l Westminster Bank,* 512 F.3d at 1353 ("When construing a treaty, '[t]he clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" (quoting *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180 (1982))); *United Techs. Corp. v. United States,* 315 F.3d 1320, 1322 (Fed. Cir. 2003) ("The terms of a treaty are to be given their ordinary meaning in the context of the treaty, and are to be interpreted to best fulfill the purpose of the treaty." (citing *Xerox Corp.,* 41 F.3d at 652)).

[9] *See Bell v. Off. of Pers. Mgmt.,* 169 F.3d 1383, 1386 (Fed. Cir. 1999) ("[W]hen a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null." (quoting *Breard v. Greene,* 523 U.S. 371, 376 (1998))); *see also Akins v. United States,* 551 F.2d 1222, 1229 (C.C.P.A. 1977) ("As a rule of priority between equals, a later dated statute in direct conflict with a treaty supersedes the treaty.").

## V.   DISCUSSION

### A. The Canada Tax Treaty

The primary locus of the parties' dispute within the Treaty is Article XXIV, notably entitled "***Elimination*** of Double Taxation."  Canada Tax Treaty, ECF No. 18-2 at 24 (emphasis added).  Paragraph 1 of Article XXIV provides, in relevant part:

> In the case of the United States, **[1]** subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows:  **[2]** In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time **[3]** without changing the general principle hereof), **[4]** the United States shall allow to a citizen or resident of the United States . . . as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada . . . .

*Id.*  (For ease of reference, the Court has inserted bracketed numbers to mark operative phrases within Paragraph 1 of Article XXIV, above; hereafter, the words "Clause" or "Clauses" followed by bracketed number(s) refers to the marked phrases.  Clause [2] is referred to as the "U.S. Law Limitation.")

Paragraph 4 of Article XXIV provides:

> Where a United States citizen is a resident of Canada, the following rules shall apply:
>
> (a) Canada shall allow a deduction from the Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income or gains which arise (within the meaning of paragraph 3) in the United States, except that such deduction need not exceed the amount of the tax that would be paid to the United States if the resident were not a United States citizen; and
>
> (b) for the purposes of computing the United States tax, *the United States shall allow as a credit against* **United States tax**

**Appx9**

> the income tax paid or accrued to Canada after the deduction
> referred to in subparagraph (a).  The credit so allowed
> shall not reduce that portion of the United States tax that
> is deductible from Canadian tax in accordance with
> subparagraph (a).

Canada Tax Treaty at 25 (emphasis added).

The Treaty, in turn, defines "United States tax" as "the taxes referred to in *Article II* (Taxes Covered) . . . that are imposed on income by the United States."  Canada Tax Treaty at 3 (Art. III ("General Definitions"), ¶ 1(d)).  And Article II provides that the Treaty "shall apply to taxes on income . . . imposed on behalf of each Contracting State, *irrespective of the manner in which they are levied.*"  *Id.* at 2 (Art. II, ¶ 1) (emphasis added).  Article II further provides that "the taxes existing on March 17, 1995 to which the Convention shall apply are . . . in the case of the United States, the Federal income taxes imposed by the Internal Revenue Code of 1986."  *Id.* (Art. II, ¶ 2(b)).  The parties also clearly anticipated future changes to their respective tax codes, with the Treaty specifying that "[t]he Convention shall apply also to . . . any taxes identical or *substantively similar* to those taxes to which the Convention applies under paragraph 2 [of Article II]."  *Id.* at 3 (Art. II, ¶ 3(a)) (emphasis added).

### B.  The NIIT

Chapter 2A of the I.R.C. covers the "Unearned Income Medicare Contribution."  It contains but a single provision: 26 U.S.C. § 1411 ("Imposition of tax").  That tax provision imposes an income tax on individuals as follows:

> **(1) Application to individuals.**--In the case of an individual,
> there is hereby imposed (in addition to any other tax imposed
> by this subtitle) for each taxable year a tax equal to 3.8 percent
> of the lesser of--

> **(A)** net investment income for such taxable year, or

> **(B)** the excess (if any) of-- **(i)** the modified adjusted gross
> income for such taxable year, over **(ii)** the threshold amount.

26 U.S.C. § 1411(a).

**Appx10**

### C. The Crux of the Interpretive Problem

According to Mr. Bruyea, the Treaty in Article XXIV, Paragraph 1 — and particularly Clause [4] of that paragraph — creates a Treaty-based tax credit applicable to the NIIT irrespective of whether the I.R.C. provides for, or permits, that credit. Three textual data points support his view. First, Article XXIV's purpose, as indicated by its title, is the "Elimination of Double Taxation." Canada Tax Treaty at 24; *see also* Pl. MSJ at 20.[10] Second, Clause [4] expressly provides that "the United States shall allow to a citizen . . . of the United States . . . as a credit against the *United States tax* on income the appropriate amount of income tax paid or accrued to Canada[.]" Canada Tax Treaty at 24 (emphasis added). The government does not dispute that the NIIT qualifies as a "United States tax" as defined in Article II and Article III of the Treaty. *See* Canada Tax Treaty at 2-3. Third, Mr. Bruyea points to Paragraph 4(b) of Article XXIV, which provides that "for the purposes of computing the United States tax, the United States shall allow as a credit against *United States tax* the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a)." *Id.* at 25 (emphasis added).

In opposing Mr. Bruyea's reading, the government relies primarily on the U.S. Law Limitation (*i.e.*, Clause [2] of Article XXIV, ¶ 1). *See* Def. MSJ at 12, 25, 32. According to the government, any Treaty-based credit — whether based on Paragraphs 1 or 4 of Article XXIV — must be "[i]n accordance with the provisions . . . of the law of the United States[.]" Canada Tax Treaty at 24. Put differently, the government maintains that a Treaty-based credit simply cannot exist independently of the I.R.C.— the "law of the United States." *Id.* The government further points out, Def. MSJ at 35, that Clause [2] specifically anticipates that the law of the United States "may be amended from time to time," thus extending the reach of the U.S. Law Limitation to future I.R.C. provisions that conflict with the Treaty.

Applying the U.S. Law Limitation to the facts of this case, the government contends that the NIIT — or, more accurately, the NIIT's placement outside of I.R.C. Chapter 1 — precludes the Treaty-based tax credit Mr. Bruyea claims. In particular, the government points to I.R.C. § 27, which provides that "[t]he amount of taxes imposed by foreign countries . . . shall be allowed as a credit against the tax imposed *by this chapter* to the extent provided in section 901[.]" 26 U.S.C. § 27 (emphasis added). Section 27 is in Chapter 1 of the I.R.C.[11] The NIIT, 26 U.S.C. § 1411, resides by its lonesome in Chapter 2A.

---

[10] Clause [1] instructs that "double taxation shall be avoided." Canada Tax Treaty at 24.

[11] I.R.C. § 901 is also contained within Chapter 1 of the I.R.C., and references "the tax imposed by

Because the I.R.C. provides that a foreign tax credit is only available for taxes within Chapter 1, and because the NIIT is outside of Chapter 1, the government argues that Mr. Bruyea cannot claim a Treaty-based foreign tax credit against the NIIT.

There is yet more textual complexity. Because the Treaty guarantees that any future amendment to United States law will not "chang[e] the general principle hereof," Canada Tax Treaty at 24 (Clause [3]), the government arguably cannot rely on the mere (later) location of the NIIT, within I.R.C. Chapter 2A, to preclude a Treaty-based credit. *See* Pl. MSJ at 37-39. Mr. Bruyea further asserts the "general principle hereof" refers to the Treaty's goal of eliminating (or avoiding) double taxation. *Id*.

By now, the basic interpretive problem is readily apparent. On the one hand, the Canada Tax Treaty plainly provides for a foreign tax credit in Mr. Bruyea's favor. *See* Canada Tax Treaty at 24–25 (Article XXIV, ¶ 1, Clause [4]; Article XXIV, ¶ 4(b)). On the other hand, a literal reading of the U.S. Law Limitation arguably takes back what Article XXIV otherwise giveth (because the I.R.C., by its terms, certainly does *not* provide for the Treaty-based tax credit Mr. Bruyea claims).

If Mr. Bruyea's refund claim were based only on the I.R.C., even he concedes that he would surely be out of luck. That is, Mr. Bruyea agrees with the foundational axiom that the I.R.C. does not provide the foreign tax credit he seeks to apply against the NIIT. He argues, however, that the I.R.C. cannot — and does not — answer the critical interpretative question posed by his complaint: "As the NIIT falls outside [C]hapter 1 [of the I.R.C.], the parties agree that no credit is allowed under domestic law, but Plaintiff's view is that the NIIT is covered by the foreign tax credit rules of the Canada Treaty." Pl. MSJ at 18. In other words, according to Mr. Bruyea, the government's position simply begs the question whether the Treaty independently provides a tax credit against the NIIT *notwithstanding* that the I.R.C. does not provide for such a credit.

More significantly, the government's interpretation has a glaring consistency problem: ***the government takes an ad-hoc approach to the U.S. Law Limitation***. The government interprets the U.S. Law Limitation differently when applied to different paragraphs within Article XXIV. In fact, as the Court details below, the government concedes that there are Treaty provisions that the government must follow even though

---

this chapter[.]"   More specifically, § 901 is within Subpart A ("Foreign Tax Credit") of Part III ("Income From Sources Without the United States") of Subchapter N ("Tax Based on Income From Sources Within or Without the United States").

**Appx12**

they are inconsistent with the I.R.C. That is a powerful concession in Mr. Bruyea's favor because if there are such Treaty provisions, how does the U.S. Law Limitation work? How can the government ask this Court to read the U.S. Law Limitation to apply to some paragraphs of Article XXIV but not others? On the other hand, Mr. Bruyea must contend with the meaning of the U.S. Law Limitation.

The Court grapples with these questions *infra*, but no matter how the interpretive problem is sliced, once a literal, expansive reading of the U.S. Law Limitation is off the table, resorting to extrinsic evidence is all but unavoidable. Accordingly, this Court first addresses the plain text of the various Treaty and I.R.C. provisions at issue, and then explores the extrinsic material — all through the lens of the treaty interpretation principles set forth in the binding Supreme Court and Federal Circuit decisions this Court summarized above. At the end of the day, the Court concludes that Mr. Bruyea has the better case.

### D. The Canada Tax Treaty Provides the Tax Credit Mr. Bruyea Claims

Consistent with the case law, both parties extensively rely on extrinsic evidence,[12] suggesting that neither party can throw a knock-out interpretive punch here. And the Court agrees: neither the Treaty nor the I.R.C. supplies a truly definitive answer — via the text's plain meaning — to the central issues in this case. More specifically, the Canada Tax Treaty contains no language that *expressly* answers the twin questions of: (1) whether "the NIIT is covered by the foreign tax credit rules of the Canada Treaty[,]" as Mr. Bruyea asserts, Pl. MSJ at 18; or (2) whether the U.S. Law Limitation precludes such a Treaty-based credit, as the government argues, Def. MSJ at 32.

But that does not mean this Court may disregard the Treaty's plain language or that it is unhelpful. To the contrary, this Court begins with the Treaty's plain language and fleshes it out by first considering points of common ground. Once we have a clear view of what the parties agree upon, the points of disagreement are sharpened into focus. Only then does the Court consider the extrinsic evidence upon which the parties rely.

---

[12] *See, e.g.*, Pl. MSJ at 36 (citing the Canadian government's interpretation of the Treaty and the Technical Explanation to the Canada Treaty); Def. MSJ at 37 (citing to the United States Treasury Department's guidance on the NIIT).

Ultimately, this Court concludes that Mr. Bruyea's interpretive approach places less strain on the Treaty's text than the government's interpretation, and that his approach finds greater support within the extrinsic evidence.

## 1. The textual evidence favors Mr. Bruyea's interpretation of the Treaty

At the outset, the government concedes[13] that a treaty generally *may* provide a self-executing tax credit (*i.e.*, even where the I.R.C. contains no implementing provisions or even where it is inconsistent with a treaty-based tax credit). In that regard, the government agrees that, in a hypothetical case, "the treaty would have effect, *notwithstanding the Code*, unless the treaty was *later* amended by a code provision providing *directly to the contrary*[.]" Tr. 4:7–17 (emphasis added). This gets us quickly to the very heart of the textual dispute in this case because that is precisely what Mr. Bruyea contends Paragraphs 1 and 4 of Article XXIV accomplish here:

> **THE COURT:** … [M]y first question when we began is that it's possible for the treaty to have a self-executing credit, even if the Code didn't expressly provide for it.
>
> **[GOVERNMENT COUNSEL]:** Yes.
>
> **THE COURT:** I think that's kind of Plaintiff's [central] position[:] . . . the Treaty gives us the credit and nothing in the Code takes it away.
>
> **[GOVERNMENT COUNSEL]:** Well, I think the Code *takes it away* by putting the [NIIT] outside of Chapter 1 [of the I.R.C.].

Tr. 22:8–18 (emphasis added).

---

[13] *See ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1352, 1361 (Fed. Cir. 2021) (quoting a concession by counsel at oral argument as evidence a plaintiff fell short of its burden); *Faiella v. Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 146 (1st Cir. 2019) ("A party ordinarily is bound by his representations to a court and — having staked out his position in response to the district court's inquiry — the appellant cannot now repudiate that position." (citation omitted)); *United States v. Lloyd*, 10 F.3d 1197, 1209 (6th Cir. 1993) (concession made by defendant's attorney in district court was binding on appeal); *Adidas Sportschuhfabriken ADI Dassler KG v. Chen*, 1988 WL 1091940, at *7 (N.D. Cal. Feb. 2, 1988) (concluding that a court "is entitled to rely upon and enforce the representations of counsel" because "the Court system would soon fail to function were the Court not able to rely upon representations and stipulations of counsel acting on behalf of their clients.").

**Appx14**

The government thus agrees that United States law need **not** expressly implement a Treaty-based tax credit for one to exist. Rather, a Treaty-based credit can be "self-executing." *Id.* And we see that the government further concedes, albeit implicitly, that the Treaty here *does* generally create a Treaty-based tax credit. Otherwise, there would be nothing for the Code to "take[] away." *Id.* Finally, according to the government, the Treaty-based tax credit claimed here — that is, *as applied to the NIIT* — is precluded not by any express I.R.C. text *per se*, but rather by the NIIT's placement outside of I.R.C. Chapter 1.

Because the NIIT's statutory terms are silent about not only foreign tax credits generally, but also about Mr. Bruyea's putative Treaty-based credit in particular, the critical question is this: may this Court infer that any Treaty-based tax credit against the NIIT is precluded based upon its placement outside of Chapter 1 of the I.R.C.?

To answer that question, we first must understand that the Treaty, as a matter of law, will give way to the I.R.C. in only two circumstances. The first is where a later-enacted statutory provision "directly" conflicts with the Treaty. Tr. 4:15–17. That "last-in-time rule" is a background, bedrock legal principle of treaty interpretation. The second circumstance is where the Treaty, by its terms, defers to the I.R.C. The government asserts both grounds in arguing that this Court should reject Mr. Bruyea's tax claim.[14] The Court addresses each issue, in turn.

### a. The "last-in-time rule" does not apply here

A later-enacted statute controls over a *directly conflicting* treaty provision. *Bell*, 169 F.3d at 1386. This is known as the "last-in-time rule." *Kappus*, 337 F.3d at 1057 ("When a statute conflicts with a treaty, the later of the two enactments prevails over the earlier under the last-in-time rule." (discussing *Whitney v. Robertson*, 124 U.S. 190, 194-95 (1888)); *Whitney*, 124 U.S. at 195 ("The duty of the courts is to construe and give effect to the latest expression of the sovereign will."). Moreover, Congress has codified, in 26 U.S.C. § 7852(d)(1), the "last-in-time principle as applied to tax treaties and statutes." *Kappus*, 337 F.3d at 1057 (discussing 26 U.S.C. § 7852(d)(1)). Here, the parties do not dispute that

---

[14] Def. MSJ at 31 ("Because the tax imposed by § 1411 on net investment income is not a Chapter 1 tax, the text and structure of the Code make clear that foreign tax credits are not allowed against it.); *id*. at 32 ("Thus, to allow a credit against the NIIT would not be '[i]n accordance with the provisions . . . of the law of the United States,' and would contravene both the Code and the text of paragraph (1).").

the NIIT was enacted after the operative Treaty provisions on which Mr. Bruyea relies to support his claim. But the "last-in-time rule" only has significance if the NIIT indeed conflicts *directly* with the treaty. The government's mere talismanic invocation of the "last-in-time rule" does not mean it is applicable or that it resolves the salient question.

Now, Mr. Bruyea concedes that if Congress had enacted a later statute that *expressly* precluded any foreign tax credit — or any Treaty-based credit — from being applied to the NIIT, such a provision would control over the Treaty, and he would not have a viable claim here. Pl. MSJ at 24 ("Later enacted statutes can override a treaty if Congress intends to do so, but . . . Congress did not intend an override when enacting the NIIT."). In other words, such a hypothetical statute would control even if the Treaty lacked the U.S. Law Limitation (contained within Art. XXIV, ¶ 1, Clause [2]). That, of course, necessarily means that the U.S. Law Limitation is completely irrelevant to the "last-in-time rule," which, again, is a background rule that would apply even if the Treaty did not contain the U.S. Law Limitation. We can thus put the U.S. Law Limitation to the side for now and concentrate solely on whether the "last-in-time rule" applies here in some dispositive way.

The first major problem for the government's argument, according to Mr. Bruyea, is that "[b]ecause there has not been an explicit Congressional override, long-established case law requires that the NIIT and the Canada Treaty should be read harmoniously to give effect to both." Pl. MSJ at 25. Mr. Bruyea is correct. This Court must attempt to harmonize Treaty and statutory provisions: "Where a treaty and a statute 'relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either.'" *Kappus*, 337 F.3d at 1056 (quoting *Whitney*, 124 U.S. at 194, and citing *Xerox Corp.*, 41 F.3d at 658)).

In *Kappus*, the United States Court of Appeals for the District of Columbia Circuit declined to attempt to harmonize the Canada Tax Treaty with 26 U.S.C. § 59(a)(2), the statute at issue in that case. 337 F.3d at 1056. There, the D.C. Circuit acknowledged that "[t]he question of whether the Treaty and statute can be harmonized as the government suggests is an extremely close one." The court concluded, however, that "[i]t is not . . . a question that [the court] need resolve" because the plaintiffs *conceded* that the Treaty and statute were in "irreconcilable conflict" — indeed, the plaintiffs "contend[ed] that harmonization is not possible" — and the D.C. Circuit found that the statute was last in time. *Id.*

Mr. Bruyea does not concede the "irreconcilable conflict" point here and he is correct not to do so. Because neither the NIIT nor any other I.R.C. provision *expressly* precludes the application of the Treaty-based tax credit Mr. Bruyea claims, this Court further agrees with Mr. Bruyea that we can dispense with the "last-in-time rule" on that basis alone. Simply put, the fact that the I.R.C. provides for foreign tax credits only in Chapter 1 does not *expressly* preclude the Treaty's serving as an independent source for such a credit against the NIIT (*i.e.*, just because the NIIT is located elsewhere within the I.R.C.).

Again, if Congress, after the Treaty's ratification, had enacted a provision mandating that "the NIIT shall not be subject to any foreign tax credit," this case would be over (and decisively so, in favor of the government). But this Court cannot *infer* such a meaning or result — and read the I.R.C. as if such express language exists — merely because the NIIT was placed in a separate chapter of the IRC. *See, e.g.*, *Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed."); *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) ("There is, first, a firm and obviously sound canon of construction against finding implicit repeal of a treaty in ambiguous congressional action." (citing *Cook*, 288 U.S. at 120, amongst other cases)); *In re Rath*, 402 F.3d 1207, 1219 (Fed. Cir. 2005) (Bryson, J., concurring) (applying *Cook*).

In *Trans World Airlines*, the Supreme Court explained that "[l]egislative silence is not sufficient to abrogate a treaty." 466 U.S. at 252 (citing *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982)). There, the Supreme Court concluded that "[n]either the legislative histories of the Par Value Modification Acts, the history of the repealing Act, nor the repealing Act itself, make any reference to the [treaty]" at issue in that case. *Id.* To the contrary, explained the Court, the legislation at issue "was unrelated to the [treaty]." *Id.* The same is true in this case. The government has pointed to no express textual or extrinsic evidence — literally, nothing — even remotely suggesting that Congress's placement of the NIIT outside of Chapter 1 was intended to preclude a Treaty-based tax credit. *See* Def. MSJ at 23-24. Nor does any such evidence likely exist.[15]

---

[15] *See* Ausher M.B. Kofsky & Bryan P. Schmutz, *What a Long Strange Trip It's Been for the 3.8% Net Investment Income Tax*, 78 Md. L. Rev. Online 14, 31 (2019) ("In summary, the NIIT arose as a last-minute revenue replacement to offset the revenue loss from Congress's delayed implementation of the 40% excise tax on high-cost . . . health insurance plans.").

In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, the Supreme Court contrasted, in the context of a treaty, "an exception to arbitrability grounded in *express congressional language*" with "a judicially implied exception." 473 U.S. 614, 639 n.21 (1985) (emphasis added). The Court reasoned that it was "[d]oubtless" that "Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention" at issue in that case. *Id.* The Court declined, however, "to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not *expressly* directed the courts to do so." *Id.* (emphasis added). Here, as in *Mitsubishi*, there is no express direction for courts to disregard the Treaty-based tax credit Mr. Bruyea claims based on Congress's having placed the NIIT in its own chapter within the I.R.C. (*i.e.*, outside of Chapter 1).

In sum, there is nothing "expressly" (or even necessarily) inconsistent about the NIIT's placement and the Treaty-based credit Mr. Bruyea claims in this case. *Magone v. Heller*, 150 U.S. 70, 74 (1893) ("the adverb 'expressly,' in its primary meaning, denotes precision of statement, as opposed to ambiguity, implication, or inference, and is equivalent to 'in an express manner' or 'in direct terms[.]'"); *Express*, *Black's Law Dictionary* (12th ed. 2024) (defining "Express" as "Clearly and unmistakably communicated; stated with directness and clarity.").[16] This Court rejects the government's argument that "the placement [of the NIIT] is itself an express inconsistency" with the Treaty. Tr. 21:18–19.

The government's argument, however, is even more ambitious, rejecting the need for any specificity in the later-enacted provision to overrule the Treaty. According to the government, the general rule that "a Congressional intention to modify a treaty by statute must be clearly expressed" does not apply to tax cases; rather, the government asserts, "a different standard applies under the [Internal Revenue] Code." Def. MSJ at 42 n.20. In particular, the government points to 26 U.S.C. § 7852(d)(1), which provides that "[f]or purposes of determining the relationship between a provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being treaty or law."[17] The government thus asserts that "treaties have no preferential status over *tax* statutes, and there need be no explicit statement of

---

[16] An "express repeal" is a "[r]epeal by specific declaration in a new statute . . . ." *Repeal*, *Black's Law Dictionary* (12th ed. 2024).

[17] This provision was enacted as part of the Technical and Miscellaneous Revenue Act of 1998 ("TAMRA"), Pub. L. No. 100-647, 102 Stat. 3342.

Appx18

Congressional intent that the Code will prevail in case of conflict with a treaty." Def. MSJ at 42 n.20 (citing S. Rep. No. 100-445 at 325-26 (1988)).

The government cannot get the mileage out of 26 U.S.C. § 7852(d)(1) it desires. As the D.C. Circuit recognized — citing the same Senate Report as the government here — "this provision was intended to codify the last-in-time principle as applied to tax treaties and statutes." *Kappus*, 337 F.3d at 1057. And, indeed, that is all the statute's plain language accomplishes. The government is wrong; tax statutes aren't different than other statutes vis-à-vis treaties.

To be clear, neither this Court nor Mr. Bruyea takes any issue with the "last-in-time" principle in general. The question is simply whether it applies here. The Court continues to answer that question in the negative. Because 26 U.S.C. § 7852(d)(1) does nothing more than codify the "last-in-time rule," as the D.C. Circuit recognized, the statute itself does nothing more than beg the question *whether there is, in fact, a necessary conflict* between the NIIT statute, on the one hand, and the Treaty, on the other. The government answers that question in the affirmative based on the NIIT's placement — and despite any textual evidence that its placement in Chapter 2A was intended to defeat the Treaty-based tax credit. Mr. Bruyea, in contrast, correctly points to the general rule that this Court should not manufacture a conflict between the statute and the Treaty by implication. That is precisely what this Court established *infra*, and 26 U.S.C. § 7852(d)(1) does not change this Court's analysis.

*Kappus* further demonstrates why the government is flat wrong. In that case, I.R.C. § 59(a)(2) — the tax statute at issue that conflicted with the Treaty — was subject to yet another TAMRA provision that specified that § 59(a)(2) was "intended to apply notwithstanding any inconsistent treaty obligations[.]" 337 F.3d at 1057 (discussing TAMRA, § 1012(aa)(2), codified at 26 U.S.C. § 861 note, and citing S. Rep. No. 100-45 at 319). According to the D.C. Circuit, "TAMRA thus made it crystal clear that Congress intended [§ 59(a)(2)] to supercede any preexisting treaty obligation with which it conflict[s]." *Id.* at 1058. Here, in contrast, the Treaty and the NIIT statute may be harmonized and, relatedly, there is no similar "crystal clear" congressional language like that in *Kappus*, indicating that the NIIT's placement was designed to "supercede" a Treaty-based tax credit.

Finally, if the government were correct that 26 U.S.C. § 7852(d)(1) somehow vitiates the Supreme Court's instruction that "a Congressional intention to modify a

treaty by statute must be clearly expressed[,]" Def. MSJ at 42 n.20, we would expect to see some clear authority to that effect.  The government notably quotes no language from the Senate Report or *any* case law so holding.  And that is because there is no support for the government's assertion.  To the contrary, the D.C. Circuit in *Kappus* recognized — as does this Court — the continued vitality of the Supreme Court's general rule that "statutes and treaties should be harmonized if possible," even in tax cases.  *Kappus*, 337 F.3d at 1059 n.7 (citing *Whitney*, 124 U.S. at 194, and the Federal Circuit's decision in *Xerox Corp.*, 41 F.3d at 658).  Indeed, the D.C. Circuit instructed that "[t]he best way to harmonize § 59(a)(2) with [later-enacted] protocols [amending the Treaty] is to *assume the latter were not intended to repeal the former.*"  *Id.* (emphasis added).  And that is precisely how this Court approaches the NIIT.  Moreover, this Court again notes that, quite unlike the plaintiffs in *Kappus*, Mr. Bruyea does not concede a conflict between the Treaty and a statute.  Nor, for that matter, does the government point to language — "crystal clear," *id.* at 1058,  or otherwise — making a conflict between the Treaty and the NIIT "irreconcilable," *id.* at 1056, or making them "absolutely incompatible," *id.* at 1059.

To side with the government, this Court would have to disregard the Federal Circuit's instruction in *Xerox Corp.* that "unless it is impossible to do so, treaty and law must stand together in harmony."  *Kappus*, 337 F.3d at 1059 n.6 (quoting *Xerox Corp.*, 41 F.3d at 658).  This Court has done its best to implement that instruction and the result favors Mr. Bruyea.

### b. The Treaty's U.S. Law Limitation does not preclude the application of a Treaty-based credit to the NIIT

But what about the second possibility: that the Treaty itself somehow precludes the application of a Treaty-based tax credit to the NIIT?  The government argues that the Treaty's U.S. Law Limitation does precisely that.  The fatal problem for the government is that the government simultaneously (and variously) contends that the U.S. Law Limitation means that the I.R.C. *always* trumps the Treaty and — try to wrap your head around this — that the Treaty *sometimes does* trump the I.R.C.  The government cannot have it both ways.  As demonstrated *infra*, the Court attempted during oral argument to pin the government down on the precise meaning and scope of the U.S. Law Limitation, but that proved to be "an effort to nail jello to a wall."  *Alexander v. Mayhew*, 334 F.R.D. 626, 627 (N.D. Fla. 2020).

For starters, the government critically concedes that the U.S. Law Limitation does not *always* preclude a Treaty-based tax credit unless implemented in the I.R.C.  Indeed,

**Appx20**

the government agrees that the Treaty, *in Article XXIV, contains several paragraphs that control over conflicting United States statutory provisions*.  For example, the government readily agrees not only that Paragraph 3 of Article XXIV is inconsistent with the I.R.C., Tr. 13:5–17, but also that "Paragraphs 3, 4, 5, and 6 [of Article XXIV] *do* make promises that are inconsistent with the Code *and provide rights that would not otherwise be provided for under the Code*[.]"  Tr. 28:1–5 (emphasis added) (further agreeing that the "extrinsic materials that we refer to are quite specific about that").  In other words, computing taxes pursuant to Article XXIV, ¶¶ 3–6, would yield a different result than if the I.R.C. were followed instead.[18]

That critical concession creates an insurmountable impediment to the government's interpretive approach to the Treaty.  That is because whatever the proper scope of the Treaty's U.S. Law Limitation, the government agrees that it cannot be read literally to mean that the I.R.C. always trumps the Treaty.  And once we know that the Treaty contains *some* provisions that must be followed even though they conflict with United States law, the next, natural question is not rocket science:  *why is the Treaty-based tax credit Mr. Bruyea claims pursuant to Paragraphs 1 and 4 of Article XXIV any different than what is permitted in Paragraphs 3-6*?  The Court spent the bulk of oral argument trying to unravel the mystery of that question — *i.e.*, how the government can contend both that U.S. Law Limitation precludes Mr. Bruyea's claimed credit, but elsewhere permits Treaty provisions to trump the I.R.C.  There is no gentle way to say this — the government had the Court going in circles:

> **THE COURT:**  But doesn't this also – ["]the subject [to] the provisions and limitations of the law of the United States["] [language] apply to all the subsequent paragraphs?  Isn't this . . .  a general rule for . . . the double taxation compromise generally?

> **[GOVERNMENT COUNSEL]:**  It does, yes. . . . [E]xcept where the other [Treaty] paragraphs specifically trump specific provisions of the Code.

---

[18] *See* Pl. MSJ at 20 ("Article XXIV(5) provides a United States foreign tax credit to a Canadian resident United States citizen on dividends, royalties, and interest arising in the United States.  Under Code Sections 901 and 904(a), a foreign tax credit is only available with respect to foreign source income.  Thus, the credit under Article XXIV(5) of the Canada Treaty represents a credit that is not available under the Code and is independently provided by the Canada Treaty.").

Tr. 28:17–29:1 (cleaned-up).

But there are no Treaty paragraphs that "specifically" — *i.e.*, explicitly, by their terms — "trump specific provisions of the Code." *Id.* No such language exists. As hard as the Court tried to pin down precisely how the government reads the U.S. Law Limitation consistently across Article XXIV, the Court could not get the government to articulate a consistent approach:

> **THE COURT:** If we're putting aside *Whitney vs. Robinson*, [and focus just on the Treaty language] "in accordance with the provisions and subject to the limitations of the [law of the] United States," the Code should trump all of these other [Treaty] provisions that you are saying are enforceable, and I'm trying analytically to figure out how do you know that some of these provisions in the Treaty trump the Code and in other cases the Code trumps the Treaty?

> **[GOVERNMENT COUNSEL]:** Because the Treaty in its text specifically provides for remedies that are different from the remedies that are in the Code.

> **THE COURT:** So? Maybe the[] [Treaty provisions] just lose in the face of the Code.

> **[GOVERNMENT COUNSEL]:** Well, the Government is not taking such a draconian position in this case, Your Honor.

> **THE COURT:** Right, but it's an unprincipled one if I can't come up with a rule, an interpretive rule that explains your position in both cases, and it doesn't sound like I've got one.

> **[GOVERNMENT COUNSEL]:** The interpretive rule is that as a general matter, for any foreign tax credit that's allowed under the Treat[y], [it] is subject to the provisions and limitations of the Code except to the extent that elsewhere in the treaty there are specific provisions of the Code that are altered by the Treaty partners agreeing to do so in a particular [case].

Tr. 29:3–30:3 (cleaned-up).

The government's explanation in a nutshell amounts to this: the Treaty governs unless it doesn't.[19]

At best, a generous characterization of the government's position is that while there is no hard-and-fast rule, the Court should consider the relative specificity of competing Treaty and statutory provisions. At worst, the government concedes that its interpretation would nullify other paragraphs within Article XXIV, but the government knows that result would be absurd and so its only recourse is to arbitrarily adjust its interpretation of the U.S. Law Limitation depending on the paragraph at issue. When the Court pressed the government on just these problems, the government hypothesized a specificity distinction:

> **THE COURT:** It seems like that . . . "in accordance language,"
> works differently depending on what we're talking about.
> When we're talking about the other paragraphs with the . . .
> greater details on the three-bite [computation] rule, you agree

---

[19] Even if the U.S. Law Limitation must be read to apply to Paragraphs 3–6 of Article XXIV, and not just Paragraph 1 of that article, Mr. Bruyea still prevails. *See, e.g.*, Def. MSJ at 38 (arguing that the U.S. Law Limitation "applie[s] to the credits referenced in paragraph 4(b) [of Article XXIV] as well"); Tr. 40:5–9 (government arguing that "Paragraph 1 is, itself, subject to Paragraphs 4, 5, and 6, so there is an interlink between the two"). Indeed, the Court is inclined to agree with the government that Paragraph 1 of Article XXIV — including the U.S. Law Limitation — applies to any Treaty-based tax credit claim based on Paragraph 4. *See* Def. MSJ at 43. Thus, in contrast to *Christensen v. United States*, 168 Fed. Cl. 263, 330 (2023), the undersigned sees no reason to distinguish between the operative Treaty-based tax credit language in Paragraph 1 and that of Paragraph 4(b). Accordingly, the undersigned disagrees with *Christensen* that the U.S. Law Limitation applies in the former but not the latter. Instead, this Court concludes that the U.S. Law Limitation applies to both paragraphs, but they must be read together and are not expressly inconsistent with the I.R.C. What that means is that the U.S. Law Limitation does not preclude the Treaty-based foreign tax credit against the NIIT in either Paragraph 1 or 4(b). In that regard, *Christensen* itself concluded that there was "no evidence of congressional intent when placing I.R.C. § 1411 in Chapter 2A of the I.R.C.," 168 Fed. Cl. at 328, and that "nothing in the legislative history of the enactment of I.R.C. § 1411 indicates the congressional intent with respect to abrogating any foreign tax credit provided by" the nearly-identical tax treaty with France at issue in that case "when Congress enacted the [NIIT] in Chapter 2A[,]" *id.* at 331. Thus, in the undersigned's view, *Christensen* ultimately correctly rejected the government's request for "this court to *assume* from the words of [the NIIT] and its placement in Chapter 2A of the I.R.C. . . . that Congress intended to exclude the [NIIT] from all foreign tax credits." *Id.* at 331 (emphasis added). *Christensen* also is correct that I.R.C. § 6511(d)(3)(A) squarely supports the proposition "that a foreign tax credit may be allowed by the provisions of a treaty without also being provided by the terms of I.R.C. § 901." *Id.* at 332–33. In sum, the U.S. Law Limitation does not preclude Mr. Bruyea's claimed tax credit even if that clause applies to Paragraph 4(b) of Article XXIV.

that the Treaty provisions -- what is it called, the sourcing rules?

**[GOVERNMENT COUNSEL]**: Yes.

**THE COURT:** That trumps the Code.

**[GOVERNMENT COUNSEL]:** Yes.

**THE COURT:** Because they are inconsistent. All I'm asking you, if they are inconsistent with the Code, why does the Treaty provisions win there, but if I interpret the Treaty provision in Paragraph 1 to be what the Plaintiff is saying, it does not trump? That's what I'm asking.

**[GOVERNMENT COUNSEL]:** Because when the parties enacted Paragraph 1 of the Treaty, they were not expressly making a promise to alter the Code, whereas paragraphs 3, 4, 5, and 6 *contain express promises* to alter certain aspects of the Code.

**THE COURT:** Where is that? Where is the express promise that they are altering the Code? Is it just in their specificity?

**[GOVERNMENT COUNSEL]:** Yes.

Tr. 31:25–32:24 (cleaned-up) (emphasis added).

This Court rejects the government's specificity argument. As the Court discussed during oral argument, and holds now, there are no "express promises" — contrary to the government's assertion — that provide that the Treaty trumps the Code in Paragraphs 3, 4, 5, and 6 of Article XXIV, but not in Paragraph 1. To conclude otherwise, and to side with the government, would require conflating the words "express" and "inferred":

> **THE COURT:** Counsel, that is not what we mean when we say "express." "Express" means [something like] "notwithstanding any provision of the United States Code, we amend it as follows." You want me to infer [such language] from the specificity [of Article XXIV, ¶¶ 3-6], which then means we're just debating levels of specificity and what ought to govern when things aren't specific. It's a much different argument.

23

**Appx24**

> **[GOVERNMENT COUNSEL]**: You are right that it does not say "notwithstanding the Code."
>
> **THE COURT:** Right. So it's not express. . . . Express means literal.
>
> **[GOVERNMENT COUNSEL]:** [The Treaty] creates rules that govern the application of foreign tax credits that are themselves inconsistent with the Code.
>
> **THE COURT:** Right. So why doesn't the Code win?
>
> **[GOVERNMENT COUNSEL]:** Because the parties . . . agreed to a provision . . . in the Treaty that differed from the Code . . . .
>
> **THE COURT:** So the Treaty wins, not the Code?
>
> **[GOVERNMENT COUNSEL]:** In that case, yes.
>
> **THE COURT:** Why?
>
> **[GOVERNMENT COUNSEL]**: Because that's what . . . the Treaty partners agreed to in the text of the Treaty[.]

Tr. 33:1–34:2 (cleaned-up).

In sum, the government's reading of the U.S. Law Limitation would simultaneously: (1) *preclude* Mr. Bruyea's claimed Treaty-based tax credit because it *putatively* conflicts with the I.R.C.'s foreign tax credit scheme in Chapter 1 of the I.R.C.; and (2) *permit* the computation of foreign tax credits in a manner that *definitely* conflicts with the I.R.C. This Court rejects the government's ad-hoc approach to the U.S. Law Limitation. Below, the Court further finds that other Treaty language supports Mr. Bruyea's claim in this case and addresses the meaning of the U.S. Law Limitation utilizing the relevant extrinsic evidence, per the treaty interpretation rules the Supreme Court and the Federal Circuit have instructed us to follow.

### c. Other Treaty language supports Mr. Bruyea's claim

The government's interpretation fails to explain the proviso in Clauses [2] and [3] of Article XXIV, Paragraph 1, reserving to the United States the right to "amend[]" its laws "from time to time *without changing the general principle*" of the Treaty. Canda Tax Treaty at 24 (emphasis added). The government does not adequately explain what

"general principle" the Treaty is referencing, but it seems quite clear to the Court that the Treaty refers to the "general principle" of eliminating or avoiding double taxation.

The government opposes this view, but once again engages in circular, question-begging reasoning, asserting that "the general principle cannot be broader than the language it follows in [P]aragraph (1), which requires the United States to provide foreign-tax-credit relief in accordance with its own domestic law." Def. MSJ at 35. At oral argument, the government further asserted that "[t]he 'general principle' refers to the allowance of a credit under the Code[.]" Tr. 18:11–12. According to the government, this language is a "promise . . . that the United States will not repeal the foreign tax credit provisions from the Code. That's what it promises." Tr. 19:17–19. But this reading critically assumes that the Treaty promised something impossible and, therefore, meaningless: to eliminate the "last-in-time rule." Of course, the Treaty cannot preclude the government from later repealing foreign tax credit provisions within the I.R.C. Moreover, the government's hypothesis about the meaning of the "general principle" language further critically assumes that a Treaty-based tax credit is precluded unless domestic law provides for it. But the government already has conceded that: (1) nothing in our domestic law expressly precludes a Treaty-based tax credit *per se*; and (2) Article XXIV itself contains provisions that ***are*** inconsistent with domestic law.

The government makes no attempt to reconcile those concessions with its frankly incredible assertion that the U.S. Law Limitation means that the Treaty "does not necessarily provide U.S. taxpayers with rights beyond those already provided by the Code[.]" Def. MSJ at 36 (arguing that "Article XXIV(1) of the Treaty need not provide rights to taxpayers beyond those in the Code"). In using the word "necessarily" without further explanation, the government confirms this Court's suspicion that the government is engaged in an *ad hoc* interpretation of the U.S. Law Limitation; it means whatever the government wants it to, depending on the paragraph. And if the government is correct that the Treaty provides nothing "beyond . . . the Code," *id.*, the Treaty accomplishes… what, precisely? The government's approach — that Paragraph 1 of Article XXIV may well give nothing beyond the I.R.C. — may render Article XXIV entirely inoperative,[20]

---

[20] *See* Tr. 17:17–23 ("**THE COURT:** But if [Paragraph 1 of Article XXIV] were inconsistent with the Code, [the Treaty provision] would give nothing. . . . [I]t [would] really all come[] down to the Code. The Code either provides for a credit or it doesn't. **[GOVERNMENT COUNSEL]:** You are correct, Your Honor, that Paragraph 1 does not give anything beyond the Code…."). That is an inexplicable position, as a matter of basic textual interpretation principles, and one that is inconsistent, in any event, with the government's own concessions, as explained *supra*.

which is exactly what the government accuses Mr. Bruyea of doing to the U.S. Law Limitation.

Accordingly, this Court agrees with Mr. Bruyea: "If Defendant's position were accepted, it is hard to understand what Defendant contends is the purpose of Article XXIV(1). If this provision simply states that domestic law governs the allowance of a foreign tax credit, the article would have no independent purpose or effect in contravention of the fundamental rules of U.S. legal interpretation." Pl. MSJ at 38.

In any event, the Court does not read that "the general principle" language as "broader" than the U.S. Law Limitation, but rather as an interpretive rule to say this: *where the United States enacts a later tax code provision, the "general principle" of eliminating or avoiding double taxation should be effectuated* (*i.e.*, unless the "last-in-time rule" requires otherwise because there is a direct conflict). Indeed, if Congress wants to override treaty obligations where there is a possible inconsistency with a statute — as opposed to a direct conflict governed by the "last-in-time rule" — Congress knows how to do that. *See, e.g.*, 26 U.S.C. § 7874(f) ("Special rule for treaties.--Nothing in section 894 or 7852(d) or in any other provision of law shall be construed as permitting an exemption, by reason of any treaty obligation of the United States heretofore or hereafter entered into, from the provisions of this section."). The Court's approach avoids the government's *ipse dixit* and gives meaning to the "the general principle" phrase, which, in the Court's view, clearly refers to the principle of eliminating or avoiding double taxation — a principle that the government, contrary to the Treaty, entirely disregards.

Finally, the government admits that the Treaty's definition of "United States tax" includes the NIIT. Def. MSJ at 32 n. 13 ("Defendant does not disagree with plaintiff's position . . . that the NIIT is a 'covered tax' under Article II(3) of the Treaty."). Now, if anything is sufficiently specific from which the Court may draw a conclusion, *that* definition *is an express* provision that is at least as specific as Paragraphs 3-6 of Article XXIV and certainly far clearer than the inference the government wants this Court to draw from the placement of the NIIT outside of I.R.C. Chapter 1. Again, the Treaty also provides that it "shall apply also to . . . any taxes identical or *substantively similar* to those taxes to which the Convention applies under paragraph 2 [of Article II]." *Id.* at 3 (emphasis added) (Art. II, ¶ 3(a)). This language covers the NIIT and the government offers no response.

26
**Appx27**

### 2.   The extrinsic evidence supports Mr. Bruyea's interpretation of the Treaty

The government — contradicting its broad reading of the U.S. Law Limitation within Paragraph 1 — asserts that "[t]he fact that certain other provisions of the Treaty, such as Article XXIV(5), may in certain circumstances provide benefits to taxpayers that would not otherwise be allowed by the Code does not mean that the 'provisions' and 'limitations' language may be read out of [Article XXIV] paragraph (1)."  Def. MSJ at 34.

There are three problems with that argument.

First, the Court notes that the government once again concedes that Article XXIV *does* contain provisions that are binding and provide benefits to taxpayers even though they conflict with the I.R.C.

Second, the government's assertion is a strawman.  The government is correct that the U.S. Law Limitation must be given meaning, but we now know that it simply cannot be read as broadly as the government insists; at least not if the provision is going to have a consistent meaning throughout Article XXIV (given the government's own view of the Treaty provisions in Paragraph 3–6 of Article XXIV that the government agrees conflict with United States law).

Third, Mr. Bruyea's interpretation of the Treaty sits comfortably alongside the disputed U.S. Law Limitation language.  To explain how, we must refer, as both parties do, to the extrinsic evidence.  The extrinsic evidence not only generally supports Mr. Bruyea's claim to a Treaty-based tax credit but also provides a plausible answer regarding what the parties intended with the U.S. Law Limitation.

### a.   The Technical Explanation

The Technical Explanation of the Treaty "is an official guide to the Convention" published by the Treasury Department.  *See* ECF No. 18-3 at 1 (Treasury Department Technical Explanation of the Convention Between the Government of the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington, D.C. on September 26, 1980, as Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984).  Both parties rely on it.  Pl. MSJ at 36–37; Def. MSJ at 44–46.  It answers three critical questions.

**Appx28**

First, what taxes does the Treaty cover?  The Technical Explanation of Article II indicates that the Treaty "shall apply . . . in the case of the United States, to the Federal income taxes imposed by the Internal Revenue Code."  ECF No. 18-3 at 2.  The Technical Explanation notes that the Treaty expressly excludes particular United States taxes, such as "the estate, gift, and generation-skipping transfer taxes, the Windfall Profits Tax, Federal unemployment taxes, social security taxes imposed under sections 1401, 3101, and 3111 of the Code, and the excise tax on insurance premiums imposed under Code section 4371."  *Id.*  More significantly — and consistent with the plain language of Article II, Paragraph 3 — the Technical Explanation makes clear that the Treaty may apply to future taxes no matter where they are located in the I.R.C.:

> Paragraph 3 provides that the Convention also applies to any taxes identical or *substantially similar to the taxes on income in existence on September 26, 1980* which are imposed *in addition to* or in place of *the taxes existing on that date*.  Similarly, taxes on capital imposed *after that date* are to be covered.

*Id.* at 3 (emphasis added); *see also id.* at 4 (addressing Paragraph 1(d) of Article III).  The Court once again notes that the government concedes that the NIIT is a "Federal income tax" and a "United States tax" as the Treaty defines those terms.  Def. MSJ at 32 n. 13 ("Defendant does not disagree with plaintiff's position (at 11-12) that the NIIT is a 'covered tax' under Article II(3) of the Treaty.").

Second, does Paragraph 1 of Article XXIV contain a mere truism that gives United States citizens nothing, as the government at times has suggested?  The Technical Explanation answers that question squarely in the negative: "Paragraph 1 provides the general *rules* that will apply under the Convention with respect to foreign tax credits for Canadian taxes paid or accrued."  ECF No. 18-3 at 37 (emphasis added).  The Technical Explanation clearly supports Mr. Bruyea's claim: "The United States undertakes to allow a citizen . . . of the United States . . . a credit against the Federal income taxes imposed by the Code for the appropriate amount of income tax paid or accrued to Canada."  *Id.*

Third, how should we read the critical language in the U.S. Law Limitation?  According to the Treasury Department, the parties intended something very specific:

> The direct and deemed-paid credits *allowed by paragraph 1* are subject to the limitations of the Code as they may be amended

from time to time without changing the general principle of paragraph 1. Thus, as is generally the case under U.S. income tax conventions, provisions such as Code sections 901(c), 904, 905, 907, 908, and 911 apply *for purposes of computing* the allowable credit under paragraph 1. In addition, the United States is not required to maintain the overall limitation currently provided by U.S. law.

ECF No. 18-3 at 37 (emphasis added).

We learn several things from the Technical Explanation: (1) the Treaty, by its terms, covers the NIIT even though it was enacted later; (2) Paragraph 1 of Article XXIV itself contains "rules" and commits the United States to allowing its citizens credits "against the federal income taxes imposed by the [I.R.C.] for taxes paid to Canada"; (3) Paragraph 1 of Article XXIV contains no suggestion that it was intended to limit in any way the type of United States tax to which a foreign tax credit might apply; and (4) consistent with United States law, particular I.R.C. provisions may be appropriately utilized to compute the quantum of the tax credit.

Any remaining contention that a taxpayer is not entitled to any Treaty-based credit unless the I.R.C. provides for it is flatly refuted by the Technical Explanation in two different ways.

First, the Technical Explanation advises this:

The term "income tax paid or accrued" is defined in paragraph 7 of Article XXIV to include certain specified taxes which are paid or accrued. The Convention only provides a credit for amounts paid or accrued. The determination of whether an amount is paid or accrued is made under the Code. **Paragraph 1 provides a credit for these specified taxes whether or not they qualify as creditable under Code section 901 or 903**.

ECF No. 18-3 at 37 (emphasis added). Whatever is meant by "these specified taxes," it is perfectly clear the parties intended that Paragraph 1 **of the Treaty** "provides a credit"

even if those taxes do "not . . . qualify as creditable under [I.R.C.] 901 or 903." *Id.* This alone is a complete refutation of the government's overall position.

Second, the Technical Explanation refers to "[a] taxpayer who claims **credit under the Convention** for Canadian taxes **made creditable solely by paragraph 1**." *Id.* (emphasis added). This, too, is a QED in Mr. Bruyea's favor. The government does not address any of this language in its briefs.

Finally, the Technical Explanation indicates that "[t]he rules of Paragraph 1" of Article XXIV must be construed in concert with the "rules in paragraphs 4 and 5." ECF No. 18-3 at 43 ("The rules of paragraph 1 are modified in certain respects by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada."). That is the government's position, *see supra* note 19, and, again, the Court takes no issue with that straightforward proposition. But the point yields the government no advantage as there is no suggestion that there is any limitation — in Paragraphs 4 and 5 — regarding the type of "United States tax" to which a Paragraph 1, 4, or 5 credit may apply. In other words, so long as the NIIT qualifies as a "United States tax," which the government concedes is this case here, the Treaty provides for the claimed credit.

### b. Other extrinsic evidence supports Mr. Bruyea's claim

The Letter of Submittal from the President to the United States Senate, seeking its "advice and consent to ratification," ECF No. 18-4 at 2, also supports Mr. Bruyea's case. The Transmittal Letter explains that the Treaty "contains a *rule . . .* for *eliminating double taxation* of United States citizens who are residents in Canada." *Id.* at 4 (emphasis added). The purpose of the Treaty — at least in the President's contemporaneous view — could not be clearer and we are instructed to take it into account. *Water Splash,* 581 U.S. at 281 (considering a report that the President included when transmitting a treaty to the United States Senate for consideration and explaining that "[t]he Court also gives 'great weight' to 'the Executive Branch's interpretation of a treaty'" (quoting *Abbott,* 560 U.S. at 15)). The Joint Committee on Taxation's explanation of the Treaty, ECF No. 18-5 ("JCT Explanation"), similarly explains that "[t]he *principal purposes* of the proposed income tax treaty between the United States and Canada is to reduce *or eliminate* double taxation of income earned by citizens and residents of either county from sources within the other country[.]" ECF No. 18-5 at 7 (emphasis added).

**Appx31**

The JCT Explanation also clarifies that the Treaty provides for a foreign tax credit independent of the I.R.C., noting that "[t]he U.S. foreign tax credit *provided for by the treaty* is to be applied on a per-country basis: that is, Canadian taxes will only be permitted to offset U.S. tax imposed on Canadian income." *Id.* at 11 (emphasis added). Indeed, that "*contrasts* with the Code limitation which is computed on an overall, worldwide basis." *Id.* (emphasis added).

And here's another total refutation of the government's position from the JCT Explanation: "[T]he treaty's rules are used *only if the taxes are not creditable under the Code.*" *Id.* (emphasis added). The JCT Explanation expressly acknowledges that the Treaty "will apply to substantially similar taxes *which either country may subsequently impose.*" ECF No. 18-5 at 16 (emphasis added).

While the JCT Explanation *does* comment that "[t]he credit is provided . . . only to the extent permitted under domestic law[,]" that means that "[t]he credit is *to be computed* in accordance with the provisions of and subject to the limitations of U.S. law." ECF No. 18-5 at 40 (emphasis added). Note that this language contains the same phrase as the U.S. Law Limitation, upon which the government primarily relies, but is explained to reflect that it references computation, and not general allowability. This dovetails nicely, and is consistent, with the Technical Evaluation's referencing specific I.R.C. provisions that could be employed to compute the quantum of any Treaty-based credit (but that do not themselves nullify such a credit). Thus, in the same section, the JCT Explanation references the "use[] [of] the Treaty credit," *id.*, as well as a taxpayer's "claiming benefits under the treaty not available under the [I.R.C. ,]" *id.* at 40-41.

The JCT Explanation directly addresses Mr. Bruyea's claim and supports it: "The proposed treaty also contains special rules for U.S. citizens who are residents of Canada. . . .  [T]he United States will allow the citizen a credit *against his U.S. tax for any tax paid to Canada* after Canda has allowed the credit for U.S. taxes." ECF No. 18-5 at 42 (emphasis added). Note the expansive language — "U.S. tax" without limitation — and the lack of any limitation based on the I.R.C.

Finally, the government relies on the Technical Explanation of the 2006 U.S. model treaty, Def. MSJ at 26 (discussing ECF No. 20-13), but that document also provides support for Mr. Bruyea. It notes that "the United States will allow a credit to its citizens and residents in accordance with the Article, *even if such credit were to provide a benefit not available under the [I.R.C.].*" ECF No. 20-13 at 6 (emphasis added).

**Appx32**

### 3.   Other interpretive principles support Mr. Bruyea's claim

As noted above, this Court must also account for Canada's view, as "[t]he 'opinions of our sister signatories,' . . . are 'entitled to considerable weight.'"  *El Al Israel Airlines,* 525 U.S. at 176 (quoting *Air France,* 470 U.S. at 404).  Here, Canada has indicated that Mr. Bruyea is entitled to the Treaty-based tax credit he seeks.  ECF No. 18-6 ("The position of the Canadian competent authority in this regard is that Canada, as the country of source, has the right to tax the gain, while the US, as the country which has residual taxation rights, must provide relief in accordance with Article XXIV of the Convention.").

The Supreme Court further instructs that "'where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred[.]'"  *Stuart*, 489 U.S. at 368 (quoting *Bacardi Corp.,* 311 U.S. at 163 (citations omitted)).  The Court sees no reason to disregard that principle here and it clearly favors Mr. Bruyea, just as it did the plaintiff in *Christensen*.  *See Christensen*, 168 Fed. Cl. at 333 (discussing *Stuart* and following the Supreme Court's instruction that a "liberal interpretation" of tax treaties is warranted).

### 4.   Treasury's own regulatory explanations refute the government's policy-based objections

The government asserts that recognizing "a Treaty-based allowance of foreign tax credits against the NIIT would require the creation of a brand new, parallel, foreign-tax credit regime not contemplated by the Code[.]"  Def. MSJ at 56.  Thus, argues the government, "[t]he absence of any such methodology in the Code suggests strongly that Congress did not contemplate the application of foreign tax credits against the NIIT."  *Id.*  The government's objection, in essence, is that the precise methodology for calculating Mr. Bruyea's claimed credit is not clear in the I.R.C. and thus this Court should infer no such credit may be claimed.

For starters, the government already has agreed that this computational question may be decided after the entitlement issue the parties' motions for summary judgment presents for resolution.  Indeed, the computation problem is a non-issue at this stage of the case because "[t]he parties have agreed at this stage to defer any computation issues pending the outcome of this motion for partial summary judgment."  Pl. Rep. at 18 n.11; *see also* Def. MSJ at 50 (explaining that "the parties have reserved questions regarding the computation of a foreign tax credit until after the Court has resolved the parties' dispute regarding the availability of a foreign tax credit in any amount").

Moreover, the government's objection, by its own admission, is overblown. In the final regulation implementing the NIIT, the Treasury Department and IRS agreed that there is no *per se* obstacle to a treaty-based credit applying to the NIIT:

> The Treasury Department and the IRS also received comments asking whether United States income tax treaties may provide an independent basis to credit foreign income taxes against the section 1411 tax. The Treasury Department and the IRS do not believe that these regulations are an appropriate vehicle for guidance with respect to specific treaties. An analysis of each United States income tax treaty would be required to determine whether the United States would have an obligation under that treaty to provide a credit against the section 1411 tax for foreign income taxes paid to the other country.

Net Investment Income Tax, 78 Fed. Reg. 72394-01, 72396, 2013 WL 6222406 (Dec. 2, 2013). The clear and necessary implication is that a treaty-based credit *may* apply to the NIIT and, thus, that the NIIT's placement in Chapter 2A of the I.R.C. (*i.e.*, outside of Chapter 1) does not preclude a foreign tax credit.

The Court recognizes that the very same Federal Register commentary reads the U.S. Law Limitation as precluding "an independent basis for a credit against the section 1411 tax." *Id.* But particularly in the absence of any explanation of that assertion — persuasive or otherwise — that addresses the canons of treaty interpretation, the extrinsic evidence, and the other interpretive difficulties this Court analyzed above but which the government fails to answer, this Court declines to afford Treasury's view any deference. *See, e.g., Loper Bright Enterprises v. Raimondo*, -- U.S. --, 144 S. Ct. 2244, 2266 (2024) (concluding that "agencies have no special competence in resolving statutory ambiguities" and that "[t]he Framers . . . expected that courts would resolve them by exercising independent legal judgment"). And to be clear, there are no actual regulatory provisions Treasury or IRS promulgated that address the issues in this case.

**Appx34**

## VI. REDUX

Given the relative complexity of the parties' contentions and arguments, the Court provides this basic summary of its decision:

1. The United States and Canada entered a tax treaty: the Convention between Canada and the United States of America with Respect to Taxes on Income and on Capital.

2. Based upon that Treaty, Mr. Bruyea claims he is entitled to a foreign tax credit to be applied against the NIIT he paid to the United States.

3. The Treaty provides in Paragraph 1 of Article XXIV that "the United States *shall allow* to a citizen or resident of the United States . . . *as a credit against the United States tax on income* the appropriate amount of income tax paid or accrued to Canada . . . ."

4. The Treaty similarly provides in Paragraph 4 of Article XXIV that "for the purposes of computing the United States tax, *the United States shall allow as a credit against **United States tax** the income tax paid or accrued to Canada.*"

5. The government agrees that, in general, a taxpayer may claim a treaty-based foreign tax credit — *i.e.,* the I.R.C. does *not* have to implement a treaty-based tax credit for one to exist.

6. The government nevertheless argues that the I.R.C. only provides for foreign tax credits against income taxes contained within Chapter 1 of the I.R.C. Because Congress placed the NIIT in Chapter 2A of the I.R.C., no foreign tax credit may be applied against the NIIT. This is for two reasons: (a) because the NIIT was enacted after the Treaty, the NIIT's terms and placement in Chapter 2A trump the Treaty pursuant to the "last-in-time rule"; and (b) pursuant to the Treaty's terms, any Treaty-based foreign tax credit must be "[i]n accordance with the provisions and subject to the limitations of the law of the United States." In that regard, Mr. Bruyea agrees that the I.R.C. does not provide for the foreign tax credit he seeks.

7. The government's "last-in-time" argument fails because the Court is required to harmonize the Treaty and the I.R.C. where possible, and here it is possible to do so; the NIIT contains no text specifically and expressly inconsistent with the Treaty-based foreign tax credit language upon which Mr. Bruyea relies.

8. More importantly, the government concedes that Article XXIV of the Treaty contains several paragraphs that are incompatible with the I.R.C. but that are *not* trumped by the I.R.C. Thus, the government does not read the phrase "[i]n accordance with the provisions and subject to the limitations of the law of the United States" (the U.S. Law Limitation clause) to mean that Treaty provisions must be consistent with the I.R.C. to be enforceable. That phrase must be read

**Appx35**

consistently across Article XXIV, but the government does not do so. Instead, the government sometimes applies it (*i.e.*, to preclude Mr. Bruyea's claimed foreign tax credit) and sometimes does not (*i.e.*, the government implements the credit calculation rules contained within Paragraphs 3-6, even though they are inconsistent with the U.S. Law Limitation). As a result, the Court rejects the government's overly-broad reading of that provision.

9. The parties in the Treaty defined "United States tax" in a manner that covers the NIIT and further agreed that "[t]he Convention shall apply also to . . . any taxes identical or *substantively similar* to those taxes to which the Convention applies under paragraph 2 [of Article II]." These Treaty terms support Mr. Bruyea's claim.

10. One purpose of the Treaty is to eliminate or avoid double taxation and Mr. Bruyea's interpretation best effectuates that purpose of the parties to the Treaty.

11. Mr. Bruyea's interpretation also better accounts for the extrinsic evidence, which substantiates that the parties contemplated Treaty-based foreign tax credits even where inconsistent with the I.R.C.

12. The U.S. Law Limitation clause is focused on how a Treaty-based credit is computed but not its existence. Thus, the Treaty may provide for a tax credit even where the I.R.C. does not otherwise effectuate that credit.

## VII. CONCLUSION

For the foregoing reasons, Mr. Bruyea is entitled to partial summary judgment on the issue of entitlement to a Treaty-based foreign tax credit for his 2015 tax year. *See* RCFC 56. On or before January 16, 2025, the parties shall file a joint status report regarding how this case should proceed.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge

# In the United States Court of Federal Claims

No. 23-766T

(Filed:  January 17, 2025)

| | |
|---|---|
| **PAUL BRUYEA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

### ORDER

Pursuant to the parties' agreement contained in their January 16, 2025, joint status report, ECF No. 32, the Clerk of this Court is directed to enter the following judgment:[1]

> **IT IS ORDERED AND ADJUDGED** this date, pursuant to Rule 58, that plaintiffs recover from the United States the following amount: For plaintiff's income-tax year ended December 31, 2015, an overpayment of income tax in the amount of $263,462.00, with statutory interest on such overpayment pursuant to section 6611 of the Internal Revenue Code.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge

---

[1] The parties further agreed that this judgment is without prejudice to the parties' rights to notice an appeal of any judgment, opinion, or order entered in the above-captioned case.

Query   Reports   Utilities   Help   Log Out

APPEAL,CLOSED,ECF

# US Court of Federal Claims
# United States Court of Federal Claims (COFC)
# CIVIL DOCKET FOR CASE #: 1:23-cv-00766-MHS

BRUYEA v. USA
Assigned to: Judge Matthew H. Solomson
Demand: $263,000
Case in other court: 25-01563
Cause: 28:1491 Tucker Act

Date Filed: 05/25/2023
Date Terminated: 01/17/2025
Jury Demand: None
Nature of Suit: 212 Tax - Income, Individual
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**PAUL BRUYEA**                    represented by   **Stuart Evan Horwich**
                                                    Horwich Law LLP
                                                    20 Old Bailey
                                                    5th Floor
                                                    London
                                                    United Kingdom of Great Britain and
                                                    Northern Irela
                                                    442080578013
                                                    Fax: 3028611411
                                                    Email: seh@horwichlaw.co.uk
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**                            represented by   **Jason Bergmann**
                                                    U.S. Department of Justice
                                                    P.O. Box 26
                                                    Washington, DC 20044
                                                    (202) 616-3425
                                                    Fax: (202) 514-9440
                                                    Email: jason.bergmann@usdoj.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/25/2023 | 1 | **SEALED**COMPLAINT against USA (TRE) (Filing fee $402, Receipt number AUSFCC-8741046) (Copy Served Electronically on Department of Justice), filed by PAUL BRUYEA. **Answer due by 7/24/2023.** (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit, # 3 Exhibit)(vds) Modified on 5/26/2023 - *Defendant served via SecureZip email to the U.S. Department of Justice, Tax Division.* (hw1). (Entered: 05/25/2023) |
| 05/25/2023 | 2 | PROPOSED REDACTED DOCUMENT, filed by PAUL BRUYEA. Redaction of 1 Complaint, FILED UNDER SEAL. (Attachments: # 1 Exhibit, # 2 Exhibit) Service: |

| | | |
|---|---|---|
| | | 5/25/2023.(vds) Modified on 5/26/2023 - *Defendant served via SecureZip email to the U.S. Department of Justice, Tax Division.* (hw1). Modified on 6/5/2023 to unseal document (vds). (Entered: 05/25/2023) |
| 05/25/2023 | 3 | MOTION to Seal Document 1 Complaint, filed by PAUL BRUYEA. Service: 5/25/2023. **Response due by 6/8/2023.**(vds) (Entered: 05/25/2023) |
| 05/25/2023 | 4 | Notice of Random Assignment Pursuant to Rule 40.1(a) to Judge Matthew H. Solomson. (vds) (Entered: 05/25/2023) |
| 05/25/2023 | 5 | NOTICE of Designation of Electronic Case. (vds) (Entered: 05/25/2023) |
| 05/25/2023 | 6 | ORDER granting 3 Motion to Seal Document. **The parties shall meet-and-confer regarding the proposed redacted complaint and either file a joint status report or a new, agreed-upon redacted complaint on or before June 5, 2023.** Signed by Judge Matthew H. Solomson. (cmb) Service on parties made. (Entered: 05/25/2023) |
| 06/04/2023 | 7 | NOTICE of Appearance by Jason Bergmann for USA . (Bergmann, Jason) (Entered: 06/04/2023) |
| 06/05/2023 | 8 | JOINT STATUS REPORT , filed by All Plaintiffs. (Horwich, Stuart) (Entered: 06/05/2023) |
| 06/05/2023 | | ORDER: Pursuant to the Court's 6 Order Granting Motion to Seal Document and the parties' 8 Joint Status Report, **the Court directs the Clerk of the Court to unseal the previously-filed 2 Proposed Redacted Complaint and its exhibits.** Signed by Judge Matthew H. Solomson. (cmb) Service on parties made. (Entered: 06/05/2023) |
| 06/07/2023 | 9 | First MOTION to Transfer to Court of Federal Claims, filed by All Plaintiffs.**Response due by 6/21/2023.**(Horwich, Stuart) (Entered: 06/07/2023) |
| 06/12/2023 | 10 | RESPONSE to 9 First MOTION to Transfer to Court of Federal Claims , filed by USA.**Reply due by 6/20/2023.** (Bergmann, Jason) (Entered: 06/12/2023) |
| 06/20/2023 | 11 | REPLY to Response to Motion re 9 First MOTION to Transfer to Court of Federal Claims , filed by All Plaintiffs. (Horwich, Stuart) (Entered: 06/20/2023) |
| 06/21/2023 | 12 | ORDER denying 9 Plaintiff's Motion to Transfer to Judge Horn of this Court. Signed by Judge Matthew H. Solomson. (cmb) Service on parties made. (Entered: 06/21/2023) |
| 07/24/2023 | 13 | Unopposed MOTION for Extension of Time until September 22, 2023 to File Response as to 1 Complaint, , filed by USA.**Response due by 8/7/2023.**(Bergmann, Jason) (Entered: 07/24/2023) |
| 07/24/2023 | | ORDER granting 13 Unopposed MOTION for Extension of Time until September 22, 2023 to File its Response as to 1 Complaint. **Defendant's Answer due by 9/22/2023.** Signed by Judge Matthew H. Solomson. (si) Service on parties made. (Entered: 07/24/2023) |
| 09/25/2023 | 14 | Unopposed MOTION for Leave to File Attached Unopposed Motion for Extension of Time to Respond to Complaint Out of Time , filed by USA.**Response due by 10/10/2023.** (Attachments: # 1 Unopposed Motion for Extension of Time)(Bergmann, Jason) (Entered: 09/25/2023) |
| 09/26/2023 | | ORDER granting Motion for Leave to File Out of Time. **Defendant's Answer due by October 6, 2023.** Signed by Judge Matthew H. Solomson. (tf) Service on parties made. (Entered: 09/26/2023) |
| 10/06/2023 | 15 | ANSWER to 1 Complaint, , filed by USA.**JPSR due by 11/24/2023.**(Bergmann, Jason) (Entered: 10/06/2023) |

**Appx39**

| 11/27/2023 | 16 | JOINT PRELIMINARY STATUS REPORT , filed by USA. (Bergmann, Jason) (Entered: 11/27/2023) |
|---|---|---|
| 01/02/2024 | 17 | SCHEDULING ORDER: **Plaintiff's motion for summary judgment is due on or before February 15, 2024. Government's cross-motion for summary judgment and response to Plaintiff's motion are due on or before March 22, 2024. Plaintiff's response to Government's cross motion and reply brief are due on or before April 12, 2024. Government's reply brief is due on or before May 3, 2024. Fact discovery closes June 7, 2024.** Signed by Judge Matthew H. Solomson. (ab) Service on parties made. (Entered: 01/02/2024) |
| 02/14/2024 | 18 | MOTION for Partial Summary Judgment , filed by All Plaintiffs. **Response due by 3/13/2024.** (Attachments: # 1 Memorandum In Support, # 2 Appendix Canada Treaty Including Protocols, # 3 Appendix Technical Explanation to Canada Treaty, # 4 Appendix Letter of Submittal of Canada Treaty, # 5 Appendix Joint Committee Report, # 6 Exhibit Canada Revenue Letter, # 7 Exhibit Competent Authority Request, # 8 Exhibit Marriage Certificate, # 9 Exhibit 2015 Canada Tax Return, # 10 Exhibit IRS Examination Report, # 11 Exhibit Protest, # 12 Exhibit Formal Claim Disallowance)(Horwich, Stuart) (Entered: 02/14/2024) |
| 03/18/2024 | 19 | Unopposed MOTION for Extension of Time until March 29, 2024 to File Response as to 18 MOTION for Partial Summary Judgment *and Cross-Motion for Summary Judgment*, filed by USA. **Response due by 4/1/2024.** (Bergmann, Jason) (Entered: 03/18/2024) |
| 03/20/2024 | 20 | ORDER granting 19 unopposed motion for extension of time. **The government shall file its cross-motion for summary judgment and its response to Plaintiff's 18 motion for partial summary judgment on or before March 29, 2024. Plaintiff's response and reply are due on or before April 19, 2024. The government's reply is due on or before May 10, 2024.** Signed by Judge Matthew H. Solomson. (ab) Service on parties made. (Entered: 03/20/2024) |
| 03/29/2024 | 20 | CROSS MOTION and RESPONSE to 18 Motion for Partial Summary Judgment,, filed by PAUL BRUYEA, filed by USA. **Response due by 4/26/2024.** (Attachments: # 1 Brief in Support of Cross-Motion for Summary Judgment and in Response to Plaintiff's Partial Summary Judgment Motion, # 2 Exhibit A - US Canada Treaty (through 2007), # 3 Exhibit B - US Canada Convention & Protocols 1-4, # 4 Exhibit C - US Canada Protocol 5, # 5 Exhibit D - Joint Committee Explanation (JCS-48-41), # 6 Exhibit E - Tax Treaties, Hearing Senate Comm Foreign Relations, # 7 Exhibit F - Senate Exec Rep 98-22, # 8 Exhibit G - 1984 Technical Explanation to US Canada Treaty, # 9 Exhibit H - 1981 US Model Income Tax Convention, # 10 Exhibit I - 1996 US Model Income Tax Convention, # 11 Exhibit J - 2006 US Model Income Tax Convention, # 12 Exhibit K - Tech. Exp. to 1996 US Model Income Tax Convention, # 13 Exhibit L - Tech. Exp. to 2006 US Model Income Tax Convention, # 14 Exhibit M - Table of Contents, Internal Revenue Code (2015), # 15 Exhibit N - Suringa, BNA, # 16 Exhibit O - Hellkamp & Dilanni-Morton, Tax Notes, # 17 Exhibit P - Kellar & Browne, BNA, # 18 Exhibit Q - ALI, Proposals on US Income Tax Treaties)(Bergmann, Jason) (Entered: 03/29/2024) |
| 04/11/2024 | 21 | MOTION for Extension of Time to File Reply as to 20 CROSS MOTION and RESPONSE to 18 Motion for Partial Summary Judgment,, filed by PAUL BRUYEA , filed by All Plaintiffs. **Response due by 4/25/2024.** (Horwich, Stuart) (Entered: 04/11/2024) |
| 04/11/2024 | | ORDER granting 21 Plaintiff's unopposed motion for extension of time to file its reply as to 20 cross motion and response to 18 motion for partial summary judgment. **Plaintiff's response and reply are due on or before April 26, 2024. Defendant's reply is due on or before May 20, 2024.** Signed by Judge Matthew H. Solomson. (ab) Service on parties made. (Entered: 04/11/2024) |

**Appx40**

| 04/26/2024 | 22 | REPLY to Response to Motion re 20 CROSS MOTION and RESPONSE to 18 Motion for Partial Summary Judgment,, filed by PAUL BRUYEA , filed by All Plaintiffs. (Attachments: # 1 Appendix)(Horwich, Stuart) (Entered: 04/26/2024) |
| 05/10/2024 | 23 | Unopposed MOTION for Leave to File Corrected Documents , filed by USA.**Response due by 5/24/2024.** (Attachments: # 1 Corrected Brief in Support of Cross Motion for Summary Judgment and in Response to Plaintiff's Partial Summary Judgment Motion, # 2 Corrected Exhibit C (Protocol No. 5 to U.S.-Canada Income Tax Treaty))(Bergmann, Jason) (Entered: 05/10/2024) |
| 05/10/2024 | | ORDER granting 23 Motion for Leave to File Corrected Documents. Signed by Judge Matthew H. Solomson. (ab) Service on parties made. (Entered: 05/10/2024) |
| 05/14/2024 | 24 | AMENDED DOCUMENT, filed by USA. Amendment to 20 CROSS MOTION and RESPONSE to 18 Motion for Partial Summary Judgment,, filed by PAUL BRUYEA *Corrected Brief of the United States in Support of its Cross-Motion for Summary Judgment and in Response to Plaintiff's Partial Summary Judgment Motion.* (Attachments: # 1 Exhibit Corrected Protocol No. 5 to U.S-Canada Tax Treaty (Ex. C))(Bergmann, Jason) (Entered: 05/14/2024) |
| 05/15/2024 | 25 | Unopposed MOTION for Extension of Time until May 22, 2024 to File Reply as to 20 CROSS MOTION and RESPONSE to 18 Motion for Partial Summary Judgment,, filed by PAUL BRUYEA , filed by USA.**Response due by 5/29/2024.**(Bergmann, Jason) (Entered: 05/15/2024) |
| 05/16/2024 | | ORDER granting 25 Motion for Extension of Time to File Reply. **Defendant shall file its reply on or before May 22, 2024.** Signed by Judge Matthew H. Solomson. (ab) Service on parties made. (Entered: 05/16/2024) |
| 05/22/2024 | 26 | REPLY to Response to Motion re 20 CROSS MOTION and RESPONSE to 18 Motion for Partial Summary Judgment,, filed by PAUL BRUYEA , filed by USA. (Bergmann, Jason) (Entered: 05/22/2024) |
| 07/31/2024 | | **ORDER setting oral argument on 18 Motion for Partial Summary Judgment for 10:00 AM on September 17, 2024, at the Howard T. Markey National Courts Building in Washington, D.C.** Signed by Judge Matthew H. Solomson. (ab) Service on parties made. (Entered: 07/31/2024) |
| 08/02/2024 | | Scheduled Proceeding Hearing Set: REPORTER PRESENT. Oral Argument set for 9/17/2024 10:00 AM in Courtroom 4 before Judge Matthew H. Solomson. (tb) (Entered: 08/02/2024) |
| 09/05/2024 | | Scheduled Proceeding Hearing Set: REPORTER PRESENT. Oral Argument set for 9/19/2024 10:00 AM in Courtroom 4 before Judge Matthew H. Solomson. (tb) (Entered: 09/05/2024) |
| 09/05/2024 | | ORDER setting oral argument on 18 Motion for Partial Summary Judgment for 10:00 AM on September 19, 2024, at the Howard T. Markey National Courts Building in Washington, D.C Signed by Judge Matthew H. Solomson. (sl) Service on parties made. (Entered: 09/05/2024) |
| 09/19/2024 | | Minute Entry - Was the proceeding sealed to the public? No. If Yes, only parties to the case may order a copy of the transcript. Oral Argument held in Washington, DC on 9/19/2024 before Judge Matthew H. Solomson. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE.(si) (Entered: 09/19/2024) |

**Appx41**

| 09/23/2024 | 27 | Notice of Filing Certified Transcript for proceedings held on September 19, 2024 in Washington, D.C. (ac7) (Entered: 09/23/2024) |
| 09/23/2024 | 28 | CERTIFIED TRANSCRIPT of proceedings held on September 19, 2024 before Judge Matthew H. Solomson. Total No. of Pages: 1-130. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 9/30/2024. Redacted Transcript Deadline set for 10/21/2024. Release of Transcript Restriction set for 12/19/2024. (ac7) (Entered: 09/23/2024) |
| 10/15/2024 | 29 | ORDER: Plaintiff's motion for partial summary judgment, ECF No. 18, appears to be missing a table of contents or index for its attachments. Accordingly, and as detailed in the Order, on or before Friday, October 18, 2024, Plaintiff shall file either: (1) a status report, indicating where the Court may locate the required table of contents for the appended materials; or (2) a supplement to its motion, containing an appropriate table of contents. Signed by Judge Matthew H. Solomson. (sl) Service on parties made. (Entered: 10/15/2024) |
| 10/16/2024 | 30 | MOTION to Supplement Pleadings - Rule 15(d) re: 18 MOTION for Partial Summary Judgment , filed by All Plaintiffs.**Response due by 10/30/2024.**(Horwich, Stuart) (Entered: 10/16/2024) |
| 12/05/2024 | 31 | REPORTED OPINION: Granting 18 Plaintiff's Motion for Partial Summary Judgment; denying 20 Defendant's Cross-Motion for Summary Judgment. On or before January 16, 2025, the parties shall file a joint status report regarding how this case should proceed. Signed by Judge Matthew H. Solomson. (sl) Service on parties made. (Entered: 12/05/2024) |
| 01/08/2025 | | Remark: Request for an audio CD of the 9/19/2024 proceeding along with the accompanying check in the amount of $34.00 is returned this date to Daniel N. Price. **Served via certified mail #9589 0710 5270 0773 5803 17 on 1/8/2025. (aoc) Modified on 1/8/2025 to correct docket text (aoc). (Entered: 01/08/2025)** |
| 01/16/2025 | 32 | JOINT STATUS REPORT , filed by USA. (Bergmann, Jason) (Entered: 01/16/2025) |
| 01/17/2025 | 33 | Unreported Order: The Clerk is directed to enter judgment as specified and pursuant to the parties' agreement. Signed by Judge Matthew H. Solomson. (sl) Service on parties made. (Entered: 01/17/2025) |
| 01/17/2025 | 34 | JUDGMENT entered pursuant to Rule 58, that plaintiff recover of and from the United States the following amount: for plaintiff's income-tax year ended December 31, 2015, an overpayment of income tax in the amount of $263,462.00, with statutory interest on such overpayment pursuant to section 6611 of the Internal Revenue Code.(Service on parties made.) (ar) (Entered: 01/17/2025) |
| 01/27/2025 | 35 | Certified copy of judgment forwarded to DOJ tax division via first class mail this day. (lld) (Entered: 02/21/2025) |
| 03/17/2025 | 36 | NOTICE OF APPEAL as to 34 Judgment,, filed by USA. Filing fee $ 605. Copy to CAFC. (Bergmann, Jason) (Entered: 03/17/2025) |
| 03/18/2025 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 36 Notice of Appeal. (ac7) (Entered: 03/18/2025) |
| 03/20/2025 | | CAFC Case Number 2025-1563 for 36 Notice of Appeal filed by USA. (ac7) (Entered: 03/20/2025) |

**Appx42**

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/24/2025 14:48:26 | | | |
| **PACER Login:** | tamebrid | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-00766-MHS |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

Receipt number AUSFCC-8741046

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PAUL  BRUYEA ) | |
| ) | |
| v.          ) | Civil Action No. ___23-766 T___ |
| ) | |
| ) | |
| THE UNITED STATES ) | Filed Electronically |
| ) | |

## COMPLAINT

1.      Plaintiff, Paul Bruyea is a married individual but did not file a joint return and is therefore the sole party to this action.  Plaintiff currently resides at ██████████ ████████ Banglamung Chonburi, Thailand.  The last four digits of Plaintiff's social security number are 1701.

2.      Defendant is the United States of America.

3.      This is an action for recovery of federal income tax founded upon the Internal Revenue Code of 1986 and the United States – Canada Convention with Respect to Taxes on Income and on Capital (the "Canada Tax Treaty") and this Court has jurisdiction by reason of 28 U.S.C. § 1491(a)(1).

4.      Recovery is sought of federal income tax for the taxable year ended December 31, 2015.

<u>2015 Tax Filings</u>

5.      On June 8, 2016, Plaintiff filed a timely federal income return for the year 2015 with the Internal Revenue Service Center in Charlotte, North Carolina.  Exhibit A (redacted version).

6.      On Plaintiff's 2015 tax return, Plaintiff reported a long-term capital gain of $7,074,236 from the disposition of certain real property located in Alberta, Canada.  After reporting certain other gains and losses on his 2015 tax return, Plaintiff reported net long-term capital gains of $7,010,078.

**Appx44**

7.      Plaintiff also reported on his 2015 tax return interest income of $648, dividend income of $1,600 and rental real estate income of $47,497.

8.      Plaintiff incurred a regular tax liability of $1,398,683 on the income and gains set forth in paragraphs 6 and 7, *supra*.

9.      On a Form 8960 (Net Investment Income Tax – Individuals, Estates, and Trusts), Plaintiff reported a total of $7,059,823 of investment income consisting of the income set forth in paragraphs 6 and 7, *supra*, of which $6,934,823 was above a $125,000 net investment income tax threshold (the "NIIT Threshold") for married individuals filing separate returns.  Plaintiff duly reported $263,523 of net investment income tax  (the "NIIT") which equals 3.8% of Plaintiff's net investment income above the NIIT Threshold.

10.     In 2015, Plaintiff was a resident of British Columbia, Canada.  Plaintiff incurred both Canadian federal and British Columbia provincial income tax (together, the "Canadian Tax") on his income.  Plaintiff paid a total of Cdn$2,498,098.40 of Canadian Tax for the 2015 calendar year (equivalent of U.S.$1,953,513), of which Plaintiff claimed a foreign tax credit of $1,398,683 to offset the regular U.S. tax liability set forth in paragraph 8, *supra*.  The remaining $554,942 of Canadian Tax, plus a carryover of $96,443 of Canadian Tax from earlier years (together, the "Excess Credits"), did not offset any other U.S. regular income tax on Plaintiff's original 2015 tax return.

11.     On Plaintiff's original 2015 tax return, Plaintiff also did not claim a foreign tax credit to offset the NIIT.

12.     On November 7, 2016, Plaintiff filed an amended tax return (Form 1040X) with the Internal Revenue Service Center in Austin, Texas, claiming a refund of $263,523 by virtue of a foreign tax credit that offsets the NIIT and using a portion of the Excess Credits.  Exhibit B

2

**Appx45**

(redacted version). The foreign tax credit claim is based on the provisions of Article XXIV of the Canada Tax Treaty which allows for a treaty based foreign tax credit even when such a foreign tax credit is not otherwise allowed under U.S. statutory foreign tax credit provisions.

13.     The Internal Revenue Service (the "IRS") selected the Plaintiff's Form 1040X for examination. On July 13, 2018, the IRS concluded its examination of the 2015 Form 1040X, accepting that sufficient foreign tax credits existed to offset the NIIT. The IRS examination unit nonetheless proposed a full disallowance of the requested refund, asserting that the Canada Tax Treaty did not provide an independent basis for a foreign tax credit to offset the NIIT and that such a foreign tax credit is not allowed under U.S. statutory foreign tax credit rules.

14.     Plaintiff administratively appealed the IRS examination unit's denial of the requested refund to the IRS Appeals Office (the "Appeals Office") by submitting a formal protest dated August 16, 2018 (the "Protest"). On October 1, 2018, the Appeals Office submitted a response disagreeing with the position taken in the Protest. Plaintiff replied to the Appeals Office on November 12, 2018 maintaining that a treaty-based foreign tax credit is available. The Appeals Office responded on February 11, 2019, again disagreeing with Plaintiff's position. On February 14, 2019, Plaintiff had a formal Appeals Conference with IRS Appeals Agent Lance Rodrigues ("Mr. Rodrigues").

15.     On February 25, 2019, Plaintiff invoked the "Simultaneous Appeal Procedure" pursuant to which he sought the opinions of the U.S. and the Canadian competent authorities to resolve a situation in which double taxation is present (*i.e.* Canadian income tax and U.S. NIIT on the same items of income and gain with no foreign tax credit offset available). On August 16, 2019, Mr. Rodrigues wrote to Plaintiff to confirm that the case was "in suspense, as we (Appeals) are waiting on response from [the Treaty Assistance and Interpretation Team]". On April 19, 2023,

3

## Appx46

IRS Appeals Agent Edwin Jhun, who took over the case from Mr. Rodrigues, wrote to Plaintiff and indicated that the matter was still pending with no formal decision being taken between the U.S. and Canadian competent authority representatives.

Competent Authority Proceedings

16.     As indicated above, Plaintiff invoked a competent authority procedure with the IRS in accordance with the formal requirements contained in Rev. Proc. 2015-40.  Such a competent authority request accords with the "mutual agreement procedures" contained in Article XXVI(1) of the Canada Tax Treaty.  A copy of the submissions to the U.S. and Canadian competent authorities was also sent to the Appeals Office.

17.     On March 5, 2019, Plaintiff contacted the Canadian competent authority to request its assistance in resolving the issue of whether a foreign tax credit should be allowed under the terms of the Canada Tax Treaty to offset the NIIT levied against the Plaintiff.

18.     In the submission to the Canadian competent authority, Plaintiff claimed:

   a.     The NIIT is a tax covered under Article II of the Canada Tax Treaty.

   b.     One of the principal purposes of the Canada Tax Treaty is to eliminate double taxation, which is precisely what is occurring in this case.

   c.     Article XXIV(1) of the Canada Tax Treaty provides an independent basis for a credit against the NIIT.

   d.     Article XXIV(4)(b) provides an independent basis for a credit against the NIIT.

   e.     The Canada Tax Treaty provides independent foreign tax credits to Canadian resident US citizens, such as Plaintiff, which do not exist under U.S. statutory law.

19.     Based on information and belief, Plaintiff understands that the Canadian tax authorities agree with Plaintiff's position that the NIIT is a tax covered under the terms of the Canada Tax

Appx47

Treaty, that Article XXIV of the Canada Tax Treaty provides an independent basis for a foreign tax credit, that the IRS's position results in impermissible double taxation and, therefore, that the United States should allow Plaintiff a foreign tax credit in these circumstances.

20.    Having failed to secure relief from double taxation through a refund claim, an examination, an administrative appeal, and a country-to-country discussion, Plaintiff now brings this refund suit.

21.    For the reasons stated above, Plaintiff asserts that he is entitled to a refund of the NIIT that he paid in the amount of $263,523 for the 2015 tax year.

WHEREFORE, Plaintiff demands judgment in the amount of $263,523.00 for the 2015 tax year, plus interest and costs allowed by law, and such other relief as the Court may deem just and appropriate.

Respectfully submitted

s/ Stuart E Horwich_____
Stuart E Horwich
Horwich Law LLP
20 Old Bailey, 5th Floor
London, EC4M 7AN, United Kingdom
011 44 208 057 8013 (phone)
302 861 1411 (fax)
seh@horwichlaw.com
Counsel for Plaintiffs

s/ Max Reed_____
Max  Reed
Polaris Tax Counsel
1788 West Broadway, Suite 900
Vancouver, British Columbia
BC V6J 1Y1  Canada
(604) 283 9301
max@polaristax.com
Dated:  May 25, 2023              Of Counsel

**Appx48**

| Form **1040X** | | | |
|---|---|---|---|
| (Rev. January 2016) | | | |

Department of the Treasury - Internal Revenue Service

# Amended U.S. Individual Income Tax Return

▶ Information about Form 1040X and its separate instructions is at *www.irs.gov/form1040x* .

OMB No. 1545-0074

**4.**

This return is for calendar year ☒ 2015 ☐ 2014 ☐ 2013 ☐ 2012
Other year. Enter one: calendar year ____ or fiscal year (month and year ended): ____

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| Paul | Bruyea | |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| | | |

Current home address (number and street). If you have a P.O. box, see instructions. | Apt. no. | Your phone number
c/o 707 Fort Street | 301 |

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
Victoria

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|
| Canada | BC | V8W 3G3 |

**Amended return filing status.** You must check one box even if you are not changing your filing status. Caution: In general, you cannot change your filing status from joint to separate returns after the due date.

☐ Single
☐ Married filing jointly
☒ Married filing separately
☐ Head of household (If the qualifying person is a child but not your dependent, see instructions.)
☐ Qualifying widow(er)

**Full-year coverage.** If all members of your household have full-year minimal essential health care coverage, check "Yes." Otherwise, check "No." (See instr.)
☐ Yes   ☒ No

| Use Part III on page 2 to explain any changes | | **A. Original amount or as previously adjusted** (see instructions) | **B. Net change -** amount of increase or (decrease) - explain in Part III | **C. Correct amount** |
|---|---|---|---|---|
| **Income and Deductions** | | | | |
| 1 Adjusted gross income. If net operating loss (NOL) carryback is included, check here ▶ ☐ | 1 | | | |
| 2 Itemized deductions or standard deduction | 2 | | | |
| 3 Subtract line 2 from line 1 | 3 | | | |
| 4 Exemptions. If changing, complete Part I on page 2 and enter the amount from line 29 | 4 | | | |
| 5 Taxable income. Subtract line 4 from line 3 | 5 | | | |
| **Tax Liability** | | | | |
| 6 Tax. Enter method(s) used to figure tax: QDCGTW; F6251 | 6 | 1,408,866. | | 1,408,866. |
| 7 Credits. If general business credit carryback is included, check here ▶ ☐ | 7 | 1,398,571. | | 1,398,571. |
| 8 Subtract line 7 from line 6. If the result is zero or less, enter -0- | 8 | 10,295. | | 10,295. |
| 9 Health care: Individual responsibility (see instructions) | 9 | | | |
| 10 Other taxes | 10 | 263,523. | -263,523. | 0. |
| 11 Total tax. Add lines 8, 9, and 10 | 11 | 273,818. | -263,523. | 10,295. |
| **Payments** | | | | |
| 12 Federal income tax withheld and excess social security and tier 1 RRTA tax withheld (If changing, see instructions.) | 12 | 240. | | 240. |
| 13 Estimated tax payments, including amount applied from prior year's return | 13 | | | |
| 14 Earned income credit (EIC) | 14 | | | |
| 15 Refundable credits from: ☐ Schedule 8812 ☐ Form(s) ☐ 2439 ☐ 4136 ☐ 8801 ☐ 8863 ☐ 8885 ☐ 8962 or ☐ other (specify): | 15 | | | |

| 16 Total amount paid with request for extension of time to file, tax paid with original return, and additional tax paid after return was filed | 16 | 273,578. |
|---|---|---|
| 17 Total payments. Add lines 12 through 16 | 17 | 273,818. |
| **Refund or Amount You Owe** | | |
| 18 Overpayment, if any, as shown on original return or as previously adjusted by the IRS | 18 | |
| 19 Subtract line 18 from line 17 (If less than zero, see instructions.) | 19 | 273,818. |
| 20 Amount you owe. If line 11, column C, is more than line 19, enter the difference | 20 | |
| 21 If line 11, column C, is less than line 19, enter the difference. This is the amount overpaid on this return | 21 | 263,523. |
| 22 Amount of line 21 you want refunded to you | 22 | 263,523. |
| 23 Amount of line 21 you want applied to your (enter year): ____ estimated tax | 23 | |

**Complete and sign this form on Page 2.**

LHA   For Paperwork Reduction Act Notice, see instructions.   510701 01-27-16   Form **1040X** (Rev. 1-2016)

Appx49

Form 1040X (Rev. 1-2016)   **Paul Bruyea**                                                                    ‒ Page 2

| Part I | Exemptions |

Complete this part only if you are increasing or decreasing the number of exemptions (personal and dependents) claimed on line 6d of the return you are amending.

| See Form 1040 or Form 1040A instructions and Form 1040X instructions. | | A. Original number of exemptions or amount reported or as previously adjusted | B. Net change | C. Correct number or amount |
|---|---|---|---|---|
| 24 Yourself and spouse. Caution: If someone can claim you as a dependent, you cannot claim an exemption for yourself ......... | 24 | | | |
| 25 Your dependent children who lived with you ................... | 25 | | | |
| 26 Your dependent children who did not live with you due to divorce or separation ......... | 26 | | | |
| 27 Other dependents ........................................ | 27 | | | |
| 28 Total number of exemptions. Add lines 24 through 27 ......... | 28 | | | |
| 29 Multiply the number of exemptions claimed on line 28 by the exemption amount shown in the instructions for line 29 for the year you are amending. Enter the result here and on line 4 on page 1 of this form ......... | 29 | | | |

**30** List ALL dependents (children and others) claimed on this amended return. If more than 4 dependents, see instructions.

| (a) First name | Last name | (b) Dependent's social security number | (c) Dependent's relationship to you | (d) Check box if qualifying child for child tax credit |
|---|---|---|---|---|
| | | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |

| Part II | Presidential Election Campaign Fund |

Checking below will not increase your tax or reduce your refund.

☐ Check here if you did not previously want $3 to go to the fund, but now do.
☐ Check here if this is a joint return and your spouse did not previously want $3 to go to the fund, but now does.

| Part III | Explanation of changes. In the space provided below, tell us why you are filing Form 1040X. |

► Attach any supporting documents and new or changed forms and schedules.

**The return is amended to relieve the taxpayer of double taxation that arises from Net Investment Income Tax. See attached form 8833.**

**Sign Here**
**Remember to keep a copy of this form for your records.**
Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information about which the preparer has any knowledge.

► _____     _____     ► _____     _____
Your signature                                        Date                        Spouse's signature. If a joint return, both must sign.    Date

**Paid Preparer Use Only**

► _____     _____     **Cameron Izard Snell**
Preparer's signature                                  Date                        Firm's name (or yours if self-employed)

**Angus Izard**                                                          **#301 - 707 Fort St**
                                                                         **Victoria, BC V8W 3G3 Canada**

| Print/type preparer's name | | ☐ Check if self-employed | Firm's address and ZIP code |
| ▮▮▮▮ 2639 | | | (250) 381-2288      ▮▮▮▮ 0119 |
| PTIN | | | Phone number          EIN |

910002
01-27-16   For forms and publications, visit IRS.gov.                                              Form 1040X (Rev. 1-2016)

6114 Disclosure

| Form **1040** | U.S. Individual Income Tax Return | (99) | **2015** | OMB No. 1545-0074 | IRS Use Only - Do not write or staple in this space. |

For the year Jan. 1-Dec. 31, 2015, or other tax year beginning , 2015, ending , 20 | See separate instructions.

| Your first name and initial | Last name | Your social security number |
| Paul | Bruyea | |

| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see instructions. | Apt. no.
c/o 707 Fort Street | 301

▲ Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below.
Victoria

Presidential Election Campaign
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

| Foreign country name | Foreign province/state/county | Foreign postal code |
| Canada | BC | V8W 3G3 |

**Filing Status**
Check only one box.

1 ☐ Single
2 ☐ Married filing jointly (even if only one had income)
3 ☒ Married filing separately. Enter spouse's SSN above and full name here. ▶ Laura Nguyen Bruyea
4 ☐ Head of household (with qualifying person). If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a ..............
b ☐ Spouse

Boxes checked on 6a and 6b | 1
No. of children on 6c who:

c Dependents:

| (1) First name Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit |
| | | | |
| | | | |
| | | | |
| | | | |

• lived with you
• did not live with you due to divorce or separation (see instructions)

Dependents on 6c not entered above

If more than four dependents, see instructions and check here ▶ ☐

d Total number of exemptions claimed ..............

Add numbers on lines above ▶ | 1

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 ...................... | 7 | |
| 8a | Taxable interest. Attach Schedule B if required ...................... | 8a | 648. |
| b | Tax-exempt interest. Do not include on line 8a ......... | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required ...................... | 9a | 1,600. |
| b | Qualified dividends ......... | 9b | 1,600. | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes ...................... | 10 | |
| 11 | Alimony received ...................... | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ ...................... | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | 7,010,078. |
| 14 | Other gains or (losses). Attach Form 4797 ...................... | 14 | |
| 15a | IRA distributions ......... | 15a | | b Taxable amount | 15b | |
| 16a | Pensions and annuities ......... | 16a | | b Taxable amount | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | 47,497. |
| 18 | Farm income or (loss). Attach Schedule F ...................... | 18 | |
| 19 | Unemployment compensation ...................... | 19 | |
| 20a | Social security benefits ......... | 20a | 20,421. | b Taxable amount | 20b | 0. |
| 21 | Other income. List type and amount | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 7,059,823. |

**Adjusted Gross Income**

| 23 | Educator expenses | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 ......... | 25 | |
| 26 | Moving expenses. Attach Form 3903 ......... | 26 | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE ......... | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans ......... | 28 | |
| 29 | Self-employed health insurance deduction ......... | 29 | |
| 30 | Penalty on early withdrawal of savings ......... | 30 | |
| 31a | Alimony paid b Recipient's SSN ▶ | 31a | |
| 32 | IRA deduction ......... | 32 | |
| 33 | Student loan interest deduction ......... | 33 | |
| 34 | Tuition and fees. Attach Form 8917 ......... | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 ......... | 35 | |
| 36 | Add lines 23 through 35 ...................... | 36 | |
| 37 | Subtract line 36 from line 22. This is your adjusted gross income ▶ | 37 | 7,059,823. |

510001
12-30-15

LHA **For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.** Form **1040** (2015)

Form 1040 (2015)  Paul Bruyea  Page 2

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) | 38 | 7,059,823. |

Standard Deduction for—
● People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions.

39a Check if: [X] You were born before January 2, 1951, ☐ Blind. Total boxes ☐ Spouse was born before January 2, 1951, ☐ Blind. checked ► 39a | 1

b If your spouse itemizes on a separate return or you were a dual-status alien, check here ► 39b ☐

| 40 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | 40 | 7,550. |
|---|---|---|---|
| 41 | Subtract line 40 from line 38 | 41 | 7,052,273. |
| 42 | Exemptions. If line 38 is $154,950 or less, multiply $4,000 by the number on line 6d. Otherwise, see inst. | 42 | 0. |
| 43 | Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | 43 | 7,052,273. |
| 44 | Tax. Check if any from: a ☐ Form(s) 8814 b ☐ Form 4972 c ☐ | 44 | 1,398,683. |
| 45 | Alternative minimum tax. Attach Form 6251 | 45 | 10,183. |
| 46 | Excess advance premium tax credit repayment. Attach Form 8962 | 46 | |
| 47 | Add lines 44, 45, and 46 | 47 | 1,408,866. |

● All others:
Single or Married filing separately, $6,300
Married filing jointly or Qualifying widow(er), $12,600
Head of household, $9,250

| 48 | Foreign tax credit. Attach Form 1116 if required | 48 | 1,398,571. | | |
|---|---|---|---|---|---|
| 49 | Credit for child and dependent care expenses. Attach Form 2441 | 49 | | | |
| 50 | Education credits from Form 8863, line 19 | 50 | | | |
| 51 | Retirement savings contributions credit. Attach Form 8880 | 51 | | | |
| 52 | Child tax credit. Attach Schedule 8812, if required | 52 | | | |
| 53 | Residential energy credits. Attach Form 5695 | 53 | | | |
| 54 | Other credits from Form: a ☐ 3800 b ☐ 8801 c ☐ | 54 | | | |
| 55 | Add lines 48 through 54. These are your total credits | | | 55 | 1,398,571. |
| 56 | Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- | | | 56 | 10,295. |

| **Other Taxes** | 57 | Self-employment tax. Attach Schedule SE | 57 | |
|---|---|---|---|---|
| | 58 | Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | 58 | |
| | 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 59 | |
| | 60a | Household employment taxes from Schedule H | 60a | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required | 60b | |
| | 61 | Health care: Individual responsibility (see instructions) Full-year coverage ☐ | 61 | |
| | 62 | Taxes from: a ☐ Form 8959 b ☐ Form 8960 c ☐ Inst.; enter code(s) | 62 | |
| | 63 | Add lines 56 through 62. This is your total tax | 63 | 10,295. |

| **Payments** | 64 | Federal income tax withheld from Forms W-2 and 1099 | 64 | 240. | Statement 5 |
|---|---|---|---|---|---|
| | 65 | 2015 estimated tax payments and amount applied from 2014 return | 65 | | |

If you have a qualifying child, attach Schedule EIC.

| | 66a | Earned income credit (EIC) | 66a | | |
|---|---|---|---|---|---|
| | b | Nontaxable combat pay election | 66b | | |
| | 67 | Additional child tax credit. Attach Schedule 8812 | 67 | | |
| | 68 | American opportunity credit from Form 8863, line 8 | 68 | | |
| | 69 | Net premium tax credit. Attach Form 8962 | 69 | | |
| | 70 | Amount paid with request for extension to file | 70 | | |
| | 71 | Excess social security and tier 1 RRTA tax withheld | 71 | | |
| | 72 | Credit for federal tax on fuels. Attach Form 4136 | 72 | | |
| | 73 | Credits from Form: a ☐ 2439 b ☐ Reserved c ☐ 8885 d ☐ | 73 | | |
| | 74 | Add lines 64, 65, 66a, and 67 through 73. These are your total payments | 74 | 240. | |

| **Refund** | 75 | If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you overpaid | 75 | |
|---|---|---|---|---|
| | 76a | Amount of line 75 you want refunded to you. If Form 8888 is attached, check here ► ☐ | 76a | |

Direct deposit? See instructions.

► b Routing number ☐ ► c Type: ☐ Checking ☐ Savings ► d Account number ☐

| | 77 | Amount of line 75 you want applied to your 2016 estimated tax ► | 77 | | Statement 4 |
|---|---|---|---|---|---|
| **Amount You Owe** | 78 | Amount you owe. Subtract line 74 from line 63. For details on how to pay, see instructions ► | 78 | 10,055. | |
| | 79 | Estimated tax penalty (see instructions) | 79 | | |

**Third Party Designee** Do you want to allow another person to discuss this return with the IRS (see instructions)? [X] Yes. Complete below. ☐ No

Designee's name ►Angus Izard  Phone no. ►250-381-2288  Personal Identification number (PIN) ► ==

**Sign Here**
Joint return? See instructions. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature | Date | Your occupation | Daytime phone number

Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here ☐

**Paid Preparer Use Only**

Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN 2639

Firm's name ►Cameron Izard Snell  Firm's EIN ► 0119

Firm's address ►#301 - 707 Fort St
Victoria, BC V8W 3G3 Canada  Phone no. (250) 381-2288

510002 12-30-15

OMB No. 1545-1354

**Form 8833**
(Rev. December 2013)
Department of the Treasury
Internal Revenue Service

## Treaty-Based Return Position Disclosure Under Section 6114 or 7701(b)

▶ Attach to your tax return.
▶ Information about Form 8833 and its instructions is at *www.irs.gov/form8833* .

Attach a separate Form 8833 for each treaty-based return position taken. Failure to disclose a treaty-based return position may result in a penalty of $1,000 ($10,000 in the case of a C corporation) (see section 6712).

| Name | U.S. taxpayer identifying number | Reference ID number, if any (see instr.) |
|---|---|---|
| Paul Bruyea | | |
| **Address in country of residence** | **Address in the United States** | |
| c/o 301-707 Fort St<br>Victoria, BC V8W 3G3<br>Canada | N/A | |

Check one or both of the following boxes as applicable:

- The taxpayer is disclosing a treaty-based return position as required by section 6114 ........................................ ▶ ☒
- The taxpayer is a dual-resident taxpayer and is disclosing a treaty-based return position as required by Regulations section 301.7701(b)-7 ............................................................................................................. ▶ ☒

Note. If the taxpayer is a dual-resident taxpayer and a long-term resident, by electing to be treated as a resident of a foreign country for purposes of claiming benefits under an applicable income tax treaty, the taxpayer will be deemed to have expatriated pursuant to section 877A. For more information, see the instructions.

Check this box if the taxpayer is a U.S. citizen or resident or is incorporated in the United States ............................. ▶ ☒

| | | |
|---|---|---|
| 1 | Enter the specific treaty relied on: | 3  Name, identifying number (if available to the taxpayer), and address in the United States of the payor of the income (if fixed or determinable annual or periodical). See instructions. |
| a | Treaty country  Canada | |
| b | Article(s)  Article XXIV(1) | |
| 2 | List the Internal Revenue Code provision(s) overruled or modified by the treaty-based return position | |

4  List the provision(s) of the limitation on benefits article (if any) in the treaty that the taxpayer relies on to prevent application of that article ▶

5  Is the taxpayer disclosing a treaty-based return position for which reporting is specifically required pursuant to Regulations section 301.6114-1(b)? ................................................................................  ☐ Yes  ☒ No
If "Yes," enter the specific subsection(s) of Regulations section 301.6114-1(b) requiring reporting ▶
Also include the information requested in line 6.

6  Explain the treaty-based return position taken. Include a brief summary of the facts on which it is based. Also, list the nature and amount of a reasonable estimate) of gross receipts, each separate gross payment, each separate gross income item, or other item (as applicable) for which the treaty benefit is claimed

The taxpayer is a US citizen resident in Canada. The taxpayer earned rental income in Canada and had a gain on the sale of the Canadian rental property. Pursuant to Article XXIV paragraph 1 of the Canada US Income Tax Treaty where a US citizen is resident in Canada the United States shall allow as credit against US tax, amounts paid to Canada. For this purpose, US tax is defined under Article II of the Treaty. The taxpayer hereby claims a foreign tax credit of $263,523 for Canadian taxes paid to offset the net investment tax calculated on Canadian source income.

810597
04-01-16   LHA  For Paperwork Reduction Act Notice, see the instructions.

Form **8833** (Rev. 12-2013)

16

| Form **8960** | **Net Investment Income Tax –** | OMB No. 1545-2227 |
|---|---|---|
| | **Individuals, Estates, and Trusts** | **2015** |
| Department of the Treasury Internal Revenue Service (99) | ► **Attach to your tax return.** ► **Information about Form 8960 and its separate instructions is at** *www.irs.gov/form8960.* | Attachment Sequence No. 72 |

Name(s) shown on your tax return
**Paul Bruvea**

Your social security number or EIN

## Part I    Investment Income

☐ Section 6013(g) election (see instructions)
☐ Section 6013(h) election (see instructions)
☐ Regulations section 1.1411-10(g) election (see instructions)

| | | | | |
|---|---|---|---|---|
| 1 | Taxable interest (see instructions) | | **1** | 648. |
| 2 | Ordinary dividends (see instructions) | | **2** | 1,600. |
| 3 | Annuities (see instructions) | | **3** | |
| 4a | Rental real estate, royalties, partnerships, S corporations, trusts, etc. (see instructions) | **4a** 47,497. | | |
| b | Adjustment for net income or loss derived in the ordinary course of a non-section 1411 trade or business (see instructions) | **4b** | | |
| c | Combine lines 4a and 4b | | **4c** | 47,497. |
| 5a | Net gain or loss from disposition of property (see instructions) | **5a** 7,010,078. | | |
| b | Net gain or loss from disposition of property that is not subject to net investment income tax (see instructions) | **5b** | | |
| c | Adjustment from disposition of partnership interest or S corporation stock (see instructions) | **5c** | | |
| d | Combine lines 5a through 5c | | **5d** | 7,010,078. |
| 6 | Adjustments to investment income for certain CFCs and PFICs (see instructions) | | **6** | |
| 7 | Other modifications to investment income (see instructions)   *See Form 8633* | | **7** | -7,059,823. |
| 8 | Total investment income. Combine lines 1, 2, 3, 4c, 5d, 6, and 7 | | **8** | |

## Part II    Investment Expenses Allocable to Investment Income and Modifications

| | | | | |
|---|---|---|---|---|
| 9a | Investment interest expenses (see instructions) | **9a** | | |
| b | State, local, and foreign income tax (see instructions) | **9b** | | |
| c | Miscellaneous investment expenses (see instructions) | **9c** | | |
| d | Add lines 9a, 9b, and 9c | | **9d** | |
| 10 | Additional modifications (see instructions) | | **10** | |
| 11 | Total deductions and modifications. Add lines 9d and 10 | | **11** | |

## Part III    Tax Computation

| | | | | |
|---|---|---|---|---|
| 12 | Net investment income. Subtract Part II, line 11 from Part I, line 8. Individuals complete lines 13-17. Estates and trusts complete lines 18a-21. If zero or less, enter -0- | | **12** | |
| | **Individuals:** | | | |
| 13 | Modified adjusted gross income (see instructions) | **13** 7,059,823. | | |
| 14 | Threshold based on filing status (see instructions) | **14** 125,000. | | |
| 15 | Subtract line 14 from line 13. If zero or less, enter -0- | **15** 6,934,823. | | |
| 16 | Enter the smaller of line 12 or line 15 | | **16** | |
| 17 | Net investment income tax for individuals. Multiply line 16 by 3.8% (.038). Enter here and include on your tax return (see instructions) | | **17** | |
| | **Estates and Trusts:** | | | |
| 18a | Net investment income (line 12 above) | **18a** | | |
| b | Deductions for distributions of net investment income and deductions under section 642(c) (see instructions) | **18b** | | |
| c | Undistributed net investment income. Subtract line 18b from 18a (see instructions). If zero or less, enter -0- | **18c** | | |
| 19a | Adjusted gross income (see instructions) | **19a** | | |
| b | Highest tax bracket for estates and trusts for the year (see instructions) | **19b** | | |
| c | Subtract line 19b from line 19a. If zero or less, enter -0- | **19c** | | |
| 20 | Enter the smaller of line 18c or line 19c | | **20** | |
| 21 | Net investment income tax for estates and trusts. Multiply line 20 by 3.8% (.038). Enter here and include on your tax return (see instructions) | | **21** | |

LHA    **For Paperwork Reduction Act Notice, see your tax return instructions.**                Form **8960** (2015)

623121
12-10-15

OMB No. 1545-0121

| Form **1116** | **Foreign Tax Credit**<br>(Individual, Estate, or Trust)<br>▶ Attach to Form 1040, 1040NR, 1041, or 990-T.<br>▶ Information about Form 1116 and its separate instructions is at *www.irs.gov/form1116*. | **2015**<br>Attachment Sequence No. 19 |
|---|---|---|

Department of the Treasury
Internal Revenue Service  (99)

Name: Paul Bruyea

Identifying number as shown on page 1 of your tax return

Use a separate Form 1116 for each category of income listed below. See Categories of Income in the instructions. Check only one box on each Form 1116. Report all amounts in U.S. dollars except where specified in Part II below.

a [X] Passive category income
b [ ] General category income
c [ ] Section 901(j) income
d [ ] Certain income re-sourced by treaty
e [ ] Lump-sum distributions

f Resident of (name of country) ▶ Canada

Note: *If you paid taxes to only one foreign country or U.S. possession, use column A in Part I and line A in Part II. If you paid taxes to more than one foreign country or U.S. possession, use a separate column and line for each country or possession.*

## Part I  Taxable Income or Loss From Sources Outside the United States (for Category Checked Above)

| | | Foreign Country or U.S. Possession | | | Total |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | (Add cols. A, B, and C.) |
| g | Enter the name of the foreign country or U.S. possession ▶ | Canada | Other Countries | | |
| 1a | Gross income from sources within country shown above and of the type checked above: | 4,117,790. | | | 1a 4,117,790. |
| b | Check if line 1a is compensation for personal services as an employee, your total compensation from all sources is $250,000 or more, and you used an alternative basis to determine its source (see instructions) ........ ▶ [ ] | | | | |
| | **Deductions and losses (Caution: See instructions):** | | | | |
| 2 | Expenses definitely related to the income on line 1a (attach statement) | 552,881. | | | |
| 3 | Pro rata share of other deductions not definitely related: | | | | |
| a | Certain itemized deductions or standard deduction | 7,550. | 7,550. | | |
| b | Other deductions (attach statement) | 7,550. | 7,550. | | |
| c | Add lines 3a and 3b | 8,276,230. | | | |
| d | Gross foreign source income | 8,277,830. | 8,277,830. | | |
| e | Gross income from all sources | .99981 | .00000 | | |
| f | Divide line 3d by line 3e | 7,549. | | | |
| g | Multiply line 3c by line 3f | | | | |
| 4 | Pro rata share of interest expense: | | | | |
| a | Home mortgage interest (use the Worksheet for Home Mortgage Interest in the instructions) | | | | |
| b | Other interest expense | | | | |
| 5 | Losses from foreign sources | 560,430. | | | |
| 6 | Add lines 2, 3g, 4a, and 5 | 560,430. | | 6 | 560,430. |
| 7 | Subtract line 6 from line 1a. Enter the result here and on line 15, page 2 .................... ▶ | | | 7 | 3,557,360. |

## Part II  Foreign Taxes Paid or Accrued

| Country | Credit is claimed for taxes (you must check one) (h) [ ] Paid (i) [X] Accrued | In foreign currency | | | | (n)Other foreign taxes paid or accrued | In U.S. dollars | | | (r) Other foreign taxes paid or accrued | (s)Total foreign taxes paid or accrued (add cols. (o) through (r)) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Taxes withheld at source on: | | | | | Taxes withheld at source on: | | | | |
| | (j) Date paid or accrued | (k) Dividends | (l) Rents and royalties | (m) Interest | | | (o) Dividends | (p) Rents and royalties | (q) Interest | | |
| A | 12/31/15 | | 2498098 | | | | | 1953513 | | | 1953513. |
| B | | | | | | | | | | | |
| C | | | | | | | | | | | |

| 8 | Add lines A through C, column (s). Enter the total here and on line 9, page 2 ................................ ▶ | 8 | 1953513. |
|---|---|---|---|

LHA   **For Paperwork Reduction Act Notice, see instructions.**

Form **1116** (2015)

511501
11-30-16

2015.06000 Bruyea, Paul

11051104 137560 AB010

AB010___3

Form 1116 (2015)   **Paul Bruyea**

Page **2**

### Part III    Figuring the Credit

| | | | |
|---|---|---|---|
| 9 | Enter the amount from line 8. These are your total foreign taxes paid or accrued for the category of income checked above Part I | **9** | 1,953,513. |
| 10 | Carryback or carryover (attach detailed computation) .... **See Statement 10** | **10** | 21,457. |
| 11 | Add lines 9 and 10 | **11** | 1,974,970. |
| 12 | Reduction in foreign taxes *Taxes used to offset tax on Form 8960* | **12** | 263,523. |
| 13 | Taxes reclassified under high tax kickout | **13** | |
| 14 | Combine lines 11, 12, and 13. This is the total amount of foreign taxes available for credit | **14** | 1,711,447. |
| 15 | Enter the amount from line 7. This is your taxable income or (loss) from sources outside the United States (before adjustments) for the category of income checked above Part I | **15** | 3,557,360. |
| 16 | Adjustments to line 15 | **16** | 303. |
| 17 | Combine the amounts on lines 15 and 16. This is your net foreign source taxable income. (If the result is zero or less, you have no foreign tax credit for the category of income you checked above Part I. Skip lines 18 through 22. However, if you are filing more than one Form 1116, you must complete line 20.) | **17** | 3,557,663. |
| 18 | Individuals: Enter the amount from Form 1040, line 41, or Form 1040NR, line 39. Estates and trusts: Enter your taxable income without the deduction for your exemption .... **See Statement 9** | **18** | 3,557,965. |
| | Caution: *If you figured your tax using the lower rates on qualified dividends or capital gains, see instructions.* | | |
| 19 | Divide line 17 by line 18. If line 17 is more than line 18, enter "1" | **19** | .99992 |
| 20 | Individuals: Enter the amount from Form 1040, lines 44 and 46. If you are a nonresident alien, enter the amounts from Form 1040NR, lines 42 and 44. Estates and trusts: Enter the amount from Form 1041, Schedule G, line 1a, or the total of Form 990-T, lines 36 and 37 | **20** | 1,398,683. |
| | Caution: *If you are completing line 20 for separate category e (lump-sum distributions), see instructions.* | | |
| 21 | Multiply line 20 by line 19 (maximum amount of credit) | **21** | 1,398,571. |
| 22 | Enter the smaller of line 14 or line 21. If this is the only Form 1116 you are filing, skip lines 23 through 27 and enter this amount on line 28. Otherwise, complete the appropriate line in Part IV ► | **22** | 1,398,571. |

### Part IV    Summary of Credits From Separate Parts III

| | | | |
|---|---|---|---|
| 23 | Credit for taxes on passive category income | **23** | 1,398,571. |
| 24 | Credit for taxes on general category income | **24** | |
| 25 | Credit for taxes on certain income re-sourced by treaty | **25** | |
| 26 | Credit for taxes on lump-sum distributions | **26** | |
| 27 | Add lines 23 through 26 | **27** | 1,398,571. |
| 28 | Enter the smaller of line 20 or line 27 | **28** | 1,398,571. |
| 29 | Reduction of credit for international boycott operations | **29** | |
| 30 | Subtract line 29 from line 28. This is your foreign tax credit. Enter here and on Form 1040, line 48; Form 1040NR, line 46; Form 1041, Schedule G, line 2a; or Form 990-T, line 40a ► | **30** | 1,398,571. |

Form 1116 (2015)

611611
11-30-15

Appx56

| Form **1040** | U.S. Individual Income Tax Return | (99) | **2015** | OMB No. 1545-0074 | IRS Use Only - Do not write or staple in this space. |

For the year Jan. 1-Dec. 31, 2015, or other tax year beginning , 2015, ending , 20 — **See separate instructions.**

Your first name and initial: **Paul** Last name: **Bruyea** — Your social security number

If a joint return, spouse's first name and initial — Last name — Spouse's social security number

Home address (number and street). If you have a P.O. box, see instructions. **c/o 707 Fort Street** — Apt. no. **301** — ▲ Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below. **Victoria**

Presidential Election Campaign — Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

Foreign country name: **Canada** — Foreign province/state/county: **BC** — Foreign postal code: **V8W 3G3**

**Filing Status**
Check only one box.

1 ☐ Single
2 ☐ Married filing jointly (even if only one had income)
3 ☒ Married filing separately. Enter spouse's SSN above and full name here. ► **Laura Nguyen Bruyea**
4 ☐ Head of household (with qualifying person). If the qualifying person is a child but not your dependent, enter this child's name here. ►
5 ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a
b ☐ Spouse

| c Dependents: | | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ☐ if child under age 17 qualifying for child tax credit |
|---|---|---|---|---|
| (1) First name | Last name | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

If more than four dependents, see instructions and check here ► ☐

d Total number of exemptions claimed

Boxes checked on 6a and 6b: **1**
No. of children on 6c who: • lived with you • did not live with you due to divorce or separation (see instructions) Dependents on 6c not entered above
Add numbers on lines above ► **1**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | |
| 8a | Taxable interest. Attach Schedule B if required | 8a | 648. |
| b | Tax-exempt interest. Do not include on line 8a | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required | 9a | 1,600. |
| b | Qualified dividends | 9b 1,600. | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes | 10 | |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ► ☐ | 13 | 7,010,078. |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | IRA distributions 15a | b Taxable amount | 15b | |
| 16a | Pensions and annuities 16a | b Taxable amount | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | 47,497. |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation | 19 | |
| 20a | Social security benefits 20a 20,421. | b Taxable amount | 20b | 0. |
| 21 | Other income. List type and amount | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your total income ► | 22 | 7,059,823. |

**Adjusted Gross Income**

| 23 | Educator expenses | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 | 25 | |
| 26 | Moving expenses. Attach Form 3903 | 26 | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 | |
| 29 | Self-employed health insurance deduction | 29 | |
| 30 | Penalty on early withdrawal of savings | 30 | |
| 31a | Alimony paid b Recipient's SSN ► | 31a | |
| 32 | IRA deduction | 32 | |
| 33 | Student loan interest deduction | 33 | |
| 34 | Tuition and fees. Attach Form 8917 | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| 36 | Add lines 23 through 35 | 36 | |
| 37 | Subtract line 36 from line 22. This is your adjusted gross income ► | 37 | 7,059,823. |

510001
12-30-15

**LHA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**

Form **1040** (2015)

Form 1040 (2015)    **Paul Bruyea**          Page **2**

| | | | |
|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) | **38** | **7,059,823.** |

| | | |
|---|---|---|
| 39a | Check if: ☒ You were born before January 2, 1951, ☐ Blind. ☐ Spouse was born before January 2, 1951, ☐ Blind. | Total boxes checked ▶ **39a** | **1** |

Standard Deduction for –
● People who check any box on line 39a or 39b or who can be claimed as a dependent, see instructions.
● All others:
Single or Married filing separately, $6,300
Married filing jointly or Qualifying widow(er), $12,600
Head of household, $9,250

| | | | |
|---|---|---|---|
| b | If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ **39b** ☐ | | |
| 40 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | **40** | **7,550.** |
| 41 | Subtract line 40 from line 38 | **41** | **7,052,273.** |
| 42 | Exemptions. If line 38 is $154,950 or less, multiply $4,000 by the number on line 6d. Otherwise, see inst. | **42** | **0.** |
| 43 | Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | **43** | **7,052,273.** |
| 44 | Tax. Check if any from: a ☐ Form(s) 8814 b ☐ Form 4972 c ☐ | **44** | **1,398,683.** |
| 45 | Alternative minimum tax. Attach Form 6251 | **45** | **10,183.** |
| 46 | Excess advance premium tax credit repayment. Attach Form 8962 | **46** | |
| 47 | Add lines 44, 45, and 46 | **47** | **1,408,866.** |
| 48 | Foreign tax credit. Attach Form 1116 if required | 48 | 1,398,571. | |
| 49 | Credit for child and dependent care expenses. Attach Form 2441 | 49 | | |
| 50 | Education credits from Form 8863, line 19 | 50 | | |
| 51 | Retirement savings contributions credit. Attach Form 8880 | 51 | | |
| 52 | Child tax credit. Attach Schedule 8812, if required | 52 | | |
| 53 | Residential energy credits. Attach Form 5695 | 53 | | |
| 54 | Other credits from Form: a ☐ 3800 b ☐ 8801 c ☐ | 54 | | |
| 55 | Add lines 48 through 54. These are your total credits | **55** | **1,398,571.** |
| 56 | Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- ▶ | **56** | **10,295.** |

| | | | |
|---|---|---|---|
| **Other Taxes** | 57 | Self-employment tax. Attach Schedule SE | **57** | |
| | 58 | Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | **58** | |
| | 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | **59** | |
| | 60a | Household employment taxes from Schedule H | **60a** | |
| | b | First-time homebuyer credit repayment. Attach Form 5405 if required | **60b** | |
| | 61 | Health care: Individual responsibility (see instructions)    Full-year coverage ☐ | **61** | |
| | 62 | Taxes from: a ☐ Form 8959 b ☒ Form 8960 c ☐ Inst.; enter code(s) | **62** | **263,523.** |
| | 63 | Add lines 56 through 62. This is your total tax ▶ | **63** | **273,818.** |

| | | | |
|---|---|---|---|
| **Payments** | 64 | Federal income tax withheld from Forms W-2 and 1099 | 64 | 240. | **Statement 5** |

If you have a qualifying child, attach Schedule EIC.

| | | |
|---|---|---|
| 65 | 2015 estimated tax payments and amount applied from 2014 return | 65 | |
| 66a | Earned income credit (EIC) | 66a | |
| b | Nontaxable combat pay election | 66b | |
| 67 | Additional child tax credit. Attach Schedule 8812 | 67 | |
| 68 | American opportunity credit from Form 8863, line 8 | 68 | |
| 69 | Net premium tax credit. Attach Form 8962 | 69 | |
| 70 | Amount paid with request for extension to file | 70 | |
| 71 | Excess social security and tier 1 RRTA tax withheld | 71 | |
| 72 | Credit for federal tax on fuels. Attach Form 4136 | 72 | |
| 73 | Credits from Form: a ☐ 2439 b ☐ ☐ 8885 d ☐ | 73 | |
| 74 | Add lines 64, 65, 66a, and 67 through 73. These are your total payments ▶ | **74** | **240.** |

| | | | |
|---|---|---|---|
| **Refund** | 75 | If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you overpaid | **75** | |
| | 76a | Amount of line 75 you want refunded to you. If Form 8888 is attached, check here ▶ ☐ | **76a** | **Statement 4** |
| Direct deposit? See Instructions. | b | Routing number   ▶ c Type: ☐ Checking ☐ Savings ▶ d Account number | | |
| | 77 | Amount of line 75 you want applied to your 2016 estimated tax ▶ | 77 | |

| | | | |
|---|---|---|---|
| **Amount You Owe** | 78 | Amount you owe. Subtract line 74 from line 63. For details on how to pay, see instructions ▶ | **78** | **273,578.** |
| | 79 | Estimated tax penalty (see instructions) | 79 | |

| | | |
|---|---|---|
| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ Yes. Complete below. ☐ No | |
| | Designee's name ▶ **Angus Izard**    Phone no. ▶ **250-381-2288**    Personal identification number (PIN) ▶ ☐☐☐ | |

**Sign Here**
Joint return? See instructions. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature | Date | Your occupation | Daytime phone number

Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here

**Paid Preparer Use Only**

| | |
|---|---|
| Print/Type preparer's name **Angus Izard** | Preparer's signature | Date | Check ☐ if self-employed | PTIN ▇▇2639 |
| Firm's name ▶ **Cameron Izard Snell** | | Firm's EIN ▶ ▇▇0119 |
| Firm's address ▶ **#301 - 707 Fort St** **Victoria, BC V8W 3G3 Canada** | | Phone no. **(250) 381-2288** |

510002 12-30-15

| Form **8833** | **Treaty-Based Return Position Disclosure** | |
|---|---|---|
| (Rev. December 2013) | **Under Section 6114 or 7701(b)** | OMB No. 1545-1354 |
| Department of the Treasury<br>Internal Revenue Service | ▶ **Attach to your tax return.**<br>▶ **Information about Form 8833 and its instructions is at** *www.irs.gov/form8833* . | |

Attach a separate Form 8833 for each treaty-based return position taken. Failure to disclose a treaty-based return position may result in a penalty of $1,000 ($10,000 in the case of a C corporation) (see section 6712).

| Name<br><br>Paul Bruyea | U.S. taxpayer identifying number | Reference ID number, if any (see instr.) |
|---|---|---|
| Address in country of residence<br><br>c/o 707 Fort St, Apt 301<br>Victoria, British Columbia V8W 3G3<br>Canada | Address in the United States | |

Check one or both of the following boxes as applicable:

● The taxpayer is disclosing a treaty-based return position as required by section 6114 ............................................................. ▶ ☒

● The taxpayer is a dual-resident taxpayer and is disclosing a treaty-based return position as required by Regulations section 301.7701(b)-7 ............................................................................................................. ▶ ☐

**Note.** If the taxpayer is a dual-resident taxpayer and a long-term resident, by electing to be treated as a resident of a foreign country for purposes of claiming benefits under an applicable income tax treaty, the taxpayer will be deemed to have expatriated pursuant to section 877A. For more information, see the instructions.

Check this box if the taxpayer is a U.S. citizen or resident or is incorporated in the United States ........................................ ▶ ☒

| | | |
|---|---|---|
| **1** | Enter the specific treaty position relied on: | **3** Name, identifying number (if available to the taxpayer), and address in the United States of the payor of the income (if fixed or determinable annual or periodical). See instructions. |
| **a** | Treaty country **Canada** | |
| **b** | Article(s) **Article XVIII(5)** | |
| **2** | List the Internal Revenue Code provision(s) overruled or modified by the treaty-based return position | **Govt of USA** |
| | **Sec 86** | |

**4** List the provision(s) of the limitation on benefits article (if any) in the treaty that the taxpayer relies on to prevent application of that article ▶

**5** Is the taxpayer disclosing a treaty-based return position for which reporting is specifically required pursuant to Regulations section 301.6114-1(b)? .................................................................................... ☐ Yes ☒ No
If "Yes," enter the specific subsection(s) of Regulations section 301.6114-1(b) requiring reporting ▶
Also include the information requested in line 6.

**6** Explain the treaty-based return position taken. Include a brief summary of the facts on which it is based. Also, list the nature and amount (or a reasonable estimate) of gross receipts, each separate gross payment, each separate gross income item, or other item (as applicable) for which the treaty benefit is claimed

$20,080 of benefits from U.S. Social Security.

The taxpayer is a U.S. citizen resident in Canada. Pursuant to a treaty $20,080 of income received in the year from U.S. Social Security is exempt from U.S. taxation.

| | | |
|---|---|---|
| 519201<br>04-01-15 | LHA For Paperwork Reduction Act Notice, see the instructions. | Form **8833** (Rev. 12-2013) |

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010___1

**SCHEDULE B**
(Form 1040A or 1040)
Department of the Treasury
Internal Revenue Service (99)

# Interest and Ordinary Dividends

▶ Attach to Form 1040A or 1040.
▶ Information about Schedule B and its instructions is at *www.irs.gov/scheduleb*.

OMB No. 1545-0074

**2015**
Attachment
Sequence No. 08

Name(s) shown on return

Paul Bruyea

Your social security number

| Part I<br>Interest | 1 | List name of payer. If any interest is from a seller-financed mortgage and the buyer used the property as a personal residence, see instructions and list this interest first. Also, show that buyer's social security number and address ▶ | | Amount | |
|---|---|---|---|---|---|
| | | Bank of Nova Scotia | | 333. | |
| | | Bank of Nova SCotia | | 315. | |
| Note: If you received a Form 1099-INT, Form 1099-OID, or substitute statement from a brokerage firm, list the firm's name as the payer and enter the total interest shown on that form. | | | 1 | | |
| | 2 | Add the amounts on line 1 | 2 | 648. | |
| | 3 | Excludable interest on series EE and I U.S. savings bonds issued after 1989. Attach Form 8815 | 3 | | |
| | 4 | Subtract line 3 from line 2. Enter the result here and on Form 1040A, or Form 1040, line 8a ▶ | 4 | 648. | |

Note: If line 4 is over $1,500, you must complete Part III.

| Part II<br>Ordinary<br>Dividends | 5 | List name of payer ▶ | | Amount | |
|---|---|---|---|---|---|
| | | Scotia Capital | | 1,600. | |
| Note: If you received a Form 1099-DIV or substitute statement from a brokerage firm, list the firm's name as the payer and enter the ordinary dividends shown on that form. | | | 5 | | |
| | 6 | Add the amounts on line 5. Enter the total here and on Form 1040A, or Form 1040, line 9a ... ▶ | 6 | 1,600. | |

Note: If line 6 is over $1,500, you must complete Part III.

| Part III<br>Foreign<br>Accounts<br>and<br>Trusts | You must complete this part if you (a) had over $1,500 of taxable interest or ordinary dividends; (b) had a foreign account; or (c) received a distribution from, or were a grantor of, or a transferor to, a foreign trust. | Yes | No |
|---|---|---|---|
| | 7a At any time during 2015, did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country? See instructions | X | |
| | If "Yes," are you required to file FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR), to report that financial interest or signature authority? See FinCEN Form 114 and its instructions for filing requirements and exceptions to those requirements | X | |
| | b If you are required to file FinCEN Form 114, enter the name of the foreign country where the financial account is located ........ ▶ Canada | | |
| | 8 During 2015, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust? If "Yes," you may have to file Form 3520. See instructions | | X |

527501
09-24-15

LHA For Paperwork Reduction Act Notice, see your tax return instructions.

Schedule B (Form 1040A or 1040) 2015

13

12050501 137560 AB010                    2015.03040 Bruyea, Paul                    AB010___1

| SCHEDULE D<br>(Form 1040)<br>Department of the Treasury<br>Internal Revenue Service (99) | **Capital Gains and Losses**<br>▶ Attach to Form 1040 or Form 1040NR.<br>▶ Information about Schedule D and its separate instructions is at *www.irs.gov/scheduled* .<br>▶ Use Form 8949 to list your transactions for lines 1b, 2, 3, 8b, 9, and 10. | OMB No. 1545-0074<br>**2015**<br>Attachment<br>Sequence No. **12** |
|---|---|---|

Name(s) shown on return

**Paul Bruyea**

Your social security number

### Part I  Short-Term Capital Gains and Losses - Assets Held One Year or Less

| See instructions for how to figure the amounts to enter on the lines below.<br><br>This form may be easier to complete if you round off cents to whole dollars. | (d)<br>Proceeds<br>(sales price) | (e)<br>Cost<br>(or other basis) | (g)<br>Adjustments<br>to gain or loss from<br>Form(s) 8949, Part I,<br>line 2, column (g) | (h) Gain or (loss)<br>Subtract column (e)<br>from column (d) and<br>combine the result<br>with column (g) |
|---|---|---|---|---|
| 1a | Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b | | | | |
| 1b | Totals for all transactions reported on Form(s) 8949 with Box A checked ................. | | | | |
| 2 | Totals for all transactions reported on Form(s) 8949 with Box B checked ................. | | | | |
| 3 | Totals for all transactions reported on Form(s) 8949 with Box C checked ................. | 1,154,500. | 1,216,577. | | <62,077.> |

| 4 | Short-term gain from Form 6252 and short-term gain or (loss) from Forms 4684, 6781, and 8824 ................. | 4 | |
| 5 | Net short-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 ................. | 5 | |
| 6 | Short-term capital loss carryover. Enter the amount, if any, from line 8 of your Capital Loss Carryover Worksheet in the instructions ................. | 6 | ( ) |
| 7 | Net short-term capital gain or (loss). Combine lines 1a through 6 in column (h). If you have any long-term capital gains or losses, go to Part II below. Otherwise, go to Part III on page 2 ................. | 7 | <62,077.> |

### Part II  Long-Term Capital Gains and Losses - Assets Held More Than One Year

| See instructions for how to figure the amounts to enter on the lines below.<br><br>This form may be easier to complete if you round off cents to whole dollars. | (d)<br>Proceeds<br>(sales price) | (e)<br>Cost<br>(or other basis) | (g)<br>Adjustments<br>to gain or loss from<br>Form(s) 8949, Part II,<br>line 2, column (g) | (h) Gain or (loss)<br>Subtract column (e)<br>from column (d) and<br>combine the result<br>with column (g) |
|---|---|---|---|---|
| 8a | Totals for all long-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 8b | | | | |
| 8b | Totals for all transactions reported on Form(s) 8949 with Box D checked ................. | | | | |
| 9 | Totals for all transactions reported on Form(s) 8949 with Box E checked ................. | | | | |
| 10 | Totals for all transactions reported on Form(s) 8949 with Box F checked ................. | 313,853. | 315,934. | | <2,081.> |

| 11 | Gain from Form 4797, Part I; long-term gain from Forms 2439 and 6252; and long-term gain or (loss) from Forms 4684, 6781, and 8824  **See Statement 6** | 11 | 7,074,236. |
| 12 | Net long-term gain or (loss) from partnerships, S corporations, estates, and trusts from Schedule(s) K-1 ................. | 12 | |
| 13 | Capital gain distributions ................. | 13 | |
| 14 | Long-term capital loss carryover. Enter the amount, if any, from line 13 of your Capital Loss Carryover Worksheet in the instructions ................. | 14 | ( ) |
| 15 | Net long-term capital gain or (loss). Combine lines 8a through 14 in column (h). Then go to Part III on page 2 ................. | 15 | 7,072,155. |

LHA   For Paperwork Reduction Act Notice, see your tax return instructions.

Schedule D (Form 1040) 2015

520511
12-09-15

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010__1

Schedule D (Form 1040) 2015  Paul Bruyea

Page 2

| Part III | Summary |

16  Combine lines 7 and 15 and enter the result ............................................................ | **16** | **7,010,078.** |

- If line 16 is a **gain,** enter the amount from line 16 on Form 1040, line 13, or Form 1040NR, line 14. Then go to line 17 below.
- If line 16 is a **loss,** skip lines 17 through 20 below. Then go to line 21. Also be sure to complete line 22.
- If line 16 is **zero,** skip lines 17 through 21 below and enter -0- on Form 1040, line 13, or Form 1040NR, line 14. Then go to line 22.

17  Are lines 15 and 16 **both** gains?
☒ **Yes.** Go to line 18.
☐ **No.** Skip lines 18 through 21, and go to line 22.

18  Enter the amount, if any, from line 7 of the **28% Rate Gain Worksheet** in the instructions ................ ▶ | **18** | |

19  Enter the amount, if any, from line 18 of the **Unrecaptured Section 1250 Gain Worksheet** in the instructions ................................................................................................ ▶ | **19** | |

20  Are lines 18 and 19 both zero or blank?
☒ **Yes.** Complete the **Qualified Dividends and Capital Gain Tax Worksheet** in the instructions for Form 1040, line 44 (or in the instructions for Form 1040NR, line 42). Do not complete lines 21 and 22 below.

☐ **No.** Complete the **Schedule D Tax Worksheet** in the instructions. Do not complete lines 21 and 22 below.

21  If line 16 is a loss, enter here and on Form 1040, line 13, or Form 1040NR, line 14, the smaller of:

- The loss on line 16 or
- ($3,000), or if married filing separately, ($1,500) | } | .......................................... | **21** | ( ) |

**Note:** When figuring which amount is smaller, treat both amounts as positive numbers.

22  Do you have qualified dividends on Form 1040, line 9b, or Form 1040NR, line 10b?

☐ **Yes.** Complete the **Qualified Dividends and Capital Gain Tax Worksheet** in the instructions for Form 1040, line 44 (or in the instructions for Form 1040NR, line 42).

☐ **No.** Complete the rest of Form 1040 or Form 1040NR.

Schedule D (Form 1040) 2015

| Form **8949** | | **Sales and Other Dispositions of Capital Assets** | | | | OMB No. 1545-0074 | |
|---|---|---|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | ▶ Information about Form 8949 and its separate Instructions is at *www.irs.gov/form8949*. ▶ File with your Schedule D to list your transactions for lines 1b, 2, 3, 8b, 9, and 10 of Schedule D. | | | | **2015** Attachment Sequence No. **12A** | |

Name(s) shown on return

Paul Bruyea

Social security number or taxpayer Identification no.

*Before you check Box A, B, or C below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.*

**Part I** | **Short-Term.** Transactions involving capital assets you held 1 year or less are short-term. For long-term transactions, see page 2.

Note: You may aggregate all short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 1a; you aren't required to report these transactions on Form 8949 (see instructions).

You must check Box A, B, or C below. Check only one box. If more than one box applies for your short-term transactions, complete a separate Form 8949, page 1, for each applicable box. If you have more short-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

☐ (A) Short-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see Note above)

☐ (B) Short-term transactions reported on Form(s) 1099-B showing basis was not reported to the IRS

☒ (C) Short-term transactions not reported to you on Form 1099-B

| 1 (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold or disposed of (Mo., day, yr.) | (d) Proceeds (sales price) | (e) Cost or other basis. See the Note below and see *Column (e)* in the instructions | (f) Code(s) | (g) Amount of adjustment | (h) Gain or (loss). Subtract column (e) from column (d) & combine the result with column (g) |
|---|---|---|---|---|---|---|---|
| 4000 BMO | 11/15/15 | 12/17/15 | 224,210. | 227,112. | | | <2,902.> |
| 4000 CIBC | 11/15/15 | 12/17/15 | 269,996. | 301,075. | | | <31,079.> |
| 17000 TD | 11/15/15 | 12/17/15 | 660,294. | 688,390. | | | <28,096.> |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **2** Totals. Add the amounts in columns (d), (e), (g) and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, line 1b (if Box A above is checked), line 2 (if Box B above is checked), or line 3 (if Box C above is checked) ▶ | | | 1154500. | 1216577. | | | <62,077.> |

Note: If you checked Box A above but the basis reported to the IRS was incorrect, enter in column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See *Column (g)* in the separate instructions for how to figure the amount of the adjustment.

523011 12-02-15   LHA  **For Paperwork Reduction Act Notice, see your tax return instructions.**

Form **8949** (2015)

16

Form 8849 (2015)

Attachment Sequence No. **12A**  Page **2**

Name(s) shown on return. Name and SSN or taxpayer Identification no. not required If shown on other side | Social security number or taxpayer Identification no.
---|---

**Paul Bruyea**

Before you check Box D, E, or F below, see whether you received any Form(s) 1099-B or substitute statement(s) from your broker. A substitute statement will have the same information as Form 1099-B. Either will show whether your basis (usually your cost) was reported to the IRS by your broker and may even tell you which box to check.

**Part II  Long-Term.** Transactions Involving capital assets you held more than 1 year are long term. For short-term transactions, see page 1.
Note: You may aggregate all long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS and for which no adjustments or codes are required. Enter the totals directly on Schedule D, line 8a; you aren't required to report these transactions on Form 8949 (see Instructions).

You must check Box D, E, or F below. Check only one box. If more than one box applies for your long-term transactions, complete a separate Form 8949, page 2, for each applicable box. If you have more long-term transactions than will fit on this page for one or more of the boxes, complete as many forms with the same box checked as you need.

☐ **(D)** Long-term transactions reported on Form(s) 1099-B showing basis was reported to the IRS (see Note above)

☐ **(E)** Long-term transactions reported on Form(s) 1099-B showing basis was not reported to the IRS

☒ **(F)** Long-term transactions not reported to you on Form 1099-B

| 1 (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold or disposed of (Mo., day, yr.) | (d) Proceeds (sales price) | (e) Cost or other basis. See the Note below and see Column (e) in the instructions | Adjustment, if any, to gain or loss. If you enter an amount in column (g), enter a code in column (f). See instructions. (f) Code(s) | (g) Amount of adjustment | (h) Gain or (loss). Subtract column (e) from column (d) & combine the result with column (g) |
|---|---|---|---|---|---|---|---|
| 1000 WTS BANK OF AMERICA | 06/25/13 | 12/17/15 | 5,802. | 5,530. | | | 272. |
| 1000 WTS BANK OF AMERICA | 06/26/13 | 12/17/15 | 5,802. | 5,336. | | | 466. |
| 1000 WTS BANK OF AMERICA | 06/27/13 | 12/17/15 | 5,802. | 5,211. | | | 591. |
| 1000 WTS BANK OF AMERICA | 06/28/13 | 12/17/15 | 5,802. | 5,420. | | | 382. |
| 1000 WTS BANK OF AMERICA | 07/01/13 | 12/17/15 | 5,802. | 5,520. | | | 282. |
| 1000 WTS BANK OF AMERICA | 07/02/13 | 12/17/15 | 5,802. | 5,539. | | | 263. |
| 1000 WTS BANK OF AMERICA | 07/03/13 | 12/17/15 | 5,802. | 5,516. | | | 286. |
| 1000 WTS BANK OF AMERICA | 07/08/13 | 12/17/15 | 5,802. | 5,632. | | | 170. |
| 1000 WTS BANK OF AMERICA | 07/09/13 | 12/17/15 | 5,802. | 5,432. | | | 370. |
| 1000 WTS BANK OF AMERICA | 07/10/13 | 12/17/15 | 5,802. | 5,525. | | | 277. |
| 10000 WTS BANK OF AMERICA | 07/24/13 | 12/17/15 | 58,016. | 63,661. | | | <5,645.> |
| 12000 WTS BANK OF AMERICA | 07/25/14 | 12/17/15 | 69,619. | 92,152. | | | <22,533.> |
| 2000 MORGAN STANLEY | 07/02/13 | 10/23/15 | 64,099. | 50,080. | | | 14,019. |
| 2000 MORGAN STANLEY | 07/24/13 | 10/23/15 | 64,099. | 55,380. | | | 8,719. |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**2  Totals.** Add the amounts In columns (d), (e), (g) and (h) (subtract negative amounts). Enter each total here and include on your Schedule D, line 8b (If Box D above Is checked), line 9 (If Box E above Is checked), or line 10 (If Box F above Is checked) ▶ | 313,853. | 315,934. | | <2,081.>

Note: If you checked Box D above but the basis was reported to the IRS was incorrect, enter In column (e) the basis as reported to the IRS, and enter an adjustment in column (g) to correct the basis. See Column (g) In the separate Instructions for how to figure the amount of the adjustment.

523012 12-02-15

Form **8949** (2015)

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010__1

**Qualified Dividends and Capital Gain Tax Worksheet - Line 44**            *Keep for Your Records*

| Name(s) shown on return | Your SSN |
|---|---|
| Paul Bruyea | |

**Before you begin:**
✓ See the Instructions for line 44 to see if you can use this worksheet to figure your tax.
✓ Before completing this worksheet, complete Form 1040 through line 43.
✓ If you do not have to file Schedule D and you received capital gain distributions, be sure you checked the box on line 13 of Form 1040.

| | | |
|---|---|---|
| 1. Enter the amount from Form 1040, line 43. However, if you are filing Form 2555 or 2555-EZ (relating to foreign earned income), enter the amount from line 3 of the Foreign Earned Income Tax Worksheet | **1.** | 7,052,273. |
| 2. Enter the amount from Form 1040, line 9b* ..... **2.** | 1,600. | |
| 3. Are you filing Schedule D?* | | |
| [X] **Yes.** Enter the smaller of line 15 or 16 of Schedule D. If either line 15 or line 16 is blank or a loss, enter -0- | **3.** | 7,010,078. |
| [ ] **No.** Enter the amount from Form 1040, line 13 | | |
| 4. Add lines 2 and 3 | **4.** | 7,011,678. |
| 5. If filing Form 4952 (used to figure investment interest expense deduction), enter any amount from line 4g of that form. Otherwise, enter -0- ... **5.** | 0. | |
| 6. Subtract line 5 from line 4. If zero or less, enter -0- | **6.** | 7,011,678. |
| 7. Subtract line 6 from line 1. If zero or less, enter -0- | **7.** | 40,595. |
| 8. Enter: | | |
| $ 37,450 if single or married filing separately, | | |
| $ 74,900 if married filing jointly or qualifying widow(er), | **8.** | 37,450. |
| $ 50,200 if head of household. | | |
| 9. Enter the smaller of line 1 or line 8 | **9.** | 37,450. |
| 10. Enter the smaller of line 7 or line 9 | **10.** | 37,450. |
| 11. Subtract line 10 from line 9. This amount is taxed at 0% | **11.** | 0. |
| 12. Enter the smaller of line 1 or line 6 | **12.** | 7,011,678. |
| 13. Enter the amount from line 11 | **13.** | 0. |
| 14. Subtract line 13 from line 12 | **14.** | 7,011,678. |
| 15. Enter: | | |
| $ 413,200 if single, | | |
| $ 232,425 if married filing separately, | **15.** | 232,425. |
| $ 464,850 if married filing jointly or qualifying widow(er), | | |
| $ 439,000 if head of household. | | |
| 16. Enter the smaller of line 1 or line 15 | **16.** | 232,425. |
| 17. Add lines 7 and 11 | **17.** | 40,595. |
| 18. Subtract line 17 from line 16. If zero or less, enter -0- | **18.** | 191,830. |
| 19. Enter the smaller of line 14 or line 18 | **19.** | 191,830. |
| 20. Multiply line 19 by 15% (0.15) | **20.** | 28,775. |
| 21. Add lines 11 and 19 | **21.** | 191,830. |
| 22. Subtract line 21 from line 12 | **22.** | 6,819,848. |
| 23. Multiply line 22 by 20% (0.20) | **23.** | 1,363,970. |
| 24. Figure the tax on the amount on line 7. If the amount on line 7 is less than $100,000, use the Tax Table to figure the tax. If the amount on line 7 is $100,000 or more, use the Tax Computation Worksheet | **24.** | 5,938. |
| 25. Add lines 20, 23, and 24 | **25.** | 1,398,683. |
| 26. Figure the tax on the amount on line 1. If the amount on line 1 is less than $100,000, use the Tax Table to figure the tax. If the amount on line 1 is $100,000 or more, use the Tax Computation Worksheet | **26.** | 2,765,658. |
| 27. Tax on all taxable income. Enter the smaller of line 25 or line 26. Also include this amount on Form 1040, line 44. If you are filing Form 2555 or 2555-EZ, do not enter this amount on Form 1040, line 44. Instead, enter it on line 4 of the Foreign Earned Income Tax Worksheet | **27.** | 1,398,683. |

*If you are filing Form 2555 or 2555-EZ, see the footnote in the Foreign Earned Income Tax Worksheet before completing this line.*

510451
01-07-16

12050501 137560 AB010            2015.03040 Bruyea, Paul            AB010__1

Appx65

| SCHEDULE E | **Supplemental Income and Loss** | OMB No. 1545-0074 |
|---|---|---|
| **(Form 1040)** | (From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.) | **2015** |
| Department of the Treasury Internal Revenue Service (99) | ▶ Attach to Form 1040, 1040NR, or Form 1041. ▶ Information about Schedule E and its separate instructions is at *www.irs.gov/schedulee*. | Attachment Sequence No. **13** |

Name(s) shown on return | Your social security number

**Paul Bruyea**

| **Part I** | **Income or Loss From Rental Real Estate and Royalties** Note: If you are in the business of renting personal property, use Schedule C or C-EZ (see instructions). If you are an individual, report farm rental income or loss from Form 4835 on page 2, line 40. |

A  Did you make any payments in 2015 that would require you to file Form(s) 1099? (see instructions) ☐ Yes ☒ No
B  If "Yes," did you or will you file the required Forms 1099? ☐ Yes ☐ No

**1a** Physical address of each property (street, city, state, ZIP code)

A **St. Albert, Alberta**
B
C

| 1b | Type of Property (from list below) | 2 For each rental real estate property listed above, report the number of fair rental and personal use days. Check the QJV box only if you meet the requirements to file as a qualified joint venture. See instructions. | | Fair Rental Days | Personal Use Days | QJV |
|---|---|---|---|---|---|---|
| A | **4** | | A | **365** | | ☐ |
| B | | | B | | | ☐ |
| C | | | C | | | ☐ |

**Type of Property:**
1  Single Family Residence  3  Vacation/Short-Term Rental  5  Land  7  Self-Rental
2  Multi-Family Residence  4  Commercial  6  Royalties  8  Other (describe)

| Income: | | Properties: | A | B | C |
|---|---|---|---|---|---|
| **3** | Rents received | 3 | **600,378.** | | |
| **4** | Royalties received | 4 | | | |
| **Expenses:** | | | | | |
| **5** | Advertising | 5 | | | |
| **6** | Auto and travel (see instructions) | 6 | | | |
| **7** | Cleaning and maintenance | 7 | | | |
| **8** | Commissions | 8 | | | |
| **9** | Insurance | 9 | **5,417.** | | |
| **10** | Legal and other professional fees | 10 | **21,715.** | | |
| **11** | Management fees | 11 | **9,530.** | | |
| **12** | Mortgage interest paid to banks, etc. (see instructions) | 12 | | | |
| **13** | Other interest | 13 | **198,268.** | | |
| **14** | Repairs | 14 | | | |
| **15** | Supplies | 15 | **935.** | | |
| **16** | Taxes | 16 | **113,837.** | | |
| **17** | Utilities | 17 | | | |
| **18** | Depreciation expense or depletion | 18 | **55,738.** | | |
| **19** | Other (list) ▶ **Stmt 7** | 19 | **147,441.** | | |
| **20** | Total expenses. Add lines 5 through 19 | 20 | **552,881.** | | |
| **21** | Subtract line 20 from line 3 (rents) and/or 4 (royalties). If result is a (loss), see instructions to find out if you must file Form 6198 | 21 | **47,497.** | | |
| **22** | Deductible rental real estate loss after limitation, if any, on Form 8582 (see instructions) | 22 | ( **Entire Disp** ) | ( ) | ( ) |

| 23a | Total of all amounts reported on line 3 for all rental properties | 23a | **600,378.** |
| b | Total of all amounts reported on line 4 for all royalty properties | 23b | |
| c | Total of all amounts reported on line 12 for all properties | 23c | |
| d | Total of all amounts reported on line 18 for all properties | 23d | **55,738.** |
| e | Total of all amounts reported on line 20 for all properties | 23e | **552,881.** |

| 24 | Income. Add positive amounts shown on line 21. Do not include any losses | 24 | **47,497.** |
| 25 | Losses. Add royalty losses from line 21 and rental real estate losses from line 22. Enter total losses here | 25 | ( ) |
| 26 | Total rental real estate and royalty income or (loss). Combine lines 24 and 25. Enter the result here. If Parts II, III, IV, and line 40 on page 2 do not apply to you, also enter this amount on Form 1040, line 17, or Form 1040NR, line 18. Otherwise, include this amount in the total on line 41 on page 2 | 26 | **47,497.** |

LHA  For Paperwork Reduction Act Notice, see the separate instructions.  Schedule E (Form 1040) 2015

521491 12-22-15

**2015 DEPRECIATION AND AMORTIZATION REPORT**
Michelin Tire Warehouse - St. Albert,

SCHEDULE E - 1

| Asset No. | Description | Date Acquired | Method | Life | Line No. | Unadjusted Cost Or Basis | Bus % Excl | Reduction In Basis | Basis For Depreciation | Accumulated Depreciation | Current Sec 179 | Current Year Deduction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | (D)Building | 052903 | SL | 39.00 | 17 | 2745812. | | | 2745812. | 813,852. | | 55,738. |
| 2 | (D)Land 668 | 052903 | L | | | 453,059. | | | 453,059. | | | 0. |
| | Total Sch E Depreciation | | | | | 3198871. | | | 3198871. | 813,852. | | 55,738. |
| | Current Activity | | | | | | | | | | | |
| | Beginning balance | | | | | 3198871. | | 0. | 3198871. | 813,852. | | |
| | Acquisitions | | | | | 0. | | 0. | 0. | 0. | | |
| | Dispositions | | | | | 3198871. | | 0. | 3198871. | 813,852. | | |
| | Ending balance | | | | | 0. | | 0. | 0. | 0. | | |

(D) - Asset disposed

*ITC, Section 179, Salvage, Bonus, Commercial Revitalization Deduction

20

Appx67

| Form **1116**<br>Department of the Treasury<br>Internal Revenue Service (99) | **Foreign Tax Credit**<br>(Individual, Estate, or Trust)<br>▶ Attach to Form 1040, 1040NR, 1041, or 990-T.<br>▶ Information about Form 1116 and its separate instructions is at *www.irs.gov/form1116*. | OMB No. 1545-0121<br>**2015**<br>Attachment<br>Sequence No. **19** |
|---|---|---|

Name

**Paul Bruyea**

Identifying number as shown on page 1 of your tax return

Use a separate Form 1116 for each category of income listed below. See Categories of Income in the instructions. Check only one box on each Form 1116. Report all amounts in U.S. dollars except where specified in Part II below.

- a [X] Passive category income
- b [ ] General category income
- c [ ] Section 901(j) income
- d [ ] Certain income re-sourced by treaty
- e [ ] Lump-sum distributions

**f** Resident of (name of country) ▶ **Canada**

Note: *If you paid taxes to only one foreign country or U.S. possession, use column A in Part I and line A in Part II. If you paid taxes to more than one foreign country or U.S. possession, use a separate column and line for each country or possession.*

**Part I   Taxable Income or Loss From Sources Outside the United States (for Category Checked Above)**

| | | Foreign Country or U.S. Possession | | | Total |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | (Add cols. A, B, and C.) |
| **g** | Enter the name of the foreign country or U.S.<br>possession ............................................ ▶ | Canada | Other<br>Countries | | |
| **1a** | Gross income from sources within country shown above<br>and of the type checked above: | | | | |
| | | 4,117,790. | | 1a | 4,117,790. |
| **b** | Check if line 1a is compensation for personal services as<br>an employee, your total compensation from all sources is<br>$250,000 or more, and you used an alternative basis to<br>determine its source (see instructions) ............ ▶ [ ] | | | | |
| **Deductions and losses (Caution: See instructions):** | | | | | |
| **2** | Expenses definitely related to the income on line 1a<br>(attach statement) ................................... | 552,881. | | | |
| **3** | Pro rata share of other deductions not definitely related: | | | | |
| **a** | Certain itemized deductions or standard deduction ........ | 7,550. | 7,550. | | |
| **b** | Other deductions (attach statement) ............... | | | | |
| **c** | Add lines 3a and 3b ................................ | 7,550. | 7,550. | | |
| **d** | Gross foreign source income ....................... | 8,276,230. | | | |
| **e** | Gross income from all sources .................... | 8,277,830. | 8,277,830. | | |
| **f** | Divide line 3d by line 3e .......................... | .99981 | .00000 | | |
| **g** | Multiply line 3c by line 3f ......................... | 7,549. | | | |
| **4** | Pro rata share of interest expense: | | | | |
| **a** | Home mortgage interest (use the Worksheet for<br>Home Mortgage Interest in the instructions) ....... | | | | |
| **b** | Other interest expense .............................. | | | | |
| **5** | Losses from foreign sources ........................ | | | | |
| **6** | Add lines 2, 3g, 4a, 4b, and 5 ................... | 560,430. | | 6 | 560,430. |
| **7** | Subtract line 6 from line 1a. Enter the result here and on line 15, page 2 ........................................ ▶ | | | 7 | 3,557,360. |

**Part II   Foreign Taxes Paid or Accrued**

| | Credit is claimed<br>for taxes<br>(you must<br>check one)<br>(h) [ ] Paid<br>(i) [X] Accrued | Foreign taxes paid or accrued | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Country | | In foreign currency | | | | In U.S. dollars | | | |
| | | Taxes withheld at source on: | | | (n) Other<br>foreign<br>taxes paid or<br>accrued | Taxes withheld at source on: | | | (r) Other<br>foreign<br>taxes paid or<br>accrued | (s)Total foreign<br>taxes paid or<br>accrued (add cols.<br>(o) through (r)) |
| | (j) Date paid<br>or accrued | (k) Dividends | (l) Rents and<br>royalties | (m) Interest | | (o) Dividends | (p) Rents and<br>royalties | (q) Interest | | |
| A | 12/31/15 | 2498098 | | | | 1953513 | | | | 1953513. |
| B | | | | | | | | | | |
| C | | | | | | | | | | |

| **8** | Add lines A through C, column (s). Enter the total here and on line 9, page 2 ........................................ ▶ | 8 | 1953513. |
|---|---|---|---|

LHA   For Paperwork Reduction Act Notice, see instructions.

Form **1116** (2015)

511501
11-30-15

12050501 137560 AB010                    2015.03040 Bruyea, Paul                    AB010__1

Form 1116 (2015) **Paul Bruyea**    2

## Part III    Figuring the Credit

| | | | |
|---|---|---|---|
| 9 | Enter the amount from line 8. These are your total foreign taxes paid or accrued for the category of income checked above Part I | 9 | 1,953,513. |
| 10 | Carryback or carryover (attach detailed computation) **See Statement 10** | 10 | 96,443. |
| 11 | Add lines 9 and 10 | 11 | 2,049,956. |
| 12 | Reduction in foreign taxes | 12 | |
| 13 | Taxes reclassified under high tax kickout | 13 | |
| 14 | Combine lines 11, 12, and 13. This is the total amount of foreign taxes available for credit | 14 | 2,049,956. |
| 15 | Enter the amount from line 7. This is your taxable income or (loss) from sources outside the United States (before adjustments) for the category of income checked above Part I | 15 | 3,557,360. |
| 16 | Adjustments to line 15 | 16 | 303. |
| 17 | Combine the amounts on lines 15 and 16. This is your net foreign source taxable income. (If the result is zero or less, you have no foreign tax credit for the category of income you checked above Part I. Skip lines 18 through 22. However, if you are filing more than one Form 1116, you must complete line 20.) | 17 | 3,557,663. |
| 18 | Individuals: Enter the amount from Form 1040, line 41, or Form 1040NR, line 39. Estates and trusts: Enter your taxable income without the deduction for your exemption **See Statement 9** | 18 | 3,557,965. |
| | *Caution: If you figured your tax using the lower rates on qualified dividends or capital gains, see instructions.* | | |
| 19 | Divide line 17 by line 18. If line 17 is more than line 18, enter "1" | 19 | .99992 |
| 20 | Individuals: Enter the amounts from Form 1040, lines 44 and 46. If you are a nonresident alien, enter the amounts from Form 1040NR, lines 42 and 44. Estates and trusts: Enter the amount from Form 1041, Schedule G, line 1a, or the total of Form 990-T, lines 36 and 37 | 20 | 1,398,683. |
| | *Caution: If you are completing line 20 for separate category e (lump-sum distributions), see instructions.* | | |
| 21 | Multiply line 20 by line 19 (maximum amount of credit) | 21 | 1,398,571. |
| 22 | Enter the smaller of line 14 or line 21. If this is the only Form 1116 you are filing, skip lines 23 through 27 and enter this amount on line 28. Otherwise, complete the appropriate line in Part IV ▶ | 22 | 1,398,571. |

## Part IV    Summary of Credits From Separate Parts III

| | | | |
|---|---|---|---|
| 23 | Credit for taxes on passive category income | 23 | 1,398,571. |
| 24 | Credit for taxes on general category income | 24 | |
| 25 | Credit for taxes on certain income re-sourced by treaty | 25 | |
| 26 | Credit for taxes on lump-sum distributions | 26 | |
| 27 | Add lines 23 through 26 | 27 | 1,398,571. |
| 28 | Enter the smaller of line 20 or line 27 | 28 | 1,398,571. |
| 29 | Reduction of credit for international boycott operations | 29 | |
| 30 | Subtract line 29 from line 28. This is your **foreign tax credit.** Enter here and on Form 1040, line 48; Form 1040NR, line 46; Form 1041, Schedule G, line 2a; or Form 990-T, line 40a ▶ | 30 | 1,398,571. |

Form **1116** (2015)

Appx69

Form **1116**

Department of the Treasury
Internal Revenue Service (99)

## Foreign Tax Credit
(Individual, Estate, or Trust)

▶ Attach to Form 1040, 1040NR, 1041, or 990-T.
▶ Information about Form 1116 and its separate instructions is at *www.irs.gov/form1116*.

OMB No. 1545-0121

**2015**

Attachment
Sequence No. **19**

Name

**Paul Bruyea**

Identifying number as shown on page 1 of your tax return

Use a separate Form 1116 for each category of income listed below. See Categories of Income in the instructions. Check only one box on each Form 1116. Report all amounts in U.S. dollars except where specified in Part II below.

- a ☐ Passive category income
- b ☒ General category income
- c ☐ Section 901(j) income
- d ☐ Certain income re-sourced by treaty
- e ☐ Lump-sum distributions

**f** Resident of (name of country) ▶ **Canada**

Note: *If you paid taxes to only one foreign country or U.S. possession, use column A in Part I and line A in Part II. If you paid taxes to more than one foreign country or U.S. possession, use a separate column and line for each country or possession.*

| Part I | Taxable Income or Loss From Sources Outside the United States (for Category Checked Above) |
|---|---|

| | | Foreign Country or U.S. Possession | | | Total |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | (Add cols. A, B, and C.) |
| g | Enter the name of the foreign country or U.S. possession ......... ▶ | Canada | | | |
| 1a | Gross income from sources within country shown above and of the type checked above: | | | | |
| | | | | | **1a** |
| b | Check if line 1a is compensation for personal services as an employee, your total compensation from all sources is $250,000 or more, and you used an alternative basis to determine its source (see instructions) ........... ▶ ☐ | | | | |
| **Deductions and losses** (*Caution: See instructions*): | | | | | |
| 2 | Expenses definitely related to the income on line 1a (attach statement) ............... | | | | |
| 3 | Pro rata share of other deductions not definitely related: | | | | |
| a | Certain itemized deductions or standard deduction ......... | 7,550. | | | |
| b | Other deductions (attach statement) ........ | | | | |
| c | Add lines 3a and 3b ............... | 7,550. | | | |
| d | Gross foreign source income ......... | | | | |
| e | Gross income from all sources ......... | 8,277,830. | | | |
| f | Divide line 3d by line 3e ......... | .00000 | | | |
| g | Multiply line 3c by line 3f ......... | | | | |
| 4 | Pro rata share of interest expense: | | | | |
| a | Home mortgage interest (use the Worksheet for Home Mortgage Interest in the instructions) ......... | | | | |
| b | Other interest expense ............... | | | | |
| 5 | Losses from foreign sources ......... | | | | |
| 6 | Add lines 2, 3g, 4a, 4b, and 5 ......... | | | | **6** |
| 7 | Subtract line 6 from line 1a. Enter the result here and on line 15, page 2 ................................. ▶ | | | | **7** |

| Part II | Foreign Taxes Paid or Accrued |
|---|---|

| Credit is claimed for taxes (you must check one) | | Foreign taxes paid or accrued | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | In foreign currency | | | | In U.S. dollars | | | | |
| (h) ☐ Paid | | Taxes withheld at source on: | | | (n) Other foreign taxes paid or accrued | Taxes withheld at source on: | | | (r) Other foreign taxes paid or accrued | (s) Total foreign taxes paid or accrued (add cols. (o) through (r)) |
| (i) ☒ Accrued | | (k) Dividends | (l) Rents and royalties | (m) Interest | | (o) Dividends | (p) Rents and royalties | (q) Interest | | |
| **Country** | (j) Date paid or accrued | | | | | | | | | |
| A | 12/31/15 | | | | | | | | | |
| B | | | | | | | | | | |
| C | | | | | | | | | | |
| 8 | Add lines A through C, column (s). Enter the total here and on line 9, page 2 ............... ▶ | | | | | | | **8** | | |

LHA  For Paperwork Reduction Act Notice, see instructions.

Form **1116** (2015)

511501
11-30-15

23

Appx70

Form 1116 (2015)  Paul Bruyea

Page 2

| Part III | Figuring the Credit | | | |
|---|---|---|---|---|
| 9 | Enter the amount from line 8. These are your total foreign taxes paid or accrued for the category of income checked above Part I | 9 | | |
| 10 | Carryback or carryover (attach detailed computation)  See Statement 11 | 10 | 23,502. | |
| 11 | Add lines 9 and 10 | 11 | 23,502. | |
| 12 | Reduction in foreign taxes | 12 | | |
| 13 | Taxes reclassified under high tax kickout | 13 | | |
| 14 | Combine lines 11, 12, and 13. This is the total amount of foreign taxes available for credit | | 14 | 23,502. |
| 15 | Enter the amount from line 7. This is your taxable income or (loss) from sources outside the United States (before adjustments) for the category of income checked above Part I | 15 | | |
| 16 | Adjustments to line 15 | 16 | | |
| 17 | Combine the amounts on lines 15 and 16. This is your net foreign source taxable income. (If the result is zero or less, you have no foreign tax credit for the category of income you checked above Part I. Skip lines 18 through 22. However, if you are filing more than one Form 1116, you must complete line 20.) | 17 | | |
| 18 | Individuals: Enter the amount from Form 1040, line 41, or Form 1040NR, line 39. Estates and trusts: Enter your taxable income without the deduction for your exemption Caution: If you figured your tax using the lower rates on qualified dividends or capital gains, see instructions. | 18 | | |
| 19 | Divide line 17 by line 18. If line 17 is more than line 18, enter "1" | | 19 | |
| 20 | Individuals: Enter the amounts from Form 1040, lines 44 and 46. If you are a nonresident alien, enter the amounts from Form 1040NR, lines 42 and 44. Estates and trusts: Enter the amount from Form 1041, Schedule G, line 1a, or the total of Form 990-T, lines 36 and 37 Caution: If you are completing line 20 for separate category e (lump-sum distributions), see instructions. | | 20 | 1,398,683. |
| 21 | Multiply line 20 by line 19 (maximum amount of credit) | | 21 | |
| 22 | Enter the smaller of line 14 or line 21. If this is the only Form 1116 you are filing, skip lines 23 through 27 and enter this amount on line 28. Otherwise, complete the appropriate line in Part IV ▶ | | 22 | 0. |
| Part IV | Summary of Credits From Separate Parts III | | | |
| 23 | Credit for taxes on passive category income | 23 | | |
| 24 | Credit for taxes on general category income | 24 | | |
| 25 | Credit for taxes on certain income re-sourced by treaty | 25 | | |
| 26 | Credit for taxes on lump-sum distributions | 26 | | |
| 27 | Add lines 23 through 26 | | 27 | |
| 28 | Enter the smaller of line 20 or line 27 | | 28 | |
| 29 | Reduction of credit for international boycott operations | | 29 | |
| 30 | Subtract line 29 from line 28. This is your foreign tax credit. Enter here and on Form 1040, line 48; Form 1040NR, line 46; Form 1041, Schedule G, line 2a; or Form 990-T, line 40a ▶ | | 30 | |

Form 1116 (2015)

511511
11-30-15

24

Appx71

OMB No. 1545-0184

Form **4797**

Department of the Treasury
Internal Revenue Service

## Sales of Business Property
(Also Involuntary Conversions and Recapture Amounts
Under Sections 179 and 280F(b)(2))
▶ Attach to your tax return.
▶ Information about Form 4797 and its separate instructions is at www.irs.gov/form4797.

**2015**

Attachment
Sequence No. **27**

Name(s) shown on return

Paul Bruyea

Identifying number

1 Enter the gross proceeds from sales or exchanges reported to you for 2015 on Form(s) 1099-B or 1099-S (or substitute statement) that you are including on line 2, 10, or 20 .................. | 1 |

## Part I | Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft-Most Property Held More Than 1 Year (see instructions)

| 2 (a) Description of property | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Gross sales price | (e) Depreciation allowed or allowable since acquisition | (f) Cost or other basis, plus improvements and expense of sale | (g) Gain or (loss) Subtract (f) from the sum of (d) and (e) |
|---|---|---|---|---|---|---|
| *Land | 01/01/05 | 10/30/15 | 1301351. | 869,590. | 2745812. | <574,871.> |
| *Building | 01/01/05 | 10/30/15 | 8102166. | | 453,059. | 7,649,107. |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| 3 | Gain, if any, from Form 4684, line 39 ............................................................ | **3** | |
| 4 | Section 1231 gain from installment sales from Form 6252, line 26 or 37 .................... | **4** | |
| 5 | Section 1231 gain or (loss) from like-kind exchanges from Form 8824 ...................... | **5** | |
| 6 | Gain, if any, from line 32, from other than casualty or theft .............................. | **6** | |
| 7 | Combine lines 2 through 6. Enter the gain or (loss) here and on the appropriate line as follows: ...... | **7** | 7,074,236. |

Partnerships (except electing large partnerships) and S corporations. Report the gain or (loss) following the instructions for Form 1065, Schedule K, line 10, or Form 1120S, Schedule K, line 9. Skip lines 8, 9, 11, and 12 below.

Individuals, partners, S corporation shareholders, and all others. If line 7 is zero or a loss, enter the amount from line 7 on line 11 below and skip lines 8 and 9. If line 7 is a gain and you did not have any prior year section 1231 losses, or they were recaptured in an earlier year, enter the gain from line 7 as a long-term capital gain on the Schedule D filed with your return and skip lines 8, 9, 11, and 12 below.

| | | | |
|---|---|---|---|
| 8 | Nonrecaptured net section 1231 losses from prior years (see instructions) .................. | **8** | |
| 9 | Subtract line 8 from line 7. If zero or less, enter -0-. If line 9 is zero, enter the gain from line 7 on line 12 below. If line 9 is more than zero, enter the amount from line 8 on line 12 below and enter the gain from line 9 as a long-term capital gain on the Schedule D filed with your return (see instructions) ...................... | **9** | |

## Part II | Ordinary Gains and Losses (see instructions)

10 Ordinary gains and losses not included on lines 11 through 16 (include property held 1 year or less):

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | | | |
|---|---|---|---|---|
| 11 | Loss, if any, from line 7 ............................................................ | **11** | ( | ) |
| 12 | Gain, if any, from line 7 or amount from line 8, if applicable .......................... | **12** | | |
| 13 | Gain, if any, from line 31 .......................................................... | **13** | | |
| 14 | Net gain or (loss) from Form 4684, lines 31 and 38a ................................ | **14** | | |
| 15 | Ordinary gain from installment sales from Form 6252, line 25 or 36 .................. | **15** | | |
| 16 | Ordinary gain or (loss) from like-kind exchanges from Form 8824 .................... | **16** | | |
| 17 | Combine lines 10 through 16 ........................................................ | **17** | | |

18 For all except individual returns, enter the amount from line 17 on the appropriate line of your return and skip lines a and b below. For individual returns, complete lines a and b below:

| | | | |
|---|---|---|---|
| a | If the loss on line 11 includes a loss from Form 4684, line 35, column (b)(ii), enter that part of the loss here. Enter the part of the loss from income-producing property on Schedule A (Form 1040), line 28, and the part of the loss from property used as an employee on Schedule A (Form 1040), line 23. Identify as from "Form 4797, line 18a." See instructions ...................... | **18a** | |
| b | Redetermine the gain or (loss) on line 17 excluding the loss, if any, on line 18a. Enter here and on Form 1040, line 14 ...................... | **18b** | |

LHA    For Paperwork Reduction Act Notice, see separate instructions.

Form **4797** (2015)

518011
12-28-15

**\* Entire Disposition of Activity**

Form 4797 (2015) Paul Bruyea ___ Page 2

| **Part III** | **Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255** (see instructions) | | | | |
|---|---|---|---|---|---|

| 19 | (a) Description of section 1245, 1250, 1252, 1254, or 1255 property: | | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) |
|---|---|---|---|---|
| A | | | | |
| B | | | | |
| C | | | | |
| D | | | | |

| | These columns relate to the properties on lines 19A through 19D. ▶ | | Property A | Property B | Property C | Property D |
|---|---|---|---|---|---|---|
| 20 | Gross sales price (Note: See line 1 before completing.) | 20 | | | | |
| 21 | Cost or other basis plus expense of sale | 21 | | | | |
| 22 | Depreciation (or depletion) allowed or allowable | 22 | | | | |
| 23 | Adjusted basis. Subtract line 22 from line 21 | 23 | | | | |
| 24 | Total gain. Subtract line 23 from line 20 | 24 | | | | |
| 25 | If section 1245 property: | | | | | |
| a | Depreciation allowed or allowable from line 22 | 25a | | | | |
| b | Enter the smaller of line 24 or 25a | 25b | | | | |
| 26 | If section 1250 property: If straight line depreciation was used, enter -0- on line 26g, except for a corporation subject to section 291. | | | | | |
| a | Additional depreciation after 1975 (see instructions) | 26a | | | | |
| b | Applicable percentage multiplied by the smaller of line 24 or line 26a (see instructions) | 26b | | | | |
| c | Subtract line 26a from line 24. If residential rental property or line 24 is not more than line 26a, skip lines 26d and 26e | 26c | | | | |
| d | Additional depreciation after 1969 and before 1976 | 26d | | | | |
| e | Enter the smaller of line 26c or 26d | 26e | | | | |
| f | Section 291 amount (corporations only) | 26f | | | | |
| g | Add lines 26b, 26e, and 26f | 26g | | | | |
| 27 | If section 1252 property: Skip this section if you did not dispose of farmland or if this form is being completed for a partnership (other than an electing large partnership). | | | | | |
| a | Soil, water, and land clearing expenses | 27a | | | | |
| b | Line 27a multiplied by applicable percentage | 27b | | | | |
| c | Enter the smaller of line 24 or 27b | 27c | | | | |
| 28 | If section 1254 property: | | | | | |
| a | Intangible drilling and development costs, expenditures for development of mines and other natural deposits, mining exploration costs, and depletion (see instructions) | 28a | | | | |
| b | Enter the smaller of line 24 or 28a | 28b | | | | |
| 29 | If section 1255 property: | | | | | |
| a | Applicable percentage of payments excluded from income under section 126 (see instructions) | 29a | | | | |
| b | Enter the smaller of line 24 or 29a (see instructions) | 29b | | | | |

**Summary of Part III Gains.** Complete property columns A through D through line 29b before going to line 30.

| 30 | Total gains for all properties. Add property columns A through D, line 24 | 30 | |
|---|---|---|---|
| 31 | Add property columns A through D, lines 25b, 26g, 27c, 28b, and 29b. Enter here and on line 13 | 31 | |
| 32 | Subtract line 31 from line 30. Enter the portion from casualty or theft on Form 4684, line 33. Enter the portion from other than casualty or theft on Form 4797, line 6 | 32 | |

| **Part IV** | **Recapture Amounts Under Sections 179 and 280F(b)(2) When Business Use Drops to 50% or Less** (see instructions) | | | |
|---|---|---|---|---|

| | | | (a) Section 179 | (b) Section 280F(b)(2) |
|---|---|---|---|---|
| 33 | Section 179 expense deduction or depreciation allowable in prior years | 33 | | |
| 34 | Recomputed depreciation (see instructions) | 34 | | |
| 35 | Recapture amount. Subtract line 34 from line 33. See the instructions for where to report | 35 | | |

518012 12-29-15

Form **4797** (2015)

26

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010___1

| Form **6251** | | **Alternative Minimum Tax - Individuals** | OMB No. 1545-0074 | |
|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service (99) | | ▶ Information about Form 6251 and its separate instructions is at *www.irs.gov/form6251.* ▶ Attach to Form 1040 or Form 1040NR. | **2015** Attachment Sequence No. **32** | |

Name(s) shown on Form 1040 or Form 1040NR | Your social security number

Paul Bruyea

**Part I** | **Alternative Minimum Taxable Income**

| | | | |
|---|---|---|---|
| 1 | If filing Schedule A (Form 1040), enter the amount from Form 1040, line 41, and go to line 2. Otherwise, enter the amount from Form 1040, line 38, and go to line 7. (If less than zero, enter as a negative amount.) | **1** | 7,059,823. |
| 2 | Medical and dental. If you or your spouse was 65 or older, enter the smaller of Schedule A (Form 1040), line 4, or 2.5% (.025) of Form 1040, line 38. If zero or less, enter -0- | **2** | |
| 3 | Taxes from Schedule A (Form 1040), line 9 | **3** | |
| 4 | Enter the home mortgage interest adjustment, if any, from line 6 of the worksheet in the instructions for this line | **4** | |
| 5 | Miscellaneous deductions from Schedule A (Form 1040), line 27 | **5** | |
| 6 | If Form 1040, line 38, is $154,950 or less, enter -0-. Otherwise, see instructions | **6** | |
| 7 | Tax refund from Form 1040, line 10 or line 21 | **7** | |
| 8 | Investment interest expense (difference between regular tax and AMT) | **8** | |
| 9 | Depletion (difference between regular tax and AMT) | **9** | |
| 10 | Net operating loss deduction from Form 1040, line 21. Enter as a positive amount | **10** | |
| 11 | Alternative tax net operating loss deduction | **11** | |
| 12 | Interest from specified private activity bonds exempt from the regular tax | **12** | |
| 13 | Qualified small business stock, see instructions | **13** | |
| 14 | Exercise of incentive stock options (excess of AMT income over regular tax income) | **14** | |
| 15 | Estates and trusts (amount from Schedule K-1 (Form 1041), box 12, code A) | **15** | |
| 16 | Electing large partnerships (amount from Schedule K-1 (Form 1065-B), box 6) | **16** | |
| 17 | Disposition of property (difference between AMT and regular tax gain or loss) | **17** | |
| 18 | Depreciation on assets placed in service after 1986 (difference between regular tax and AMT) | **18** | |
| 19 | Passive activities (difference between AMT and regular tax income or loss)   **See Statement 12** | **19** | 0. |
| 20 | Loss limitations (difference between AMT and regular tax income or loss) | **20** | |
| 21 | Circulation costs (difference between regular tax and AMT) | **21** | |
| 22 | Long-term contracts (difference between AMT and regular tax income) | **22** | |
| 23 | Mining costs (difference between regular tax and AMT) | **23** | |
| 24 | Research and experimental costs (difference between regular tax and AMT) | **24** | |
| 25 | Income from certain installment sales before January 1, 1987 | **25** | |
| 26 | Intangible drilling costs preference | **26** | |
| 27 | Other adjustments, including income-based related adjustments | **27** | |
| 28 | Alternative minimum taxable income. Combine lines 1 through 27. (If married filing separately and line 28 is more than $246,250, see instructions.) | **28** | 7,101,523. |

**Part II** | **Alternative Minimum Tax (AMT)**

| | | | |
|---|---|---|---|
| 29 | Exemption. (If you were under age 24 at the end of 2015, see instructions.) | | |
| | IF your filing status is...                          AND line 28 is not over...          THEN enter on line 29... | | |
| | Single or head of household ...........................$119,200 ....................................$53,600 | | |
| | Married filing jointly or qualifying widow(er) ...   158,900 ..................................83,400 | | |
| | Married filing separately ...........................  79,450 ..................................41,700 | **29** | 0. |
| | If line 28 is over the amount shown above for your filing status, see instructions. | | |
| 30 | Subtract line 29 from line 28. If more than zero, go to line 31. If zero or less, enter -0- here and on lines 31, 33, and 35, and go to line 34 | **30** | 7,101,523. |
| 31 | • If you are filing Form 2555 or 2555-EZ, see instructions for the amount to enter. • If you reported capital gain distributions directly on Form 1040, line 13; you reported qualified dividends on Form 1040, line 9b; or you had a gain on lines 15 and 16 of Schedule D (Form 1040) (as refigured for the AMT, if necessary), complete Part III on page 2 and enter the amount from line 64 here. • All others: If line 30 is $185,400 or less ($92,700 or less if married filing separately), multiply line 30 by 26% (.26). Otherwise, multiply line 30 by 28% (.28) and subtract $3,708 ($1,854 if married filing separately) from the result. | **31** | 1,416,105. |
| 32 | Alternative minimum tax foreign tax credit (see instructions) | **32** | 1,405,810. |
| 33 | Tentative minimum tax. Subtract line 32 from line 31 | **33** | 10,295. |
| 34 | Add Form 1040, line 44 (minus any tax from Form 4972), and Form 1040, line 46. Subtract from the result any foreign tax credit from Form 1040, line 48. If you used Sch J to figure your tax on Form 1040, line 44, refigure that tax without using Schedule J before completing this line (see instructions) | **34** | 112. |
| 35 | **AMT.** Subtract line 34 from line 33. If zero or less, enter -0-. Enter here and on Form 1040, line 45 | **35** | 10,183. |

519481
01-11-16  LHA     **For Paperwork Reduction Act Notice, see your tax return instructions.**                                   Form **6251** (2015)

12050501 137560 AB010                    2015.03040 Bruyea, Paul                    AB010__1

27

Appx74

Form 6251 (2015)    **Paul Bruyea**            Page **2**

| Part III | Tax Computation Using Maximum Capital Gains Rates |
|---|---|

Complete Part III only if you are required to do so by line 31 or by the Foreign Earned Income Tax Worksheet in the instructions.

| | | | |
|---|---|---|---|
| 36 | Enter the amount from Form 6251, line 30. If you are filing Form 2555 or 2555-EZ, enter the amount from line 3 of the worksheet in the instructions for line 31 | 36 | 7,101,523. |
| 37 | Enter the amount from line 6 of the Qualified Dividends and Capital Gain Tax Worksheet in the instructions for Form 1040, line 44, or the amount from line 13 of the Schedule D Tax Worksheet in the instructions for Schedule D (Form 1040), whichever applies (as refigured for the AMT, if necessary) (see instructions). If you are filing Form 2555 or 2555-EZ, see instructions for the amount to enter | 37 | 7,011,678. |
| 38 | Enter the amount from Schedule D (Form 1040), line 19 (as refigured for the AMT, if necessary) (see instructions). If you are filing Form 2555 or 2555-EZ, see instructions for the amount to enter | 38 | |
| 39 | If you did not complete a Schedule D Tax Worksheet for the regular tax or the AMT, enter the amount from line 37. Otherwise, add lines 37 and 38, and enter the smaller of that result or the amount from line 10 of the Schedule D Tax Worksheet (as refigured for the AMT, if necessary). If you are filing Form 2555 or 2555-EZ, see instructions for the amount to enter | 39 | 7,011,678. |
| 40 | Enter the smaller of line 36 or line 39 | 40 | 7,011,678. |
| 41 | Subtract line 40 from line 36 | 41 | 89,845. |
| 42 | If line 41 is $185,400 or less ($92,700 or less if married filing separately), multiply line 41 by 26% (.26). Otherwise, multiply line 41 by 28% (.28) and subtract $3,708 ($1,854 if married filing separately) from the result ▶ | 42 | 23,360. |
| 43 | Enter: • $74,900 if married filing jointly or qualifying widow(er), • $37,450 if single or married filing separately, • $50,200 if head of household. | 43 | 37,450. |
| 44 | Enter the amount from line 7 of the Qualified Dividends and Capital Gain Tax Worksheet in the instructions for Form 1040, line 44, or the amount from line 14 of the Schedule D Tax Worksheet in the instructions for Schedule D (Form 1040), whichever applies (as figured for the regular tax). If you did not complete either worksheet for the regular tax, enter the amount from Form 1040, line 43; if zero or less, enter -0-. If you are filing Form 2555 or 2555-EZ, see instructions for the amount to enter | 44 | 40,595. |
| 45 | Subtract line 44 from line 43. If zero or less, enter -0- | 45 | 0. |
| 46 | Enter the smaller of line 36 or line 37 | 46 | 7,011,678. |
| 47 | Enter the smaller of line 45 or line 46. This amount is taxed at 0% | 47 | 0. |
| 48 | Subtract line 47 from line 46 | 48 | 7,011,678. |
| 49 | Enter: • $413,200 if single • $232,425 if married filing separately • $464,850 if married filing jointly or qualifying widow(er) • $439,000 if head of household | 49 | 232,425. |
| 50 | Enter the amount from line 45 | 50 | 0. |
| 51 | Enter the amount from line 7 of the Qualified Dividends and Capital Gain Tax Worksheet in the instructions for Form 1040, line 44, or the amount from line 19 of the Schedule D Tax Worksheet, whichever applies (as figured for the regular tax). If you did not complete either worksheet for the regular tax, enter the amount from Form 1040, line 43; if zero or less, enter -0-. If you are filing Form 2555 or 2555-EZ, see instructions for the amount to enter | 51 | 40,595. |
| 52 | Add line 50 and line 51 | 52 | 40,595. |
| 53 | Subtract line 52 from line 49. If zero or less, enter -0- | 53 | 191,830. |
| 54 | Enter the smaller of line 48 or line 53 | 54 | 191,830. |
| 55 | Multiply line 54 by 15% (.15) | 55 | 28,775. |
| 56 | Add lines 47 and 54 | 56 | 191,830. |
| | If lines 56 and 36 are the same, skip lines 57 through 61 and go to line 62. Otherwise, go to line 57. | | |
| 57 | Subtract line 56 from line 46 | 57 | 6,819,848. |
| 58 | Multiply line 57 by 20% (.20) ▶ | 58 | 1,363,970. |
| | If line 38 is zero or blank, skip lines 59 through 61 and go to line 62. Otherwise, go to line 59. | | |
| 59 | Add lines 41, 56, and 57 | 59 | |
| 60 | Subtract line 59 from line 36 | 60 | |
| 61 | Multiply line 60 by 25% (.25) ▶ | 61 | |
| 62 | Add lines 42, 55, 58, and 61 | 62 | 1,416,105. |
| 63 | If line 36 is $185,400 or less ($92,700 or less if married filing separately), multiply line 36 by 26% (.26). Otherwise, multiply line 36 by 28% (.28) and subtract $3,708 ($1,854 if married filing separately) from the result | 63 | 1,986,572. |
| 64 | Enter the smaller of line 62 or line 63 here and on line 31. If you are filing Form 2555 or 2555-EZ, do not enter this amount on line 31. Instead, enter it on line 4 of the worksheet in the instructions for line 31 | 64 | 1,416,105. |

519591 01-11-16

           Form **6251** (2015)

12050501 137560 AB010        2015.03040 Bruyea, Paul        AB010__1

## ALTERNATIVE MINIMUM TAX RECONCILIATION REPORT

Name(s): **Paul Bruyea**

Social Security Number:

| Form Name | Description | Income | Form 6251, Line 17 | Form 6251, Line 18 | Form 6251, Line 19 | Form 6251, Line 20 | Form 8251 Other Adjustment |
|---|---|---|---|---|---|---|---|
| 4797 | Land 100% Disposition | | | | | | |
| | * Regular Income | <574,871.> | | | | | |
| | * AMT Net Income | <574,871.> | | | | | |
| 4797 | Building 100% Disposition | | | | | | |
| | * Regular Income | 7,649,107. | | | | | |
| | * AMT Net Income | 7,649,107. | | | | | |
| E- | Michelin Tire Warehouse - St. Albert, Albert | | | | | | |
| | * Regular Income | 47,497. | | | | | |
| | * AMT Net Income | 47,497. | | | | | |

*Adjustment* (spanning Form 6251, Line 17 through Form 6251, Line 20)

519911
04-01-15

**Appx76**

**ALTERNATIVE MINIMUM TAX DEPRECIATION REPORT**

| Asset No. | Description | Date Acquired | AMT Method | AMT Life | AMT Cost Or Basis | AMT Accumulated | Regular Depreciation | AMT Depreciation | AMT Adjustment |
|---|---|---|---|---|---|---|---|---|---|
| | Michelin Tire Warehouse - St. Albert, Alberta | | | | | | | | |
| 1 | Building | 052903 | SL | 39.00 | 2,745,812. | 813,852. | 55,738. | 55,738. | 0. |
| | ** Subtotal ** | | | | 2,745,812. | 813,852. | 55,738. | 55,738. | 0. |
| | | | | | | | | | |
| | *** Grand Total *** | | | | 2,745,812. | 813,852. | 55,738. | 55,738. | 0. |

30

5381D4
04-01-15

OMB No. 1545-0121

# Alternative Minimum Tax
# Foreign Tax Credit
(Individual, Estate, or Trust)

Form **1116**

Department of the Treasury
Internal Revenue Service (99)

► **Attach to Form 1040, 1040NR, 1041, or 990-T.**
► **Information about Form 1116 and its separate instructions is at www.irs.gov/form1116.**

**2015**

Attachment
Sequence No. **19**

Name

**Paul Bruyea**

Identifying number as shown on page 1 of your tax return

Use a separate Form 1116 for each category of income listed below. See Categories of Income in the instructions. Check only one box on each Form 1116. Report all amounts in U.S. dollars except where specified in Part II below.

a [X] Passive category income    c [ ] Section 901(j) income    e [ ] Lump-sum distributions
b [ ] General category income    d [ ] Certain income re-sourced by treaty

**f Resident of (name of country) ►  Canada**

Note: *If you paid taxes to only one foreign country or U.S. possession, use column A in Part I and line A in Part II. If you paid taxes to more than one foreign country or U.S. possession, use a separate column and line for each country or possession.*

| Part I | Taxable Income or Loss From Sources Outside the United States (for Category Checked Above) | | | | |
|---|---|---|---|---|---|
| | | **Foreign Country or U.S. Possession** | | | **Total** |
| | | **A** | **B** | **C** | (Add cols. A, B, and C.) |
| g | Enter the name of the foreign country or U.S. possession ............ ► | Canada | Other Countries | | |
| 1a | Gross income from sources within country shown above and of the type checked above: | 5,578,260. | | | 1a 5,578,260. |
| b | Check if line 1a is compensation for personal services as an employee, your total compensation from all sources is $250,000 or more, and you used an alternative basis to determine its source (see instructions) ......... ► [ ] | | | | |
| | **Deductions and losses (Caution: See instructions):** | | | | |
| 2 | Expenses definitely related to the income on line 1a (attach statement) ...................... | 552,881. | | | |
| 3 | Pro rata share of other deductions not definitely related: | | | | |
| a | Certain itemized deductions or standard deduction | | | | |
| b | Other deductions (attach statement) ............ | | | | |
| c | Add lines 3a and 3b ...................... | | | | |
| d | Gross foreign source income .................. | 8,276,230. | | | |
| e | Gross income from all sources ................ | 8,277,830. | 8,277,830. | | |
| f | Divide line 3d by line 3e ................... | .99981 | .00000 | | |
| g | Multiply line 3c by line 3f .................. | | | | |
| 4 | Pro rata share of interest expense: | | | | |
| a | Home mortgage interest (use the Worksheet for Home Mortgage Interest in the instructions) .......... | | | | |
| b | Other interest expense .................... | | | | |
| 5 | Losses from foreign sources ................. | | | | |
| 6 | Add lines 2, 3g, 4a, 4b, and 5 ............... | 552,881. | | 6 | 552,881. |
| 7 | Subtract line 6 from line 1a. Enter the result here and on line 15, page 2 ........................ ► | | | | 7 | 5,025,379. |

| Part II | Foreign Taxes Paid or Accrued | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Country | Credit is claimed for taxes (you must check one) | **Foreign taxes paid or accrued** | | | | | | | |
| | | In foreign currency | | | | In U.S. dollars | | | |
| | (h) [ ] Paid (i) [X] Accrued | Taxes withheld at source on: | | | (n) Other foreign taxes paid or accrued | Taxes withheld at source on: | | | (r) Other foreign taxes paid or accrued |
| | (j) Date paid or accrued | (k) Dividends | (l) Rents and royalties | (m) Interest | | (o) Dividends | (p) Rents and royalties | (q) Interest | | (s) Total foreign taxes paid or accrued (add cols. (o) through (r)) |
| A | 12/31/15 | | 2498098 | | | | 1953513 | | | 1953513. |
| B | | | | | | | | | | |
| C | | | | | | | | | | |

| 8 | Add lines A through C, column (s). Enter the total here and on line 9, page 2 ........................ ► | 8 | 1953513. |

LHA   For Paperwork Reduction Act Notice, see instructions.        Form **1116** (2015)

511501
11-30-15

12050501 137560 AB010      2015.03040 Bruyea, Paul      AB010__1

## Alternative Minimum Tax

Form 1116 (2015) **Paul Bruyea**                                                                                                                         2

| Part III | Figuring the Credit | | |
|---|---|---|---|
| 9 | Enter the amount from line 8. These are your total foreign taxes paid or accrued for the category of income checked above Part I | 9 | 1,953,513. |
| 10 | Carryback or carryover (attach detailed computation)   **See Statement 15** | 10 | 122,234. |
| 11 | Add lines 9 and 10 | 11 | 2,075,747. |
| 12 | Reduction in foreign taxes | 12 | |
| 13 | Taxes reclassified under high tax kickout | 13 | |

| 14 | Combine lines 11, 12, and 13. This is the total amount of foreign taxes available for credit | 14 | 2,075,747. |
|---|---|---|---|
| 15 | Enter the amount from line 7. This is your taxable income or (loss) from sources outside the United States (before adjustments) for the category of income checked above Part I | 15 | 5,025,379. |
| 16 | Adjustments to line 15 | 16 | 1,846. |
| 17 | Combine the amounts on lines 15 and 16. This is your net foreign source taxable income. (If the result is zero or less, you have no foreign tax credit for the category of income you checked above Part I. Skip lines 18 through 22. However, if you are filing more than one Form 1116, you must complete line 20.) | 17 | 5,027,225. |
| 18 | Individuals: Enter the amount from Form 1040, line 41, or Form 1040NR, line 39. Estates and trusts: Enter your taxable income without the deduction for your exemption   **See Statement 16** | 18 | 5,064,025. |
|  | Caution: If you figured your tax using the lower rates on qualified dividends or capital gains, see instructions. | | |
| 19 | Divide line 17 by line 18. If line 17 is more than line 18, enter "1" | 19 | .99273 |
| 20 | Individuals: Enter the amounts from Form 1040, lines 44 and 46. If you are a nonresident alien, enter the amounts from Form 1040NR, lines 42 and 44. Estates and trusts: Enter the amount from Form 1041, Schedule G, line 1a, or the total of Form 990-T, lines 36 and 37 | 20 | 1,416,105. |
|  | Caution: If you are completing line 20 for separate category e (lump-sum distributions), see instructions. | | |
| 21 | Multiply line 20 by line 19 (maximum amount of credit) | 21 | 1,405,810. |
| 22 | Enter the smaller of line 14 or line 21. If this is the only Form 1116 you are filing, skip lines 23 through 27 and enter this amount on line 28. Otherwise, complete the appropriate line in Part IV ▶ | 22 | 1,405,810. |

| Part IV | Summary of Credits From Separate Parts III | | |
|---|---|---|---|
| 23 | Credit for taxes on passive category income | 23 | 1,405,810. | |
| 24 | Credit for taxes on general category income | 24 | | |
| 25 | Credit for taxes on certain income re-sourced by treaty | 25 | | |
| 26 | Credit for taxes on lump-sum distributions | 26 | | |
| 27 | Add lines 23 through 26 | 27 | | 1,405,810. |
| 28 | Enter the smaller of line 20 or line 27 | 28 | | 1,405,810. |
| 29 | Reduction of credit for international boycott operations | 29 | | |
| 30 | Subtract line 29 from line 28. This is your foreign tax credit. Enter here and on Form 1040, line 48; Form 1040NR, line 46; Form 1041, Schedule G, line 2a; or Form 990-T, line 40a ▶ | 30 | | 1,405,810. |

Form 1116 (2015)

611511
11-30-15

Appx79

OMB No. 1545-0121

Form **1116**

Department of the Treasury
Internal Revenue Service (99)

**Alternative Minimum Tax**
**Foreign Tax Credit**
(Individual, Estate, or Trust)
▶ Attach to Form 1040, 1040NR, 1041, or 990-T.
▶ Information about Form 1116 and its separate instructions is at *www.irs.gov/form1116.*

**2015**

Attachment
Sequence No. **19**

Name
**Paul Bruyea**

Identifying number as shown on page 1 of your tax return

Use a separate Form 1116 for each category of income listed below. See Categories of Income in the instructions. Check only one box on each Form 1116. Report all amounts in U.S. dollars except where specified in Part II below.

a ☐ Passive category income
b ☒ General category income
c ☐ Section 901(j) income
d ☐ Certain income re-sourced by treaty
e ☐ Lump-sum distributions

**f** Resident of (name of country) ▶ **Canada**

Note: *If you paid taxes to only one foreign country or U.S. possession, use column A in Part I and line A in Part II. If you paid taxes to more than one foreign country or U.S. possession, use a separate column and line for each country or possession.*

**Part I**  Taxable Income or Loss From Sources Outside the United States (for Category Checked Above)

| | | Foreign Country or U.S. Possession | | | Total (Add cols. A, B, and C.) |
|---|---|---|---|---|---|
| | | A | B | C | |
| **g** | Enter the name of the foreign country or U.S. possession ......................... ▶ | Canada | | | |
| **1a** | Gross income from sources within country shown above and of the type checked above: | | | | |
| | | | | | 1a |
| **b** | Check if line 1a is compensation for personal services as an employee, your total compensation from all sources is $250,000 or more, and you used an alternative basis to determine its source (see instructions) ............ ▶ ☐ | | | | |
| | Deductions and losses (Caution: See instructions): | | | | |
| **2** | Expenses definitely related to the income on line 1a (attach statement) ...................... | | | | |
| **3** | Pro rata share of other deductions not definitely related: | | | | |
| **a** | Certain itemized deductions or standard deduction ........ | | | | |
| **b** | Other deductions (attach statement) ...................... | | | | |
| **c** | Add lines 3a and 3b ...................... | | | | |
| **d** | Gross foreign source income ...................... | | | | |
| **e** | Gross income from all sources ...................... | 8,277,830. | | | |
| **f** | Divide line 3d by line 3e ...................... | .00000 | | | |
| **g** | Multiply line 3c by line 3f ...................... | | | | |
| **4** | Pro rata share of interest expense: | | | | |
| **a** | Home mortgage interest (use the Worksheet for Home Mortgage Interest in the instructions) ........... | | | | |
| **b** | Other interest expense ...................... | | | | |
| **5** | Losses from foreign sources ...................... | | | | |
| **6** | Add lines 2, 3g, 4a, 4b, and 5 ...................... | | | | 6 |
| **7** | Subtract line 6 from line 1a. Enter the result here and on line 15, page 2 ......................................................... ▶ | | | | 7 |

**Part II**  Foreign Taxes Paid or Accrued

| Country | Credit is claimed for taxes (you must check one) (h) ☐ Paid (i) ☒ Accrued | | Foreign taxes paid or accrued | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | In foreign currency | | | | In U.S. dollars | | | |
| | | | Taxes withheld at source on: | | | (n) Other foreign taxes paid or accrued | Taxes withheld at source on: | | | (r) Other foreign taxes paid or accrued | (s) Total foreign taxes paid or accrued (add cols. (o) through (r)) |
| | (j) Date paid or accrued | | (k) Dividends | (l) Rents and royalties | (m) Interest | | (o) Dividends | (p) Rents and royalties | (q) Interest | |
| **A** | 12/31/15 | | | | | | | | | |
| **B** | | | | | | | | | | |
| **C** | | | | | | | | | | |

**8**  Add lines A through C, column (s). Enter the total here and on line 9, page 2 ............................................................ ▶ | 8 |

LHA   For Paperwork Reduction Act Notice, see instructions.

Form **1116** (2015)

511501
11-30-15

33

12050501 137560 AB010                2015.03040 Bruyea, Paul                AB010__1

**Alternative Minimum Tax**

Form 1116 (2015)  Paul Bruyea                                                                                        2

| Part III | Figuring the Credit |
|---|---|

9  Enter the amount from line 8. These are your total foreign taxes paid or accrued
for the category of income checked above Part I ............... **9**

10  Carryback or carryover (attach detailed computation)  **See Statement 17**  **10**  23,359.

11  Add lines 9 and 10 ............................................................ **11**  23,359.

12  Reduction in foreign taxes .................................... **12**

13  Taxes reclassified under high tax kickout ..................... **13**

14  Combine lines 11, 12, and 13. This is the total amount of foreign taxes available for credit .......... **14**  23,359.

15  Enter the amount from line 7. This is your taxable income or (loss) from sources outside the
United States (before adjustments) for the category of income checked above Part I .............. **15**

16  Adjustments to line 15 ........................................... **16**

17  Combine the amounts on lines 15 and 16. This is your net foreign source taxable income.
(If the result is zero or less, you have no foreign tax credit for the category of income
you checked above Part I. Skip lines 18 through 22. However, if you are filing more than
one Form 1116, you must complete line 20.) ........................... **17**

18  Individuals: Enter the amount from Form 1040, line 41, or Form 1040NR, line 39.
Estates and trusts: Enter your taxable income without the deduction for your
exemption ................................................................. **18**
Caution: *If you figured your tax using the lower rates on qualified dividends or capital gains, see instructions.*

19  Divide line 17 by line 18. If line 17 is more than line 18, enter "1" ..................... **19**

20  Individuals: Enter the amounts from Form 1040, lines 44 and 46. If you are a nonresident alien, enter the amounts from
Form 1040NR, lines 42 and 44. Estates and trusts: Enter the amount from Form 1041, Schedule G, line 1a, or the total
of Form 990-T, lines 36 and 37 ............................... **20**  1,416,105.
Caution: *If you are completing line 20 for separate category e (lump-sum distributions), see instructions.*

21  Multiply line 20 by line 19 (maximum amount of credit) ..................... **21**

22  Enter the smaller of line 14 or line 21. If this is the only Form 1116 you are filing, skip lines 23 through 27 and enter this
amount on line 28. Otherwise, complete the appropriate line in Part IV ............... ▶ **22**  0.

| Part IV | Summary of Credits From Separate Parts III |
|---|---|

23  Credit for taxes on passive category income ..................... **23**

24  Credit for taxes on general category income ..................... **24**

25  Credit for taxes on certain income re-sourced by treaty ............ **25**

26  Credit for taxes on lump-sum distributions ..................... **26**

27  Add lines 23 through 26 ........................................... **27**

28  Enter the smaller of line 20 or line 27 ........................... **28**

29  Reduction of credit for international boycott operations ............ **29**

30  Subtract line 29 from line 28. This is your foreign tax credit. Enter here and on Form 1040, line 48;
Form 1040NR, line 46; Form 1041, Schedule G, line 2a; or Form 990-T, line 40a ......... ▶ **30**

Form 1116 (2015)

611511
11-30-15

Appx81

OMB No. 1545-0191

Form **4952**

Department of the Treasury
Internal Revenue Service (99)

# Investment Interest Expense Deduction

▶ Information about Form 4952 and its instructions is at *www.irs.gov/form4952.*
▶ Attach to your tax return.

**2015**

Attachment
Sequence No. **51**

Name(s) shown on return

Paul Bruyea

Identifying number

| Part I | Total Investment Interest Expense | | |
|---|---|---|---|
| 1 | Investment interest expense paid or accrued in 2015 (see instructions) **See Statement 18** | 1 | 4,189. |
| 2 | Disallowed investment interest expense from 2014 Form 4952, line 7 | 2 | 42,571. |
| 3 | Total investment interest expense. Add lines 1 and 2 | 3 | 46,760. |

| Part II | Net Investment Income | | | | |
|---|---|---|---|---|---|
| 4a | Gross income from property held for investment (excluding any net gain from the disposition of property held for investment) **Stmt 19** | 4a | 2,248. | | |
| b | Qualified dividends included on line 4a | 4b | 1,600. | | |
| c | Subtract line 4b from line 4a | | | 4c | 648. |
| d | Net gain from the disposition of property held for investment | 4d | | | |
| e | Enter the smaller of line 4d or your net capital gain from the disposition of property held for investment (see instructions) | 4e | | | |
| f | Subtract line 4e from line 4d | | | 4f | |
| g | Enter the amount from lines 4b and 4e that you elect to include in investment income (see instructions) | | | 4g | |
| h | Investment income. Add lines 4c, 4f, and 4g | | | 4h | 648. |
| 5 | Investment expenses (see instructions) | | | 5 | |
| 6 | Net investment income. Subtract line 5 from line 4h. If zero or less, enter -0- | | | 6 | 648. |

| Part III | Investment Interest Expense Deduction | | |
|---|---|---|---|
| 7 | Disallowed investment interest expense to be carried forward to 2016. Subtract line 6 from line 3. If zero or less, enter -0- **See Statement 20** | 7 | 46,112. |
| 8 | Investment interest expense deduction. Enter the smaller of line 3 or 6. See instructions **Stmt 21** | 8 | 648. |

LHA   For Paperwork Reduction Act Notice, see separate instructions.

Form **4952** (2015)

518901
11-02-15

35

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010__1

Appx82

Alternative Minimum Tax

| Form **4952** | **Investment Interest Expense Deduction** | OMB No. 1545-0191 |
|---|---|---|
| | ► Information about Form 4952 and its instructions is at *www.irs.gov/form4952*. | **2015** |
| Department of the Treasury Internal Revenue Service (99) | ► Attach to your tax return. | Attachment Sequence No. 51 |

| Name(s) shown on return | Identifying number |
|---|---|
| Paul Bruyea | |

**Part I  Total Investment Interest Expense**

| | | | |
|---|---|---|---|
| 1 | Investment interest expense paid or accrued in 2015 (see instructions) **See Statement 22** | 1 | 4,189. |
| 2 | Disallowed investment interest expense from 2014 Form 4952, line 7 | 2 | 32,782. |
| 3 | Total investment interest expense. Add lines 1 and 2 | 3 | 36,971. |

**Part II  Net Investment Income**

| | | | | | |
|---|---|---|---|---|---|
| 4a | Gross income from property held for investment (excluding any net gain from the disposition of property held for investment) | 4a | 2,248. | | |
| b | Qualified dividends included on line 4a | 4b | 1,600. | | |
| c | Subtract line 4b from line 4a | | | 4c | 648. |
| d | Net gain from the disposition of property held for investment | 4d | | | |
| e | Enter the smaller of line 4d or your net capital gain from the disposition of property held for investment (see instructions) | 4e | | | |
| f | Subtract line 4e from line 4d | | | 4f | |
| g | Enter the amount from lines 4b and 4e that you elect to include in investment income (see instructions) | | | 4g | . |
| h | Investment income. Add lines 4c, 4f, and 4g | | | 4h | 648. |
| 5 | Investment expenses (see instructions) | | | 5 | |
| 6 | Net investment income. Subtract line 5 from line 4h. If zero or less, enter -0- | | | 6 | 648. |

**Part III  Investment Interest Expense Deduction**

| | | | |
|---|---|---|---|
| 7 | Disallowed investment interest expense to be carried forward to 2016. Subtract line 6 from line 3. If zero or less, enter -0- | 7 | 36,323. |
| 8 | Investment interest expense deduction. Enter the smaller of line 3 or 6. See instructions | 8 | 648. |

LHA  For Paperwork Reduction Act Notice, see separate instructions.                Form **4952** (2015)

```
Regular Form 4952, line 8                              648.
Less recomputed Form 4952, line 8                      648.
Interest adjustment - Form 6251, line 8
```

| Form **8960** | | **Net Investment Income Tax -** **Individuals, Estates, and Trusts** | OMB No. 1545-2227 | **2015** |
|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service (99) | | ► Attach to your tax return. ► Information about Form 8960 and its separate instructions is at www.irs.gov/form8960. | | Attachment Sequence No. **72** |

Name(s) shown on your tax return
**Paul Bruyea**

Your social security number or EIN

| Part I | Investment Income | ☐ Section 6013(g) election (see instructions) ☐ Section 6013(h) election (see instructions) ☐ Regulations section 1.1411-10(g) election (see instructions) | | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 1 | Taxable interest (see instructions) | | **1** | 648. |
| 2 | Ordinary dividends (see instructions) | | **2** | 1,600. |
| 3 | Annuities (see instructions) | | **3** | |
| 4a | Rental real estate, royalties, partnerships, S corporations, trusts, etc. (see instructions) | **4a** 47,497. | | |
| b | Adjustment for net income or loss derived in the ordinary course of a non-section 1411 trade or business (see instructions) | **4b** | | |
| c | Combine lines 4a and 4b | | **4c** | 47,497. |
| 5a | Net gain or loss from disposition of property (see instructions) | **5a** 7,010,078. | | |
| b | Net gain or loss from disposition of property that is not subject to net investment income tax (see instructions) | **5b** | | |
| c | Adjustment from disposition of partnership interest or S corporation stock (see instructions) | **5c** | | |
| d | Combine lines 5a through 5c | | **5d** | 7,010,078. |
| 6 | Adjustments to investment income for certain CFCs and PFICs (see instructions) | | **6** | |
| 7 | Other modifications to investment income (see instructions) | | **7** | |
| 8 | Total investment income. Combine lines 1, 2, 3, 4c, 5d, 6, and 7 | | **8** | 7,059,823. |

| Part II | Investment Expenses Allocable to Investment Income and Modifications | | | |
|---|---|---|---|---|
| 9a | Investment interest expenses (see instructions) | **9a** | | |
| b | State, local, and foreign income tax (see instructions) | **9b** | | |
| c | Miscellaneous investment expenses (see instructions) | **9c** | | |
| d | Add lines 9a, 9b, and 9c | | **9d** | |
| 10 | Additional modifications (see instructions) | | **10** | |
| 11 | Total deductions and modifications. Add lines 9d and 10 | | **11** | |

| Part III | Tax Computation | | | |
|---|---|---|---|---|
| 12 | Net investment income. Subtract Part II, line 11 from Part I, line 8. Individuals complete lines 13-17. Estates and trusts complete lines 18a-21. If zero or less, enter -0- | | **12** | 7,059,823. |
| | **Individuals:** | | | |
| 13 | Modified adjusted gross income (see instructions) | **13** 7,059,823. | | |
| 14 | Threshold based on filing status (see instructions) | **14** 125,000. | | |
| 15 | Subtract line 14 from line 13. If zero or less, enter -0- | **15** 6,934,823. | | |
| 16 | Enter the smaller of line 12 or line 15 | | **16** | 6,934,823. |
| 17 | Net investment income tax for individuals. Multiply line 16 by 3.8% (.038). Enter here and include on your tax return (see instructions) | | **17** | 263,523. |
| | **Estates and Trusts:** | | | |
| 18a | Net investment income (line 12 above) | **18a** | | |
| b | Deductions for distributions of net investment income and deductions under section 642(c) (see instructions) | **18b** | | |
| c | Undistributed net investment income. Subtract line 18b from line 18a (see instructions). If zero or less, enter -0- | **18c** | | |
| 19a | Adjusted gross income (see instructions) | **19a** | | |
| b | Highest tax bracket for estates and trusts for the year (see instructions) | **19b** | | |
| c | Subtract line 19b from line 19a. If zero or less, enter -0- | **19c** | | |
| 20 | Enter the smaller of line 18c or line 19c | | **20** | |
| 21 | Net investment income tax for estates and trusts. Multiply line 20 by 3.8% (.038). Enter here and include on your tax return (see instructions) | | **21** | |

LHA   For Paperwork Reduction Act Notice, see your tax return instructions.

Form **8960** (2015)

523121 12-10-15

Form **8965**

Department of the Treasury
Internal Revenue Service

**Health Coverage Exemptions**

▶ Attach to Form 1040, Form 1040A, or Form 1040EZ.
▶ Information about Form 8965 and its separate instructions is at *www.irs.gov/form8965.*

OMB No. 1545-0074

**2015**

Attachment
Sequence No. **75**

Name as shown on return
Paul Bruyea

Your social security number

Complete this form if you have a Marketplace-granted coverage exemption or you are claiming a coverage exemption on your return.

**Part I** — **Marketplace-Granted Coverage Exemptions for Individuals.** If you and/or a member of your tax household have an exemption granted by the Marketplace, complete Part I.

| | (a) Name of Individual | (b) SSN | (c) Exemption Certificate Number |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |

**Part II** — **Coverage Exemptions Claimed on Your Return for Your Household**

7a   Are you claiming an exemption because your household income is below the filing threshold? .................... ☐ Yes ☒ No

b   Are you claiming a hardship exemption because your gross income is below the filing threshold? .................... ☐ Yes ☒ No

**Part III** — **Coverage Exemptions Claimed on Your Return for Individuals.** If you and/or a member of your tax household are claiming an exemption on your return, complete Part III.

| | (a) Name of Individual | (b) SSN | (c) Exemption Type | (d) Full Year | (e) Jan | (f) Feb | (g) Mar | (h) Apr | (i) May | (j) June | (k) July | (l) Aug | (m) Sept | (n) Oct | (o) Nov | (p) Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | Paul Bruyea | ▦-1701 | C | X | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | |

521021
11-18-15  LHA   **For Privacy Act and Paperwork Reduction Act Notice, see your tax return instructions.**   Form **8965** (2015)

38

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010___1

<table>
<tr><td>Form <strong>8582</strong></td><td colspan="2" align="center"><strong>Passive Activity Loss Limitations</strong><br>▶ See separate instructions.<br>▶ Attach to Form 1040 or Form 1041.</td><td>OMB No. 1545-1008</td></tr>
<tr><td>Department of the Treasury<br>Internal Revenue Service (99)</td><td colspan="2" align="center">▶ Information about Form 8582 and its instructions is available at www.irs.gov/form8582.</td><td><strong>2015</strong><br>Attachment<br>Sequence No. <strong>88</strong></td></tr>
</table>

Name(s) shown on return | Identifying number

Paul Bruyea

**Part I** | **2015 Passive Activity Loss** *Caution: Complete Worksheets 1, 2, and 3 before completing Part I.*

Rental Real Estate Activities With Active Participation (For the definition of active participation, see Special Allowance for Rental Real Estate Activities in the instructions.)

| | | | |
|---|---|---|---|
| **1a** Activities with net income (enter the amount from Worksheet 1, column (a)) | **1a** | | |
| **b** Activities with net loss (enter the amount from Worksheet 1, column (b)) | **1b** ( | ) | |
| **c** Prior years unallowed losses (enter the amount from Worksheet 1, column (c)) | **1c** ( | ) | |
| **d** Combine lines 1a, 1b, and 1c | | | **1d** |

Commercial Revitalization Deductions From Rental Real Estate Activities

| | | | |
|---|---|---|---|
| **2a** Commercial revitalization deductions from Worksheet 2, column (a) | **2a** ( | ) | |
| **b** Prior year unallowed commercial revitalization deductions from Worksheet 2, column (b) | **2b** ( | ) | |
| **c** Add lines 2a and 2b | | | **2c** ( ) |

All Other Passive Activities

| | | | |
|---|---|---|---|
| **3a** Activities with net income (enter the amount from Worksheet 3, column (a)) | **3a** | 7,696,604. | |
| **b** Activities with net loss (enter the amount from Worksheet 3, column (b)) | **3b** ( | 574,871. ) | |
| **c** Prior years unallowed losses (enter the amount from Worksheet 3, column (c)) | **3c** ( | ) | |
| **d** Combine lines 3a, 3b, and 3c | | | **3d** 7,121,733. |

**4** Combine lines 1d, 2c, and 3d. If this line is zero or more, stop here and include this form with your return; all losses are allowed, including any prior year unallowed losses entered on line 1c, 2b, or 3c. Report the losses on the forms and schedules normally used | **4** | 7,121,733.

If line 4 is a loss and: • Line 1d is a loss, go to Part II.
• Line 2c is a loss (and line 1d is zero or more), skip Part II and go to Part III.
• Line 3d is a loss (and lines 1d and 2c are zero or more), skip Parts II and III and go to line 15.

Caution: *If your filing status is married filing separately and you lived with your spouse at any time during the year, do not complete Part II or Part III. Instead, go to line 15.*

**Part II** | **Special Allowance for Rental Real Estate Activities With Active Participation**
Note: *Enter all numbers in Part II as positive amounts. See instructions for an example.*

| | | | |
|---|---|---|---|
| **5** Enter the smaller of the loss on line 1d or the loss on line 4 | | | **5** |
| **6** Enter $150,000. If married filing separately, see instructions | **6** | | |
| **7** Enter modified adjusted gross income, but not less than zero (see instructions) | **7** | | |
| Note: *If line 7 is greater than or equal to line 6, skip lines 8 and 9, enter -0- on line 10. Otherwise, go to line 8.* | | | |
| **8** Subtract line 7 from line 6 | **8** | | |
| **9** Multiply line 8 by 50% (.5). Do not enter more than $25,000. If married filing separately, see instructions | | | **9** |
| **10** Enter the smaller of line 5 or line 9 | | | **10** |
| If line 2c is a loss, go to Part III. Otherwise, go to line 15. | | | |

**Part III** | **Special Allowance for Commercial Revitalization Deductions From Rental Real Estate Activities**
Note: *Enter all numbers in Part III as positive amounts. See the example for Part II in the instructions.*

| | | | |
|---|---|---|---|
| **11** Enter $25,000 reduced by the amount, if any, on line 10. If married filing separately, see instructions | | | **11** |
| **12** Enter the loss from line 4 | | | **12** |
| **13** Reduce line 12 by the amount on line 10 | | | **13** |
| **14** Enter the smallest of line 2c (treated as a positive amount), line 11, or line 13 | | | **14** |

**Part IV** | **Total Losses Allowed**

| | | | |
|---|---|---|---|
| **15** Add the income, if any, on lines 1a and 3a and enter the total | | | **15** |
| **16** Total losses allowed from all passive activities for 2015. Add lines 10, 14, and 15. See instructions to find out how to report the losses on your tax return | | | **16** |

LHA 519781 12-09-15 **For Paperwork Reduction Act Notice, see instructions.** Form **8582** (2015)

12050501 137560 AB010 2015.03040 Bruyea, Paul AB010__1

Form 8582 (2015)  Paul Bruyea

Page 2

**Caution:** *The worksheets must be filed with your tax return. Keep a copy for your records.*

**Worksheet 1 - For Form 8582, Lines 1a, 1b, and 1c (See instructions.)**

| Name of activity | Current year | | Prior years | Overall gain or loss | |
| --- | --- | --- | --- | --- | --- |
| | (a) Net income (line 1a) | (b) Net loss (line 1b) | (c) Unallowed loss (line 1c) | (d) Gain | (e) Loss |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total. Enter on Form 8582, lines 1a, 1b, and 1c ▶ | | | | | |

**Worksheet 2 - For Form 8582, Lines 2a and 2b (See instructions.)**

| Name of activity | (a) Current year deductions (line 2a) | (b) Prior year unallowed deductions (line 2b) | (c) Overall loss |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| Total. Enter on Form 8582, lines 2a and 2b ▶ | | | |

**Worksheet 3 - For Form 8582, Lines 3a, 3b, and 3c (See instructions.)**

| Name of activity | Current year | | Prior years | Overall gain or loss | |
| --- | --- | --- | --- | --- | --- |
| | (a) Net income (line 3a) | (b) Net loss (line 3b) | (c) Unallowed loss (line 3c) | (d) Gain | (e) Loss |
| | | | | | |
| | | | | | |
| | | See Attached Statement for Worksheet 3 | | | |
| Total. Enter on Form 8582, lines 3a, 3b, and 3c ▶ | 7,696,604. | <574,871.> | | | |

**Worksheet 4 - Use this worksheet if an amount is shown on Form 8582, line 10 or 14 (See instructions.)**

| Name of activity | Form or schedule and line number to be reported on (see instructions) | (a) Loss | (b) Ratio | (c) Special allowance | (d) Subtract column (c) from column (a) |
| --- | --- | --- | --- | --- | --- |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total ▶ | | | | | |

**Worksheet 5 - Allocation of Unallowed Losses (See instructions.)**

| Name of activity | Form or schedule and line number to be reported on (see instructions) | (a) Loss | (b) Ratio | (c) Unallowed loss |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total ▶ | | | | |

510762 12-09-15

Form 8582 (2015)

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010__1

| Form **5471** | **Information Return of U.S. Persons With Respect To Certain Foreign Corporations** | OMB No. 1545-0704 |
|---|---|---|
| (Rev. December 2015) Department of the Treasury Internal Revenue Service | ▶ For more information about Form 5471, see www.irs.gov/form5471 Information furnished for the foreign corporation's annual accounting period (tax year required by section 898) (see instructions) beginning JAN 1 , 2015, and ending DEC 31, 2015 | Attachment Sequence No. **121** |

Name of person filing this return

Paul Bruyea

**A** Identifying number

Number, street, and room or suite no. (or P.O. box number if mail is not delivered to street address)

c/o 707 Fort Street Apt. No. 301

City or town, state, and ZIP code

Victoria, BC, Canada, V8W 3G3

**B** Category of filer (See instructions. Check applicable box(es)):

1 (repealed) 2 ☐ 3 ☐ 4 ☒ 5 ☒

**C** Enter the total percentage of the foreign corporation's voting stock you owned at the end of its annual accounting period _____ %

Filer's tax year beginning JAN 1 , 2015 , and ending DEC 31,2015

**D** Check if any excepted specified foreign financial assets are reported on this form (see instructions) .................... ☐

**E** Person(s) on whose behalf this information return is filed:

| (1) Name | (2) Address | (3) Identifying number | (4) Check applicable box(es) | | |
|---|---|---|---|---|---|
| | | | Shareholder | Officer | Director |
| Paul Bruyea | 707 Fort Street, Apt 301, Victoria, BC V8W 3G3 Canada | ███-1701 | X | X | X |
| | | | | | |

**Important:** *Fill in all applicable lines and schedules. All information must be in English. All amounts must be stated in U.S. dollars unless otherwise indicated.*

**1a** Name and address of foreign corporation

1043369 Alberta Ltd
7B Pleasant Blvd
Toronto, ON M4T 1K2 Canada

**b(1)** Employer identification number, if any

**b(2)** Reference ID number (see instructions)
001

**c** Country under whose laws incorporated
CANADA

| **d** Date of incorporation | **e** Principal place of business | **f** Principal business activity code number | **g** Principal business activity | **h** Functional currency |
|---|---|---|---|---|
| 04/23/03 | Canada | 551112 | Inactive | Canadian Dollar |

**2** Provide the following information for the foreign corporation's accounting period stated above.

**a** Name, address, and identifying number of branch office or agent (if any) in the United States

**b** If a U.S. income tax return was filed, enter:

| (i) Taxable income or (loss) | (ii) U.S. income tax paid (after all credits) |
|---|---|
| | |

**c** Name and address of foreign corporation's statutory or resident agent in country of incorporation

Paul Bruyea
301-707 Fort St
Victoria, BC V8W 3G3
Canada

**d** Name and address (including corporate department, if applicable) of person (or persons) with custody of the books and records of the foreign corporation, and the location of such books and records, if different

Witten LLP
2500, 10303 Jasper Avenue
Edmonton, AB T5J 5N6
Canada

| Schedule A | Stock of the Foreign Corporation |
|---|---|

| (a) Description of each class of stock | (b) Number of shares issued and outstanding | |
|---|---|---|
| | (i) Beginning of annual accounting period | (ii) End of annual accounting period |
| Common shares | 100. | 100. |
| | | |
| | | |

LHA For Paperwork Reduction Act Notice, see instructions.

Form **5471** (Rev. 12-2015)

512301 12-30-15

41

12050501 137560 AB010     2015.03040 Bruyea, Paul     AB010__1

Form 5471 (Rev. 12-2015) Paul Bruyea / 1043369 Alberta Ltd                                                    Page **2**

| Schedule B | U.S. Shareholders of Foreign Corporation | | |

| (a) Name, address, and identifying number of shareholder | (b) Description of each class of stock held by shareholder. Note: This description should match the corresponding description entered in Schedule A, column (a). | (c) Number of shares held at beginning of annual accounting period | (d) Number of shares held at end of annual accounting period | (e) Pro rata share of subpart F income (enter as a percentage) |
|---|---|---|---|---|
| Paul Bruyea<br>301-707 Fort St<br>Victoria, Canada V8W 3G3<br>▇▇▇-1701 | Common shares | 100.000 | 100.000 | |
| | | | | |

| Schedule C | Income Statement | |

**Important:** Report all information in functional currency in accordance with U.S. GAAP. Also, report each amount in U.S. dollars translated from functional currency (using GAAP translation rules). However, if the functional currency is the U.S. dollar, complete only the U.S. Dollars column. See instructions for special rules for DASTM corporations.

| | | | Functional Currency | U.S. Dollars |
|---|---|---|---|---|
| **Income** | 1a Gross receipts or sales | 1a | | |
| | b Returns and allowances | 1b | | |
| | c Subtract line 1b from line 1a | 1c | | |
| | 2 Cost of goods sold | 2 | | |
| | 3 Gross profit (subtract line 2 from line 1c) | 3 | | |
| | 4 Dividends | 4 | | |
| | 5 Interest | 5 | | |
| | 6a Gross rents | 6a | | |
| | b Gross royalties and license fees | 6b | | |
| | 7 Net gain or (loss) on sale of capital assets | 7 | | |
| | 8 Other income (attach statement) | 8 | | |
| | 9 Total income (add lines 3 through 8) | 9 | | |
| **Deductions** | 10 Compensation not deducted elsewhere | 10 | | |
| | 11a Rents | 11a | | |
| | b Royalties and license fees | 11b | | |
| | 12 Interest | 12 | | |
| | 13 Depreciation not deducted elsewhere | 13 | | |
| | 14 Depletion | 14 | | |
| | 15 Taxes (exclude provision for income, war profits, and excess profits taxes) | 15 | | |
| | 16 Other deductions (attach statement - exclude provision for income, war profits, and excess profits taxes) | 16 | | |
| | 17 Total deductions (add lines 10 through 16) | 17 | | |
| **Net Income** | 18 Net income or (loss) before extraordinary items, prior period adjustments, and the provision for income, war profits, and excess profits taxes (subtract line 17 from line 9) | 18 | | |
| | 19 Extraordinary items and prior period adjustments | 19 | | |
| | 20 Provision for income, war profits, and excess profits taxes | 20 | | |
| | 21 Current year net income or (loss) per books (combine lines 18 through 20) | 21 | | |

512311 12-30-15                                                                                Form **5471** (Rev. 12-2015)

12050501 137560 AB010          2015.03040 Bruyea, Paul                    AB010___1

Form 5471 (Rev. 12-2015) Paul Bruyea / 1043369 Alberta Ltd                          Page **3**

| Schedule E | Income, War Profits, and Excess Profits Taxes Paid or Accrued | | | |
|---|---|---|---|---|
| | | Amount of tax | | |
| | **(a)**<br>Name of country or U.S. possession | **(b)**<br>In foreign currency | **(c)**<br>Conversion rate | **(d)**<br>In U.S. dollars |
| 1 | U.S. | . | | |
| 2 | Canada | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | Total ............................................................► | | | |

| Schedule F | Balance Sheet |
|---|---|

**Important:** *Report all amounts in U.S. dollars prepared and translated in accordance with U.S. GAAP. See instructions for an exception for DASTM corporations.*

| Assets | | | **(a)**<br>Beginning of annual<br>accounting period | **(b)**<br>End of annual<br>accounting period |
|---|---|---|---|---|
| 1 | Cash ....................................................... | 1 | 1. | 1. |
| 2a | Trade notes and accounts receivable ................. | 2a | | |
| b | Less allowance for bad debts ......................... | 2b | ( ) | ( ) |
| 3 | Inventories ............................................... | 3 | | |
| 4 | Other current assets (attach statement) ............. | 4 | | |
| 5 | Loans to shareholders and other related persons ... | 5 | | |
| 6 | Investment in subsidiaries (attach statement) ...... | 6 | | |
| 7 | Other investments (attach statement) ................ | 7 | | |
| 8a | Buildings and other depreciable assets .............. | 8a | | |
| b | Less accumulated depreciation ....................... | 8b | ( ) | ( ) |
| 9a | Depletable assets ...................................... | 9a | | |
| b | Less accumulated depletion ........................... | 9b | ( ) | ( ) |
| 10 | Land (net of any amortization) ....................... | 10 | | |
| 11 | Intangible assets: | | | |
| a | Goodwill ................................................. | 11a | | |
| b | Organization costs ..................................... | 11b | | |
| c | Patents, trademarks, and other intangible assets ... | 11c | | |
| d | Less accumulated amortization for lines 11a, b, and c | 11d | ( ) | ( ) |
| 12 | Other assets (attach statement) ...................... | 12 | | |
| 13 | Total assets ............................................. | 13 | 1. | 1. |

| Liabilities and Shareholders' Equity | | | | |
|---|---|---|---|---|
| 14 | Accounts payable ....................................... | 14 | | |
| 15 | Other current liabilities (attach statement) .......... | 15 | | |
| 16 | Loans from shareholders and other related persons .. | 16 | | |
| 17 | Other liabilities (attach statement) .................. | 17 | | |
| 18 | Capital stock: | | | |
| a | Preferred stock ......................................... | 18a | | |
| b | Common stock .......................................... | 18b | 1. | 1. |
| 19 | Paid-in or capital surplus (attach reconciliation) .... | 19 | | |
| 20 | Retained earnings ...................................... | 20 | | |
| 21 | Less cost of treasury stock ............................ | 21 | ( ) | ( ) |
| 22 | Total liabilities and shareholders' equity ........... | 22 | 1. | 1. |

Form **5471** (Rev. 12-2015)

Form 5471 (Rev. 12-2015) Paul Bruyea / 1043369 Alberta Ltd

## Schedule G  Other Information

| | | Yes | No |
|---|---|---|---|
| 1 | During the tax year, did the foreign corporation own at least a 10% interest, directly or indirectly, in any foreign partnership? If "Yes," see the instructions for required statement. | ☐ | ☒ |
| 2 | During the tax year, did the foreign corporation own an interest in any trust? | ☐ | ☒ |
| 3 | During the tax year, did the foreign corporation own any foreign entities that were disregarded as entities separate from their owners under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," you are generally required to attach Form 8858 for each entity (see instructions). | ☐ | ☒ |
| 4 | During the tax year, was the foreign corporation a participant in any cost sharing arrangement? | ☐ | ☒ |
| 5 | During the course of the tax year, did the foreign corporation become a participant in any cost sharing arrangement? | ☐ | ☒ |
| 6 | During the tax year, did the foreign corporation participate in any reportable transaction as defined in Regulations section 1.6011-4? If "Yes," attach Form(s) 8886 if required by Regulations section 1.6011-4(c)(3)(i)(G). | ☐ | ☒ |
| 7 | During the tax year, did the foreign corporation pay or accrue any foreign tax that was disqualified for credit under section 901(m)? | ☐ | ☒ |
| 8 | During the tax year, did the foreign corporation pay or accrue foreign taxes to which section 909 applies, or treat foreign taxes that were previously suspended under section 909 as no longer suspended? | ☐ | ☒ |

## Schedule H  Current Earnings and Profits

**Important:** Enter the amounts on lines 1 through 5c in functional currency.

| | | Net Additions | Net Subtractions | | |
|---|---|---|---|---|---|
| 1 | Current year net income or (loss) per foreign books of account | | | 1 | |
| 2 | Net adjustments made to line 1 to determine current earnings and profits according to U.S. financial and tax accounting standards (see instructions): | | | | |
| a | Capital gains or losses | | | | |
| b | Depreciation and amortization | | | | |
| c | Depletion | | | | |
| d | Investment or incentive allowance | | | | |
| e | Charges to statutory reserves | | | | |
| f | Inventory adjustments | | | | |
| g | Taxes | | | | |
| h | Other (attach statement) | | | | |
| 3 | Total net additions | | | | |
| 4 | Total net subtractions | | | | |
| 5a | Current earnings and profits (line 1 plus line 3 minus line 4) | | | 5a | |
| b | DASTM gain or (loss) for foreign corporations that use DASTM | | | 5b | |
| c | Combine lines 5a and 5b | | | 5c | |
| d | Current earnings and profits in U.S. dollars (line 5c translated at the appropriate exchange rate as defined in section 989(b) and the related regulations) | | | 5d | |
| | Enter exchange rate used for line 5d ▶ | | | | |

## Schedule I  Summary of Shareholder's Income From Foreign Corporation

If Item E on page 1 is completed, a separate Schedule I must be filed for each Category 4 or 5 filer for whom reporting is furnished on this Form 5471. This schedule I is being completed for:

Name of U.S. shareholder ▶                                    Identifying number ▶

| | | | |
|---|---|---|---|
| 1 | Subpart F income (line 38b, Worksheet A in the instructions) | 1 | |
| 2 | Earnings invested in U.S. property (line 17, Worksheet B in the instructions) | 2 | |
| 3 | Previously excluded subpart F income withdrawn from qualified investments (line 6b, Worksheet C in the instructions) | 3 | |
| 4 | Previously excluded export trade income withdrawn from investment in export trade assets (line 7b, Worksheet D in the instructions) | 4 | |
| 5 | Factoring income | 5 | |
| 6 | Total of lines 1 through 5. Enter here and on your income tax return | 6 | |
| 7 | Dividends received (translated at spot rate on payment date under section 989(b)(1)) | 7 | |
| 8 | Exchange gain or (loss) on a distribution of previously taxed income | 8 | |

| | | Yes | No |
|---|---|---|---|
| • | Was any income of the foreign corporation blocked? | ☐ | ☒ |
| • | Did any such income become unblocked during the tax year (see section 964(b))? | ☐ | ☒ |

If the answer to either question is "Yes," attach an explanation.

512331
12-30-15

Form **5471** (Rev. 12-2015)

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010__1

Appx91

**Form 8948**
(Rev. September 2012)

Department of the Treasury
Internal Revenue Service

# Preparer Explanation for Not Filing Electronically

▶ Attach to taxpayer's Form 1040, 1040A, 1040EZ, or Form 1041.
▶ Information about Form 8948 and its instructions is available at *www.irs.gov/form8948* .

OMB No. 1545-2200

Attachment
Sequence No. 173

| Name(s) on tax return | Tax year of return | Taxpayer's identifying number |
|---|---|---|
| Paul Bruyea | 2015 | ██████ |

| Preparer's name | Preparer Tax Identification Number (PTIN) |
|---|---|
| Angus Izard | ████2639 |

Three out of four taxpayers now use IRS e-file. Go to *www.irs.gov/efile* for details on using IRS e-file. The benefits of electronic filing include the following:

- Faster refunds
- More accurate returns
- Secure transmissions
- Easier filing method
- E-payment options
- Receipt acknowledged

Check the applicable box to indicate the reason this return is not being filed electronically. Do not check more than one box.

1 ☐ Taxpayer chose to file this return on paper.

2 ☐ The preparer received a waiver from the requirement to electronically file the tax return.

Waiver Reference Number _____ Approval Letter Date _____

3 ☐ The preparer is a member of a recognized religious group that is conscientiously opposed to filing electronically.

4 ☐ This return was rejected by IRS *e-file* and the reject condition could not be resolved.

Reject code: _____ Number of attempts to resolve reject: _____

5 ☐ The preparer's e-file software package does not support Form _____ or Schedule _____ attached to this return.

6 Check the box that applies and provide additional information if requested.
  a ☒ The preparer is ineligible to file electronically because IRS *e-file* does not accept foreign preparers without social security numbers who live and work abroad.
  b ☐ The preparer is ineligible to participate in IRS *e-file*.
  c ☐ Other: Describe below the circumstances that prevented the preparer from filing this return electronically.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

531131 04-01-15    LHA  For Paperwork Reduction Act Notice, see instructions.    Form **8948** (Rev. 9-2012)

45

12050501 137560 AB010           2015.03040 Bruyea, Paul           AB010__1

| Form **8938** | Statement of Specified Foreign Financial Assets | OMB No. 1545-2195 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | ▶ Information about Form 8938 and its separate instructions is at *www.irs.gov/form8938*. ▶ Attach to your tax return. | **2015** Attachment Sequence No. **175** |

For calendar year 2015 or tax year beginning _____ and ending _____ .

If you have attached continuation statements, check here ▶ [X]    Number of continuation statements ___2___

| Name(s) shown on return | TIN |
|---|---|
| Paul Bruyea | |

### Part I   Foreign Deposit and Custodial Accounts Summary

| | | |
|---|---|---|
| 1 Number of Deposit Accounts (reported on Form 8938) | ▶ | 4 |
| 2 Maximum Value of All Deposit Accounts | $ | 4,346,087. |
| 3 Number of Custodial Accounts (reported on Form 8938) | ▶ | 3 |
| 4 Maximum Value of All Custodial Accounts | $ | 3,852,082. |
| 5 Were any foreign deposit or custodial accounts closed during the tax year? | | [ ] Yes   [X] No |

### Part II   Other Foreign Assets Summary

| | | |
|---|---|---|
| 1 Number of Foreign Assets (reported on Form 8938) | ▶ | |
| 2 Maximum Value of All Assets | $ | |
| 3 Were any foreign assets acquired or sold during the tax year? | | [ ] Yes   [ ] No |

### Part III   Summary of Tax Items Attributable to Specified Financial Financial Assets (see instructions)

| (a) Asset Category | (b) Tax item | (c) Amount reported on form or schedule | (d) Form and line | (e) Schedule and line |
|---|---|---|---|---|
| **1 Foreign Deposit and Custodial Accounts** | 1a Interest | $ 648. | Statement 25 | |
| | 1b Dividends | $ 1,600. | | Sch B, ln 5 |
| | 1c Royalties | $ | | |
| | 1d Other income | $ | | |
| | 1e Gains (losses) | $ <64,158.> | Statement 26 | |
| | 1f Deductions | $ | | |
| | 1g Credits | $ | | |
| **2 Other Foreign Assets** | 2a Interest | $ | | |
| | 2b Dividends | $ | | |
| | 2c Royalties | $ | | |
| | 2d Other income | $ | | |
| | 2e Gains (losses) | $ 7,074,236. | Statement 27 | |
| | 2f Deductions | $ | | |
| | 2g Credits | $ | | |

### Part IV   Excepted Specified Foreign Financial Assets (see instructions)

If you reported specified foreign financial assets on one or more of the following forms, enter the number of such forms filed. You do not need to include these assets on Form 8938 for the tax year.

| | | |
|---|---|---|
| 1. Number of Forms 3520 _____ | 2. Number of Forms 3520-A _____ | 3. Number of Forms 5471 _____ |
| 4. Number of Forms 8621 _____ | 5. Number of Forms 8865 _____ | |

### Part V   Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary (see instructions)

If you have more than one account to report, attach a continuation statement for each additional account (see instructions).

| | |
|---|---|
| 1 Type of account   [ ] Deposit   [X] Custodial | 2 Account number or other designation 81-2-9C |

3 Check all that apply   a [ ] Account opened during tax year   b [ ] Account closed during tax year
c [ ] Account jointly owned with spouse   d [X] No tax item reported in Part III with respect to this asset

| | | |
|---|---|---|
| 4 Maximum value of account during tax year | $ | 168,351. |
| 5 Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars? | | [X] Yes   [ ] No |

6 If you answered "Yes" to line 5, complete all that apply.

| (a) Foreign currency in which account is maintained | (b) Foreign currency exchange rate used to convert to U.S. dollars | (c) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| Canada, Dollar | 1.386000000 | |

LHA   For Paperwork Reduction Act Notice, see the separate instructions.    Form **8938** (2015)

523021 11-05-15
12050501 137560 AB010          46          2015.03040 Bruyea, Paul          AB010__1

Form 8938 (2015)      Paul Bruyea                                                      Page 2

**Part V   Detailed Information for Each Foreign Deposit and Custodial Account Included in the Part I Summary**
(see instructions) (continued)

**7a** Name of financial institution in which account is maintained          **b** Reserved
Scotia Capital

**8** Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.
102-9838 Fourth St

**9** City or town, state or province, and country (including postal code)
Sidney, British Columbia V8L 2Z3 Canada

**Part VI   Detailed Information for Each "Other Foreign Asset" Included in the Part II Summary (see instructions)**

Note. *If you reported specified foreign financial assets on Forms 3520, 3520-A, 5471, 8621, or 8865, you do not have to include the assets on Form 8938. You must complete Part IV. See instructions.*

If you have more than one asset to report, attach a continuation statement for each additional asset (see instructions).

| 1 | Description of asset | 2 | Identifying number or other designation |
|---|---|---|---|

**3** Complete all that apply. See instructions for reporting of multiple acquisition or disposition dates.
a Date asset acquired during tax year, if applicable  ..........
b Date asset disposed of during tax year, if applicable  ..........
c ☐ Check if asset jointly owned with spouse      d ☐ Check if no tax item reported in Part III with respect to this asset

**4** Maximum value of asset during tax year (check box that applies)
a ☐ $0 - $50,000      b ☐ $50,001 - $100,000      c ☐ $100,001 - $150,000      d ☐ $150,001 - $200,000
e If more than $200,000, list value  ..........  $

**5** Did you use a foreign currency exchange rate to convert the value of the asset into U.S. dollars?  ..........  ☐ Yes  ☐ No

**6** If you answered "Yes" to line 5, complete all that apply.

| (a) Foreign currency in which asset is denominated | (b) Foreign currency exchange rate used to convert to U.S. dollars | (c) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|

**7** If asset reported on line 1 is stock of a foreign entity or an interest in a foreign entity, enter the following information for the asset.
a Name of foreign entity                                          b Reserved
c Type of foreign entity      (1) ☐ Partnership      (2) ☐ Corporation      (3) ☐ Trust      (4) ☐ Estate
d Mailing address of foreign entity. Number, street, and room or suite no.

e City or town, state or province, and country (including postal code)

**8** If asset reported on line 1 is not stock of a foreign entity or an interest in a foreign entity, enter the following information for the asset.
Note. *If this asset has more than one issuer or counterparty, attach a continuation statement with the same information for each additional issuer or counterparty (see instructions).*
a Name of issuer or counterparty
Check if information is for      ☐ Issuer      ☐ Counterparty

b Type of issuer or counterparty
(1) ☐ Individual      (2) ☐ Partnership      (3) ☐ Corporation      (4) ☐ Trust      (5) ☐ Estate

c Check if issuer or counterparty is a      ☐ U.S. person      ☐ Foreign person

d Mailing address of issuer or counterparty. Number, street, and room or suite no.

e City or town, state or province, and country (including postal code)

Form **8938** (2015)

523022
11-05-15

47

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010__1

Appx94

Last Name or Organization Name
**Paul Bruyea**

Identification Number     Form 8938

**Part V   Foreign Deposit and Custodial Accounts** (see instructions)

**1** Type of account   [X] Deposit   [ ] Custodial     **2** Account number or other designation
72 80

**3** Check all that apply   **a** [ ] Account opened during tax year   **b** [ ] Account closed during tax year
    **c** [ ] Account jointly owned with spouse   **d** [X] No tax item reported in Part III with respect to this asset

**4** Maximum value of account during tax year ............................................................. $    **74,286.**

**5** Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars?   [X] Yes   [ ] No

**6** If you answered "Yes" to line 5, complete all that apply.

| (1) Foreign currency in which account is maintained | (2) Foreign currency exchange rate used to convert to U.S. dollars | (3) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| Canada, Dollar | 1.386000000 | |

**7a** Name of financial institution in which account is maintained     **b** Reserved

**Bank of Nova Scotia**

**8** Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.

**5116 Cordova Bay Road**

**9** City or town, province or state, and country (including postal code)

**Victoria, British Columbia V8Y 2K5 Canada**

**1** Type of account   [X] Deposit   [ ] Custodial     **2** Account number or other designation
7810

**3** Check all that apply   **a** [ ] Account opened during tax year   **b** [ ] Account closed during tax year
    **c** [ ] Account jointly owned with spouse   **d** [X] No tax item reported in Part III with respect to this asset

**4** Maximum value of account during tax year ............................................................. $    **25,737.**

**5** Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars?   [X] Yes   [ ] No

**6** If you answered "Yes" to line 5, complete all that apply.

| (1) Foreign currency in which account is maintained | (2) Foreign currency exchange rate used to convert to U.S. dollars | (3) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| Canada, Dollar | 1.386000000 | |

**7a** Name of financial institution in which account is maintained     **b** Reserved

**Bank of Nova Scotia**

**8** Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.

**5116 Cordova Bay Road**

**9** City or town, province or state, and country (including postal code)

**Victoria, British Columbia V8Y 2K5 Canada**

**1** Type of account   [ ] Deposit   [X] Custodial     **2** Account number or other designation
3540

**3** Check all that apply   **a** [X] Account opened during tax year   **b** [ ] Account closed during tax year
    **c** [ ] Account jointly owned with spouse   **d** [ ] No tax item reported in Part III with respect to this asset

**4** Maximum value of account during tax year ............................................................. $    **3,343,654.**

**5** Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars?   [X] Yes   [ ] No

**6** If you answered "Yes" to line 5, complete all that apply.

| (1) Foreign currency in which account is maintained | (2) Foreign currency exchange rate used to convert to U.S. dollars | (3) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| Canada, Dollar | 1.386000000 | |

**7a** Name of financial institution in which account is maintained     **b** Reserved

**iTrade**

**8** Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.

**1200 - 225 King St West**

**9** City or town, province or state, and country (including postal code)

**Toronto, Ontario M5V3M2 Canada**

Last Name or Organization Name                 Identification Number      **Form 8938**

**Paul Bruyea**

## Part V  Foreign Deposit and Custodial Accounts (see Instructions)

**1** Type of account  ☐ Deposit  ☒ Custodial        **2** Account number or other designation
                                                   **881-2-pU**

**3** Check all that apply  **a** ☐ Account opened during tax year   **b** ☐ Account closed during tax year
                     **c** ☐ Account jointly owned with spouse   **d** ☐ No tax item reported in Part III with respect to this asset

**4** Maximum value of account during tax year .................................................. $    **340,077.**

**5** Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars? ............... ☒ Yes   ☐ No

**6** If you answered "Yes" to line 5, complete all that apply.

| (1) Foreign currency in which account is maintained | (2) Foreign currency exchange rate used to convert to U.S. dollars | (3) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| U.S.,Dollar | | |

**7a** Name of financial institution in which account is maintained       **b** Reserved

**Scotia Capital**

**8** Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.

**102-9838 Fourth St**

**9** City or town, province or state, and country (including postal code)

**Sidney, British Columbia V8L 2Z3 Canada**

**1** Type of account  ☒ Deposit  ☐ Custodial        **2** Account number or other designation
                                                  **6381**

**3** Check all that apply  **a** ☒ Account opened during tax year   **b** ☐ Account closed during tax year
                     **c** ☐ Account jointly owned with spouse   **d** ☐ No tax item reported in Part III with respect to this asset

**4** Maximum value of account during tax year .................................................. $    **270,852.**

**5** Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars? ............... ☒ Yes   ☐ No

**6** If you answered "Yes" to line 5, complete all that apply.

| (1) Foreign currency in which account is maintained | (2) Foreign currency exchange rate used to convert to U.S. dollars | (3) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| Canada, Dollar | 1.386000000 | |

**7a** Name of financial institution in which account is maintained       **b** Reserved

**Bank of Nova Scotia**

**8** Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.

**5116 Cordova Bay Road**

**9** City or town, province or state, and country (including postal code)

**Victoria, British Columbia V8Y 2K5 Canada**

**1** Type of account  ☒ Deposit  ☐ Custodial        **2** Account number or other designation
                                                  **2220**

**3** Check all that apply  **a** ☒ Account opened during tax year   **b** ☐ Account closed during tax year
                     **c** ☐ Account jointly owned with spouse   **d** ☐ No tax item reported in Part III with respect to this asset

**4** Maximum value of account during tax year .................................................. $    **3,975,212.**

**5** Did you use a foreign currency exchange rate to convert the value of the account into U.S. dollars? ............... ☒ Yes   ☐ No

**6** If you answered "Yes" to line 5, complete all that apply.

| (1) Foreign currency in which account is maintained | (2) Foreign currency exchange rate used to convert to U.S. dollars | (3) Source of exchange rate used if not from U.S. Treasury Department's Bureau of the Fiscal Service |
|---|---|---|
| Canada, Dollar | 1.386000000 | |

**7a** Name of financial institution in which account is maintained       **b** Reserved

**Bank of Nova Scotia**

**8** Mailing address of financial institution in which account is maintained. Number, street, and room or suite no.

**5116 Cordova Bay Road**

**9** City or town, province or state, and country (including postal code)

**Victoria, British Columbia V8Y 2K5 Canada**

523031 06-24-15                              49
12050501 137560 AB010            2015.03040 Bruyea, Paul             AB010__1

| Form 1116 | | U.S. and Foreign Source Income Summary | | | |
|---|---|---|---|---|---|

NAME

**Paul Bruyea**

| INCOME TYPE | | TOTAL | U.S. | FOREIGN | |
|---|---|---|---|---|---|
| | | | | GENERAL | Passive |
| Compensation | | | | | |
| Dividends/Distributions | | 1,600. | 1,600. | | |
| Interest | Stmt 28 | 648. | | | 648. |
| Capital Gains | | 7,675,204. | | | 7,675,204. |
| Business/Profession | | | | | |
| Rent/Royalty | | 600,378. | | | 600,378. |
| State/Local Refunds | | | | | |
| Partnership/S Corporation | | | | | |
| Trust/Estate | | | | | |
| Other Income | | | | | |
| Gross Income | | 8,277,830. | 1,600. | | 8,276,230. |
| | | | | | |
| Less: | | | | | |
| Section 911 Exclusion | | | | | |
| Capital Losses | | 665,126. | | | 665,126. |
| Capital Gains Tax Adjustment | | | | | 3,493,314. |
| Total Income - Form 1116 | | 7,612,704. | 1,600. | | 4,117,790. |
| | | | | | |
| Deductions: | | | | | |
| Business/Profession Expenses | | | | | |
| Rent/Royalty Expenses | | 552,881. | | | 552,881. |
| Partnership/S Corporation Losses | | | | | |
| Trust/Estate Losses | | | | | |
| Capital Losses | | | | | |
| Non-capital Losses | | | | | |
| Individual Retirement Account | | | | | |
| Moving Expenses | | | | | |
| Self-employment Tax Deduction | | | | | |
| Self-employment Health Insurance | | | | | |
| Keogh Contributions | | | | | |
| Alimony | | | | | |
| Forfeited Interest | | | | | |
| Foreign Housing Deduction | | | | | |
| Other Adjustments | | | | | |
| Capital Gains Tax Adjustment | | | | | |
| Total Deductions | | 552,881. | | | 552,881. |
| | | | | | |
| Adjusted Gross Income | | 7,059,823. | 1,600. | | 3,564,909. |
| | | | | | |
| Less Itemized Deductions: | | | | | |
| Specifically Allocated | | | | | |
| Home Mortgage Interest | | | | | |
| Other Interest | | | | | |
| Ratably Allocated | | 7,550. | 1. | | 7,549. |
| Total Adjustments to Adjusted Gross Income | | 7,550. | 1. | | 7,549. |
| Taxable Income Before Exemptions | | 7,052,273. | 1,599. | | 3,557,360. |

528601 04-01-15

**Form 1116**  Foreign Tax Credit Carryover Statement (Page 1 of 2)

NAME

**Paul Bruyea**

Foreign Income Category  General Limitation Income

**Regular**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| 1. Foreign tax paid/accrued | | | | | | |
| 2. FTC carryback to 2015 for amended returns | | | | | | |
| 3. Reduction in foreign taxes | | | | | | |
| 4. Foreign tax available | | | | | | |
| 5. Maximum credit allowable | | | | | | |
| 6. Unused foreign tax ( + ) or excess of limit ( - ) | 4,121. | 5,040. | 4,374. | 1,815. | | |
| 7. Foreign tax carryback | | | | | | |
| 8. Foreign tax carryforward | | | | | | |
| 9. Foreign tax or excess limit remaining | 4,121. | 5,040. | 4,374. | 1,815. | | |

Total foreign taxes from all available years to be carried to next year ................................................ 23,502.

| | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| 1. Foreign tax paid/accrued | | | | | |
| 2. FTC carryback to 2015 for amended returns | | | | | |
| 3. Reduction in foreign taxes | | | | | |
| 4. Foreign tax available | | | | | |
| 5. Maximum credit allowable | | | | | |
| 6. Unused foreign tax ( + ) or excess of limit ( - ) | 4,123. | | 4,029. | | |
| 7. Foreign tax carryback | | | | | |
| 8. Foreign tax carryforward | | | | | |
| 9. Foreign tax or excess limit remaining | 4,123. | | 4,029. | | |

Form 1116      **Foreign Tax Credit Carryover Statement (Page 2 of 2)**

NAME

**Paul Bruyea**

Foreign Income Category      **General Limitation Income**

| AMT | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| 1. | Foreign tax paid/accrued | | | | | | |
| 2. | FTC carryback to 2015 for amended returns | | | | | | |
| 3. | Reduction in foreign taxes | | | | | | |
| 4. | Foreign tax available | | | | | | |
| 5. | Maximum credit allowable | | | | | | |
| 6. | Unused foreign tax ( + ) or excess of limit ( - ) | 4,121. | 5,040. | 4,374. | 1,815. | | |
| 7. | Foreign tax carryback | | | | | | |
| 8. | Foreign tax carryforward | | | | | | |
| 9. | Foreign tax or excess limit remaining | 4,121. | 5,040. | 4,374. | 1,815. | | |

Total foreign taxes from all available years to be carried to next year ..................... 23,359.

| | | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| 1. | Foreign tax paid/accrued | | | | | |
| 2. | FTC carryback to 2015 for amended returns | | | | | |
| 3. | Reduction in foreign taxes | | | | | |
| 4. | Foreign tax available | | | | | |
| 5. | Maximum credit allowable | | | | | |
| 6. | Unused foreign tax ( + ) or excess of limit ( - ) | 4,123. | | 3,886. | | |
| 7. | Foreign tax carryback | | | | | |
| 8. | Foreign tax carryforward | | | | | |
| 9. | Foreign tax or excess limit remaining | 4,123. | | 3,886. | | |

527916
04-01-15

12050501 137560 AB010      2015.03040 Bruyea, Paul      AB010__1

Appx99

**Form 1116** — **Foreign Tax Credit Carryover Statement (Page 1 of 2)**

NAME

**Paul Bruyea**

Foreign Income Category — **Passive Income**

**Regular**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| 1. Foreign tax paid/accrued | | | | | | 1953513. |
| 2. FTC carryback to 2015 for amended returns | | | | | | |
| 3. Reduction in foreign taxes | | | | | | |
| 4. Foreign tax available | | | | | | 1953513. |
| 5. Maximum credit allowable | | | | | | 1398571. |
| 6. Unused foreign tax ( + ) or excess of limit ( − ) | 10,313. | 2,061. | | | 45,641. | 554,942. |
| 7. Foreign tax carryback | | | | | | |
| 8. Foreign tax carryforward | | | | | | |
| 9. Foreign tax or excess limit remaining | 10,313. | 2,061. | | | 45,641. | 554,942. |
| Total foreign taxes from all available years to be carried to next year | | | | | | 651,385. |

| | 2006 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| 1. Foreign tax paid/accrued | | | | | |
| 2. FTC carryback to 2015 for amended returns | | | | | |
| 3. Reduction in foreign taxes | | | | | |
| 4. Foreign tax available | | | | | |
| 5. Maximum credit allowable | | | | | |
| 6. Unused foreign tax ( + ) or excess of limit ( − ) | | | | 3,056. | 35,372. |
| 7. Foreign tax carryback | | | | | |
| 8. Foreign tax carryforward | | | | | |
| 9. Foreign tax or excess limit remaining | | | | 3,056. | 35,372. |

**Form 1116**  **Foreign Tax Credit Carryover Statement (Page 2 of 2)**

NAME

Paul Bruyea

Foreign Income Category    **Passive Income**

AMT

| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| 1. | Foreign tax paid/accrued | | | | | | 1953513. |
| 2. | FTC carryback to 2015 for amended returns | | | | | | |
| 3. | Reduction in foreign taxes | | | | | | |
| 4. | Foreign tax available | | | | | | 1953513. |
| 5. | Maximum credit allowable | | | | | | 1405810. |
| 6. | Unused foreign tax ( + ) or excess of limit ( - ) | 12,189. | 4,192. | 1,600. | | 46,111. | 547,703. |
| 7. | Foreign tax carryback | | | | | | |
| 8. | Foreign tax carryforward | | | | | | |
| 9. | Foreign tax or excess limit remaining | 12,189. | 4,192. | 1,600. | | 46,111. | 547,703. |

Total foreign taxes from all available years to be carried to next year .................................................... 669,937.

| | | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| 1. | Foreign tax paid/accrued | | | | | |
| 2. | FTC carryback to 2015 for amended returns | | | | | |
| 3. | Reduction in foreign taxes | | | | | |
| 4. | Foreign tax available | | | | | |
| 5. | Maximum credit allowable | | | | | |
| 6. | Unused foreign tax ( - ) or excess of limit ( - ) | | 7,163. | 3,313. | 11,966. | 35,700. |
| 7. | Foreign tax carryback | | | | | |
| 8. | Foreign tax carryforward | | | | | |
| 9. | Foreign tax or excess limit remaining | | 7,163. | 3,313. | 11,966. | 35,700. |

54

12050501 137560 AB010        2015.03040 Bruyea, Paul        AB010___1

Appx101

| Form 1116 | Foreign Source Gains and Losses |
|---|---|

**NAME**

Paul Bruyea

## Passive Income - Canada

| | | |
|---|---|---|
| Long-term capital gain | 26,097. | |
| Long-term capital loss | 28,178. | |
| Net long-term capital gain/(loss) | | <2,081.> |
| Short-term capital gain | | |
| Short-term capital loss | 62,077. | |
| Net short-term capital gain/(loss) | | <62,077.> |
| Section 1231 gain | 7,649,107. | |
| Section 1231 loss | 574,871. | |
| | 7,074,236. | |
| Nonrecaptured net Section 1231 losses | | |
| Net Section 1231 gain/(loss) | | 7,074,236. |
| Non-capital gain | | |
| Non-capital loss | | |
| Net Section 1231 loss | | |
| Recaptured Section 1231 losses | | |
| Net non-capital gain/(loss) | | |

**Foreign source capital gain/(loss) summary:**

| | | |
|---|---|---|
| Net long-term gain/(loss) | <2,081.> | |
| Net short-term gain/(loss) | <62,077.> | |
| Net section 1231 gain | 7,074,236. | |
| Prorata share of U.S. capital loss adjustment | | |
| Total foreign source capital gain/(loss) | 7,010,078. | |
| Prorata share of capital gain rate differential adjustment | 3,493,314. | |
| Prorata share of capital loss rate differential adjustment | | |
| Net foreign source capital gain/(loss) after adjustment | 3,516,764. | |
| Net capital loss limitation | | |
| Non-capital gains | | |
| Foreign source gains/(losses) included on Form 1116, Line 1 | 3,516,764. | |
| Net capital loss limitation | | |
| Net section 1231 loss | | |
| Net non-capital asset loss | | |
| Other foreign source losses | | |
| Foreign source losses included on Form 1116, Line 5 | | |
| Foreign source capital loss carryover | | |

531971 04-01-15

12050501 137560 AB010      2015.03040 Bruyea, Paul      AB010__1

| Form 1116 | Foreign Source Gains and Losses - Alternative Minimum Tax | |
|---|---|---|

**NAME**

Paul Bruyea

## Passive Income - Canada

| | | |
|---|---|---|
| Long-term capital gain | 26,097. | |
| Long-term capital loss | 28,178. | |
| Net long-term capital gain/(loss) | | <2,081.> |
| Short-term capital gain | | |
| Short-term capital loss | 62,077. | |
| Net short-term capital gain/(loss) | | <62,077.> |
| Section 1231 gain | 7,649,107. | |
| Section 1231 loss | 574,871. | |
| | 7,074,236. | |
| Nonrecaptured net Section 1231 losses | | |
| Net Section 1231 gain/(loss) | | 7,074,236. |
| Non-capital gain | | |
| Non-capital loss | | |
| Net Section 1231 loss | | |
| Recaptured Section 1231 losses | | |
| Net non-capital gain/(loss) | | |

**Foreign source capital gain/(loss) summary:**

| | |
|---|---|
| Net long-term gain/(loss) | <2,081.> |
| Net short-term gain/(loss) | <62,077.> |
| Net section 1231 gain | 7,074,236. |
| Prorata share of U.S. capital loss adjustment | |
| Total foreign source capital gain/(loss) | 7,010,078. |
| Prorata share of capital gain rate differential adjustment | 2,036,755. |
| Prorata share of capital loss rate differential adjustment | 3,911. |
| Net foreign source capital gain/(loss) after adjustment | 4,977,234. |
| Net capital loss limitation | |
| Non-capital gains | |
| Foreign source gains/(losses) included on Form 1116, Line 1 | 4,977,234. |
| Net capital loss limitation | |
| Net section 1231 loss | |
| Net non-capital asset loss | |
| Other foreign source losses | |
| Foreign source losses included on Form 1116, Line 5 | |
| Foreign source capital loss carryover | |

529991 04-01-15

12050501 137560 AB010        2015.03040 Bruyea, Paul        AB010__1

**Appx103**

527841 04-01-15

**Form 1116**        **Pro Rata Share of Allocated Losses**

NAME

Paul Bruyea

**Allocation of Losses from Other Categories**

| INCOME CLASSIFICATION | INCOME | LOSS | ALLOCATED LOSS | LOSS NOT ALLOCATED |
|---|---|---|---|---|
| Passive income | 3,557,360. | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
|    Totals | 3,557,360. | | | |

**Allocation of U.S. Losses**

| INCOME CLASSIFICATION | REMAINING INCOME | U.S. LOSS | ALLOCATED LOSS | LOSS NOT ALLOCATED |
|---|---|---|---|---|
| Passive income | 3,557,360. | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
|    Totals | 3,557,360. | | | |

**Recapture of Prior Year Overall Foreign Loss**

| INCOME CLASSIFICATION | REMAINING INCOME | OVERALL PRIOR YEAR LOSS | RECAPTURED LOSS | LOSS NOT RECAPTURED |
|---|---|---|---|---|
| Passive income | 3,557,360. | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
|    Totals | 3,557,360. | | | |
| Recapture percentage | | | | |

**Recapture of Separate Limitation Loss Accounts**

| INCOME CLASSIFICATION | REMAINING INCOME | PRIOR YEAR LOSS | RECHARACTERIZED LOSS | LOSS NOT RECHARACTERIZED |
|---|---|---|---|---|
| Passive income | 3,557,360. | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
|    Totals | 3,557,360. | | | |

**Recapture of Overall Domestic Loss Prior to 2012**

| INCOME CLASSIFICATION | U.S. TAXABLE INCOME LIMIT | PRIOR YEAR LOSS | RECAPTURED LOSS | LOSS NOT RECAPTURED |
|---|---|---|---|---|
| Passive income | | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
|    Totals | | | | |

**Recapture of Overall Domestic Loss**

| INCOME CLASSIFICATION | U.S. TAXABLE INCOME LIMIT | PRIOR YEAR LOSS | RECAPTURED LOSS | LOSS NOT RECAPTURED |
|---|---|---|---|---|
| Passive income | 303. | 2,074. | 303. | 1,771. |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
|    Totals | 303. | 2,074. | 303. | 1,771. |

**Adjustments to Form 1116, Line 16**

| INC. CLASSIFICATION | OTHER CATEGORIES | U.S. LOSSES | PRIOR YEAR OVERALL | RECAPTURE OF LOSS ACCOUNTS | DOMESTIC RECAPTURE | FORM 1116, LINE 16 |
|---|---|---|---|---|---|---|
| Passive | | | | | 303. | 303. |
| Re-sourced by treaty | | | | | | |
| General limitation | | | | | | |

12050501 137560 AB010      2015.03040 Bruyea, Paul      AB010___1

Appx104

527881 04-01-15

| Form 1116 | Alternative Minimum Tax Foreign Tax Credit<br>Pro Rata Share of Allocated Losses |
|---|---|

NAME

**Paul Bruyea**

### Allocation of Losses from Other Categories

| INCOME CLASSIFICATION | INCOME | LOSS | ALLOCATED LOSS | LOSS NOT ALLOCATED |
|---|---|---|---|---|
| Passive income | 5,025,379. | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
| Totals | 5,025,379. | | | |

### Allocation of U.S. Losses

| INCOME CLASSIFICATION | REMAINING INCOME | U.S. LOSS | ALLOCATED LOSS | LOSS NOT ALLOCATED |
|---|---|---|---|---|
| Passive income | 5,025,379. | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
| Totals | 5,025,379. | | | |

### Recapture of Prior Year Overall Foreign Loss

| INCOME CLASSIFICATION | REMAINING INCOME | OVERALL PRIOR YEAR LOSS | RECAPTURED LOSS | LOSS NOT RECAPTURED |
|---|---|---|---|---|
| Passive income | 5,025,379. | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
| Totals | 5,025,379. | | | |
| Recapture percentage | | | | |

### Recapture of Separate Limitation Loss Accounts

| INCOME CLASSIFICATION | REMAINING INCOME | PRIOR YEAR LOSS | RECHARACTERIZED LOSS | LOSS NOT RECHARACTERIZED |
|---|---|---|---|---|
| Passive income | 5,025,379. | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
| Totals | 5,025,379. | | | |

### Recapture of Overall Domestic Loss Prior to 2012

| INCOME CLASSIFICATION | U.S. TAXABLE INCOME LIMIT | PRIOR YEAR LOSS | RECAPTURED LOSS | LOSS NOT RECAPTURED |
|---|---|---|---|---|
| Passive income | | | | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
| Totals | | | | |

### Recapture of Overall Domestic Loss

| INCOME CLASSIFICATION | U.S. TAXABLE INCOME LIMIT | PRIOR YEAR LOSS | RECAPTURED LOSS | LOSS NOT RECAPTURED |
|---|---|---|---|---|
| Passive income | 19,323. | 1,846. | 1,846. | |
| Income re-sourced by treaty | | | | |
| General limitation income | | | | |
| Totals | 19,323. | 1,846. | 1,846. | |

### Adjustments to Form 1116, Line 15

| INC. CLASSIFICATION | OTHER CATEGORIES | U.S. LOSSES | PRIOR YEAR OVERALL | RECAPTURE OF LOSS ACCOUNTS | DOMESTIC RECAPTURE | FORM 1116, LINE 16 |
|---|---|---|---|---|---|---|
| Passive | | | | | 1,846. | 1,846. |
| Re-sourced by treaty | | | | | | |
| General limitation | | | | | | |

12050501 137560 AB010     2015.03040 Bruyea, Paul     AB010___1

*Appx105*

Paul Bruyea

| Form 1040 | Personal Exemption Worksheet | Statement | 1 |

1.  Is the amount on Form 1040, line 38, more than the amount shown on line 4
    below for your filing status?
    No.   Stop. Multiply $4,000 by the total number of exemptions claimed
          on Form 1040, line 6d, and enter the result on line 42.
    Yes. Continue
2.  Multiply $4,000 by the total number of exemptions claimed
    on Form 1040, line 6d                                                    4,000.
3.  Enter the amount from Form 1040, line 38          7,059,823.
4.  Enter the amount for your filing status            154,950.
        Single                          $258,250
        Married filing jointly or widow(er) $309,900
        Married filing separately       $154,950
        Head of household               $284,050
5.  Subtract line 4 from line 3. If the result is
    more than $122,500 ($61,250 if married filing
    separately), STOP. Enter -0- on line 42            6,904,873.
6.  Divide line 5 by $2,500 ($1,250 if married
    filing separately).  If the result is not a
    whole number, increase it to the next higher
    whole number (for example, increase 0.0004
    to 1)
7.  Multiply line 6 by 2% (.02) and enter the result
    as a decimal
8.  Multiply line 2 by line 7                                             _____
9.  Subtract line 8 from line 2. Total to Form 1040, line 42.             _____

| Form 1040 | Qualified Dividends | Statement | 2 |

| Name of Payer | Ordinary Dividends | Qualified Dividends |
|---|---|---|
| Scotia Capital | 1,600. | 1,600. |
| Total included in Form 1040, line 9b | | 1,600. |

Paul Bruyea

| Form 1040 | Social Security Benefits Worksheet | Statement | 3 |

Check only one box:
    A. Single, Head of household, or Qualifying widow(er)
    B. Married filing jointly
X  C. Married filing separately and lived with your spouse
       at any time during 2015
    D. Married filing separately and lived apart from your spouse
       for all of 2015
 1. Enter the total amount from Box 5 of all your
    Forms SSA-1099 and RRB-1099                                    20,421.
       If you checked Box B: Taxpayer amount
                            Spouse amount
1a Enter the amount of nontaxable social security according
   to treaty provision                                            20,421.
1b Subtract line 1a from line 1
 2. Multiply line 1b by 50% (0.50)                                      0.
 3. Add the amounts on Form 1040, line 7, 8b, 9a, 10 thru 12, 13,
    14, 15b, 16b, 17 thru 19, 21 and Schedule B, line 2.  Do not
    include any amounts from box 5 of Forms SSA-1099 or RRB-1099  7,059,823.
 4. Enter the amount of any exclusions from foreign earned
    income, foreign housing, income from U.S. possessions,
    or income from Puerto Rico by bona fide residents of
    Puerto Rico that you claimed
 5. Add lines 2, 3, and 4                                         7,059,823.
 6. Add the amounts on Form 1040, lines 23 thru 25 and 28
    through 34a, and any amount you entered on the dotted
    line next to line 35                                                0.
 7. Subtract line 6 from line 5                                   7,059,823.
 8. Enter:  $25,000 if you checked Box A or D, or
            $32,000 if you checked Box B, or
            $-0-    if you checked Box C                                0.
 9. Is the amount on line 8 less than the amount on line 7?
    [ ] No.  Stop. None of your social security benefits are
    taxable.  You do not have to enter any amounts on lines
    20a or 20b of Form 1040.  But if you are married filing
    separately and you lived apart from your spouse for all of
    2015, enter -0- on line 20b.  Be sure you entered 'D' to
    the left of line 20a.
    [X] Yes. Subtract line 8 from line 7                          7,059,823.
10. Enter $9,000  if you checked Box A or D,
          $12,000 if you checked Box B
          $-0-    if you checked Box C                                  0.
11. Subtract line 10 from line 9.  If zero or less, enter -0-    7,059,823.
12. Enter the smaller of line 9 or line 10
13. Enter one half of line 12
14. Enter the smaller of line 2 or line 13
15. Multiply line 11 by 85% (.85). If line 11 is zero, enter -0-  6,000,850.
16. Add lines 14 and 15                                           6,000,850.
17. Multiply line 1 by 85% (.85)

18. Taxable benefits.  Enter the smaller of line 16 or line 17         0.
    * Enter the amount from line 1 above on Form 1040, line 20a
    * Enter the amount from line 18 above on Form 1040, line 20b

Paul Bruyea

| Form 1040 | Automatic Two-Month Extension | Statement 4 |

The taxpayer qualifies for an automatic extension pursuant to Treasury Regulation 1.6081-5.

| Form 1040 | Federal Income Tax Withheld | Statement 5 |

| T S Description | Amount |
| --- | --- |
| T Withholding from Form 1099-MISC | 240. |
| Total to Form 1040, line 64 | 240. |

| Schedule D | Net Long-Term Gain or Loss from Forms 4797, 2439, 6252, 4684, 6781 and 8824 | Statement 6 |

| Description of Property | Gain or Loss | 28% Gain |
| --- | --- | --- |
| Form 4797 | 7,074,236. | |
| Total to Schedule D, Part II, line 11 | 7,074,236. | |

| Schedule E | Other Expenses | Statement 7 |

Michelin Tire Warehouse - St. Albert, Alberta

| Description | Amount |
| --- | --- |
| Refinancing/buy-down costs | 31,562. |
| Leasing costs | 115,879. |
| Total to Schedule E, Page 1, line 19 | 147,441. |

Appx108

Paul Bruyea

---

| Form 1116 | Foreign Capital Gains Worksheet B | Statement | 8 |

**Passive Income**

|  | Subtotal | Total |
|---|---|---|

Short-term

| | | |
|---|---|---|
| 1 Sep category rate group capital gain(loss) | <62,077.> | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | <62,077.> | |
| 4 Rate differential factor | | |
| 5 Adjusted capital gains and losses | | |

Long-term - 0%

| | | |
|---|---|---|
| 1 Sep category rate group capital gain(loss) | | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | | |
| 4 Rate differential factor | | |
| 5 Adjusted capital gains and losses | | |

Long-term - 15%

| | | |
|---|---|---|
| 1 Sep category rate group capital gain(loss) | 190,230. | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | 190,230. | |
| 4 Rate differential factor | .3788 | |
| 5 Adjusted capital gains and losses | | 72,059. |

Long-term - 20%

| | | |
|---|---|---|
| 1 Sep category rate group capital gain(loss) | 6,819,848. | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | 6,819,848. | |
| 4 Rate differential factor | .5051 | |
| 5 Adjusted capital gains and losses | | 3,444,705. |

Long-term - 25%

| | | |
|---|---|---|
| 1 Sep category rate group capital gain(loss) | | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | | |
| 4 Rate differential factor | | |
| 5 Adjusted capital gains and losses | | |

Long-term - 28%

| | | |
|---|---|---|
| 1 Sep category rate group capital gain(loss) | | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | | |
| 4 Rate differential factor | | |
| 5 Adjusted capital gains and losses | | |

| | | |
|---|---|---|
| Total adjusted capital gains and losses | | 3,516,764. |

Appx109

Paul Bruyea

| Form 1116 | Worldwide Capital Gains Worksheet for Line 18 | Statement 9 |
|---|---|---|

| | | | |
|---|---|---|---|
| 1 | Enter the amount from Form 1040, line 41. If you are a nonresident alien, enter the amount from Form 1040NR, line 39 | | 7,052,273. |
| 2 | Enter worldwide 28% gains | | |
| 3 | Multiply line 2 by 0.2929 | | |
| 4 | Enter worldwide 25% gains | | |
| 5 | Multiply line 4 by 0.3687 | | |
| 6 | Enter worldwide 20% gains and qualified dividends | 6,819,848. | |
| 7 | Multiply line 6 by 0.4949 | 3,375,143. | |
| 8 | Enter worldwide 15% gains and qualified dividends | 191,830. | |
| 9 | Multiply line 8 by 0.6212 | 119,165. | |
| 10 | Enter worldwide 0% gains and qualified dividends | | |
| 11 | Add lines 3, 5, 7, 9 and 10 | | 3,494,308. |
| 12 | Subtract line 11 from line 1. Enter the result here and on Form 1116, line 18 | | 3,557,965. |

Paul Bruyea

| Form 1116 | Foreign Tax Credit Carryover / Carryback | Statement 10 |

**Passive Income**

| Year of Credit | Total Foreign Taxes Paid | Foreign Tax Cr Claimed | Balance Available |
|---|---|---|---|
| 2014 Foreign tax credit | 100,840. | 55,199. | 45,641. |
| 2013 Foreign tax credit | 238,269. | 238,269. | 0. |
| 2012 Foreign tax credit | 25,907. | 25,907. | 0. |
| 2011 Foreign tax credit | 45,291. | 43,230. | 2,061. |
| 2010 Foreign tax credit | 51,202. | 40,889. | 10,313. |
| 2009 Foreign tax credit | 35,700. | 328. | 35,372. |
| 2008 Foreign tax credit | 12,101. | 9,045. | 3,056. |
| 2007 Foreign tax credit | 21,710. | 21,710. | 0. |
| 2006 Foreign tax credit | 32,927. | 29,093. | 0. |
| 2005 Foreign tax credit | 0. | 0. | 0. |
| Foreign tax cr carryback to 2015 | | | 0. |
| Total to Form 1116, Part III, line 10 | | | 96,443. |

Appx111

Paul Bruyea

| Form 1116 | Foreign Tax Credit Carryover / Carryback | Statement 11 |
|---|---|---|

General Limitation Income

| Year of Credit | Total Foreign Taxes Paid | Foreign Tax Cr Claimed | Balance Available |
|---|---|---|---|
| 2014 Foreign tax credit | 0. | 0. | 0. |
| 2013 Foreign tax credit | 1,815. | 0. | 1,815. |
| 2012 Foreign tax credit | 4,374. | 0. | 4,374. |
| 2011 Foreign tax credit | 5,040. | 0. | 5,040. |
| 2010 Foreign tax credit | 4,121. | 0. | 4,121. |
| 2009 Foreign tax credit | 0. | 0. | 0. |
| 2008 Foreign tax credit | 0. | 0. | 0. |
| 2007 Foreign tax credit | 4,029. | 0. | 4,029. |
| 2006 Foreign tax credit | 0. | 0. | 0. |
| 2005 Foreign tax credit | 0. | 0. | 4,123. |
| Foreign tax cr carryback to 2015 | | | 0. |
| Total to Form 1116, Part III, line 10 | | | 23,502. |

| Form 6251 | Passive Activities | Statement 12 |
|---|---|---|

| Name of Activity | Form | Net Income (Loss) | | Adjustment |
|---|---|---|---|---|
| | | AMT | Regular | |
| Building | Form 4797 | 7,649,107. | 7,649,107. | |
| Land | Form 4797 | <574,871.> | <574,871.> | |
| Michelin Tire | Sch E | | | |
| Warehouse - St. | | | | |
| Albert, Alberta | | 47,497. | 47,497. | |
| Total to Form 6251, line 19 | | | | |

Appx112

Paul Bruyea

---

| Form 1116 | Alternative Minimum Tax Foreign Tax Credit Foreign Capital Losses Worksheet | Statement 13 |

---

**Passive Income**

| | | Long-term | | | |
| | Short-term | 0% | 15% | 25% | 28% |
|---|---|---|---|---|---|
| 1 Separate category rate group capital loss | | | 62,077. | | |
| 2 Rate differential factor | | | .5357 | | |
| 3 Adjusted capital losses | | | 33,255. | | |

Appx113

Paul Bruyea

| Form 1116 | Alternative Minimum Tax Foreign Tax Credit Foreign Capital Gains Worksheet B | Statement 14 |
|---|---|---|

**Passive Income**

| | Subtotal | Total |
|---|---|---|
| **Short-term** | | |
| 1 Sep category rate group capital gain(loss)    <62,077.> | | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | <62,077.> | |
| 4 Rate differential factor | | |
| 5 Adjusted capital gains and losses | | |
| | | |
| **Long-term - 0%** | | |
| 1 Sep category rate group capital gain(loss) | | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | | |
| 4 Rate differential factor | | |
| 5 Adjusted capital gains and losses | | |
| | | |
| **Long-term - 15%** | | |
| 1 Sep category rate group capital gain(loss)    190,230. | | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | 190,230. | |
| 4 Rate differential factor | .5357 | |
| 5 Adjusted capital gains and losses | | 101,906. |
| | | |
| **Long-term - 20%** | | |
| 1 Sep category rate group capital gain(loss) 6,819,848. | | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | 6,819,848. | |
| 4 Rate differential factor | .7143 | |
| 5 Adjusted capital gains and losses | | 4,871,417. |
| | | |
| **Long-term - 25%** | | |
| 1 Sep category rate group capital gain(loss) | | |
| 2 U.S. capital loss adjustment | | |
| 3 Subtotal | | |
| 4 Rate differential factor | | |
| 5 Adjusted capital gains and losses | | |
| | | |
| Total adjusted capital gains and losses | | 4,973,323. |

Appx114

Paul Bruyea

| Form 1116 | Alternative Minimum Tax Foreign Tax Credit Carryover/Carryback | Statement 15 |
|---|---|---|

Passive Income

| Year of Credit | Total Foreign Taxes Paid | Foreign Tax Cr Claimed | Balance Available |
|---|---|---|---|
| 2014 Alt. Min. Tax Credit | 100,840. | 54,729. | 46,111. |
| 2013 Alt. Min. Tax Credit | 238,269. | 238,269. | 0. |
| 2012 Alt. Min. Tax Credit | 25,907. | 24,307. | 1,600. |
| 2011 Alt. Min. Tax Credit | 45,291. | 41,099. | 4,192. |
| 2010 Alt. Min. Tax Credit | 51,202. | 39,013. | 12,189. |
| 2009 Alt. Min. Tax Credit | 35,700. | 0. | 35,700. |
| 2008 Alt. Min. Tax Credit | 12,101. | 135. | 11,966. |
| 2007 Alt. Min. Tax Credit | 84,984. | 73,504. | 3,313. |
| 2006 Alt. Min. Tax Credit | 32,927. | 22,147. | 7,163. |
| 2005 Alt. Min. Tax Credit | 0. | 0. | 0. |
| Foreign tax cr carryback to 2015 | | | 0. |
| Total to Form 1116 (AMT), Part III, line 10 | | | 122,234. |

Appx115

Paul Bruyea

| Form 1116 | Alternative Minimum Tax Foreign Tax Credit<br>Worldwide Capital Gains<br>Worksheet for Line 18 | | Statement 16 |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 1 | Enter the amount from Form 6251, line 28 | | 7,101,523. |
| 2 | Enter worldwide 25% gains | | |
| 3 | Multiply line 2 by 0.1071 | | |
| 4 | Enter worldwide 20% gains<br>and qualified dividends | 6,819,848. | |
| 5 | Multiply line 4 by 0.2857 | 1,948,431. | |
| 6 | Enter worldwide 15% gains<br>and qualified dividends | 191,830. | |
| 7 | Multiply line 6 by 0.4643 | 89,067. | |
| 8 | Enter worldwide 0% gains<br>and qualified dividends | | |
| 9 | Add lines 3, 5, 7 and 8 | | 2,037,498. |
| 10 | Subtract line 9 from line 1. Enter the<br>result here and on Form 1116 AMT, line 18 | | 5,064,025. |

Appx116

Paul Bruyea

| Form 1116 | Alternative Minimum Tax Foreign Tax Credit Carryover/Carryback | Statement 17 |
|---|---|---|

**General Limitation Income**

| Year of Credit | Total Foreign Taxes Paid | Foreign Tax Cr Claimed | Balance Available |
|---|---|---|---|
| 2014 Alt. Min. Tax Credit | 0. | 0. | 0. |
| 2013 Alt. Min. Tax Credit | 1,815. | 0. | 1,815. |
| 2012 Alt. Min. Tax Credit | 4,374. | 0. | 4,374. |
| 2011 Alt. Min. Tax Credit | 5,040. | 0. | 5,040. |
| 2010 Alt. Min. Tax Credit | 4,121. | 0. | 4,121. |
| 2009 Alt. Min. Tax Credit | 0. | 0. | 0. |
| 2008 Alt. Min. Tax Credit | 0. | 0. | 0. |
| 2007 Alt. Min. Tax Credit | 3,886. | 0. | 3,886. |
| 2006 Alt. Min. Tax Credit | 0. | 0. | 0. |
| 2005 Alt. Min. Tax Credit | 0. | 0. | 4,123. |
| Foreign tax cr carryback to 2015 | | | 0. |
| Total to Form 1116 (AMT), Part III, line 10 | | | 23,359. |

| Form 4952 | Investment Interest Expense | Statement 18 |
|---|---|---|

| Description | Current | Carryover |
|---|---|---|
| Scotia Capital | 3,923. | |
| Disallowed Investment Interest Prior Years | | 42,571. |
| iTrade | 266. | |
| Totals to Form 4952, lines 1 and 2 | 4,189. | 42,571. |

| Form 4952 | Income from Property Held for Investment | Statement 19 |
|---|---|---|

| Description | Amount |
|---|---|
| Interest income | 648. |
| Dividend income | 1,600. |
| Total to Form 4952, line 4a | 2,248. |

Appx117

Paul Bruyea

| Form 4952 | Disallowed Investment Interest Expense | Statement 20 |
|---|---|---|

| Description | Amount |
|---|---|
| Schedule A - C/O | 42,571. |
| Schedule A | 3,541. |
| Total to Form 4952, line 7 | 46,112. |

| Form 4952 | Investment Interest Expense Deduction Summary | Statement 21 |
|---|---|---|

| Name | Form or Schedule | Investment Interest Expense | Investment Interest Expense C/O | Disallowed Investment Interest Expense | Allowed Investment Interest Expense |
|---|---|---|---|---|---|
| Scotia Capital | SCH A | 3,923. | 0. | 3,316. | 607. |
| Disallowed Investment | SCH A | 0. | 42,571. | 42,571. | 0. |
| iTrade | SCH A | 266. | 0. | 225. | 41. |
| Totals | | 4,189. | 42,571. | 46,112. | 648. |

| Form 4952AMT | Investment Interest Expense | Statement 22 |
|---|---|---|

| Description | Current | Carryover |
|---|---|---|
| AMT Investment Interest Carryover | | 32,782. |
| Scotia Capital | 3,923. | |
| iTrade | 266. | |
| Totals to Form 4952AMT, lines 1 and 2 | 4,189. | 32,782. |

| Form 8582 | Other Passive Activities - Worksheet 3 | Statement 23 |
|---|---|---|

| Name of Activity | Current Year | | Prior Year Unallowed Loss | Overall Gain or Loss | |
|---|---|---|---|---|---|
| | Net Income | Net Loss | | Gain | Loss |
| Michelin Tire Warehouse - St. Albert, Alberta | 7,696,604. | <574,871.> | | 7,121,733. | |
| Totals | 7,696,604. | <574,871.> | | 7,121,733. | |

Appx118

Paul Bruyea

| Form 8582 | Summary of Passive Activities | Statement 24 |

| R R E A Name | Form or Schedule | Gain/Loss | Prior Year C/O | Net Gain/Loss | Unallowed Loss | Allowed Loss |
|---|---|---|---|---|---|---|
| Land | Form 4797 | <574,871.> | | <574,871.> | | 574,871. |
| Building | Form 4797 | 7649107. | | 7,649,107. | | |
| Michelin Tire | Sch E | | | | | |
| Warehouse - St. | | | | | | |
| Albert, Alberta | | 47,497. | | 47,497. | | |
| Totals | | 7121733. | | 7,121,733. | | 574,871. |

Prior year carryovers allowed due to current year net activity income

| Total | | | | | | 574,871. |

| Form 8938 | Foreign Deposit and Custodial Accounts | Statement 25 |

| Interest Description | Amount | Form and line | Sch and line |
|---|---|---|---|
| Bank of Nova Scotia | 333. | | Sch B, ln 1 |
| Bank of Nova SCotia | 315. | | Sch B, ln 1 |
| Total | 648. | | |

| Form 8938 | Foreign Deposit and Custodial Accounts | Statement 26 |

| Gains/Losses Description | Amount | Form and line | Sch and line |
|---|---|---|---|
| 1000 WTS BANK OF AMERICA | 272. | | Sch D, ln 10 |
| 1000 WTS BANK OF AMERICA | 466. | | Sch D, ln 10 |
| 1000 WTS BANK OF AMERICA | 591. | | Sch D, ln 10 |
| 1000 WTS BANK OF AMERICA | 382. | | Sch D, ln 10 |
| 1000 WTS BANK OF AMERICA | 282. | | Sch D, ln 10 |
| 1000 WTS BANK OF AMERICA | 263. | | Sch D, ln 10 |
| 1000 WTS BANK OF AMERICA | 286. | | Sch D, ln 10 |
| 1000 WTS BANK OF AMERICA | 170. | | Sch D, ln 10 |
| 1000 WTS BANK OF AMERICA | 370. | | Sch D, ln 10 |
| 1000 WTS BANK OF AMERICA | 277. | | Sch D, ln 10 |
| 10000 WTS BANK OF AMERICA | <5,645.> | | Sch D, ln 10 |
| 12000 WTS BANK OF AMERICA | <22,533.> | | Sch D, ln 10 |

Appx119

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

No. 23-766-T

(Judge Matthew H. Solomson)

PAUL BRUYEA,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, by and through his counsel, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, hereby moves for partial summary judgment that he is entitled to a foreign tax credit for his 2015 tax year under the terms of the income tax treaty between the United States and Canada, for the reasons set forth in the accompanying Memorandum in Support of the Plaintiff's Motion for Partial Summary Judgment and accompanying Exhibits.

February 14, 2024

/s/ Stuart E. Horwich
Horwich Law LLP
20 Old Bailey, 5th Floor
London  EC4M 7AD
United Kingdom
011 44 20 8057 8013
seh@horwichlaw.co.uk

/s/ Max Reed
Suite 900
1788 West Broadway
Vancouver, British Columbia
Canada
V6J 1Y1
604-283-9301
max@polaristax.com

Attorneys for Plaintiff

**Appx132**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

————————

No. 23-766-T

(Judge Matthew H. Solomson)

PAUL BRUYEA

Plaintiff,

v.

THE UNITED STATES,

Defendant

————————

MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

————————

February 14, 2024

/s/ Stuart E. Horwich
Horwich Law LLP
20 Old Bailey, 5th Floor
London  EC4M 7AD
United Kingdom
011 44 20 8057 8013
seh@horwichlaw.co.uk


/s/ Max Reed
Polaris Tax Counsel
Suite 900
1788 West Broadway
Vancouver, British Columbia
Canada
V6J 1Y1
604-283-9301
max@polaristax.com

Attorneys for Plaintiff

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I. The Canada Treaty Provides a Foreign Tax Credit Against the NIIT that Is Not
   Allowed Under the Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   A. Unlike the Canada Treaty, the Code Provides a Three-Step Analysis Before a
      Taxpayer Can Claim a Foreign Tax Credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      1. Code Section 901 Defines a Creditable Tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      2. Code Section 904 Limits the Amount of the Credit . . . . . . . . . . . . . . . . . . . . . . . . 10

      3. Code Section 27 Allows the Credit to the Extent Permitted Under
         Code Sections 901 and 904 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   B. The NIIT Is an Income Tax Covered Under the Terms of the Canada Treaty . . . . . . . . . . . 11

II. The Canada Treaty Provides a Foreign Tax Credit Against the NIIT . . . . . . . . . . . . . . . . . . . . . . . 13

   A. The Standards of Treaty Interpretation Favor a Result that Avoids
      Double Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      1. The Shared Expectations of the Treaty Partners at the Time the Treaty
         Is Signed Control the Interpretation of its Provisions . . . . . . . . . . . . . . . . . . . . . . . 14

      2. The Defendant's Proposed Interpretation of the Canada Treaty Is
         Not Entitled to Any Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      3. The Enactment of the NIIT Does Not Override the Foreign Tax
         Credit Provisions in the Canada Treaty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   B. Article XXIV(4) Provides a Standalone Treaty-Based Foreign Tax Credit
      Against the NIIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      1. The Plain Meaning of Article XXIV(4) Provides a Credit . . . . . . . . . . . . . . . . . . . 20

i

**Appx134**

TABLE OF CONTENTS (continued)

2.  Article XXIV(4) Is Independent from Article XXIV(1)…………...…………………24

C.  Article XXIV(1) Also Allows a Treaty-Based Foreign Tax Credit………...……………28

III. CONCLUSION . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . 33

**Appx135**

TABLE OF AUTHORITIES

**Rules of the United States Court of Federal Claims**

Rule 56(a) ……..………………………………………………………………....…6

**Case Law**

*Abbott v. Abbott*, 560 U.S. 1, 16 (2010)……………………………………………..16,29

*Air France v. Saks* 470 U.S. 392 (1985)……………………...….…....…………….……14, 16

*Bacardi Corp of Am. V. Domenech*, 311 U.S. 150 (1940)………………………………15

*BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25 (2014)……………………………14

*Burnet v. Chicago Portrait Co.*, 285 U.S. 1 (1932)……....………………………………15

*Christensen v. United States,* No. 1:2020cv00935, (Fed. Cl. Oct 23, 2023),
    *appeal pending*, (Fed. Cir. 24-1284)……………………...……….......……………..*passim*

*Cook v. United States*, 288 U.S. 102 (1933)………………….….…..……………..……17

*El Al Israeli Airlines v. Tseng*, 525 U.S. 155 (1999) ……………………..……………..……16

*Eshel v. Comm'r*, 831 F.3d 521 (D.C. Cir. 2016)….…………………………….……16

*Estate of Ballard v. Commissioner*, 85 T.C. 300 (1985)……………………………………32

*Haver v. Comm'r*, 444. F.3d 656 (D.C. Cir. 2006)….….………………………..……24, 25-26

*Iceland Steamship Co. Eimskip v. U.S. Dep't of the Army*, 201 F.3d 451 (D.C. Cir. 2000)……..16

*Jordan v. Tashiro*, 278 U.S. 123 (1928)…………………………………………………15

*Kappus v. Comm'r*, 337 F.3d 1053 (D.C. Cir. 2003) ….…………………………………24-25

*Kolovrat v. Oregon*, 366 U.S. 187 (1961)…………………………….……………………16

*Lozano v. Montoya Alvarez,* 572 U.S. 1 (2014)…………………………………………14

*Marriott International Resorts v. United States*, 586 F.3d 962 (Fed. Cir. 2009)……………...….6

*Medellin v. Texas*, 552 U.S. 491 (2008)……………………………………………………14

**Appx136**

*Murray v. Schooner Charming Betsy*, 6 U.S. (Cranch) 64 (1804)…………………………………18

*National Westminster Bank plc v. United States*, 512 F.3d 1347 (2009)………….……….16, 17

*North West Life Insurance Co. of Canada v. Comm'r*, 107 T.C. 363 (1996)…………………16

*Olympic Airways v. Husain*, 540 U.S. 644 (2004)……………………………………………15

*Pekar v. Comm'r*, 113 T.C. 158, 161 (1999)………………………………………………..……18

*Pigeon River Imp., Slide & Boom Co. v. Charles W. Cox, Ltd*., 291 U.S. 138 (1934)………...18

*Rocca v. Thompson*, 223 U.S. 317, 332 (1912)…..……………………………………..……….31

*Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140
   (D.D.C. 2002), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003)………..…………………………..……18

*Sullivan v. Kidd*, 254 U.S. 433 (1921)………………………………………………………..14

*Sumitomo Shoji America Inc. v. Avagliano*, 457 U.S. 176 (1982)…………...………………15, 16

*Toulouse v. Comm'r*, 157 T.C. 49 (2021)……………….…………………..…….…28, 29, 31

*United States v. Butler*, 297 U.S. 1 (1936)………….…………………………..……..27, 31

*United States v. Choctaw Nation*, 179 U.S. 494 (1900)………………………………………14

*United States v. Stuart*, 489 U.S. 353 (1989)………………………………………..…….15, 21, 27

*Whitney v. Robertson*, 124 U.S. 190 (1888)…………………………………………………18

*Wright v. Henkel*, 190 U.S. 40, 57 (1903)………………………………………………14

*Xerox v. United States*, 41 F.3d 647 (Fed Cir. 1994)……………………….………………..14-15

## Treaties and Treaty Materials

*Convention Between The United States Of America And Canada With Respect To Taxes On Income And Capital, Signed At Washington On September 26, 1980, as amended by Protocols signed on June 14, 1983, March 28, 1984, March 17, 1995, July 29, 1997, and September 21, 2007*

   Article 2………………………………………………………….…….....11-12, 23
   Article 10………………………………..……………………………………22
   Article 13………………………………………………………...…….6, 23
   Article 24…………………………………………………………*passim*
   Article 26……………………………………………………………...…….4, 7

iv

**Appx137**

**Treaties and Treaty Materials (continued)**

*Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital*, (French Treaty) Fr.-U.S., Aug 31, 1994, 1963 U.N.T.S. 67, as supplemented by Protocols dated Dec. 8, 2004 and Jan. 13, 2009………………….8, 26

*Convention Between the Government of the United States and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income*……….………………...…………………………………12

*Convention Between the Government of the United States of America and the Government of the Italian Republic for the Avoidance of Double Taxation with Respect to Taxes on Income and the Prevention of Fraud and Fiscal Evasion*………..…………….…………………...………....12

*Convention Between the Government of the United States of America and the Government of the Republic of Croatia for the Avoidance of Double Taxation and the Prevention of Tax Evasion with Respect to Taxes on Income*…………...……………………………………………..33

Edmund S. Muskie, Letter of Submittal, Department of State, Washington, October 16, 1980), https://www.irs.gov/pub/irs-trty/canada.pdf ……...............................................…………..13

Explanation of the Proposed Income Tax Treaty Between the United States and Canada, *Joint Comm. on Taxation,* JCS-48-81 at 38 (1981)……………..…………………….…………..21

Treasury Department Technical Explanation of the Convention between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington D.C. on September 26, 1980, As Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984……………..……………23, 29-31

**Statutes**

Internal Revenue Service Codes of 1986 (26 U.S.C):

    Chapter 1…………………………………………………………………*passim*
    Chapter 2A…………………………………………………………………*passim*
    § 27……………..…………………………………………………………*passim*
    § 59……………..……………………....………………………..……………24
    § 884……………..…………………………………………..……………18
    § 894……………..…………………………………………..……………18
    § 901……………..…………………………………………………………*passim*
    § 904……………..…………………………………………………………*passim*
    § 908……………..…………………………………………………………*passim*
    § 1411……………..…………………………………………………………*passim*
    § 6511……………..……………………....………………………………31
    § 7874……………..……………………………………………………18

**Appx138**

**Treasury Regulations and Other Taxation Materials**

Treas. Regs. § 1.1411-1(a)……………………………………….…………………………11

Treas. Regs. § 1.901-2(b)(4)….……………………………………….…………………………11

Treasury Decision 9644, 78 FR 72393-72449, December 2, 2013,
    as corrected by 79 FR 18161, April 1, 2014……………..…………………………...……..12

Notice 2008-3, 2008-2 I.R.B. 253…………………………………………………………………..12

**Other Materials**

Blanchard, *The Tax Court's Erroneous Decision in Toulouse*,
    50 Tax Mgm't Int'l J., No. 10 (Oct. 1, 2021)……………………………………………28

Gould, *The Tax Court's Flawed Analysis in Toulouse Should Be*
    *Challenged*, *Tax Notes International*, vol. 103, p. 1695-1696 (Sept. 27, 2021)……………...28

Rosenbloom and Shaheen, "*Toulouse*: *No Treaty-Based Credit?*,
    *Tax Notes International*, vol. 104, pp. 417-422 (Oct. 25, 2021)………………..…………..28

**Appx139**

QUESTION PRESENTED

Does the income tax treaty between the United States and Canada, in accordance with the Canadian Government's views, allow Plaintiff a foreign tax credit for Canadian tax he paid on the sale of a Canadian real estate to offset his U.S. tax liability, thereby avoiding double tax on the same item of income?

## STATEMENT OF THE CASE

Plaintiff believes that the following facts are not in dispute and form the basis for Plaintiff's motion for summary judgment.

1.     Plaintiff Paul Bruyea is married, and in 2015 was a dual citizen of the United States and Canada.  In that year, Plaintiff resided at ▮▮▮▮▮▮▮▮▮▮ Victoria, British Columbia, Canada and filed a Canadian tax return as a resident for that year. Exhibit 3 – marriage certificate, Exhibit 4 – 2015 Canadian tax return.

2.     Plaintiff also timely filed a U.S. federal income tax return for the year 2015 (selecting filing status as married filing separately).  Plaintiff reported several items of income on this return, including: (i) net capital gains of $7,010,078, of which $7,074,236 derived from the disposition of real property located in Alberta, Canada (which was otherwise reduced by capital losses from the sale of certain publicly traded securities); and (ii) other passive income of $49,745.  Before taking into account any credits for tax paid to Canada, Plaintiff had a $1,398,683 regular U.S. federal income tax liability plus $10,183 alternative minimum tax liability on this income arising under Chapter 1 of the Internal Revenue Code of 1986 (26 U.S.C.) (the "Code").  Doc 1-3 (2015 U.S. federal tax return); Doc. 5 (Answer).

3.     In addition, Code Section 1411 (codified in Chapter 2A of the Code) imposes a 3.8 percent "net investment income tax" (or "NIIT") of $263,523 on Plaintiff's "Net Investment Income" (income from paragraph 2(i) and (ii) above).  Doc. 1-3 (2015 U.S. federal tax return).

4.      As a British Columbia tax resident, Plaintiff incurred a combined Canadian and British Columbian tax liability of CAD $2,498,098 (USD $1,953,513), which exceeded his U.S. tax liability (including the NIIT) on this income.[1]  Exhibit 4 – 2015 Canadian tax return.

5.      On his originally filed 2015 U.S. tax return, Plaintiff claimed a foreign tax credit of $1,398,571 which eliminated virtually all his regular U.S. federal income tax liability (although Plaintiff remained liable for $10,183 of alternative minimum tax).  Plaintiff also reported a total of $7,059,823 of "net investment income" on a Form 8960 which gave rise to a tax liability for the NIIT in the amount of $263,523.  Neither the Form 8960 nor related tax schedules on Plaintiff's tax return allowed Plaintiff to offset the NIIT with a foreign tax credit for the Canadian taxes he incurred.  Plaintiff duly paid $273,818 of tax (comprising $10,183 of alternative minimum tax, $263,523 of NIIT and less than $120 of regular income tax).  Doc 1-3 (2015 U.S. federal tax return).

6.      On November 25, 2016, Plaintiff filed a claim for refund (a Form 1040-X), seeking a refund of the $263,523 "to relieve the taxpayer of double taxation that arises from Net Investment Income Tax." Doc. 1-2 (Amended Return).  The refund claim claimed the benefit contained in Article XXIV of the Convention Between The United States Of America And Canada With Respect To Taxes On Income And Capital, Signed At Washington On September 26, 1980, as amended by Protocols signed on June 14, 1983, March 28, 1984, March 17, 1995, July 29, 1997, and September 21, 2007 (the "Canada Treaty") for Plaintiff, "a U.S. citizen resident in Canada".   Appendix A.

7.      On July 13, 2018, the Internal Revenue Service Examination Division proposed a full disallowance of the refund claim, asserting that the "[f]oreign tax credit cannot be claimed to offset

---

[1]      The Canadian tax liability was subsequently increase by CAD $50.

**Appx142**

the Net Investment Income Tax (NIIT) calculated on the [Plaintiff's] Canadian source investment income." Exhibit 5.

8.      On August 16, 2018, Plaintiff filed a protest with the IRS requesting IRS Appeals Office (the "Appeals Office") review of the proposed refund claim disallowance (the "Protest"). The Protest pointed out that Plaintiff "has double tax exposure – to Canada by virtue of his residency and to the United States by virtue of his citizenship. [Plaintiff] files this appeal to claim a foreign tax credit as provided in the [Canada Treaty], such that he is not subject to double tax in Canada and the United States on the same Canadian sourced income for 2015…". Exhibit 6.

9.      On February 14, 2019, Plaintiff had an Appeals Conference with IRS Appeals Agent Lance Rodrigues ("Mr. Rodrigues"). At this conference Mr. Rodrigues indicated that the IRS would not provide relief for the double taxation imposed on Plaintiff. In response, Plaintiff indicated that he would seek competent authority relief from the United States and Canadian tax authorities in an effort to resolve the dispute.

10.     On March 4 and March 5, 2019, Plaintiff filed a request with the IRS and the Canadian competent authorities respectively, pursuant to the "mutual agreement procedures" ("MAP") set out in Article XXVI(1) of the Canada Treaty, to request the U.S. and Canadian tax authorities "consult together for the elimination of double taxation." Specifically, the submission indicated that "[c]ompetent authority assistance is being requested for the following issue: Whether a U.S. citizen may claim a foreign tax credit against the Net Investment Income Tax under the authority of the Treaty." Exhibit 2.

11.     More than four years after filing the MAP request, on July 10, 2023, the Canadian competent authority wrote to counsel for Plaintiff, stating that "[t]he position of the Canadian competent authority in this regard is that Canada, as the country of source, has the right to tax the

Appx143

gain, while the US, as the country which has residual taxation rights, must provide relief in accordance with Article XXIV of the Convention.  Discussions with the U.S. competent authority under the Mutual Agreement Procedure to obtain relief from double taxation are ongoing and our respective positions remain far apart."  Exhibit 1.

12.      Plaintiff brought the instant refund suit claiming a foreign tax credit based upon Article XXIV of the Canada Treaty. Complaint. As a result of the refund suit the U.S. competent authority closed Plaintiff's case on August 15, 2023, and IRS Appeals issued a formal notice of claim disallowance on September 11, 2023.  Exhibit 7.

Appx144

**ARGUMENT**

I. **The Canada Treaty Provides a Foreign Tax Credit Against the NIIT That Is Not Allowed Under the Code**

Plaintiff's motion and Defendant's cross motion come before this Court as motions for partial summary judgment.  *See* Rule 56(a) of the Rules of the U.S. Court of Federal Claims; *Marriott International Resorts v. United States*, 586 F.3d 962 (Fed. Cir. 2009).  These motions seek a ruling on whether a treaty-based foreign tax credit is allowed in this case.[2]

For over 80 years, Canada and the United States have had income tax treaties in place, a primary purpose of which has been to prevent double taxation on the same income.  The basic mechanics to avoid double taxation are:  (i) the Canada Treaty assigns primary taxing rights to one country or the other (*e.g.* pursuant to Article XIII of the Canada Treaty, the country in which the real property is located is given primary taxing rights on gains arising from its sale) and (ii) the other country provides a foreign tax credit against its own tax (in accordance with the treaty) on that same income (the other country has "top up taxing rights" to the extent that its tax exceeds the tax imposed by the country with primary taxing rights).  In simple terms, Canada may tax Canadian real property gain in full and the United States may only tax the difference, if any, between the U.S. tax liability on that gain and the Canadian tax so levied.  If the U.S. tax is less than the Canadian tax, then the United States loses any taxing rights over the gain; if the United States tax is more than the Canadian tax, the United States may "top up" the taxpayer's total tax liability by that excess.

---

[2]     Separately, the parties are attempting to resolve any factual disputes regarding the quantum of such foreign tax credit and Defendant may seek additional discovery until June 7, 2024 in the event that Defendant requires further factual clarification before agreeing (or disputing) whether, if Plaintiff prevails on this partial summary judgment, he is entitled to a refund of $263,523.

For the 2015 tax year at issue, Plaintiff was subject to both (1) Canadian taxation by virtue of his Canadian tax residency and (2) U.S. taxation by virtue of his U.S. citizenship.  In that year he sold real property located in Canada, and the Canada Treaty assigned primary taxing rights to Canada on the gain arising from that sale.  The United States, however, in stark disregard of the Canada Treaty's purpose, imposed $263,523 of net investment income tax (the "NIIT") on that sale even though the parties agree that the Canadian tax exceeded the U.S. tax (including both the regular income tax and the NIIT).  Plaintiff therefore suffered double taxation on the sale of this Canadian real property in violation of the terms of the Canada Treaty.

The Canada Treaty contemplates that instances may arise where the Canadian and U.S. governments disagree on the taxing rights arising under the treaty's terms.  When that occurs, a taxpayer, such as Plaintiff, may request that the United States and Canada attempt to resolve the disagreement through a Mutual Agreement Procedure ("MAP") in which the competent authorities of both countries try to reach an appropriate resolution.  *See* Canada Treaty Article XXVI.  Here, Plaintiff filed a MAP application claiming he should receive a treaty-based foreign tax credit in the United States to offset the NIIT.  The Canadian Government agreed and sent a letter to Plaintiff that stated:

> The Taxpayer [Plaintiff], a Canadian resident and US citizen, has been subject to double taxation on capital gains he earned from the disposition of Canadian real estate. As a fiscal resident of Canada, the Taxpayer is subject to tax on his worldwide income in Canada. As a citizen of the US, he is also subject to tax on his worldwide income in the US.  Relief from double taxation is granted in accordance with domestic laws and the Convention. In the vast majority of cases, double taxation is relieved without any difficulties. However, with the introduction of the US Net Investment Income Tax (NIIT), such relief has proven difficult.

> The position of the Canadian competent authority in this regard is that Canada, as the country of source, has the right to tax the gain, while the US, as the country which has residual taxation rights, must provide relief in accordance with Article XXIV of the Convention.

- 7 -

Appx146

Exhibit 1.  As the talks between the two countries were deadlocked for four years, Plaintiff has brought the instant refund suit.

The Canadian Government is correct and the plain meaning of Article XXIV(4) and Article XXIV(1) of the Canada Treaty support Plaintiff's case.  These provisions include a very detailed foreign tax credit regime that is not available under the Code, allowing a treaty-based foreign tax credit in this situation.  Indeed, this Court recently held in *Christensen v. United States*, No. 1:2020cv00935, (Fed. Cl. Oct 23, 2023), *appeal pending*, (Fed. Cir. 24-1284) in review of substantially similar terms in the income tax treaty between the United States and France, that a treaty-based foreign tax credit is available to offset the NIIT. *Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital*, Fr.-U.S., Aug 31, 1994, 1963 U.N.T.S. 67, as supplemented by Protocols dated Dec. 8, 2004 and Jan. 13, 2009 (the "French Treaty").  Plaintiff believes that this Court's logic in *Christensen* accords with the fundamental purpose of the Canada Treaty to avoid double taxation and mandates a similar result in this case.

The operation of the U.S. domestic provisions of the Code, which result in double taxation, are crucial to this analysis as, although a credit is not allowed under those statutory rules, they provide the background regarding the U.S. foreign tax credit regime.

A.     **Unlike the Canada Treaty, the Code Provides a Three-Step Analysis Before a Taxpayer Can Claim a Foreign Tax Credit**

U.S. citizens are subject to U.S. federal income tax on their worldwide income whether or not they reside in the United States.  Plaintiff is a U.S. citizen as well as a British Columbian tax resident. He is therefore subject to U.S. federal and Canadian income tax (as well as British Columbian provincial tax) on his worldwide income. The dual worldwide taxation faced by Plaintiff is common to many U.S. citizens living abroad. To prevent double taxation where both

- 8 -

**Appx147**

the United States and another country seek to tax the same income based on residency and citizenship, the Code provides an elaborate foreign tax credit mechanism following a three-step approach: (1) the foreign levy in question must be an income, war profits, or excess profits tax meeting the requirements of a creditable tax within the meaning of Code Section 901 *et seq.* (foreign tax determination), (2) the amount of the available credit is prescribed by provisions contained in Code Section 904 (quantum and timing limitations), and (3) a credit must be provided for the tax under Code Section 27(a) (U.S. tax limitation). Each of these points is discussed in detail below.

1. Code Section 901 Defines a Creditable Tax

Code Section 901 provides that a taxpayer may elect a foreign tax credit against taxes imposed by Chapter 1 of the Code for "the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country * * *." Code Sec. 901(b)(1). Additional rules define whether a particular foreign levy is a creditable "income tax." Other rules contained in Code Section 901 *et seq*. provide that certain foreign levies, even if they meet the "tax on income" requirement, are not otherwise creditable.[3]

The Code Section 901 determination of whether a foreign levy is eligible to be a creditable income tax is central to the operation of the U.S. foreign tax credit system. Thus, taxpayers first compute the total amounts of foreign taxes they have incurred, and then, as described below, Code Section 904 determines the limitation on the use of such foreign tax credits.

---

[3] For example, in certain circumstances based on a Presidential finding, a foreign tax credit is not provided to U.S. resident aliens if U.S. citizens residing in the resident alien's home country are not allowed a foreign tax credit for U.S. taxes. Code Sec. 901(c). Similarly, a country's taxes are not creditable in certain circumstances if the country participates in an international boycott as prohibited by the Secretary of Treasury. Code Sec. 908.

2.     <u>Code Section 904 Limits the Amount of the Credit</u>

Code Section 904 is entitled "Limitation on Credit" and effectively provides that a taxpayer cannot credit foreign taxes against U.S. source income nor claim a foreign tax credit in excess of the taxpayer's total U.S. tax liability.  Code Section 904(d) further subcategorizes income into limitation categories (often referred to as "baskets") to preclude a taxpayer from, for example, crediting high foreign taxes on foreign active income (income falling in the general limitation basket) against the U.S. tax on foreign source investment income that is taxed lightly in the foreign country (income falling in the passive limitation basket).

Though Code Section 904 divides up the U.S. tax into categories (U.S. source versus foreign source; general versus passive, etc.), it does not define the total U.S. "tax against which such credit is taken."  It is merely the mechanism to prevent "cross crediting" of foreign taxes against U.S. source income or foreign source income that falls within a separate limitation category.  Excess foreign taxes in one limitation category may not be used to offset U.S. tax on income in another limitation category.  The policy against cross-crediting achieved by Code Section 904 is not undermined by allowing a foreign tax credit against all U.S. income taxes arising on foreign source income in the same basket.  Code Section 904 limits the amount of foreign tax that may be credited for the year in question; it does not define the U.S. taxes against which such foreign tax credit is allowed.

3.     <u>Code Section 27 Allows the Credit to the Extent Permitted Under Code Sections 901 and 904</u>

Code Section 27(a) dovetails with the foreign tax credit provisions and allows, in accordance with the language in Code Section 901, a foreign tax credit against the taxes imposed by Chapter 1 of the Code.  *See* 26 U.S.C. Chapter 1 ("Normal Taxes and Surtaxes").  Other chapters of the Code, imposing social security, self-employment taxes, estate and gift taxes, and excise

Appx149

taxes, cannot be offset by a foreign tax credit under the Code alone. As the NIIT falls outside chapter 1, the parties agree that no credit is allowed under domestic law, but Plaintiff's view is that the NIIT is covered by the foreign tax credit rules of the Canada Treaty.

### B. The NIIT Is an Income Tax Covered Under the Terms of the Canada Treaty

The NIIT is imposed at a rate of 3.8 percent on a taxpayer's net investment income to the extent that the taxpayer's modified adjusted gross income exceeds certain thresholds. Codified under Code Section 1411 in 2010 and in its own separate Chapter 2A, the NIIT is in addition to the regular income tax that is imposed on the same income under Chapter 1 of the Code. The NIIT is an income tax, imposed using concepts identical to those contained in Chapter 1, as explained in Treas. Regs. Sec. 1.1411-1(a), which states that "Except as otherwise provided, all Internal Revenue Code (Code) provisions that apply for chapter 1 purposes in determining taxable income * * * also apply in determining the [NIIT])." The NIIT also meets the definition in the Code for a tax on income as that concept is understood in the foreign tax credit provisions. *See*, *e.g.*, Treas. Regs. Sec. 1.901-2(b)(4).

The NIIT is a tax that is covered by the Canada Treaty. Article II of the Canada Treaty states as a general matter that "[t]his Convention shall apply to taxes on income and on capital imposed on behalf of each Contracting State, irrespective of the manner in which they are levied." Article II(1). Article II(2) further defines such taxes on income, stating that "the taxes existing on March 17, 1995 to which the Convention shall apply are * * * (b) in the case of the United States, the Federal income taxes imposed by the Internal Revenue Code of 1986." The definition of United States taxes, however, is not static as Article II(3) expands that definition to "any taxes identical or substantially similar to those taxes to which the Convention applies under paragraph 2."

The NIIT did not exist at the time of the ratification of the Canada Treaty and Protocols adopted thereafter; therefore, it is not specifically referenced within paragraph 2. However, the NIIT falls within the Article II(3) definition of a covered tax as it is a federal income tax imposed by the Code that is identical or substantially similar to the taxes described in paragraph 2. Plaintiff understands that the Defendant agrees that the NIIT is a covered income tax under the Canada Treaty.

The Defendant, in a Treasury Decision shortly after the enactment of the NIIT, took the view that, on the basis of the terms of its model treaty, no treaty-based credit would be allowed and has rigidly maintained that position. The decision stated:

> An analysis of each United States income tax treaty would be required to determine whether the United States would have an obligation under that treaty to provide a credit against the section 1411 tax for foreign income taxes paid to the other country. If, however, a United States income tax treaty contains language similar to that in paragraph 2 of Article 23 (Relief from Double Taxation) of the 2006 United States Model Income Tax Convention, which refers to the limitations of United States law (which include sections 27(a) and 901), then such treaty would not provide an independent basis for a credit against the section 1411 tax.

*See* Treasury Decision 9644 (the "Treasury Decision"), 78 FR 72393-72449, December 2, 2013, as corrected by 79 FR 18161, April 1, 2014. With no analysis whatsoever, Defendant asserts that the Canada Treaty language is "similar" to a model treaty that postdates the Canada Treaty by over twenty years and that contains multiple provisions that significantly differ from the Canada Treaty. In particular, the Defendant completely ignores the elaborate treaty mechanism in the Canada Treaty for how foreign taxes are credited when in fact the Canada Treaty clearly applies to the NIIT and provides a credit against it.

## II.   **The Canada Treaty Provides a Foreign Tax Credit Against the NIIT**

A principal purpose of the Canada Treaty is to avoid double taxation such as that faced by Plaintiff in this case. Article XXIV of the Canada Treaty, entitled "Elimination of Double Taxation", advances this purpose by providing that certain taxes imposed by each country are eligible for a foreign tax credit even if not otherwise allowed by domestic law.[4]  Article XXIV(5) provides a United States foreign tax credit to a Canadian resident United States citizen on dividends, royalties, and interest arising in the United States. Under Code Sections 901 and 904(a), a foreign tax credit is only available with respect to foreign source income.  Thus, the credit under Article XXIV(5) of the Canada Treaty represents a credit that is not available under the Code and is independently provided by the Canada Treaty.  Reflecting this and the overall context of the Canada Treaty, the Letter of Submittal from the Secretary of State to the President recommending ratification of the Canada Treaty stated "[i]n addition to the normal rules for the avoidance of double taxation, the Convention contains a rule not found in either the model or the existing convention for eliminating double taxation of United States citizens who are residents in Canada." (*see* Edmund S. Muskie, Letter of Submittal, Department of State, Washington, October 16, 1980), https://www.irs.gov/pub/irs-trty/canada.pdf (the "Letter of Submittal"). Appendix C.

Paragraphs 1 and 4 of Article XXIV provide a U.S. citizen resident in Canada, such as Plaintiff, a treaty-based foreign tax credit that is wider than Code Sec. 901.  Plaintiff is claiming a

---

[4]     Numerous other U.S. tax treaties provide for a foreign tax credit for levies that would fall outside the Code definition of a creditable tax.  *See*, *e.g.*, *Convention Between the Government of the United States and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income* ("subparagraph (c) refers to taxes paid to Denmark by residents or national of the United States under the Danish Hydrocarbon Tax Act and may allow for greater foreign tax credits than allowed under U.S. statutory law). Italian Treaty allows for a foreign tax credit for the *imposta regionale sulle attivita produittive* (the "IRAP").  *See* Article 2(b)(iii) of the *Convention Between the Government of the*

- 13 -

# Appx152

treaty-based foreign tax credit based on these provisions of the Canada Treaty, a position with which the Canadian Government agrees.  *See* Canada Treaty Articles XXIV(1) and (4).

### A. The Standards of Treaty Interpretation Favor a Result That Avoids Double Taxation

As discussed immediately below, the proper interpretation of these treaty articles, in accordance with Supreme Court authority on treaty interpretation, focuses on the shared expectations of the treaty partners.  No deference should be accorded Defendant's contrary view in this regard, as it goes against the purpose of the treaty and directly conflicts with the Canadian Government's view of its meaning.  Instead, a plain reading of the treaty provisions controls, thereby allowing a treaty-based foreign tax credit.

1. The Shared Expectations of the Treaty Partners at the Time the Treaty Is Signed Control the Interpretation of its Provisions

The principal rule governing the interpretation of treaties in the United States is well established:  a treaty is a contract between nations such that its interpretation is first and foremost "a matter of determining the parties' intent."  *See BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) (citing *Air France v. Saks*, 470 U.S. at 399; *Sullivan v. Kidd*, 254 U.S. 433, 439 (1921); *Wright v. Henkel*, 190 U.S. 40, 57 (1903)); *Lozano v. Montoya Alvarez*, 572 U.S. at 11 (citing *Medellin v. Texas*, 552 U.S. 491, 505 (2008); *United States v. Choctaw Nation*, 179 U.S. 494, 535 (1900)).  It is therefore the Court's "responsibility to read the treaty in a manner consistent

---

*United States of America and the Government of the Italian Republic for the Avoidance of Double Taxation with Respect to Taxes on Income and the Prevention of Fraud and Fiscal Evasion*, Committee on Foreign Relations Report on the Proposed Italian Tax Treaty ("Because the IRAP tax base does not permit deductions for labor and, in certain cases, interest, it is not likely to be a creditable tax under U.S. internal law.  The proposed treaty provides that a portion of the taxes imposed under the IRAP will be considered a creditable tax under this article.")  *See also* Notice 2008-3, 2008-2 I.R.B. 253 (Mexican *impuesto empresarial a tasa unica* creditable under the Mexico tax treaty pending further study without regard to whether such tax meets the definition of an income tax under Code Section 901).

# Appx153

with the shared expectations of the contracting parties." *Lozano v. Montoya Alvarez*, 572 U.S. at 12 (quoting *Olympic Airways v. Husain*, 540 U.S. 664, 650 (2004)); *see also Xerox v. United States*, 41 F.3d 647, 652 (Fed Cir. 1994) ("In construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purpose of the treaty.").

The Supreme Court reviewed the predecessor income tax treaty between the United States and Canada in *United States v. Stuart*, 489 U.S. 353 (1989). In that case, the Supreme Court specifically declined to look to U.S. internal law constraints in determining when the IRS could serve a request for documents to a third party recordkeeper upon a document request by Canadian officials made under certain treaty provisions. In refusing to allow an internal law to trump the plain language of the treaty, the Court held, "The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *United States v. Stuart*, 489 U.S. at 365-66 (quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982)).

In reaching that interpretation, the Court stated that "a treaty should generally be "construe[d] * * * *liberally* to give effect to the purpose which animates it." *Id.* at 368, quoting *Bacardi Corp of Am. v. Domenech*, 311 U.S. 150 (1940) (emphasis added). An expansive interpretation of treaty language is favored: "[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred." *Id.*; *see also Jordan v. Tashiro*, 278 U.S. 123, 128 (1928). The treaty between the United States and Canada has one of its principal purposes to avoid what the Supreme Court has described as "the evil of double taxation." *Burnet v. Chicago*

- 15 -

**Appx154**

*Portrait Co.*, 285 U.S. 1, 7 (1932). The Canada Treaty should be read in a way to excise that evil, not to perpetuate it.

> 2. The Defendant's Proposed Interpretation of the Canada Treaty Is Not Entitled to Any Deference

The Executive Branch's interpretation of a treaty is not accorded significant deference where the Executive Branch argues for an interpretation in isolation, without regard to or in conflict with the views of its treaty partner. *Iceland Steamship Co. Eimskip v. U.S. Dep't of the Army*, 201 F.3d 451 (D.C. Cir. 2000); *Eshel v. Comm'r*, 831 F.3d 512, 521 (D.C. Cir. 2016) (where the IRS asserts a meaning of a treaty without analysis of the shared expectations of the two sovereigns, its position "is the legal equivalent of trying to clap with one hand"); *see also*, *North West Life Insurance Co. of Canada v. Comm'r*, 107 T.C. 363, 379 (1996) ("There is no authority for the proposition that a court construing a convention must follow the interpretation suggested by our Government when that interpretation runs contrary to what the Court concludes was the intent of the contracting parties."). The deference that may be shown the Executive Branch (*see, e.g., El Al Israeli Airlines v. Tseng*, 525 U.S. 155, 168 (1999)) must be based on evidence which shows the interpretation accords with the negotiating history, past practices or diplomatic communications showing the shared understanding of the treaty partners. *E.g.*, *Sumitomo Shoji America Inc. v. Avagliano*, *supra*; *Kolovrat v. Oregon*, 366 U.S. 187 (1961).

In the same vein, the Supreme Court has indicated that "the opinions of our sister signatories' * * * are entitled to considerable weight." *Abbott v. Abbott*, 560 U.S. 1, 16 (2010), quoting *El Al Israel*, *supra* at 176 and *Air France v. Saks*, 470 U.S. 392, 404 (1985). For example, in *National Westminster Bank plc v. United States*, 512 F.3d 1347 (2009), the Federal Circuit considered a case involving a U.K. bank with a branch (a "permanent establishment") in the United States. At issue was the proper allocation of interest expense to the branch. The United States

- 16 -

argued that regulations issued in 1980, regarding the way interest expense should be allocated to a branch, were entitled to deference when interpreting a treaty signed in 1976. The Federal Circuit rejected giving any such deference, pointing out that the United States adduced no evidence showing that the shared expectations of the sovereign nations when agreeing to the treaty in 1976 accorded with the United States' unilateral position taken in the 1980 regulation. In reaching this conclusion, the Federal Circuit noted that the U.K. did not agree with the United States' asserted position.

Here, like in *National Westminster*, the dispute revolves around the application of a treaty to a provision enacted after the treaty (and the protocols) was signed. The Canadian Government has specifically indicated that it disagrees with the unilateral interpretation provided by the Defendant. *See* Exhibit 1 ("The position of the Canadian competent authority in this regard is that Canada, as the country of source, has the right to tax the gain, while the US * * * must provide relief in accordance with Article XXIV * * *.") Under such circumstances, Federal Circuit precedent calls for rejecting any deference for the Defendant's interpretation of the Canada Treaty.

### 3. The Enactment of the NIIT Does Not Override the Foreign Tax Credit Provisions in the Canada Treaty

One final treaty interpretation point remains: whether the later-enacted NIIT is compatible with or overrides the treaty-based foreign tax credit provisions of the Canada Treaty. Plaintiff's interpretation demonstrates that they are compatible and gives effect to each, while the Defendant's view fails to read the Canada Treaty and the NIIT in a harmonious way. Later enacted statutes can override a treaty if Congress intends to do so, but as this Court held in *Christensen,* Congress did not intend an override when enacting the NIIT. *Christensen* at 83; *see also Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly

expressed"). The intention to abrogate or modify a treaty is not to be lightly imputed to Congress. *Pigeon River Imp., Slide & Boom Co. v. Charles W. Cox, Ltd*., 291 U.S. 138, 160 (1934); *Murray v. Schooner Charming Betsy*, 6 U.S. (Cranch) 64, 118 (1804). Legislative silence does not constitute an override. *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 175 (D.D.C. 2002), aff'd, 333 F.3d 228 (D.C. Cir. 2003) ("The Supreme Court has unequivocally held that legislative silence is not sufficient to abrogate a treaty or a bilateral executive international agreement."). Previously, where Congress has intended new Code provisions to override treaty obligations, it has done so unambiguously.[5] Here, there is no evidence whatsoever that Congress intended to override the Canada Treaty in enacting the NIIT.

Because there has not been an explicit Congressional override, long-established case law requires that the NIIT and the Canada Treaty should be read harmoniously to give effect to both. If a harmonious reading is possible, then that harmonious reading will control. *Whitney v Robertson*, 124 U.S. 190, 194 (1888) ("When the two [legislation and a Treaty] relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other * * *."); *Pekar v. Comm'r*, 113 T.C. 158, 161 (1999) ("[T]he Code and the treaty should be read harmoniously, to give effect to each").

Here, it is possible and thus necessary to read the Canada Treaty and the Code harmoniously. The Code is silent as to the availability of a treaty foreign tax credit against the NIIT – it neither permits nor prohibits a credit. The Canada Treaty, by contrast, provides a credit

---

[5] For example, Code Section 7874(f) specifically provides that it overrides treaty obligations in the case of inversions, Code Section 884(e) specifically provides that it overrides treaties with respect to the branch profits tax, and Code Section 894(c) specifically denies treaty benefits to certain hybrid entities.

against the NIIT under both Article XXIV(4) and XXIV(1). This credit is available to the subset of U.S. taxpayers who are US citizens resident in Canada, and it is not available to the broader base of U.S. taxpayers who do not qualify for benefits under the Treaty. This is generally consistent with how tax treaties are supposed to work. Treaties provide benefits, not available under the Code, to a subset of taxpayers (either domestic or foreign) to accomplish specific goals. As the Letter of Submittal accompanying the Treaty stated, "In addition to the normal rules for the avoidance of double taxation, the Convention contains a rule not found in either the model or the existing convention for eliminating double taxation of United States citizens who are residents in Canada." Appendix C. There is no conflict between a treaty and domestic law merely because the treaty provides benefits not available under domestic law; providing such benefits is indeed the entire point of a treaty.

In summary, the above authorities require the following approach in interpreting paragraphs XXIV(1) and XXIV(4) of the Canada Treaty:

- The primary task is to give effect to the intention of the parties to the treaty.

- The interpretation focuses on the plain text of the treaty unless the language is inconsistent with the intention of the parties.

- A liberal interpretation is preferred to a restrictive one.

- The United States' interpretation is not entitled to deference when it conflicts with the views of its treaty partner.

- The views of the treaty partner are given great weight.

- Later enacted statutes do not override a treaty without a clear showing of Congressional intent.

The following sections explain how these rules, as applied each to Article XXIV(4) and Article XXIV(1), conclusively demonstrate that Plaintiff is entitled to a treaty-based foreign tax credit in this case.

- 19 -

Appx158

## B. Article XXIV(4) Provides a Standalone Treaty-Based Foreign Tax Credit Against the NIIT

Plaintiff is claiming a treaty-based foreign tax credit based on paragraphs 1 and 4 of

Article XXIV of the Canada Treaty.  Article XXIV(1) of the Canada Treaty provides:

> In the case of the United States, *subject to the provisions of paragraphs 4, 5 and 6*, double taxation shall be avoided as follows: In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States, * * * as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada * * *."

Emphasis added.  Article XXIV(4) of the Canada Treaty further provides:

> Where a United States citizen is a resident of Canada, *the following rules shall apply*:

> (a) Canada shall allow a deduction from the Canadian tax in respect of income paid or accrued to the United States in respect of profits, income or gains which arise * * * in the United States, except that such deduction need not exceed the amount of the tax that would be paid if the resident were not a United States citizen; and

> (b) for the purposes of computing the United States tax, the United States shall allow as a credit against the United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a) * * *.

Emphasis added.  As discussed further below, the plain meaning of each of these two paragraphs

in the Canada Treaty allows a treaty-based foreign tax credit in this case.

### 1.   The Plain Meaning of Article XXIV(4) Provides a Credit

U.S. citizens who are also Canadian tax residents are subject to double taxation on their

worldwide incomes as both countries claim worldwide taxation rights.  Article XXIV(4) together

with Article XXIV(5) and XXIV(6) of the Canada Treaty provide a special foreign tax credit to

such persons to eliminate this evil of double taxation.[6]  The plain meaning of Article XXIV(4)(b)

---

[6]     Only Article XXIV(4) is relevant here.  Article XXIV(5) applies to dividends, interest and royalties.  Article XXIV(6) is a "re-sourcing provision" that changes the source of income from U.S. to Canada in order to allow for the intended crediting provisions to apply.

- 20 -

is simple and straightforward: "the United States shall allow as a credit against the United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a)." The credit is not discretionary nor is it limited. The treaty-based credit provides a foreign tax credit for tax paid to Canada to offset "United States tax" to accomplish the goal of "eliminating double taxation." "United States tax" is a defined term in the treaty that includes the NIIT. According to Supreme Court authority interpreting the Canada Treaty, no further inquiry on the meaning of this provision should be necessary as this plain meaning fulfills a primary purpose of the Canada Treaty. *See Stuart, supra* 489 U.S. at 368 ("The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.").

Article XXIV(4) implements what has been described by this Court as the so-called "three bite rule." *See Christensen v. United States*, *slip op.* at 66. The purpose of the three-bite rule is to cover the situation faced by U.S. citizens resident in Canada who are most susceptible to double taxation. The Joint Committee on Taxation explained this rule, stating:

> The proposed treaty also contains special rules for U.S. citizens who are residents of Canada. Under the first rule, Canada will permit the U.S. citizen a credit against Canadian tax imposed on certain income that arises in the United States. This credit is limited to the tax that the citizen would have paid if he were not a U.S. citizen. In addition, the United States will allow the citizen a credit against his U.S. tax for any tax paid to Canada after Canada has allowed the credit for U.S. taxes. The credit comes after the Canadian tax is reduced by the deduction for U.S. taxes.

Explanation of the Proposed Income Tax Treaty Between the United States and Canada, *Joint Comm. on Taxation*, JCS-48-81 at 38 (1981). Appendix D.

Under the terms of the "three-bite rule," whichever country is assigned primary taxing rights on the item of income in question may exercise those rights as if the taxpayer were a non-U.S. citizen (that country is allowed the "first bite" of taxation). In a simple example, absent U.S.

Appx160

citizenship, if a Canadian resident taxpayer receives a U.S. source dividend, the United States has primary taxing rights (the first bite) of 15 percent on the amount of such a dividend. Canada Treaty Article X(2)(b).[7]

After taking into account the source-based taxing rights allowed to one or the other country (the first bite), Canada then is allowed the "second bite," which is residence-based taxing rights arising on the income in accordance with Canadian law. This second bite is restricted, however, as Canada is obliged to give a credit for any U.S. tax imposed on the first bite. So, for example, if Canada imposes a 35 percent tax on its resident, in the case of a U.S. source dividend of $100, Canada collects $20 of tax (*i.e.* $35 of Canadian tax less a $15 credit for the U.S. "first bite" tax).

Finally, the third bite recognizes that a U.S. citizen, even one resident in Canada, is subject to United States residual taxing rights based on such U.S. citizenship. This third bite requires the United States to credit the Canadian tax (the second bite) against any residual tax the United States may have (the third bite). As an example, if the taxpayer receives a U.S. source dividend on which 35 percent Canadian tax and 37 percent U.S. tax applies, the operation of the third bite would be as follows:

| | |
|---|---|
| First Bite (source-based): | 15 percent tax to United States |
| Second Bite (Canadian residency-based): | 20 percent tax to Canada (35 percent rate less First Bite Credit) |
| Third Bite (U.S. citizenship-based): | 2 percent tax to United States (37 percent tax less First and Second Bites) |

The parties agree on the operation of the three-bite rule provided by Article XXIV(4) as described above.

---

[7]    Article XXIV(5) may modify this example depending on certain aspects of Canadian law, but this example clearly demonstrates the operation of the three-bite rule.

Application of the Article XXIV(4) three-bite rule in the present case allows a treaty-based foreign tax credit. The gain giving rise to the NIIT at issue in this case arises on the sale of Canadian real property over which Canada has primary taxing rights. Canada Treaty Article XIII(1). Thus, the United States is not entitled to a "first bite." Under the "second bite," Canada may tax this gain in full based on Plaintiff's Canadian tax residency. The parties agree that the "United States tax" as defined in Article II(3) includes the NIIT, and thus the Canadian tax incurred by Plaintiff is creditable against Plaintiff's regular US income tax liability and the NIIT in accordance with this provision. Although the United States has residual citizenship-based taxing rights (the "third bite"),[8] the United States must credit the Canadian tax against that third bite, which eliminates all U.S. tax liability – in essence, Plaintiff has no residual liability for the NIIT.

Defendant cannot contest the above application of the three-bite rule as applied in this case. Defendant instead must argue that Article XXIV(4), despite containing no such indication in the text, is subject to the limitations contained in Article XXIV(1). In this respect, Defendant errs in two respects: (i) as this Court found in *Christensen*, the Article XXIV(4) three-bite rule is a separate standalone provision not subject to Article XXIV(1) at all and (ii) even if Article XXIV(1) applies, that Article does not restrict the claimed treaty-based foreign tax credit as is made apparent by the Technical Explanation to the Canada Treaty,[9] standard rules of treaty interpretation and the Canadian Government's views.

---

[8]     For purposes of this partial summary judgment motion, the parties assume the Canadian tax on the sale of the Canadian real property exceeds the U.S. regular tax and the NIIT arising on such gain.

[9]     Treasury Department Technical Explanation of the Convention between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington D.C. on September 26, 1980, As Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984 (the "Technical Explanation").

- 23 -

**Appx162**

### 2. Article XXIV(4) Is Independent from Article XXIV(1)

Contrary to Defendant's position that Article XXIV(1) governs the outcome of this case, the plain text of Article XXIV(1) explicitly recognizes that Article XXIV(4) is a separate provision. Article XXIV(1) states that its rules to avoid double taxation are "*subject to the provisions of paragraphs 4, 5 and 6*" (Emphasis added). Defendant inexplicably imports terms contained in Article XXIV(1) to Article XXIV(4) even though by the express terms of the treaty itself, the two provisions are drafted in the exact opposite way, namely, that Article XXIV(1) is subject to the provisions of paragraph 4 – not the other way around. Defendant's reading reverses the hierarchical order that is explicitly provided in the text to deny Plaintiff a treaty-based foreign tax credit, and in so doing produces double taxation where the Treaty would by its plain text prevent it. Two appellate courts analysing the availability of credits against the alternative minimum tax (AMT) expressed deep scepticism of Defendant's position, which has since been rejected explicitly by this Court in *Christensen*.

In 1986, the Code was amended such that a taxpayer could only claim a foreign tax credit against 90 percent of his or her alternative minimum tax obligation.[10] Thus, even if a taxpayer incurred foreign tax sufficient to offset 100 percent of his or her AMT liability, Code Section 59(a) expressly limited foreign tax credits such that a taxpayer would be required to pay no less than 10 percent of this U.S. tax liability. Taxpayers brought refund suits asserting that U.S. tax treaties nonetheless allowed a full foreign tax credit against the entire amount of AMT. *Haver v. Comm'r*, 444. F.3d 656 (D.C. Cir. 2006); *Kappus v. Comm'r*, 337 F.3d 1053 (D.C. Cir 2003). In *Kappus*, the Defendant maintained that Canada Treaty Article XXIV(4) "does not impose a substantive

---

[10]   Code Sec. 59(a).  This limitation was repealed in 2004.  American Jobs Creation Act of 2004, Pub. L. 108-357, Sec. 421(a)(1).

obligation on the part of the United States to grant a tax credit, but rather 'merely provides rules for determining the order in which deductions or credits for taxes paid to the other jurisdiction are applied when the same income is subject to tax by both.'" *Kappus*, 337 F.3d at 1056. In essence, the Defendant argued that despite the "shall apply" language contained in Article XXIV(4), Article XXIV(1) instead governs whether a treaty-based foreign tax credit applies.

The *Kappus* Court was not convinced by Defendant's argument, stating that "[t]he question of whether the [Canada Treaty] and statute can be harmonized as the government suggests is an extremely close one. It is not, however, a question that we need to resolve." The *Kappus* Court ultimately held in favor of the government based instead on Congressional legislation explicitly communicating its intent to override a treaty-based foreign tax credit in the AMT context, which does not apply in the instant case, where there was no explicit Congressional override.[11] The *Haver* Court echoed this conclusion, stating that "*Kappus* raised interpretive difficulties that are not present here [as *Haver* involved the interpretation of the German/U.S. tax treaty]. The [Canada Treaty] provision we examined contained a clause subjecting its tax credit to the limitations of U.S. law, but it also expressly conditioned the tax credit and *arguably the limitation* itself on subsequent paragraphs of the treaty." *Haver*, 444 F.3d at 659 (Emphasis added). In other words, the courts in both decisions recognized the special role of Article XXIV(4) in the Canada Treaty and acknowledged that it could be understood to provide a credit independent of Article XXIV(1), but ultimately did not have to reach a conclusion on that question.

---

[11]     Congress specifically overrode any U.S. treaty that may have allowed a treaty-based foreign tax credit to eliminate the 90 percent AMT limitation. *See* Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102. Stat. 3342, Sec.1012(aa)(2) (AMT limitation "shall apply notwithstanding any treaty obligation of the United States in effect on the date of [its] enactment").

Recently, this Court in *Christensen* came to a conclusion on this same question as applied to similar language in the French Treaty. The taxpayers in *Christensen* were French resident U.S. citizens who disposed of shares of a French company. The French Treaty assigned primary taxing rights on this income to the French Government. Under the three-bite rule described above, the United States did not have taxing rights under the first bite (since the gain in question was French source gain). The French Government then imposed tax on the gain in an amount that exceeded the United States income tax including the NIIT (the second bite). As a result of the higher amounts of such French tax, the United States did not have any residual taxing rights under the third bite, including the NIIT.

In *Christensen*, Defendant maintained that the French Treaty equivalent of the three bite rule of Article XXIV(4) was subject to the limiting language "[i]n accordance with the provisions and subject to the limitations of the law of the United States," found in the provision of the French Treaty that is substantially identical to that in Article XXIV(1) of the Canada Treaty. This Court disagreed, relying on the rules of treaty interpretation as summarized above. This Court found that "a liberal interpretation" of the treaty's foreign tax credit rules better suited the overall purpose of the French Treaty, "to avoid double taxation of each signatory government's citizens who reside in the other signatory country." *Id.*, Slip Op. at 91; *citing United States v. Stuart*, 489 U.S. at 368; *Xerox Corp v. United States*, 41 F.3d at 652; *McManus v. United States*, 130 Fed. Cl. 613 (2017). This Court concluded that "the provision of a foreign tax credit under [the three bite rule in the French Treaty], which is distinct from the limitation in [the treaty's equivalent of Article XXIV(1)], best gives effect to the apparent shared intent of the United States and France * * *." *Id.* Such a conclusion is even more warranted in this situation where the Canadian Government has expressly indicated its views that a treaty-based tax credit applies in the Plaintiff's situation.

- 26 -

**Appx165**

To summarize, the plain meaning of Article XXIV(4) is harmonious with the meaning of Article XXIV read as a whole and read together with the rest of the treaty. Article XXIV(1) commits the parties to eliminate double taxation (as described more fully below), while Article XXIV(4) achieves that purpose by providing clear crediting rules for the targeted group, namely U.S. citizens resident in Canada, whose exposure to double taxation is greater than residents of Canada who are not U.S. citizens. This interpretation accords with the need to construe the text of the treaty as a whole, to give effect to every part of the treaty, and to avoid reading the provisions as if they conflicted if it is possible to read them harmoniously without straining the plain meaning of the text. *United States v. Butler*, 297 U.S. 1, 65 (1936) ("[W]ords cannot be meaningless, else they would not have been used.").

Taken together the plain meaning, purpose, context, and judicial authority all require the conclusion that Article XXIV(4) provides an independent foreign tax credit against the NIIT:

- The plain text of the provision obliges the United States, without limitation, to give a foreign tax credit for tax paid to Canada by a Canadian resident U.S. citizen. Consistent with *Stuart*, that should end the inquiry.

- The purpose of the provision is implementing the "three-bite rule" to allocate taxing rights between the United States and Canada. This provision covers Canadian resident U.S. citizens who are otherwise more susceptible to double worldwide taxation based on their residency and citizenship.

- Defendant's view that Article XXIV(4) is somehow subsumed within Article XXIV(1) is contrary to the plain text of Article XXIV(1), two appellate court opinions, and to this Court's decision in *Christensen*.

- 27 -

**Appx166**

Thus, the text of Article XXIV(4), in which "the following rules *shall apply*," provides a treaty-based foreign tax credit in this case by its plain terms. No further inquiry is required into the application of Article XXIV(1). Nonetheless, Plaintiff asserts this paragraph would also allow a treaty-based foreign tax credit in this case.

### C. Article XXIV(1) Also Allows a Treaty-Based Foreign Tax Credit

Even if Defendant were to prevail on its argument that Article XXIV(4) is merely an ordering rule rather than an independent credit, Plaintiff would nonetheless prevail, as Article XXIV(1) also allows a treaty-based foreign tax credit in this case. Article XXIV(1) provides in relevant part that

> [i]n accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States, * * * as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada * * *."

Plaintiff recognizes that the Tax Court, in *Toulouse v. Comm'r*, 157 T.C. 49 (2021), and this Court in *Christensen*, held that similar language in the French Treaty did not provide an independent treaty-based foreign tax credit. However, in the context of the Canada Treaty and in particular the position advocated by the Canadian Government, the logic of the *Toulouse* and *Christensen* decisions is not convincing.[12] Indeed, a treaty-by-treaty analysis is specifically required, as acknowledged by the Treasury Department. *See* Treasury Decision, *supra* at 12 ("An analysis of each United States income tax treaty would be required to determine whether the United States

---

[12] Several commentators have questioned the logic of the *Toulouse* decision. *See* Blanchard, *The Tax Court's Erroneous Decision in Toulouse*, 50 *Tax Mgm't Int'l J.*, No. 10 (Oct. 1, 2021); Gould, *The Tax Court's Flawed Analysis in Toulouse Should Be Challenged*, *Tax Notes International*, vol. 103, p. 1695-1696 (Sept. 27, 2021); Rosenbloom and Shaheen, "*Toulouse*: No Treaty-Based Credit?, *Tax Notes International*, vol. 104, pp. 417-422 (Oct. 25, 2021).

would have an obligation under that treaty to provide a credit against the section 1411 tax for foreign income taxes paid to the other country.").

In *Christensen*, this Court, like the Tax Court in *Toulouse,* did not have the benefit of the French Government's views of the meaning of the terms of Article 24(2)(a) of the French Treaty, the analog of Article XXIV(1) of the Canada Treaty. *See*, *Christensen*, Slip op. at 86 (the analysis was made "without anything in the record before the court to establish the Government of the French Republic's understanding of the [French Treaty]."). Lacking evidence regarding whether the U.S. position reflected the shared intentions of the parties to the French Treaty, this Court accorded deference to Defendant's interpretation that imported the rules set forth in Code Secs. 27 and 901(a) to determine if a treaty-based foreign tax credit is allowed. As the NIIT is codified in Chapter 2A and Code Secs. 27 and 901(a) restrict a foreign tax credit to Chapter 1 taxes, the Court held that a treaty-based foreign tax credit would not be allowed under Article 24(2)(a) of the French Treaty.

Here, however, the Canadian Government disagrees with the interpretation advocated by Defendant (and adopted by this Court with respect to the French Treaty). As the Supreme Court has ruled, views of a sister treaty signatory are entitled to great weight. *Abbott v. Abbott*, *supra*. Therefore, the Canadian Government's interpretation of the Treaty is a significant difference between the case at hand and the *Toulouse* and *Christensen* cases.

Moreover, the Technical Explanation to the Canada Treaty refutes the argument that the "limitations" language contained in Article XXIV(1) would restrict a treaty-based foreign tax credit from applying against the NIIT. The Technical Explanation specifically indicates that treaty-based foreign tax credits

- 29 -

**Appx168**

allowed by paragraph 1 are subject to the limitations of the Code as they may be amended from time to time without changing the general principle of paragraph 1. Thus, as is generally the case under U.S. income tax conventions, provisions such as Code sections 901(c), 904, 905, 907, 908, and 911 apply for purposes of computing the allowable credit under paragraph 1. In addition, the United States is not required to maintain the overall limitation currently provided by U.S. law.

Technical Explanation at 37. Appendix B.

The Technical Explanation thus sets forth various statutory limitations contained in the Code and imports them into the analysis of whether a particular Canadian income tax is creditable.[13] Such rules have no application in this case – the parties agree that the Canadian taxes incurred by Plaintiff are creditable – as the question is not the creditability of the Canadian tax, but whether such credits can be used to offset the NIIT (a United States tax as defined by the treaty).

Article XXIV(1) also includes the phrase that such provisions and limitations in the Code are applied "without changing the general principle hereof." Fundamentally, Article XXIV(1) requires the United States to provide its citizens "as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada * * *." The NIIT is a United States income tax and therefore the appropriate amount of Canadian tax is allowable to offset the NIIT.

---

[13] A careful reading of the Code sections cited in the Technical Explanation quoted above demonstrates the point. Code Secs. 904 and 907 limit the credit of Canadian taxes to the same or similar types of foreign income (including cross crediting as discussed above). Code Sec. 905 deals with the timing of when a Canadian tax arises, carryforwards and carryback of unused credits, and foreign exchange computations. Code Sec. 911 precludes a taxpayer from claiming a foreign tax credit with respect to income that is otherwise excluded under the foreign earned income rules. Code Secs. 901(c) and 908 retain the Executive Branch's ability to restrict a foreign tax credit in the highly unlikely situation in which the Canadian government decides to retaliate against U.S. citizens living in Canada or supports an international boycott. *See*, fn. 3, *supra*.

The logic of the *Christensen* and *Toulouse* cases therefore does not apply to the Canada Treaty. The "shared expectation of the treaty partners," as evidenced by the Technical Explanation and the view of the Canadian Government, is that Code Section 901(a) does not limit the creditability of Canada taxes against United States taxes (including the NIIT) under Article XXIV(1) of the Canada Treaty. As such, there should be a credit against the NIIT.

If Defendant's position were accepted, it is hard to understand what Defendant contends is the purpose of Article XXIV(1). If this provision simply states that domestic law governs the allowance of a foreign tax credit, the article would have no independent purpose or effect in contravention of the fundamental rules of U.S. legal interpretation. *United States v. Butler*, *supra*.[14] Moreover, interpreting a provision to have no effect ignores the fact that treaties are subject to years of painstaking negotiation. *See, e.g., Rocca v. Thompson*, 223 U.S. 317, 332 (1912) ("[T]reaties are the subject of careful consideration before they are entered"). A more logical and liberal interpretation of the plain meaning of the words of Article XXIV(1), as echoed by the Canadian Government and the text of the Technical Explanation, is that a foreign tax credit is allowed "in accordance with the provisions and subject to the limitations of the law of the United States" (*i.e.*, permitting Code-based limitations for cross-crediting, carryforwards and carrybacks, etc.) and the subsequent parenthetical phrase "as it may be amended from time to time without changing the general principle thereof" ensures that any Canadian income tax covered by the Canada Treaty may be credited against U.S. income taxes that come within the treaty's scope. The Code may be relevant to the timing and amount of the treaty-based foreign tax credit, but the

---

[14]    The Code recognize the existence of independent treaty-based foreign tax credits. Code Sec. 6511(d)(3)(A) provides a special limitation period for a claim for refund "for which credit is allowed against the tax imposed by subtitle A in accordance with the provisions of section 901 or the provisions of any treaty to which the United States is a party."

- 31 -

Appx170

general principle allowing a credit of Canadian income taxes against U.S. income taxes to avoid double taxation is guaranteed.

Other parts of Article XXIV confirm this result – the question of what taxes are allowed as a credit and the corollary, against which taxes would a credit be allowed, are based on the treaty and not on domestic law. *First,* Article XXIV(5) provides a United States foreign tax credit to a Canadian resident United States citizen on dividends, royalties, and interest arising in the United States. Under Code Sections 901 and 904(a), a foreign tax credit is only available with respect to foreign source income. Thus, the credit under Article XXIV(5) of the Canada Treaty represents a credit that is not available under the Code and is thus independently provided by the Canada Treaty. *Second,* Article XXIV(8) obliges the United States to provide a foreign tax credit for a Canadian capital tax. The Canadian capital tax imposes a tax on the total cash balance of a corporation regardless of the income it earns. Such a tax would not normally be creditable under Code Section 901 as it is not a tax on *income. Third,* Article XXIX B(7) provides a credit against the U.S. federal estate tax for the Canadian income tax that is triggered upon the death of an individual. This Canadian tax would not normally be creditable against the U.S. estate tax under 2014 since it would not qualify as a foreign death tax. *Estate of Ballard v. Commissioner*, 85 T.C. 300 (1985).[15]

In the end, the Defendant would simply prefer, on its own and disregarding the intention of Congress by reading in an override provision that does not exist, to rewrite the Canada Treaty, overriding its specific terms, the context of other provisions, and the expectations of the Canadian

---

[15]     Other provisions in the Canada Treaty safeguard a treaty-based foreign tax credit even if U.S. law is later modified. For example, a U.S. corporation can claim an indirect foreign tax credit for taxes paid by a 10 percent or greater owned Canadian company under Article XXIV(1), which accorded with U.S. domestic law at the time the Canada Treaty was signed. That statutory credit is no longer available, but the right to a treaty-based credit remains.

Government, and adopt the provisions as contained in the most recent treaty signed with Croatia. In that treaty, the *Convention Between the Government of the United States of America and the Government of the Republic of Croatia for the Avoidance of Double Taxation and the Prevention of Tax Evasion With Respect to Taxes on Income* (the "Croatia Treaty"), the foreign tax credit article (Article 23(2)) provides that the United States shall allow a foreign tax credit "to the extent allowed under the law of the United States (as it may be amended from time to time)." This is significantly different from the wording in the Canada Treaty which states that a credit shall be allowed "[i]n accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof)". The Croatia Treaty language specifically limits the foreign tax credit article to that which is allowed under "the law of the United States," rather than granting a credit and then permitting certain U.S. limitations to apply. The absence in the Croatia Treaty of the more detailed language in the Canada Treaty demonstrates that when treaty partners intend that a treaty-based foreign tax credit will not be allowed, they are perfectly capable of drafting accordingly.

## III.   Conclusion

In 2015, Plaintiff paid tax twice on the sale of his Canadian real property: to Canada by virtue of his residency and to the United States by virtue of his citizenship. Recognizing the unfairness of paying tax twice on the same income to two different countries, Canada and the United States have had in place, for over 80 years, tax treaties to prevent this.  To solve the problem, the Canada Treaty includes several highly negotiated foreign tax credits that are not available under U.S. statutory law.  Despite this longstanding bargain between the two countries, the United States now insists on subjecting Plaintiff to the exact type of double taxation on the sale of Canadian real property that the Canada Treaty was put in place to prevent by refusing to credit

**Appx172**

Canadian tax against the NIIT. Plaintiff requested that the Canada and the United States confer to relieve this double taxation. Over four years of negotiations, the United States has steadfastly refused to provide relief.

Longstanding and uncontroversial principles of treaty interpretation accord great weight to Canada's position, which is clear: Plaintiff should not face double taxation and is entitled to a credit under the "Elimination of Double Taxation" article. Plaintiff is now forced to sue to enforce the bargain agreed to by the United States. Article XXIV(4) is a special foreign tax credit regime for Canadian tax resident United States citizens that – without reservation – obliges the United States to credit Canadian income tax against a United States income tax such as the NIIT. Under the plain meaning of Article XXIV(4), where a United States citizen is a tax resident of Canada "the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada." Under longstanding Supreme Court authority, this is sufficient to dispose of this case.

Plaintiff's interpretation of Article XXIV(4) is supported by this Court's opinion in *Christensen,* by two circuit court opinions, and by explanations produced by the United States Government at the time of ratification. Additionally, both the language and the logic of Article XXIV(1) oblige the United States to provide a credit. The limitations contained in Article XXIV(1) relate to rules regarding the timing of when a Canadian tax is creditable, the amount of such Canadian tax, and whether the Canadian tax can be cross-credited against other items of income. However, the general principle of Article XXIV(1) is that a tax covered by the terms of the Canada Treaty, which may be wider than a creditable tax under either country's domestic rules, may offset, or be offset, by taxes of the other jurisdiction. The treaty defines which country has primary or secondary taxing rights, but the general purpose of Article XXIV, that a treaty-based foreign tax credit be allowed, is guaranteed.

- 34 -

# Appx173

For the reasons set forth above, Plaintiff requests this Court to enforce the United States'
longstanding bargain with Canada, confirm that Plaintiff is entitled to a treaty-based foreign tax
credit to offset the NIIT and provide such other relief as the Court may deem just and appropriate.

Respectfully submitted,

/s/ Stuart E. Horwich

Horwich Law LLP
20 Old Bailey, 5th Floor
London  EC4M 7AD
United Kingdom
011 44 20 8057 8013
seh@horwichlaw.co.uk

/s/ Max Reed
Polaris Tax Counsel
Suite 900
1788 West Broadway
Vancouver, British Columbia
Canada
V6J 1Y1
604-283-9301
max@polaristax.com

Attorneys for Plaintiff

- 35 -

2. To the extent that income distributed by an estate or trust is subject to the provisions of paragraph 1, then, notwithstanding such provisions, income distributed by an estate or trust which is a resident of a Contracting State to a resident of the other Contracting State who is a beneficiary of the estate or trust may be taxed in the first-mentioned State and according to the laws of that State, but the tax so charged shall not exceed 15 per cent of the gross amount of the income; provided, however, that such income shall be exempt from tax in the first-mentioned State to the extent of any amount distributed out of income arising outside that State.

3. Losses incurred by a resident of a Contracting State with respect to wagering transactions the gains on which may be taxed in the other Contracting State shall, for the purpose of taxation in that other State, be deductible to the same extent that such losses would be deductible if they were incurred by a resident of that other State.

4. Notwithstanding the provisions of paragraph 1, compensation derived by a resident of a Contracting State in respect of the provision of a guarantee of indebtedness shall be taxable only in that State, unless such compensation is business profits attributable to a permanent establishment situated in the other Contracting State, in which case the provisions of *Article VII* (Business Profits) shall apply.

**Article XXIII Capital**

1. Capital represented by real property, owned by a resident of a Contracting State and situated in the other Contracting State, may be taxed in that other State.

2. Capital represented by personal property forming part of the business property of a permanent establishment which a resident of a Contracting State has in the other Contracting State may be taxed in that other State.

3. Capital represented by ships and aircraft operated by a resident of a Contracting State in international traffic, and by personal property pertaining to the operation of such ships and aircraft, shall be taxable only in that State.

4. All other elements of capital of a resident of a Contracting State shall be taxable only in that State.

**Article XXIV Elimination of Double Taxation**

1. In the case of the United States, subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows: In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States, or to a company electing to be treated as a domestic corporation, as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada; and, in the case of a company which is a resident of the United States owning at least 10 per cent of the voting stock of a company which is a resident of Canada from which it receives dividends in any taxable year, the United States shall allow as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada by that company with respect to the profits out of which such dividends are paid.

2. In the case of Canada, subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows:

(a) subject to the provisions of the law of Canada regarding the deduction from tax payable in Canada

**Bloomberg Law**®

of tax paid in a territory outside Canada and to any subsequent modification of those provisions (which shall not affect the general principle hereof)

(i) income tax paid or accrued to the United States on profits, income or gains arising in the United States, and

(ii) in the case of an individual, any social security taxes paid to the United States (other than taxes relating to unemployment insurance benefits) by the individual on such profits, income or gains

shall be deducted from any Canadian tax payable in respect of such profits, income or gains;

(b) in the case of a company which is a resident of Canada owning at least 10 percent of the voting stock of a company which is a resident of the United States from which it receives dividends in any taxable year, Canada shall allow as a credit against the Canadian tax on income the appropriate amount of income tax paid or accrued to the United States by the second company with respect to the profits out of which the dividends are paid; and

(c) notwithstanding the provisions of subparagraph (a), where Canada imposes a tax on gains from the alienation of property that, but for the provisions of paragraph 5 of *Article XIII* (Gains), would not be taxable in Canada, income tax paid or accrued to the United States on such gains shall be deducted from any Canadian tax payable in respect of such gains.

3. For the purposes of this Article:

(a) profits, income or gains (other than gains to which paragraph 5 of *Article XIII* (Gains) applies) of a resident of a Contracting State which may be taxed in the other Contracting State in accordance with the Convention (without regard to paragraph 2 of *Article XXIX* (Miscellaneous Rules)) shall be deemed to arise in that other State; and

(b) profits, income or gains of a resident of a Contracting State which may not be taxed in the other Contracting State in accordance with the Convention (without regard to paragraph 2 of *Article XXIX* (Miscellaneous Rules)) or to which paragraph 5 of *Article XIII* (Gains) applies shall be deemed to arise in the first-mentioned State.

4. Where a United States citizen is a resident of Canada, the following rules shall apply:

(a) Canada shall allow a deduction from the Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income or gains which arise (within the meaning of paragraph 3) in the United States, except that such deduction need not exceed the amount of the tax that would be paid to the United States if the resident were not a United States citizen; and

(b) for the purposes of computing the United States tax, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a). The credit so allowed shall not reduce that portion of the United States tax that is deductible from Canadian tax in accordance with subparagraph (a).

5. Notwithstanding the provisions of paragraph 4, where a United States citizen is a resident of Canada, the following rules shall apply in respect of the items of income referred to in *Article X* (Dividends), XI (Interest) or XII (Royalties) that arise (within the meaning of paragraph 3) in the United States and that would be subject to United States tax if the resident of Canada were not a citizen of the United States, as long as the law in force in Canada allows a deduction in computing income for

**Bloomberg Law**®　　　　© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

the portion of any foreign tax paid in respect of such items which exceeds 15 per cent of the amount thereof:

(a) the deduction so allowed in Canada shall not be reduced by any credit or deduction for income tax paid or accrued to Canada allowed in computing the United States tax on such items;

(b) Canada shall allow a deduction from Canadian tax on such items in respect of income tax paid or accrued to the United States on such items, except that such deduction need not exceed the amount of the tax that would be paid on such items to the United States if the resident of Canada were not a United States citizen; and

(c) for the purposes of computing the United States tax on such items, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (b). The credit so allowed shall reduce only that portion of the United States tax on such items which exceeds the amount of tax that would be paid to the United States on such items if the resident of Canada were not a United States citizen.

6. Where a United States citizen is a resident of Canada, items of income referred to in paragraph 4 or 5 shall, notwithstanding the provisions of paragraph 3, be deemed to arise in Canada to the extent necessary to avoid the double taxation of such income under paragraph 4(b) or paragraph 5(c).

7. For the purposes of this Article, any reference to "income tax paid or accrued" to a Contracting State shall include Canadian tax and United States tax, as the case may be, and taxes of general application which are paid or accrued to a political subdivision or local authority of that State, which are not imposed by that political subdivision or local authority in a manner inconsistent with the provisions of the Convention and which are substantially similar to the Canadian tax or United States tax, as the case may be.

8. Where a resident of a Contracting State owns capital which, in accordance with the provisions of the Convention, may be taxed in the other Contracting State, the first-mentioned State shall allow as a deduction from the tax on the capital of that resident an amount equal to the capital tax paid in that other State. The deduction shall not, however, exceed that part of the capital tax, as computed before the deduction is given, which is attributable to the capital which may be taxed in that other State.

9. The provisions of this Article relating to the source of profits, income or gains shall not apply for the purpose of determining a credit against United States tax for any foreign taxes other than income taxes paid or accrued to Canada.

10. Where in accordance with any provision of the Convention income derived or capital owned by a resident of a Contracting State is exempt from tax in that State, such State may nevertheless, in calculating the amount of tax on other income or capital, take into account the exempted income or capital.

### Article XXV Non-Discrimination

1. Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances, particularly with respect to taxation on worldwide income, are or may be subjected. This provision shall also apply to individuals who are not residents of one or both of the Contracting States.

**Bloomberg Law**®                    © 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

TREASURY DEPARTMENT TECHNICAL EXPLANATION OF THE CONVENTION
BETWEEN THE UNITED STATES OF AMERICA AND CANADA WITH RESPECT TO
TAXES ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON, D.C. ON
SEPTEMBER 26, 1980, AS AMENDED BY THE PROTOCOL SIGNED AT OTTAWA ON
JUNE 14, 1983 AND THE PROTOCOL SIGNED AT WASHINGTON ON MARCH 28, 1984.

GENERAL EFFECTIVE DATE UNDER ARTICLE XXX: 1 JANUARY 1985

INTRODUCTION

This is a technical explanation of the Convention between the United States and Canada signed on September 26, 1980, as amended by the Protocols signed on June 14, 1983 and March 28, 1984. ("the Convention"). References are made to the Convention and Protocol between Canada and the United States with respect to Income Taxes signed on March 4, 1942, as amended by the Convention signed on June 12, 1950, the Convention signed on August 8, 1956 and the Supplementary Convention signed on October 25, 1966 (the "1942 Convention"). These references are intended to put various provisions of the Convention into context. The technical explanation does not, however, provide a complete comparison between the Convention and the 1942 Convention. Moreover, neither the Convention nor the technical explanation is intended to have implications for the interpretation of the 1942 Convention.

The technical explanation is an official guide to the Convention. It reflects policies behind particular Convention provisions, as well as understandings reached with respect to the interpretation and application of the Convention.

TABLE OF ARTICLES

Article I----------------------------------Personal Scope
Article II---------------------------------Taxes Covered
Article III--------------------------------General Definitions
Article IV--------------------------------Residence
Article V---------------------------------Permanent Establishment
Article VI--------------------------------Income from Real Property
Article VII-------------------------------Business Profits
Article VIII------------------------------Transportation
Article IX--------------------------------Related Persons
Article X---------------------------------Dividends
Article XI--------------------------------Interest
Article XII-------------------------------Royalties
Article XIII------------------------------Gains
Article XIV------------------------------Independent Personal Services
Article XV-------------------------------Dependent Personal Services
Article XVI------------------------------Artistes and Athletes
Article XVII-----------------------------Withholding of Taxes in Respect of Independent

                     Personal Services
Article XVIII----------------------------Pensions and Annuities
Article XIX-------------------------------Government Service
Article XX --------------------------------Students
Article XXI-------------------------------Exempt Organizations
Article XXII------------------------------Other Income
Article XXIII-----------------------------Capital
Article XXIV-----------------------------Elimination of Double Taxation
Article XXV------------------------------Non-Discrimination
Article XXVI-----------------------------Mutual Agreement Procedure
Article XXVII----------------------------Exchange of Information
Article XXVIII--------------------------Diplomatic Agents and Consular Officers
Article XXIX----------------------------Miscellaneous Rules
Article XXX-----------------------------Entry into Force
Article XXXI----------------------------Termination
Protocol 3-------------------------------of 17 March, 1995
Protocol 4-------------------------------of 29 July, 1997

## ARTICLE I
### Personal Scope

Article I provides that the Convention is generally applicable to persons who are residents of either Canada or the United States or both Canada and the United States. The word "generally" is used because certain provisions of the Convention apply to persons who are residents of neither Canada nor the United States.

## ARTICLE II
### Taxes Covered

Paragraph I states that the Convention applies to taxes "on income and on capital" imposed on behalf of Canada and the United States, irrespective of the manner in which such taxes are levied. Neither Canada nor the United States presently impose taxes on capital. Paragraph 1 is not intended either to broaden or to limit paragraph 2, which provides that the Convention shall apply, in the case of Canada, to the taxes imposed by the Government of Canada under Parts I, XIII, and XIV of the Income Tax Act and, in the case of the United States, to the Federal income taxes imposed by the Internal Revenue Code ("the Code").

National taxes not generally covered by the Convention include, in the case of the United States, the estate, gift, and generation-skipping transfer taxes, the Windfall Profits Tax, Federal unemployment taxes, social security taxes imposed under sections 1401, 3101, and 3111 of the Code, and the excise tax on insurance premiums imposed under Code section 4371. The Convention also does not generally cover the Canadian excise tax on net insurance premiums paid by residents of Canada for coverage of a risk situated in Canada, the Petroleum and Gas Revenue Tax (PGRT) and the Incremental Oil Revenue Tax (IORT). However, the Convention

has the effect of covering the Canadian social security tax in certain respects because under Canadian domestic tax law no such tax is due if there is no income subject to tax under the Income Tax Act of Canada. Taxes imposed by the states of the United States, and by the provinces of Canada, are not generally covered by the Convention. However, if such taxes are imposed in accordance with the provisions of the Convention, a foreign tax credit is ensured by paragraph 7 of Article XXIV (Elimination of Double Taxation).

Paragraph 2 contrasts with paragraph 1 of the Protocol to the 1942 Convention, which refers to "Dominion income taxes." In addition, unlike the 1942 Convention, the Convention does not contain a reference to "surtaxes and excess-profits taxes."

Paragraph 3 provides that the Convention also applies to any taxes identical or substantially similar to the taxes on income in existence on September 26, 1980 which are imposed in addition to or in place of the taxes existing on that date. Similarly, taxes on capital imposed after that date are to be covered.

It was agreed that Part I of the Income Tax Act of Canada is a covered tax even though Canada has made certain modifications in the Income Tax Act after the signature of the Convention and before the signature of the 1983 Protocol. In particular, Canada has enacted a low flat rate tax on petroleum production (the PGRT) which, at the time of the signature of the 1983 Protocol, is imposed generally at the statutory rate of 14.67 percent for the period June 1, 1982 to May 31, 1983, and at 16 percent thereafter, generally reduced to an effective rate of 11 percent or 12 percent after deducting a 25 percent resource allowance. The PGRT is not deductible in computing income for Canadian income tax purposes. This agreement is not intended to have implications for any other convention or for the interpretation of Code sections 901 and 903. Further, the PGRT and IORT are not taxes described in paragraphs 2 or 3.

Paragraph 4 provides that, notwithstanding paragraphs 2 and 3 the Convention applies to certain United States taxes for certain specified purposes: the accumulated earnings tax and personal holding company tax are covered only to the extent necessary to implement the provisions of paragraphs 5 and 8 of Article X (Dividends); the excise taxes imposed with respect to private foundations are covered only to the extent necessary to implement the provisions of paragraph 4 of Article XXI (Exempt Organizations); and the social security taxes imposed under sections 1401, 3101, and 3111 of the Code are covered only to the extent necessary to implement the provisions of paragraph 4 of Article XXIX (Miscellaneous Rules). The pertinent provisions of Articles X, XXI, and XXIX are described below. Canada has no national taxes similar to the United States accumulated earnings tax, personal holding company tax, or excise taxes imposed with respect to private foundations.

Article II does not specifically refer to interest, fines and penalties. Thus, each Contracting State may, in general, impose interest, fines, and penalties or pay interest pursuant to its domestic laws. Any question whether such items are being imposed or paid in connection with covered taxes in a manner consistent with provisions of the Convention, such as Article XXV (Non-Discrimination), may, however, be resolved by the competent authorities pursuant to Article XXVI (Mutual Agreement Procedure). See, however, the discussion below of the treatment of certain interest under Articles XXIX (Miscellaneous Rules) and XXX (Entry Into

Force).

## ARTICLE III
### General Definitions

Article III provides definitions and general rules of interpretation for the Convention. Paragraph 1(a) states that the term "Canada," when used in a geographical sense, means the territory of Canada, including any area beyond the territorial seas of Canada which, under international law and the laws of Canada, is an area within which Canada may exercise rights with respect to the seabed and subsoil and their natural resources. This definition differs only in form from the definition of Canada in the 1942 Convention; paragraph 1(a) omits the reference in the 1942 Convention to "the Provinces, the Territories and Sable Island" as unnecessary.

Paragraph 1(b)(i) defines the term "United States" to mean the United States of America. The term does not include Puerto Rico, the Virgin Islands, Guam, or any other United States possession or territory.

Paragraph 1(b)(ii) states that when the term "United States" is used in a geographical sense the term also includes any area beyond the territorial seas of the United States which, under international law and the laws of the United States, is an area within which the United States may exercise rights with respect to the seabed and subsoil and their natural resources.

Paragraph 1(c) defines the term "Canadian tax" to mean the taxes imposed by the Government of Canada under Parts I, XIII, and XIV of the Income Tax Act as in existence on September 26, 1980 and any identical or substantially similar taxes on income imposed by the Government of Canada after that date and which are in addition to or in place of the then existing taxes. The term does not extend to capital taxes, if and when such taxes are ever imposed by Canada.

Paragraph 1(d) defines the term "United States tax" to mean the Federal income taxes imposed by the Internal Revenue Code as in existence on September 26, 1980 and any identical or substantially similar taxes on income imposed by the United States after that date in addition to or in place of the then existing taxes. The term does not extend to capital taxes, nor to the United States taxes identified in paragraph 4 of Article II (Taxes Covered).

Paragraph 1(e) provides that the term "person" includes an individual, an estate, a trust, a company, and any other body of persons. Although both the United States and Canada do not regard partnerships as taxable entities, the definition in the paragraph is broad enough to include partnerships where necessary.

Paragraph 1(f) defines the term "company" to mean any body corporate or any entity which is treated as a body corporate for tax purposes.

The term "competent authority" is defined in paragraph 1(g) to mean, in the case of Canada, the Minister of National Revenue or his authorized representative and, in the case of the

**Appx221**

United States, the Secretary of the Treasury or his delegate. The Secretary of the Treasury has delegated the general authority to act as competent authority to the Commissioner of the Internal Revenue Service, who has redelegated such authority to the Associate Commissioner (Operations). The Assistant Commissioner (Examination) has been delegated the authority to administer programs for simultaneous, spontaneous and industry wide exchanges of information. The Director, Foreign Operations District, has been delegated the authority to administer programs for routine and specific exchanges of information and mutual assistance in collection. The Assistant Commissioner (Criminal Investigations) has been delegated the authority to administer the simultaneous criminal investigation program with Canada.

Paragraph 1(h) defines the term "international traffic" to mean, with reference to a resident of a Contracting State, any voyage of a ship or aircraft to transport passengers or property (whether or not operated or used by that resident), except where the principal purpose of the voyage is transport between points within the other Contracting State. For example, in determining for Canadian tax purposes whether a United States resident has derived profits from the operation of ships or aircraft in international traffic, a voyage of a ship or aircraft (whether or not operated or used by that resident) that includes stops in both Contracting States will not be international traffic if the principal purpose of the voyage is to transport passengers or property from one point in Canada to another point in Canada.

Paragraph 1(i) defines the term "State" to mean any national State, whether or not a Contracting State.

Paragraph 1(j) establishes "the 1942 Convention" as the term to be used throughout the Convention for referring to the pre-existing income tax treaty relationship between the United States and Canada.

Paragraph 2 provides that, in the case of a term not defined in the Convention, the domestic tax law of the Contracting State applying to the Convention shall control, unless the context in which the term is used requires a definition independent of domestic tax law or the competent authorities reach agreement on a meaning pursuant to Article XXVI (Mutual Agreement Procedure). The term "context" refers to the purpose and background of the provision in which the term appears.

Pursuant to the provisions of Article XXVI, the competent authorities of the Contracting States may resolve any difficulties or doubts as to the interpretation or application of the Convention. An agreement by the competent authorities with respect to the meaning of a term used in the Convention would supersede conflicting meanings in the domestic laws of the Contracting States.

ARTICLE IV
Residence

Article IV provides a detailed definition of the term "resident of a Contracting State." The definition begins with a person's liability to tax as a resident under the respective taxation laws of

Appx222

the Contracting States. A person who, under those laws, is a resident of one Contracting State and not the other need look no further. However, the Convention definition is also designed to assign residence to one State or the other for purposes of the Convention in circumstances where each of the Contracting States believes a person to be its resident. The Convention definition is, of course, exclusively for purposes of the Convention.

Paragraph 1 provides that the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature. The phrase "any other criterion of a similar nature" includes, for U.S. purposes, an election under the Code to be treated as a U.S. resident. An estate or trust is, however, considered to be a resident of a Contracting State only to the extent that income derived by such estate or trust is liable to tax in that State either in its hands or in the hands of its beneficiaries. To the extent that an estate or trust is considered a resident of a Contracting State under this provision, it can be a "beneficial owner" of items of income specified in other articles of the Convention - e.g., paragraph 2 of Article X (Dividends).

Paragraphs 2, 3, and 4 provide rules to determine a single residence for purposes of the Convention for persons resident in both Contracting States under the rules set forth in paragraph 1. Paragraph 2 deals with individuals. A "dual resident" individual is initially deemed to be a resident of the Contracting State in which he has a permanent home available to him in both States or in neither, he is deemed to be a resident of the Contracting State with which his personal and economic relations are closer. If the personal and economic relations of an individual are not closer to one Contracting State than to the other, the individual is deemed to be a resident of the Contracting State in which he has an habitual abode. If he has such an abode in both States or in neither State, he is deemed to be a resident of the Contracting State of which he is a citizen. If the individual is a citizen of both States or of neither, the competent authorities are to settle the status of the individual by mutual agreement.

Paragraph 3 provides that if, under the provisions of paragraph 1, a company is a resident of both Canada and the United States, then it shall be deemed to be a resident of the State under whose laws (including laws of political subdivisions) it was created. Paragraph 3 does not refer to the State in which a company is organized, thus making clear that the tie-breaker rule for a company is controlled by the State of the company's original creation. Various jurisdictions may allow local incorporation of an entity that is already organized and incorporated under the laws of another country. Paragraph 3 provides certainty in both the United States and Canada with respect to the treatment of such an entity for purposes of the Convention.

Paragraph 4 provides that where, by reason of the provisions of paragraph 1, an estate, trust, or other person, other than an individual or a company, is a resident of both Contracting States, the competent authorities of the States shall by mutual agreement endeavor to settle the question and determine the mode of application of the Convention to such person. This delegation of authority to the competent authorities complements the provisions of Article XXVI (Mutual Agreement Procedure), which implicitly grant such authority.

Paragraph 5 provides a special rule for certain government employees, their spouses, and

dependent children. An individual is deemed to be a resident of a Contracting State if he is an employee of that State or of a political subdivision, local authority, or instrumentality of that State, is rendering services in the discharge of functions of a governmental nature in any State, and is subjected in the first-mentioned State to "similar obligations" in respect of taxes on income as are residents of the first-mentioned State. Paragraph 5 provides further that a spouse and dependent children residing with a government employee and also subject to "similar obligations" in respect of income taxes as residents if the first-mentioned State are also deemed to be residents of that State. Paragraph 5 overrides the normal tie-breaker rule of paragraph 2. A U.S. citizen or resident who is an employee of the U.S. government in a foreign country or who is a spouse or dependent of such employee is considered to be subject in the United States to "similar obligations" in respect of taxes on income as those imposed on residents of the United States, notwithstanding that such person may be entitled to the benefits allowed by sections 911 or 912 of the Code.

## ARTICLE V
### Permanent Establishment

Paragraph 1 provides that for the purposes of the Convention the term "permanent establishment" means a fixed place of business through which the business of a resident of a Contracting State is wholly or partly carried on. Article V does not use. the term "enterprise of a Contracting State," which appears in the 1942 Convention. Thus, paragraph 1 avoids introducing an additional term into the Convention. The omission of the term is not intended to have any implications for the interpretation of the 1942 Convention.

Paragraph 2 provides that the term "permanent establishment" includes especially a place of management, a branch, an office, a factory, a workshop, and a mine, oil or gas well, quarry, or any other place of extraction of natural resources. Paragraph 3 adds that a building site or construction or installation project constitutes a permanent establishment if and only if it lasts for more than 12 months. Paragraph 4 provides that a permanent establishment exists in a Contracting State if the use of an installation or drilling rig or drilling ship in that State to explore for or exploit natural resources lasts for more than 3 months in any 12 month period, but not if such activity exists for a lesser period of time. The competent authorities have entered into an agreement under the 1942 Convention setting forth guidelines as to certain aspects of Canadian taxation of drilling rigs owned by U.S. persons that constitute Canadian permanent establishments. The agreement will be renewed when this Convention enters into force.

Paragraph 5 provides that a person acting in a Contracting State on behalf of a resident of the other Contracting State is deemed to be a permanent establishment of the resident if such person has and habitually exercises in the first-mentioned State the authority to conclude contracts in the name of the resident. This rule does not apply to an agent of independent status, covered by paragraph 7. Under the provisions of paragraph 5, a permanent establishment may exist even in the absence of a fixed place of business. If, however, the activities of a person described in paragraph 5 are limited to the ancillary activities described in paragraph 6, then a permanent establishment does not exist solely on account of the person's activities.

Appx224

There are a number of minor differences between the provisions of paragraphs 1 through 5 and the analogous provisions of the 1942 Convention. One important deviation is elimination of the rule of the 1942 Convention which deems a permanent establishment to exist in any circumstance where a resident of one State uses substantial equipment in the other State for any period of time. The Convention thus generally raises the thresh-hold for source basis taxation of activities that involve substantial equipment (and that do not otherwise constitute a permanent establishment). Another deviation of some significance is elimination of the rule of the 1942 Convention that considers a permanent establishment to exist where a resident of one State carries on business in the other State through an agent or employee who has a stock of merchandise from which he regularly fills orders that he receives. The Convention provides that a person other than an agent of independent status who is engaged solely in the maintenance of a stock of goods or merchandise belonging to a resident of the other State for the purpose of storage, display or delivery does not constitute a permanent establishment.

Paragraph 6 provides that a fixed place of business used solely for, or an employee described in paragraph 5 engaged solely in, certain specified activities is not a permanent establishment, notwithstanding the provisions of paragraphs 1, 2, and 5. The specified activities are:

    (a) the use of facilities for the purpose of storage, display, or delivery of goods or merchandise belonging to the resident whose business is being carried on;

    (b) the maintenance of a stock of goods or merchandise belonging to the resident for the purpose of storage, display, or delivery;

    (c) the maintenance of a stock of goods or merchandise belonging to the resident for the purpose of processing by another person;

    (d) the purchase of goods or merchandise, or the collection of information, for the resident; and

    (e) advertising, the supply of information, scientific research, or similar activities which have a preparatory or auxiliary character, for the resident.

Combinations of the specified activities have the same status as any one of the activities. Thus, unlike the OECD Model Convention, a combination of the activities described in subparagraphs 6(a) through 6(e) need not be of a preparatory or auxiliary character (except as required by subparagraph 6(e)) in order to avoid the creation of a permanent establishment. The reference in paragraph 6(e) to specific activities does not imply that any other particular activities - for example, the servicing of a patent or a know-how contract or the inspection of the implementation of engineering plans - do not fall within the scope of paragraph 6(e) provided that, based on the facts and circumstances, such activities have a preparatory or auxiliary character.

Paragraph 7 provides that a resident of a Contracting State is not deemed .to have a permanent establishment in the other Contracting State merely because such resident carries on business in the other State through a broker, general commission agent, or any other agent of independent status, provided that such persons are acting in the ordinary course of their business.

Paragraph 8 states that the fact that a company which is a resident of one Contracting State controls or is controlled by a company which is either a resident of the other Contracting State or which is carrying on a business in the other State, whether through a permanent establishment or

otherwise, does not automatically render either company a permanent establishment of the other.

Paragraph 9 provides that, for purposes of the Convention, the provisions of Article V apply in determining whether any person has a permanent establishment in any State. Thus, these provisions would determine whether a person other than a resident of Canada or the United States has a permanent establishment in Canada or the United States, and whether a person resident in Canada or the United States, has a permanent establishment in a third State.

ARTICLE VI
Income from Real Property

Paragraph 1 provides that income derived by a resident of a Contracting State from real property situated in the other Contracting State may be taxed by that other State. Income from real property includes, for purposes of Article VI, income from agriculture, forestry or other natural resources. Also, while "income derived .... from real property" includes income from rights such as an overriding royalty or a net profits interest in a natural resource, it does not include income in the form of rights to explore for or exploit natural resources which a party receives as compensation for services (e.g., exploration services); the latter income is subject to the provisions of Article VII (Business Profits), XIV (Independent Personal Services), or XV (Dependent Personal Services), as the case may be. As provided by paragraph 3, paragraph 1 applies to income derived from the direct use, letting or use in any other form of real property and to income from the alienation of such property.

Generally speaking, the term "real property" has the meaning which it has under the taxation laws of the Contracting State in which the property in question is situated, in accordance with paragraph 2. In any case, the term includes any option or similar right in respect of real property, the usufruct of real property, and rights to explore for or to exploit mineral deposits, sources, and other natural resources. The reference to "rights to explore for or to exploit mineral deposits, sources and other natural resources" includes rights generating either variable (e.g., computed by reference to the amount of value or production) or fixed payments. The term "real property" does not include ships and aircraft.

Unlike Article XIII A of the 1942 Convention, Article VI does not contain an election to allow a resident of a Contracting State to compute tax on income from real property situated in the other State on a net basis. Both the Internal Revenue Code and the Income Tax Act of Canada generally allow for net basis taxation with respect to real estate rental income, although Canada does not permit such an election for natural resource royalties. Also, unlike the 1942 Convention which in Article XI imposes a 15 percent limitation on the source basis taxation of rental or royalty income from real property, Article VI of the Convention allows a Contracting State to impose tax on such income under its internal law. In Canada the rate of tax on resource royalties is 25 percent of the gross amount of the royalty, if the income is not attributable to a business carried on in Canada. In an exchange of notes to the Protocol, the United States and Canada agreed to resume negotiations, upon request by either country, to provide an appropriate limit on taxation in the State of source if either country subsequently increases its statutory tax rate now applicable to such royalties (25 percent in the case of Canada and 30 percent in the case of the

**Appx226**

United States).

ARTICLE VII
Business Profits

Paragraph 1 provides that business profits of a resident of a Contracting State are taxable only in that State unless the resident carries on business in the other Contracting State through a permanent establishment situated in that other State. If the resident carries on, or has carried on, business through such a permanent establishment, the other State may tax such business profits but only so much of them as are attributable to the permanent establishment. The reference to a prior permanent establishment ("or has carried on") makes clear that a Contracting State in which a permanent establishment existed has the right to tax the business profits attributable to that permanent establishment, even if there is a delay in the receipt or accrual of such profits until after the permanent establishment has been terminated.

Any business profits received or accrued in taxable years in which the Convention has effect, in accordance with Article XXX (Entry Into Force), which are attributable to a permanent establishment that was previously terminated are subject to tax in the Contracting State in which such permanent establishment existed under the provisions of Article VII.

Paragraph 2 provides that where a resident of either Canada or the United States carries on business in the other Contracting State through a permanent establishment in that other State, both Canada and the United States shall attribute to that permanent establishment business profits which the permanent establishment might be expected to make if it were a distinct and separate person engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the resident and with any other person related to the resident. The term "related to the resident" is to be interpreted in accordance with paragraph 2 of Article IX (Related Persons). The reference to other related persons is intended to make clear that the test of paragraph 2 is not restricted to independence between a permanent establishment and a home office.

Paragraph 3 provides that, in determining business profits of a permanent establishment, there are to be allowed as deductions those expenses which are incurred for the purposes of the permanent establishment, including executive and administrative expenses, whether incurred in the State in which the permanent establishment is situated or in any other State. However, nothing in the paragraph requires Canada or the United States to allow a deduction for any expenditure which would not generally be allowed as a deduction under its taxation laws. The language of this provision differs from that of paragraph 1 of Article III of the 1942 Convention, which states that in the determination of net industrial and commercial profits of a permanent establishment there shall be allowed as deductions "all expenses, wherever incurred" as long as such expenses are reasonably allocable to the permanent establishment. Paragraph 3 of Article VII of the Convention is not intended to have any implications for interpretation of the 1942 Convention, but is intended to assure that under the Convention deductions are allowed by a Contracting State which are generally allowable by that State.

Paragraph 4 provides that no business profits are to be attributed to a permanent establishment of a resident of a Contracting State by reason of the use of the permanent establishment for merely purchasing goods or merchandise or merely providing executive, managerial, or administrative facilities or services for the resident. Thus, if a company resident in a Contracting State has a permanent establishment in the other State, and uses the permanent establishment for the mere performance of stewardship or other managerial services carried on for the benefit of the resident, this activity will not result in profits being attributed to the permanent establishment.

Paragraph 5 provides that business profits are to be attributed to a permanent establishment by the same method in every taxable period unless there is good and sufficient reason to change such method. In the United States, such a change may be a change in accounting method requiring the approval of the Internal Revenue Service.

Paragraph 6 explains the relationship between the provisions of Article VII and other provisions of the Convention. Where business profits include items of income which are dealt with separately in other Articles of the Convention, those other Articles are controlling.

Paragraph 7 provides a definition for the term "attributable to". Profits "attributable to" a permanent establishment are those derived from the assets or activities of the permanent establishment. Paragraph 7 does not preclude Canada or the United States from using appropriate domestic tax law rules of attribution. The "attributable to" definition does not, for example, preclude a taxpayer from using the rules of section 1, 864-4(c)(5) of the Treasury Regulations to assure for U.S. tax purposes that interest arising in the United States is attributable to a permanent establishment in the United States. (Interest arising outside the United States is attributable to a permanent establishment in the United States based on the principles of Regulations sections 1.864-5 and 1.864-6 and Revenue Ruling 75-253, 1975-2 C.B. 203.) Income that would be taxable under the Code and that is "attributable to" a permanent establishment under paragraph 7 is taxable pursuant to Article VII, however, even if such income might under the Code be treated as fixed or determinable annual or periodical gains or income not effectively connected with the conduct of a trade or business within the United States. The "attributable to" definition means that the limited "force-of-attraction" rule of Code section 864(c)(3) does not apply for U.S. tax purposes under the Convention.

ARTICLE VIII
Transportation

Paragraph 1 provides that profits derived by a resident of a Contracting State from the operation of ships or aircraft in international traffic are exempt from tax in the other Contracting State, even if, under Article VII (Business Profits), such profits are attributable to a permanent establishment. Paragraph 1 also provides that gains derived by a resident of a Contracting State from the alienation of ships, aircraft or containers (including trailers and related equipment for the transport of containers) used principally in international traffic are exempt from tax in the other Contracting State even if, under Article XIII (Gains), those gains would be taxable in that other State. These rules differ from Article V of the 1942 Convention, which conditions the exemption

in the State of source on registration of the ship or aircraft in the other State. Paragraph 1 also applies notwithstanding the provisions of Article XII (Royalties). Thus, to the extent that profits described in paragraph 2 would also fall within Article XII (Royalties) (e.g., rent from the lease of a container), the provisions of Article VIII are controlling.

Paragraph 2(a) provides that profits covered by paragraph 1 include profits from the rental of ships or aircraft operated in international traffic. Such rental profits are included whether the rental is on a time, voyage, or bareboat basis, and irrespective of the State of residence of the operator.

Paragraph 2(b) provides that profits covered by paragraph 1 include profits derived from the use, maintenance or rental of containers, including trailers and related equipment for the transport of containers, if such containers are used in international traffic.

Paragraph 2(c) provides that profits covered by paragraph 1 include profits derived by a resident of a Contracting State from the rental of ships, aircraft, or containers (including trailers and related equipment for the transport of containers), even if not operated in international traffic, as long as such profits are incidental to profits of such person referred to in paragraphs 1, 2(a), or 2(b).

Paragraph 3 states that profits derived by a resident of a Contracting State from a voyage of a ship where the principal purpose of the voyage is to transport passengers or property between points in the other Contracting State is taxable in that other State, whether or not the resident maintains a permanent establishment there. Paragraph 3 overrides the provisions of Article VII. Profits from such a voyage do not qualify for exemption under Article VIII by virtue of the definition of "international traffic" in paragraph 1(h) of Article III (General Definitions). However, profits from a similar voyage by aircraft are taxable in the Contracting State of source only if the profits are attributable to a permanent establishment maintained in that State.

Paragraph 4 provides that profits derived by a resident of a Contracting State engaged in the operation of motor vehicles or a railway as a common carrier or contract carrier, and attributable to the transportation of passengers or property between a point outside the other Contracting State and any other point are exempt from tax in that other State. In addition, profits of such a person from the rental of motor vehicles (including trailers) or railway rolling stock, or from the use, maintenance, or rental of containers (including trailers and related equipment for the transport of containers) used to transport passengers or property between a point outside the other Contracting State and any other point are exempt from tax in that other State.

Paragraph 5 provides that a resident of a Contracting State that participates in a pool, a joint business, or an international operating agency is subject to the provisions of paragraphs 1, 3, and 4 with respect to the profits or gains referred to in paragraphs 1, 3, and 4.

Paragraph 6 states that profits derived by a resident of a Contracting State from the use, maintenance, or rental of railway rolling stock, motor vehicles, trailers, or containers (including trailers and related equipment for the transport of containers) used in the other Contracting State for a period not expected to exceed 183 days in the aggregate in any 12-month period are exempt

from tax in that other State except to the extent that the profits are attributable to a permanent establishment, in which case the State of source has the right to tax under Article VII. The provisions of paragraph 6, unlike the provisions of paragraph 4, apply whether or not the resident is engaged in the operation of motor vehicles or a railway as a common carrier or contract carrier. Paragraph 6 overrides the provisions of Article XII (Royalties), which would otherwise permit taxation in the State of source in the circumstances described.

Gains from the alienation of motor vehicles and railway rolling stock derived by a resident of a Contracting State are not affected by paragraph 4 or 6. Such gains would be taxable in the other Contracting State, however, only if the motor vehicles or rolling stock formed part of a permanent establishment maintained there. See paragraphs 2 and 4 of Article XIII.

ARTICLE IX
Related Persons

Paragraph 1 authorizes Canada and the United States, as the case may be, to adjust the amount of income, loss, or tax payable by a person with respect to arrangements between that person and a related person in the other Contracting State. Such adjustment may be made when arrangements between related persons differ from those that would obtain between unrelated persons. The term "person" encompasses a company resident in a third State with, for example, a permanent establishment in a Contracting State.

Paragraph 2 provides that, for the purposes of Article IX, a person is deemed to be related to another person if either participates directly or indirectly in the management or control of the other or if any third person or persons participate directly or indirectly in the management or control of both. Thus, if a resident of any State controls directly or indirectly a company resident in Canada and a company resident in the United States, such companies are considered to be related persons for purposes of Article IX. Article IX and the definition of "related person" in paragraph 2 may encompass situations that would not be covered by provisions in the domestic laws of the Contracting States. Nor is the paragraph 2 definition controlling for the definition of "related person" or similar terms appearing in other Articles of the Convention. Those terms are defined as provided in paragraph 2 of Article III (General Definitions).

Paragraph 3 provides that where, pursuant to paragraph 1, an adjustment is made or to be made by a Contracting State, the other Contracting State shall make a corresponding adjustment to the income, loss, or tax of the related person in that other State, provided that the other State agrees with the adjustment and, within six years from the end of the taxable year of the person in the first State to which the adjustment relates, the competent authority of the other State has been notified in writing of the adjustment. The reference to an adjustment which "is made or to be made" does not require a Contracting State to formally propose an adjustment before paragraph 3 becomes pertinent. The notification required by paragraph 3 may be made by any of the related persons involved or by the competent authority of the State which makes or is to make the initial adjustment. The notification must give details regarding the adjustment sufficient to apprize the competent authority receiving the notification of the nature of the adjustment. If the requirements of paragraph 3 are complied with, the corresponding adjustment will be made by the other

Appx230

Contracting State notwithstanding any time or procedural limitations in the domestic law of that State.

Paragraph 4 provides that in a case where the other Contracting State has not been notified as provided in paragraph 3 and if the person whose income, loss, or tax is being adjusted has not received notification of the adjustment within five and one-half years from the end of its taxable year to which the adjustment relates, such adjustment shall not be made to the extent that the adjustment would give rise to double taxation between the United States and Canada. Again, the notification referred to in this paragraph need not be a formal adjustment, but it must be in writing and must contain sufficient details to permit the taxpayer to give the notification referred to in paragraph 3.

If, for example, the Internal Revenue Service proposes to make an adjustment to the income of a U.S. company pursuant to Code section 482, and the adjustment involves an allocation of income from a related Canadian company, the competent authority of Canada must receive written notification of the proposed IRS adjustment within six years from the end of the taxable year of the U.S. company to which the adjustment relates. If such notification is not received in a timely fashion and if the U.S. company does not receive written notification of the adjustment from the IRS within 5-1/2 years from the end of its relevant taxable year, the IRS will unilaterally recede on the proposed section 482 adjustment to the extent that this adjustment would otherwise give rise to double taxation between the United States and Canada. The Internal Revenue Service will determine whether and to what extent the adjustment would give rise to double taxation with respect to income arising in Canada by examining the relevant facts and circumstances such as the amount of foreign tax credits attributable to Canadian taxes paid by the U.S. company, including any carry-overs and credits for deemed paid taxes.

Paragraph 5 provides that neither a corresponding adjustment described in paragraph 3 nor the canceling of an adjustment described in paragraph 4 will be made in any case of fraud, willful default, neglect, or gross negligence on the part of the taxpayer or any related person.

Paragraphs 3 and 4 of Article IX are exceptions to the "saving clause" contained in paragraph 2 of Article XXIX (Miscellaneous Rules), as provided in paragraph 3(a) of Article XXIX. Paragraphs 3 and 4 of Article IX apply to adjustments made or to be made with respect to taxable years for which the Convention has effect as provided in paragraphs 2 and 5 of Article XXX (Entry Into Force).

ARTICLE X
Dividends

Paragraph 1 allows a Contracting State to impose tax on its residents with respect to dividends paid by a company which is a resident of the other Contracting State.

Paragraph 2 limits the amount of tax that may be imposed on such dividends by the Contracting State in which the company paying the dividends is resident if the beneficial owner of the dividends is a resident of the other Contracting State. The limitation is 10 percent of the gross

amount of the dividends if the beneficial owner is a company that owns 10 percent or more of the voting stock of the company paying the dividends; and 15 percent of the gross amount of the dividends in all other cases. Paragraph 2 does not impose any restrictions with respect to taxation of the profits out of which the dividends are paid.

Paragraph 3 defines the term "dividends," as the term is used in this Article. Each Contracting State is permitted to apply its domestic law rules for differentiating dividends from interest and other disbursements.

Paragraph 4 provides that the limitations of paragraph 2 do not apply if the beneficial owner of the dividends carries on business in the State in which the company paying the dividends is a resident through a permanent establishment or fixed base situated there, and the stock holding in respect of which the dividends are paid is effectively connected with such permanent establishment or fixed base. In such a case, the dividends are taxable pursuant to the provisions of Article VII (Business Profits) or Article XIV (Independent Personal Services), as the case may be. Thus, dividends paid in respect of holdings forming part of the assets of a permanent establishment or fixed base or which are otherwise effectively connected with such permanent establishment or fixed base (i.e., dividends attributable to the permanent establishment or fixed base) will be taxed on a net basis using the rates and rules of taxation generally applicable to residents of the State in which the permanent establishment or fixed base is situated.

Paragraph 5 imposes limitations on the right of Canada or the United States, as the case may be, to impose tax on dividends paid by a company which is a resident of the other Contracting State. The State in which the company is not resident may not tax such dividends except insofar as they are paid to a resident of that State or the holding in respect of which the dividends are paid is effectively connected with a permanent establishment or fixed base in that State. In the case of the United States such dividends may also be in the hands of a U.S. citizen and certain former citizens, pursuant the "saving clause" of paragraph 2 of Article XXIX (Miscellaneous Rules). In addition, the Contracting State in which the company is not resident may not subject such company's undistributed profits to any tax. See, however, paragraphs 6, 7, and 8 which, in certain circumstances, qualify the rules of paragraph 5. Neither paragraph 5 nor any other provision of the Convention restricts the ability of the United States to apply the provisions of the Code concerning foreign personal holding companies and controlled foreign corporations.

Paragraph 6 provides that, notwithstanding paragraph 5, a Contracting State in which is maintained permanent establishment or permanent establishments of a company resident in the other Contracting State may impose tax on such company's earnings, in addition to the tax that would be charged on the earnings of a company resident in that State. The additional tax may not, however, exceed 10 percent of amount of the earnings which have not been subjected to such additional tax in previous taxation years. Thus, Canada, which has a branch profits tax in force, may impose that tax up to the 10 percent limitation in the case of a United States company with one or more permanent establishments in Canada. This branch profits tax may be imposed notwithstanding other rules of the Convention, including paragraph 6 of Article XXV (Non-Discrimination).

For purposes of paragraph 6, the term "earnings" means the excess of business profits attributable to all permanent establishments for a year and previous years over the sum of:

(a) business losses attributable to such permanent establishments for such years;

(b) all taxes on profits, whether or not covered by the Convention (e.g., provincial taxes on profits and provincial resource royalties (which Canada considers "taxes") in excess of the mineral resource allowance provided for under the law of Canada), other than the additional tax referred to in paragraph 6;

(c) profits reinvested in such State; and

(d) $500,000 (Canadian, or its equivalent in U.S. dollars) less any amounts deducted under paragraph 6(d) with respect to the same or a similar business by the company or an associated company.

The deduction under paragraph 6(d) is available as of the first year for which the Convention has effect, regardless of the prior earnings and tax expenses, if any, of the permanent establishment. The $500,000 deduction is taken into account after other deductions, and is permanent. For the purpose of paragraph 6, references to business profits and business losses include gains and losses from the alienation of property forming part of the business property of a permanent establishment. The term "associated company" includes a company which directly or indirectly controls another company or two companies directly or indirectly controlled by the same person or persons, as well as any two companies that deal with each other not at arm's length. This definition differs from the definition of "related persons" in paragraph 2 of Article IX (Related Persons).

Paragraph 7 provides that, notwithstanding paragraph 5, a Contracting State that does not impose a branch profits tax as described in paragraph 6 (i.e., under current law, the United States) may tax a dividend paid by a company which is a resident of the other Contracting State if at least 50 percent of the company's gross income from all sources was included in the computation of business profits attributable to one or more permanent establishments which such company had in the first-mentioned State. The dividend subject to such a tax must, however, be attributable to profits earned by the company in taxable years beginning after September 26, 1980 and the 50 percent test must be met for the three-year period preceding the taxable year of the company in which the dividend is declared (including years ending on or before September 26, 1980) or such shorter period as the company had been in existence prior to that taxable year. Dividends will be deemed to be distributed, for purposes of paragraph 7, first out of profits of the taxation year of the company in which the distribution is made and then out of the profits of the preceding year or years of the company. Paragraph 7 provides further that if a resident of the other Contracting State is the beneficial owner of such dividends, any tax imposed under paragraph 7 is subject to the 10 or 15 percent limitation of paragraph 2 or the rules of paragraph 4 (providing for dividends to be taxed as business profits or income from independent personal services), as the case may be.

Paragraph 8 provides that, notwithstanding paragraph 5, a company which is a resident of Canada and which, absent the provisions of the Convention, has income subject to tax by the United States may be liable for the United States accumulated earnings tax and personal holding company tax. These taxes can be applied, however, only if 50 percent or more in value of the outstanding voting shares of the company is owned, directly or indirectly, throughout the last half of its taxable year by residents of a third State or by citizens or residents of the United States,

other than citizens of Canada who are resident in the United States but who either do not have immigrant status in the United States or who have not been resident in the United States for more than three taxable years. The accumulated earnings tax is applied to accumulated taxable income calculated without the benefits of the Convention. Similarly, the personal holding company tax is applied to undistributed personal holding company income computed as if the Convention had not come into force.

Article X does not apply to dividends paid by a company which is not a resident of either Contracting State. Such dividends, if they are income of a resident of one of the Contracting States, are subject to tax as provided in Article XXII (Other Income).

## ARTICLE XI
### Interest

Paragraph 1 allows interest arising in Canada or the United States and paid to a resident of the other State to be taxed in the latter State. Paragraph 2 provides that such interest may also be taxed in the Contracting State where it arises, but if a resident of the other Contracting State is the beneficial owner, the tax imposed by the State of source is limited to 15 percent of the gross amount of the interest.

Paragraph 3 provides a number of exceptions to the right of the source State to impose a 15 percent tax under paragraph 2. The following types of interest beneficially owned by a resident of a Contracting State are exempt from tax in the State of source:

(a) interest beneficially owned by a Contracting State, a political subdivision, or a local authority thereof, or an instrumentality of such State, subdivision, or authority, which interest is not subject to tax by such State;

(b) interest beneficially owned by a resident of a Contracting State and paid with respect to debt obligations issued at arm's length which are guaranteed or insured by such State or a political subdivision thereof, or by an instrumentality of such State or subdivision (not by a local authority or an instrumentality thereof), but only if the guarantor or insurer is not subject to tax by that State;

(c) interest paid by a Contracting State, a political subdivision, or a local authority thereof, or by an instrumentality of such State, subdivision, or authority, but only if the payor is not subject to tax by such State; and

(d) interest beneficially owned by a seller of equipment, merchandise, or services, but only if the interest is paid in connection with a sale on credit of equipment, merchandise, or services and the sale was made at arm's length.

Whether such a transaction is made at arm's length will be determined in the United States under the facts and circumstances. The relationship between the parties is a factor, but not the only factor, taken into account in making this determination. Furthermore, interest paid by a company resident in the other Contracting State with respect to an obligation entered into before September 26, 1980 is exempt from tax in the State of source (irrespective of the State of residence of the beneficial owner), provided that such interest would have been exempt from tax in the Contracting State of source under Article XII of the 1942 Convention. Thus, interest paid by a

## Appx234

United States corporation whose business is not managed and controlled in Canada to a recipient not resident in Canada or to a corporation not managed and controlled in Canada would be exempt from Canadian tax as long as the debt obligation was entered into before September 26, 1980. The phrase "not subject to tax by that State" in paragraph 3(a), (b), and (c) refers to taxation at the Federal levels of Canada and the United States.

The phrase "obligation entered into before the date of signature of this Convention" means:

(1) any obligation under which funds were dispersed prior to September 26, 1980;

(2) any obligation under which funds are dispersed on or after September 26, 1980, pursuant to a written contract binding prior to and on such date, and at all times thereafter until the obligation is satisfied; or

(3) any obligation with respect to which, prior to September 26, 1980, a lender had taken every action to signify approval under procedures ordinarily employed by such lender in similar transactions and had sent or deposited for delivery to the person to whom the loan is to be made written evidence of such approval in the form of a document setting forth, or referring to a document sent by the person to whom the loan is to be made that sets forth, the principal terms of such loan.

Paragraph 4 defines the term "interest," as used in Article XI, to include, among other things, debt claims of every kind as well as income assimilated to income from money lent by the taxation laws of the Contracting State in which the income arises. In no event, however, is income dealt with in Article X (Dividends) to be considered interest.

Paragraph 5 provides that neither the 15 percent limitation on tax in the Contracting State of source provided in paragraph 2 nor the various exemptions from tax in such State provided in paragraph 3 apply if the beneficial owner of the interest is a resident of the other Contracting State carrying on business in the State of source through a permanent establishment or fixed base, and the debt claim in respect of which the interest is paid is effectively connected with such permanent establishment or fixed base (i.e., the interest is attributable to the permanent establishment or fixed base). In this case, interest income is to be taxed in the Contracting State of source as business profits - that is, on a net basis.

Paragraph 6 establishes the source of interest for purposes of Article XI. Interest is considered to arise in a Contracting State if the payer is that State, or a political subdivision, local authority, or resident of that State. However, in cases where the person paying the interest, whether a resident of a Contracting State or of a third State, has in a State other than that of which he is a resident a permanent establishment or fixed base in connection with which the indebtedness on which the interest was paid was incurred, and such interest is borne by the permanent establishment or fixed base, then such interest is deemed to arise in the State in which the permanent establishment or fixed base is situated and not in the State of the payer's residence. Thus, pursuant to paragraphs 6 and 2, and Article XXII (Other Income), Canadian tax will not be imposed on interest paid to a U.S. resident by a company resident in Canada if the indebtedness is incurred in connection with, and the interest is borne by, a permanent establishment of the company situated in a third State. "Borne by" means allowable as a deduction in computing taxable income.

Paragraph 7 provides that in cases involving special relationships between persons Article XI does not apply to amounts in excess of the amount which would have been agreed upon between persons having no special relationship; any such excess amount remains taxable according to the laws of Canada and the United States, consistent with any relevant provisions of the Convention.

Paragraph 8 restricts the right of a Contracting State to impose tax on interest paid by a resident of the other Contracting State. The first State may not impose any tax on such interest except insofar as the interest is paid to a resident of that State or arises in that State or the debt claim in respect of which the interest is paid is effectively connected with a permanent establishment or fixed base situated in that State. Thus, pursuant to paragraph 8 the United States has agreed not to impose tax on certain interest paid by Canadian companies to persons not resident in the United States, to the extent that such companies would pay U.S.- source interest under Code section 861(a)(1)(C) but not under the source rule of paragraph 6. It is to be noted that paragraph 8 is subject to the "saving clause" of paragraph 2 of Article XXIX (Miscellaneous Rules), so the United States may in all events impose its tax on interest received by U.S. citizens.

## ARTICLE XII
### Royalties

Generally speaking, under the 1942 Convention royalties, including royalties with respect to motion picture films, which are derived by a resident of one Contracting State from sources within the other Contracting State are taxed at a maximum rate of 15 percent in the latter State; copyright royalties are exempt from tax in the State of source, if the resident does not have a permanent establishment in that State. See Articles II, III, XIII C, and paragraph 1 of Article XI of the 1942 Convention, and paragraph 6(a) of the Protocol the 1942 Convention.

Paragraph 1 of Article XII of the Convention provides that a Contracting State may tax its residents with respect to royalties arising in the other Contracting State. Paragraph 2 provides that such royalties may also be taxed in the Contracting State in which they arise, but that if a resident of the other Contracting State is the beneficial owner of the royalties the tax in the Contracting State of source is limited to 10 percent of the gross amount of the royalties.

Paragraph 3 provides that, notwithstanding paragraph 2, copyright royalties and other like payments in respect of the production or reproduction of any literary, dramatic, musical, or artistic work, including royalties from such works on videotape or other means of reproduction for private (home) use, if beneficially owned by a resident of the other Contracting State, may not be taxed by the Contracting State of source. This exemption at source does not apply to royalties in respect of motion pictures, and of works on film, videotape or other means of reproduction for use in connection with television broadcasting. Such royalties are subject to tax at a maximum rate of 10 percent in the Contracting State in which they arise, as provided in paragraph 2 (unless the provisions of paragraph 5, described below, apply).

Paragraph 4 defines the term "royalties" for purposes of Article XII. "Royalties" means

payments of any kind received as consideration for the use of or the right to use any copyright of literary, artistic, or scientific work, including motion pictures, and works on film, videotape or other means of reproduction for use in connection with television broadcasting, any patent, trademark, design or model, plan, secret formula or process, or any payment for the use of or the right to use tangible personal property or for information concerning industrial, commercial, or scientific experience. The term "royalties" also includes gains from the alienation of any intangible property or rights described in paragraph 4 to the extent that such gains are contingent on the productivity, use, or subsequent disposition of such intangible property or rights. Thus, a guaranteed minimum payment derived from the alienation of (but not the use of) any right or property described in paragraph 4 is not a "royalty." Any amounts deemed contingent on use by reason of Code section 871(e) are, however, royalties under paragraph 2 of Article III (General Definitions), subject to Article XXVI (Mutual Agreement Procedure). The term "royalties" does not encompass management fees, which are covered by the provisions of Article VII (Business Profits) or XIV (Independent Personal Services), or payments under a bona fide cost - sharing arrangement. Technical service fees may be royalties in cases where the fees are periodic and dependent upon productivity or a similar measure.

Paragraph 5 provides that the 10 percent limitation on tax in the Contracting State of source provided by paragraph 2, and the exemption in the Contracting State of source for certain copyright royalties provided by paragraph 3, do not apply if the beneficial owner of the royalties carries on business in the State of source through a permanent establishment or fixed base and the right or property in respect of which the royalties are paid is effectively connected with such permanent establishment or fixed base (i.e., the royalties are attributable to the permanent establishment or fixed base). In that event, the royalty income would be taxable under the provisions of Article VII (Business Profits) or XIV (Independent Personal Services), as the case may be.

Paragraph 6 establishes rules to determine the source of royalties for purposes of Article XII. The first rule is that royalties arise in a Contracting State when the payer is that State, or a political subdivision, local authority, or resident of that State. Notwithstanding that rule, royalties arise not in the State of the payer's residence but in any State, whether or not a Contracting State, in which is situated a permanent establishment or fixed base in connection with which the obligation to pay royalties was incurred, if such royalties are borne by such permanent establishment or fixed base. Thus, royalties paid to a resident of the United States by a company resident in Canada for the use of property in a third State will not be subject to tax in Canada if the obligation to pay the royalties is incurred in connection with, and the royalties are borne by, a permanent establishment of the company in a third State. "Borne by" means allowable as a deduction in computing taxable income.

A third rule, which overrides both the residence rule and the permanent establishment rule just described, provides that royalties for the use of, or the right to use, intangible property or tangible personal property in a Contracting State arise in that State. Thus, consistent with the provisions of Code section 861(a)(4), if a resident of a third State pays royalties to a resident of Canada for the use of or the right to use intangible property or tangible personal property in the United States, such royalties are considered to arise in the United States and are subject to taxation by the United States consistent with the Convention. Similarly, if a resident of Canada

pays royalties to a resident of a third State, such royalties are considered to arise in the United States and are subject to U.S. taxation if they are for the use of or the right to use intangible property or tangible personal property in the United States. The term "intangible property" encompasses all the items described in paragraph 4, other than tangible personal property.

Paragraph 7 provides that in cases involving special relationships between persons the benefits of Article XII do not apply to amounts in excess of the amount which would have been agreed upon between persons with no special relationship; any such excess amount remains taxable according to the laws of Canada and the United States, consistent with any relevant provisions of the Convention.

Paragraph 8 restricts the right of a Contracting State to impose tax on royalties paid by a resident of the other Contracting State. The first State may not impose any tax on such royalties except insofar as they arise in that State or they are paid to a resident of that State or the right or property in respect of which the royalties are paid is effectively connected with a permanent establishment or fixed base situated in that State. This rule parallels the rule in paragraph 8 of Article XI (Interest) and paragraph 5 of Article X (Dividends). Again, U.S. citizens remain subject to U.S. taxation on royalties received despite this rule, by virtue of paragraph 2 of Article XXIX (Miscellaneous Rules).

ARTICLE XIII
Gains

Paragraph 1 provides that Canada and the United States may each tax gains from the alienation of real property situated within that State which are derived by a resident of the other Contracting State. The term "real property situated in the other Contracting State" is defined for this purpose in paragraph 3 of this Article. The term "alienation" used in paragraph 1 and other paragraphs of Article XIII means sales, exchanges and other dispositions or deemed dispositions (e.g., change of use, gifts, distributions, death) that are taxable events under the taxation laws of the Contracting State applying the provisions of the Article.

Paragraph 2 of Article XIII provides that the Contracting State in which a resident of the other Contracting State "has or had" a permanent establishment or fixed base may tax gains from the alienation of personal property constituting business property if such gains are attributable to such permanent establishment or fixed base. Unlike paragraph 1 of Article VII (Business Profits), paragraph 2 limits the right of the source State to tax such gains to a twelve-month period following the termination of the permanent establishment or fixed base.

Paragraph 3 provides a definition of the term "real property situated in the other Contracting State." Where the United States is the other Contracting State, the term includes real property (as defined in Article VI (Income from Real Property)) situated in the United States and a United States real property interest. Thus, the United States retains the ability to exercise its full taxing right under the Foreign Investment in Real Property Tax Act (Code section 897). (For a transition rule from the 1942 Convention, see paragraph 9 of this Article.)

Where Canada is the other Contracting State, the term means real property (as defined in Article VI) situated in Canada; shares of stock of a company, the value of whose shares consists principally of Canadian real property; and an interest in a partnership, trust or estate, the value of which consists principally of Canadian real property. The term "principally" means more than 50 percent. Taxation in Canada is preserved through several tiers of entities if the value of the company's shares or the partnership, trust or estate is ultimately dependent principally upon real property situated in Canada.

Paragraph 4 reserves to the Contracting State of residence the sole right to tax gains from the alienation of any property other than property referred to in paragraphs 1, 2, and 3.

Paragraph 5 states that, despite paragraph 4, a Contracting State may impose tax on gains derived by an individual who is a resident of the other Contracting State if such individual was a resident of the first-mentioned State for 120 months (whether or not consecutive) during any period of 20 consecutive years preceding the alienation of the property, and was a resident of that State at any time during the 10-year period immediately preceding the alienation of the property. The property (or property received in substitution in a tax-free transaction in the first-mentioned State) must have been owned by the individual at the time he ceased to be a resident of the first-mentioned State.

Paragraph 6 provides a rule to coordinate Canadian and United States taxation of gains from the alienation of a principal residence situated in Canada. An individual (not a citizen of the United States) who was a resident of Canada and becomes a resident of the United States may determine his liability for U.S. income tax purposes in respect of gain from the alienation of a principal residence in Canada owned by him at the time he ceased to be a resident of Canada by claiming an adjusted basis for such residence in an amount no less than the fair market value of the residence at that time. Under paragraph 2(b) of Article XXX, the rule of paragraph 6 applies to gains realized for U.S. income tax purposes in taxable years beginning on or after the first day of January next following the date when instruments of ratification are exchanged, even if a particular individual described in paragraph 6 ceased to be a resident of Canada prior to such date. Paragraph 6 supplements any benefits available to a taxpayer pursuant to the provisions of the Code, e.g., section 1034.

Paragraph 7 provides a rule to coordinate U.S. and Canadian taxation of gains in circumstances where an individual is subject to tax in both Contracting States and one Contracting State deems a taxable alienation of property by such person to have occurred, while the other Contracting State at that time does not find a realization or recognition of income and thus defers, but does not forgive taxation. In such a case the individual may elect in his annual return of income for the year of such alienation to be liable to tax in the latter Contracting State as if he had sold and repurchased the property for an amount equal to its fair market value at a time immediately prior to the deemed alienation. The provision would, for example, apply in the case of a gift by a U.S. citizen or a U.S. resident individual which Canada deems to be an income producing event for its tax purposes but with respect to which the United States defers taxation while assigning the donor's basis to the donee. The provision would also apply in the case of a U.S. citizen who, for Canadian tax purposes, is deemed to recognize income upon his departure from Canada, but not to a Canadian resident (not a U.S. citizen) who is deemed to recognize such

income. The rule does not apply in the case death, although Canada also deems that to be a taxable event, because the United States in effect forgives income taxation of economic gains at death. If in one Contracting State there are losses and gains from deemed alienations of different properties, then paragraph 7 must be applied consistently in the other Contracting State within the taxable period with respect to all such properties. Paragraph 7 only applies, however, if the deemed alienations of the properties result in a net gain.

Paragraph 8 concerns the coordination of Canadian and U.S. rules with respect to the recognition of gain on corporate organizations, reorganizations, amalgamations, divisions, and similar transactions. Where a resident of a Contracting State alienates property in such a transaction, and profit, gain, or income with respect to such alienation is not recognized for income tax purposes in the Contracting State of residence, the competent authority of the other Contracting State may agree, pursuant to paragraph 8, if requested by the person who acquires the property, to defer recognition of the profit, gain, or income with respect to such property for income tax purposes. This deferral shall be for such time and under such other conditions as are stipulated between the person who acquires the property and the competent authority. The agreement of the competent authority of the State of source is entirely discretionary and will be granted only to the extent necessary to avoid double taxation of income. This provision means, for example, that the United States competent authority may agree to defer recognition of gain with respect to a transaction if the alienator would otherwise recognize gain for U.S. tax purposes and would not recognize gain under Canada's law. The provision only applies, however, if alienations described in paragraph 8 result in a net gain. In the absence of extraordinary circumstances the provisions of the paragraph must be applied consistently within a taxable period with respect to alienations described in the paragraph that take place within that period.

Paragraph 9 provides a transitional rule reflecting the fact that under Article VIII of the 1942 Convention gains from the sale or exchange of capital assets are exempt from taxation in the State of source provided the taxpayer had no permanent establishment in that State. Paragraph 9 applies to deemed, as well as actual, alienations or dispositions. In addition, paragraph 9 applies to a gain described in paragraph 1, even though such gain is also income within the meaning of paragraph 3 of Article VI. Paragraph 9 will apply to transactions notwithstanding section 1125(c) of the Foreign Investment in Real Property Tax Act, Public Law 96-499 ("FIRPTA").

Paragraph 9 applies to capital assets alienated by a resident of a Contracting State if
(a) that person owned the asset on September 26, 1980 and was a resident of that Contracting State on September 26, 1980 (and at all times after that date until the alienation), or
(b) the asset was acquired by that person in an alienation of property which qualified as a non-recognition transaction for tax purposes in the other Contracting State.

For purposes of subparagraph 9(b), a non-recognition transaction is a transaction in which gain resulting therefrom is, in effect, deferred for tax purposes, but is not permanently forgiven. Thus, in the United States, certain tax-free organizations, reorganizations, liquidations and like kind exchanges will qualify as non-recognition transactions. However, a transfer of property at death will not constitute a non-recognition transaction, since any gain due to appreciation in the property is permanently forgiven in the United States due to the fair market value basis taken by

the recipient of the property. If a transaction is a non-recognition transaction for tax purposes, the transfer of non-qualified property, or "boot," which may cause some portion of the gain on the transaction to be recognized, will not cause the transaction to lose its character as a non-recognition transaction for purposes of subparagraph 9(b). In addition, a transaction that would have been a non-recognition transaction in the United States but for the application of sections 897(d) and 897(e) of the Code will also constitute a non-recognition transaction for purposes of subparagraph 9(b). Further, a transaction which is not a non-recognition transaction under U.S. law, but to which non-recognition treatment is granted pursuant to the agreement of the competent authority under paragraph 8 of this Article, is a non-recognition transaction for purposes of subparagraph 9(b). However, a transaction which is not a non-recognition transaction under U.S. law does not become a non-recognition transaction for purposes of subparagraph 9(b) merely because the basis of the property in the hands of the transferee is reduced under section 1125(d) of FIRPTA.

The benefits of paragraph 9 are not available to the alienation or disposition by a resident of a Contracting State of an asset that

(a) on September 26, 1980 formed part of the business property of a permanent establishment or pertained to a fixed base which a resident of that Contracting State had in the other Contracting State,

(b) was alienated after September 26, 1980 and before the alienation in question in any transaction that was not a non-recognition transaction, as described above, or

(c) was owned at any time prior to the alienation in question and after September 26, 1980 by a person who was not a resident of that same Contracting State after September 26, 1980 while such person held the asset.

Thus, for example, in order for paragraph 9 to be availed of by a Canadian resident who did not own the alienated asset on September 26, 1980, the asset must have been owned by other Canadian residents continuously after September 26, 1980 and must have been transferred only in transactions which were non-recognition transactions for U.S. tax purposes.

The availability of the benefits of paragraph 9 is illustrated by the following examples. It should be noted that the examples do not purport to fully describe the U.S. and Canadian tax consequences resulting from the transactions described therein. Any condition for the application of paragraph 9 which is not discussed in an example should be assumed to be satisfied.

*Example 1.*    A, an individual resident of Canada, owned an appreciated U.S. real property interest on September 26, 1980. On January 1, 1982, A transferred the U.S. real property interest to X, a Canadian corporation, in exchange for 100 percent of X's voting stock. A's gain on the transfer to X is exempt from U.S. tax under Article VIII of the 1942 Convention. Since the transaction qualifies as a non-recognition transaction for U.S. tax purposes, as described above, X is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(b), upon a subsequent disposition of the U.S. real property interest occurring after the entry into force of this Convention. If A's transfer to X had instead occurred after the entry into force of this Convention, A would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to U.S. taxation of that portion of the gain resulting from the transfer to

X that is attributable on a monthly basis to the period ending on December 31 of the year in which the Convention enters into force (or a greater portion of the gain as is shown to the satisfaction of the U.S. competent authority). X would be entitled to the benefits of paragraph 9 pursuant to subparagraph 9(b), upon a subsequent disposition of the U.S. real property interest.

*Example 2.*     The facts are the same as in *Example 1,* except that A is a corporation which is resident in Canada. Assuming that the transfer of the U.S. real property interest to X is a section 351 transaction or a tax-free reorganization for U.S. tax purposes, the results are the same as in *Example 1.*

*Example* 3.     The facts are the same as in *Example 1,* except that X is a U.S. corporation. If the transfer to X by A took place on January 1, 1982, A's gain on the transfer to X would be exempt from tax under Article VIII of the 1942 Convention and A would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(b), upon a subsequent disposition of the stock of X occurring after the entry into force of this Convention. If the transfer to X by A took place after the entry into force of this Convention, A would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to U.S. taxation (if any) of the gain resulting from the transfer to X, and would also be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(b), upon a subsequent disposition of the stock of X. For several reasons, including the fact that X is a U.S. corporation, paragraph 9 has no impact on the U.S. tax consequences of a subsequent disposition by X of the U.S. real property interest in either case.

*Example 4.*     B, a corporation resident in Canada, owns all of the stock of C, which is also a corporation resident in Canada. C owns a U.S. real property interest. After the Convention enters into force, B liquidates C in a section 332 liquidation. The transaction is treated as a non-recognition transaction for U.S. tax purposes under the definition of a non-recognition transaction described above. C is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to gain taxed (if any) under section 897(d), and B is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(b), upon a subsequent disposition of the U.S. real property interest. Generally, the United States would not subject B to tax upon the liquidation of C.

*Example 5.*     The facts are the same as in *Example 4,* except that C is a U.S. corporation. B is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to U.S. taxation (if any) of the gain resulting from the liquidation of C. B is not entitled to the benefits of paragraph 9 upon a subsequent disposition of the U.S. real property interest since that asset was held after September 26, 1980 by a person who was not a resident of Canada. The U.S. tax consequences to C are governed by the internal law of the United States.

*Example* 6.     D, an individual resident of the United States, owns Canadian real estate. On January 1, 1982, D transfers the Canadian real estate to E, a corporation resident in

**Appx242**

Canada, in exchange for all of E's stock. This transfer is treated as a taxable transaction under the Income Tax Act of Canada. However, D's gain on the transfer is exempt from Canadian tax under Article VIII of the 1942 Convention. D is not entitled to the benefits of subparagraph 9(b) upon a subsequent disposition of the stock of E since the stock was not transferred in a transaction which was a non-recognition transaction for Canadian tax purposes. E is not entitled to Canadian benefits under this paragraph since, *inter alia,* it is a Canadian resident. (However, under Canadian law, both D and E would have a basis for tax purposes equal to the fair market value of the property at the time of D's transfer). If the transfer to E had taken place after entry into force of this Convention, D would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to Canadian tax resulting from the transfer to E, but would not be entitled to the benefits of subparagraph 9(b) upon a subsequent disposition of the E stock. (Note that E could seek to have the transaction treated as a non-recognition transaction under paragraph 8 of this Article, with the result that, if the competent authority agrees, D will take a carryover basis in the stock of E and be entitled to the benefits of subparagraph 9(b) upon a subsequent disposition thereof).

*Example 7.*    The facts are the same as in *Example 6,* except that E is a U.S. corporation. This transaction is also a recognition event under Canadian law at the shareholder level. The results are generally the same as in *Example* 6. However, if the transfer to E had been granted non-recognition treatment in Canada pursuant to paragraph 8, both D and E would be entitled to the benefits of paragraph 9 for Canadian tax purposes, pursuant to subparagraph 9(b), upon subsequent dispositions of the stock of E or the Canadian real estate, respectively.

*Example 8.*    F, an individual resident of the United States, owns all of the stock of G, a Canadian corporation, which in turn owns Canadian real estate. F causes G to be amalgamated in a merger with another Canadian corporation. This is a non-recognition transaction under Canadian law and F is entitled, for Canadian tax purposes, to the benefits of paragraph 9, pursuant to subparagraph 9(b) upon a subsequent disposition of the stock of the other Canadian corporation.

*Example 9.*    H, a U.S. corporation, owns all of the stock of J, another U.S. corporation. J owns Canadian real estate. H liquidates J. For Canadian tax purposes, no tax is imposed on H as a result of the liquidation and H received a fair market value basis in the Canadian real estate. Accordingly, since gain has been forgiven due to the fair market value basis (rather than postponed in a non-recognition transaction), H would not be entitled to the benefits of subparagraph 9(b) upon the subsequent disposition of the Canadian real estate. Canada would impose a tax on J, but J would be entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to Canadian tax imposed on the liquidation.

*Example 10.*   The facts are the same as in *Example 9,* except that J is a Canadian corporation. Paragraph 9 does not affect the Canadian taxation of J. While H is subject to Canadian tax on the liquidation of J, H is entitled to the benefits of paragraph 9,

pursuant to subparagraph 9(a), with respect to such Canadian taxation. H will take a fair market value basis (rather than have gain postponed in a non-recognition transaction) in the Canadian real estate for Canadian tax purposes and is thus not entitled to the benefits of paragraph 9 upon a subsequent disposition of the Canadian real estate (since, *inter alia,* the gain has been forgiven due to the fair market value basis).

*Example 11.* K, a U.S. corporation, owns the stock of L, another U.S. corporation, which in turn owns Canadian real estate. K causes L to be merged into another U.S. corporation. For Canadian tax purposes, such a transaction treated as a recognition event, but Canada will not impose a tax on K under its internal law. Canada would impose tax on L, but L is entitled to the benefits of paragraph 9, pursuant to subparagraph 9(a), with respect to Canadian taxation of gain resulting from the merger. The acquiring U.S. corporation would take a fair market value basis in the Canadian real estate, and would thus not be entitled to the benefits of subparagraph 9(b) upon subsequent disposition of the real estate. (Note that the acquiring U.S. corporation could seek to obtain non-recognition treatment under paragraph 8 of this Article, with the results that, if approved by the competent authority it would obtain a carryover basis in the property and be entitled to the benefits of subparagraph 9(b) upon a subsequent disposition of the Canadian real estate.)

Paragraph 9 provides that where a resident of Canada or the United States is subject to tax pursuant to Article XIII in the other Contracting State on gains from the alienation of a capital asset, and if the other conditions of paragraph 9 are satisfied, the amount of the gain shall be reduced for tax purposes in that other State by the amount of the gain attributable to the period during which the property was held up to and including December 31 of the year in which the documents of ratification are exchanged. The gain attributable to such person is normally determined by dividing the total gain by the number of full calendar months the property was held by such person, including, in the case of an alienation described in paragraph 9(b), the number of months in which a predecessor in interest held the property, and multiplying such monthly amount by the number of full calendar months ending on or before December 31 of the year in which the instruments of ratification are exchanged.

Upon a clear showing, however, a taxpayer may prove that a greater portion of the gain was attributable to the specified period. Thus, in the United States the fair market value of the alienated property at the treaty valuation date may be established under paragraph 9 in the manner and with the evidence that is generally required by U.S. Federal Income, estate, and gift tax regulations. For this purpose a taxpayer may use valid appraisal techniques for valuing real estate such as the comparable sales approach (see Rev. Proc. 79-24, 1979-1 C.B. 565) and the reproduction cost approach. If more than one property is alienated in a single transaction each property will be considered individually.

A taxpayer who desires to make this alternate showing for U.S. tax purposes must so indicate on his U.S. income tax return for the year of the sale or exchange and must attach to the return a statement describing the relevant evidence. The U.S. competent authority or his authorized delegate will determine whether the taxpayer has satisfied the requirements of

paragraph 9.

The amount of gain which is reduced by reason of the application of paragraph 9 is not to be treated for U.S. tax purposes as an amount of "non-taxed gain" under section 1125(d)(2)(B) of FIRPTA, where that section would otherwise apply. (Note that gain not taxed by virtue of the 1942 Convention is "non-taxed gain".)

U.S. residents, citizens and former citizens remain subject to U.S. taxation on gains as provided by the Code notwithstanding the provisions of Article XIII, other than paragraphs 6 and 7. See paragraphs 2 and 3(a) of Article XXIX (Miscellaneous Rules).

ARTICLE XIV
Independent Personal Services

Article XIV concerns the taxation of income derived by an individual in respect of the performance of independent personal services. Such income may be taxed in the Contracting State of which such individual is a resident. It may also be taxed in the other Contracting State if the individual has or had a fixed base regularly available to him in the other State for the purpose of performing his activities, but only to the extent that the income is attributable to that fixed base. The use of the term "has or had" ensures that a Contracting State in which a fixed base existed has the right to tax income attributable to that fixed base even if there is a delay between the termination of the fixed base and the receipt or accrual of such income.

Unlike Article VII of the 1942 Convention, which provides a limited exemption from tax at source on income from independent personal services, Article XIV does not restrict the exemption to persons present in the State of source for fewer than 184 days. Furthermore, Article XIV does not allow the $5,000 exemption at source of the 1942 Convention, which was available even if services were performed through a fixed base. However, Article XIV provides complete exemption at source if a fixed base does not exist.

ARTICLE XV
Dependent Personal Services

Paragraph 1 provides that, in general, salaries, wages, and other similar remuneration derived by a resident of a Contracting State in respect of an employment are taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is exercised in the other Contracting State, the entire remuneration derived therefrom may be taxed in that other State but only if, as provided by paragraph 2, the recipient is present in the other State for a period or periods exceeding 183 days in the calendar year, or the remuneration is borne by an employer who is a resident of that other State or by a permanent establishment or fixed base which the employer has in that other State. However, in all cases where the employee earns $10,000 or less in the currency of the State of source, such earnings are exempt from tax in that State. "Borne by" means allowable as a deduction in computing taxable income. Thus, if a Canadian resident individual employed at the Canadian permanent establishment of a U.S.

company performs services in the United States, the income earned by the employee from such services is not exempt from U.S. tax under paragraph 1 if such income exceeds $10,000 (U.S.) because the U.S. company is entitled to a deduction for such wages in computing its taxable income.

Paragraph 3 provides that a resident of a Contracting State is exempt from tax in the other Contracting State with respect to remuneration derived in respect of an employment regularly exercised in more than one State on a ship, aircraft, motor vehicle, or train operated by a resident of the taxpayer's State of residence. The word "regularly" is intended to distinguish crew members from persons occasionally employed on a ship, aircraft, motor vehicle, or train. Only the Contracting State of which the employee and operator are resident has the right to tax such remuneration. However, this provision is subject to the "saving clause" of paragraph 2 of Article XXIX (Miscellaneous Rules), which permits the United States to tax its citizens despite paragraph 3.

Article XV states that its provisions are overridden by the more specific rules of Article XVIII (Pensions and Annuities) and Article XIX (Government Services).

## ARTICLE XVI
### Artistes and Athletes

Article XVI concerns income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio, or television artiste, or a musician, or as an athlete, from his personal activities as such exercised in the other Contracting State. Article XVI overrides Articles XIV (Independent Personal Services) and XV (Dependent Personal Services) to allow source basis taxation of an entertainer or athlete in cases where the latter Articles would not permit such taxation. Thus, paragraph 1 provides that certain income of an entertainer or athlete may be taxed in the State of source in all cases where the amount of gross receipts derived by the entertainer or athlete, including expenses reimbursed to him or borne on his behalf, exceeds $15,000 in the currency of that other State for the calendar year concerned. For example, where a resident of Canada who is an entertainer derives income from his personal activities as an entertainer in the United States, he is taxable in the United States on all such income in any case where his gross receipts are greater than $15,000 for the calendar year. Article XVI does not restrict the right of the State of source to apply the provisions of Articles XIV and XV. Thus, an entertainer or athlete resident in a Contracting State and earning $14,000 in wages borne by a permanent establishment in the other State may be taxed in the other State as provided in Article XV

Paragraph 2 provides that where income in respect of personal activities exercised by an entertainer or an athlete accrues not to the entertainer or athlete himself but to another person, that income may, notwithstanding the provisions of Article VII (Business Profits), Article XIV, and Article XV, be taxed in the Contracting State in which the activities are exercised. The anti-avoidance rule of paragraph 2 does not apply if it is established by the entertainer or athlete that neither he nor persons related to him participate directly or indirectly in the profits of the other person in any manner, including the receipt of deferred remuneration, bonuses, fees, dividends,

partnership distributions, or other distributions.

Thus, if an entertainer who is a resident of Canada is under contract with a company and the arrangement between the entertainer and the company provides for payments to the entertainer based on the profits of the company, all of the income of the company attributable to the performer's U.S. activities may be taxed in the United States irrespective of whether the company maintains a permanent establishment in the United States. Paragraph 2 does not affect the rule of paragraph 1 that applies to the entertainer or athlete himself.

Paragraph 3 provides that paragraphs 1 and 2 of Article XVI do not apply to the income of an athlete in respect of an employment with a team which participates in a league with regularly scheduled games in both Canada and the United States, nor do those paragraphs apply to the income of such a team. Such an athlete is subject to the rules of Article XV. Thus, the athlete's remuneration would be exempt from tax in the Contracting State of source if he is a resident of the other Contracting State and earns $10,000 or less in the currency of the State of source, or if he is present in that State for a period or periods not exceeding in the aggregate 183 days in the calendar year, and his remuneration is not borne by a resident of that State or a permanent establishment or fixed base in that State. In addition, a team described in paragraph 3 may not be taxed in a Contracting State under paragraph 2 of this Article solely by reason of the fact that a member of the team may participate in the profits of the team through the receipt of a bonus based, for example, on ticket sales. The employer may be taxable pursuant to other articles of the Convention, such as Article VII.

Paragraph 4 provides that, notwithstanding Articles XIV and XV, an amount paid by a resident of a Contracting State to a resident of the other State as an inducement to sign an agreement relating to the performance of the services of an athlete may be taxed in the first-mentioned State. However, the tax imposed may not exceed 15 percent of the gross amount of the payment. The provision clarifies the taxation of signing bonuses in a manner consistent with their treatment under U.S. interpretations of the 1942 Convention. Amounts paid as salary or other remuneration for the performance of the athletic services themselves are not taxable under this provision but are subject to the provisions of paragraphs 1 and 3 of this Article, or Articles XIV or XV, as the case may be. The paragraph covers all amounts paid (to the athlete or another person) as an inducement to sign an agreement for the services of an athlete, such as a bonus to sign a contract not to perform for other teams. An amount described in this paragraph is not to be included in determining the amount of gross receipts derived by an athlete in a calendar year for purposes of paragraph 1. Thus, if an athlete receives a $50,000 signing bonus and a $12,000 salary for a taxable year, the State of source would not be entitled to tax the salary portion of the receipt of the athlete for that year under paragraph 1 of this Article.

ARTICLE XVII
Withholding of Taxes in Respect of Personal Services

Article XVII confirms that a Contracting State may require withholding of tax on account of tax liability with respect to remuneration paid to an individual who is a resident of the other Contracting State, including an entertainer or athlete, in respect of the performance of

independent personal services in the first-mentioned State. However, withholding with respect to the first $5,000 (in the currency of the State of source) of such remuneration paid in that taxable year by each payor shall not exceed 10 percent of such payment. In the United States, the withholding described in paragraph 1 relates to withholding with respect to income tax liability and does not relate to withholding with respect to other taxes, such as social security taxes. Nor is the paragraph intended to suggest that withholding in circumstances not specifically mentioned, such as withholding with respect to dependent personal services, is precluded by the Convention.

Paragraph 2 provides that in any case where the competent authority of Canada or the United States believes that withholding with respect to remuneration for the performance of personal services is excessive in relation to the estimated tax liability of an individual to that State for a taxable year, it may determine that a lesser amount will be deducted or withheld. In the case of independent personal services, paragraph 2 may thus result in a lesser withholding than the maximum authorized by paragraph 1.

Paragraph 3 states that the provisions of Article XVII do not affect the liability of a resident of a Contracting State for taxes imposed by the other Contracting State. The Article deals only with the method of collecting taxes and not with substantive tax liability.

Article XVIII A of the 1942 Convention authorizes the issuance of regulations to specify circumstances under which residents of the United States temporarily performing personal services in Canada may be exempted from deduction and withholding of United States tax. This provision is omitted from the Convention as unnecessary. The Code and regulations provide sufficient authority to avoid excessive withholding of U.S. income tax. Further, paragraph 2 provides for adjustments in the amount of withholding where appropriate.

ARTICLE XVIII
Pensions and Annuities

Paragraph 1 provides that a resident of a Contracting State is taxable in that State with respect to pensions and annuities arising in the other Contracting State. However, the State of residence shall exempt from taxation the amount of any such pension that would be excluded from taxable income in the State of source if the recipient were a resident thereof. Thus, if a $10,000 pension payment arising in a Contracting State is paid to a resident of the Contracting State and $5,000 of such payment would be excluded from taxable income as a return of capital in the first-mentioned State if the recipient were a resident of the first-mentioned State, the State of residence shall exempt from tax $5,000 of the payment. Only $5,000 would be so exempt even if the first-mentioned State would also grant a personal allowance as a deduction from gross income if the recipient were a resident thereof. Paragraph 1 imposes no such restriction with respect to the amount that may be taxed in the State of residence in the case of annuities.

Paragraph 2 provides rules with respect to the taxation of pensions and annuities in the Contracting State in which they arise. If the beneficial owner of a periodic pension payment is a resident of the other Contracting State, the tax imposed in the State of source is limited to 15 percent of the gross amount of such payment. Thus, the State of source is not required to allow a

deduction or exclusion for a return of capital to the pensioner, but its tax is limited in amount in the case of a periodic payment. Other pension payments may be taxed in the State of source without limit.

In the case of annuities beneficially owned by a resident of a Contracting State, the Contracting State of source is limited to a 15 percent tax on the portion of the payment that would not be excluded from taxable income (i.e., as a return of capital) in that State if the beneficial owner were a resident thereof.

Paragraph 3 defines the term "pensions" for purposes of the Convention to include any payment under a superannuation, pension, or retirement plan, Armed-Forces retirement pay, war veterans pensions and allowances, and amounts paid under a sickness, accident, or disability plan. Thus, the term "pension" includes pensions paid by private employers as well as any pension paid by a Contracting State in respect of services rendered to that State. A pension for government service is covered. The term "pensions" does not include payments under an income averaging annuity contact or benefits paid under social security legislation. The latter benefits are taxed, pursuant to paragraph 5, only in the Contracting State paying the benefit. Income derived from an income averaging annuity contract is taxable pursuant to the provisions of Article XXII (Other Income).

Paragraph 4 provides that, for purposes of the Convention, the term "annuities" means a stated sum paid periodically at stated times during life or during a specified number of years, under an obligation to make payments in return for adequate and full consideration other than services rendered. The term does not include a payment that is not periodic or any annuity the cost of which was deductible for tax purposes in the Contracting State where the annuity was acquired. Items excluded from the definition of "annuities" are subject to the rules of Article XXII.

Paragraph 5, as amended by the 1984 Protocol, provides that benefits under social security legislation in Canada or the United States paid to a resident of the other Contracting State are taxable only in the State in which the recipient is resident. However, the State of residence must exempt from taxation one-half of the total amount of such benefits paid in a taxable year. Thus, if U.S. social security benefits are paid to a resident of Canada, the United States will exempt such benefits from tax and Canada will exempt one-half of the benefits from taxation. The exemption of one-half of the benefits in the State of residence is an exception to the saving clause under subparagraph 3(a) of Article XXIX (Miscellaneous Rules). The United States will not exempt U.S. social security benefits from tax if the Canadian resident receiving such benefits is a U.S. citizen. If a U.S. citizen and resident receives Canadian social security benefits, Canada will not tax such benefits and the United States will exempt from tax one-half of the total amount of such benefits. The United States will also exempt one-half of Canadian social security benefits from tax if the recipient is a U.S. citizen who is a resident of Canada, under paragraph 7 of Article XXIX. Paragraph 5 encompasses benefits paid under social security legislation of a political subdivision, such as a province of Canada.

Paragraph 6(a) provides that only the State of which a person is resident has the right to tax alimony and other similar amounts (including child support payments) arising in the other

Contracting State and paid to such person. However, under paragraph 6(b), the State of residence shall exempt from taxation the amount that would be excluded from taxable income in the State of source if the recipient were a resident thereof. Thus, if child support payments are made by a U.S. resident to a resident of Canada, Canada shall exempt from tax the amount of such payments which would be excluded from taxable income under section 71(b) of the Internal Revenue Code. Paragraph 6 does not define the term "alimony"; the term is defined pursuant to the provisions of paragraph 2 of Article III (General Definitions).

Article XVIII does not provide rules to determine the State in which pensions, annuities, alimony, and other similar amounts arise. The provisions of paragraph 2 of Article III are used to determine where such amounts arise for purposes of determining whether a Contracting State has the right to tax such amounts.

Paragraphs 1, 3, 4, 5(b) and 6(b) of Article XVIII are, by reason of paragraph 3(a) of Article XXIX (Miscellaneous Rules), exceptions to the "saving clause." Thus, the rules in those paragraphs change U.S. taxation of U.S. citizens and residents.

## ARTICLE XIX
### Government Service

Article XIX provides that remuneration, other than a pension, paid by a Contracting State or political subdivision or local authority thereof to a citizen of that State in respect of services rendered in the discharge of governmental functions shall be taxable only in that State. (Pursuant to paragraph 5 of Article IV (Residence), other income of such a citizen may also be exempt from tax, or subject to reduced rates of tax, in the State in which he is performing services, in accordance with other provisions of the Convention.) However, if the services are rendered in connection with a trade or business, then the provisions of Article XIV (Independent Personal Services), Article XV (Dependent Personal Services), or Article XVI (Artistes and Athletes), as the case may be, are controlling. Whether functions are of a governmental nature may be determined by a comparison with the concept of a governmental function in the State in which the income arises.

Pursuant to paragraph 3(a) of Article XXIX (Miscellaneous Rules), Article XIX is an exception to the "saving clause." As a result, a U.S. citizen resident in Canada and performing services in Canada in the discharge of functions of a governmental nature for the United States is taxable only in the United States on remuneration for such services.

This provision differs from the rules of Article VI of the 1942 Convention. For example, Article XIX allows the United States to impose tax on a person other than a citizen of Canada who earns remuneration paid by Canada in respect of services rendered in the discharge of governmental functions in the United States. (Such a person may, however, be entitled to an exemption from U.S. tax as provided in Code section 893.) Also, under the provisions of Article XIX Canada will not impose tax on amounts paid by the United States in respect of services rendered in the discharge of governmental functions to a U.S. citizen who is ordinarily resident in Canada for purposes other than rendering governmental services. Under paragraph 1 of Article VI

of the 1942 Convention, such amounts would be taxable by Canada.

ARTICLE XX
Students

Article XX provides that a student, apprentice, or business trainee temporarily present in a Contracting State for the purpose of his full-time education or training is exempt from tax in that State with respect to amounts received from outside that State for the purpose of his maintenance, education, or training, if the individual is or was a resident of the other Contracting State immediately before visiting the first-mentioned State. There is no limitation on the number of years or the amount of income to which the exemption applies.

The Convention does not contain provisions relating specifically to professors and teachers. Teachers are treated under the Convention pursuant to the rules established in Articles XIV (Independent Personal Services) and XV (Dependent Personal Services), in the same manner as other persons performing services. In Article VIII A of the 1942 Convention there is a 2-year exemption in the Contracting State of source in the case of a professor or teacher who is a resident of the other Contracting State.

ARTICLE XXI
Exempt Organizations

Paragraph 1 provides that a religious, scientific, literary, educational, or charitable organization resident in a Contracting State shall be exempt from tax on income arising in the other Contracting State but only to the extent that such income is exempt from taxation in the Contracting State in which the organization is resident. Since this paragraph, and the remainder of Article XXI, deal with entities that are not normally taxable, the test of "resident in" is intended to be similar - but cannot be identical - to the one outlined in paragraph 1 of Article IV (Residence). Paragraph 3 provides that paragraph 1 does not exempt from tax, income of a trust, company, or other organization from carrying on a trade or business, or income from a "related person" other than a person referred to in paragraph 1 or 2.

Paragraph 2 provides that a trust, company, or other organization that is resident in a Contracting State constituted and operated exclusively to administer or provide employee benefits or benefits for the self-employed under one or more funds or plans established to provide pension or retirement benefits or other employee benefits is exempt from taxation on dividend and interest income arising in the other Contracting State in a taxable year, if the income of such, organization is generally exempt from taxation for that year in the Contracting State in which it is resident. In addition, a trust, company, or other organization resident in a Contracting State and not taxed in a taxable year in that State shall be exempt from taxation in the other State in that year on dividend and interest income arising in that other State if it is constituted and operated exclusively to earn, income for the benefit of an organization described in the preceding sentence. Pursuant to paragraph 3 the exemption at source provided by paragraph 2 does not apply to dividends or interest from carrying on trade or business or from a "related person," other than a person referred

to in paragraph 1 or 2. The term "related person" is not necessarily defined by paragraph 2 of Article IX (Related Persons).

Paragraph 4 provides an exemption from U.S. excise taxes on private foundations in the case of a religious, scientific, literary, educational, or charitable organization which is resident in Canada but only if such organization has received substantially all of its support from persons other than citizens or residents of the United States.

Paragraph 5 provides that contributions by a citizen or resident of the United States to an organization which is resident in Canada and is generally exempt from Canadian tax are treated as charitable contributions, but only if the organization could qualify in the United States to receive deductible contributions if it were resident in (i.e., organized in) the United States. Paragraph 5 generally limits the amount of contributions made deductible by the Convention to the income of the U.S. citizen or resident arising in Canada, as determined under the Convention. In the case of contributions to a college or university at which the U.S. citizen or resident or a member of his family is or was enrolled, the special limitation to income arising in Canada is not required. The percentage limitations of Code section 170 in respect of the deductibility of charitable contributions apply after the limitations established by the Convention. Any amounts treated as charitable contributions by paragraph 5 which are in excess of amounts deductible in a taxable year pursuant to paragraph 5 may be carried over and deducted in subsequent taxable years, subject to the limitations of paragraph 5.

Paragraph 6 provides rules for purposes of Canadian taxation with respect to the deductibility of gifts to a U.S. resident organization by a resident of Canada. The rules of paragraph 6 parallel the rules of paragraph 5. The current limitations in Canadian law provide that deductions for gifts to charitable organizations may not exceed 20 percent of income. Excess deductions may be carried forward for one year.

The term "family" used in paragraphs 5 and 6 is defined in paragraph 2 of the Exchange of Notes accompanying the Convention to mean an individual's brothers and sisters (whether by whole or half-blood, or by adoption), spouse, ancestors, lineal descendants, and adopted descendants. Paragraph 2 of the Exchange of Notes also provides that the competent authorities of Canada and the United States will review procedures and requirements for organizations to establish their exempt status under paragraph 1 of Article XXI or as an eligible recipient of charitable contributions or gifts under paragraphs 5 and 6 of Article XXI. It is contemplated that such review will lead to the avoidance of duplicative administrative efforts in determining such status and eligibility.

The provisions of paragraph 5 and 6 generally parallel the rules of Article XIII D of the 1942 Convention. However, paragraphs 5 and 6 permit greater deductions for certain contributions to colleges and universities than do the provisions of the 1942 Convention.

ARTICLE XXII
Other Income

Appx252

Paragraph 1 provides that a Contracting State of which a person is a resident has the sole right to tax items of income, wherever arising, if such income is not dealt with in the prior Articles of the Convention. If such income arises in the other Contracting State, however, it may also be taxed in that State. The determination of where income arises for this purpose is made under the domestic laws of the respective Contracting States unless the Convention specifies where the income arises (e.g., paragraph 6 of Article XI (Interest)) for purposes of determining the right to tax, in which case the provisions of the Convention control.

Paragraph 2 provides that to the extent that income distributed by an estate or trust resident in one Contracting State is deemed under the domestic law of that State to be a separate type of income "arising" within that State, such income distributed to a beneficiary resident in the other Contracting State may be taxed in the State of source at a maximum rate of 15 percent of the gross amount of such distribution. Such a distribution will, however, be exempt from tax in the State of source to the extent that the income distributed by the estate or trust was derived by the estate or trust from sources outside that State. Thus, in a case where the law of Canada treats a distribution made by a trust resident in Canada as a separate type of income arising in Canada, Canadian tax is limited by paragraph 2 to 15 percent of the gross amount distributed to a U.S. resident beneficiary. Although the Code imposes tax on certain domestic trusts (e.g., accumulation trusts) and such trusts are residents of the United States for purposes of Article IV (Residence) and paragraph 2 of Article XXII, paragraph 2 does not apply to distributions by such trusts because, pursuant to Code sections 667(e) and 662(b), these distributions have the same character in the hands of a nonresident beneficiary as they do in the hands of the trust. Thus, a distribution by a domestic accumulation trust is not a separate type of income for U.S. purposes. The taxation of such a distribution in the United States is governed by the distribution's character, the provisions of the Code and the provisions of the Convention other than the provision in paragraph 2 limiting the tax at source to 15 percent.

ARTICLE XXIII
Capital

Although neither Canada nor the United States currently has national taxes on capital, Article XXIII provides rules for the eventuality that such taxes might be enacted in the future. Paragraph 1 provides that capital represented by real property (as defined in paragraph 2 of Article VI (Income From Real Property)) owned by a resident of a Contracting State and situated in the other Contracting State may be taxed in that other State.

Paragraph 2 provides that capital represented by either personal property forming part of the business property of a permanent establishment or personal property pertaining to a fixed base in a Contracting State may be taxed in that State.

Paragraph 3 provides that capital represented by ships and aircraft operated by a resident of a Contracting State in international traffic and by personal property pertaining to the operation of such ships and aircraft are taxable only in the Contracting State of residence.

Paragraph 4 provides that all elements of capital other than those covered by paragraphs 1,

2, and 3 are taxable only in the Contracting State of residence. Thus, capital represented by motor vehicles or railway cars, not pertaining to a permanent establishment or fixed base in a Contracting State, would be taxable only in the Contracting State of which the taxpayer is a resident.

ARTICLE XXIV
Elimination of Double Taxation

Paragraph 1 provides the general rules that will apply under the Convention with respect to foreign tax credits for Canadian taxes paid or accrued. The United States undertakes to allow to a citizen or resident of the United States, or to a company electing under Code section 1504(d) to be treated as a domestic corporation, a credit against the Federal income taxes imposed by the Code for the appropriate amount of income tax paid or accrued to Canada. In the case of a company which is a resident of the United States owning 10 percent or more of the voting stock of a company which is a resident of Canada (which for this purpose does not include a company electing under Code section 1504(d) to be treated as a domestic corporation), and from which it receives dividends in a taxable year, the United States shall allow as a credit against income taxes imposed by the Code the appropriate amount of income tax paid or accrued to Canada by the Canadian company with respect to the profits out of which such company paid the dividends.

The direct and deemed-paid credits allowed by paragraph 1 are subject to the limitations of the Code as they may be amended from time to time without changing the general principle of paragraph 1. Thus, as is generally the case under U.S. income tax conventions, provisions such as Code sections 901(c), 904, 905, 907, 908, and 911 apply for purposes of computing the allowable credit under paragraph 1. In addition, the United States is not required to maintain the overall limitation currently provided by U.S. law.

The term "income tax paid or accrued" is defined in paragraph 7 of Article XXIV to include certain specified taxes which are paid or accrued. The Convention only provides a credit for amounts paid or accrued. The determination of whether an amount is paid or accrued is made under the Code. Paragraph 1 provides a credit for these specified taxes whether or not they qualify as creditable under Code section 901 or 903. A taxpayer who claims credit under the Convention for Canadian taxes made creditable solely by paragraph 1 is not, as a result of the Protocol, subject to a per-country limitation with respect to Canadian taxes. Thus, credit for such Canadian taxes would be computed under the overall limitation currently provided by U.S. law. (However, see the discussion below of the source rules of paragraphs 3 and 9 for a restriction on the use of third country taxes to offset the U.S. tax imposed on resourced income.)

A taxpayer claiming credits for Canadian taxes under the Convention must apply the source rules of the Convention, and must apply those source rules in their entirety. Similarly, a taxpayer claiming credit for Canadian taxes which are creditable under the Code and who wishes to use the source rules of the Convention in computing that credit must apply the source rules of the Convention in their entirety.

Paragraph 3 provides source rules for purposes of applying Article XXIV. Profits, income

**Appx254**

or gains of a resident of a Contracting State which may be taxed in the other Contracting State in accordance with the Convention, for reasons other than the saving clause of paragraph 2 of Article XXIX (Miscellaneous Rules) (e.g., pensions and annuities taxable where arising pursuant to Article XVIII (Pensions and Annuities)), are deemed to arise in the latter State. This rule does not, however, apply to gains taxable under paragraph 5 of Article XIII (Gains) (i.e., gains taxed by a Contracting State derived from the alienation of property by a former resident of that State). Gains from such an alienation arise, pursuant to paragraph 3(b), in the State of which the alienator is a resident. Thus, if in accordance with paragraph 5 of Article XIII, Canada imposes tax on certain gains of a U.S. resident such gains are deemed, pursuant to paragraphs 2 and 3(b) of Article XXIV, to arise in the United States for purposes of computing the deduction against Canadian tax for the U.S. tax on such gain. Under the Convention such gains arise in the United States for purposes of the United States foreign tax credit. Paragraph 3(b) also provides that profits, income, or gains arise in the Contracting State of which a person is a resident if they may not be taxed in the other Contracting State under the provisions of the Convention (e.g., alimony), other than the "saving clause" of paragraph 2 of Article XXIX.

Paragraph 9 provides clarification that the source rules of this Article shall not be used to determine the credit available against U.S. tax for foreign taxes other than income taxes paid or accrued to Canada (i.e., taxes of third countries). Thus, creditable third country taxes may not offset the U.S. tax on income treated as arising in Canada under the source rules of the Convention. A person claiming credit for income taxes of a third country may not rely upon the rules of paragraphs 3 and 6 for purposes of treating income that would otherwise have a U.S. source as having a foreign source. Thus, if the taxpayer elects to compute the foreign tax credit for any year using the special source rules set forth in paragraphs 3 and 6, paragraph 9 requires that a separate limitation be computed for taxes not covered by paragraph 1 without regard to the source rules of paragraphs 3 and 6, and the credit for such taxes may not exceed such limitation. The credit allowed under this separate limitation may not exceed the proportion of the Federal income taxes imposed by the Code that the taxpayer's taxable income from foreign sources (under the Code) not included in taxable income arising in Canada (and not in excess of total foreign source taxable income under the Code) bears to the taxpayer's worldwide taxable income. In any case the credit for taxes covered by paragraph 1 and the credit for other foreign taxes is limited to the amount allowed under overall limitation computed by aggregating taxable income arising in Canada and other foreign source taxable income.

If creditable Canadian taxes exceed the proportion of U.S. tax that taxable income arising in Canada bears to the entire taxable income, such taxes may qualify to be absorbed by any excess in the separate limitation computed with respect to other taxes.

In a case where a taxpayer has different types of income subject to separate limitations under the Code (e.g., section 904(d)(l)(B) DISC dividends) the Convention rules just described apply in the context of each of the separate Code limitations.

A taxpayer may, for any year, claim a credit pursuant to the rules of the Code. In such case, the taxpayer would be subject to the limitations established in the Code, and would forego the rules of the Convention that determine where taxable income arises. In addition, any Canadian taxes covered by paragraph 1 which are not creditable under the Code would not be credited.

Thus, where a taxpayer elects to use the special source rules of this Article to compute the foreign tax credit for any year, the following computations must be made:

*Step 1(a):*      Compute a hypothetical foreign tax credit limitation for Canadian income and taxes using the source rules of the Convention.

*Step 1(b):*      Compute a hypothetical foreign tax credit limitation for third country income and taxes using the source rules of the Code.

*Step 1*(c):      Compute an overall foreign tax credit limitation using the source rules of the Convention to the extent they resource Canadian income as U.S. source income or U.S. source income as Canadian source income, and using the source rules of the Code with respect to any other income.

*Step 2:*      Allocate the amount of creditable Canadian taxes to the amount of the limitation computed under step 1(a), and allocate the amount of creditable third country taxes to the amount of the limitation computed under step 1(b). The amount of credit to be so allocated may not exceed the amount of the respective limitation.

*Step 3*:

(1) If the total credits allocated under step 2 exceed the amount of the limitation computed under step 1(c), the amount of allowable credits must be reduced to that limitation (see Rev. Rule. 82-215, 1982-2 C.B. 153 for the method of such reduction).

(2) If the total credits allocated under step 2 are less than the amount of the limitation computed under step 1(c), then

(a) any amount of creditable Canadian taxes in excess of the amount of the step 1(a) limitation may be credited to the extent of the excess of the step 1(c) limitation over the total step 2 allocation, and

(b) any amount of third country taxes in excess of the amount of the step 1(b) limitation may not be credited.

The following examples (in which the taxpayer's U.S. tax rate is presumed to be 46%) illustrate the application of the source rules of Article XXIV:

*Example 1.*

(a) A U.S. corporate taxpayer has for the taxable year $100 of taxable income having a U.S. source under both the Convention and the Code; $100 of taxable income having a Canadian source under both the Convention and the Code; $50 of taxable income having a Canadian source under the Convention but a U.S. source under the Code (see, for example, paragraph 1 of Article VII (Business Profits) and paragraph 3(a) of Article XXIV); and $80 of taxable income having a foreign (non-Canadian) source under the Code. The taxpayer pays $75 of Canadian income taxes and $45 of third country income taxes. All the foreign source income of the taxpayer constitutes "other" income described in Code section 904(d)(l)(C).

The source rule of the Convention are applied as follows to compute the taxpayer's foreign tax credit:

Step 1(a): <u>$150</u>   (<u>Canadian source taxable income under convention</u>)
          $330   (total taxable income)
x $151.80 = $69    limit for Canadian taxes.

Step 1(b): <u>$ 80</u>  (<u>third country source taxable income under Code</u>)
          $330 (total taxable income)
x $151.80 = $36.80 limit for third country taxes.

Step 1(c): <u>$230</u> (<u>overall foreign taxable income under source rules described above</u>)
          $330 (total taxable income)
x $151.80 = $105.80 total limit.

Step 2: The taxpayer may tentatively credit $69 of the $75 Canadian income taxes under the step 1(a) limitation, and $36.80 of the third country income taxes under the step 1(b) limitation.

Step 3: Since the total amount of taxes credited under step 2 equals the taxpayer's total limitation of $105.80 under step 1(c), no additional taxes may be credited. The taxpayer has a $6 Canadian income tax carryover and a $8.20 third country income tax carryover for U.S. foreign tax credit purposes.

(b) If the taxpayer had paid only $30 of third country taxes, he would credit that $30 in step 2. Since the total amount of credits allowed under step 2 ($99) is less than the taxpayer's total limit of $105.80, and since the taxpayer has $6 of excess Canadian taxes not credited under step 2, he may also claim a credit for that $6 of Canadian income taxes, for a total credit of $105.

(c) If the taxpayer had paid $45 of third country income taxes and $65 of Canadian income taxes, the computation would be as follows:

Step 2: The taxpayer would credit the $65 of Canadian income taxes, and would also credit $36.80 of the $45 of third country income taxes.

Step 3: Although the total amount of credits computed under step 2 ($101.80) is less than the taxpayer's total limitation of $105.80, no additional credits can be claimed since the taxpayer has only excess third country income taxes. The excess third country income taxes are thus not permitted to offset U.S. tax on income that is Canadian source income under the Convention. The taxpayer would have $8.20 of third country income taxes as a carryover for U.S. foreign tax credit purposes.

*Example 2.*    A United States corporate taxpayer has for the taxable year $100 of taxable income having a Canadian source under the Convention but a U.S. source under the Code; $100 of taxable income having a U.S. source under both the Convention and the

Code; $80 of taxable income having a foreign (non-Canadian) source under the Code; and ($50) of loss allocated or apportioned to Canadian source income. The taxpayer pays $50 of foreign (non-Canadian) income taxes, and $20 of Canadian income taxes.

The source rules of the Convention are applied as follows to compute the taxpayer's foreign tax credit:

Step 1(a):  $ 50 (Canadian source taxable income under Contention)
              $230 (total taxable income)
x $105.80 = $23 limit for Canadian taxes.

Step 1(b):  $ 80 (third country source taxable income under Code)
              $230 (total taxable income)
x $105.80 = $36.80 limit for third country taxes.

Step 1(c): $130 (overall foreign taxable income under source rules described above)
              $230 (total taxable income)
x $105.80 = $59.80 total limit.

Step 2: Since the taxpayer paid $20 of Canadian income taxes, he may credit that amount in full since the step 1(a) limit is $23. Since the step 1(b) limit is $36.80, the taxpayer may credit $36.80 of the $50 foreign income taxes paid.

Step 3: Although the total taxes credited under step 2 ($56.80) is less than the taxpayer's total limit of $59.80, no additional credits may be claimed since the only excess taxes are third country income taxes, and those may not be used to offset any excess limitation in step 3. The $13.20 of foreign taxes not allowed as a credit is available as a foreign tax credit carryover.

*Example 3:*    The facts are the same as in *Example 2,* except that foreign (non-Canadian) operations result in a loss of ($30) rather than taxable income of $80, and no foreign (non-Canadian) income taxes are paid. The taxpayer's credit is computed as follows:

Step 1(a):  $ 50 x  $55.20 = $23 limit for Canadian taxes.
              $120

Step 1(b): Since there is no third country source taxable income under the Code, the limit for third country income taxes is zero.

Step 1(c): $ 20 x $55.20 = $9.20 total limit.
              $120

Step 2: Since the taxpayer paid $20 of Canadian income tax, he may tentatively credit that amount in full since the step 1(a) limit is $23.

Step 3: Since the total taxes credited under step 2 ($20) exceeds the taxpayer's total limit

**Appx258**

of $9.20, the taxpayer must reduce the total amount claimed as a credit of $9.20. The remaining $10.80 of Canadian income taxes are available as a foreign tax credit carryover.

*Example 4.*    The facts are the same as in *Example 2,* except that the first $100 of taxable income mentioned in *Example 2* has a Canadian source under both the Convention and the Code.

Step 1(a): $\underline{\$ 50} \times \$105.80 = \$23$ limit for Canadian taxes.
$\$120$

Step 1(b): $\underline{\$ 80} \times \$105.80 = \$36.80$ limit for third country income taxes.
$\$120$

Step 1(c): $\underline{\$130} \times \$105.80 = \$59.80$ total limit.
$\$230$

Step 2: The taxpayer credits the $20 of Canadian income tax and $36.80 of third country income tax.

Step 3: As explained in *Example 2,* the taxpayer's total credit is limited to $56.80. In this case, however, if the Canadian taxes covered by the Convention are creditable under the Code, the taxpayer could elect the Code limitation of $59.80 ($\underline{\$130} \times \$105.80$),
$\$230$
which is more advantageous than the Convention limitation because that limitation does not permit third country income taxes to be credited against the U.S. tax on income arising in Canada under the Convention.

*Example 5.*    The facts are the same as in *Example 2,* except that the corporation pays $25 of Canadian income taxes and $12 of foreign (non-Canadian) income taxes. Under step 2, the taxpayer would credit $23 of the $25 of Canadian income taxes and the full $12 of third country income taxes. Since the total amount of income taxes credited under step 2 is $35, which is less than the taxpayer's total limit of $59.80, the taxpayer may credit an amount of Canadian income taxes up to the $24.80 excess. Here, the taxpayer may claim a credit for the additional $2 of Canadian income taxes not credited under step 2, and has a total credit of $37.

*Example 6.*
 (a) A U.S. corporate taxpayer has for the taxable year $100 of taxable income having a Canadian source under the Convention and the Code; $50 of taxable income having a Canadian source under the Convention but a U.S. source under the Code; $80 of taxable income having a foreign (non-Canadian) source under the Code; and ($50) of loss allocated or apportioned to U.S. source income. The taxpayer pays $65 of Canadian income taxes, and $45 of third country income taxes.

Step 1(a):  $\underline{\$150} \times \$82.80 = \$69$ limit for Canadian income taxes.
$\$180$

Step 1(b): $\dfrac{\$80}{\$180}$ x $82.80 = $36.80 limit for third country income taxes.

Step 1(c): $\dfrac{\$180}{\$180}$ x $82.80 = $82.80 total limit.

Step 2: The taxpayer tentatively credits the $65 of Canadian income taxes against the $69 limit of step 1(a), and $36.80 of the $45 of third country income taxes against the $36.80 limit of step 1(b).

Step 3: Since the total amount of credits tentatively allowed under step 2 ($101.80) exceeds the taxpayer's total limit of $82.80 under step 1(c), the taxpayer's allowable credit is reduced to $82.80 under the method provided by Rev. Rul. 82-215.

(b) If the taxpayer had paid only $40 of Canadian income taxes, the total credits tentatively allowed under step 2 is $76.80. Although that amount is less than the $82.80 total limit under step 1(c), no additional taxes may be credited since the taxpayer only has excess third country income taxes. The $8.20 of excess third country income taxes would be allowed as a foreign tax credit carryover.

The general rule for avoiding double taxation in Canada is provided in paragraph 2. Pursuant to paragraph 2(a) Canada undertakes to allow to a resident of Canada a credit against income taxes imposed under the Income Tax Act for the appropriate amount of income taxes paid or accrued to the United States. Paragraph 2(b) provides for the deduction by a Canadian company, in computing taxable income, of any dividend received out of the exempt surplus of a U.S. company which is an affiliate. The provisions of paragraphs 2(a) and (b) are subject to the provisions of the Income Tax Act as they may be amended from time to time without changing the general principle of paragraph 2. Paragraph 2(c) provides that where Canada imposes a tax on the alienation of property pursuant to the provisions of paragraph 5 of Article XIII (Gains), Canada will allow a credit for the income tax paid or accrued to the United States on such gain.

The rules of paragraph 1 are modified in certain respects by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada. Paragraph 4 provides two steps for the elimination of double taxation in such a case. First, paragraph 4(a) provides that Canada shall allow a deduction from (credit against) Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income, or gains which arise in the United States (within the meaning of paragraph 3(a)); the deduction against Canadian tax need not, however, exceed the amount of income tax that would be paid or accrued to the United States if the individual were not a U.S. citizen, after taking into account any relief available under the Convention.

The second step, as provided in paragraph 4(b), is that the United States allows as a credit against United States tax, subject to the rules of paragraph 1, the income tax paid or accrued to Canada after the Canadian credit for U.S. tax provided by paragraph 4(a). The credit so allowed by the United States is not to reduce the portion of the United States tax that is creditable against

Canadian tax in accordance with paragraph 4(a).

The following example illustrates the application of paragraph 4.

*Example A*

　　- A U.S. citizen who is a resident of Canada earns $175 of income from the performance of independent personal services, of which $100 is derived from services performed in Canada and $75 from services performed in the United States. That is his total world-wide income.

　　If he were not a U.S. citizen, the United States could tax $75 of that amount under Article XIV (Independent Personal Services). By reason of paragraph 3(a), the $75 that may be taxed by the United States under Article XIV is deemed to arise in the United States. Assume that the U.S. tax on the $75 would be $25 if the taxpayer were not a U.S. citizen.

　　- However, since the individual is a U. S. citizen, he is subject to U.S. tax on his worldwide income of $175. After excluding $75 under section 911, his taxable income is $100 and his U.S. tax is $40.

　　- Because he is a resident of Canada, he is also subject to Canadian tax on his world-wide income. Assume that Canada taxes the $175 at $75.

　　- Canada will credit against its tax of $75 the U.S. tax at source of $25, leaving a net Canadian tax of $50.

　　- The United States will credit against its tax of $40 the Canadian tax net of credit, but without reducing its source basis tax of $25; thus, the allowable credit is $40 - $25 = $15.

　　- To use a credit of $15 requires Canadian source taxable income of $37.50 ($37.50/$100 x $40 = $15). Without any special treaty rule, Canadian source taxable income would be only $25 ($100 less the section 911 exclusion of $75). Paragraph 6 provides for resourcing an additional $12.50 of income to Canada, so that the credit of $15 can be fully used.

　　Paragraph 5 provides special rules for the elimination of double taxation in the case of dividends, interest, and royalties earned by a U.S. citizen resident in Canada. These rules apply notwithstanding the provisions of paragraph 4, but only as long as the law in Canada allows a deduction in computing income for the portion of any foreign tax paid in respect of dividends, interest, or royalties which exceeds 15 percent of the amount of such items of income, and only with respect to those items of income. The rules of paragraph 4 apply with respect to other items of income; moreover, if the law in force in Canada regarding the deduction for foreign taxes changes, the provisions of paragraph 5 shall not apply and the U.S. foreign tax credit for Canadian taxes and the Canadian credit for U.S. taxes will be determined solely pursuant to the provisions of paragraph 4.

　　The calculations under paragraph 5 are as follows. First, the deduction allowed in Canada in computing income shall be made with respect to U.S. tax on the dividends, interest and royalties before any foreign tax credit by the United States with respect to income taxes paid or accrued to Canada. Second, Canada shall allow a deduction from (credit against) Canadian tax for U.S. tax paid or accrued with respect to the dividends, interest, royalties, but such credit need not exceed 15 percent of the gross amount of such items income that have been included in computed

income for Canadian tax purposes. (The credit may, however, exceed the amount of tax that the United States would be entitled to levy under the Convention upon a Canadian resident who is not a U.S. citizen.) Third, for purposes of computing the U.S. tax on such dividends, interest, and royalties, the United States shall allow as a credit against the U.S. tax the income tax paid or accrued to Canada after the 15 percent credit against Canadian tax for income tax paid or accrued to the United States. The United States is in no event obliged to give a credit for Canadian income tax which will reduce the U.S. tax below 15 percent of the amount of the dividends, interest, and royalties.

The rules of paragraph 5 are illustrated by the following examples.

*Example B*

- A U.S. citizen who is a resident of Canada has $100 of royalty income arising in the United States. The tentative U.S. tax before foreign tax credit is $40.
- Canada, under its law, allows a deduction for the U.S. tax in excess of 15 percent or, in this case, a deduction of $25 ($40 - $15). The Canadian taxable income is $75 and the Canadian tax on that amount is $35.
- Canada gives a credit of $15 (the maximum credit allowed is 15 percent of the gross royalty taken into Canadian income) and collects a net tax of $20.
- The United States allows a credit for the net Canadian tax against its tax in excess of 15 percent. Thus, the maximum credit is $25 ($40 - $15). But since the net Canadian tax paid was $20, the usable credit is $20.
- To be able to use a credit of $20 requires Canadian source taxable income of $50 (50% of the U.S. tentative tax of $40). Under paragraph 6, $50 of the U.S. royalty is resourced to be of Canadian source. The credit of $20 may then be offset against the U.S. tax of $40, leaving a net U.S. tax of $20.
- The combined tax paid to both countries is $40, $20 to Canada and $20 to the United States.

*Example C*

A U.S. citizen who is a resident of Canada receives $200 of income with respect to personal services performed within Canada and $100 of royalty income arising within the United States. Taxable income for U.S. purposes, taking into account the rules of Code section 911, is $220. U.S. tax (before foreign tax credits) is $92. The $100 of royalty income is deemed to bear U.S. tax (before foreign tax credits) of $41.82

$$\frac{(\$100 \times \$92)}{\$220}.$$

Under Canadian law, a deduction of $26.82 (the excess of $41.82 over 15 percent of the $100 royalty income) is allowed in computing income. The Canadian tax on $273.18 of income ($300 less the $26.82 deduction) is $130. Canada then gives a credit against the $130 for $15 (the U.S. tax paid or accrued with respect to the royalty, $41.82, but limited to 15 percent of the gross amount of such income, or $15), leaving a final Canadian tax of $115. Of the $115, $30.80 is

attributable to the royalty

(\$ 73.18 (\$100 royalty less \$26.82 deduction  x \$115.
($273.18 ($300 income less $26.82 deduction)

Of this amount, \$26.82 is creditable against U.S. tax pursuant to paragraph 5. (Although the U.S. allows a credit for the Canadian tax imposed on the royalty, \$30.80, the credit may not reduce the U.S. tax below 15 percent of the amount of the royalty. Thus, the maximum allowable credit is the excess of \$41.82, the U.S. tax imposed on the royalty income, over \$15, which is 15 percent of the \$100 royalty). The remaining \$3.98 (the Canadian tax of \$30.80 less the credit allowed of \$26.82) is a foreign tax credit carryover for U.S. purposes, subject to the limitations of paragraph 5. (An additional \$50.18 of Canadian tax with respect to Canadian source services income is creditable against U.S. tax pursuant to paragraphs 3 and 4(b). The \$50.18 is computed as follows: tentative U.S. tax (before foreign tax credits) is \$92; the U.S. tax on Canadian source services income is \$50.18 (\$92 less the U.S. tax on the royalty income of \$41.82); the limitation on the services income is

$120 (taxable income from services) x $92.
$220 (total taxable income)

or \$50.18. The credit for Canadian tax paid on the services income is therefore \$50.18; the remainder of the Canadian tax on the services income, or \$34.02, is a foreign tax credit carryover for U.S. purposes, subject to the limitations of paragraph 5).

Paragraph 6 is necessary to implement the objectives of paragraphs 4(b) and 5(c). Paragraph 6 provides that where a U.S. citizen is a resident of Canada, items of income referred to in paragraph 4 or 5 are deemed for the purposes of Article XXIV to arise in Canada to the extent necessary to avoid double taxation of income by Canada and the United States consistent with the objectives of paragraphs 4(b) and 5(c). Paragraph 6 can override the source rules of paragraph 3 to permit a limited resourcing of income. The principles of paragraph 6 have effect, pursuant to paragraph 3(b) of Article XXX (Entry Into Force), for taxable years beginning on or after January 1, 1976. See the discussion of Article XXX below.

The application of paragraph 6 is illustrated by the following example.

*Example D*

The facts are the same as in *Example C.* The United States has undertaken, pursuant to paragraph 5(c) and paragraph 6, to credit \$26.82 of Canadian taxes on royalty income that has a U.S. source under both paragraph 3 and the Internal Revenue Code. (As illustrated in *Example C,* the credit, however, only reduces the U.S. tax on the royalty income which exceeds 15 percent of the amount of such income included in computing U.S. taxable income.) Pursuant to paragraph 6, for purposes of determining the U.S. foreign tax credit limitation under the Convention with respect to Canadian taxes,

$ 64.13 (  A   x  $92 =  $26.82;  A = $64.13)
$220

of taxable income with respect to the royalties is deemed to arise in Canada.

Paragraph 7 provides that any reference to "income tax paid or accrued" to Canada or the United States includes Canadian tax or United States tax, as the case may be. The terms "Canadian tax" and "United States tax" are defined in paragraphs 1(c) and 1(d) of Article III (General Definitions). References to income taxes paid or accrued also include taxes of general application paid or accrued to a political subdivision or local authority of Canada or the United States which are not imposed by such political subdivision or local authority in a manner inconsistent with the provisions of the Convention and which are substantially similar to taxes of Canada or the United States referred to in paragraphs 2 and 3(a) of Article II (Taxes Covered).

In order for a tax imposed by a political subdivision or local authority to fall within the scope of paragraph 7, such tax must apply to individuals, companies, or other persons generally, and not only to a particular class of individuals or companies or a particular type of business. The tax must also be substantially similar to the national taxes referred to in paragraphs 2 and 3(a) of Article II. Finally, the political subdivision or local authority must apply its tax in a manner not inconsistent with the provisions of the Convention. For example, the political subdivision or local authority must not impose its tax on a resident of the other Contracting State earning business profits within the political subdivision or local authority but not having a permanent establishment there. It is understood that a Canadian provincial income tax that satisfied the conditions of paragraph 7 on September 26, 1980 also satisfied the conditions of that paragraph on June 14, 1983 - i.e., no significant changes have occurred in the taxes imposed by Canadian provinces.

Paragraph 8 relates to the provisions of Article XXIII (Capital). It provides that where a resident of a Contracting State owns capital which, in accordance with the provisions of Article XXIII, may be taxed in the other Contracting State, the State of residence shall allow as a deduction from (credit against) its tax on capital an amount equal to the capital tax paid in the other Contracting State. The deduction is not, however, to exceed that part of the capital tax, computed before the deduction, which is attributable to capital which may be taxed in the other State.

## ARTICLE XXV
### Non-discrimination

Paragraphs 1 and 2 of Article XXV protect individual citizens of a Contracting State from discrimination by the other Contracting State in taxation matters. Paragraph 1 provides that a citizen of a Contracting State who is a resident of the other Contacting State may not be subjected in that other State to any taxation or requirement connected with taxation which is other or more burdensome than the taxation and connected requirements imposed on similarly situated citizens of the other State.

Paragraph 2 assures protection in a case where a citizen of a Contracting State is not a resident of the other Contracting State. Such a citizen may not be subjected in the other State to any taxation or requirement connected to taxation which is other or more burdensome than the taxation and connected requirements to which similarly situated citizens of any third State are subjected. The reference to citizens of a third State "in the same circumstances" includes

consideration of the State of residence. Thus, pursuant to paragraph 2, the Canadian taxation with respect to a citizen of the United States resident in, for example, the United Kingdom may not be more burdensome than the taxation of a U.K. citizen resident in the United Kingdom. Any benefits available to the U.K. citizen by virtue of an income tax convention between the United Kingdom and Canada would be available to the U.S. citizen resident in the United Kingdom if he is otherwise in the same circumstances as the U.K. citizen.

Paragraph 3 assures that, in computing taxable income, an individual resident of a Contracting State will be entitled to the same deduction for dependents resident in the other Contracting State that would be allowed if the dependents were residents of the individual's State of residence. The term "dependent" is defined in accordance with the rules set forth in paragraph 2 of Article III (General Definitions). For U.S. tax purposes, paragraph 3 does not expand the benefits currently available to a resident of the United States with a dependent resident in Canada. See Code section 152(b)(3).

Paragraph 4 allows a resident of Canada (not a citizen of the United States) to file a joint return in cases where such person earns salary, wages, or other similar remuneration as an employee and such income is taxable in the United States under the Convention. Paragraph 4 does not apply where the resident of Canada earns wages which are exempt in the United States under Article XV (Dependent Personal Services) or earns only income taxable by the United States under provisions of the Convention other than Article XV.

The benefit provided by paragraph 4 is available regardless of the residence of the taxpayer's spouse. It is limited, however, by a formula designed to ensure that the benefit is available solely with respect to persons whose U.S. source income is entirely, or almost entirely, wage income. The formula limits the United States tax with respect to wage income to that portion of the total U.S. tax that would be payable for the taxable year if both the individual and his spouse were United States citizens as the individual's taxable income (determined without any of the benefits made available by paragraph 4, such as the standard deduction) bears to the total taxable income of the individual and his spouse. The term "total United States tax" used in the formula is total United States tax without regard to any foreign tax credits, as provided in subparagraph 4(a). (Foreign income taxes may, however, be claimed as deductions in computing taxable income, to the extent allowed by the Code.) In determining total taxable income of the individual and his spouse, the benefits made available by paragraph 4 are taken into account, but a deficit of the spouse is not.

The following example illustrates the application of paragraph 4.

A, a Canadian citizen and resident, is married to B who is also a Canadian citizen and resident. A earns $12,000 of wages taxable in the U.S. under Article XV (Dependent Personal Services) and $2,000 of wages taxable only in Canada. B earns $1,000 of U.S. source dividend income, taxed by the United States at 15 percent pursuant to Article X (Dividends). B also earns $2,000 of wages taxable only in Canada. A's taxable income for U.S. Pu poses, determined without regard to paragraph 4, is $11,700 ($12,000 - $2,000 (Code sections 151(b) and 873(b)(3)) + $1,700 (Code sections 63)). The U.S. tax (Code section 1(d)) with respect to such income is $2,084.50. The total U.S. tax payable by A and B if both were U.S. citizens and all their income

arose in the United States would be $2,013 under Code section 1(a) on taxable income of $14,800 ($17,000 - $200 (Code section 116) - $2,000 (Code section 151)). Pursuant to paragraph 4, the U.S. tax imposed on A's wages from U.S. sources is limited to B's U.S. tax liability with respect to the U.S. source dividends remains $150.

$1,591.36 ($11,700 x $2,013).
            $14,800

The provisions of paragraph 4 may be elected on a year-by-year basis They are purely computational and do not make either or both spouses residents of the United States for the purpose of other U.S. income tax conventions. The rules relating to the election provided by U.S. law under Code section 6013(g)(see section 1.6013-6 of the Treasury Regulations) do not apply to the election described in this paragraph.

Paragraph 5 protects against discrimination in a case where the capital of a company which is a resident of one Contracting State is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State. Such a company shall not be subjected in the State of which it is a resident to any taxation or requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which are subjected to other similar companies which are residents of that State but whose capital is wholly or partly owned or controlled, directly or indirectly, by one or more residents of a third State.

Paragraph 6 protects against discrimination in the case of a permanent establishment which a resident of one Contracting State has in the other Contracting State. The taxation of such a permanent establishment by the other Contracting State shall not be less favorable than the taxation of residents of that other State carrying on the same activities. The paragraph specifically overrides the provisions of Article XXIV (Elimination of Double Taxation), thus ensuring that permanent establishments will be entitled to relief from double taxation on a basis comparable to the relief, afforded to similarly situated residents. Paragraph 6 does not oblige a Contracting State to grant to a residents of the other Contracting State any personal allowances, reliefs, and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents. In addition, paragraph 6 does not require a Contracting State to grant to a company which is a resident of the other Contracting State the same tax relief that it grants to companies which are resident in the first-mentioned State with respect to intercorporate dividends. This provision is merely clarifying in nature, since neither the United States nor Canada would interpret paragraph 6 to provide for granting the same relief in the absence of a specific denial thereof. The principles of paragraph 6 would apply with respect to a fixed base as well as a permanent establishment. Paragraph 6 does not, however, override the provisions of Code section 906.

Paragraph 7 concerns the right of a resident of a Contracting State to claim deductions for purposes of computing taxable profits in the case of disbursements made to a resident of the other Contracting State. Such disbursements shall be deductible under the same conditions as if they had been made to a resident of the first-mentioned State. Thus, this paragraph does not require Canada to permit a deduction to a Canadian trust for disbursements made to a nonresident beneficiary out of income derived from a business in Canada or Canadian real property; granting

such a deduction would result in complete exemption by Canada of such income and would put Canadian trusts with nonresident beneficiaries in a better position than if they had resident beneficiaries. These provisions do not apply to amounts to which paragraph 1 of Article IX (Related Persons), paragraph 7 of Article XI (Interest), or paragraph 7 of Article XII (Royalties) apply. Paragraph 7 of Article XXV also provides that, for purposes of determining the taxable capital of a resident of a Contracting State, any debts of such person to a resident of the other Contracting State shall be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State. This portion of paragraph 7 relates to Article XXIII (Capital).

Paragraph 8 provides that, notwithstanding the provisions of paragraph 7, a Contracting State may enforce the provisions of its taxation laws relating to the deductibility of interest, in force on September 26, 1980, or as modified subsequent to that date in a manner that does not change the general nature of the provisions in force on September 26, 1980; or which are adopted after September 26, 1980, and are designed to ensure that nonresidents do not enjoy a more favorable tax treatment under the taxation laws of that State than that enjoyed by residents. Thus Canada may continue to limit the deductions for interest paid to certain nonresidents as provided in section 18(4) of Part 1 of the Income Tax Act.

Paragraph 9 provides that expenses incurred by citizens or residents of a Contracting State with respect to any Convention, including any seminar, meeting, congress, or other function of similar nature, held in the other Contracting State, are deductible for purposes of taxation in the first-mentioned State to the same extent that such expenses would be deductible if the convention were held in that first-mentioned State. Thus, for U.S. income tax purposes an individual who is a citizen or resident of the United States and who attends a convention held in Canada may claim deductions for expenses incurred in connection with such convention without regard to the provisions of Code section 274(h). Section 274(h) imposes special restrictions on the deductibility of expenses incurred in connection with foreign conventions. A claim for a deduction for such an expense remains subject, in all events, to the provisions of U.S. law with respect to the deductibility of convention expenses generally (e.g., Code sections 162 and 212). Similarly, in the case of a citizen or resident of Canada attending a convention in the United States, paragraph 9 requires Canada to allow a deduction for expenses relating to such convention as if the convention had taken place in Canada.

Paragraph 10 provides that, notwithstanding the provisions of Article II (Taxes Covered), the provisions of Article XXV apply in the case of Canada to all taxes imposed under the Income Tax Act; and, in the case of the United States, to all taxes imposed under the Code. Article XXV does not apply to taxes imposed by political subdivisions or local authorities of Canada or the United States.

Article XXV substantially broadens the protection against discrimination provided by the 1942 Convention, which contains only one provision dealing specifically with this subject. That provision, paragraph 11 of the Protocol to the 1942 Convention, states that citizens of one of the Contracting States residing within the other Contracting State are not to be subjected to the payment of more burdensome taxes than the citizens of the other State.

The benefits of Article XXV may affect the tax liability of a U.S. citizen or resident with respect to the United States. See paragraphs 2 and 3 of Article XXIX (Miscellaneous Rules).

## ARTICLE XXVI
### Mutual Agreement Procedure

Paragraph 1 provides that where a person considers that the actions of one or both of the Contracting States will result in taxation not in accordance with the Convention, he may present his case in writing to the competent authority of the Contracting State of which he is a resident or, if he is a resident of neither Contracting State, of which he is a national. Thus, a resident of Canada must present to the Minister of National Revenue (or his authorized representative) any claim that such resident is being subjected to taxation contrary to the Convention. A person who requests assistance from the competent authority may also avail himself of any remedies available under domestic laws.

Paragraph 2 provides that the competent authority of the Contracting State to which the case is presented shall endeavor to resolve the case by mutual agreement with the competent authority of the other Contracting State, unless he believes that the objection is not justified or he is able to arrive at a satisfactory unilateral solution. Any agreement reached between the competent authorities of Canada and the United States shall be implemented notwithstanding any time or other procedural limitations in the domestic laws of the Contracting States, except where the special mutual agreement provisions of Article IX (Related Persons) apply, provided that the competent authority of the Contracting State asked to waive its domestic time or procedural limitations has received written notification that such a case exists within six years from the end of the taxable year in the first-mentioned State to which the case relates. The notification may be given by the competent authority of the first-mentioned State, the taxpayer who has requested the competent authority to take action, or a person related to the taxpayer. Unlike Article IX, Article XXVI does not require the competent authority of a Contracting State to grant unilateral relief to avoid double taxation in a case where timely notification is not given to the competent authority of the other Contracting State. Such unilateral relief may, however, be granted by the competent authority in its discretion pursuant to the provisions of Article XXVI and in order to achieve the purposes of the Convention. In a case where the provisions of Article IX apply, the provisions of paragraphs 3, 4, and 5 of that Article are controlling with respect to adjustments and corresponding adjustments of income, loss, or tax and the effect of the Convention upon time or procedural limitations of domestic law. Thus, if the provisions of paragraph 2 of Article XXVI do not independently authorize such relief.

Paragraph 3 provides that the competent authorities of the Contacting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular, the competent authorities may agree to the same attribution of profits to a resident of a Contracting State and its permanent establishment in the other Contracting State; the same allocation of income, deductions, credits, or allowances between persons; the same determination of the source of income; the same characterization of particular items of income; a common meaning of any term used in the Convention; rules, guidelines, or procedures for the elimination of double taxation with respect to income distributed

by an estate or trust, or with respect to a partnership; or to increase any dollar amounts referred to in the Convention to reflect monetary or economic developments. The competent authorities may also consult and reach agreements on rules, guidelines, or procedures for the elimination of double taxation in cases not provided for in the Convention.

The list of subjects of potential mutual agreement in paragraph 3 is not exhaustive; it merely illustrates the principles set forth in the paragraph. As in the case of other U.S. tax conventions, agreement can be arrived at in the context of determining the tax liability of a specific person or in establishing rules, guidelines, and procedures that will apply generally under the Convention to resolve issues for classes of taxpayers. It is contemplated that paragraph 3 could be utilized by the competent authorities, for example, to resolve conflicts between the domestic laws of Canada and the United States with respect to the allocation and apportionment of deductions.

Paragraph 4 provides that each Contracting State will endeavor to collect on behalf of the other State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by the other State does not enure to the benefit of persons not entitled to such relief. Paragraph 4 does not oblige either Contracting State to carry out administrative measures of a different nature from those that would be used by Canada or the United States in the collection of its own tax or which would be contrary to its public policy.

Paragraph 5 confirms that the competent authorities of Canada and the United States may communicate with each other directly for the purpose of reaching agreement in the sense of paragraphs 1 through 4.

ARTICLE XXVII
Exchange of Information

Paragraph 1 authorizes the competent authorities to exchange the information necessary for carrying out the provisions of the Convention or the domestic laws of Canada and the United States concerning taxes covered by the Convention, insofar as the taxation under those domestic laws is not contrary to the Convention. The authority to exchange information granted by paragraph 1 is not restricted by Article I (Personal Scope), and thus need not relate solely to persons otherwise covered by the Convention. It is contemplated that Article XXVII will be utilized by the competent authorities to exchange information upon request, routinely, and spontaneously.

Any information received by a Contracting State pursuant to the Convention is to be treated as secret in the same manner as information is obtained under the taxation laws of that State. Such information shall be disclosed only to persons or authorities, including courts and administrative bodies, involved in the assessment or collection of, the administration and enforcement in respect of, or the determination of appeals in relation to, the taxes covered by the Convention and the information may be used by such persons only for such purposes. (In accordance with paragraph 4, for the purposes of this Article the Convention applies to a broader range of taxes than those covered specifically by Article II (Taxes Covered).

In specific cases a competent authority providing information may, pursuant to paragraph 3, impose such other conditions on the use of information as are necessary. Although the information received by persons described in paragraph 1 is to be treated as secret, it may be disclosed by such persons in public court proceedings or in judicial decisions.

The provisions of paragraph 1 authorize the U.S. competent authority to continue to allow the General Accounting Office to examine tax return information received from Canada when GAO is engaged in a study of the administration of U.S. tax laws pursuant to a directive of Congress. However, the secrecy requirements of paragraph 1 must be met.

If a Contracting State requests information in accordance with Article XXVII, the other Contracting State, shall endeavor, pursuant to paragraph 2, to obtain the information to which the request relates in the same manner as if its own taxation were involved, notwithstanding the fact that such States does not need the information. In addition, the competent authority requested to obtain information shall endeavor to provide the information in the particular form requested, such as depositions of witnesses and copies of unedited original documents, to the same extent such depositions and documents can be obtained under the laws or administrative practices of that State with respect to its own taxes.

Paragraph 3 provides that the provisions of paragraphs 1 and 2 do not impose on Canada or the United States the obligation to carry out administrative measures at variance with the laws and administrative practice of either State; to supply information which is not obtainable under the laws or in the normal course of the administration of either State; or to supply information which would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information the disclosure of which would be contrary to public policy. Thus, Article XXVII allows, but does not obligate, the United States and Canada to obtain and provide information that would not be available to the requesting State under its laws or administrative practice or that in different circumstances would not be available to the State requested to provide the information. Further, Article XXVII allows a Contracting State to obtain information for the other Contracting State even if there is no tax liability in the State requested to obtain the information. Thus, the United States will continue to be able to give Canada tax information even if there is no U.S. tax liability at issue.

Paragraph 4 provides that, for the purposes of Article XXVII, the Convention applies, in the case of Canada, to all taxes imposed by the Government of Canada on estates and gifts and under the Income Tax Act and, in the case of the United States, to all taxes imposed under the Internal Revenue Code. Article XXVII does not apply to taxes imposed by political subdivisions or local authorities of the Contracting States. Paragraph 4 is designed to ensure that information exchange will extend to most national level taxes on both sides, and specifically to information gathered for purposes of Canada's taxes on estates and gifts (not effective for deaths or gifts after 1971). This provision is intended to mesh with paragraph 8 of Article XXX (Entry Into Force), which terminates the existing estate tax convention between the United States and Canada.

ARTICLE XXVIII

Appx270

<u>Diplomatic Agents and Consular Officers</u>

Article XXVIII states that nothing in the Convention affects the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements. However, various provisions of the Convention could apply to such persons, such as those concerning exchange of information, mutual agreement, and non-discrimination.

ARTICLE XXIX
<u>Miscellaneous Rules</u>

Paragraph 1 states that the provisions of the Convention do not restrict in any manner any exclusion, exemption, deduction, credit, or other allowance accorded by the laws of a Contracting State in the determination of the tax imposed by that State. Thus, if a deduction would be allowed for an item in computing the taxable income of a Canadian resident under the Code, such deduction is available to such person in computing taxable income under the Convention. Paragraph 1 does not, however, authorize a taxpayer to make inconsistent choices between rules of the Code and rules of the Convention. For example, if a resident of Canada desires to claim the benefits of the "attributable to" rule of paragraphs 1 and 7 of Article VII (Business Profits) with respect to the taxation of business profits of a permanent establishment, such person must use the "attributable to" concept consistently for all items of income and deductions and may not rely upon the "effectively connected" rules of the Code to avoid U.S. tax on other items of attributable income. In no event are the rules of the Convention to increase overall U.S. tax liability from what liability would be if there were no convention.

Paragraph 2 provides a "saving clause" pursuant to which Canada and the United States may each tax its residents, as determined under Article IV (Residence), and the United States may tax its citizens (including any former citizen whose loss of citizenship had as one of its principal purposes the avoidance of tax, but only for a period of 10 years following such loss) and companies electing under Code section 1504(d) to be treated as domestic corporations, as if there were no convention between the United States and Canada with respect to taxes on income and capital.

Paragraph 3 provides that, notwithstanding paragraph 2, the United States and Canada must respect certain specified provisions of the Convention in regard to residents, citizens, and section 1504(d) companies. Paragraph 3(a) lists certain paragraphs and Articles of the Convention that represent exceptions to the "saving clause" in all situations; paragraph 3(b) provides a limited further exception for students who have not acquired immigrant status in the State where they are temporarily present.

Paragraph 4 provides relief with respect to social security taxes imposed on employers, employees, and self-employed persons under Code sections 1401, 3101, and 3111. Income from personal services not subject to tax by the United States under the provisions of this Convention or the 1942 Convention is not to be considered wages or net earnings from self-employment for purposes of the U.S. social security taxes with respect to taxable years of the taxpayer not barred

by the statute of limitations relating to refunds (under the Code) ending on or before December 31 of the year before the year in which the Social Security Agreement between Canada and the United States (signed in Ottawa on March 11, 1981) enters into force. Thus, if that agreement enters into force in 1986, a resident of Canada earning income from personal services and such person's employer may apply for refunds of the employee's and employer's shares of U.S. social security tax paid attributable to the employee's income from personal services that is exempt from U.S. tax by virtue of this Convention or the 1942 Convention. In this example, the refunds would be available for social security taxes paid with respect to taxable years not barred by the statute of limitations of the Code ending on or before December 31, 1985. For purposes of Code section 6611, the date of overpayment with respect to refunds of U.S. tax pursuant to paragraph 4 is the later of the date on which the Social Security Agreement between Canada and the United States enters into force and the date on which instruments of ratification of the Convention are exchanged.

Under certain limited circumstances, an employee may, pursuant to paragraph 5 of Article XXX (Entry Into Force), claim an exemption from U.S. tax on wages under the 1942 Convention for one year after the Convention comes into force. The provisions of paragraph 4 would not, however, provide an exemption from U.S. social security taxes for such year.

Paragraph 4 does not modify existing U.S. statutes concerning social security benefits or funding. The Social Security Act requires the general funds of the Treasury to reimburse the social security trust funds on the basis of the records of wages and self-employment income maintained by the Social Security Administration. The Convention does not alter those records. Thus, any refunds of tax made pursuant to paragraph 4 would not affect claims for U.S. quarters of coverage with respect to social security benefits. And such refunds would be charged to general revenue funds, not social security trust funds.

Paragraph 5 provides a method to resolve conflicts between the Canadian and U.S. treatment of individual retirement accounts. Certain Canadian retirement plans which are qualified plans for Canadian tax purposes do not meet Code requirements for qualification. As a result, the earnings of such a plan are currently included in income, for U.S. tax purposes, rather than being deferred until actual distributions are made by the plan. Canada defers current taxes on the earnings of such a plan but imposes tax on actual distributions from the plan. Paragraph 5 is designed to avoid a mismatch of U.S. taxable income and foreign tax credits attributable to the Canadian tax on such distributions. Under the paragraph a beneficiary of a Canadian registered retirement savings plan may elect to defer U.S. taxation with respect to any income accrued in the plan but not distributed by the plan, until such time as a distribution is made from the plan or any substitute plan. The election is to be made under rules established by the competent authority of the United States. The election is not available with respect to income accrued in the plan which is reasonably attributable to contributions made to the plan by the beneficiary while he was not a Canadian resident.

Paragraph 6 provides rules denying the benefits of the Convention in certain situations where both countries believed that granting benefits would be inappropriate. Paragraph 6(a) provides that Articles VI (Income from Real Property) through XXIV (Elimination of Double Taxation) shall not apply to profits, income or gains derived by a trust which is treated as the

income of a resident of a Contracting State (see paragraph 1 of Article IV (Residence)), if a principal purpose of the establishment, acquisition or maintenance of the trust was to obtain a benefit under the Convention or the 1942 Convention for persons who are not residents of that State. For example, the provision could be applied to a case where a nonresident of the United States created a United States trust to derive dividend income from Canada and a principal purpose of the establishment or maintenance of the trust was to obtain the reduced rate of Canadian tax under Article X (Dividends) for the nonresident. Paragraph 6(b) provides that Articles VI through XXIV shall not apply to Canadian nonresident owned investment companies, as defined in section 133 of the Income Tax Act, or under a similar provision that is subsequently enacted. This provision operates to deny the benefits of the Convention to a Canadian nonresident owned investment company, and does not effect the grant of benefits to other persons. Thus, for example, a dividend paid by such a company to a shareholder who is a U.S. resident is subject to the reduced rates of tax provided by Article X. The denial of the benefits of Articles VI through XXIV in such cases applies notwithstanding any other provision of the Convention. A Canadian nonresident owned investment company may, however, be entitled to claim the benefits of the 1942 Convention for an additional one-year period, pursuant to paragraph 5 of Article XXX (Entry Into Force). Where the provisions of this paragraph apply, the Contracting State in which the income arises may tax such income under its domestic law.

Paragraph 7 provides rules for the U.S. taxation of Canadian social security benefits paid to a resident of Canada who is a U.S. citizen. These rules are described in the discussion of paragraph 5 of Article XVIII (Pensions and Annuities).

ARTICLE XXX
Entry into Force

Paragraph 1 provides that the Convention is subject to ratification in accordance with the procedures of Canada and the United States. The exchange of instruments of ratification is to take place at Ottawa as soon as possible.

Paragraph 2 provides, subject to paragraph 3, that the Convention shall enter into force upon the exchange of instruments of ratification. It has effect, with respect to source State taxation of dividends, interest, royalties, pensions, annuities, alimony, and child support, for amounts paid or credited on or after the first day of the second calendar month after the date on which the instruments of ratification are exchanged. For other taxes, the Convention takes effect for taxable years beginning on or after January 1 next following the date when instrument of ratification are exchanged. In the case of relief from United States social security taxes provided by paragraph 4 of Article XXIX (Miscellaneous Rules), the Convention also has effect for taxable year before the date on which instrument of ratification are exchanged.

Paragraph 3 provides special effective date rules for foreign tax credit computations with respect to tax paid or accrued to Canada. Paragraph 3(a) provides that the tax on 1971 undistributed income on hand imposed by Part IX of the Income Tax Act of Canada is considered to be an "income tax" for distribution made on or after January 1, 1972 and before January 1, 1979. Any such tax which is paid or accrued under U.S. standards is considered be imposed at the

time of distribution and on the recipient of the distribution, in the proportion that the distribution out of undistributed income with respect to which the tax has been paid bears to 85 percent of undistributed income. A person claiming a credit for tax pursuant to paragraph 3(a) is obligated to compute the amount of the credit in accordance with that paragraph.

Paragraph 3(b) provides that the principles of paragraph 6 of Article XXIV (Elimination of Double Taxation), which provides for resourcing of certain dividend, interest, and royalty income to eliminate double taxation of U.S. citizens residing in Canada, have effect for taxable years beginning on or after January 1, 1976. The paragraph is intended to grant the competent authorities sufficient flexibility to address certain practical problems that have arisen under the 1942 Convention. It is anticipated that the competent authorities will be guided by paragraphs 4 and 5 of Article XXIV in applying paragraph 3(b) of Article XXX. Paragraph 3(c) provides that the provisions of paragraph 1 of Article XXIV (and the source rules of that Article) shall have effect for taxable years beginning on or after January 1,1981.

Any claim for refund based on the provisions of paragraph 3 may be filed on or before June 30 of the calendar year following the year in which instruments of ratification are exchanged, notwithstanding statutes of limitations or other rules of domestic law to the contrary. For purposes of Code section 6611, the date of overpayment is the date on which instruments of ratification are exchanged, with respect to any refunds of U.S. tax pursuant to paragraph 3.

Paragraph 4 provides that, subject to paragraph 5, the 1942 Convention ceases to have effect for taxes for which the Convention has effect under the provisions of paragraph 2. For example, if under paragraph 2 the Convention were to have effect with respect to taxes withheld at source on dividends paid as of October 1, 1984, the 1942 Convention will not have effect with respect to such taxes.

Paragraph 5 modifies the rule of paragraph 4 to allow all of the provisions of the 1942 Convention to continue to have effect for the period through the first taxable year with respect to which the provisions of the Convention would otherwise have effect under paragraph 2(b), if greater relief from tax is available under the 1942 Convention than under the Convention. Paragraph 5 applies to all provisions of the 1942 Convention, not just those provisions of the convention for which the Convention takes effect under paragraph 2(b) of this Article. Thus, for example, assume that the Convention has effect, pursuant to paragraph 2(b), for taxable years of a taxpayer beginning on or after January 1, 1985. Further assume that a U.S. resident with a taxable year beginning on April 1 and ending on March 31 receives natural resource royalties from Canada which are subject to a 25% tax under Article VI (Income from Real Property) of the Convention, as amended by the Protocol, and Canada's internal law, but which would be subject to a 15% tax under Article XI of the 1942 Convention. Pursuant to paragraph 5, the greater benefits of the 1942 Convention would continue to apply to royalties paid or credited to the U.S. resident through March 31, 1986.

Paragraph 6 provides that the 1942 Convention terminates on the last of the dates on which it has effect in accordance with the provisions of paragraphs 4 and 5.

Paragraph 7 terminates the Exchange of Notes between the United States and Canada of

August 2 and September 17, 1928 providing for relief from double taxation of shipping profits. The provisions of the Exchange of Notes no longer have effect for taxable years beginning on or after January 1 following the exchange of instruments of ratification of the Convention. The 1942 Convention, in Article V, had suspended the effectiveness of the Exchange of Notes.

Paragraph 8 terminates the Convention between Canada and the United States for the Avoidance of Double Taxation with Respect to Taxes on the Estates of Deceased Persons signed on February 17, 1961. The provisions of that Convention cease to have effect with respect to estates of persons deceased on or after January 1 of the year following the exchange of instruments of ratification of the Convention.

ARTICLE XXXI
Termination

Paragraph 1 provides that the Convention shall remain in force until terminated by Canada or the United States.

Paragraph 2 provides that either Canada or the United States may terminate the Convention at any time after 5 years from the date on which instruments of ratification are exchanged, provided that notice of termination is given through diplomatic channels at least 6 months prior to the date on which the Convention is to terminate.

Paragraph 3 provides a special termination rule in situations where Canada or the United States changes its taxation laws and the other Contracting State believes that such change is significant enough to warrant modification of the Convention. In such a circumstance, the Canadian Ministry of Finance and the United States Department of the Treasury would consult with a view to resolving the matter. If the matter cannot be satisfactorily resolved, the Contracting State requesting an accommodation because of the change in the other Contracting State's taxation laws may terminate the Convention by giving the 6 months' prior notice required by paragraph 2, without regard to whether the Convention has been in force for 5 years.

Paragraph 4 provides that, in the event of termination, the Convention ceases to have effect for tax withheld at source under Articles X (Dividends), XI (Interest), XII (Royalties), and XVIII (Pensions and Annuities), and under paragraph 2 of Article XXII (Other Income), with respect to amounts paid or credited on or after the first day of January following the expiration of the 6 month period referred to in paragraph 2. In the case of other taxes, the Convention shall cease to have effect in the event of termination with respect to taxable years beginning on or after January 1 following the expiration of the 6 month period referred to in paragraph 2.

PROTOCOL 3

Treasury Department Technical Explanation of the Protocol Amending the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980, as Amended by the Protocols

Signed on June 14, 1983 and March 28, 1984

The Protocol, signed at Washington on March 17, 1995 (the "Protocol"), amends the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital, signed at Washington on September 26, 1980, as amended by the Protocols signed on June 14, 1983 and March 28, 1984 (collectively referred to as the "Convention"). This technical explanation is an official guide to the Protocol. It explains policies behind particular provisions, as well as understandings reached during the negotiations with respect to the interpretation and application of the Protocol. The technical explanation is not intended to provide a complete comparison between the Protocol and the Articles of the Convention that it amends. To the extent that the Convention has not been amended by the Protocol, the Technical Explanation of the Convention remains the official explanation. References to "he" or "his" should be read to mean "he" or "she" or "his" or "her."

## ARTICLE 1

Article 1 of the Protocol amends Article II (Taxes Covered) of the Convention. Article II identifies the taxes to which the Convention applies. Paragraph 1 of Article 1 replaces paragraphs 2 through 4 of Article II of the Convention with new paragraphs 2 and 3. For each Contracting State, new paragraph 2 of Article II specifies the taxes existing on the date of signature of the Protocol to which the Convention applies. New paragraph 3 provides that the Convention will also apply to taxes identical or substantially similar to those specified in paragraph 2, and to any new capital taxes, that are imposed after the date of signature of the Protocol.

New paragraph 2(a) of Article II describes the Canadian taxes covered by the Convention. As amended by the Protocol, the Convention will apply to all taxes imposed by the Government of Canada under the Income Tax Act.

New paragraph 2(b) of Article II amends the provisions identifying the U.S. taxes covered by the Convention in several respects. The Protocol incorporates into paragraph 2(b) the special rules found in paragraph 4 of Article II of the present Convention. New paragraph 2(b)(iii) conforms the rule previously found in paragraph 4(c) of Article II to the amended provisions of Article XXIV (Elimination of Double Taxation), under which Canada has agreed to grant a foreign tax credit for U.S. social security taxes. In addition, the Protocol adds a fourth special rule to reflect the addition to the Convention of new Article XXIX B (Taxes Imposed by Reason of Death) and related provisions in new paragraph 3(g) of Article XXVI (Mutual Agreement Procedure).

Article 1 of the Protocol also makes minor clarifying, nonsubstantive amendments to paragraphs 2 and 3 of the Article.

## ARTICLE 2

This Article of the Protocol amends paragraphs 1(c) and 1(d) of Article III (General

**Appx276**

Definitions) of the Convention. These paragraphs define the terms "Canadian tax" and "United States tax," respectively. The present Convention defines "Canadian tax" to mean the Canadian taxes specified in paragraph 2(a) or 3(a) of Article II (Taxes Covered), i.e., Canadian income taxes. It similarly defines the term "United States tax" to mean the U.S. taxes specified in paragraph 2(b) or 3(a) of Article II, i.e., U.S. income taxes.

As amended by the Protocol, paragraph 2(a) of Article II of the Convention covers all taxes imposed by Canada under its Income Tax Act, including certain taxes that are not *income* taxes. As explained below, paragraph 2(b) is similarly amended by the Protocol to include certain U.S. taxes that are not *income* taxes. It was, therefore, necessary to amend the terms "Canadian tax" and "United States tax" so that they would continue to refer exclusively to the *income* taxes imposed by each Contracting State. The amendment to the definition of the term "Canadian tax" ensures, for example, that the Protocol will not obligate the United States to give a foreign tax credit under Article XXIV (Elimination of Double Taxation) for covered taxes other than income taxes.

The definition of "United States tax," as amended, excludes certain United States taxes that are covered in Article II only for certain limited purposes under the Convention. These include the accumulated earnings tax, the personal holding company tax, foundation excise taxes, social security taxes, and estate taxes. To the extent that these are to be creditable taxes in Canada, that fact is specified elsewhere in the Convention. A Canadian income tax credit for U.S. social security taxes is provided in new paragraph 2(a)(ii) of Article XXIV (Elimination of Double Taxation). A Canadian income tax credit for the U.S. estate taxes is provided in paragraph 6 of new Article XXIX B (Taxes Imposed by Reason of Death).

ARTICLE 3

Article 3 of the Protocol amends Article IV (Residence) of the Convention. It clarifies the meaning of the term "resident" in certain cases and adds a special rule, found in a number of recent U.S. treaties, for determining the residence of U.S. citizens and "green card" holders.

The first sentence of paragraph 1 of Article IV sets forth the general criteria for determining residence under the Convention. It is amended by the Protocol to state explicitly that a person will be considered a resident of a Contracting State for purposes of the Convention if he is liable to tax in that Contracting State by reason of citizenship. Although the sentence applies to both Contracting States, only the United States taxes its nonresident citizens in the same manner as its residents. Aliens admitted to the United States for permanent residence ("green card" holders) continue to qualify as U.S. residents under the first sentence of paragraph 1, because they are taxed by the United States as residents, regardless of where they physically reside.

U.S. citizens and green card holders who reside outside the United States, however, may have relatively little personal or economic nexus with the United States. The Protocol adds a second sentence to paragraph 1 that acknowledges this fact by limiting the circumstances under which such persons are to be treated, for purposes of the Convention, as U.S. residents.

Under that sentence, a U.S. citizen or green card holder will be treated as a resident of the United States for purposes of the Convention, and, thereby, be entitled to treaty benefits, only if

(1) the individual has a substantial presence, permanent home, or habitual abode in the United States, and

(2) the individual's personal and economic relations with the United States are closer than those with any third country.

If, however, such an individual is a resident of both the United States and Canada under the first sentence of the paragraph, his residence for purposes of the Convention is determined instead under the "tie-breaker" rules of paragraph 2 of the Article.

The fact that a U.S. citizen who does not have close ties to the United States may not be treated as a U.S. resident under Article IV of the Convention does not alter the application of the saving clause of paragraph 2 of Article XXIX (Miscellaneous Rules) to that citizen. However, like any other individual that is a resident alien under U.S. law, a green card holder is treated as a resident of the United States for purposes of the saving clause only if he qualifies as such under Article IV.

New paragraph 1(a) confirms that the term "resident" of a Contracting State includes the Government of that State or a political subdivision or local authority of that State, as well as any agency or instrumentality of one of these governmental entities. This is implicit in the current Convention and in other U.S. and Canadian treaties, even where not specified.

New paragraph 1 also clarifies, in subparagraph (b), that trusts, organizations, or other arrangements operated exclusively to provide retirement or employee benefits, and other not-for-profit organizations, such as organizations described in section 501(c) of the Internal Revenue Code, are residents of a Contracting State if they are constituted in that State and are generally exempt from income taxation in that State by reason of their nature as described above. This change clarifies that the specified entities are to be treated as residents of one of the Contracting States. This corresponds to the interpretation that had previously been adopted by the Contracting States. Such entities, therefore, will be entitled to the benefits of the Convention with respect to the other Contracting State, provided that they satisfy the requirements of new Article XXIX A (Limitation on Benefits) (discussed below).

Article 3 of the Protocol adds a sentence to paragraph 3 of Article IV of the current Convention to address the residence of certain dual resident corporations. Certain jurisdictions allow local incorporation of an entity that is already organized and incorporated under the laws of another country. Under Canadian law, such an entity is referred to as having been "continued" into the other country. Although the Protocol uses the Canadian term, the provision operates reciprocally. The new sentence states that such a corporation will be considered a resident of the State into which it is continued. Paragraph 5 of Article 21 of the Protocol governs the effective date of this provision.

ARTICLE 4

Appx278

Article 4 of the Protocol amends paragraphs 3 and 4 of Article IX (Related Persons) of the Convention. Paragraph 1 of Article IX authorizes a Contracting State to adjust the amount of income, loss, or tax payable by a person with respect to arrangements between that person and a related person in the other Contracting State, when such arrangements differ from those that would obtain between unrelated persons. Under the present Convention, if an adjustment is made or to be made by a Contracting State under paragraph 1, paragraph 3 obligates the other Contracting State to make a corresponding adjustment if two conditions are satisfied:

(1) the other Contracting State agrees with the adjustment made or to be made by the first Contracting State, and

(2) the competent authority of the other Contracting State has received notice of the first adjustment within six years of the end of the taxable year to which that adjustment relates.

If notice is not given within the six-year period, and if the person to whom the first adjustment relates is not notified of the adjustment at least six months prior to the end of the six-year period, paragraph 4 of Article IX of the present Convention requires that the first Contracting State withdraw its adjustment, to the extent necessary to avoid double taxation.

Article 4 of the Protocol amends paragraphs 3 and 4 of Article IX to prevent taxpayers from using the notification requirements of the present Convention to avoid adjustments. Paragraph 4, as amended, eliminates the requirement that a Contracting State withdraw an adjustment if the notification requirement of paragraph 3 has not been met. Paragraph 4 is also amended to delete the requirement that the taxpayer be notified at least six months before expiration of the six-year period specified in paragraph 3.

As amended by the Protocol, Article IX also explicitly authorizes the competent authorities to relieve double taxation in appropriate cases, even if the notification requirement is not satisfied. Paragraph 3 confirms that the competent authorities may agree to a corresponding adjustment if such an adjustment is not otherwise barred by time or procedural limitations such as the statute of limitations. Paragraph 4 provides that the competent authority of the State making the initial adjustment may grant unilateral relief from double taxation in other cases, although such relief is not obligatory.

ARTICLE 5

Article 5 of the Protocol amends Article X (Dividends) of the Convention, paragraph 1 of Article 5 amends paragraph 2(a) of Article X to reduce from 10 percent 5 percent the maximum rate of tax that may be imposed by a Contracting State on the gross amount of dividends beneficially owned by a company resident in the other Contracting State that owns at least 10 percent of the voting stock of the company paying the dividends. The rate at which the branch profits tax may be imposed under paragraph 6 is also reduced by paragraph 1 of Article 5 from 10 percent to 5 percent. Under the entry-into-force provisions of Article 21 of the Protocol, these reductions will be phased in over a three-year period.

Paragraph 2 of Article 5 of the Protocol replaces paragraph 7 of Article X of the Convention with a new paragraph 7. Paragraph 7 of the existing Convention is no longer relevant

because it applies only in the case where a Contracting State does not impose a branch profits tax. Both Contracting States now do impose such a tax.

New paragraph 7 makes the 5 percent withholding rate of new paragraph 2(a) inapplicable in certain situations. Under new paragraph 7(b), dividends paid by U.S. regulated investment companies (RICs) are denied the 5 percent withholding rate even if the Canadian shareholder is a corporation that would otherwise qualify as a direct investor by satisfying the 10-percent ownership requirement. Consequently, all RIC dividends to Canadian beneficial owners are subjected to the 15 percent rate that applies to dividends paid to portfolio investors.

Dividends paid by U.S. real estate investment trusts (REITs) to Canadian beneficial owners are also denied the 5 percent rate under the rules of paragraph 7(c). REIT dividends paid to individuals who own less than a 10 percent interest in the REIT are subject to withholding at a maximum rate of 15 percent. Paragraph 7(c) also provides that dividend distributions by a REIT to an estate or a testamentary trust acquiring the interest in the REIT as a consequence of the death of an individual will be treated as distributions to an individual, for the five-year period following the death. Thus, dividends paid to an estate or testamentary trust in respect of a holding of less than a 10 percent interest in the REIT also will be entitled to the 15 percent rate of withholding, but only for up to five years after the death. REIT dividends paid to other Canadian beneficial owners are subject to the rate of withholding tax that applies under the domestic law of the United States (i.e., 30 percent).

The denial of the 5 percent withholding rate at source to all RIC and REIT shareholders, and the denial of the 15 percent rate to most shareholders of REITs, is intended to prevent the use of these nontaxable conduit entities to gain unjustifiable benefits for certain shareholders. For example, a Canadian corporation that wishes to hold a portfolio of U.S. corporate shares may hold the portfolio directly and pay a U.S. withholding tax of 15 percent on all of the dividends that it receives. Alternatively, it may place the portfolio of U.S. stocks in a RIC, in which the Canadian corporation owns more than 10 percent of the shares, but in which there are enough small shareholders to satisfy the RIC diversified ownership requirements. Since the RIC is a pure conduit, there are no U.S. tax costs to the Canadian corporation of interposing the RIC as an intermediary in the chain of ownership. It is unlikely that a 10 percent shareholding in a RIC will constitute a 10 percent share holding in any company from which the dividends originate. In the absence of the special rules in paragraph 7(b), however, interposition of a RIC would transform what should be portfolio dividends into direct investment dividends taxable at source by the United States only at 5 percent. The special rules of paragraph 7 prevent this.

Similarly, a resident of Canada may hold U.S. real property directly and pay U.S. tax either at a 30 percent rate on the gross income or at the income tax rates specified in the Internal Revenue Code on the net income. By placing the real estate holding in a REIT, the Canadian investor could transform real estate income into dividend income and thus transform high-taxed income into much lower-taxed income. In the absence of the special rule, if the REIT shareholder were a Canadian corporation that owned at least a 10 percent interest in the REIT, the withholding rate would be 5 percent; in all other cases, it would be 15 percent. In either event, with one exception, a tax rate of 30 percent or more would be significantly reduced. The exception is the relatively small individual Canadian investor who might be subject to U.S. tax at a rate of only 15

percent on the net income even if he earned the real estate income directly. Under the rule in paragraph 7(c), such individuals, defined as those holding less than a 10 percent interest in the REIT, remain taxable at source at a 15 percent rate.

Subparagraph (a) of paragraph 7 provides a special rule for certain dividends paid by Canadian non-resident-owned investment corporations ("NROs"). The subparagraph provides for a maximum rate of 10 percent (instead of the standard rate of 5 percent) for dividends paid by NROs that are Canadian residents to a U.S. company that owns 10 percent or more of the voting stock of the NRO and that is the beneficial owner of the dividend. This rule maintains the rate available under the current Convention for dividends from NROs. Canada wanted the withholding rate for direct investment NRO dividends to be no lower than the maximum withholding rates under the Convention on interest and royalties, to make sure that a foreign investor cannot transform interest or royalty income subject to a 10 percent withholding tax into direct dividends qualifying for a 5 percent withholding tax by passing it through to an NRO.

ARTICLE 6

Article 6 of the Protocol amends Article XI (Interest) of the Convention. Paragraph 1 of the Article reduces the general maximum withholding rate on interest under paragraph 2 of Article XI from 15 percent to 10 percent.

Paragraph 3 of Article XI of the Convention provides that, notwithstanding the general withholding rate applicable to interest payments under paragraph 2, certain specified categories of interest are exempt from withholding at source. Paragraph 2 of Article 6 of the Protocol amends paragraph 3(d) of the Convention, which deals with interest paid on indebtedness arising in connection with a sale on credit of equipment, merchandise, or services. The exemption provided by that paragraph in the Convention is broadened under the Protocol to apply to interest that is beneficially owned either by the seller in the underlying transaction, as under the present Convention, or by any beneficial owner of interest paid with respect to an indebtedness arising as a result of the sale on credit of equipment, merchandise, or services. This exemption, however, does not apply in cases where the purchaser is related to the seller or the debtor is related to the beneficial owner of the interest. The negotiators agreed that this exemption is subject, as are the other provisions of the Convention, to any anti-avoidance rules applicable under the respective domestic law of the Contracting States.

The reference to "related persons" in paragraph 3(d) of Article XI of the Convention, as amended, is a change from the present Convention, which refers to "persons dealing at arm's length." The term "related person" as used in this Article is not defined for purposes of the Convention. Accordingly, the meaning of the term, and, therefore, the application of this Article, will be governed by the domestic law of each Contracting State (as is true with the use of the term "arm's length" under the current Convention) under the interpretative rule of paragraph 2 of Article III (General Definitions). The United States will define the term "related person" as under section 482 of the Internal Revenue Code, to include organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests. The Canadian definition of

"related persons" is found in section 251 of the Income Tax Act.

Paragraph 3 of Article 6 of the Protocol adds a new paragraph 9 to Article XI of the Convention. Although the definition of "interest" in paragraph 4 includes an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit (REMIC) described in section 86OG of the Internal Revenue Code, new paragraph 9 provides that the reduced rates of tax at source for interest provided for in paragraphs 2 and 3 do not apply to such income. This class of interest, therefore, remains subject to the statutory 30 percent U.S. rate of tax at source. The legislation that created REMICs in 1986 provided that such excess inclusions were to be taxed at the full 30 percent statutory rate, regardless of any then-existing treaty provisions to the contrary. The 30 percent rate of tax on excess inclusions received by residents of Canada is consistent with this expression of Congressional intent.

## ARTICLE 7

Article 7 of the Protocol modifies Article XII (Royalties) of the Convention by expanding the classes of royalties exempt from withholding of tax at source. Paragraph 3, as amended by the Protocol, identifies four classes of royalty payments arising in one Contracting State and beneficially owned by a resident of the other that are exempt at source:

(1) subparagraph (a) preserves the exemption in paragraph 3 of the present Convention for copyright royalties in respect of literary and other works, other than certain such payments in respect of motion pictures, videotapes, and similar payments;

(2) subparagraph (b) specifies that computer software royalties are also exempt;

(3) subparagraph (c) adds royalties paid for the use of, or the right to use, patents and information concerning industrial, commercial, and scientific experience, other than payments in connection with rental or franchise agreements; and

(4) subparagraph (d) allows the Contracting States to reach an agreement, through an exchange of diplomatic notes, with respect to the application of paragraph 3 of Article XII to payments in respect of certain live broadcasting transmissions.

The specific reference to software in subparagraph (b) is not intended to suggest that the United States views the term "copyright" as excluding software in other U.S. treaties (including the current treaty with Canada).

The negotiators agreed that royalties paid for the use of, or the right to use, designs or models, plans, secret formulas, or processes are included under subparagraph 3(c) to the extent that they represent payments for the use of, or the right to use, information concerning industrial, commercial, or scientific experience. In addition, they agreed that royalties paid for the use of, or the right to use, "know-how," as defined in paragraph 11 of the Commentary on Article 12 of the OECD Model Income Tax Treaty, constitute payments for the use of, or the right to use, information concerning industrial, commercial, or scientific experience. The negotiators further agreed that a royalty paid under a "mixed contract," "package fee," or similar arrangement will be treated as exempt at source by virtue of paragraph 3 to the extent of any portion that is paid for the use of, or the right to use, property or information with respect to which paragraph 3 grants an exemption.

The exemption granted under subparagraph 3(c) does not, however, extend to payments made for information concerning industrial, commercial, or scientific experience that is provided in connection with a rental or franchise agreement. For this purpose, the negotiators agreed that a franchise is to be distinguished from other arrangements resulting in the transfer of intangible property. They agreed that a license to use intangibles (whether or not including a trademark) in a territory, in and of itself, would not constitute a franchise agreement for purposes of subparagraph 3(c) in the absence of other rights and obligations in the license agreement or in any other agreement that would indicate that the arrangement in its totality constituted a franchise agreement. For example, a resident of one Contracting State may acquire a right to use a secret formula to manufacture a particular product (e.g., a perfume), together with the right to use a trademark for that product and to market it at a non-retail level, in the other Contracting State. Such an arrangement would not constitute a franchise in the absence of any other rights or obligations under that arrangement or any other agreement that would indicate that the arrangement in its totality constituted a franchise agreement. Therefore, the royalty payment under that arrangement would be exempt from withholding tax in the other Contracting State to the extent made for the use of, or the right to use, the secret formula or other information concerning industrial, commercial, or scientific experience; however, it would be subject to withholding tax at a rate of 10 percent, to the extent made for the use of, or the right to use, the trademark.

The provisions of paragraph 3 do not fully reflect the U.S. treaty policy of exempting all types of royalty payments from taxation at source, but Canada was not prepared to grant a complete exemption for all types of royalties in the Protocol. Although the Protocol makes several important changes to the royalty provisions of the present Convention in the direction of bringing Article XII into conformity with U.S. policy, the United States remains concerned about the imposition of withholding tax on some classes of royalties and about the associated administrative burdens. In this connection, the Contracting States have affirmed their intention to collaborate to resolve in good faith any administrative issues that may arise in applying the provisions of subparagraph 3(c). The United States intends to continue to pursue a zero rate of withholding for all royalties in future negotiations with Canada, including discussions under Article 20 of the Protocol, as well as in negotiations with other countries.

As noted above, new subparagraph 3(d) enables the Contracting States to provide an exemption for royalties paid with respect to broadcasting through an exchange of notes. This provision was included because Canada was not prepared at the time of the negotiations to commit to an exemption for broadcasting royalties. Subparagraph 3(d) was included to enable the Senate to give its advice and consent in advance to such an exemption, in the hope that such an exemption could be obtained without awaiting the negotiation of another full protocol. Any agreement reached under the exchange of notes authorized by subparagraph 3(d) would lower the withholding rate from 10 percent to zero and, thus, bring the Convention into greater conformity with established U.S. treaty policy.

Paragraph 2 of Article 7 of the Protocol amends the rules in paragraph 6 of Article XII of the Convention for determining the source of royalty payments. Under the present Convention, royalties generally are deemed to arise in a Contracting State if paid by a resident of that State.

However, if the obligation to pay the royalties was incurred in connection with a permanent establishment or a fixed base in one of the Contracting States that bears the expense, the royalties are deemed to arise in that State.

The Protocol continues to apply these basic rules but changes the scope of an exception provided under the present Convention. Under the present Convention, a royalty paid for the use of, or the right to use, property in a Contracting State is deemed to arise in that State. Under the Protocol, this "place of use" exception applies only if the Convention does not otherwise deem the royalties to arise in one of the Contracting States. Thus, the "place of use" exception will apply only if royalties are neither paid by a resident of one of the Contracting States nor borne by a permanent establishment or fixed base in either State. For example, if a Canadian resident were to grant franchise rights to a resident of Chile for use in the United States, the royalty paid by the Chilean resident to the Canadian resident for those rights would be U.S. source income under this Article, subject to U.S. withholding at the 10 percent rate provided in paragraph 2.

The rules of this Article differ from those provided under U.S. domestic law. Under U.S. domestic law, a royalty is considered to be from U.S. sources if it is paid for the use of, or the privilege of using, an intangible within the United States; the residence of the payor is irrelevant. If paid to a nonresident alien individual or other foreign person, a U.S. source royalty is generally subject to withholding tax at a rate of 30 percent under U.S. domestic law. By reason of paragraph 1 of Article XXIX (Miscellaneous Rules), a Canadian resident would be permitted to apply the rules of U.S. domestic law to its royalty income if those rules produced a more favorable result in its case than those of this Article. However, under a basic principle of tax treaty interpretation recognized by both Contracting States, the prohibition against so-called "cherry-picking," the Canadian resident would be precluded from claiming selected benefits under the Convention (e.g., the tax rates only) and other benefits under U.S. domestic law (e.g., the source rules only) with respect to its royalties. See, e.g., Rev. Rul. 84-17, 1984-1 C.B. 308. For example, if a Canadian company granted franchise rights to a resident of the United States for use 50 percent in the United States and 50 percent in Chile, the Convention would permit the Canadian company to treat all of its royalty income from that single transaction as U.S. source income entitled to the withholding tax reduction under paragraph 2. U.S. domestic law would permit the Canadian company to treat 50 percent of its royalty income as U.S. source income subject to a 30 percent withholding tax and the other 50 percent as foreign source income exempt from U.S. tax. The Canadian company could choose to apply either the provisions of U.S. domestic law or the provisions of the Convention to the transaction, but would not be permitted to claim both the U.S. domestic law exemption for 50 percent of the income and the Convention's reduced withholding rate for the remainder of the income.

Royalties generally are considered borne by a permanent establishment or fixed base if they are deductible in computing the taxable income of that permanent establishment or fixed base.

Since the definition of "resident" of a Contracting State in Article IV (Residence), as amended by Article 3 of the Protocol, specifies that this term includes the Contracting States and their political subdivisions and local authorities, the source rule does not include a specific reference to these governmental entities.

ARTICLE 8

Article 8 of the Protocol broadens the scope of paragraph 8 of Article XIII (Gains) of the Convention to cover organizations, reorganizations, amalgamations, and similar transactions involving either corporations or other entities. The present Convention covers only transactions involving corporations. The amendment is intended to make the paragraph applicable to transactions involving other types of entities, such as trusts and partnerships.

As in the case of transactions covered by the present Convention, the deferral allowed under this provision shall be for such time and under such other conditions as are stipulated between the person acquiring the property and the competent authority. The agreement of the competent authority of the State of source is entirely discretionary and, when granted, will be granted only to the extent necessary to avoid double taxation.

ARTICLE 9

Article 9 of the Protocol amends Article XVIII (Pensions and Annuities) of the Convention. Paragraph 3 of Article XVIII defines the term "pensions" for purposes of the Convention, including the rules for the taxation of cross-border pensions in paragraphs 1 and 2 of the Article, the rules in paragraphs 2 and 3 of Article XXI (Exempt Organizations) for certain income derived by pension funds, and the rules in paragraph 1(b)(i) of Article IV (Residence) regarding the residence of pension funds and certain other entities. The Protocol amends the present definition by substituting the phrase "other retirement arrangement" for the phrase "retirement plan." The purpose of this change is to clarify that the definition of "pensions" includes, for example, payments from Individual Retirement Accounts (IRAs) in the United States and to provide that "pensions" includes, for example, Registered Retirement Savings Plans (RRSPS) and Registered Retirement Income Funds (RRIFs) in Canada. The term "pensions" also would include amounts paid by other retirement plans or arrangements, whether or not they are qualified plans under U.S. domestic law; this would include, for example, plans and arrangements described in section 457 or 414(d) of the Internal Revenue Code.

Paragraph 2 of Article 9 of the Protocol amends paragraph 5 of Article XVIII to modify the treatment of social security benefits under the Convention. Under the amended paragraph, benefits paid under the U.S. or Canadian social security legislation to a resident of the other Contracting State, or, in the case of Canadian benefits, to a U.S. citizen, are taxable exclusively in the paying State. This amendment brings the Convention into line with current U.S. treaty policy. Social security benefits are defined, for this purpose, to include tier 1 railroad retirement benefits but not unemployment benefits (which therefore fall under Article XXII (Other Income) of the Convention). Pensions in respect of government service are covered not by this rule but by the rules of paragraphs 1 and 2 of Article XVIII.

The special rule regarding U.S. citizens is intended to clarify that only Canada, and not the United States, may tax a social security payment by Canada to a U.S. citizen not resident in the

United States. This is consistent with the intention of the general rule, which is to give each Contracting State exclusive taxing jurisdiction over its social security payments. Since paragraph 5 is an exception to the saving clause, Canada will retain exclusive taxing jurisdiction over Canadian social security benefits paid to U.S. residents and citizens, and vice versa. It was not necessary to provide a special rule to clarify the taxation of U.S. social security payments to Canadian citizens, because Canada does not tax on the basis of citizenship and, therefore, does not include citizens within the scope of its saving clause.

A new paragraph 7 is added to Article XVIII by Article 9 of the Protocol. This paragraph replaces paragraph 5 of Article XXIX (Miscellaneous Rules) of the present Convention. The new paragraph makes reciprocal the rule that it replaced and expands its scope, so that it no longer applies only to residents and citizens of the United States who are beneficiaries of Canadian RRSPs. As amended, paragraph 7 applies to an individual who is a citizen or resident of a Contracting State and a beneficiary of a trust, company, organization, or other arrangement that is a resident of the other Contracting State and that is both generally exempt from income taxation in its State of residence and operated exclusively to provide pension, retirement, or employee benefits. Under this rule, the beneficiary may elect to defer taxation in his State of residence on income accrued in the plan until it is distributed or rolled over into another plan. The new rule also broadens the types of arrangements covered by this paragraph in a manner consistent with other pension-related provisions of the Protocol.

ARTICLE 10

Article 10 of the Protocol amends Article XXI (Exempt Organizations) of the Convention. Paragraph 1 of Article 10 amends paragraphs 2 and 3 of Article XXI. The most significant changes are those that conform the language of the two paragraphs to the revised definition of the term "pension" in paragraph 3 of Article XVIII (Pensions and Annuities). The revision adds the term "arrangement" to "trust, company or organization" in describing the residents of a Contracting State that may receive dividend and interest income exempt from current income taxation by the other Contracting State. This clarifies that IRAs, for example, are eligible for the benefits of paragraph 2, subject to the exception in paragraph 3, and makes Canadian RRSPs and RRIFs, for example, similarly eligible (provided that they are operated exclusively to administer or provide pension, retirement, or employee benefits).

The other changes, all in paragraph 2, are intended to improve and clarify the language. For example, the reference to "tax" in the present Convention is changed to a reference to "income taxation." This is intended to clarify that if an otherwise exempt organization is subject to an excise tax, for example, it will not lose the benefits of this paragraph. In subparagraph 2 (b), the phrase "not taxed in a taxable year" was changed to "generally exempt from income taxation in a taxable year" to ensure uniformity throughout the Convention; this change was not intended to disqualify a trust or other arrangement that qualifies for the exemption under the wording of the present Convention.

Paragraph 2 of Article 10 adds a sentence to paragraph 5 of Article XXI of the Convention. The paragraph in the present Convention provides that a U.S. citizen or resident may

deduct, for U.S. income tax purposes, contributions made to Canadian charities under certain circumstances. The added sentence makes clear that the benefits of the paragraph are available to a company that is a resident of Canada but is treated by the United States as a domestic corporation under the consolidated return rules of section 1504(d) of the Internal Revenue Code. Thus, such a company will be able to deduct, for U.S. income tax purposes, contributions to Canadian charities that are deductible to a U.S. resident under the provisions of the paragraph.

Paragraph 3 of Article 10 amends paragraph 6 of Article XXI of the Convention to replace references to "deductions" for Canadian tax purposes with references to "relief" from tax. These changes clarify that the provisions of paragraph 6 apply to the credit for charitable contributions allowed under current Canadian law. The Protocol also makes other non-substantive drafting changes to paragraph 6.

## ARTICLE 11

Article 11 of the Protocol adds a new paragraph 3 to Article XXII (Other Income) of the Convention. This Article entitles residents of one Contracting State who are taxable by the other State on gains from wagering transactions to deduct losses from wagering transactions for the purposes of taxation in that other State. However, losses are to be deductible only to the extent that they are incurred with respect to wagering transactions, the gains on which could be taxable in the other State, and only to the extent that such losses would be deductible if incurred by a resident of that other State.

This Article does not affect the collection of tax by a Contracting State. Thus, in the case of a resident of Canada, this Article does not affect, for example, the imposition of U.S. withholding taxes under section 1441 or section 1442 of the Internal Revenue Code on the gross amount of gains from wagering transactions. However, in computing its U.S. income tax liability on net income for the taxable year concerned, the Canadian resident may reduce its gains from wagering transactions subject to taxation in the United States by any wagering losses incurred on such transactions, to the extent that those losses are deductible under the provisions of new paragraph 3. Under U.S. domestic law, the deduction of wagering losses is governed by section 165 of the Internal Revenue Code. It is intended that the resident of Canada file a nonresident income tax return in order to substantiate the deduction for losses and to claim a refund of any overpayment of U.S. taxes collected by withholding.

## ARTICLE 12

Article 12 of the Protocol amends Article XXIV (Elimination of Double Taxation) of the Convention. Paragraph 1 of Article 12 amends the rules for Canadian double taxation relief in subparagraphs (a) and (b) of paragraph 2 of Article XXIV. The amendment to subparagraph (a) obligates Canada to give a foreign tax credit for U.S. social security taxes paid by individuals. The amendment to subparagraph (b) of paragraph 2 does not alter the substantive effect of the rule, but conforms the language to current Canadian law. Under the provision as amended, Canada generally continues to allow an exemption to a Canadian corporation for direct dividends

paid from the exempt surplus of a U.S. affiliate.

Paragraphs 4 and 5 of Article XXIV of the Convention provide double taxation relief rules, for both the United States and Canada, with respect to U.S. source income derived by a U.S. citizen who is resident in Canada. These rules address the fact that a U.S. citizen resident in Canada remains subject to U.S. tax on his worldwide income at ordinary progressive rates, and may, therefore, be subject to U.S. tax at a higher rate than a resident of Canada who is not a U.S. citizen. In essence, these paragraphs limit the foreign tax credit that Canada is obliged to allow such a U.S. citizen to the amount of tax on his U.S. source income that the United States would be allowed to collect from a Canadian resident who is not a U.S. citizen. They also oblige the United States to allow the U.S. citizen a credit for any income tax paid to Canada on the remainder of his income. Paragraph 4 deals with items of income other than dividends, interest, and royalties and is not changed by the Protocol. Paragraph 5, which deals with dividends, interest, and royalties, is amended by paragraph 2 of Article 12 of the Protocol.

The amendments to paragraph 5 of the Article make that paragraph applicable only to dividend, interest, and royalty income that would be subject to a positive rate of U.S. tax if paid to a Canadian resident who is not a U.S. citizen. This means that the rules of paragraph 4, not paragraph 5, will apply to items of interest and royalties, such as portfolio interest, that would be exempt from U.S. tax if paid to a non-U.S. citizen resident in Canada. Under paragraph 4, Canada will not allow a credit for the U.S. tax on such income, and the United States will credit the Canadian tax to the extent necessary to avoid double taxation.

Paragraph 2 of Article 12 of the Protocol makes further technical amendments to paragraph 5 of Article XXIV of the Convention. The existing Technical Explanation of paragraphs 5 and 6 of Article XXIV of the Convention should be read as follows to reflect the amendments made by the Protocol.

Paragraph 5 provides special rules for the elimination of double taxation in the case of dividends, interest, and royalties earned by a U.S. citizen resident in Canada. These rules apply notwithstanding the provisions of paragraph 4, but only as long as the law in Canada allows a deduction in computing income for the portion of any foreign tax paid in respect of dividends, interest, or royalties which exceeds 15 percent of the amount of such items of income, and only with respect to those items of income. The rules of paragraph 4 apply with respect to other items of income; moreover, if the law in force in Canada regarding the deduction for foreign taxes is changed so as to no longer allow such a deduction, the provisions of paragraph 5 shall not apply and the U.S. foreign tax credit for Canadian taxes and the Canadian credit for U.S. taxes will be determined solely pursuant to the provisions of paragraph 4.

The calculations under paragraph 5 are as follows. First, the deduction allowed in Canada in computing income shall be made with respect to U.S. tax on the dividends, interest, and royalties before any foreign tax credit by the United States with respect to income tax paid or accrued to Canada. Second, Canada shall allow a deduction from (credit against) Canadian tax for U.S. tax paid or accrued with respect to the dividends, interest, and royalties, but such credit need not exceed the amount of income tax that would be paid or accrued to the United States on such items of income if the individual were not a U.S. citizen after taking into account any relief

available under the Convention. Third, for purposes of computing the U.S. tax on such dividends, interest, and royalties, the United States shall allow as a credit against the U.S. tax the income tax paid or accrued to Canada after the credit against Canadian tax for income tax paid or accrued to the United States. The United States is in no event obliged to give a credit for Canadian income tax which will reduce the U.S. tax below the amount of income tax that would be paid or accrued to the United States on the amount of the dividends, interest, and royalties if the individual were not a U.S. citizen after taking into account any relief available under the Convention.

The rules of paragraph 5 are illustrated by the following examples.

*Example B*

- A U.S. citizen who is a resident of Canada has $100 of dividend income arising in the United States. The tentative U.S. tax before foreign tax credit is $40.

- Canada, under its law, allows a deduction for the U.S. tax in excess of 15 percent or, in this case, a deduction of $25 ($40 - $15). The Canadian taxable income is $75 and the Canadian tax on that amount is $35.

- Canada gives a credit of $15 (the maximum credit allowed is 15 percent of the gross dividend taken into Canadian income) and collects a net tax of $20.

- The United States allows a credit for the net Canadian tax against its tax in excess of 15 percent. Thus, the maximum credit is $25 ($40 - $15). But since the net Canadian tax paid was $20, the usable credit is $20.

- To be able to use a credit of $20 requires Canadian source taxable income of $50 (50% of the U.S. tentative tax of $40). Under paragraph 6, $50 of the U.S. dividend is resourced to be of Canadian source. The credit of $20 may then be offset against the U.S. tax of $40, leaving a net U.S. tax of $20.

- The combined tax paid to both countries is $40, $20 to Canada and $20 to the United States.

*Example C*

- A U.S. citizen who is a resident of Canada receives $200 of income with respect to personal services performed within Canada and $100 of dividend income arising within the United States. Taxable income for U.S. purposes, taking into account the rules of Code section 911, is $220. U.S. tax (before foreign tax credits) is $92. The $100 of dividend income is deemed to bear U.S. tax (before foreign tax credits) of $41.82 ($100/$200 x $92). Under Canadian law, a deduction of $26.82 (the excess of $41.82 over 15 percent of the $100 dividend income) is allowed in computing income. The Canadian tax on $273.18 of income ($300 less the $26.82 deduction) is $130. Canada then gives a credit against the $130 for $15 (the U.S. tax paid or accrued with respect to the dividend, $41.82 but limited to 15 percent of the gross amount of such income, or $15), leaving a final Canadian tax of $115. Of the $115, $30.80 is attributable to the

dividend:

> $73.18 ($100 dividend less $26.82 deduction) x $115
> $273.18 ($300 income less $26.82 deduction)

Of this amount, $26.82 is creditable against U.S. tax pursuant to paragraph 5. (Although the U.S. allows a credit for the Canadian tax imposed on the dividend, $30.80, the credit may not reduce the U.S. tax below 15 percent of the amount of the dividend. Thus, the maximum allowable credit is the excess of $41.82, the U.S. tax imposed on the dividend income, over $15, which is 15 percent of the $100 dividend.) The remaining $3.98 (the Canadian tax of $30.80 less the credit allowed of $26.82) is a foreign tax credit carryover for U.S. purposes, subject to the limitations of paragraph 5. (An additional $50.18 of Canadian tax with respect to Canadian source services income is creditable against U.S. tax pursuant to paragraphs 3 and 4(b). The $50.18 is computed as follows: tentative U.S. tax (before foreign tax credits) is $92; the U.S. tax on Canadian source services income is $50.18 ($92 less the U.S. tax on the dividend income of $41.82); the limitation on the services income is:

> $120 (taxable income from services) x $92
> $220 (total taxable income),

or $50.18. The credit for Canadian tax paid on the services income is therefore $50.18; the remainder of the Canadian tax on the services income, or $34.02, is a foreign tax credit carryover for U.S. purposes, subject to the limitations of paragraph 5.)

Paragraph 6 is necessary to implement the objectives of paragraphs 4(b) and 5(c). Paragraph 6 provides that where a U.S. citizen is a resident of Canada, items of income referred to in paragraph 4 or 5 are deemed for the purposes of Article XXIV to arise in Canada to the extent necessary to avoid double taxation of income by Canada and the United States consistent with the objectives of paragraphs 4(b) and 5(c). Paragraph 6 can override the source rules of paragraph 3 to permit a limited resourcing of income. The principles of paragraph 3 have effect, pursuant to paragraph 3(b) of Article XXX (Entry Into Force) of the Convention, for taxable years beginning on or after January 1, 1976. See the discussion of Article XXX below.

The application of paragraph 6 is illustrated by the following example.

*Example D*

The facts are the same as in Example C. The United States has undertaken, pursuant to paragraph 5(c) and paragraph 6, to credit $26.82 of Canadian taxes on dividend income that has a U.S. source under both paragraph 3 and the Internal Revenue Code. (As illustrated in Example C, the credit, however, only reduces the U.S. tax on the dividend income which exceeds the amount of income tax that would be paid or accrued to the United States on such income if the individual were not a U.S. citizen after taking into account any relief available under the Convention. Pursuant to paragraph 6, for purposes of determining the U.S. foreign tax credit limitation under the Convention with respect to Canadian taxes,

> $64.13 ( __A__ X $92 $26.82; A = $64.13

$220

of taxable income with respect to the dividends is deemed to arise in Canada.

Paragraph 3 of Article 12 of the Protocol makes a technical amendment to paragraph 7 of Article XXIV. It conforms the reference to U.S. and Canadian taxes to the amended definitions of "United States tax" and "Canadian tax" in subparagraphs (c) and (d) of paragraph 1 of Article III (General Definitions). No substantive change in the effect of the paragraph is intended.

Paragraph 4 of Article 12 of the Protocol adds a new paragraph 10 to Article XXIV of the Convention. This paragraph provides for the application of the rule of "exemption with progression" by a Contracting State in cases where an item of income of a resident of that State is exempt from tax in that State by virtue of a provision of the Convention. For example, where under Canadian law a tax benefit, such as the goods and services tax credit, to a Canadian resident individual is reduced as the income of that individual, or the individual's spouse or other dependent, increases, and any of these persons receives U.S. social security benefits that are exempt from tax in Canada under the Convention, Canada may, nevertheless, take the U.S. social security benefits into account in determining whether, and to what extent, the benefit should be reduced.

New Article XXIX B (Taxes Imposed by Reason of Death), added by Article 19 of the Protocol, also provides relief from double taxation in certain circumstances in connection with Canadian income tax imposed by reason of death and U.S. estate taxes. However, subparagraph 7(c) of Article XXIX B generally denies relief from U.S. estate tax under that Article to the extent that a credit or deduction has been claimed for the same amount in determining any other tax imposed by the United States. This restriction would operate to deny relief, for example, to the extent that relief from U.S. income tax is claimed under Article XXIV in respect of the same amount of Canadian tax. There is, however, no requirement that relief from U.S. tax be claimed first (or exclusively) under Article XXIV. Paragraph 6 of Article XXIX B also prevents the claiming of double relief from Canadian income taxation under both that Article and Article XXIV, by providing that the credit provided by Article XXIX B applies only after the application of the credit provided by Article XXIV.

ARTICLE 13

Article 13 of the Protocol amends Article XXV (Non-Discrimination) of the Convention. Paragraph 1 of Article 13 amends paragraph 3 of Article XXV to conform the treaty language to a change in Canadian law. The paragraph is intended to allow the treatment of dependents under the income tax law of a Contracting State to apply with respect to dependents who are residents of the other Contracting State. As drafted in the present Convention, the rule deals specifically only with deductions; the amendments made by the Protocol clarify that it also applies to the credits now provided by Canadian law.

Paragraph 2 of Article 13 of the Protocol amends paragraph 10 of Article XXV of the Convention to broaden the scope of the non-discrimination protection provided by the Convention. As amended, Article XXV will apply to all taxes imposed by a Contracting State.

Under the present Convention, non-discrimination protection is limited in the case of Canadian taxes to taxes imposed under the Income Tax Act. As amended by the Protocol, non-discrimination protection will extend, for example, to the Canadian goods and services tax and other Canadian excise taxes.

## ARTICLE 14

Article 14 of the Protocol makes two changes to Article XXVI (Mutual Agreement Procedure) of the Convention. First, it adds a new subparagraph 3(g) specifically authorizing the competent authorities to provide relief from double taxation in certain cases involving the distribution or disposition of property by a U.S. qualified domestic trust or a Canadian spousal trust, where relief is not otherwise available.

Article 14 also adds a new paragraph 6 to Article XXVI (Mutual Agreement Procedure). Paragraph 6 provides for a voluntary arbitration procedure, to be implemented only upon the exchange of diplomatic notes between the United States and Canada. Similar provisions are found in the recent U.S. treaties with the Federal Republic of Germany, the Netherlands, and Mexico. Paragraph 6 provides that where the competent authorities have been unable, pursuant to the other provisions of Article XXVI, to resolve a disagreement regarding the interpretation or application of the Convention, the disagreement may, with the consent of the taxpayer and both competent authorities, be submitted for arbitration, provided the taxpayer agrees in writing to be bound by the decision of the arbitration board. Nothing in the provision requires that any case be submitted for arbitration. However, if a case is submitted to an arbitration board, the board's decision in that case will be binding on both Contracting States and on the taxpayer with respect to that case.

The United States was reluctant to implement an arbitration procedure until there has been an opportunity to evaluate the process in practice under other agreements that allow for arbitration, particularly the U.S.-Germany Convention. It was agreed, therefore, as specified in paragraph 6, that the provisions of the Convention calling for an arbitration procedure will not take effect until the two Contracting States have agreed through an exchange of diplomatic notes to do so. This is similar to the approach taken with the Netherlands and Mexico. Paragraph 6 also provides that the procedures to be followed in applying arbitration will be agreed through an exchange of notes by the Contracting States. It is expected that such procedures will ensure that arbitration will not generally be available where matters of either State's tax policy or domestic law are involved.

Paragraph 2 of Article 20 of the Protocol provides that the appropriate authorities of the Contracting State will consult after three years following entry into force of the Protocol to determine whether the diplomatic notes implementing the arbitration procedure should be exchanged.

## ARTICLE 15

Article 15 of the Protocol adds to the Convention a new Article XXVI A (Assistance in

Collection). Collection assistance provisions are included in several other U.S. income tax treaties, including the recent treaty with the Netherlands, and in many U.S. estate tax treaties. U.S. negotiators initially raised with Canada the possibility of including collection assistance provisions in the Protocol, because the Internal Revenue Service has claims pending against persons in Canada that would be subject to collection under these provisions. However, the ultimate decision of the U.S. and Canadian negotiators to add the collection assistance article was attributable to the confluence of several unusual factors.

Of critical importance was the similarity between the laws of the United States and Canada. The Internal Revenue Service, the Justice Department, and other U.S. negotiators were reassured by the close similarity of the legal and procedural protections afforded by the Contracting States to their citizens and residents and by the fact that these protections apply to the tax collection procedures used by each State. In addition, the U.S. negotiators were confident, given their extensive experience in working with their Canadian counterparts, that the agreed procedures could be administered appropriately, effectively, and efficiently. Finally, given the close cooperation already developed between the United States and Canada in the exchange of tax information, the U.S. and Canadian negotiators concluded that the potential benefits to both countries of obtaining such assistance would be immediate and substantial and would far outweigh any cost involved.

Under paragraph 1 of Article XXVI A, each Contracting State agrees, subject to the exercise of its discretion and to the conditions explicitly provided later in the Article, to lend assistance and support to the other in the collection of revenue claims. The term "revenue claim" is defined in paragraph 1 to include all taxes referred to in paragraph 9 of the Article, as well as interest, costs, additions to such taxes, and civil penalties. Paragraph 9 provides that, notwithstanding the provisions of Article II (Taxes Covered) of the Convention, Article XXVI A shall apply to all categories of taxes collected by or on behalf of the Government of a Contracting State.

Paragraph 2 of the Article requires the Contracting State applying for collection assistance (the "applicant State") to certify that the revenue claim for which collection assistance is sought has been "finally determined." A revenue claim has been finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

Paragraph 3 of the Article clarifies that the Contracting State from which assistance was requested (the "requested State") has discretion as to whether to accept a particular application for collection assistance. However, if the application for assistance is accepted, paragraph 3 requires that the requested State grant assistance under its existing procedures as though the claim were the requested State's own revenue claim finally determined under the laws of that State. This obligation under paragraph 3 is limited by paragraph 7 of the Article, which provides that, although generally treated as a revenue claim of the requested State, a claim for which collection assistance is granted shall not have any priority accorded to the revenue claims of the requested State.

Paragraph 4 of Article XXVI A provides that, when the United States accepts a request for assistance in collection, the claim will be treated by the United States as an assessment as of the time the application was received. Similarly, when Canada accepts a request, a revenue claim shall be treated as an amount payable under the Income Tax Act, the collection of which is not subject to any restriction.

Paragraph 5 of the Article provides that nothing in Article XXVI A shall be construed as creating in the requested State any rights of administrative or judicial review of the applicant State's finally determined revenue claim. Thus, when an application for collection assistance has been accepted, the substantive validity of the applicant State's revenue claim cannot be challenged in an action in the requested State. Paragraph 5 further provides, however, that if the applicant State's revenue claim ceases to be finally determined, the applicant State is obligated to withdraw promptly any request that had been based on that claim.

Paragraph 6 provides that, as a general rule, the requested State is to forward the entire amount collected to the competent authority of the applicant State. The ordinary costs incurred in providing collection assistance will normally be borne by the requested State and only extraordinary costs will be borne by the applicant State. The application of this paragraph, including rules specifying which collection costs are to be borne by each State and the time and manner of payment of the amounts collected, will be agreed upon by the competent authorities, as provided for in paragraph 11.

Paragraph 8 provides that no assistance is to be given under this Article for a claim in respect of an individual taxpayer, to the extent that the taxpayer can demonstrate that he was a citizen of the requested State during the taxable period to which the revenue claim relates. Similarly, in the case of a company, estate, or trust, no assistance is to be given to the extent that the entity can demonstrate that it derived its status as such under the laws in force in the requested State during the taxable period to which the claim relates.

Subparagraph (a) of paragraph 10 clarifies that Article XXVI A supplements the provisions of paragraph 4 of Article XXVI (Mutual Agreement Procedure). The Mutual Agreement Procedure paragraph, which is more common in U.S. tax treaties, provides for collection assistance in cases in which a Contracting State seeks assistance in reclaiming treaty benefits that have been granted to a person that is not entitled to those benefits. Subparagraph (b) of paragraph 10 makes clear that nothing in Article XXVI A can require a Contracting State to carry out administrative measures of a different nature from those used in the collection of its own taxes, or that would be contrary to its public policy (ordre public).

Paragraph 11 requires the competent authorities to agree upon the mode of application of Article XXVI A, including agreement to ensure comparable levels of assistance to each of the Contracting States.

Paragraph 3 of Article 21 of the Protocol allows collection assistance under Article XXVI A to be sought for revenue claims that have been finally determined at any time within the 10 years preceding the date on which the Protocol enters into force.

ARTICLE 16

Article 16 of the Protocol amends Article XXVII (Exchange of Information) of the Convention. Paragraph 1 of Article 16 amends paragraph 1 of Article XXVII. The first change is a wording change to make it clear that information must be exchanged if it is "relevant" for carrying out the provisions of the Convention or of the domestic laws of the Contracting States, even if it is not "necessary." Neither the United States nor Canada views this as a substantive change. The second amendment merely conforms the language of the paragraph to the language of Article II (Taxes Covered), as amended, by referring to the taxes "to which the Convention applies" rather than to the taxes "covered by the Convention."

The Protocol further amends paragraph 1 to allow a Contracting State to provide information received from the other Contracting State to its states, provinces, or local authorities, if it relates to a tax imposed by that state, province, or local authority that is substantially similar to a national-level tax covered under Article II (Taxes Covered). However, this provision does not authorize a Contracting State to request information on behalf of a state, province, or local authority. The Protocol also amends paragraph 1 to authorize the competent authorities to release information to any arbitration panel that may be established under the provisions of new paragraph 6 of Article XXVI (Mutual Agreement Procedure). Any information provided to a state, province, or local authority or to an arbitration panel is subject to the same use and disclosure provisions as is information received by the national Governments and used for their purposes.

Paragraph 2 of Article 16 amends paragraph 4 of Article XXVII, which describes the applicable taxes for the purposes of this Article. Under the present Convention, the Article applies in Canada to taxes imposed by the Government of Canada under the Income Tax Act and on estates and gifts and in the United States to all taxes imposed under the Internal Revenue Code. The Protocol broadens the scope of the Article to apply to "all taxes imposed by a Contracting State." This change allows information to be exchanged, for example, with respect to Canadian excise taxes, as is the case with respect to U.S. excise taxes under the present Convention. Paragraph 4 is also amended to authorize the exchange of information with respect to other taxes, to the extent relevant to any other provision of the Convention.

ARTICLE 17

Article 17 of the Protocol amends Article XXIX (Miscellaneous Rules) of the Convention. Paragraph 1 of Article 17 modifies paragraph 3(a), the exceptions to the saving clause, to conform the cross-references in the paragraph to changes in other parts of the Convention. The paragraph also adds to the exceptions to the saving clause certain provisions of Article XXIX B (Taxes Imposed by Reason of Death). Thus, certain benefits under that Article will be granted by a Contracting State to its residents and, in the case of the United States, to its citizens, notwithstanding the saving clause of paragraph 2 of Article XXIX.

Paragraph 2 of Article 17 replaces paragraphs 5 through 7 of Article XXIX of the present

Appx295

Convention with three new paragraphs. (Paragraph 5 in the present Convention was moved to paragraph 7 of Article XVIII (Pensions and Annuities), and paragraphs 6 and 7 were deleted as unnecessary.) New paragraph 5 provides a rule for the taxation by Canada of a Canadian resident that is a shareholder in a U.S. S corporation. The application of this rule is relatively limited, because U.S. domestic law requires that S corporation shareholders be either U.S. citizens or U.S. residents. Therefore, the rule provided by paragraph 5 would apply only to an S corporation shareholder who is a resident of both the United States and Canada (i.e., a "dual resident" who meets certain requirements), determined before application of the "tie-breaker" rules of Article IV (Residence), or a U.S. citizen resident in Canada. Since the shareholder would be subject to U.S. tax on its share of the income of the S corporation as it is earned by the S corporation and, under Canadian statutory law, would be subject to tax only when the income is distributed, there could be a timing mismatch resulting in unrelieved double taxation. Under paragraph 5, the shareholder can make a request to the Canadian competent authority for relief under the special rules of the paragraph. Under these rules, the Canadian shareholder will be subject to Canadian tax on essentially the same basis as he is subject to U.S. tax, thus eliminating the timing mismatch.

The Protocol adds to Article XXIX a new paragraph 6, which provides a coordination rule for the Convention and the General Agreement on Trade in Services ("GATS"). Paragraph 6(a) provides that, for purposes of paragraph 3 of Article XXII (Consultation) of the GATS, a measure falls within the scope of the Convention only if the measure relates to a tax
(1) to which Article XXV (Non-Discrimination) of the Convention applies, or
(2) to which Article XXV does not apply and to which any other provision of the Convention applies, but only to the extent that the measure relates to a matter dealt with in that other provision.

Under paragraph 6(b), notwithstanding paragraph 3 of Article XXII of the GATS, any doubt as to the interpretation of subparagraph (a) will be resolved under paragraph 3 of Article XXVI (Mutual Agreement Procedure) of the Convention or any other procedure agreed to by both Contracting States.

GATS generally obliges its Members to provide national treatment and most-favored-nation treatment to services and service suppliers of other Members. A very broad exception from the national treatment obligation applies to direct taxes. An exception from the most-favored-nation obligation applies to a difference in treatment resulting from an international agreement on the avoidance of double taxation (a "tax agreement") or from provisions on the avoidance of double taxation in any other international agreement or arrangement by which the Member is bound.

Article XXII(3) of GATS specifically provides that there will be no access to GATS procedures to settle a national treatment dispute concerning a measure that falls within the scope of a tax agreement. This provision preserves the exclusive application of nondiscrimination obligations in the tax agreement and clarifies that the competent authority mechanism provided by the tax agreement will apply, instead of GATS procedures, to resolve nondiscrimination disputes involving the taxation of services and service suppliers.

In the event of a disagreement between Members as to whether a measure falls within the

scope of a tax agreement that existed at the time of the entry into force of the Agreement establishing the World Trade Organization, Article XXII(2), footnote 11, of GATS reserves the resolution of the dispute to the Contracting States under the tax agreement. In such a case, the issue of the scope of- a tax agreement may be resolved under GATS procedures (rather than tax treaty procedures) only if both parties to the existing tax agreement consent. With respect to subsequent tax agreements, GATS provides that either Member may bring the jurisdictional matter before the Council for Trade In Services, which will refer the matter to arbitration for a decision that will be final and binding on the Members.

Both Canada and the United States agree that a protocol to a convention that is grandfathered under Article XXII(2), footnote 11, of GATS is also grandfathered. Nevertheless, since the Protocol extends the application of the Convention, and particularly the nondiscrimination article, to additional taxes (e.g., some non-income taxes imposed by Canada), the negotiators sought to remove any ambiguity and agreed to a provision that clarified the scope of the Convention and the relationship between the Convention and GATS.

The purpose of new paragraph 6(a) of the Convention is to provide the agreement of the Contracting States as to the measures considered to fall within the scope of the Convention in applying Article XXII(3) of GATS between the Contracting States. The purpose of new paragraph 6(b) is to reserve the resolution of the issue of the scope of the Convention for purposes of Article XXII(3) of GATS to the competent authorities under the Convention rather than to settlement under GATS procedures.

The Protocol also adds to Article XXIX a new paragraph 7, relating to certain changes in the law or treaty policy of either of the Contracting States. Paragraph 7 provides, first, that in response to a change in the law or policy of either State, the appropriate authority of either State may request consultations with its counterpart in the other State to determine whether a change in the Convention is appropriate. If a change in domestic legislation has unilaterally removed or significantly limited a material benefit provided by the Convention, the appropriate authorities are instructed by the paragraph to consult promptly to consider an appropriate amendment to the Convention. The "appropriate authorities" may be the Contracting States themselves or the competent authorities under the Convention. The consultations may be initiated by the authority of the Contracting State making the change in law or policy or by the authority of the other State. Any change in the Convention recommended as a result of this process can be implemented only through the negotiation, signature, ratification, and entry into force of a new protocol to the Convention.

## ARTICLE 18

### *In general.*

Article 18 of the Protocol adds a new Article XXIX A (Limitation on Benefits) to the Convention. Article XXIX A addresses the problem of "treaty shopping" by requiring, in most cases, that the person seeking U.S. treaty benefits not only be a Canadian resident but also satisfy other tests. In a typical case of treaty shopping, a resident of a third State might establish an entity

resident in Canada for the purpose of deriving income from the United States and claiming U.S. treaty benefits with respect to that income. Article XXIX A limits the benefits granted by the United States under the Convention to those persons whose residence in Canada is not considered to have been motivated by the existence of the Convention. Absent Article XXIX A, the entity would be entitled to U.S. benefits under the Convention as a resident of Canada, unless it were denied benefits as a result of limitations (e.g., business purpose, substance-over-form, step transaction, or conduit principles or other anti-avoidance rules) applicable to a particular transaction or arrangement. General anti-abuse provisions of this sort apply in conjunction with the Convention in both the United States and Canada. In the case of the United States, such anti-abuse provisions complement the explicit anti-treaty-shopping rules of Article XXIX A. While the anti-treaty-shopping rules determine whether a person has a sufficient nexus to Canada to be entitled to treaty benefits, general anti-abuse provisions determine whether a particular transaction should be recast in accordance with the substance of the transaction.

The present Convention deals with treaty-shopping in a very limited manner, in paragraph 6 of Article XXIX, by denying benefits to Canadian residents that benefit from specified provisions of Canadian law. The Protocol removes that paragraph 6 from Article XXIX, because it is superseded by the more general provisions of Article XXIX A.

The Article is not reciprocal, except for paragraph 7. Canada prefers to rely on general anti-avoidance rules to counter arrangements involving treaty-shopping through the United States.

The structure of the Article is as follows: paragraph 1 states that, in determining whether a resident of Canada is entitled to U.S. benefits under the Convention, a "qualifying person is entitled to all of the benefits of the Convention, and other persons are not entitled to benefits, except where paragraphs 3, 4, or 6 provide otherwise. Paragraph 2 lists a number of characteristics, any one of which will make a Canadian resident a qualifying person. These are essentially mechanical tests. Paragraph 3 provides an alternative rule, under which a Canadian resident that is not a qualifying person under paragraph 2 may claim U.S. benefits with respect to those items of U.S. source income that are connected with the active conduct of a trade or business in Canada. Paragraph 4 provides a limited "derivative benefits" test for entitlement to benefits with respect to U.S. source dividends, interest, and royalties beneficially owned by a resident of Canada that is not a qualifying person. Paragraph 5 defines certain terms used in the Article. Paragraph 6 requires the U.S. competent authority to grant benefits to a resident of Canada that does not qualify for benefits under any other provision of the Article, where the competent authority determines, on the basis of all factors, that benefits should be granted. Paragraph 7 clarifies the application of general anti-abuse provisions.

### Individuals and governmental entities

Under paragraph 2, the first two categories of qualifying persons are
(1) individual residents of Canada, and
(2) the Government of Canada, a political subdivision or local authority thereof, or an agency or instrumentality of that Government, political subdivision, or local authority.

It is considered unlikely that persons falling into these two categories can be used, as the

beneficial owner of income, to derive treaty benefits on behalf of a third-country person. If a person is receiving income as a nominee on behalf of a third-country resident, benefits will be denied with respect to those items of income under the articles of the Convention that grant the benefit, because of the requirements in those articles that the beneficial owner of the income be a resident of a Contracting State.

***Publicly traded entities.***

Under subparagraph (c) of paragraph 2, a Canadian resident company or trust is a qualifying person if there is substantial and regular trading in the company's principal class of shares, or in the trust's units, on a recognized stock exchange. The term "recognized stock exchange" is defined in paragraph 5(a) of the Article to mean, in the United States, the NASDAQ System and any stock exchange registered as a national securities exchange with the Securities and Exchange Commission, and, in Canada, any Canadian stock exchanges that are "prescribed stock exchanges" under the Income Tax Act. These are, at the time of signature of the Protocol, the Alberta, Montreal, Toronto, Vancouver, and Winnipeg Stock Exchanges. Additional exchanges may be added to the list of recognized exchanges by exchange of notes between the Contracting States or by agreement between the competent authorities.

Certain companies owned by publicly traded corporations also may be qualifying persons. Under subparagraph (d) of paragraph 2, a Canadian resident company will be a qualifying person, even if not publicly traded, if more than 50 percent of the vote and value of its shares is owned (directly or indirectly) by five or fewer persons that would be qualifying persons under subparagraph (c). In addition, each company in the chain of ownership must be a qualifying person or a U.S. citizen or resident. Thus, for example, a Canadian company that is not publicly traded but that is owned, one4hird each, by three companies, two of which are Canadian resident corporations whose principal classes of shares are substantially and regularly traded on a recognized stock exchange, will qualify under subparagraph (d).

The 50-percent test under subparagraph (d) applies only to shares other than "debt substitute shares." The term "debt substitute shares" is defined in paragraph 5(e) of the definition in the Canadian Income Tax Act of "term preferred shares" (see section 248(1) of the Income Tax Act), which relates to certain shares received in debt-restructuring arrangements undertaken by reason of financial difficulty or insolvency. Paragraph 5 also provides that the competent authorities may agree to treat other types of shares as debt substitute shares.

***Ownership/base erosion test.***

Subparagraph (e) of paragraph 2 provides a two-part test under which certain other entities may be qualifying persons, based on ownership and "base erosion." Under the first of these tests, benefits will be granted to a Canadian resident company if 50 percent or more of the vote and value of its shares (other than debt substitute shares), or to a Canadian resident trust if 50 percent or more of its beneficial interest, is *not* owned, directly or indirectly, by persons other than qualifying persons or U.S. residents or citizens. The wording of these tests is intended to make clear that, for example, if a Canadian company is more than 50 percent owned by a U.S. resident

corporation that is, itself, wholly owned by a third-country resident other than a U.S. citizen, the Canadian company would not pass the ownership test. This is because more than 50 percent of its shares is owned indirectly by a person (the third-country resident) that is not a qualifying person or a citizen or resident of the United States.

For purposes of this subparagraph (e) and other provisions of this Article, the term "shares" includes, in the case of a mutual insurance company, any certificate or contract entitling the holder to voting power in the corporation. This is consistent with the interpretation of similar limitation on benefits provisions in other U.S. treaties.

The second test of subparagraph (e) is the so-called "base erosion" test. A Canadian company or trust that passes the ownership test must also pass this test to be a qualifying person. This test requires that the amount of expenses that are paid or payable by the Canadian entity in question to persons that are not qualifying persons or U.S. citizens or residents, and that are deductible from gross income, be less than 50 percent of the gross income of the company or trust. This test is applied for the fiscal period immediately preceding the period for which the qualifying person test is being applied. If it is the first fiscal period of the person, the test is applied for the current period.

The ownership/base erosion test recognizes that the benefits of the Convention can be enjoyed indirectly not only by equity holders of an entity, but also by that entity's obligees, such as lenders, licensers, service providers, insurers and reinsurers, and others. For example, a third-country resident could license technology to Canadian-owned Canadian corporation to be sub licensed to a U.S. resident. The U.S. source royalty income of the Canadian corporation would be exempt from U.S. withholding tax under Article XII (Royalties) of the Convention (as amended by the Protocol). While the Canadian corporation would be subject to Canadian corporation income tax, its taxable income could be reduced to near zero as a result of the deductible royalties paid to the third-country resident. If, under a Convention between Canada and the third country, those royalties were either exempt from Canadian tax or subject to tax at a low rate, the U.S. treaty benefit with respect to the U.S. source royalty income would have flowed to the third-country resident at little or no tax cost, with no reciprocal benefit to the United States from the third country. The ownership/base erosion test therefore requires both that qualifying persons or U.S. residents or citizens substantially own the entity and that the entity's deductible payments be made in substantial part to such persons.

### Other qualifying persons.

Under subparagraph (f) of paragraph 2, a Canadian resident estate is a qualifying person, entitled to the benefits of the Convention with respect to its U.S. source income.

Subparagraphs (g) and (h) specify the circumstances under which certain types of not-for-profit organizations will be qualifying persons. Subparagraph (g) of paragraph 2 provides that a not-for-profit organization that is a resident of Canada is a qualifying person, and thus entitled to U.S. benefits, if more than half of the beneficiaries, members, or participants in the organization are qualifying persons or citizens or residents of the United States. The term "not-for-profit organization" of a Contracting State is defined in subparagraph (b) of paragraph 5 of the Article to

mean an entity created or established in that State that is generally exempt from income taxation in that State by reason of its not-for-profit status. The term includes charities, private foundations, trade unions, trade associations, and similar organizations.

Subparagraph (h) of paragraph 2 specifies that certain organizations described in paragraph 2 of Article XXI (Exempt Organizations), as amended by Article 10 of the Protocol, are qualifying persons. To be a qualifying person, such an organization must be established primarily for the purpose of providing pension, retirement, or employee benefits to individual residents of Canada who are (or were, within any of the five preceding years) qualifying persons, or to citizens or residents of the United States. An organization will be considered to be established "primarily" for this purpose if more than 50 percent of its beneficiaries, members, or participants are such persons. Thus, for example, a Canadian Registered Retirement Savings Plan ("RRSP") of a former resident of Canada who is working temporarily outside of Canada would continue to be a qualifying person during the period of the individual's absence from Canada or for five years, whichever is shorter. A Canadian pension fund established to provide benefits to persons employed by a company would be a qualifying person only if most of the beneficiaries of the fund are (or were within the five preceding years) individual residents of Canada or residents or citizens of the United States.

The provisions of paragraph 2 are self-executing, unlike the provisions of paragraph 6, discussed below. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

### Active trade or business test.

Paragraph 3 provides an eligibility test for benefits for residents of Canada that are not qualifying persons under paragraph 2. This is the so-called "active trade or business" test. Unlike the tests of paragraph 2, the active trade or business test looks not solely at the characteristics of the person deriving the income, but also at the nature of the activity engaged in by that person and the connection between the income and that activity. Under the active trade or business test, a resident of Canada deriving an item of income from the United States is entitled to benefits with respect to that income if that person (or a person related to that person under the principles of Internal Revenue Code section 482) is engaged in an active trade or business in Canada and the income in question is derived in connection with, or is incidental to, that trade or business. Income that is derived in connection with, or is incidental to, the business of making or managing investments will not qualify for benefits under this provision, unless those investment activities are carried on with customers in the ordinary course of the business of a bank, insurance company, registered securities dealer, or deposit-taking financial institution.

Income is considered derived "in connection" with an active trade or business in the United States if, for example, the income-generating activity in the United States is "upstream," "downstream," or parallel to that conducted in Canada. Thus, if the U.S. activity consisted of selling the output of a Canadian manufacturer or providing inputs to the manufacturing process, or of manufacturing or selling in the United States the same sorts of products that were being sold by the Canadian trade or business in Canada, the income generated by that activity would be treated as earned in connection with the Canadian trade or business. Income is considered

"incidental" to the Canadian trade or business if, for example, it arises from the short-term investment of working capital of the Canadian resident in U.S. securities.

An item of income will be considered to be earned in connection with or to be incidental to an active trade or business in Canada if the income is derived by the resident of Canada claiming the benefits directly or indirectly through one or more other persons that are residents of the United States. Thus, for example, a Canadian resident could claim benefits with respect to an item of income earned by a U.S. operating subsidiary but derived by the Canadian resident indirectly through a wholly-owned U.S. holding company interposed between it and the operating subsidiary. This language would also permit a Canadian resident to derive income from the United States through one or more U.S. residents that it does not wholly own. For example, a Canadian partnership in which three unrelated Canadian companies each hold a one-third interest could form a wholly-owned U.S. holding company with a U.S. operating subsidiary. The "directly or indirectly" language would allow otherwise available treaty benefits to be claimed with respect to income derived by the three Canadian partners through the U.S. holding company, even if the partners were not considered to be related to the U.S. holding company under the principles of Internal Revenue Code section 482.

Income that is derived in connection with, or is incidental to, an active trade or business in Canada, must pass an additional test to qualify for U.S. treaty benefits. The trade or business in Canada must be substantial in relation to the activity in the United States that gave rise to the income in respect of which treaty benefits are being claimed. To be considered substantial, it is not necessary that the Canadian trade or business be as large as the U.S. income-generating activity. The Canadian trade or business cannot, however, in terms of income, assets, or other similar measures, represent only a very small percentage of the size of the U.S. activity.

The substantiality requirement is intended to prevent treaty-shopping. For example, a third-country resident may want to acquire a U.S. company that manufactures television sets for worldwide markets; however, since its country of residence has no tax treaty with the United States, any dividends generated by the investment would be subject to a U.S. withholding tax of 30 percent. Absent a substantiality test, the investor could establish a Canadian corporation that would operate a small outlet in Canada to sell a few of the television sets manufactured by the U.S. company and earn a very small amount of income. That Canadian corporation could then acquire the U.S. manufacturer with capital provided by the third-country resident and produce a very large number of sets for sale in several countries, generating a much larger amount of income. It might attempt to argue that the U.S. source income is generated from business activities in the United States related to the television sales activity of the Canadian parent and that the dividend income should be subject to U.S. tax at the 5 percent rate provided by Article X of the Convention, as amended by the Protocol. However, the substantiality test would not be met in this example, so the dividends would remain subject to withholding in the United States at a rate of 30 percent.

In general, it is expected that if a person qualifies for benefits under one of the tests of paragraph 2, no inquiry will be made into qualification for benefits under paragraph 3. Upon satisfaction of any of the tests of paragraph 2, any income derived by the beneficial owner from the other Contracting State is entitled to treaty benefits. Under paragraph 3, however, the test is

applied separately to each item of income.

***Derivative benefits test.***

Paragraph 4 of Article XXIX A contains a so-called "derivative benefits" rule not generally found in U.S. treaties. This rule was included in the Protocol because of the special economic relationship between the United States and Canada and the close coordination between the tax administrations of the two countries.

Under the derivative benefits rule, a Canadian resident company may receive the benefits of Articles X (Dividends), XI (Interest), and XII (Royalties), even if the company is not a qualifying person and does not satisfy the active trade or business test of paragraph 3. To qualify under this paragraph, the Canadian company must satisfy both
        (i) the base erosion test under subparagraph (e) of paragraph 2, and
        (ii) an ownership test.

The derivative benefits ownership test requires that shares (other than debt substitute shares) representing more than 90 percent of the vote and value of the Canadian company be owned directly or indirectly by either
        (i) qualifying persons or U.S. citizens or residents, or
        (ii) other persons that satisfy each of three tests. The three tests that must be
      satisfied by these other persons are as follows:

First, the person must be a resident of a third State with which the United States has a comprehensive income tax convention and be entitled to all of the benefits under that convention. Thus, if the person fails to satisfy the limitation on benefits tests, if any, of that convention, no benefits would be granted under this paragraph. Qualification for benefits under an active trade or business test does not suffice for these purposes, because that test grants benefits only for certain items of income, not for all purposes of the convention.

Second, the person must be a person that would qualify for benefits with respect to the item of income for which benefits are sought under one or more of the tests of paragraph 2 or 3 of this Convention, if the person were a resident of Canada and, for purposes of paragraph 3, the business were carried on in Canada. For example, a person resident in a third country would be deemed to be a person that would qualify under the publicly-traded test of paragraph 2 of this Convention if the principal class of its shares were substantially and regularly traded on a stock exchange recognized either under the treaty between the United States and Canada or under the treaty between the United States and the third country. Similarly, a company resident in a third country would be deemed to satisfy the ownership/base erosion test of paragraph 2 under this hypothetical analysis if, for example, it were wholly owned by an individual resident in that third country and most of its deductible payments were made to individual residents of that country (i.e., it satisfied base erosion).

The third requirement is that the rate of U.S. withholding tax on the item of income in respect of which benefits are sought must be at least as low under the convention between the person's country of residence and the United States as under this Convention.

*Competent authority discretion*.

Paragraph 6 provides that when a resident of Canada derives income from the United States and is not entitled to the benefits of the Convention under other provisions of the Article, benefits may, nevertheless be granted at the discretion of the U.S. competent authority. In making a determination under this paragraph, the competent authority will take into account all relevant facts and circumstances relating to the person requesting the benefits. In particular, the competent authority will consider the history, structure, ownership (including ultimate beneficial ownership), and operations of the person. In addition, the competent authority is to consider

(1) whether the creation and existence of the person did not have as a principal purpose obtaining treaty benefits that would not otherwise be available to the person, and

(2) whether it would not be appropriate, in view of the purpose of the Article, to deny benefits.

The paragraph specifies that if the U.S. competent authority determines that either of these two standards is satisfied, benefits shall be granted.

For purposes of implementing paragraph 6, a taxpayer will be expected to present his case to the competent authority for an advance determination based on the facts. The taxpayer will not be required to wait until it has been determined that benefits are denied under one of the other provisions of the Article. It also is expected that, if and when the competent authority determines that benefits are to be allowed, they will be allowed retroactively to the time of entry into force of the relevant treaty provision or the establishment of the structure in question, whichever is later (assuming that the taxpayer also qualifies under the relevant facts for the earlier period).

*General anti-abuse provisions*.

Paragraph 7 was added at Canada's request to confirm that the specific provisions of Article XXIX A and the fact that these provisions apply only for the purposes of the application of the Convention by the United States should not be construed so as to limit the right of each Contracting State to invoke applicable anti-abuse rules. Thus, for example, Canada remains free to apply such rules to counter abusive arrangements involving "treaty-shopping" through the United States, and the United States remains free to apply its substance-over-form and anti conduit rules, for example, in relation to Canadian residents. This principle is recognized by the Organization for Economic Cooperation and Development in the Commentaries to its Model Tax Convention on Income and on Capital, and the United States and Canada agree that it is inherent in the Convention. The agreement to state this principle explicitly in the Protocol is not intended to suggest that the principle is not also inherent in other tax conventions, including the current Convention with Canada.


ARTICLE 19


*In general*.

Article 19 of the Protocol adds to the Convention a new Article XXIX B (Taxes Imposed by Reason of Death). The purpose of Article XXIX B is to better coordinate the operation of the death tax regimes of the two Contracting States. Such coordination is necessary because the United States imposes an estate tax, while Canada now applies an income tax on gains deemed realized at death rather than an estate tax. Article XXIX B also contains other provisions designed to alleviate death taxes in certain situations.

For purposes of new Article XXIX B, the term "resident" has the meaning provided by Article IV (Residence) of the Convention, as amended by Article 3 of the Protocol. The meaning of the term "resident" for purposes of Article XXIX B, therefore, differs in some respects from its meaning under the estate, gift, and generation-skipping transfer tax provisions of the Internal Revenue Code.

*Charitable bequests.*

Paragraph 1 of new Article XXIX B facilitates certain charitable bequests. It provides that a Contracting State shall accord the same death tax treatment to a bequest by an individual resident in one of the Contracting States to a qualifying exempt organization resident in the other Contracting State as it would have accorded if the organization had been a resident of the first Contracting State. The organizations covered by this provision are those referred to in paragraph 1 of Article XXI (Exempt Organizations) of the Convention. A bequest by a U.S. citizen or U.S. resident (as defined for estate tax purposes under the Internal Revenue Code) to such an exempt organization generally is deductible for U.S. estate tax purposes under section 2055 of the Internal Revenue Code, without regard to whether the organization is a U.S. corporation. However, if the decedent is not a U.S. citizen or U.S. resident (as defined for estate tax purposes under the Internal Revenue Code), such a bequest is deductible for U.S. estate tax purposes, under section 2106(a)(2) of the Internal Revenue Code, only if the recipient organization is a U.S. corporation. Under paragraph 1 of Article XXIX B, a U.S. estate tax deduction also will be allowed for a bequest by a Canadian resident (as defined under Article IV (Residence)) to a qualifying exempt organization that is a Canadian corporation. However, paragraph 1 does not allow a deduction for U.S. estate tax purposes with respect to any transfer of property that is not subject to U.S. estate tax.

*Unified credit*.

Paragraph 2 of Article XXIX B grants a "pro rata" unified credit to the estate of a Canadian resident decedent, for purposes of computing U.S. estate tax. Although the Congress anticipated the negotiation of such *pro rata* unified credits in Internal Revenue Code section 2102(c)(3)(A), this is the first convention in which the United States has agreed to give such a credit. However, certain exemption provisions of existing estate and gift tax conventions have been interpreted as providing a pro rata unified credit.

Under the Internal Revenue Code, the estate of a nonresident not a citizen of the United States is subject to U.S. estate tax only on its U.S. situs assets and is entitled to a unified credit of $13,000, while the estate of a U.S. citizen or U.S. resident is subject to U.S. estate tax on its entire worldwide assets and is entitled to a unified credit of $192,800. (For purposes of these Internal

Revenue Code provisions, the term "resident" has the meaning provided for estate tax purposes under the Internal Revenue Code.) A lower unified credit is provided for the former category of estates because it is assumed that the estate of a nonresident not a citizen generally will hold fewer U.S. situs assets, as a percentage of the estate's total assets, and thus will have a lower U.S. estate tax liability. The pro rata unified credit provisions of paragraph 2 increase the credit allowed to the estate of a Canadian resident decedent to an amount between $13,000 and $192,800 in appropriate cases, to take into account the extent to which the assets of the estate are situated in the United States. Paragraph 2 provides that the amount of the unified credit allowed to the estate of a Canadian resident decedent will in no event be less than the $13,000 allowed under the Internal Revenue Code to the estate of a nonresident not a citizen of the United States (subject to the adjustment for prior gift tax unified credits, discussed below). Paragraph 2 does not apply to the estates of U.S. citizen decedents, whether resident in Canada or elsewhere, because such estates receive a unified credit of $192,800 under the Internal Revenue Code.

Subject to the adjustment for gift tax unified credits, the pro rata credit allowed under paragraph 2 is determined by multiplying $192,800 by a fraction, the numerator of which is the value of the part of the gross estate situated in the United States and he denominator of which is the value of the entire gross estate wherever situated. Thus, if half of the entire gross estate (by value) of a decedent who was a resident and citizen of Canada were situated in the United States, the estate would be entitled to a pro rata unified credit of $96,400 (provided that the U.S. estate tax due is not less than that amount). For purposes of the denominator, the entire gross estate wherever situated (i.e., the worldwide estate, determined under U.S. domestic law) is to be taken into account for purposes of the computation. For purposes of the numerator, an estate's assets will be treated as situated in the United States if they are so treated under U.S. domestic law. However, if enacted, a technical correction now pending before the Congress will amend U.S. domestic law to clarify that assets will not be treated as U.S. situs assets for purposes of the pro rata unified credit computation if the United States is precluded from taxing them by reason of a treaty obligation. This technical correction will affect the interpretation of both this paragraph 2 and the analogous provisions in existing conventions. As currently proposed, it will take effect on the date of enactment.

Paragraph 2 restricts the availability of the pro rata unified credit in two respects. First, the amount of the unified credit otherwise allowable under paragraph 2 is reduced by the amount of any unified credit previously allowed against U.S. gift tax imposed on any gift by the decedent. This rule reflects the fact that, under U.S. domestic law, a U.S. citizen or U.S. resident individual is allowed a unified credit against the U.S. gift tax on lifetime transfers. However, as a result of the estate tax computation, the individual is entitled only to a total unified credit of $192,800, and the amount of the unified credit available for use against U.S. estate tax on the individual's estate is effectively reduced by the amount of any unified credit that has been allowed in respect of gifts by the individual. This rule is reflected by reducing the amount of the pro rata unified credit otherwise allowed to the estate of a decedent individual under paragraph 2 by the amount of any unified credit previously allowed with respect to lifetime gifts by that individual. This reduction will be relevant only in rare cases, where the decedent made gifts subject to the U.S. gift tax while a U.S. citizen or U.S. resident (as defined under the Internal Revenue Code for U.S. gift tax purposes).

Paragraph 2 also conditions allowance of the pro rata unified credit upon the provision of all information necessary to verify and compute the credit. Thus, for example, the estate's representatives will be required to demonstrate satisfactorily both the value of the worldwide estate and the value of the U.S. portion of the estate. Substantiation requirements also apply, of course, with respect to other provisions of the Protocol and the Convention. However, the negotiators believed it advisable to emphasize the substantiation requirements in connection with this provision, because the computation of the pro rata unified credit involves certain information not otherwise relevant for U.S. estate tax purposes.

In addition, the amount of the pro rata unified credit is limited to the amount of U.S. estate tax imposed on the estate. See section 2102(c)(4) of the Internal Revenue Code.

*Marital credit.*

Paragraph 3 of Article XXIX B allows a special "marital credit" against U.S. estate tax in respect of certain transfers to a surviving spouse. The purpose of this marital credit is to alleviate, in appropriate cases, the impact of the estate tax marital deduction restrictions enacted by the Congress in the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA"). It is the firm position of the U.S. Treasury Department that the TAMRA provisions do not violate the non-discrimination provisions of this Convention or any other convention to which the United States is a party. This is because the estate--not the surviving spouse--is the taxpayer, and the TAMRA provisions treat the estates of nonresidents not citizens of the United States in the same manner as the estates of U.S. citizen and U.S. resident decedents. However, the U.S. negotiators believed that it was not inappropriate, in the context of the Protocol, to ease the impact of those TAMRA provisions upon certain estates of limited value.

Paragraph 3 allows a non-refundable marital credit in addition to the pro rata unified credit allowed under paragraph 2 (or, in the case of a U.S. citizen or U.S. resident decedent, the unified credit allowed under U.S. domestic law). However, the marital credit is allowed only in connection with transfers satisfying each of the five conditions set forth in paragraph 3. First, the property must be "qualifying property," i.e., it must pass to the surviving spouse (within the meaning of U.S. domestic law) and be property that would have qualified for the estate tax marital deduction under U.S. domestic law if the surviving spouse had been a U.S. citizen and all applicable elections specified by U.S. domestic law had been properly made. Second, the decedent must have been, at the time of death, either a resident of Canada or the United States or a citizen of the United States. Third, the surviving spouse must have been, at the time of the decedent's death, a resident of either Canada or the United States. Fourth, if both the decedent and the surviving spouse were residents of the United States at the time of the decedent's death, at least one of them must have been a citizen of Canada. Finally, to limit the benefits of paragraph 3 to relatively small estates, the executor of the decedent's estate is required to elect the benefits of paragraph 3, and to waive irrevocably the benefits of any estate tax marital deduction that would be allowed under U.S. domestic law, on a U.S. Federal estate tax return filed by the deadline for making a qualified domestic trust election under Internal Revenue Code section 2056A(d). In the case of the estate of a decedent for which the U.S. Federal estate tax return is filed on or before the date on which this Protocol enters into force, this election and waiver must be made on any return filed to claim a refund pursuant to the special effective date applicable to such estates

(discussed below).

Paragraph 4 governs the computation of the marital credit allowed under paragraph 3. It provides that the amount of the marital credit shall equal the lesser of

(i) the amount of the unified credit allowed to the estate under paragraph 2 or, where applicable, under U.S. domestic law (before reduction for any gift tax unified credit), or

(ii) the amount of U.S. estate tax that would otherwise be imposed on the transfer of qualifying property to the surviving spouse.

For this purpose, the amount of U.S. estate tax that would otherwise be imposed on the transfer of qualifying property equals the amount by which

(i) the estate tax (before allowable credits) that would be imposed if that property were included in computing the taxable estate exceeds

(ii) the estate tax (before allowable credits) that would be imposed if the property were not so included.

Property that, by reason of the provisions of paragraph 8 of this Article, is not subject to U.S. estate tax is not taken into account for purposes of this hypothetical computation.

Finally, paragraph 4 provides taxpayers with an ordering rule. The rule states that, solely for purposes of determining any other credits (e.g., the credits for foreign and state death taxes) that may be allowed under U.S. domestic law to the estate, the marital credit shall be allowed after such other credits.

In certain cases, the provisions of paragraphs 3 and 4 may affect the U.S. estate taxation of a trust that would meet the requirements for a qualified terminable interest property ("QTIP") election, for example, a trust with a life income interest for the surviving spouse and a remainder interest for other family members. If, in lieu of making the QTIP election and the qualified domestic trust election, the decedent's executor makes the election described in paragraph 3(d) of this Article, the provisions of Internal Revenue Code sections 2044 (regarding inclusion in the estate of the second spouse of certain property for which the marital deduction was previously allowed), 2056A (regarding qualified domestic trusts), and 2519 (regarding dispositions of certain life estates) will not apply. To obtain this treatment, however, tile executor is required, under paragraph 3, to irrevocably waive the benefit of any marital deduction allowable under the Internal Revenue Code with respect to the trust.

The following examples illustrate the operation of the marital credit and its interaction with other credits. Unless otherwise stated, assume for purposes of illustration that H, the decedent, and W, his surviving spouse, are Canadian citizens resident in Canada at the time of the decedent's death. Assume further that all conditions set forth in paragraphs 2 and 3 of this Article XXIX B are satisfied (including the condition that the executor waive the estate tax marital deduction), that no deductions are available under the Internal Revenue Code in computing the U.S. estate tax liability, and that there are no adjusted taxable gifts within the meaning of Internal Revenue Code section 2001(b) or 2101(c). Also assume that the applicable U.S. domestic estate and gift tax laws are those that were in effect on the date the Protocol was signed.

| | |
|---|---|
| *Example 1.* | H has a worldwide gross estate of $1,200,000. He bequeaths U.S. real property worth $600,000 to W. The remainder of H's estate consists of Canadian situs property. H's estate would be entitled to a pro rata unified credit of $96,400 (= $192,800 x ($600,000/$1,200,000)) and to a marital credit in the same amount (the lesser of the unified credit allowed ($96,400) and the U.S. estate tax that would otherwise be imposed on the property transferred to W ($192,800 [tax on U.S. taxable estate of $600,000])). The pro rata unified credit and the marital credit combined would eliminate all U.S. estate tax with respect to the property transferred to W. |
| *Example 2.* | H has a worldwide gross estate of $1,200,000, all of which is situated in the United States. He bequeaths U.S. real property worth $600,000 to W and U.S. real property worth $600,000 to a child, C. H's estate would be entitled to a pro rata unified credit of $192,800 (= $192,800 x $1,200,000/$1,200,000) and to a marital credit of $192,800 (the lesser of the unified credit ($192,800) and the U.S. estate tax that would otherwise be imposed on the property transferred to W ($235,000, i.e., $427,800 [tax on U.S. taxable estate of $1,200,000] less $192,800 [tax on U.S. taxable estate of $600,000])). This would reduce the estate's total U.S. estate tax liability of $427,800 by $385,600. |
| *Example 3.* | H has a worldwide gross estate of $700,000, of which $500,000 is real property situated in the United States. H bequeaths U.S. real property valued at $100,000 to W. The remainder of H's gross estate, consisting of U.S. and Canadian situs real property, is bequeathed to H's child, C. H's estate would be entitled to a pro rata unified credit of $137,714 ($192,800 x $500,000/$700,000). In addition, H's estate would be entitled to a marital credit of $34,000, which equals the lesser of the unified credit ($137,714) and $34,000 (the U.S. estate tax that would otherwise be imposed on the property transferred to W before allowance of any credits, i.e., $155,800 [tax on U.S. taxable estate of $500,000] less $121,800 [tax on U.S. taxable estate of $400,000]). |
| *Example 4.* | H has a worldwide gross estate of $5,000,000, $2,000,000 of which consists of U.S. real property situated in State X. State X imposes a state death tax equal to the federal credit allowed under Internal Revenue Code section 2011. H bequeaths U.S. situs real property worth $1,000,000 to W and U.S. situs real property worth $1,000,000 to his child, C. The remainder of H's estate ($3,000,000) consists of Canadian situs property passing to C. H's estate would be entitled to a pro rata unified credit of $77,120 ($192,800 x $2,000,000/$5,000,000). H's estate would be entitled to a state death tax credit under Internal Revenue Code section 2102 of $99,600 (determined under Internal Revenue Code section 2011(b) with respect to an adjusted taxable estate of $1,940,000). H's estate also would be entitled to a marital credit of $77,120, which equals the lesser of the unified credit ($77,120) and |

$435,000 (the U.S. estate tax that would otherwise be imposed on the property transferred to W before allowance of any credits, i.e., $780,000 [tax on U.S. taxable estate of $2,000,000] less $345,800 [tax on U.S. taxable estate of $1,000,000]).

*Example 5.*     The facts are the same as in Example 4, except that H and W are Canadian citizens who are resident in the United States at the time of H's death. Canadian Federal and provincial income taxes totaling $500,000 are imposed by reason of H's death. H's estate would be entitled to a unified credit of $192,800 and to a state death tax credit of $300,880 under Internal Revenue Code sections 2010 and 2011(b), respectively. Under paragraph 6 of Article XXIX B, H's estate would be entitled to a credit for the Canadian income tax imposed by reason of death, equal to the lesser of $500,000 (the Canadian taxes paid) or $1,138,272 ($2,390,800 (tax on $5,000,000 taxable estate) less total of unified and state death tax credits ($493,680) x $3,000,000/$5,000,000). H's estate also would be entitled to a marital credit of $192,800, which equals the lesser of the unified credit ($192,800) and $550,000 (the U.S. estate tax that would otherwise be imposed on the property transferred to W before allowance of any credits, i.e., $2,390,800 (tax on U.S. taxable estate of $5,000,000) less $1,840,800 [tax on U.S. taxable estate of $4,000,000]).

### *Canadian treatment of certain transfers.*

The provisions of paragraph 5 relate to the operation of Canadian law. They are intended to provide deferral ("rollover") of the Canadian tax at death for certain transfers to a surviving spouse and to permit the Canadian competent authority to allow such deferral for certain transfers to a trust. For example, they would enable the competent authority to treat a trust that is a qualified domestic trust for U.S. estate tax purposes as a Canadian spousal trust as well for purposes of certain provisions of Canadian tax law and of the Convention. These provisions do not affect U.S. domestic law regarding qualified domestic trusts. Nor do they affect the status of U.S. resident individuals for any other purpose.

### *Credit for U.S. taxes.*

Under paragraph 6, Canada agrees to give Canadian residents and Canadian resident spousal trusts (or trusts treated as such by virtue of paragraph 5) a deduction from tax (i.e., a credit) for U.S. Federal or state estate or inheritance taxes imposed on U.S. situs property of the decedent or the trust. This credit is allowed against the income tax imposed by Canada, in an amount computed in accordance with subparagraph 6(a) or 6(b).

Subparagraph 6(a) covers the first set of cases---where the U.S. tax is imposed upon a decedent's death. Subparagraph 6(a)(i) allows a credit for U.S. tax against the total amount of Canadian income tax payable by the decedent in the taxable year of death on any income, profits, or gains arising in the United States (within the meaning of paragraph 3 of Article XXIV

(Elimination of Double Taxation)). For purposes of subparagraph 6(a)(i), income, profits, or gains arising in the United States within the meaning of paragraph 3 of Article XXIV include gains deemed realized at death on U.S. situs real property and on personal property forming part of the business property of a U.S. permanent establishment or fixed base. (As explained below, these are the only types of property on which the United States may impose its estate tax if the estate is worth $1.2 million or less.) Income, profits, or gains arising in the United States also include income and profits earned by the decedent during the taxable year of death, to the extent that the United States may tax such amounts under the Convention (e.g., dividends received from a U.S. corporation and wages from the performance of personal services in the United States).

Where the value of the decedent's entire gross estate exceeds $1.2 million, subparagraph 6(a)(ii) allows a credit against the Canadian income tax on any income, profits, or gains from any U.S. situs property, in addition to any credit allowed by subparagraph 6(a)(i). This provision is broader in scope than is the general rule under subparagraph 6(a)(i), because the United States has retained the right to impose its estate tax on all types of property in the case of larger estates.

Subparagraph 6(b) provides rules for a second category of cases----where the U.S. tax is imposed upon the death of the surviving spouse. In these cases, Canada agrees to allow a credit against the Canadian tax payable by a trust for its taxable year during which the surviving spouse dies on any income, profits, or gains

(i) arising in the United States on U.S. situs real property or business property, or
(ii) from property situated in the United States.

These rules are intended to provide a credit for taxes imposed as a result of the death of the surviving spouse in situations involving trusts. To the extent that taxes are imposed on the estate of the surviving spouse, subparagraph 6(a) would apply as well. In addition, the competent authorities are authorized to provide relief from double taxation in certain additional circumstances involving trusts, as described above in connection with Article 14 of the Protocol.

The credit allowed under paragraph 6 is subject to certain conditions. First, where the decedent was a U.S. citizen or former citizen (described in paragraph 2 of Article XXIX (Miscellaneous Rules)), paragraph 6 does not obligate Canada to provide a credit for U.S. taxes in excess of the amount of U.S. taxes that would have been payable if the decedent had not been a U.S. citizen or former citizen. Second, the credit allowed under paragraph 6 will be computed after taking into account any deduction for U.S. income tax provided under paragraph 2(a), 4(a), or 5(b) of Article XXIV (Elimination of Double Taxation). This clarifies that no double credit will be allowed for any amount and provides an ordering rule. Finally, because Canadian domestic law does not contain a definition of U.S. situs property for death tax purposes, such a definition is provided for purposes of paragraph 6. To maximize coordination of the credit provisions, the Contracting States agreed to follow the U.S. estate tax law definition as in effect on the date of signature of the Protocol and, subject to competent authority agreement, as it may be amended in the future.

***Credit for Canadian taxes.***

Under paragraph 7, the United States agrees to allow a credit against U.S. Federal estate tax imposed on the estate of a U.S. resident or U.S. citizen decedent, or upon the death of a surviving spouse with respect to a qualified; domestic trust created by such a decedent (or the decedent's executor or surviving spouse). The credit is allowed for <u>Canadian Federal and provincial income taxes</u> imposed at death with respect to property of the estate or trust that is situated outside of the United States. As in the case under paragraph 6, the competent authorities also are authorized to provide relief from double taxation in certain cases involving trusts (see discussion of Article 14, above).

The amount of the credit generally will be determined as though the income tax imposed by Canada were a creditable tax under the U.S. estate tax provisions regarding credit for foreign death taxes, in accordance with the provisions and subject to the limitations of Internal Revenue Code section 2014. However, subparagraph 7(a) clarifies that a credit otherwise allowable under paragraph 7 will not be denied merely because of inconsistencies between U.S. and Canadian law regarding the identity of the taxpayer in the case of a particular taxable event. For example, the fact that the taxpayer is the decedent's estate for purposes of U.S. estate taxation and the decedent for purposes of Canadian income taxation will not prevent the allowance of a credit under paragraph 7 for Canadian income taxes imposed by reason of the death of the decedent.

In addition, subparagraph 7(c) clarifies that the credit against the U.S. estate tax generally may be claimed only to the extent that no credit or deduction is claimed for the same amount of Canadian tax in determining any other U.S. tax. This makes clear, for example, that a credit may not be claimed for the same amount under both this provision and Article XXIV (Elimination of Double Taxation). To prevent double taxation, an exception to this restriction is provided for certain taxes imposed with respect to qualified domestic trusts. Subject to the limitations of subparagraph 7(c), the taxpayer may choose between relief under Article XXIV, relief under this paragraph 7, or some combination of the two.

***Relief for small estates.***

Under paragraph 8, the United States agrees to limit the application of its estate tax in the case of certain small estates of Canadian resident decedents. This provision is intended to eliminate the "trap for the unwary" that exists for such decedents, in the absence of an estate tax convention between the United States and Canada. In the absence of sophisticated estate tax planning, such decedents may inadvertently subject their estates to U.S. estate tax liability by holding shares of U.S. corporate stock or other U.S. situs property. U.S. resident decedents are already protected in this regard by the provisions of Article XIII (Gains) of the present Convention, which prohibit Canada from imposing its income tax on gains deemed realized at death by U.S. residents on such property.

Paragraph 8 provides relief only in the case of Canadian resident decedents whose entire gross estates wherever situated (i.e., worldwide gross estates determined under U.S. law) have a value, at the time of death, not exceeding $1.2 million. Paragraph 8 provides that the United States may impose its estate tax upon property forming part of such estates only if any gain on alienation of the property would have been subject to U.S. income taxation under Article XIII (Gains). For estates with a total value not exceeding $1.2 million, this provision has the effect of

permitting the United States to impose its estate tax only on real property situated in the United States within the meaning of Article XIII, and personal property forming part of the business property of a U.S. permanent establishment or fixed base.

*Saving clause exceptions.*

Certain provisions of Article XXIX B are included in the list of exceptions to the general "saving clause" of Article XXIX (Miscellaneous Rules), as amended by Article 17 of the Protocol. To the extent that an exception from the saving clause is provided for a provision, each Contracting State is required to allow the benefits of that provision to its residents (and, in the case of the United States, its citizens), notwithstanding the saving clause. General saving clause exceptions are provided for paragraphs 1, 5, and 6 of Article XXIX B. Saving clause exceptions are provided for paragraphs 2, 3, 4, and 7, except for the estates of former U.S. citizens referred to in paragraph 2 of Article XXIX.

*Effective dates.*

Article 21 of the Protocol contains special retrospective effective date provisions for paragraphs 2 through 8 of Article XXIX B and certain related provisions of the Protocol. Paragraphs 2 through 8 of Article XXIX B and the specified related provisions generally will take effect with respect to deaths occurring after the date on which the Protocol enters into force (i.e., the date on which the instruments of ratification are exchanged). However, the benefits of those provisions will also be available with respect to deaths occurring after November 10, 1988, provided that a claim for refund due as a result of these provisions is filed by the later of one year from the date on which the Protocol enters into force or the date on which the applicable period for filing such a claim expires under the domestic law of the Contracting State concerned. The general effective dates set forth in Article 21 of the Protocol otherwise apply.

It is unusual for the United States to agree to retrospective effective dates. In this case, however, the negotiators believed that retrospective application was not inappropriate, given the fact that the TAMRA provisions were the impetus for negotiation of the Protocol and that the negotiations commenced soon after the enactment of TAMRA. The United States has agreed to retrospective effective dates in certain other instances (e.g., in the case of the U.S.-Germany estate tax treaty). The retrospective effective dates apply reciprocally, so that they will benefit the estates of U.S. decedents as well as Canadian decedents.

ARTICLE 20

Article 20 of the Protocol does not amend the text of the Convention. It states two understandings between the Contracting States regarding future action relating to matters dealt with in the Protocol. Paragraph 1 requires the appropriate authorities of the Contracting States to consult on two matters within three years from the date on which the Protocol enters into force. First, they will consult with a view to agreeing to further reductions in withholding rates on dividends, interest and royalties under Articles X, XI, and XII, respectively. This provision reflects the fact that, although the Protocol does significantly reduce withholding rates, the United

States remains interested in even greater reductions, to further open the capital markets and fulfill the objectives of the North American Free Trade Agreement. Second, the appropriate authorities of the Contracting States will consult about the rules in Article XXIX A (Limitation on Benefits). By that time, both Contracting States will have had an opportunity to observe the operation of the Article, and the United States will have had greater experience with the corresponding provisions in other recent U.S. tax conventions.

Paragraph 2 of Article 20 also requires consultations between the appropriate authorities, after the three-year period from the date on which the Protocol enters into force, to determine whether to implement the arbitration procedure provided for in paragraph 6 of Article XXVI (Mutual Agreement Procedure), added by Article 14 of the Protocol. The three-year period is intended to give the authorities an opportunity to consider how arbitration has functioned in other tax conventions, such as the U.S.-Germany Convention, before implementing it under this Convention.


ARTICLE 21

Article 21 of the Protocol provides the rules for the entry into force of the Protocol provisions. The Protocol will be subject to ratification according to the normal procedures in both Contracting States and instruments of ratification will be exchanged as soon as possible. Upon the exchange of instruments, the Protocol will enter into force.

Paragraph 2(a) of Article 21 generally governs the entry into force of the provisions of the Protocol for taxes withheld at source, while paragraph 2(b) generally governs for other taxes. Paragraphs 3, 4, and 5 provide special rules for certain provisions.

Paragraph 2(a) provides that the Protocol generally will have effect for taxes withheld at source on dividends, interest, royalties, and pensions and annuities (other than social security benefits), under Articles X, XI, XII, and XVIII, respectively, with respect to amounts paid or credited on or after the first day of the second month following the date on which the Protocol enters into force (i.e., the date on which instruments of ratification are exchanged). However, with respect to direct investment dividends, the 5 percent rate specified in paragraph 2(a) of Article X will be phased in as follows:

(1) for dividends paid or credited after the first day of the second month referred to above, and during 1995, the rate of withholding will be 7 percent;

(2) for dividends paid or credited after the first day of the second month, and during 1996, the rate will be 6 percent; and

(3) for dividends paid or credited after the first day of the second month and after 1996, the rate will be 5 percent.

For taxes other than those withheld at source and for the provisions of the Protocol relating to taxes withheld on social security benefits, the Protocol will have effect with respect to taxable years beginning on or after the first day of January following the date on which the Protocol enters into force. However, the rate of tax applicable to the branch tax under paragraph 6 of Article X (Dividends) will be phased in a manner similar to the direct investment dividend

withholding tax rate; that is, a rate of 6 percent will apply for taxable years beginning in 1996 and a rate of 5 percent will apply for taxable years beginning in 1997 and subsequent years.

Paragraph 3 of Article 21 provides a special effective date for the provisions of the new Article XXVI A (Assistance in Collection) of the Convention, introduced by Article 15 of the Protocol. Collection assistance may be granted by a Contracting State with respect to a request by the other Contracting State for a claim finally determined by the requesting State after the date that is ten years before the date of the entry into force of the Protocol. Thus, for example, if instruments of ratification are exchanged on July 1,1995, assistance may be given by Canada under Article XXVI A for a claim that was finally determined in the United States at any time after July 1, 1985.

Paragraph 4 of Article 21 provides special effective date provisions for paragraphs 2 through 7 of the new Article XXIX B (Taxes Imposed by Reason of Death) of the Convention, introduced by Article 18 of the Protocol, and certain related provisions elsewhere in the Convention. These special effective date provisions are discussed above in connection with Article 18.

Finally, paragraph 5 of Article 21 provides a special effective date for paragraph 2 of Article 3 of the Protocol, which provides a new residence rule for certain "continued" corporations. Under paragraph 5, the new residence rule for such corporations will have effect for taxable years beginning on or after the first day of January following the date on which the Protocol enters into force.


PROTOCOL 4

DEPARTMENT OF THE TREASURY TECHNICAL EXPLANATION OF THE
PROTOCOL BETWEEN THE UNITED STATES OF AMERICA AND CANADA
SIGNED AT OTTAWA ON JULY 29, 1997 AMENDING THE CONVENTION
BETWEEN THE UNITED STATES OF AMERICA AND CANADA
WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL
SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980 AS AMENDED BY THE
PROTOCOLS SIGNED ON JUNE 14, 1983, MARCH 28, 1984 AND MARCH 17, 1995

GENERAL EFFECTIVE DATE UNDER ARTICLE XXX: 1 JANUARY 1985

INTRODUCTION

This document is a technical explanation of the Protocol Between the United States of America and Canada signed on July 29, 1997 (the "Protocol") amending the Convention Between the United States of America and Canada With Respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980 as Amended by the Protocols Signed on June 14, 1983, March 28, 1984 and March 17, 1995 (the "Convention").

This technical explanation is an official guide to the Protocol. It reflects the policies

behind particular Protocol provisions, as well as understandings reached with respect to the application and interpretation of the Protocol. References in this technical explanation to "he" or "his" should be read to mean "he or she" or "his or her."

## ARTICLE 1

Article 1 of the Protocol amends paragraph 3 of Article XIII (Gains) of the Convention. Paragraph 1 of Article XIII of the Convention provides that gains derived by a resident of a Contracting State from the alienation of real property situated within the other Contracting State may be taxed in that other State. The term "real property situated in the other Contracting State" is defined for this purpose in paragraph 3 of Article XIII of the Convention.

Under paragraph 3(a) of Article XIII of the Convention, real property situated in the United States includes real property (as defined in Article VI (Income from Real Property) of the Convention) situated in the United States and a United States real property interest. Under section 897(c) of the Internal Revenue Code (the "Code") the term "United States real property interest" includes shares in a U.S. corporation that owns sufficient U.S. real property interests to satisfy an asset-ratio test on certain testing dates.

Under Paragraph 3(b) of Article XIII of the Convention, real property situated in Canada means real property (as defined in Article VI of the Convention) situated in Canada; shares of stock of a company, the value of whose shares consists principally of Canadian real property; and an interest in a partnership, trust or estate, the value of which consists principally of Canadian real property. The term "principally" means more than 50 percent.

Under the Code, stock of a foreign corporation is not considered a "United States real property interest." Therefore, the United States does not tax a resident of Canada on the sale of stock of a foreign corporation, regardless of the composition of the corporation's assets. Although the Convention permits Canada to tax a U.S. resident on the sale of stock of a company that is not a resident of Canada if the value of the company's shares consists principally of Canadian real property, Canada does not currently impose such a tax. However, on April 26, 1995, amendments were proposed to the Canadian Income Tax Act that would impose Canadian income tax on gains realized on stock of certain companies that are not residents of Canada if

(i) more than 50 percent of the fair market value of all of the company's properties consists of any combination of taxable Canadian property, Canadian resource property, timber resource property in Canada and income interests in Canadian trusts, and

(ii) more than 50 percent of the fair market value of the shares in question is derived directly or indirectly from any combination of real property located in Canada, Canadian resource property, and timber resource property in Canada.

This amendment is proposed to be effective as of April 26, 1995 with proration for gains that accrued before that date. Although the Canadian Parliament was dissolved before these amendments were passed, they are expected to be re-introduced in the current session with the same effective date.

The Protocol amends paragraphs 3(a) and 3(b)(ii) of Article XIII of the Convention to limit each State's right to tax the gains of a resident of the other State from the sale of stock of a real property holding company to cases where the company is resident in that State. Although the United States does not impose and is not currently considering imposing a tax under the Code on gains from the sale of stock of nonresident real property holding companies, the Protocol nevertheless amends the Convention to prohibit the imposition of such a tax on Canadian residents. Although Canada is considering imposing such a tax on gains from the sale of shares of companies that are not residents of Canada, this Protocol provision will cause the proposed amendments to the Canadian Income Tax Act to be inapplicable to U.S. residents who derive gains from the sale of stock of real property holding companies that are not residents of Canada. This provision will be retroactively effective to April 26, 1995, the date the previous Canadian legislation was proposed to be effective.

ARTICLE 2

*Paragraph 1*

Paragraph 1 of Article 2 of the Protocol amends paragraph 3 of Article XVIII (Pensions and Annuities) of the Convention to clarify that social security benefits paid by one Contracting State in respect of services rendered to that State or a subdivision or authority of that State are subject to the rules set forth in paragraph 5 of Article XVIII, and are not subject to Article XIX (Government Service). Thus, all social security benefits paid by a Contracting State will be subject to the same rules, regardless of whether the services were rendered to a private sector employer, the government, or both.

*Paragraph 2*

Paragraph 2 of Article 2 of the Protocol amends paragraph 5 of Article XVIII of the Convention, which provides rules for the taxation of social security benefits (including tier 1 railroad retirement benefits but not including unemployment benefits), and reverses changes made by the third protocol to the Convention, which was signed on March 17, 1995 and generally took effect as of January 1, 1996 (the "1995 Protocol"). Under the Convention prior to amendment by the 1995 Protocol, the State of residence of the recipient of social security benefits had the exclusive right to tax social security benefits paid by the other State on a net basis but exempted 50 percent of the benefit. This was changed by the 1995 Protocol. Under the 1995 Protocol, effective January 1, 1996 benefits paid under the U.S. or Canadian social security legislation to a resident of the other Contracting State (or, in the case of Canadian benefits, paid to a U.S. citizen) are taxable exclusively in the paying State.

Canada and the United States impose different source-basis taxing regimes on social security benefits. Under Code section 871(a)(3), 85 percent of social security benefits paid to a nonresident alien are includible in gross income. The taxable portion of social security benefits is subject to the regular 30 percent withholding tax, with the result that the gross social security benefit is subject to an effective tax rate of 25.5 percent. This is a final payment of tax and

Canadian recipients of U.S. social security benefits, regardless of their level of income, may not elect to be taxed in the United States on a net basis at graduated rates.

In Canada, social security benefits paid to nonresidents are subject to a general withholding tax of 25 percent. However, Canada permits U.S. recipients of Canadian benefits to file a Canadian tax return and pay tax at regular graduated rates on their net income. As a result, low-income U.S. recipients of Canadian social security typically pay little or no tax on their benefits.

The Protocol returns to a system of residence-based taxation in which social security benefits are exclusively taxable in the State where the recipient lives. Social security benefits will generally be taxed as if they were benefits paid under the social security legislation in the residence State. Therefore, social security benefits will be taxed on a net basis at graduated rates and low-income recipients will not pay any tax on these benefits. However, the Protocol modifies the residence State's taxation of cross-border benefits in order to take into account how the benefits would have been taxed in the source State if paid to a resident of that State.

In the case of Canadian recipients of U.S. social security benefits, the Protocol provides that only 85 percent of these benefits will be subject to tax in Canada. This reflects the fact that, although in Canada social security benefits are fully includible, a maximum of 85 percent of United States social security benefits are includible in income for U.S. tax purposes. See Code section 86. This is also consistent with the taxation of social security benefits under the Convention prior to the effective date of the 1995 Protocol, since at the time the pre-1996 rule was adopted the United States included a maximum of 50 percent of the social security benefits in income.

In the case of U.S. recipients of Canadian social security benefits, the Protocol provides that the benefits will be taxed as if they were payments under the Social Security Act. Therefore, a maximum of 85 percent of the Canadian benefits will be included in the gross income of a U.S. recipient, even though the entire benefit would have been taxed by Canada if received by a Canadian resident. However, if the Canadian benefit is of a type that is not subject to Canadian tax when paid to a resident of Canada, it will not be subject to U.S. tax when received by a resident of the United States. This provision is necessary to take into account certain proposed changes to Canada's Old Age Security benefits. At present, Old Age Security benefits paid to U.S. residents are subject to both ordinary Canadian income tax and an additional "recovery tax" that has the effect of means-testing the benefit. Canada has proposed to change the Old Age Security benefit system so that the benefit would be means-tested at source and not subject to the recovery tax. Because the amount of such future benefits will have already been reduced to take into account the recipient's income, it would not be appropriate to subject such benefits to additional U.S. tax.

ARTICLE 3

Article 3 of the Protocol contains the rules for bringing the Protocol into force and giving effect to its provisions.

*Paragraph 1*

Paragraph 1 provides for the ratification of the Protocol by both Contracting States according to their constitutional and statutory requirements and instruments of ratification will be exchanged as soon as possible.

In the United States, the process leading to ratification and entry into force is as follows: Once a protocol has been signed by authorized representatives of the two Contracting States, the Department of State sends the protocol to the President who formally transmits it to the Senate for its advice and consent to ratification, which requires approval by two-thirds of the Senators present and voting. Prior to this vote, however, it generally has been the practice for the Senate Committee on Foreign Relations to hold hearings on the protocol and make a recommendation regarding its approval to the full Senate. Both Government and private sector witnesses may testify at these hearings. After receiving the advice and consent of the Senate to ratification, the protocol is returned to the President for his signature on the ratification document. The President's signature on the document completes the process in the United States.

*Paragraph 2*

Paragraph 2 of Article 3 provides that the Protocol will enter into force on the date on which the instruments of ratification are exchanged. However, the date on which the Protocol enters into force will not be the date on which its provisions will take effect. Paragraph 2, therefore, also contains rules that determine when the provisions of the Protocol will have effect.

Under paragraph 2(a), Article 1 of the Protocol will have effect as of April 26, 1995. As discussed above, this is the date on which certain proposed amendments to Canadian law would be effective.

Under paragraph 2(b), Article 2 of the Protocol will have effect as of January 1, 1996, which is the date as of which the changes to the taxation of social security benefits that were implemented by the 1995 Protocol became effective. Consequently, the source-basis taxation of social security benefits that was implemented by the 1995 Protocol will be retroactively eliminated and recipients of cross-border social security benefits will be entitled to a refund of any source-State tax withheld on their benefits for 1996 and later years. This return to residence-basis taxation of social security benefits means that some high-income recipients of cross-border benefits may be required to pay additional taxes to their State of residence if their average tax rate on these benefits in their State of residence is higher than the current rate of source-State withholding tax. It is only for future years, however, that such high-income recipients of benefits will be subject to a higher rate of tax. No one will be subject to a higher rate of tax for the retroactive period. If, as a result of the change, the residence-State tax would exceed the amount of the refund otherwise due, there will be neither a refund of source-State tax nor the imposition of additional residence-State tax.

Subparagraphs (b)(i) and (ii) provide rules that determine how the retroactive effect of the Protocol will generally be implemented for the year in which the Protocol enters into effect. As

discussed below, these rules are required as a result of administrative limitations on the ability of the relevant Government organizations to effect the payment of refunds. Withholding taxes imposed by the United States on cross-border social security benefits are collected and administered by the Social Security Administration (SSA), not the Internal Revenue Service (IRS). However, any refunds of withholding tax improperly collected on social security benefits are ordinarily paid by the IRS. If the Protocol enters into force prior to September 1 of a calendar year, it is possible for the SSA to pay refunds of the tax withheld for the entire year directly to the individual Canadian recipient. If the Protocol enters into force after August 31 of a calendar year, it will not be possible for SSA to pay refunds of tax withheld for that year and refunds must be paid through the IRS.

Paragraphs 3, 4 and 5 of Article 3 establish administrative procedures to govern the payment of refunds through the IRS, including rules to ensure that benefits will not be subject to a higher rate of tax in the residence State for the retroactive period. The taxes withheld on social security benefits paid for years after 1995 and prior to the calendar year in which the Protocol enters into force (referred to in the Protocol as "source-taxed benefits") will be subject to the refund procedures set forth in paragraphs 3, 4, and 5, regardless of when the Protocol enters into force. Social security benefits paid for calendar years beginning after the Protocol enters into force will not be subject to the refund procedures set forth in paragraphs 3, 4, and 5 because source State tax will not be withheld.

If the Protocol enters into force after August 31 of a calendar year, subparagraph (b)(i) provides that social security benefits paid during such calendar year will be treated as benefits paid for calendar years ending before the year in which the Protocol enters into force (and thus will be treated as "source-taxed benefits"). In this case, the taxes withheld on these benefits will be subject to the refund procedures set forth in paragraphs 3, 4, and 5 of Article 3 and these benefits will not be subject to a higher rate of residence-State tax. If the Protocol enters into force before September 1 of a calendar year, subparagraph (b)(ii) provides that social security benefits paid during such calendar year will be treated as benefits paid for calendar years beginning after the year in which the Protocol enters into force. In this case, the taxes withheld on these benefits will be directly and automatically refunded by the source State and the potentially higher rate of residence-State tax will apply.

*Paragraph 3*

Paragraph 3 of Article 3 of the Protocol provides rules governing the payment of refunds of source-State tax with respect to "source-taxed benefits." In general, all applications for refund must be made to the competent authority of the source State within three years of entry into force of the Protocol.

Except as set forth in subparagraph (b) of paragraph 2, the retroactive effect of the Protocol is elective and applies only if a recipient of benefits applies for a refund of the tax paid or withheld. Consequently, if a recipient of benefits does not apply for a refund of the tax paid or withheld, the Protocol will not be given retroactive effect, except as set forth in subparagraph (b) of paragraph 2. If the residence-State tax that would be imposed on such source-taxed benefits is greater than the source-State tax imposed on such benefits, it is assumed that the recipient will not

apply for a refund of the source-State tax and such benefits will not be subject to the retroactive effect of the Protocol. Because the application for refund may be made on a year-by-year basis, the recipient may elect the most beneficial treatment for each year. Therefore, social security benefits will not be subject to a higher rate of tax for the retroactive period, except as set forth in subparagraph (b) of paragraph 2.

The refund procedure depends on the recipient's State of residence. In the case of U.S. residents who received Canadian social security benefits that were subject to Canadian tax, a U.S. resident who elects to have the Protocol apply retroactively will apply directly to the Canadian competent authority for the refund of any Canadian tax not previously refunded. On the receipt of such refund, the Canadian social security benefits will be includible in the U.S. resident's gross income for the years with respect to which the refund was paid. Consequently, the U.S. recipient may be required to file an amended U.S. income tax return for such years and pay U.S. tax on such benefits. Pursuant to Article XXVII (Exchange of Information) of the Convention, the Canadian competent authority will provide the U.S. competent authority with information regarding the payment of refunds.

In the case of Canadian residents who received U.S. social security benefits, the Canadian competent authority shall be the only person entitled to apply for a refund of the U.S. taxes withheld on such benefits. Individual residents of Canada will not apply directly to the IRS for refunds. However, the Canadian competent authority may base its applications on information received from individual Canadians, as well as on information to be provided by the United State competent authority. The Protocol provides that the Canadian competent authority shall apply for and receive all such refunds on behalf of individual residents of Canada and shall remit such refunds to individual residents of Canada after deducting any additional Canadian tax that may be imposed as a result of such social security benefits being subject to tax in Canada. The Canadian competent authority shall make such application for refund on behalf of an individual resident of Canada only if the additional Canadian tax that would be imposed is less than the amount of the U.S. tax to be refunded. If, with respect to an individual resident of Canada, the additional Canadian tax that would be imposed on the individual's social security benefits is equal to or greater than the U.S. tax withheld, the Canadian competent authority shall not apply for a refund of the U.S. tax withheld on the individual's benefits. This provision ensures that refunds of U.S. tax will be paid only when the refund will benefit an individual resident of Canada. A refund of U.S. tax will not be paid if it would simply result in a payment from the U.S. Treasury to the Government of Canada without any portion of the refund being paid to an individual resident of Canada.

*Paragraph 4*

Paragraph 4 provides that all taxes refunded as a result of the Protocol will be refunded without interest. Consequently, any additional taxes assessed as a result of the Protocol will be assessed without interest provided that the additional taxes are paid in a timely manner. However, interest and penalties on underpayments may be assessed for periods beginning after December 31 of the year following the year in which the Protocol enters into force.

*Paragraph 5*

     Paragraph 5 provides that the competent authorities shall establish procedures for making or revoking the application for refund provided for in paragraph 3 and such other procedures as are necessary to ensure the appropriate implementation of the Protocol. It will be necessary to establish procedures for a taxpayer to revoke his application for refund because a taxpayer may apply for a refund and then determine that the residence-State tax imposed on his social security benefits pursuant to Article 2 of the Protocol exceeds the amount of source-State tax refunded. Such a taxpayer (or, in the case of a Canadian resident, the Canadian competent authority acting on behalf of such taxpayer) will be permitted to revoke his application for refund provided that the taxpayer returns the source-State refund and the three-year period established in paragraph 3 has not expired as of the date on which the revocation is filed. The competent authorities will also establish procedures to ensure that duplicate refunds are not paid.

As in the model, items of income not dealt with elsewhere in the Convention are taxable in the State of residence of the recipient. However, in the Convention, such income is also taxable in the other State if it arises there.

In addition to the normal rules for the avoidance of double taxation, the Convention contains a rule not found in either the model or the existing convention for eliminating double taxation of United States citizens who are residents in Canada. Under Canadian law, the credit for foreign taxes on dividends, interest, and royalties is limited to 15 percent. Though the United States withholding rates under the Convention on these forms of income do not exceed 15 percent, United States citizens are subject to United States tax at normal progressive rates. Under the new Convention the United States agrees to give Canada the primary right to any tax on such income in excess of 15 percent, with the United States retaining only a residual right to tax.

The nondiscrimination protection of the Convention is somewhat narrower than the United States model, but is broader than the protection in the existing convention. In a rule not found in any other United States income tax treaty, expenses incurred by a resident of a Contracting State with respect to a convention or conference held in the other State are deductible to the same extent as if the convention were held in the State of residence.

Under the mutual agreement procedures of the Convention, if one State adjusts the accounts of a taxpayer the other State may make a corresponding adjustment (to the benefit of the taxpayer) even after the statute of limitations has run, if that other State has received notice of the case within six years from the end of the year to which the case relates. No such waiver of the statute is provided for in the existing convention. If, on the other hand, appropriate notice is not given, and the case involves an adjustment of arrangements between related persons, the first State agrees to withdraw the adjustment.

The Convention provides a number of transitional rules to protect taxpayer rights in going from the existing to the new convention.

The Convention provides for the termination of the United States-Canada estate tax convention of 1961. That convention is presently operative only on the United States side, because Canada has repealed its Federal estate tax. A 1928 note between the United States and Canada, providing relief from double taxation of shipping profits, is also terminated by the terms of the new Convention.

In an exchange of notes signed at the time of the signing of the Convention, it is agreed that the competent authorities of the two States will work out procedures for certifying the eligibility of organizations to receive tax exempt income and deductible contributions. The note also recognizes Canada's objections to the so-called "unitary apportionment" system used in several states of the United States to assess the income of corporations doing business in the state.

[JOINT COMMITTEE PRINT]

**EXPLANATION OF PROPOSED
INCOME TAX TREATY BETWEEN
THE UNITED STATES AND CANADA**

———

Prepared for the Use of the

COMMITTEE ON FOREIGN RELATIONS
UNITED STATES SENATE

by the staff of the

JOINT COMMITTEE ON TAXATION



SEPTEMBER 22, 1981

U.S. GOVERNMENT PRINTING OFFICE
83-237 O          WASHINGTON : 1981          JCS-48-81

CONTENTS

| | Page |
|---|---|
| Introduction | 1 |
| I. Summary | 3 |
| II. Overview of United States Taxation of International Trade and Investments and Tax Treaties | 8 |
| A. United States Tax Rules | 8 |
| B. United States Tax Treaties—In General | 9 |
| III. Explanation of Proposed Tax Treaty | 12 |
| Article I. Personal Scope | 12 |
| Article II. Taxes Covered | 12 |
| Article III. General Definitions | 13 |
| Article IV. Residence | 14 |
| Article V. Permanent Establishment | 15 |
| Article VI. Income from Real Property | 16 |
| Article VII. Business Profits | 17 |
| Article VIII. Transport | 19 |
| Article IX. Related Persons | 21 |
| Article X. Dividends | 22 |
| Article XI. Interest | 25 |
| Article XII. Royalties | 27 |
| Article XIII. Gains | 28 |
| Article XIV. Independent Personal Services | 31 |
| Article XV. Dependent Personal Services | 31 |
| Article XVI. Artistes and Athletes | 31 |
| Article XVII. Withholding of Taxes in Respect of Independent Personal Services | 32 |
| Article XVIII. Pensions and Annuities | 32 |
| Article XIX. Governmental Service | 33 |
| Article XX. Students | 33 |
| Article XXI. Exempt Organizations | 33 |
| Article XXII. Other Income | 35 |
| Article XXIII. Capital | 35 |
| Article XXIV. Elimination of Double Taxation | 35 |
| Article XXV. Nondiscrimination | 38 |
| Article XXVI. Mutual Agreement Procedure | 40 |
| Article XXVII. Exchange of Information | 41 |
| Article XXVIII. Diplomatic Agents and Consular Officers | 42 |
| Article XXIX. Miscellaneous Rules | 42 |
| Article XXX. Entry into Force | 44 |
| Article XXXI. Termination | 44 |
| Exchange of Notes | 44 |

(III)

**Appx331**

## INTRODUCTION

This pamphlet provides an explanation of the proposed income tax treaty between the United States and Canada. The proposed treaty was signed on September 26, 1980, and was amplified by an exchange of notes signed the same date. A similar treaty between two countries, effective since 1942, is currently in force. The proposed treaty has been scheduled for a public hearing on September 24, 1981, by the Senate Committee on Foreign Relations.

The proposed treaty is similar to other recent U.S. income tax treaties, the U.S. model income tax treaty, and the model income tax treaty of the Organization of Economic Cooperation and Development (OECD). However, there are certain important deviations from the U.S. model, in part, reflecting the close economic and physical ties between the two countries.

The first part of the pamphlet is the summary of the applicable provisions of the proposed treaty. The second part provides an overview of U.S. tax rules relating to international trade and investment and U.S. tax treaties in general. This is followed by a detailed, article-by-article explanation of the proposed treaty.

(1)

# I. SUMMARY

## In General

The principal purposes of the proposed income tax treaty between the United States and Canada is to reduce or eliminate double taxation of income earned by citizens and residents of either country from sources within the other country, and to prevent avoidance or evasion of the income taxes of the two countries. The proposed treaty is intended to continue to promote close economic cooperation between the two countries and to eliminate possible barriers to trade caused by overlapping taxing jurisdictions of the two countries. It is intended to enable the countries to cooperate in preventing avoidance and evasion of taxes.

As in other U.S. tax treaties, these objectives are principally achieved by each country agreeing to limit, in certain specified situations, its right to tax income derived from its territory by residents of the other. For example, the treaty contains the standard tax treaty provision that neither country will tax the business income derived from sources within that country by residents of the other unless the business activities of the taxing country are substantial enough to constitute a permanent establishment or fixed base (Articles VII or XIV). Similarly, the treaty contains the standard "commercial visitor" exemptions under which residents of one country performing personal services in the other will not be required to file tax returns and pay tax in the other unless their contact with the other exceeds certain specified minimums (Articles XIV, XV, XVI, and XVII). The proposed treaty provides that dividends, interest, royalties, capital gains and certain other income derived by a resident of either country from sources within the other country generally may be taxed by both countries (Articles X, XI, XII, and XIII). Generally, however, dividends, interests, and royalties received by a resident of one country from sources within the other country are to be taxed on a restricted basis (Articles X, XI, and XII).

In situations where the country of source retains the right under the proposed treaty to tax income derived by residents of the other country, the treaty generally provides for the relief of the potential double taxation by the country of residence allowing a foreign tax credit or, in a limited case, a partial exemption.

This treaty contains the standard provision (the "saving clause") contained in U.S. tax treaties that each country retains the right to tax its citizens and residents as if the treaty had not come into effect (Article XXIX). In addition, it contains the standard provision that the treaty will not be applied to deny any taxpayer any benefits he would be entitled to under the domestic law of the country or under any other agreement between the two countries (Article XXIX); that is, the treaty will only be applied to the benefit of taxpayers.

(3)

4

The treaty differs in certain respects from many U.S. income tax treaties and the U.S. model. It also differs in significant respects from the present treaty. Many of these differences accrue to the benefit of U.S. businesses.

(1) The proposed treaty does not generally cover U.S. citizens who are not also U.S. residents. The U.S. model does cover such U.S. citizens. However, the U.S. has rarely been able to negotiate coverage for nonresident citizens.

(2) The proposed treaty does not contain a definition of the term "business profits," although certain categories of business profits are defined in other articles. This leaves to local law the definition of that term in some cases, and accordingly the profits that must be attributed to a permanent establishment before those profits can be taxed by the country of source. Most U.S. treaties, and the U.S. model, define the term business profits.

(3) The transportation article, Article VIII, covers income from the operation or rental of motor vehicles and railway cars. Income derived by a common carrier which is a resident of one country from the carriage of passengers or freight from the country of residence to the other country is taxable only in the country of the carrier's residence. Also, the countries give up the right to tax income that a resident of the other country earns from the short-term (183 days or less) use or lease of rolling stock or motor vehicles in the host country. This provision reflects Canada's physical proximity to the United States.

(4) The limit on the dividend withholding tax that the country of source may impose is 10 percent in the case of a direct investor and 15 percent in all other cases (Article X). The United States generally seeks a 5 percent limit on direct dividends. The present treaty, however, allows a 15 percent rate.

(5) The treaty does not permit U.S. shareholders in Canadian corporations any relief similar to the imputation credit allowed Canadian shareholders. The United States has obtained relief in the United Kingdom and French treaties.

(6) The withholding tax on interest is limited to 15 percent (Article XI), the same as under the present treaty. Exemptions are provided in some limited cases such as commercial credit. The U.S. model exempts interest from tax at source (provides a zero rate). A zero rate is not generally achieved in many treaties, but is at times achieved for interest earned by banks on loans made to the source country.

(7) The withholding tax on royalties is limited to 10 percent generally and is eliminated for certain copyright royalties (Article XII). Movies and certain television royalties are not copyright royalties and thus may be taxed at source at 10 percent. The present treaty allows a 15 percent rate generally, and also exempts copyright royalties from tax at source. The U.S. model exempts royalties from tax at source. It does not distinguish between copyright and other royalties.

(8) The language of the capital gains provisions (Article XIII) would limit the situations in which Canadian investors in U.S. corporations and other entities hold U.S. real estate would be taxed under the recently enacted legislation taxing foreign investors on their gains from the sale of real estate. On its face it would also give Canadians who owned U.S. real estate on the date the treaty is signed

a step-up in basis for purposes of computing gain on the sale of the property to the effective date of the treaty. Also, the treaty states that the United States to tax Canadians on certain dispositions of U.S. real property interests only as long as Canada would tax U.S. persons on similar interests in Canadian real property. The present treaty is the only U.S. treaty that exempts gains from the sale of real property from tax.

(9) The treaty permits a resident of one country a charitable contribution deduction for donations to charities of the other country (Article XXI). This provision is not found in the U.S. model or most other U.S. income tax treaties. It is contained in the present treaty.

(10) The nondiscrimination provision is more limited than the model provisions and other provisions found in many treaties. For example, it does not cover residents of one country who own stock in a corporation of the other country. The provision is, however, considerably broader than the very limited provision in the present treaty.

(11) An organization exempt from tax in one country may be exempt from tax in the other country. An exemption from tax at source is also provided for dividends and interest paid to pension plans resident in the other country. An exemption from the U.S. excise tax on private foundations is provided a Canadian exempt organization that receives substantially all of its support from non-U.S. persons.

(12) Residents of one country may, under certain condition treat a contribution to a charity of the other country as a deductible charitable contribution.

*Specific Issues*

The proposed treaty presents the following specific issues:

(1) *Nondiscrimination.*—Canada's tax system evidently contains certain provisions that discriminate against foreign investors as opposed to Canadian investors. For example, it is understood that in certain cases Canadian corporations receive a surtax exemption if they are owned by Canadians but not if they are owned by foreign persons. Another area of concern in this regard is Canadian natural resource taxation.

The United States generally insists that its tax treaties contain a broad nondiscrimination provision that would prohibit the treaty partner from discriminating against U.S. investors. At the insistence of Canada, the nondiscrimination provision in the proposed treaty is not as comprehensive as that sought by the United States or as that contained in the U.S. or the OECD model treaties or the U.N. guidelines. On the other hand, the nondiscrimination provision in the proposed treaty is much broader than that contained in the present treaty with Canada which only applies to individual U.S. citizens resident in Canada. We understand that the provision is the broadest agreed to by Canada in any of its treaties.

This raises the issue of whether the United States should enter into a treaty that countenances the right of a developed country to discriminate against U.S. investors in circumstances not generally permitted in tax treaties. At the present, staff does not have sufficient information to identify and evaluate the provisions of Canadian tax law

which may be viewed as discriminating against U.S. investors but which would be permitted under the proposed treaty language.

(2) *Mineral royalties.*—The present treaty contains an overall 15-percent limit on the rate of tax that either country can impose on investment income paid to residents of the other country. The proposed treaty removes this overall limitation but replaces it with limitations on the level of source basis taxation of various types of investment income. There is, however, no limitation on taxation of mineral rents and royalties. Accordingly, the Canadian tax on mineral royalties will be increased to the 25 percent of gross Canadian statutory rate. The U.S. rate will increase to the statutory 30 percent rate. The U.S. and OECD models do not contain a limitation on the taxation of mineral royalties.

(3) *Real property.*—The proposed treaty contains special rules for Canadian residents investing in U.S. real property that differ from U.S. real estate legislation. (The proposed treaty was negotiated before the real estate legislation was enacted.) Among the more important of these differences is that it states that Canadian investors get a step-up in the basis of their U.S. real property (for purposes of computing the U.S. tax on sale of the property) to the effective date of the new treaty. Other differences include various limitations on the situations where the United States can tax Canadians on their sales, their interest in U.S. corporations, and other entities whose assets include U.S. real estate. Also the treaty contains a provision which states that either country can tax gains on the sale of real property holding companies by residents of the other unless the other country would tax foreign investors in its real property holding companies in comparable circumstances. The purpose of this last limitation is not clear. Some may argue that Canadian investors should not be allowed such preferential treatment on their U.S. real estate investments. Conversely, others may argue that the limitations on taxing real estate related gains should be expanded to protect U.S. investors in Canada from Canadian tax.

The present treaty exempts gain from tax at source. Accordingly, it can be argued that a step-up in basis would be a reasonable transition rule.

(4) *Exempt organizations.*—Unlike other U.S. tax treaties, the proposed treaty would exempt charitable organizations of either country from tax imposed by the other. In addition, Canadian private foundations which receive substantially all their support from non-U.S. persons would be exempt from the 4-percent U.S. excise tax on income of private foundations. An exemption is also provided for pension funds but the exemption is limited to interest and dividends received from sources within the other country.

(5) *Conventions.*—The proposed treaty contains a provision that would permit U.S. persons to deduct expenses incurred in attending business conventions in Canada. At the time this provision was negotiated, deductions for conventions held in all foreign countries, including Canada, were subject to substantial restrictions pursuant to amendments to the Code made by the 1976 Act. However, the Code was amended in 1980 to permit deductions for conventions in Canada and Mexico on the same basis as those held in United States and its possessions. Accordingly, the treaty provision would no longer have

any impact on U.S. taxpayers attending Canadian conventions. Unless a contrary intention is expressed by the Senate, however, the inclusion of this provision in the treaty could be taken as precedent for other negotiations. (The Jamaican protocol, discussed below, also contains a convention provision.) It should be noted that Canada also has statutory provisions denying Canadian taxpayers deductions for attending foreign business conventions, so the principal impact of the provision is to allow Canadians deductions for Canadian tax purposes for attending business conventions in the United States.

(6) *Foreign tax credit.*—The U.S. foreign tax credit provided for by the treaty is to be applied on a per-country basis: that is, Canadian taxes will only be permitted to offset U.S. tax imposed on Canadian income. This contrasts with the Code limitation which is computed on an overall, worldwide basis. The interaction between the treaty limitation and the limitations provided by the Internal Revenue Code is complex, and a number of questions arise as to exactly how the two overlapping systems are to be applied. Also, there appears to be some uncertainty as to the application of the treaty per country limitation where income is resource to Canada under the treaty. However, the treaty rules are used only if the taxes are not creditable under the Code.

Another issue is which Canadian taxes are creditable for U.S. purposes. Treasury's technical explanation says that the Canadian general corporate tax will continue to be creditable even if Canada imposes a flat rate tax on natural resource income that is not deductible in computing the general corporate tax. The technical explanation refers to a possible 8-percent tax, but it is now possible that the tax will be significantly higher. This issue is relevant only to persons realizing income from natural resources.

(7) *Imputation credit.*—Canada has a modified "imputation" corporate tax system that provides some relief to resident shareholders from dual corporate-shareholder tax. Individual shareholders resident in Canada who receive dividends from a Canadian corporation must gross up to that dividend by 50 percent of the dividend. The full dividend plus the gross-up is included in income and is taxed. However, he may credit an amount equal to one-half of the dividends against his tax liability. Nonresident shareholders do not get the imputation credit. Accordingly, nonresident shareholders may be subject to a higher combined corporate and personal tax than a Canadian shareholder would be. Relief is granted under U.S. treaties with France and the United Kingdom. The issue raised is whether the United States should insist on complete relief for its shareholders in Canadian companies. The reduction of the dividend withholding tax does provide some relief.

## II. OVERVIEW OF UNITED STATES TAXATION OF INTERNATIONAL TRADE AND INVESTMENT AND TAX TREATIES

### A. United States Tax Rules

The United States taxes U.S. citizens and residents and U.S. corporations on their worldwide income. The United States generally taxes nonresident alien individuals and foreign corporations only on their U.S. source income.

Income of a nonresident alien or foreign corporation which is effectively connected with the conduct of a trade or business in the United States is subject to tax at the normal graduated rates on the basis of net taxable income. Deductions are allowed in computing effectively connected taxable income, but only if and to the extent they are connected with income which is effectively connected.

U.S. source fixed or determinable, annual or periodical income (e.g. interest, dividends, rents, salaries, wages, premiums, annuities) which is not effectively connected with a U.S. trade or business is subject to tax at a rate of 30 percent of the gross amount paid to the nonresident alien or foreign corporation. This gross tax on fixed or determinable income is often reduced or eliminated in the case of payments to residents of countries with which the U.S. has an income tax treaty. The 30-percent (or lower treaty rate) tax imposed on U.S. source noneffectively connected income paid to foreign persons is collected by means of withholding (hence they are often called withholding taxes).

Certain exemptions from the gross tax are provided. Bank account interest is defined as foreign source interest and, therefore, is exempt. Exemptions are also provided for certain original issue discount and for income of a foreign government from investments in U.S. securities. Our treaties also provide for exemption from tax in certain cases.

Net U.S. source capital gains are also subject to the 30 percent tax but only in the case of a nonresident alien who is present in the United States for at least 183 days during the taxable year. Otherwise foreign corporations and nonresident aliens are only subject to U.S. taxation (at the graduated rates) on those capital gains that are effectively connected with the conduct of a trade or business in the United States.

Prior to June 18, 1980, noneffectively connected capital gains from the sale of U.S. real estate were subject to U.S. taxation only if received by a nonresident alien who was present in the United States for at least 183 days. However, in the Omnibus Reconciliation Act of 1980 a provision was added to the Internal Revenue Code that the sale, exchange or disposition of U.S. real estate by a foreign corporation or a nonresident alien would be taxed as effectively connected income. Also taxable under the legislation are dispositions by foreign investors

(8)

of their interests in certain U.S. corporations and other entities whose assets include U.S. real property and associated personal property.

The source of income received by nonresident aliens and foreign corporations is determined under special rules contained in the Internal Revenue Code. Under these rules interest and dividends paid by a U.S. citizen or resident or by a U.S. corporation are considered U.S. source income. However, if the U.S. corporation derives more than 80 percent of its gross income from foreign sources, then dividends and interest paid by such corporation will be foreign source rather than U.S. source. Conversely, dividends and interest paid by a foreign corporation, which has at least 50 percent of its income as effectively connected income, are U.S. source to the extent of the ratio of its effectively connected income to total income.

Rents and royalties paid for the use of property in the United States is considered U.S. source income. The property use can be either tangible property or intangible property (e.g., patents, secret processes and formulas, franchises and other like property).

Since it taxes U.S. persons on their worldwide income, double taxation of income can arise because income earned abroad by a U.S. person will be taxed by the country in which the income is earned and also by the United States. The United States seeks to mitigate this double taxation by allowing U.S. taxpayers to credit their foreign income taxes against the U.S. tax imposed on their foreign source income. A fundamental premise of the foreign tax credit is that it may not offset the U.S. tax on U.S. source income. Therefore, the foreign tax credit provisions contain a limitation that insures that the foreign tax credit only offset the U.S. tax on foreign source income. This limitation is computed on a world-wide consolidated bases. Hence, all income taxes paid to all foreign countries are combined to offset U.S. taxes on all foreign income. Separate limitations on the foreign tax credit are provided for certain interest, DISC dividends, and oil income.

A U.S. corporation that owns 10 percent or more of the stock of a foreign corporation may credit foreign income taxes paid or deemed paid by that foreign corporation on earnings that are received as dividends. These deemed paid taxes are included in total foreign taxes paid for the year the dividend is received and go into the general pool of taxes to be credited.

## B. United States Tax Treaties—In General

The traditional objectives of U.S. tax treaties have been the avoidance of international double taxation and the prevention of tax avoidance and evasion. To a large extent, the treaty provisions designed to carry out these objectives supplement Code provisions having the same objectives, modifying the generally applicable statutory rules with provisions which take into account the particular tax system of the treaty country. Given the diversity of tax systems in the world, it would be virtually impossible to develop in the Code rules which unilaterally would achieve these objectives for all countries.

Notwithstanding the unilateral relief measures of the United States and our treaty partners, double taxation might arise because of differences in source rules between the United States and the other coun-

10

try. Likewise, if both countries consider the same deduction allocable to foreign sources, double taxation can result. Significant problems arise in the determination of whether a foreign tax qualifies for the U.S. foreign tax credit. Also, double taxation may arise in those limited situations where a corporation or individual may be treated as a resident of both countries and be taxed on a worldwide basis by both.

In addition, there may be significant problems involving "excess" taxation—situations where either country taxes income received by nonresidents at rates which exceed the rates imposed on residents. This is most likely to occur in the case of income taxed at a flat rate on a gross income basis. (Most countries, like the United States, generally tax domestic source income on a gross income basis when it is received by nonresidents who are not engaged in business in the country.) In many situations the gross income tax is imposed at a rate which exceeds the tax which would have been paid under the net income tax system applicable to residents.

Another related objective of U.S. tax treaties is the removal of barriers to trade, capital flows, and commercial travel caused by overlapping tax jurisdictions and the burdens of complying with the tax laws of a jurisdiction where the contacts with, and income derived from, that jurisdiction are minimal.

The objective of limiting double taxation is generally accomplished in treaties by the agreement of each country to limit, in certain specified situations, its right to tax income earned from its territory by residents of the other country. For the most part, the various rate reductions and exemptions by the source country provided in the treaties are premised on the assumption that the country of residence will tax the income in any event at levels comparable to those imposed by the source country on its residents. The treaties also provide for the elimination of double taxation by requiring the residence country to allow a credit for taxes which the source country retains the right to impose under the treaty. In some cases, the treaties may provide for exemption by the residence country of income taxed by the source country pursuant to the treaty.

Treaties first seek to eliminate double taxation by defining the term "resident" so that an individual or corporation generally will not be subject to tax as a resident by each of the two countries. The treaty also provides that neither country will tax business income derived from sources within it by residents of the other country unless the business activities in the taxing jurisdiction are substantial enough to constitute a branch or other permanent establishment or fixed base. The treaties contain commercial visitation exemptions under which individual residents of one country performing personal services in the other will not be required to file tax returns and pay tax in that other country unless their contacts exceed certain specified minimums, for example, presence for a set number of days or earnings of over a certain fixed dollar amount.

The treaties deal with passive income such as dividends, interest, or royalties, or capital gains, from sources within one country derived by residents of the other country by either providing that they are taxed only in the country of residence or by providing that the with-

holding tax generally imposed on those payments is reduced. As described above, the U.S. generally imposes a 30 percent tax and seeks to reduce this tax in some cases on some income to zero in its tax treaties.

In its treaties, the United States, as a matter of policy, retains the right to tax its citizens and residents on their worldwide income as if the treaty had not come into effect, and provides this in the treaties in the so-called "saving clause." Double taxation can therefore still arise. Double taxation can also still arise because most countries will not exempt passive income from tax at source.

This double taxation is further mitigated either by granting a credit for income taxes paid to the other country, or, in the case of some of our treaty partners, by providing that income will be exempt from tax in the country of residence. The United States provides in its treaties that it will allow a credit against United States tax for income taxes paid to our treaty partners, subject to the limitations of U.S. law. An important function of the treaty is to define the taxes to which it applies to provide that they will be considered creditable income taxes for purposes of the treaty.

The treaties also provide for administrative cooperation between the countries. This cooperation includes a competent authority mechanism to resolve double taxation problems arising in individual cases, or more generally, by consultation between tax officials of the two governments.

Administrative cooperation also includes provision for an exchange of tax-related information to help the United States and its treaty partners administer their tax laws. The treaties generally provide for the exchange of information between the tax authorities of the two countries where such information is necessary for carrying out the provisions of the treaty or of their domestic tax laws. The obligation to exchange information under the treaties typically does not require either country to carry out measures contrary to its laws or administrative practices or to supply information not obtainable under its laws or in the normal course of its administration, or to supply information which would disclose trade secrets or other information the disclosure of which would be contrary to public policy.

The provisions generally result in an exchange of routine information, such as the names of U.S. residents receiving investment income. The IRS (and the treaty partner's tax authorities) also can request specific tax information from a treaty partner. This can include information to be used in a criminal investigation or prosecution.

## III. EXPLANATION OF PROPOSED TAX TREATY

A detailed, article-by-article explanation of the proposed income tax treaty between the United States and Canada is presented below.

### Article I. Personal Scope

The personal scope Article describes the persons who may claim the benefits of the treaty.

The proposed treaty applies generally to residents of the United States and to residents of Canada, with specific exceptions designated in other articles. This follows other U.S. income tax treaties, the U.S. model income tax treaty, and the OECD model income tax treaty. The treaty also applies, in limited cases, to persons who are residents of neither Canada nor the United States. The term "resident" is defined in Article IV.

### Article II. Taxes Covered

The proposed treaty applies to taxes on income and capital which are imposed by either country. At present, neither Canada nor the United States imposes a tax on capital.

In the case of the United States, the proposed treaty applies to the Federal income taxes imposed by the Internal Revenue Code. In addition, the proposed treaty applies to certain U.S. taxes for specified limited purposes. The proposed treaty applies to the U.S. accumulated earnings tax and the personal holding company tax, only to the extent provided in Article X (Dividends). The proposed treaty applies to the excise tax imposed by the United States on private foundations but only to the extent necessary to implement the special provisions of Article XXI(4), relating to exempt organizations. It also applies to the social security tax but only to the extent necessary to implement the rules in Article XXIX(4) (Miscellaneous Rules).

In the case of Canada, the treaty applies to the income taxes imposed by the Federal Government of Canada under Parts I, XIII, and XIV of the Income Tax Act. These taxes will be treated as creditable income taxes for purposes of the U.S. foreign tax credit granted by Article XXIV(1) (Relief from Double Taxation).

The proposed treaty also contains a provision generally found in U.S. income tax treaties to the effect that it will apply to substantially similar taxes which either country may subsequently impose. It also contains a provision that it will apply to taxes on capital that either country may later impose.

It is understood that the Treasury and the government of Canada agreed that the general Canadian corporate tax would be considered a substantially similar tax if Canada were to enact a low flat-rate tax on natural resource revenues even though that tax is not deductible in computing income under the general rules of Part I of the Canadian

(12)

13

Income Tax Act. The Treasury technical explanation indicates that an eight percent tax on oil and gas production revenues would be consistent with this understanding. It is now understood that the tax may be substantially higher. This leaves unclear the effect of the under-standing described in the technical explanation.

Because the proposed treaty generally applies only to income taxes, it does not generally cover the U.S. excise tax on insurance premiums imposed under section 4371 of the Code, nor does it cover a similar Canadian excise tax on net insurance premiums paid by residents of Canada for coverage of a risk situated in Canada. Accordingly, the countries can continue to impose those taxes without restriction. The exchange of information under the proposed treaty is not limited to the taxes covered by the treaty. (See Article XXVI (Ex-change of Information).)

### Article III. General Definitions

Certain of the standard definitions found in most U.S. income tax treaties are contained in the proposed treaty.

Under the proposed treaty, the term "Canada" means the territory of Canada, including any area beyond the territorial seas of Canada which, in accordance with international law and the laws of Canada, is an area within which Canada may exercise rights with respect to the seabed and subsoil and their natural resources. Therefore, income earned on the Canadian Continental Shelf is covered. This definition is substantially similar to that contained in the present convention except that the reference to "the provinces, territories and Sable Island" has been deleted as unnecessary.

The "United States" means the United States of America, but not including Puerto Rico, the Virgin Islands, Guam or any other United States possession or territory. The definition of the United States also includes, when the term is used in a geographical sense, any area beyond the territorial seas of the United States, which, in accordance with international law and the laws of the United States, is an area within which the United States may exercise rights with respect to the sea beds and subsoil and their natural resources. The intent is to cover the U.S. continental shelf consistent with the definition of con-tinental shelf contained in section 638 of the Code.

The proposed treaty would define the term "Canadian tax" as mean-ing the Canadian income taxes described in the taxes covered article and the term "United States taxes" as meaning the U.S. taxes on in-come described in that article. The term does not include capital taxes nor does it include the penalty taxes, excise tax, and social security taxes which are covered to a limited degree by the treaty.

"Person" includes an individual, an estate or trust, a company and any other body of persons. A "company" is any body corporate or any entity which is treated as a body corporate for tax purposes. The Cana-dian component authority is the Minister of National Revenue or his authorized representative. The U.S. competent authority is the Secre-tary of Treasury or his delegate. In fact, the U.S. competent authority function has been delegated to the Commissioner of the Internal Reve-nue Service, who has redelegated the authority to the Assistant Com-missioner (Compliance) with the concurrence, in certain cases involv-

14

ing interpretation, of the Assistant Commissioner (Technical). This
authority has again been redelegated in certain cases to the Director of
International Operations and to the Director, Examination Division.

International traffic means any voyage of a ship or aircraft to trans-
port passengers or property, other than voyages for the principal pur-
poses of transporting passengers or property between places within
a country. Thus, voyages that include stops in both countries are not
included if the principal purpose of the voyage is to transport pas-
sengers or property within one country.

The proposed treaty also contains the standard provision that, unless
the context otherwise requires, or the competent authorities of the
two countries establish a common meaning, all terms are to have the
meaning which they have under the law of the particular country
applying the proposed treaty.

### Article IV. Fiscal Residence

The assignment of a country of residence is important because the
benefits of the proposed treaty generally are available only to a resident
of one of the countries as that term is defined in the treaty. Further-
more, double taxation is often avoided by the treaty assigning one of
the countries as the country of residence where under the laws of the
countries the person might be a resident of both. The term "residence"
is not defined in the present treaty.

Under U.S. law, residence of an individual is important because a
resident alien is taxed on his worldwide income, while a nonresident
alien is taxed only on U.S. source income and on his income that is effec-
tively connected with a U.S. trade or business. The Code, however, does
not define the term. Instead, IRS regulations state that an alien is a
resident of the United States if he is actually present in the U.S. and
is not a mere transient or sojourner. Whether he is a transient is deter-
mined by his intentions as to the length and nature of his stay. (See
Treas. Reg. § 1.871-2(b).) Generally, a corporation is resident in the
United States if it is organized in the United States.

Under the proposed treaty, a person (either an individual or an
entity such as a corporation or partnership) is considered to be a
resident of a country if, under the laws of that country, the person is
subject to taxation by that country because it is his country of domicile,
residence, place of management, place of incorporation, or by reason
of other criterion of a similar nature. An estate or trust will be con-
sidered to be a resident of a country only to the extent that the income
it derives is subject to tax, either in its hands or in the hands of its
beneficiaries by that country.

The provision of the proposed treaty is generally based on the fiscal
domicile article of the U.S. and OECD model tax treaties and
is similar to the provisions found in other U.S. tax treaties. Consistent
with most U.S. income tax treaties, citizenship alone does not establish
residence. As a result, U.S. citizens residing overseas are not entitled
to the benefits of the treaty as U.S. residents. This result is contrary
to U.S. treaty policy as expressed in the U.S. model, but the U.S. model
result is achieved in very few treaties.

A set of rules is provided to determine residence in the case of a
person who, under the basic treaty definition, would be considered
to be a resident of both countries (e.g., a U.S. citizen who is resident in

15

Canada). In the case of a dual resident individual, the individual will be deemed for all purposes of the treaty to be a resident of the country in which he has a permanent home (where an individual dwells with his family), his center of vital interests (his closest economic and personal relations), his habitual abode, or his citizenship. If the residence of an individual cannot be determined by these tests, the competent authorities of the countries will settle the question by mutual agreement.

A corporation that is a dual resident of both the United States and Canada because of Article IV, and which is created under the laws of either country (or a political subdivision), will be treated as a resident of the country in which first created. Dual residence can arise under domestic law because Canada treats a corporation as a resident if it is managed in Canada. Thus, for example, a U.S. incorporated company with its management in Canada would be resident in Canada under its internal law. However, under the proposed treaty it would be resident only in the United States. The residence of a dual resident partnership, trust, or estate, and the mode of application of the treaty to that person will be determined by the competent authorities.

An individual who is an employee performing services of a governmental nature for either country will be treated as a resident of that country if he is subject to tax by that country as a resident. The same rule applies to an employee of a local government of one of the countries. Such an individual's spouse and children are also residents of the country that employs him, provided they too are subject to tax by that country as a resident. Under this rule, a U.S. citizen or resident who is employed by the U.S. in a foreign country would be considered a U.S. resident under the treaty.

### Article V. Definition of Permanent Establishment

The proposed treaty contains a definition of the term "permanent establishment" which generally follows the pattern of other recent U.S. income tax treaties, the U.S. model and the OECD model.

The permanent establishment concept is one of the basic devices used in income tax treaties to avoid double taxation. Generally, an enterprise that is a resident of one country is not taxable by the other country on its business profits unless those profits are attributable to a permanent establishment of the resident in the other country. In addition, the permanent establishment concept is used to determine whether the reduced rates of, or exemption from, tax provided for dividends, interest, and royalties are applicable, or whether those amounts will be taxed as business profits. U.S. taxation of business profits is discussed under Article VII (Business Profits).

In general, a permanent establishment is a fixed place of business through which a resident of one country engages in business in the other country. A permanent establishment includes a place of management, a branch, an office, a factory, a workshop, and a mine, an oil or gas well, a quarry, or other place of extraction of natural resources. It also includes any building site, construction or installation project, if the site or project lasts for more than 12 months.

The use of a drilling rig or ship in a country to explore for or exploit natural resources also gives rise to a permanent establishment if the use in that country is for more than three months in any 12 month period.

16

If a resident of one country maintains an agent in the other country who has, and regularly exercises, the authority to enter into contracts in that other country in the name of the resident, then the resident will be deemed to have a permanent establishment in the other country with respect to the activities which the agent undertakes on its behalf. This rule does not apply where the contracting authority is limited to those activities such as storage, display, or delivery of merchandise which are excluded from the definition of permanent establishment. The proposed treaty contains the usual provision that the agency rule will not apply if the agent is a broker, general commission agent, or other agent of independent status acting in the ordinary course of its business.

This general rule is modified to provide that a fixed place of business that is used solely for any or all of a number of specified activities will not constitute a permanent establishment. These activities include the use of facilities for storing, displaying, or delivering merchandise belonging to the resident or for the maintenance of a stock of goods belonging to the resident for storage, display, or delivery, or for processing by another person. These activities also include the maintenance of a fixed place of business for the purchase of goods or merchandise or the collection of information, for advertising or scientific research, or any other preparatory or auxiliary activities for the resident.

Thus, any activity that is preparatory or auxiliary in nature would not be treated as giving rise to a permanent establishment, even though the activity is not specifically mentioned in the proposed treaty.

The determination of whether a company of one country has a permanent establishment in the other country is to be made without regard to the fact that the company may be related to a resident of the other country or to a person who engages in business in that other country. The relationship is thus not relevant; only the activities of the company being tested are relevant.

The proposed treaty would make certain changes in the present treaty that could generally limit the cases in which a permanent establishment exists. The proposed treaty would eliminate the rule in the present treaty that includes as a permanent establishment the use by a resident of one country of substantial equipment in the other country. The proposed treaty would also eliminate the provision of the present treaty under which a business is considered to have a permanent establishment if it carries on business in a country through an agent or employee who has a stock of goods or merchandise from which he regularly fills orders that he receives.

The proposed treaty specifically states that its provisions are to be applied in determining whether any person has a permanent establishment in any country. Thus, the provisions are to be applied to determine whether a resident of a country other than Canada or the United States has a permanent establishment in Canada or the United States, and whether a person resident in Canada or the United States has a permanent establishment in a third country.

### Article VI. Income from Real Property

Under the proposed treaty, income from real property may be taxed in the country where the real property is located. For purposes of the treaty, real property will generally have the meaning pro-

17

vided under the laws of the country where the property is located, but will in any case include property which is accessory to real property rights, usufruct of real property, and rights to certain payments regarding natural resources. The term also includes options or similar rights with respect to real property. Ships, boats, and aircraft will not be considered real property.

Income from real property includes income from the direct use or renting of the property. It also includes royalties and other payments in respect of the exploitation of natural resources (e.g., oil wells) and gains on the sale, exchange, or other disposition of the royalty rights or the underlying natural resource. It does not include interest on loans secured by real property.

Under Article XIII (Gains), gains on the sale, exchange or other disposition of the property may also be taxed by the country where the property is located. Also, gain from the disposition of stock in a company whose assets consist, directly or indirectly, principally of real estate may generally be taxed in the country in which the company's real estate is located.

Generally, gain realized by a nonresident alien or a foreign corporation from the sale of a capital asset is not subject to U.S. tax unless the gain is effectively connected with the conduct of a U.S. trade or business or, in the case of a nonresident alien, he is physically present in the United States for at least 183 days in the taxable year. However, under the Foreign Investment in Real Property Tax Act of 1980, as amended, a nonresident alien or foreign corporation is taxed by the United States on gain from the sale of a U.S. real property interest, as if gain was effectively connected with a trade or business conducted in the U.S. The real estate provision of Article XIII generally would not restrict the right of the United States to tax the gain from the sale of U.S. real estate under the provisions of the 1980 legislation or any similar but later enacted legislation. It also retains the right of the United States to impose relevant reporting or withholding requirements. However, language of the article would limit the right of the United States to tax Canadian investors on their sales of their interests in U.S. corporations or other entities holding U.S. real estate under the legislation.

The present convention permits a resident of one country to elect to be taxed on income from real property in the other country on a net basis. The proposed treaty does not contain that election, but such an election is provided for United States real property income under the Code. Also, the present treaty limits the tax a country may impose on rental or royalty income from real property to 15 percent. There is no limit in the proposed treaty. Under its domestic law, Canada would presently impose a 25 percent tax.

### Article VII. Business Profits

*U.S. Code rules.*—United States law separates the business and investment income of a nonresident alien or foreign corporation. A nonresident alien or foreign corporation is subject to a flat 30 percent (or lower treaty rate) rate of tax on its U.S. source income if that income is not effectively connected with the conduct of a trade or business within the United States. The regular individual or corporate rates apply to U.S. source income which is effectively connected with the conduct of a trade or business within the United States.

18

The taxation of income as business or investment income varies depending upon whether the income is U.S. or foreign, In general, U.S. source periodic income, such as interest, dividends, rents, wages, and capital gains, is effectively connected with the conduct of a trade or business within the United States only if the asset generating the income is used in or held for use in the conduct of the trade or business, or if the activities of the trade or business were a material factor in the realization of the income. All other U.S. source income is treated as effectively connected income.

Foreign source income is effectively connected income only if the foreign person has an office or other fixed place of business in the United States and the income is attributable to that place of business. Only three types of foreign source income can be effectively connected income; rents and royalties derived from the active conduct of a licensing business; dividends, interest, or gain from stock or debt derived in the active conduct of a banking, financing or similar business in the United States; and certain sales income attributable to a United States sales office.

Except in the case of a dealer, the trading in stocks, securities or commodities in the United States for one's own account does not constitute a trade or business in the United States and accordingly income from those activities is not taxed by the U.S. as business income. This concept includes trading through a U.S. based employee, a resident broker, commission agent, custodian or other agent or trading by a foreign person physically present in the United States.

*Proposed treaty rules.*—Under the proposed treaty, business profits of an enterprise of one country are taxable in the other country only to the extent they are attributable to a permanent establishment in the other country through which the enterprise carries on, or has carried on, business. This is one of the basic limitations on a source country's right to tax income of a nonresident.

The taxation of business profits under the proposed treaty differs from United States rules for taxing business profits primarily in requiring more than merely being engaged in trade or business before a country can tax business profits. Under the Internal Revenue Code, all that is necessary for effectively connected business profits to be taxed is that a trade or business be carried on in the United States. Under the proposed treaty, on the other hand, some level of fixed place of business must be present.

The proposed treaty permits a country to tax business profits attributable to a permanent establishment that no longer exists. Thus, a country may tax business profits received in a year after the permanent establishment to which those business profits are attributable has been terminated. This rule applies to business profits received after the proposed treaty comes into force that are attributable to a permanent establishment that terminated before the proposed treaty came into force.

Unlike most U.S. treaties and the U.S. model, the proposed treaty does not define the term "business profits." Thus, to the extent not dealt with in other Articles, the term will be defined under the law of the two countries. If the definitions cause double taxation, the competent authorities could agree on a common meaning of the term.

The business profits of a permanent establishment are determined on an arm's-length basis. Thus, there is to be attributed to a permanent establishment the business profits which would reasonably be expected to have been derived by it if it were an independent entity engaged in the same or similar activities under the same or similar conditions and dealing at arm's-length with the resident enterprise of which it is a permanent establishment, or with any other person related to the resident. Thus, for example, this arm's-length rule applies to transactions between the permanent establishment and a branch of the resident enterprise located in a third country. Amounts may be attributed whether they are from sources within or without the country in which the permanent establishment is located.

In computing taxable business profits, deductions are allowed for expenses, wherever incurred, which are incurred for purposes of the permanent establishment. These deductions include a reasonable allocation of executive and general administrative expenses, interest, research and development, and other expenses which are incurred for purposes of the enterprise as a whole (or for purposes of that part of the enterprise which includes the permanent establishment). Thus, for example, a U.S. company which has a branch office in Canada but which has its head office in the United States will, in computing the Canadian tax liability of the branch, be entitled to deduct a portion of the executive and general administrative expenses incurred in the United States by the head office for purposes of administering the Canadian branch. However, a country is not required to permit a deduction for an expense that is not by reason of its nature generally deductible under its tax laws.

Business profits will not be attributed to a permanent establishment merely by reason of the purchase of merchandise by a permanent establishment for the account of the enterprise or by reason of the provision of executive, managerial or administrative facilities or services for the resident. Thus, where a permanent establishment purchases goods for its head office, the business profits attributed to the permanent establishment with respect to its other activities will not be increased by a profit element on its purchasing activities. Likewise, the permanent establishment could be the headquarters office for the company without being taxed in the country on profits generated by that activity.

Where business profits include items of income which are dealt with separately in other articles of the treaty, those other articles, and not this business profits article, will govern the treatment of those items of income. Thus, for example, film rentals are taxed under the provisions of Article XII (Royalties), and not as business profits.

Under the proposed treaty, the only business profits that can be attributed to a permanent establishment are those derived from the assets or activities of the permanent establishment. In some cases, this rule is somewhat more restrictive than the Code rule that treats all U.S. source income, other than investment type income, as effectively connected income.

### Article VIII. Transportation

As a general rule, the United States taxes the U.S. source income of a foreign person from the operation of ships or aircraft to or from the United States. An exemption from U.S. tax is provided if the ship or

20

aircraft is documented under the laws of a foreign country that grants an equivalent exemption to the U.S. citizens and corporations. The United States has entered into agreements with a number of countries under which that country grants an exemption which results in the United States exempting that country's shipping.

The proposed treaty provides that income which is derived by a resident of one country from the operation of ships and aircraft in international traffic are exempt from tax by the other country. Likewise, gains derived by a resident of one country from the disposition of ships or aircraft used principally in international traffic are exempt from tax in the other country. International traffic means any transportation by ship or aircraft, except where the transportation is solely between places in the other country (Article III(1)(d) (Definitions)).

The exemption applies even if the ship or aircraft is not registered in either country. Thus, for example, income of a U.S. resident from the operation of a ship flying, for example, the Liberian flag would not be subject to Canadian tax. This exemption based solely on residence is a liberalization of the rule in the present treaty that provides for an exemption only if the ship or aircraft is registered in the country of residence of the operator. The exemption also applies to income from participation in a pool, a joint business or an international operating agency which is engaged in the operation of ships and aircraft in international traffic.

The exemption for shipping and air transport profits applies to profits from the rental on a full or bare boat basis of ships or aircraft which are operated in international traffic by the lessee, or if the rental profits are incidental to the operation of ships and aircraft in international traffic. (Rental on a full or bare boat basis refers to whether the ships or aircraft are leased fully equipped, manned and supplied or not.) Income from the operation in international traffic of ships or aircraft also includes income derived from the use, maintenance, or rental of containers, trailers for the inland transportation of containers, and other related equipment where the equipment is used in the international transport of goods and merchandise or is incidental to the rental of containers used in international traffic.

However, a country may tax the profits of a resident of the other country from the voyage of a ship where the principal purpose of the voyage is to transport passengers or property between places in that country. Thus, for example, Canada could tax the profits of a U.S. person from a voyage between two Canadian ports on the Great Lakes. This right to tax applies even though the profits are not taxable under the business profits article by the country in which the voyage takes place.

The proposed treaty also contains a special provision dealing with the taxation of income earned by a common carrier from the use of motor vehicles or railway cars. Under the proposed treaty, the profits of a resident of one country from the transportation of passengers or property from a point outside the other country, or from the rental of motor vehicles (including trailers) or railway rolling stock, or the use, maintenance or rental of containers used to transport passengers or property from a point outside the other country are not taxed in the

country that is not the country of residence. This provision only applies if the resident earning the income is engaged in the operation of motor vehicles or a railway as a common carrier. Thus, for example, if a U.S. resident transports goods from a place in the United States to a Canadian destination, Canada may not tax any of the profits from that delivery.

The proposed treaty also contains a special provision for limiting the right of the countries to tax profits from the use of railway rolling stock, motor vehicles or containers. Profits derived by a resident of one country from the use, maintenance or rental of railway rolling stock, motor vehicles, trailers or containers (including trailers and related equipment for the transportation of containers) used in the other country for a period or periods not expected to exceed 183 days in any 12-month period are not taxed in that other country except to the extent the profits are attributable to a permanent establishment in the other country. Unlike the provision dealing with income from the carriage of passengers or freight, this exemption applies even if the owner is not a common carrier. Thus, for example, Canada would not tax the rental income of a U.S. bank from the short-term (less than 183 days) lease of a railroad car to a Canadian railroad.

### Article IX. Related Persons

The proposed treaty, like most other U.S. tax treaties, specifically recognizes the arm's length pricing principal. The proposed treaty contains a provision similar to section 482 of the Internal Revenue Code which recognizes the right of each country to make an allocation of income to that country in the case of transactions between related enterprises, if an allocation is necessary to reflect the conditions and arrangements which would have been made between independent enterprises. When a redetermination has been made, or is to be made, by one country, the other country, if it agrees with the adjustment, will make an appropriate adjustment to the amount of tax paid in that country on the redetermined income. However, that other country must make an adjustment only if it has been notified of the adjustment within six years from the end of the taxable year to which the adjustment relates.

An enterprise in one country is not independent with respect to an enterprise in another country if one of the enterprises participates directly or indirectly in the management, control or capital of the other enterprise. The enterprises are also not independent if the same persons participate directly or indirectly in the management, control, or capital of both enterprises.

The competent authority of the country making the adjustment is not required to advise the competent authority of the other country of the adjustment. If notification is not given to the competent authority of the other country and the taxpayer doesn't receive notice of the adjustment six months or more before the time the competent authority of the other country must receive notice, then the initial adjustment cannot be made to the extent that making it would give rise to double taxation. The intent of this provision is to place the burden of notifying the other competent authority on the taxpayer, and the burden of giving the taxpayer timely notice so that he can protect himself on

the competent authority of the country making the initial adjustment. However, a competent authority of one country may notify the competent authority of the other country.

The relief provisions do not apply if the adjustment, or the time lag, is due to fraud, willful default or neglect or gross negligence.

The relief provisions do not require that an adjustment actually have been made or formally proposed. However, the taxpayer must be notified of a possible adjustment in writing with sufficient details to permit the taxpayer to notify the competent authority of the other country. Likewise, the notification to the competent authority of the other country must be in sufficient detail to apprise the competent authority of the nature of the adjustment.

These relief provisions apply notwithstanding the saving clause found in Article XXIX (Miscellaneous Rules). Thus, the United States will give up tax on a resident corporation if the notice provisions are not met.

Apart from the above procedural limitations, the provisions of the proposed treaty are not intended to limit any law in either country which permits the distribution, apportionment, or allocation of income, deductions, credits or allowances between related persons when such law is necessary to prevent evasion of taxes or to clearly reflect the income of those persons. This provision makes clear that the U.S. retains the right to apply its intercompany pricing rules (section 482) and its rules relating to the allocation of deductions (sections 861, 862, and 863, and Treas. Reg. Section 1.861–8).

### Article X. Dividends

The United States imposes a 30-percent tax on the gross amount of U.S. source dividends paid to nonresident alien individuals and foreign corporations. The 30-percent tax does not apply if the foreign recipient is engaged in a trade or business in the United States and the dividends are effectively connected with that trade or business. U.S. source dividends are dividends paid by a U.S. corporation, and dividends paid by a foreign corporation if at least 50 percent of the gross income of the corporation, in the prior three year period, was effectively connected with a U.S. trade or business of that foreign corporation. The treaty reduces this tax, and also Canadian tax on dividend income.

Under the proposed treaty, each country may tax dividends paid by its resident companies but the rate of tax is limited by the treaty if the beneficial owner of the dividend is a resident of the other country. Source country taxation is limited to 10 percent of the gross amount of the dividends if the beneficial owner is a corporation that owns at least 10 percent of the voting stock of the payor corporation. The tax is limited to 15 percent of the gross amount of the dividend in all other cases involving dividends paid to residents of the other country. For example, under the proposed treaty, Canada could impose a 10-percent tax on gross dividends paid to a U.S. parent corporation by its Canadian subsidiary. Likewise, Canada could impose a 15-percent tax on the gross dividends paid to a U.S. investor by a Canadian company. The 10-percent rate of tax on corporate direct investment dividends represents a reduction from the 15 percent provided for in the present

treaty. It is greater than the five-percent rate found in many U.S. treaties and the U.S. model.

The proposed treaty does not restrict the right of a country to tax the profits out of which the dividends are paid. Canada has a modified "integrated" corporate tax system. Under this system, a Canadian resident shareholder (individuals or trust) must "gross-up" the dividend he receives from a Canadian corporation by a portion of the amount of tax paid at the corporate level on the distributed income. He is then taxed on the grossed up amount but may credit a portion of the tax paid by the corporation ("imputation credit"). If the credit is greater than his tax due, he does not get a tax refund. The proposed treaty does not give U.S. shareholders any relief from the corporate tax in the form of a refund or otherwise. Such relief is granted to U.S. shareholders in U.S. income tax treaties with France and the United Kingdom, which also have integrated tax systems. Under those treaties, some U.S. shareholders in a resident company who receive dividends get a partial refund of the corporate income tax paid.

The proposed treaty defines dividends as income from shares or other rights which participate in profits and which are not debt claims. Dividends also include income from other corporate rights which are taxed by the country in which the distributing corporation is resident in the same manner as income from shares. Under this provision, each country may apply its rules for determining when a payment by a resident company is on a debt obligation or an equity interest. Thus, for example, the United States could apply its section 385 rules for determining whether an interest is debt or equity.

The reduced rates of tax on dividends will apply unless the recipient has a permanent establishment (or fixed base in the case of an individual performing independent personal services) in the source country and the shareholdings on which the dividends are paid are effectively connected with the permanent establishment (or fixed base). Dividends effectively connected with a permanent establishment are to be taxed on a net basis as business profits (Article VII). Dividends effectively connected with a fixed base are to be taxed on a net basis as income from the performance of independent personal services (Article XIV).

The proposed treaty would limit the right of one of the countries to tax dividends paid by a corporation resident in the other country. The country in which the corporation is not resident may tax dividends paid by the corporation only if they are paid to a resident of that country or if the equity interest with respect to which the dividends are paid is effectively connected with a permanent establishment or fixed base maintained in that country.

A country may, however, tax dividends paid by a corporation resident in the other country if at least 50 percent of the corporation's gross income for the past three years was included in the computation of the business profits of a permanent establishment that the corporation had in the other country. This applies only if the country imposing the tax does not impose a branch profits tax. The rate of tax on the dividend is limited to the rates provided by the proposed treaty if the dividend is paid to a resident of the other country. The provision is unfunded to apply to the withholding tax the United States imposes

24

on dividend payments by foreign corporations substantially all of
whose income is effectively connected with a U.S. business. Canada
does not impose such a tax but imposes a branch profits tax instead.

The proposed treaty would also reserve the right of the United
States or Canada to impose a tax in addition to the regular corporate
tax imposed on that permanent establishment on the earnings of a
permanent establishment maintained there. The rate of tax is limited
to 10 percent of the earnings not previously subject to an additional
tax. The purpose of this provision to to permit Canada, subject to
the special limitations, to continue to impose its branch profits tax.
The Canadian tax of 25 percent is imposed on the profits of a Cana-
dian branch of a foreign corporation remaining after imposition of
the regular corporate tax and after reinvestment in Canada is taken
into account. Canada generally reduces this tax rate to 15 percent in
treaties. The proposed treaty would reduce the rate to 10 percent and
give the $500,000 exclusion described above. The United States does
not impose such a tax.

The amount of earnings that may be taxed under this provision is
the business profits attributable to all permanent establishments for
the year or previous years over the sum of: (a) business losses attrib-
utable to such permanent establishments (including losses from the
alienation of property forming part of the business property of such
permanent establishments) for such year and previous years; (b) all
taxes, other than the branch profits tax, imposed on such profits in that
country (including, for example, provincial taxes); (c) profits re-
invested in that country, provided that where that country is Canada,
such amount shall be determined in accordance with the existing pro-
visions of the law of Canada regarding the computation of the allow-
ance in respect to investment in property in Canada, and any sub-
sequent modification of those provisions which shall not affect the
general principle hereof; and (d) five hundred thousand Canadian
dollars ($500,000) or its equivalent in United States currency, less any
amounts deducted by the company, or by an associated company with
respect to the same or a similar business, under this rule.

This $500,000 amount is cumulative. Thus, in effect, a country can-
not impose a branch profits tax on the earnings of a permanent estab-
lishment under this provision until it has earned $500,000 after the
proposed treaty becomes effective. The exclusion is available to perma-
nent establishments that have earnings before the treaty is effective.
Thus, even existing permanent establishments in Canada will qualify
for the exemption on their first $500,000 in earnings after the effective
date of the provision.

The proposed treaty would reserve the right of the United States to
impose its accumulated earnings tax and personal holding company
tax, but only if at least 50 percent or more in value of the outstanding
voting stock of the company is owned, directly or indirectly throughout
the last half of the taxable year by U.S. citizens or residents or by
third country residents. Canadian citizens, not immigrants in the
United States or who have not been United States residents for more
than three taxable years are not considered to be residents of the
United States for this purpose.

The provisions of Article X do not apply to dividends paid by a
corporation that is not a resident of the United States or Canada.

**Appx356**

Those dividends are covered by Article XXII (Other Income) if they are income of a resident of one of the countries.

### Article XI. Interest

The U.S. imposes a 30-percent tax on U.S. source interest paid to foreign persons under the same rules that are applicable to dividends. Under the Code, U.S. source interest generally is interest on debt obligations of U.S. persons, but not interest on deposits in banks. U.S. source interest also includes interest paid by a foreign corporation if at least 50 percent of the gross income of the foreign corporation, in the prior three year period, was effectively connected with a U.S. trade or business of that corporation.

Under the proposed treaty, interest may be taxed by a country only if the beneficial owner of the interest is a resident of that country, the interest arose in that country, or the debt claim to which the interest relates is effectively connected with a permanent establishment or fixed base in that country. The proposed treaty limits the withholding tax to 15 percent generally and exempts interest payments to exempt governmental organizations of the other country. The 15 percent rate is the same as that allowed by the present treaty. The limitation applies only if the interest is beneficially owned by a resident of the other country. Accordingly, it does not apply if the recipient is a nominee for a nonresident.

Interest will be exempt from tax at source in certain cases. These include where the beneficial owner is a political subdivision, local authority or instrumentality of the other country and not taxed by that country; where the interest is beneficially owned by a resident of the other country and the debt obligation is guaranteed or insured by the other country, a political subdivision of it or the like; the interest is beneficially owned by a resident of the other country and paid by the source country, a tax exempt political subdivision or local authority or instrumentality thereof; the interest is on a commercial credit obligation and is beneficially owned by a seller resident in the other country; or the interest is exempt under the present treaty and paid by a company organized under the laws of one country on debt obligations entered into before September 26, 1980, the date the proposed treaty was signed.

An obligation is considered entered into before the date of signature of the proposed treaty if it is; (1) an obligation under which funds were dispersed prior to September 26, 1980; (2) an obligation under which funds are dispersed on or after September 26, 1980, pursuant to a written contract binding prior to and on such date, and at all times thereafter until the obligation is satisfied; or (3) an obligation with respect to which, prior to September 26, 1980, a lender had taken every action to signify approval under procedures ordinarily employed by such lender in similar transactions and had sent or deposited for delivery to the person to whom the loan is to be made written evidence of such approval in the form of a document setting forth, or referring to a document sent by the person to whom the loan is to be made that sets forth, the principal terms of such loan. The present treaty contains a limited exemption from tax for interest paid by corporations resident in Canada or the United States to certain persons not resident in the other country.

26

The proposed treaty defines interest as income from debt claims of every kind, whether or not secured and whether or not carrying a right to participate in profits. In particular, it includes income from government securities and from bonds or debentures, including premiums or prizes attaching to bonds or debentures. The impact of this provision on U.S. domestic rules (section 385) for distinguishing between debt and equity is made clear. The provision is intended to permit the United States to apply its rules with the competent authorities settling disputes if this causes double taxation.

The reduction in the withholding tax will not apply if the recipient has a permanent establishment or fixed base in the source country and the debt claim is effectively connected with the permanent establishment or fixed base. In that event, the interest will be taxed as business profits (Article VII) or income from the performance of independent personal services (Article XIV).

The proposed treaty provides a source rule for interest (which is used in Article XXIV (Elimination of Double Taxation)) for foreign tax credit purposes. Interest will be sourced within a country if the payor is the government of that country, including political subdivisions and local authorities, or a resident of that country. Generally, this is consistent with U.S. source rules (sections 861–862) which say that interest income is sourced in the country in which the payor is resident. However, if the interest is borne by a permanent establishment (or fixed based) that the payor has in a country other than his country of resident and the indebtedness was incurred with respect to that permanent establishment (or fixed base), the interest will be sourced in that country, regardless of the residency of the payor. Thus, for example, if a Canadian resident has a permanent establishment in France and indebtedness to a U.S. person is incurred by the resident for the permanent establishment, and the interest is borne by the permanent establishment, Canada will not tax the interest.

The proposed treaty also addresses the issue of non-arm's-length interest charges between related parties (or parties having an otherwise special relationship) by holding that the amount of interest for purposes of applying the treaty rules will be the amount of arm's-length interest. Any amount of interest paid in excess of the arm's length interest will be taxable according to the laws of each country, taking into account the other provisions of this treaty (for example, excess interest paid to a parent corporation may be treated as a dividend under local law and thus be entitled to the benefits of Article X of this treaty).

As described above, under U.S. law certain interest paid by foreign corporations doing business in the United States is considered U.S. source and thus subject to the 30-percent withholding tax. The proposed treaty restricts the right of the United States to apply this tax to the interest that a Canadian company pays to a person not a resident of the United States. Under the existing treaty the United States cannot impose this tax at all. Under the proposed treaty, one country will not tax interest paid by a resident of the other country, unless the interest is paid to a resident of the first country, or is sourced in that first country under the treaty or the debt-claim on which the interest is paid is effectively connected with a permanent establishment or fixed base in the first country.

27

*Article XII. Royalties*

Under the same system that applies to dividends and interest, the U.S. imposes a 30-percent tax on all U.S. source royalties paid to foreign persons. Royalties are from U.S. sources if they are from property located in the United States including royalties for the use of or, including moving picture royalties, the right to use intangibles in the United States.

The proposed treaty provides for a reduction of source basis taxation, but differs from the U.S. and OECD models by providing separate rules for taxation at source of copyright royalties and all other royalties. Copyright royalties are exempt from tax by the country of source while other royalties are not.

Royalties, other than copyright royalties, that arise (see royalty source rule discussed below) in one country and are paid to a resident of the other country may be taxed by both countries. However, the withholding tax imposed in the source country may not exceed 10 percent of the gross royalty.

Copyright royalties generally include copyright royalties and other like payments for the production or reproduction of any literary, dramatic, musical or artistic work arising in one country and beneficially owned by a resident of the other. Royalties for motion picture films and works on film or videotape for use in connection with television are not cultural royalties, but instead are other royalties. Thus, motion picture royalties could be taxed at 10 percent of the gross payment.

Royalties are generally defined as payments for the use of, or the right to use, cinematographic films tapes for television or broadcasting, patents, designs, models, plans, secret processes or formulae, trademarks or other similar property or rights. They also include payments for scientific, technical, industrial or commercial knowledge or information ("know-how") held by the person supplying the know-how, including ancillary and subsidiary assistance with respect to the know-how, and payments for the use of, or the right to use tangible personal property. Finally, gains from the sale or other disposition of these properties or rights will be considered to be royalties to the extent that the payment of the sale price is contingent on the productivity, use or subsequent disposition of the property or rights.

The reduced withholding tax rate or exemption does not apply where the recipient is an enterprise with a permanent establishment in the source country or an individual performing personal services in an independent capacity through a fixed base in the source country, and the property giving rise to the royalties is effectively connected with the permanent establishment or fixed base. In that event the royalties will be taxed as business profits (Article VII) or income from the performance of independent personal services (Article XIV).

The proposed treaty provides special source rules for royalties. The general rule in the proposed treaty is the same as the U.S. Code rule, that is, if the property or rights which are the subject of the royalty are used in one of the countries then the royalty is sourced in that country. If the property is not used in one of the countries and the person paying the royalties has a permanent establishment or

28

fixed base in a country other than the country of which he is a resident then if the obligation to pay the royalty was incurred, and the royalties are borne by the permanent establishment or fixed base, the royalties arise in the country in which the permanent establishment or fixed base is situated.

If a royalty is paid by the government of one of the countries, including political subdivisions and local authorities, or by a resident of that country, and if the property is used in a third country then the income will be sourced in the country of residence of the payor.

The proposed treaty provides that in the case of royalty payments between related parties or persons otherwise having a special relationship, only that portion of the payment that represents an arm's-length royalty will be treated as a royalty under the treaty. Payments in excess of the arm's-length amount will be taxable according to the law of each country with due regard being given for the other provisions of the treaty. Thus, for example, any excess amount might be treated as a dividend subject to the taxing limitations of Article X.

The proposed treaty provides that one country may not tax royalties paid by a resident of the other country unless they are paid to a resident of that first country, arise in it or are effectively connected.

### Article XIII. Gains

Under the Code, capital gains derived from U.S. sources by foreign investors are generally exempt from U.S. tax. Special rules are provided for a disposition of a U.S. real property interest. The present treaty contains a broad exemption for capital gains which is significantly cut back by the proposed treaty. The proposed treaty also deals with problems created by the Canadian departure tax.

Under the language of the proposed treaty gains derived by a resident of one country from the disposition of real property located in the other country may be taxed by both countries. Gains from the disposition of personal property which forms a part of the business property of a permanent establishment or a fixed base (including gains on the disposition of the permanent establishment or the fixed base itself) may be taxed in the country where the permanent establishment or fixed base is located. For this purpose a permanent establishment includes a permanent establishment that existed within the last 12 months prior to the disposition of the property. This rule does not apply to gains from the sale or exchange of ships, aircraft or containers operated by an enterprise of the other country in international traffic; such gains are only taxable by the country of residence under Article VIII.

Gains from the disposition of intangible property described in Article XII (Royalties) will only be taxed in accordance with that article.

As stated above, the proposed treaty contains language that would permit a country to tax a resident of the other country when he disposes of real property located in the first country. For example, the United States could tax a Canadian resident on any gain realized when he sells U.S. real estate.

The proposed treaty also provides that a country can tax gains on the disposition of stock or an interest in a partnership, trust or estate where the value of the interest is derived principally from real estate

29

located in that country. The intent is to permit the United States or
Canada to tax the gain on the disposition of real property even if held
in corporate solution or otherwise. The value is to be considered
derived "principally from" real estate if more than 50 percent of the
value of the entity is attributable to real estate situated in that coun-
try. The term "principally from" is defined in Treasury's technical
explanation and not in the proposed treaty. The technical explanation
generally represents the views of the Treasury Department at the
time prepared.[1]

Under the language of the proposed treaty this right to tax applies
only if the country of residence of the person disposing of the prop-
erty would, in comparable circumstances, tax any gains derived by a
resident of the other country. Thus, for example, if at the time a Cana-
dian resident disposes of the shares of stock of a U.S. corporation
owning U.S. real property Canada does not tax dispositions of stock
in similarly situated Canadian companies, the United States may not
tax the disposition.

For this purpose, real property includes the shares of a company or
an interest in a partnership, trust or estate where the value of the
shares or interest is derived principally from real property. It does
not include property in which the business of the entity being disposed
of is carried on, unless that property is mines, oil or gas wells, rental
property, or agricultural property. On its face, this provision is gen-
erally intended to permit the United States to tax a Canadian resident
on his disposition of a U.S. real property interest under the 1980
legislation (section 897). However, it does restrict this right by ex-
cluding real property in which the business of the taxpayer is carried
on. Also, under the U.S. legislation a Canadian selling an interest in
a partnership would be taxed on his proportionate share of the U.S.
real property of the partnership. Under the language of the treaty he
would not be taxed unless real estate was more than 50 percent of the
value of the partnership.

Gains from the disposition of property other than that described
above may be taxed only by the country of residence of the person dis-
posing of the property.

The proposed treaty would preserve Canada's right to impose its
"departure tax" on the disposition of Canadian property by a former
Canadian resident. The proposed treaty provides that a country can
tax the gain realized by an individual resident of the other country if
that individual was a resident of the taxing country for 120 months
during any period of 20 years, and at any time during the ten years
immediately preceding the disposition of the property. Accordingly,
Canada could tax a U.S. resident on his disposition of Canadian real
property if the individual was a resident of Canada for the requisite
time.

However, gains that are taxable by one country under this provision
are considered sourced in the country of residence. Thus, the country
of residence will have the primary right to tax the gain, that is, it will
be able to tax the disposition and the country of former residence will

---

[1] The technical explanation was reviewed by Canada. The Canadian Govern-
ment has announced that it concurs in the positions taken in the explanation.

30

also tax, but will allow a foreign tax credit for the tax paid to the country of residence. (See Article XXIV (Elimination of double taxation).)

The proposed treaty also contains a provision that provides for a step-up in the basis of a principal residence in Canada when a Canadian resident moves to the U.S. The adjusted basis of the real estate for purposes of determining any U.S. gain on the disposition of the Canadian residence will be its fair market value at the time the individual ceased being a resident of Canada. The rule does not apply to a U.S. citizen. The rule applies to dispositions after the treaty becomes effective even if the individual became a nonresident of Canada before that date.

The proposed treaty gives an individual the right to elect to be taxed on certain deemed gain inherent in the property. This provision applies where one of the countries treats an individual as having disposed of property and taxes him on that deemed disposition, while the other country defers (but does not forgive) taxation. In such a case, the proposed treaty provides that the individual may elect to be liable to tax in that other country on the difference between his basis and the fair market value of the property at the time of disposition. The individual then gets a basis in the property equal to that fair market value. The provision is intended to permit a Canadian resident who is a U.S. citizen and who immigrates to the United States and incurs the Canadian departure tax, to also have that property taxed by the United States in that year. He could then credit the Canadian tax against his U.S. tax, avoiding double taxation. Likewise, the provision would apply in the case of a gift by a U.S. citizen or resident because Canada considers a gift to be income of the recipient.

The proposed treaty also provides special rules for corporate reorganization transactions. Where a resident of one country disposes of property in a nonrecognition transaction, the competent authority of the other country may agree to defer recognition of gain on the transaction until such time and in such manner as may be provided in an agreement between the taxpayer and the competent authority. Nonrecognition is to be permitted in order to avoid double taxation and subject to terms and conditions satisfactory to the competent authority.

The present convention generally exempts capital gains from tax at source, while the proposed convention does not. The proposed convention contains a transitional rule that takes this difference into account. It applies to property that was owned by a resident of the nonsource country on September 26, 1980 (the date of signature) and which was not part of a permanent establishment or fixed base in the source country.

Under the transitional rule, for purposes of computing source basis taxation on the gain from the disposition of property the gain realized on a disposition is to be reduced by the proportion of any gain attributable to the period the property was held by the person disposing of the property up to December 31 of the year in which the instruments of ratification are exchanged. The effect is to give the owner of the property a step-up in basis for purpose of computing gain computed as provided in the proposed treaty. If the taxpayer shows to the satisfaction of the competent authority of the source

31

country that a greater than proportional part of the gain is reasonably attributable to that period, then the competent authority may permit that greater portion to be excluded from tax.

### Article XIV. Independent Personal Services

Under the code, the income of a nonresident alien from the performance of personal services in the United States is not taxed if the individual is not in the United States for at least 90 days, the compensation does not exceed $3,000, and the services are performed as an employee of a foreign person not engaged in a trade or business in the United States or they are performed for a foreign permanent establishment of a U.S. person. His income is taxed at regular rates if the income is effectively connected with the conduct of a trade or business in the United States by the individual. (See discussion of U.S. taxation of business profits under Article VII (Business Profits).) The performance of personal services within the United States can be a trade or business within the United States (sec. 864(b)).

The present treaty provides a limited exemption from tax at source, and has a $5,000 threshold for source taxation even where the services are performed through a fixed based in the source country.

The proposed treaty limits the right of a country to tax income from the performance of personal services by a resident of the other country. Income from the performance of independent personal services is treated separately from income from the performance of dependent personal services (i.e., as an employee).

Income from the performance of independent personal services by a resident of one country may be taxed by the other country only where the individual performing the personal services has a fixed base available to him in the other country. The income is then taxable in that other country only to the extent attributable to that fixed base.

### Article XV. Dependent Personal Services

Under the proposed treaty, income from services performed as an employee in a country (the source country) by a resident of the other country will not be taxable in the source country and will be taxable only in the country of residence unless one of three requirements is met: (1) the individual receives remuneration exceeding $10,000 in the source country's currency, or (2) the individual is present in the source country for more than 183 days during the taxable year or (3) the compensation is not borne by a permanent establishment or fixed base or a resident of the source country.

Compensation derived by an employee aboard a ship, aircraft, motor vehicle or train operated by a resident of one country is exempt from tax by the other country, provided that the compensation is in respect of employment regularly exercised in more than one country.

The article does not apply to pensions and annuities (Article XVIII) or to compensation as a government employee (Article XIX).

### Article XVI. Entertainers and Athletes

The proposed treaty contains an additional set of rules which govern the taxation of income earned by public entertainers (such as theater, motion picture, radio or television entertainers and musicians) and athletes. The proposed article is in addition to the other provisions

**Appx363**

dealing with the taxation of personal services (Articles XIV and XV). Under the Article, one country may tax an entertainer or athlete who is a resident of the other country on the income from his personal services performed in that country during any year in which the gross receipts derived by him, including his reimbursed expenses, exceed $15,000 in the currency of the source country. As in the case of the other provisions dealing with personal services income, this provision does not bar the country of residence or, or in the case of the United States, citizenship from also taxing that income (subject to a foreign tax credit).

In addition, the proposed treaty provides that where income in respect of personal services performed by an entertainer or athlete is paid not to the entertainer or athlete but rather to another person or entity, that income will be taxable by the country in which the services are performed in any situation where the entertainer or athlete shares directly or indirectly in the profits of the person or entity receiving the income. (This provision applies notwithstanding Article VII, XIV and XV.) For this purpose, participation in the profits of the recipient of the income includes the receipt of deferred compensation, bonuses, fees, dividends, partnership distributions, or other distributions. The provision does not apply if it is established that neither the entertainer or athlete, nor related persons, participate directly or indirectly in the profits of the person or entity receiving the income in any manner. This provision is intended to prevent highly paid performers and athletes from avoiding tax in the country in which they perform by routing the compensation for their services through a third person such as a personal holding company or trust located in a country that would not tax the income.

The provision does not apply to the income of an athlete earned as an employee of a team that participates in a league with regularly scheduled games in both Canada and the United States. The dependent personal services rules of Article XV would apply.

### Article XVII. Withholding of Taxes in Respect of Independent Personal Services

Under the proposed treaty a country may impose a withholding tax at source on remuneration paid to a resident of a country who performs services in the source country. However, in the case of the first $5,000 paid during the year, the withholding is limited to 10 percent of the payment. The competent authority of the source country can reduce the amount of withholding if he considers it too high. This provision in no way limits taxation of income or an individual's tax liability.

### Article XVIII. Pensions and Annuities

As a general rule, the proposed treaty provides that a pension or annuity may be taxed in both the country where it arises (source country) and the country of residence of the recipient. The amount which may be subject to tax by the country of residence is limited to the amount which would have been subject to tax by the source country had the recipient been a resident of the source country.

Source country taxation of pensions and annuities beneficially owned by a resident of the other country is limited. Pensions may be taxed at 15 percent of the gross amount of the payment and the tax on annuities is limited to 15 percent of the portion taxable by the source country.

Under the literal language of the proposed treaty, pensions and annuities, alimony and similar payments are excluded from the saving clause as applied to U.S. taxation of U.S. citizens resident in Canada. Accordingly, for example, a U.S. citizen resident in Canada and receiving a U.S. source pension would be taxed by the United States, but only at the 15 percent rate. It is understood that this result was not intended, and that it will be corrected.

A pension is defined as a payment under a superannuation, pension or retirement plan, Armed Forces retirement pay, war veterans pensions and allowances, and amounts paid under a sickness, accident or disability plan. Social security payments are not pensions. An annuity is defined to include a stated sum paid periodically at stated times during life or a specified number of years, under an obligation to make the payments for full and adequate consideration. The term does not include a payment that is not a periodic payment or any annuity the cost of which was deductible in the country in which acquired.

Social security benefits paid to a resident of the other country or to a U.S. citizen are taxable only by the source country.

### Article XIX. Government Service

Under the proposed treaty, compensation paid by one country, its political subdivisions or local authorities, to one of its citizens for services rendered in the discharge of governmental functions is taxable only by the paying country. This rule does not apply if the services are rendered in connection with a trade or business carried on by the country or one of its political subdivisions or local authorities. Those services would be taxable in accordance with Article XIV (Independent Personal Services), XV (Dependent Personal Services) or XVI (Artists and Athletes), as appropriate. This provision is excluded from the saving clause. Thus, for example, Canada would not tax the compensation of a U.S. citizen who resides in Canada and performs services for the U.S. government in the discharge of functions of a governmental nature.

### Article XX. Students

Under the proposed treaty, an individual who was a resident of one country who becomes a full-time student, apprentice, or business trainee in the other country will generally be exempt from tax in the host country on payments from abroad used for maintenance, education, or training. There is no limitation on the amount of income to which the exemption applies or the number of years the student may take advantage of the exemption.

The present treaty (Article VIII A) contains a two-year exemption by the source country of income paid a teacher who is a resident of the other country. The proposed treaty does not contain any special rules for teachers; accordingly, they would be covered by the Articles relating to personal services generally (Articles XIV and XV).

### Article XXI. Exempt Organizations

The proposed treaty contains a number of provisions that permit an entity that is exempt from tax in one country to be tax exempt in the other country. Also, citizens and residents of one country may, subject to limitations, receive a charitable contribution deduction for contributions to entities resident in the other country. The present

34

treaty contains similar provisions in Articles X and XIII D, but they
do not exempt pension plans.

*Exemption for Charities and Pensions.*—Under the proposed treaty
treaty, a religious, scientific, literary educational or charitable organi-
zation ("exempt organization") resident in one country is exempt
from tax in the other country to the extent its income is exempt from
tax in its country of residence. This exemption does not apply to in-
come of the exempt organization received for carrying on a trade or
business or received from a related person unless that person is also a
charitable organization, or is a pension plan.

The provision contemplates that a determination will be made that
an organization is or is not charitable. A note exchanged at the signing
of the proposed treaty states that the competent authorities will re-
view the procedures of the other country for deciding whether an
organization is charitable to determine whether they are similar to
their own procedures. If they are, the competent authority will accept
the certification of the organization by the other competent authority
and not require an organization to qualify in both countries. Under
U.S. law, charities often have to file an application for exempt status
and obtain a ruling from the Internal Revenue Service to the effect
that they meet the requirements for exempt status (section 501(c)
(3)). In the absence of this note, it is anticipated that a Canadian
organization would have to go through that process in order to qualify
as a charitable organization to which U.S. persons could donate de-
ductible amounts.

The proposed treaty also provides an exemption from source country
taxation of dividends and interest paid to a pension plan resident in
the other country. This exemption does not apply to income from
carrying on a trade or business by the pension plan or from a related
person unless that person is an exempt organization or a pension plan.

*Excise tax on private foundations.*—An exemption from the U.S.
excise tax on private foundations is provided a Canadian resident
exempt organization that receives substantially all of its support from
persons who are not U.S. citizens or residents.

*Deductions for charitable contributions.*—The proposed treaty
provides that a citizen or resident of the United States can take
a charitable contribution deduction for certain contributions to
certain Canadian charities and visa-versa. Under the proposed
treaty, a U.S. citizen or resident can deduct contributions to a
Canadian resident organization that is exempt from tax in Canada
and that would qualify in the United States to receive deductible con-
tributions if it were resident in the United States. The amount of the
deduction is limited to the percentage limitations of U.S. law applied
to the donor's Canadian income, and is further limited so that the
donors total contribution for the year cannot exceed the U.S. statutory
limitations. For example, under U.S. law, an individual can deduct
contributions to certain charitable organizations up to 50 percent of
his income for the year. Under the proposed treaty, a U.S. citizen
could deduct amounts paid to a Canadian charity that would qualify
as a 50 percent charity if it were a resident of the United States, but
only up to 50 percent of his Canadian income. The limitation based
on Canadian income does not apply to a contribution by a U.S. person

to a Canadian college or university attended by the donor or a member of his family. Similar rules apply to donations by Canadian residents to U.S. charities.

### Article XXII. Other Income

As a general rule, items of income not otherwise dealt with in the proposed treaty which are derived by residents of either country shall be taxable only by the country of residence. However, if the income is sourced in the other country, it may also be taxed by that country. The source of an item of income is determined under the domestic laws of the two countries unless the treaty contains a rule. This provision, for example, gives the United States the sole right to tax income sourced in a third country and paid to a resident of the United States.

Income distributed by an estate or trust to a resident of the other country that is not dealt with elsewhere in the treaty may be taxed in the country of residence of the estate or trust if the income is from sources within that country. However, the tax is limited to 15 percent of the gross amount of the income. Accordingly, Canada can tax distributions of income by a Canadian resident estate to a U.S. resident out of income arising in Canada, but the rate of tax cannot exceed 15 percent of the gross amount of the distribution. This provision does not affect U.S. estates.

### Article XXIII. Capital

Many countries impose a tax on capital in addition to imposing a tax on income. As a general rule, capital taxes are imposed when the income from the capital would be taxed by the country imposing the capital tax. Neither the United States nor Canada currently imposes a capital tax. However, under Article II (Taxes Covered), such a tax would be covered by the treaty if later enacted by one of the countries. The rules in Article XXIII would then apply to that tax.

Under the proposed treaty, capital could be taxed by the country in which located if it is real property or personal property forming part of the business property of a permanent establishment or fixed base maintained by a resident of the other country. The owner's country of residence could also tax that property. The country of residence would have the exclusive right to tax ships and aircraft and related personal property operated by a resident in international traffic. All other elements of capital would also be taxed only by the country of residence.

### Article XXIV. Relief from Double Taxation

*Background*

One of the two principal purposes for entering into an income tax treaty is to limit double taxation of income earned by a resident of one of the countries that may be taxed by the other country. The United States seeks to unilaterally mitigate double taxation by allowing U.S. taxpayers to credit the foreign income taxes that they pay against the U.S. tax imposed on their foreign source income. A fundamental premise of the foreign tax credit is that it may not offset the U.S. tax on U.S. source income. Therefore, the foreign tax credit provisions contain a limitation that insures that the foreign tax credit only offset U.S. tax on foreign source income. This limitation is computed

on a worldwide consolidated basis. Hence, all income taxes paid to all foreign countries are combined to offset U.S. taxes on all foreign income. Separate limitations on the foreign tax credit are provided for certain interest, DISC dividends, and oil income.

A U.S. corporation that owns 10 percent or more of the stock of a foreign corporation may credit foreign taxes paid or deemed paid by that foreign corporation on earnings that are received as dividends (deemed paid credit). These deemed paid taxes are included in the U.S. shareholder's total foreign taxes paid for the year the dividend is received and go into the general pool of taxes to be credited.

Unilateral efforts to limit double taxation are imperfect. Because of differences in rules as to when a person may be taxed on business income, a business may be taxed by two countries as if it were engaged in business to both countries. Also, a corporation or individual may be treated as a resident of more than one country and be taxed on a worldwide basis by both.

Part of the double tax problem was dealt with in previous articles that limited the right of a source country to tax income, and that coordinated the source rules. This article provides further relief where both Canada and the United States will still tax the same item of income.

The present treaty provides for relief from double taxation by each country permitting a credit against its tax for the appropriate amount of taxes paid to the other country on income from sources within that other country. The credit is provided, however, only to the extent permitted under domestic law.

The proposed treaty provides separate rules for relief of double taxation by the United States and Canada. In addition, it provides special rules covering U.S. citizens resident in Canada.

*United States*

The proposed treaty contains the provision found in many U.S. income tax treaties that the United States will allow a citizen or resident a foreign tax credit for income taxes paid or accrued to Canada. The credit is to be computed in accordance with the provisions of and subject to the limitations of U.S. law. The credit is limited to the proportion of the U.S. tax that taxable income arising in Canada bears to the taxpayer's entire taxable income. The credit is allowed to certain Canadian companies that have elected to be treated as domestic U.S. companies for purposes of being included in a consolidated return of a U.S. group of corporations (this election is permitted by section 1504(d)).

The proposed treaty also allows the U.S. indirect credit (section 902) to U.S. corporate shareholders of Canadian corporations receiving dividends from those corporations if the U.S. company owns 10 percent or more of the rating stock of the Canadian corporation. The credit is allowed for Canadian income taxes paid by the Canadian corporation on the profits out of which the dividends are paid.

By making a taxpayer subject to both the Code and the treaty limitation, the taxpayer who uses the treaty credit gets to credit the lesser of the per country limitation or the worldwide overall limitation. For purposes of computing the treaty per country rule, the Code separate limitations are to be applied. For example, for purposes of computing

37

the treaty per country rule, the separate limitation for oil and gas income (section 907) would be applied in addition to the per country limitation. There appears to be some uncertainty as to the application of the treaty per country limitation where income is resourced to Canada under the treaty.

It should be noted that the additional per country limitation only applies if the taxpayer is claiming benefits under the treaty not available under the code; for example, claiming a credit for a Canadian tax not creditable under the code.

### Canada

Canada will allow a credit against Canadian tax for income taxes paid to the United States on income arising in the United States. This credit is available subject to the provisions of Canadian law relating to the foreign tax credit, as they may be modified. If Canadian law provides a greater deduction or relief, then the taxpayer may use Canadian rules.

Relief from double taxation is provided a corporation resident in Canada by permitting it to deduct any dividends received by it out of exempt surplus of a foreign affiliate which is resident in the United States. This deduction is to be based on the provisions of Canadian law, as they may be modified without changing their general principal.

### Other provisions

The proposed treaty in the various articles dealing with specific items of income provides source rules for determining when an item of income arises in one of the countries. These rules are used for credit or exemption purposes. In general, an item of income of a resident of one country that may be taxed in the other country under the treaty is considered to arise in that other country. Accordingly, income taxes paid to that other country on that income will be creditable (subject to any relevant limitations). Income that may not be taxed in the source country is deemed to arise in the residence country.

The Treasury technical explanation explaining the proposed treaty contains a detailed explanation of how the Treasury views the foreign tax credit rules in the proposed treaty as working. It is understood that these rules only represent the current views of the Treasury and, accordingly, they do not foreclose the Treasury from modifying those interpretations in the future should it deem it advisable to do so. Here, however, the Canadian government has reviewed the technical explanation and approved it.

Generally, under U.S. law foreign taxes paid or owned in a taxable year that exceed the foreign tax credit limitation may be carried back and then forward to be used in other years if the foreign taxes paid in those other years do not eliminate U.S. tax on foreign income. While not specifically provided in the treaty, it is understood that the general carryover rules in the treaty will apply. For example, if taxes paid in a year in which the treaty is being used are carried to a year in which the treaty is not being used, the treaty limitation is used in the later year to determine whether the taxes may be credited against U.S. taxes in that later year.

The proposed treaty also provides that any reference to income tax paid or accrued to a country includes Canadian tax and United States

38

tax. Accordingly, those taxes, which are defined in Article II (Taxes Covered) are creditable under the treaty. In addition, the proposed treaty provides a credit for local taxes of general application provided the local authority does not impose the taxes in a manner inconsistent with the provisions of the treaty and the taxes are substantially similar to the taxes of the countries described in Article II. Thus, for example, Canada would allow a credit for a State income tax that was similar to the U.S. Federal income tax. Likewise, the United States will allow a credit for a provincial income tax that is imposed in a manner consistent with the provisions of the proposed treaty if it is substantially similar to the Canadian Federal income tax.

The proposed treaty also contains special rules for U.S. citizens who are residents of Canada. Under the first rule, Canada will permit the U.S. citizen a credit against Canadian tax imposed on certain income that arises in the United States. This credit is limited to the tax that the citizen would have paid if he were not a U.S. citizen. In addition, the United States will allow the citizen a credit against his U.S. tax for any tax paid to Canada after Canada has allowed the credit for U.S. taxes. The credit comes after the Canadian tax is reduced by the deduction for U.S. taxes.

A further special rule is provided for dividends, interest and royalties arising in the United States and beneficially owned by a citizen of the United States resident in Canada. Under this rule, Canada will permit a deduction of any U.S. tax paid on the dividends, interest and royalties but not reduced by Canadian taxes creditable for U.S. purposes in computing the U.S. net tax due. Canada will also allow a credit for U.S. tax imposed on that income, but Canada may limit the credit to 15 percent of the gross amount of those items included in income for Canadian tax purposes. The United States will allow a credit against U.S. tax imposed on that income for Canadian tax after the credit allowed for U.S. taxes paid or accrued on the income. The United States does not have to allow the credit to the extent it reduces U.S. tax below 15 percent of the gross amount of the interest, dividends, and royalties.

The proposed treaty provides for a limited resourcing of income to give effect to the special rules for U.S. citizens resident in Canada.

Finally, a credit is provided for capital taxes imposed by one country on capital of a resident of the other country.

### Article XXV. Nondiscrimination

The proposed treaty contains a nondiscrimination provision relating to all income taxes of every kind imposed at the national level. It is similar to provisions which have been embodied in other recent U.S. income tax treaties. There are, however, some important differences.

Under the provision, neither country can discriminate by imposing more burdensome taxes (or other requirements connected with taxes) on citizens of the other country resident in the host country than it imposes on its own citizens who are in the same circumstances.

The proposed treaty provides that citizens of one country not resident in the other country cannot be subjected in that other country to more burdensome taxes (or requirements connected with taxes) than a similarly situated citizen of a third country would be subject to. The

same circumstances, includes residence in the same country as those as against whom he believes he is being discriminated. Accordingly, Canada could discriminate against a U.S. citizen not resident in Canada vis-a-vis a Canadian resident. However, Canada could not discriminate against a U.S. citizen resident in country A vis-a-vis a French citizen resident in country A. One major purpose of this provision is to guarantee a U.S. citizen resident in a third country the benefits of any tax treaty between Canada and that country.

The proposed treaty provides that a resident of one country may take dependents allowances or deductions to the extent provided for by the country of residence for dependents residing in the other country. This rule is the same as that provided under U.S. law but is a change from Canadian law which does not permit those allowances.

The proposed treaty also permits a married Canadian resident who is not a citizen of the United States to claim joint return rates for dependent personal service income. The provision does not apply if the individuals earning are exempt from tax as dependent personal service income under Article XV. The provision is limited so that any benefit derived is available only to wage income.

The proposed treaty provides for limited nondiscriminatory treatment for corporations resident in one country owned by residents of the other country. Under the proposed treaty, a corporation which is resident in one country and which is owned by residents of the other country cannot be subject in the country of residence to other or more burdensome taxation (or related requirements) than the taxation and related requirements to which other similar corporations of the country of residence which are wholly or partially owned by residents of a third country may be subjected. For example, Canadian companies owned by U.S. residents cannot be taxed in a more burdensome manner than a Canadian company owned, for example, by a Swiss resident, is required to be treated under the Swiss-Canadian income tax treaty. However, a Canadian subsidiary of a U.S. company can be taxed in a more burdensome rate than a Canadian company owned by Canadians.

Under the proposed treaty, neither country may tax a permanent establishment of a resident of the other country less favorably than it taxes its own residents carrying on the same activities. Consistent with the U.S. and OECD models, however, a country is not obligated to grant residents of the other country any personal allowances, reliefs and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents. The proposed treaty also provides that expenses paid by a resident of one country to a resident of the other must be deductible as if paid to a resident of the country for the payor. Further, for purposes of capital taxes, debts are owed residents of the other country are to be deductible to the extent that they would be deductible if owed to residents of the country of residence of the obligor.

The proposed treaty would, however, permit a country to continue discriminatory laws relating to the deductibility of interest provided the laws are in force as of September 26, 1980 (the date of the signing of the treaty), including any later modification of those laws that does not change their general nature. It would also permit a country to

40

continue in effect any provision of its internal law, designed to insure that a nonresident does not obtain a tax treatment more favorable than that obtained by its own residents.

The proposed treaty also contains a reciprocal provision that permits a citizen or resident of one country to deduct expenditures occurred in attending a convention held in the other country to the extent that they would be deductible under the laws of the country of citizenship or residence if the convention was held in that country. This provision was intended to override U.S. law which denied deductions for expenses incurred in attending foreign conventions with certain exceptions limited to the relevance of the situs of the convention. However, Public Law 96-608, enacted December 28, 1980, amended the Code to permit deductions for conventions in Canada to the extent permitted under normal U.S. rules.

### Article XXVI. Mutual Agreement Procedure

The proposed treaty contains the standard mutual agreement provision which authorizes the competent authorities of the United States and Canada to consult together to attempt to alleviate individual cases of double taxation or cases of taxation not in accordance with the proposed treaty.

Under the proposed article a resident or citizen of one country who considers that the action of the countries or either of them will cause for him taxation not in accordance with the treaty may present his case to the competent authority of the country of which he is a resident or citizen. The claim must be presented in writing. The competent authority then makes a determination as to whether or not the claim has merit. If it is determined that the claim does have merit, and if the competent authority cannot unilaterally solve the problem, that competent authority endeavors to come to an agreement with the competent authority of the other country to limit the taxation which is not in accordance with the provisions of the treaty.

A second provision directs the competent authorities to resolve any difficulties or doubts arising as to the application of the convention. Specifically, they are authorized to agree as to the attribution of profits to a resident of one country and its permanent establishment in another country, the allocation of income, deductions or credits and the readjustment of taxes, the determination as to source of income, the characterization of items of income, and to the common meaning of terms. Under this authority, the Internal Revenue Service from time to time issues rulings defining terms in a treaty. The proposed treaty contains a provision, not found in most existing treaties, that permits the competent authorities to agree to increase dollar amounts reflected in the treaty to reflect monetary or economic developments.

The competent authorities may also consult for the elimination of double taxation in cases not provided for in the proposed treaty.

The treaty authorizes the competent authorities to communicate with each other directly for purposes of reaching an agreement in the sense of the mutual agreement provision. It also authorizes them to meet together for an oral exchange of opinions. These provisions make clear that it is not necessary to go through normal diplomatic channels in order to discuss problems arising in the application of the treaty

41

and also removes any doubt as to restrictions that might otherwise arise by reason of the confidentiality rules of the United States or Canada.

Finally, the provision provides for the waiver of the statute of limitations of either country so as to permit the issuance of a refund or credit not withstanding the statute of limitation. The provision, however, does not authorize the imposition of additional taxes after the statute of limitations has run. Furthermore, it only applies if the competent authority of the country other than the country to which the case has been presented is notified within six years from the end of the taxable year to which the case relates.

*Article XXVII. Exchange of Information*

This article forms the basis for cooperation between the two countries in their attempts to deal with avoidance or evasion of their respective taxes and to enable them to obtain information so that they can properly administer the treaty. The proposed treaty provides for the exchange of information which is necessary to carry out the provisions of the proposed treaty or for the prevention of fraud or for the administration of statutory provisions concerning taxes to which the convention applies. It also applies to taxes imposed by Canada on estate and gifts, and to taxes Canada imposes under the Income Tax Act, and to all taxes that the United States imposes under the Internal Revenue Code. This would include, for example, social security and excise taxes.

The exchange of information is specifically not limited by the personal scope article. Thus, information can be exchanged with respect to persons not covered by the proposed treaty such as persons not resident in either country.

The information exchanged may relate to tax compliance generally and not merely to avoidance or evasion of tax.

Information exchanged is to be treated as secret in the same manner as information obtained under the domestic laws of the receiving country, except that it may be disclosed to persons involved in the assessment or collection of, the administration and enforcement in respect of, or litigation concerning, the taxes to which they treaty applies. The information may be used for such purposes only. It is not clear from the language of the proposed treaty that Congress, in the exercise of its oversight responsibilities, could obtain the information. It is understood, however, that the provision is intended to permit legislative bodies involved in the administration of taxes, including their agents such as, for example, the U.S. General Accounting Office, access to such information as they consider to be necessary to carry out their oversight responsibilities. A country is not required to carry out administrative measures at variance with its laws or which it cannot obtain in the normal course of administration, or to supply information that would disclose a trade secret or the disclosure of which would be contrary to public policy.

The proposed treaty provides that a requested country will try to obtain the information requested the same way as if its own taxation was involved. notwithstanding the fact that the requested country does not, at that time, need the information. What this means is that

**Appx373**

42

a requested country will use its subpoena or summons powers or any other powers that it has under its own laws to collect information requested by the other country, even though it itself does not need that information for its own purposes. It is intended that the requested country may use those powers even if the requesting country could not under its own laws. Thus, it is not intended that provision be strictly reciprocal. For example, once the U.S. Internal Revenue Service has referred a case to the Justice Department for possible criminal prosecution, the United States investigators can no longer use an administrative summons to obtain information. If, however, Canada could still use administrative process to obtain requested information, it would be expected to do so even though the U.S. cannot. The United States could not, however, tell Canada which of its procedures to use.

Where specifically requested, the requested competent authority will attempt to provide the information in the form requested. Specifically, the competent authority will attempt to provide depositions of witnesses and copies of unedited original documents (including books, papers, statements, records, accounts, or writings) to the extent that they can be obtained under the laws and practices of the requested state in the enforcement of its own tax laws.

### Article XXVIII. Diplomatic Agents and Consulars Officers

The proposed treaty contains the rule found in other U.S. tax treaties that its provisions are not to affect the taxation privileges of diplomatic agents or consular officials under the general rules of international law or the provisions of special agreements. Accordingly, the convention will not defeat the general exemption from tax which a host country grants to diplomatic officials of the other country.

### Article XXIX. Miscellaneous Rules

The proposed treaty contains a number of special rules that amplify or modify other provisions of the treaty.

The proposed treaty contains the general rule that its provisions will not restrict the right of a country to grant an exclusion, exemption, deduction, credit or other allowance whether currently allowed or later enacted in determining its own tax.

The proposed treaty also contains the "saving clause" contained in all U.S. income tax treaties that provides, with specific exceptions, that the treaty is not to affect the taxation by the United States of its citizens and residents or the taxation by Canada of its residents. The provision also applies to Canadian corporations that elect to be included in a consolidated return filed by a U.S. affiliated group of corporations. Consequently, unless otherwise specifically provided in the proposed treaty, the United States will continue to tax its citizens who are residents of Canada. Residents for purposes of the treaty (and thus, for purposes of the savings clause), include corporations and other entities as well as individuals (Article IV (Residence)).

Under Section 877, a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of U.S. income tax, will, in certain cases, be subject to tax for a period of 10 years following the loss of citizenship. The treaty contains the standard provision found in the U.S. model, and most recent treaties specifically retaining the

right to tax former citizens. Even absent a specific provision the IRS takes the position that the U.S. retains the right to tax former citizens resident in the treaty partner.

Exceptions to the savings clause are provided for the benefits confirmed by the articles dealing with related persons (Article IX), Gains (Article XIII), U.S. beneficiaries of Canadian retirement plans (Article XXIX) certain transitional rules contained in paragraphs 3 and 5 of Article XXX, Pensions (Article XVIII) Government Service (Article XIX), Exempt Organizations (Article XXI), Elimination of Double Taxation (Article XXIV), Nondiscrimination (Article XXV), and the Mutual Agreement Provisions (Article XXVI). In addition, the saving clause does not apply to individuals who are subject to the student article (Article XX) and who are neither citizens of nor have immigrant status in the country in which they are students.

The proposed treaty also contains a provision intended to grant relief from social security taxes imposed on employers, employees, and self-employed persons under the Internal Revenue Code. It provides that with respect to taxable years not barred by the statute of limitations ending on or before December 31 of the year in which the treaty enters into force, income from personal services that is not subject to tax by the United States under the existing treaty will not be considered wages on that earnings from self-employment for purposes of social security taxes imposed under the Code. This provision would permit persons who have paid social security taxes for years which are still open, including the year in which the instruments of ratification are exchanged, to obtain a refund of those taxes.

The proposed treaty would also permit the United States to recognize the tax deferral accorded by Canadian registered retirement savings plan. It provides that a U.S. citizen who is also a resident of Canada and a beneficiary of a Canadian registered retirement savings plan may elect to defer U.S. tax on any income accrued in the plan but not distributed by the plan until the time a distribution is made from the plan or a plan substituted therefore. The Internal Revenue Service is to establish rules under which such an election may be made. This provision is intended to solve a problem which exists under current rules. Certain Canadian retirement plans which are qualified plans for Canadian tax purposes do not meet U.S. requirements for qualification. As a result, the earnings of the plans are currently included in income of a U.S. citizen or resident for U.S. tax purposes. The proposed treaty would prevent the mismatching of the income so that a U.S. person would be able to get a foreign tax credit for taxes paid when Canada finally taxes the income and the United States would then tax it at the same time.

Under the proposed treaty, if 25 percent or more of the capital of a company which is a resident in one country is owned directly or indirectly by individuals who are not residents of that country, and if by reason of special rules a tax imposed by the country of residence of the company on that company with respect to dividends, interest or royalties, arising in the second country is substantially less than the tax generally imposed by the country on corporate business profits, then, notwithstanding the provisions of the proposed treaty relating to

dividends, interest or royalties, the other country may tax those amounts as if there were no treaty between the United States and Canada.

### Article XXX. Entry into Force

The proposed treaty contains detailed transitional rules. The proposed treaty is subject to ratification in accordance with the applicable procedures of each country and the instruments of ratification will be exchanged as soon as possible at Ottawa. In general, the proposed treaty will enter into force when the instruments of ratification are exchanged.

As a general rule, the treaty will become effective for taxable years beginning on or after January 1 of the year following the year in which the proposed treaty comes into force. With respect to the withholding taxes at source on dividends, interest, royalties and pension annuities, the treaty will be effective on the first day of the second month next following the date on which the convention enters into force. Other special rules are also provided.

The proposed treaty also provides that the present estate tax treaty between the United States and Canada will continue in effect for estates of persons who died prior to the first day of January following the date on which the treaty enters into force. The proposed treaty further provides, however, that the estate tax treaty will be terminated with respect to estates of persons who die on or after that date. This reflects the fact that Canada has repealed its Federal estate tax law and now taxes transfers by reason of death under its income tax law.

### Article XXXI. Termination

The proposed treaty will continue in force indefinitely, but either country may terminate it at any time after five years from its entry into force by giving at least six months prior notice through diplomatic channels.

If one of the countries determine that a significant change introduced in the laws of the other country should be accommodated by a modification of the treaty, the countries will consult together with a view to resolving the matter. If the matter cannot be satisfactorily resolved, then the State who feels that the other State had modified its laws in a significant way, may terminate the treaty by giving notice through diplomatic channels, even if the five-year period has not elapsed.

If terminated, the termination will be effective with respect to dividends, interest, royalties, pension annuities and other income for amounts paid or credited on or after the first day of January next following the expiration of the six months notice.

### Exchange of Notes

At the signing of the treaty, notes were exchanged dealing with three issues. First, the note recognizes a definitional problem that the term "societe" also means a "corporation" within the meaning of Canadian law.

Second, the notes provide rules which permit a resident of one country to deduct as a charitable contribution contributions to certain orga-

45

nizations created or organized in the other country. The effect of this
note is discussed under Article XXI.

Third, the notes state the Canadian position that the unitary tax
system used by many States of the United States to allocate income to
the United States offices or businesses of foreign companies result in
inequitable taxation and also imposes excessive administrative bur-
dens on Canadian companies doing business in those States. It is
Canada's view that that method of computing taxable income by those
State governments is not determined on the basis of arm's-length rela-
tions but is based on a formula taking into account the income of the
Canadian company and its worldwide operations and subsidiaries, in-
cluding the assets, payroll and salaries of all those companies. In the
Canadian view, the requirement that a Canadian multi-national com-
pany submit its books and records of all its subsidiaries to a State of
the United States imposes a costly burden. The notes reflect Canada's
correct understanding that the Senate of the United States has not
consented to any limitation on the taxing jurisdiction of the States by
treaty and that a provision which would have restricted the use of the
unitary apportionment was recently rejected by the Senate in the case
of the United States Kingdom Treaty. The notes reflect Canada's con-
cern about this issue and states that if an acceptable provision on uni-
tary apportionment can be devised the United States will reopen
discussions with Canada on that subject.

O



Canada Revenue    Agence du revenu
Agency            du Canada

July 10, 2023

Mr. Max Reed                                          *Our file*
Polaris Tax Counsel                                   ILBD-AMT-56731
1788 West Broadway, Suite 900
Vancouver, BC V6J 1Y1

Dear Mr. Reed:

**Subject:    Competent Authority Request**
**            Taxpayer: Paul Bruya**
**            <u>Tax Years:  2013 through 2020</u>**

We are writing in response to your request for an update on the status of negotiations between the
Canadian Competent Authority and the United States (US) Competent Authority in relation to the
Taxpayer's case, which was submitted under Article XXVI of the Canada-US Tax Convention
(Convention).

The Taxpayer, a Canadian resident and US citizen, has been subject to double taxation on capital
gains he earned from the disposition of Canadian real estate. As a fiscal resident of Canada, the
Taxpayer is subject to tax on his worldwide income in Canada. As a citizen of the US, he is also
subject to tax on his worldwide income in the US. Relief from double taxation is granted in
accordance with domestic laws and the Convention. In the vast majority of cases, double taxation
is relieved without any difficulties. However, with the introduction of the US Net Investment
Income Tax (NIIT), such relief has proven difficult.

The position of the Canadian competent authority in this regard is that Canada, as the country of
source, has the right to tax the gain, while the US, as the country which has residual taxation
rights, must provide relief in accordance with Article XXIV of the Convention. Discussions with
the US competent authority under the Mutual Agreement Procedure to obtain relief from double
taxation are ongoing and our respective positions remain far apart.

We will continue to keep you informed of any developments in this case. Please do not hesitate to
contact us should you have further question about this case.

Your sincerely,

Digitally signed by
JENNINGS MICHAEL
Date: 2023.07.10
17:36:56 -04'00'

Michael Jennings
Director
Competent Authority Services Division
International and Large Business Directorate
Canada Revenue Agency



344 Slater Street, 18th flo          **Appx378**          0L5  Fax  613-990-7370



**Max Reed** LLB, BCL
Cross-Border Tax Lawyer
(British Columbia & New York)
**max@skltax.com**
T: **+1  604  416  1902** · F: **+1  604  733  1311**
**403-1155 Robson Street · Vancouver, British Columbia · V6E 1B5**

Deputy Commissioner (International)
Large Business and International Division
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C. 20224
SE:LB:IN:ADCI:TAIT:M4-365
(Attention: TAIT)


**Re: Request for assistance  regarding application of United States - Canada Convention with Respect to Taxes on Income and on Capital Art. XXIV, Elimination of Double Taxation**

To the Deputy Commissioner (International),

This is to request assistance regarding the application of the United States - Canada Convention with Respect to Taxes on Income and on Capital signed at Washington on September 26, 1980, as amended by the Protocols signed on June 14, 1983, March 28, 1984, March 17, 1995 and July 29, 1997, and September 21, 2007 (hereinafter the "Treaty")[1], in light of section 1411 of the United States Internal Revenue Code of 1986, as amended through 2018 (hereinafter the "Code") [2], and applicable regulations.

Specifically, Regulation § 1.1411-1(e) imposes a limitation on the creditability under section 901 of foreign taxes paid in respect of net investment income, as defined in section 1411(c).[3] We respectfully request that the United States competent authority confirm that Treaty Article XXIV respecting the elimination of double taxation by the United States continues to apply, such that the application of section 1411 to creditability under section 901 does not alter the creditability of Canadian taxes paid in respect of net investment income, as discussed more fully below.

---

[1] Convention with Respect to Taxes on Income and on Capital, U.S.- Can., Sep. 26, 1980 (as amended by the Protocols signed on June 14, 1983, March 28, 1984, March 17, 1995 and July 29, 1997, and September 21, 2007) [hereinafter Treaty].
[2] 26 U.S.C.A. § 1411 (West) [hereinafter 26 U.S.C.].
[3] 26 C.F.R. § 1.1411-1(e)(2013)[hereinafter 26 C.F.R. § 1.1411-1(e)]; 26 U.S.C.A. § 901; 26 U.S.C.A. § 1411.

1

Paul Bruyea, (hereinafter the "Taxpayer") is a Canadian resident US citizen. Both countries tax his worldwide income – Canada by virtue of his residency and the United States by virtue of his citizenship. He sold Canadian real property on which he paid tax to Canada. The United States only granted him partial credit for the tax paid to Canada by denying a credit for the 3.8% Net Investment Income Tax. Therefore, contrary to the Treaty's text and purpose, the Taxpayer paid tax twice on the same income in the same year to two different countries.

The request is formatted pursuant to the requirements listed in Rev. Proc. 2015-40.[4] Part I provides the identifying information and summary of issues and proceedings. Part II provides the detailed account of the competent authority issues raised in this request. The required statements and power of attorney are attached as Appendix A. The historical correspondence to the matter is attached as Appendix B. That background is quite voluminous.

We request the opportunity to make an oral submission to the Competent Authority as part of this process.

Please let me know if you have any questions.

Yours truly,

Max Reed, LLB, BCL, Esq. (bars of New York and BC)
SKL Tax
max@skltax.com
604-732-1515

---

[4] Rev. Proc. 2015-40, 2015-35 I.R.B 236 [hereinafter Rev. Proc. 2015-40].

2

**Appx380**

## PART 1: IDENTIFYING INFORMATION AND SUMMARY OF ISSUES AND PROCEEDINGS

### 1.1 IDENTIFYING INFORMATION:

a. Paul Bruyea;

   707 Fort Street Apt 301, Victoria, British Columbia, Canada V8W 3G3;

   Resident of Canada and citizen of the United States

b. US Social Security Number: ███████;

c. N/A

### 1.2 AUTHORIZATIONS AND CONTACTS:

a. Max Reed of SKL Tax is the individual authorized by Form 2848, *Power of Attorney and Declaration of Representative*, to represent the Taxpayer in connection with the competent authority request;

b. N/A

c. Max Reed of SKL Tax is the individual who will serve as the Taxpayer's point of contact for the U.S. competent authority. Max Reed's contact information is as follows:

   **Max Reed, LLB, BCL**

   **Cross-border tax lawyer (BC & New York)**

   **SKL Tax**

   403-1155 Robson Street, Vancouver, BC V6E 1B5

   **Direct:** +1 604 416 1902

   **T:** +1 604 732 1515

   **F:** +1 604 733 1311

   **E:** max@skltax.com

### 1.3 IRS OFFICE

a. The competent authority issues arise from U.S.-initiated adjustments. The IRS office that made the adjustment and the name of and contact information for the Taxpayer's IRS examination team manager is:

Kimberly Slack
Department of Treasury
Internal Revenue Service
Large Business and International
1999 Broadway, MS 4355DEN
Denver, CO 80202

b. N/A

## 1.4 TREATY(IES)

The Taxpayer's request for the assistance of the U.S. competent authority is made pursuant to Article XXVI(1) of the Treaty.[5] Under this article, issues that are not in accordance with the provisions of the Treaty may be brought to the attention of the competent authority.[6] Although Article XXVI(1) stipulates that a person may present his case in writing to the competent authority of the Contracting State of which he is a resident, the Taxpayer is a resident of both countries – Canada by virtue of his residency and the United States by virtue of his citizenship. The Taxpayer thus applies to the U.S. Competent Authority.

The Taxpayer's request for the assistance of the U.S. Competent Authority concerns Article XXIV(1) and Article XXIV(4)(b) of the Treaty.

## 1.5 SUMMARY OF COMPETENT AUTHORITY ISSUE(S)

---

[5] Treaty, *supra* note 1 at art. XXVI (1). See Internal Revenue Service, https://www.irs.gov/businesses/tax-treaties-can-affect-your-income-tax (last visited February 19, 2019) ("If you are a U.S. citizen or U.S. resident for purposes of a treaty, you can request assistance from the U.S. competent authority if you think that the actions of the U.S., the applicable treaty country or both caused or will cause double taxation or taxation otherwise inconsistent with the treaty").
[6] Treaty, *supra* note 1 at art. XXVI (1).

4

Competent authority assistance is being requested for the following issue: Whether a U.S. citizen may claim a foreign tax credit against the Net Investment Income Tax under the authority of the Treaty?

## 1.6 YEARS AND AMOUNTS

In tax year 2015, the Taxpayer disposed of real estate located in Canada for total proceeds of $9,403,517 and a gain of $7,074,236. The Taxpayer's total income for 2015 as shown on his tax return was $7,059,823. On this income, the Taxpayer paid US$263,523 of Net Investment Income Tax in 2015.

In tax year 2016, the Taxpayer's total income was $328,809, consisting of interest, dividends, and capital gains arising from trades in his investment account. On this income, the Taxpayer paid US$7,745 of the Net Investment Income Tax in 2016.

## 1.7 TAXPAYER PROCEEDINGS:

a. The Taxpayer filed a claim for refund on an amended 2015 and 2016 U.S. federal income tax return. His claim was denied on examination. He filed a protest to raise the issue to IRS Appeals. The initial appeals conference was on February 14, 2019. He now brings this application for relief to the U.S. Competent Authority. He has notified the Canadian Competent Authority of this request.

b. N/A

## 1.8 OTHER PROCEEDINGS

The Taxpayer is aware of one other case pending before the competent authorities of both countries that concerns Net Investment Income Tax paid by a Canadian resident US citizen. The Taxpayer does not have knowledge of the identity of the taxpayer in that other case.

## 1.9 STATUTES OF LIMITATIONS

5

The applicable statutes of limitation in the US for the taxable years covered by the competent authority request are found in Code section 6501.[7] The claims for relief were filed within the applicable time periods. The time period for a MAP request under Article XXVI (2) of the Treaty is six years. This request is within that time frame.

## PART 2. COMPETENT AUTHORITY ISSUES

**The Taxpayer's view of the Competent Authority issues addressed in Part 2 are organized as follows:**

Part 2.1(a) provides an overview of the relevant circumstances surrounding the competent authority issues.

Part 2.1(b) provides a detailed account of the Taxpayer's understanding of the legal basis for the U.S.-initiated action giving rise to the competent authority issues.

2.1(b)(i) addresses the Net Investment Income Tax under Code section 1411.

2.1(b)(ii) outlines the nature of the Taxpayer's income which was foreign source.

2.1(b)(iii) describes how the Net Investment Income Tax creates double taxation.

Part 2.1(c) provides a detailed account of the Taxpayer's view on the justification for assistance under the Treaty.

2.1(c)(i) describes the Taxpayer's position that the determination of whether the Treaty provides for a foreign tax credit against the Net Investment Income Tax is a matter of first impression.

2.1(c)(ii) provides an overview of the general principles of Treaty interpretation under US law.

2.1(c)(iii) describes the application of the Treaty to the Net Investment Income Tax.

---

[7] 26 U.S.C. § 6501.

2.1(c)(iv) describes the application of Treaty Article XXIV credit against the Net Investment Income Tax. The claim that Article XXIV is applicable against the Net Investment Income Tax is supported by:

    (a) An overview of Article XXIV(1);

    (b) The assertion that the limitation under US domestic law does not block a credit against the Net Investment Income tax;

        (i)    Any limitation must consistent with the general principle that a credit should be provided to avoid double taxation;

        (ii)    Paragraphs XXIV(4)-(6) narrow the domestic law limitation;

        (iii)    Article XXIV(4)(b) provides a credit against the Net Investment Income Tax;

            a.  The plain meaning of Treaty Article XXIV(4) provides that there should be a credit against the Net Investment Income Tax;

            b.  Technical Commentary supports the position that Treaty Article XXIV(4) provides a credit against the Net Investment Income Tax;

            c.  XXIV(4) is not a resourcing provision;

            d.  Conclusion: Article XXIV(4)(b) provides a credit.

        (iv)    The Code does not limit the Treaty credit against the Net Investment Income Tax;

        (v)    The IRS interpretation of the domestic law limitation leads to absurd results;

        (vi)    Conclusion – scope of the domestic law limitation

2.1(c)(v) concludes that the Code and Treaty should be read harmoniously.

2.1(d) describes the related request for assistance submitted to the foreign competent authority (yet to be submitted).

**2.1 <u>COMPETENT AUTHORITY ISSUES:</u>**

a. **THE RELEVANT TRANSACTIONS, ACTIVITIES, OR OTHER CIRCUMSTANCES SURROUNDING THE COMPETENT AUTHORITY ISSUES FOR WHICH ASSISTANCE IS REQUESTED;**

In tax year 2015, the Taxpayer disposed of real estate located in Canada for total proceeds of $9,403,517 and a gain of $7,074,236. The Taxpayer's total income for 2015 as shown on his tax return was $7,059,823. In tax year 2016, the Taxpayer's total income was $328,809 consisting of interest, dividends, and capital gains arising from trades in his investment account. On this income, the Taxpayer paid $263,523 of Net Investment Income Tax in 2015, and $7,745 of Net Investment Income Tax in 2016. The Taxpayer then subsequently timely filed amended 2015 and 2016 tax returns to claim a refund of Net Investment Income Tax paid, on the basis of a foreign tax credit claimed pursuant to Article XXIV(1) and (4) of the Treaty. The Taxpayer's claims for refund were timely filed with Form 1040X and disclosed his Treaty-based return position as required under section 6114.

The Taxpayer had sufficient foreign tax credits available in tax years 2015 and 2016 to fully offset his Net Investment Income Tax liability.

Specifically, in 2015, the Taxpayer had an available pool of carryover passive foreign tax credits of $96,443 and paid Canadian income tax of $1,953,513 such that his total available pool of passive foreign tax credits for 2015 was $2,049,956. With his originally filed 2015 tax return, the Taxpayer claimed $1,398,571 of foreign tax credit, such that he had a remaining passive foreign tax credit pool of $651,385. With his timely filed Form 1040X claim for refund, the Taxpayer then applied $263,523 of this remaining pool against his Net Investment Income Tax liability by applying the Treaty based foreign tax credit under Articles XXIV(1) and (4).

In 2016, the Taxpayer then had an available pool of carryover passive foreign tax credits of $387,862 and paid foreign income tax of $22,102 such that his total available pool of passive foreign tax credits for 2016 was $409,964. With his originally filed 2016 tax return, the Taxpayer claimed $39,385 of foreign tax credit, such that he had a remaining passive foreign tax credit pool of $370,579. With his timely filed Form 1040X claim for refund, the Taxpayer then applied $7,745

8

of this remaining pool against his Net Investment Income Tax liability by applying the Treaty based foreign tax credit under Articles XXIV(1) and (4).

As requested by the IRS, the Taxpayer has provided copies of his 2015 and 2016 Canadian tax return (T1) and related schedules evidencing his Canadian tax liability on this income. The IRS agent did not challenge these conclusions.

The Taxpayer submitted a formal protest to IRS appeals dated August 16, 2018. IRS issued a rebuttal dated October 1, 2018. The Taxpayer issued a reply dated November 12, 2018 to which IRS issued a sur-reply dated February 11, 2019. The Taxpayer had a conference at IRS appeals on February 14, 2019.

Shortly thereafter, the Taxpayer submitted this Competent Authority request and invoked the Simultaneous Appeals Procedure available under Rev. Proc. 2015-4.[8]

## b. **THE TAXPAYER'S UNDERSTANDING OF THE LEGAL BASIS FOR EACH U.S.-INITIATED ACTION, FOREIGN-INITIATED ACTION, OR TAXPAYER-INITIATED POSITION GIVING RISE TO THE COMPETENT AUTHORITY ISSUES;**

### (i) **The Net Investment Income Tax under Code section 1411**

The Net Investment Income Tax was created by the Health Care and Education Reconciliation Act of 2010.[9] It imposes an income tax of 3.8% on investment income above a certain threshold.[10] In general terms, investment income includes interest, dividends, rent, royalties, and most net gains.[11]

The text of Code section 1411 does not specifically address the availability of a foreign tax credit in respect of foreign taxes paid on net investment income as defined thereunder.[12] Rather, Code

---

[8] Rev. Proc. 2015-40, *supra* note 4 at section 6.04(2)(a)(General overview of the simultaneous appeals procedure).
[9] Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, 124 STAT. 1029 (2010).
[10] *Id.* § 1411.
[11] *Id.*
[12] 26 U.S.C. § 1411.

9

sections 901 and 27 limit the foreign tax credit in the Code to those imposed under Chapter 1.[13] The Net Investment Income Tax is imposed under Chapter 2A.[14] Thus, no foreign tax credit is expressly provided for under the Code.

This interpretation is confirmed in the Treasury Regulations. Regulation 1.1411-1(e) states that "Amounts that may be credited against only the tax imposed by Chapter 1 of the Code may not be credited against the section 1411 tax imposed by Chapter 2A of the Code unless specifically provided in the Code."[15] The regulation provides by way of example that the foreign income, war profits, and excess profits taxes allowed as a foreign tax credit by section 901 "are not allowed as a credit against the section 1411 tax."[16] Regulation 1.1411-2 addresses the application of section 1411 to individuals who are not U.S. tax residents under an applicable tax treaty.[17]

Neither the Code nor the Regulations address the availability of a foreign tax credit under the Treaty or any treaty. They are silent with respect to that issue.

(ii)     **The Taxpayer's income was foreign source**

In both 2015 and 2016, all of the Taxpayer's income was Canadian source and Canadian tax was paid on it. In 2015, the Taxpayer's primary source of income was the sale of Canadian real property. Per section 862(a)(5), gains, profits, and income from the sale or exchange of real property located without the U.S. is treated as income from sources without the U.S.[18] Similarly, under Article XIII, gains derived from the alienation of real property is sourced to the country in which the real property is located.[19] As noted above, the Taxpayer paid considerable Canadian tax on this sale–in the amount of $1,953,513. Therefore, the Taxpayer's income arising from the sale of the rental property located in Canada was Canadian sourced and Canadian tax was paid on this income.

---

[13] *Id*. § 901 (Taxes of foreign countries and of possession of United States), *id.* § 27 (Taxes of foreign countries and possession of United States; possession tax credit).
[14] *Id*. § 1411 (Title of Chapter 2A is Unearned Income Medicare Contribution).
[15] 26 C.F.R. § 1.1411-1(e), *supra* note 3.
[16] *Id*.
[17] 26 C.F.R. § 1.1411-2 (2013).
[18] 26 U.S.C. § 862(a)(5)(Gross income from sources without United States: "The following items of gross income shall be treated as income from sources without the United States: gains, profits, and income from the sale or exchange of real property located without the United States").
[19] Treaty, *supra* note 1 at art. XIII (Gains).

10

The same is true in 2016. The Taxpayer is a Canadian resident under Article IV(2)(a) of the Treaty as his permanent home is located in Canada.[20] In 2016, the Taxpayer's income consisted of interest, dividends, and capital gains from trades in his investment accounts. Per section 862(a)(1)[21] and consistent with Treaty Article XI[22], $1,853 of the Taxpayer's total interest income of $1,891 was Canadian sourced from the Bank of Nova Scotia; similarly, per section 862(a)(2)[23] and consistent with Treaty Article X[24], the Taxpayer's total dividend income of $168,620 received from the Taxpayer's Canadian investments were Canadian sourced; and finally, per section 865(a)(1)[25] and consistent with Treaty Article XIII(4)[26], the Taxpayer's total capital gains income of $158,298 was Canadian sourced. As noted above, the Taxpayer paid a considerable amount of Canadian tax on this income.

### (iii)  The Net Investment Income Tax creates double taxation

Denying the Taxpayer a foreign tax credit against the Net Investment Income Tax creates textbook double taxation. Double taxation is defined as when two states tax the taxpayer on the same income stream with the same type of taxes.[27]

Here, the Taxpayer sold Canadian real property. He paid income tax to Canada on that income by virtue of his residency. He paid income tax to the United States on that same income by virtue of his citizenship. His total US federal tax liability on that income was 23.8%. The US provided a

---

[20] *Id.* art. IV(2)(a)(Residence).

[21] 26 U.S.C. § 862(a)(1)("The following items of gross income shall be treated as income from sources without the United States: interest other than that derived from sources within the United States as provided in section 861(a)(1)").

[22] Treaty, *supra* note 1 at art. XI (Interest).

[23] 26 U.S.C. § 862(a)(2)("The following items of gross income shall be treated as income from sources without the United States: dividends other than those derived from sources within the United States as provided in section 861(a)(2)").

[24] Treaty, *supra* note 1 at art. X (Dividends).

[25] 26 U.S.C. § 865(a)(1)(Source rules for personal property sales).

[26] Treaty, *supra* note 1 at art. XIII(4)(Gains).

[27] *See* Joint Comm. on Taxation, JCS-48-81, at 35 (1981) (provides that "one of the two principal purposes for entering into an income tax treaty is to limit double taxation of income earned by a resident of one of the countries that may be taxed by the other country," relating the risk of double taxation as determined on a per income basis) [hereinafter JCS-48-81]. *See also* THE ORGANIZATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, http://www.oecd.org/ctp/glossaryoftaxterms.htm (last visited February 23, 2019) ("International double taxation arises when comparable taxes are imposed in two or more states on the same taxpayer in respect of the same taxable income or capital, e.g. where income is taxable in the source country and in the country of residence of the recipient of such income").

11

credit for the Canadian tax liability, but not the 3.8% Net Investment Income Tax. The refusal of the US to provide a credit to the Taxpayer against the 3.8% Net Investment Income Tax represents textbook double taxation on Canadian source income. This is because the 3.8% Net Investment Income Tax was levied on a net basis on the proceeds of the sale of Canadian real property for which the taxpayer paid income tax to Canada.

The IRS asserted that the US federal system provides a carry forward for excess tax paid to Canada. This is incorrect because under the IRS' view the Net Investment Income Tax would never be reduced by a credit for foreign taxes paid.

### c. THE TAXPAYER'S VIEW ON THE JUSTIFICATION FOR ASSISTANCE UNDER THE APPLICABLE U.S. TAX TREATY

#### (i) This is a matter of first impression

The issue of whether the Treaty provides for a foreign tax credit against the Net Investment Income Tax is a matter of first impression. The same is true of the more general question on the scope of Treaty credit. Courts have considered the scope of the Treaty foreign tax credit in a variety of cases. Notably, cases related to the foreign tax credit limitation against the alternative minimum tax (hereinafter "AMT") liability under now repealed Code section 59(a)(2).[28] These cases are all inapplicable here. They were all resolved using the last-in-time principle[29] as former Code section 59(a)(2) expressly overrode any treaty obligation.[30] With respect to the Net Investment Income

---

[28] *See Kappus v. Comm'r*, 337 F.3d 1053 (D.C. Cir. 2003) (concerned a challenge by a taxpayer residing in Canada of the IRS' limitation of the taxpayer's foreign tax credit to 90% of their AMT liability) [hereinafter *Kappus v. Comm'r*] . *See also Jamieson v. Comm'r*, 584 F.3d 1074 (D.C. Cir. 2009) [hereinafter *Jamieson v. Comm'r*].

[29] See *Kappus v. Comm'r*, *supra* note 28 at 1057 ("When a statute conflicts with a treaty, the later of the two enactments prevails over the earlier under the last-in-time rule"). See also *Jamieson v. Comm'r*, *supra* note 28 at 1075 (affirming *Kappus v. Comm'r* that the "the limitation in § 59(a)(2) was controlling over the treaty because it was "last-in-time"). *See also Pekar v. Comm'r*, 113 T.C. 158, 158 (1999) (the case concerned the U.S.-Germany treaty and the U.S.-United Kingdom Treaty. The Court stated that "[…] because of the established last-in-time rule, the sec. 59, I.R.C., limitation on the foreign tax credit trumps any conflicting provision in the treaty because the Code section was subsequently promulgated").

[30] *See Kappus v. Comm'r*, *supra* note 28 at 1058 ("TAMRA […] made it crystal clear that Congress intended the 90% cap on the AMT foreign tax credit to supercede any preexisting treaty obligation with which it conflicted"). *See also* The Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. No. 100-647, 102 Stat. 3342 at § 1012(aa)(2)("Certain amendments to apply notwithstanding treaties. — The following amendments made by the Reform Act "26 USC 861 note" shall apply notwithstanding any treaty obligation of the United States in effect on

tax, there is no such explicit override. Consequently, as outlined below, the Treaty and Code should be interpreted harmoniously[31]. Thus, the interpretative approach is different and the AMT cases, while useful for the general principles they set out, do not resolve the question at hand. The DC Circuit recognized this fact in *Kappus v. Comm'r* itself holding that, "The question of whether the Treaty and statute can be harmonized as the government suggests is an extremely close one. It is not, however, a question that we need resolve."[32] The case of *Haver v. Comm'r* involved the US-German Tax Treaty which was expressly distinguished by the Court from the US-Canada Treaty.[33] Further, the Court in *Haver v. Comm'r* also left open the question of interpreting the Treaty and Code harmoniously.[34] Again, *Haver v. Comm'r* is useful for the general principles it sets out, but does not resolve the matter at hand here.

Having established that this is a matter of first impression, and the need to start from first principles, next consider the basics of treaty interpretation.

### (ii) General principles of Treaty interpretation under US law

The resolution of an alleged conflict between domestic law and a treaty in the US relies on the principles of treaty interpretation developed by the US Supreme Court.[35] The US Constitution plays a central role in US tax law and treaty interpretation.[36] The US Constitution's supremacy clause provides that federal statutes and treaties "shall be the supreme law of the land."[37]

---

the date of the enactment of the Reform Act"). *See also* 26 U.S.C. § 861 (Income from sources within the United States). *See also* S. REP. 100-445, 316-28, 1988 U.S.C.C.A.N. 4515, 4827 [hereinafter S.REP. No. 100-445].

[31] *See* S.REP. No. 100-445, *supra* note 30 (One of the most important [interpretative guidelines] is the initial presumption of harmony between earlier and later pronouncements. In the case of two statutes, "[t]he cardinal rule is that repeals by implication are not favored. Where there are two acts upon the same subject, effect should be given to both if possible.... [T]he intention of the legislature to repeal must be clear and manifest").

[32] *See Kappus v. Comm'r*, *supra* note 28 at 1056.

[33] *Haver v. Comm'r*, 444 F.3d 656, 659 (D.C. Cir. 2006) (Discussion on distinction from *Kappus v. Comm'r*. "But *Kappus* raised interpretive difficulties not present here. The U.S.-Canada Treaty provision we examined contained a clause subjecting its tax credit to limitations of U.S. law, but it also explicitly conditioned the tax credit and arguably the limitation itself on subsequent paragraphs of the treaty").

[34] *Id.* at 659 ("[I]t is unnecessary for us to decide what more might have been contemplated by the provision in Article 23(1) that conditions the tax credit on limitations of U.S. law "as it may be amended from time to time without changing the general principles" of the Treaty. Nor need we ponder whether the United States may effectively abrogate the Treaty by enacting legislation that cannot be reconciled with the Treaty.").

[35] JUAN A.BECERRA, INTERPRETATION AND APPLICATION OF TAX TREATIES IN NORTH AMERICA (2013) at 165.

[36] *Id.* ("The interpretation of treaties is a question of law in the United States").

[37] US Const art VI, § 2, cl 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any

13

Therefore, domestic tax statutes and tax treaties are considered to be equal and on the 'same footing'.[38]

Long-established case law holds that where possible, the Code and the Treaty should be read harmoniously to give effect to both.[39] Where there is no conflict, the last-in-time rule is inapplicable.[40] Generally, a conflict occurs where the Code overrides the Treaty. These overrides are possible. However, the US Supreme Court has held that such overrides must be explicit[41] and that legislative silence does not constitute an override.[42] Consistent with this rule, such overrides elsewhere in the Code are explicit. Consider for example:

- Code section 7874(f) which specifically overrides treaty obligations in the case of inversions.[43]

- Code section 884(e) which clearly overrides treaties with respect to the Branch Profits Tax.[44]

- Code section 894(c) which denies treaty benefits to certain hybrid entities.[45]

---

State to the contrary notwithstanding"). *See Whitney v. Robertson*, 124 U.S. 190, 194 (1888) ("By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other") [hereinafter *Whitney v. Robertson*].

[38] See *Whitney v. Robertson*, *supra* note 39. See also Robert R. Olivia, *Conflicts Between US Tax Treaties and Tax Statutes*, 44:5 Can Tax J 1314 at 1315 (1994).

[39] See *Whitney v Robertson*, *supra* note 39 ("When the two [legislation and a Treaty] relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other…"). *See also Pigeon River Imp., Slide & Boom Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138, 160 (1934) ("But the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress"). *See also Pekar v. Comm'r*, 113 T.C. 158, 161 (1999) ("the Code and the treaty should be read harmoniously, to give effect to each").

[40] See *Chae Chan Ping v. United States*, 130 U.S. 581, 600 (1889) ("It will not be presumed that the legislative department of the government will lightly pass laws which are in conflict with the treaties of the country…"). *See also Whitney v Robertson*, *supra* note 39.

[41] *Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed"). *See also Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) [hereinafter *Trans World Airlines, Inc. v. Franklin Mint Corp*]

[42] *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 175 (D.D.C. 2002), aff'd, 333 F.3d 228 (D.C. Cir. 2003) ("The Supreme Court has unequivocally held that legislative silence is not sufficient to abrogate a treaty or a bilateral executive international agreement. When a later statute conflicts with an earlier agreement, and Congress has neither mentioned the agreement in the text of the statute nor in the legislative history of the statute, the Supreme Court has conclusively held that it cannot find the requisite Congressional intent to abrogate"). *See also Trans World Airlines, Inc. v. Franklin Mint Corp.*, *supra* note 43 at 252 (1984) ("Legislative silence is not sufficient to abrogate a treaty").

[43] 26 U.S.C. § 7874(f) (Rules relating to expatriated entities and their foreign parents. Special rule for treaties).

[44] *Id.* § 884(e) (Branch profit tax. Coordination with income tax treaties; etc.).

[45] *Id.* § 894(c) (Income affected by treaty. Denial of Treaty benefits for certain payments through hybrid entities).

- The limitations on the foreign tax credit with respect to the AMT under former section 59(a).

More specifically, in the case *United States v. Stuart* the US Supreme Court has had occasion to discuss the interpretation principles that should be applied to the Treaty.[46] While that case dealt with the interpretation of Articles XIX and XXI, it stated the following general principles with how the Treaty should be interpreted:

- *The plain meaning of the Treaty controls.* The Court held, "The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories."[47]
- *The Treaty must be interpreted liberally.* The Court wrote, "a treaty should generally be "construe[d] . . . liberally to give effect to the purpose which animates it."[48]
- *Expansive interpretations are favored.* Finally, the Court held, "[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred."[49]

Having established the relevant general principles under US law, the threshold issue as to whether the Treaty applies to the Net Investment Income Tax will be addressed below.

### (iii)     <u>The Treaty applies to the Net Investment Income Tax</u>

The Net Investment Income Tax is an income tax and is thus subject to the Treaty. Article II(1) of the Treaty specifies that the Treaty "shall apply to taxes on income and on capital imposed on behalf of each Contracting State, irrespective of the manner in which they are levied."[50] For even greater certainty, Article XXIV(2) and (3) then together provide that the Treaty shall apply to U.S. tax imposed under the Internal Revenue Code of 1986 as existing on March 17, 1995, and also to any taxes identical or substantially similar which are imposed after March 17, 1995.[51]

---

[46] *United States v. Stuart*, 489 U.S. 353 (1989) [hereinafter *United States v. Stuart*].
[47] *Id*. at 365–66.
[48] *Id*. at 368.
[49] *Id*.
[50] Treaty, *supra* note 1 at art. II(1) (Taxes covered).
[51] *Id*. at art. XXIV (Elimination of double taxation).

15

Under all available definitions, the Net Investment Income Tax is a US income tax. The OECD Model Convention on Income and on Capital, defines a tax on income to include "all taxes imposed on total income, …, or on elements of income…, including taxes on gains from the alienation of movable or immovable property."[52] The Net Investment Income Tax is included in Chapter 2A within Subtitle A, Income Taxes. It defines net investment income as gross income from specified sources over allowable deductions, the latter being those "allowed by this subtitle."[53] Thus, section 1411 specifically refers to Subtitle A in its allowance of properly allocable deductions, but it also defines net investment income by reference to enumerated types of income, that is, interest, dividends, annuities, royalties, and rent, which are defined elsewhere in Subtitle A. Further, since it is a tax imposed on net income, if the Net Investment Income Tax were a foreign tax it would qualify as an income tax that is creditable under Code section 901 and the definitions under Treas. Reg. 1.901-2.[54] Finally, it is substantially similar to those income taxes imposed under the Internal Revenue Code of 1986, as existing on March 17, 1995.

In short, it is clear that the Treaty applies to the Net Investment Income Tax. Having established that the Treaty applies here, next consider the application of Article XXIV.

### (iv)   Article XXIV provides a credit against the Net Investment Income Tax

Article XXIV(1) of the Treaty provides that, with a view to avoiding double taxation, subject to paragraphs 4, 5, and 6, the US provides a credit to a US citizen against the US tax imposed on income, for the appropriate amount of income tax paid to Canada.[55] To start out, consider the text of the provision.

---

[52] MODEL CONVENTION WITH RESPECT TO TAXES ON INCOME AND CAPITAL (ORG. FOR ECON. COOPERATION & DEV. 2014), https://www.oecd.org/ctp/treaties/2014-model-tax-convention-articles.pdf, at art. 2(2) [hereinafter OECD Model Convention].

[53] 26 U.S.C. § 1411(c)(1)(B).

[54] 26 C.F.R. § 1.901-2 (2017).

[55] Treaty, *supra* note 1 at art. XXIV(1) (The full text of this provision is as follows: " In the case of the United States, subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows: In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States, or to a company electing to be treated as a domestic corporation, as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada; and, in the case of a company which is a resident of the United States owning at least 10 per cent of the voting stock of a company which is a resident of Canada from which it receives dividends in any taxable year, the United States shall allow as a credit against the

16

### a. *Overview of Article XXIV(1)*

Breaking down the provision into its component parts, the Article XXIV(1) mandates a credit where:

- The goal is avoiding double taxation;
- The income was Canadian source and tax is paid to Canada on that income with a view to avoiding double taxation;
- Paragraphs 4, 5, 6 do not limit the credit (and, in fact, guarantee it); and
- There is no limitation on the credit under U.S. domestic law.

All three requirements are met here. Take each in turn. The first three can be disposed of easily:

- *The goal is avoiding double taxation.* There is double tax exposure here, as explained above.
- *The income was Canadian source and tax is paid to Canada on that income.* As noted above, there is Canadian tax on Canadian source income.
- *Paragraphs 4, 5, 6 do not limit the credit.* As explained further below, paragraph 4 explicitly grants the credit to US citizens resident in Canada. Paragraphs 5 and 6 are inapplicable in the present case as they relate to the application of the Treaty credit on US source income, and Taxpayer's income on which the credit is being claimed was entirely Canadian sourced.

The only potentially available restriction is the phrase "In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof)."[56] Next, consider why this limitation does not restrict the credit.

---

United States tax on income the appropriate amount of income tax paid or accrued to Canada by that company with respect to the profits out of which such dividends are paid").

[56] *Id.*

17

**b.** **_The limitation under US domestic law does not block a credit against the Net Investment Income Tax_**

There is no restriction under US domestic law for a Treaty credit against the Net Investment Income Tax because:

- Any limitation under US domestic law must accord with the "general principle" that a credit must be allowed;
- Any limitation under US domestic law is restricted by the content of paragraphs 4, 5, and 6;
- Article XXIV(4)(b) guarantees a foreign tax credit for tax paid to Canada;
- US domestic law does not limit the Treaty credit;
- An interpretation which equates the Treaty credit to the credit under the Code would lead to absurd results;
- Conclusion – the US domestic law limitation does not deny a credit against the Net Investment Income Tax.

Take each point in turn.

(i)   _Any limitation must be consistent with the "general principle" that a credit should be provided to avoid double taxation_

The text of Article XXIV(1) narrows the use of the US domestic law limitation as it must not "change the general principle hereof."[57] The Taxpayer's view is that this limitation means that US law can only limit the credit to the extent that a credit is provided and double taxation is alleviated. The following reasons support this conclusion. There is no case law that interprets this question and courts have expressly left it open when the Code was amended after the last amendment to the Treaty.[58]

---

[57] _Id._

[58] _See Haver v. Comm'r, supra_ note 35 at 659 ("Therefore, it is unnecessary for us to decide what more might have been contemplated by the provision in Article 23[(2)] that conditions the tax credit on limitations of U.S. law 'as it may be amended from time to time without changing the general principles' of the Treaty. Nor need we ponder whether the United States may effectively abrogate the Treaty by enacting legislation that cannot be reconciled with the Treaty"). _See also Kappus v. Comm'r, supra_ note 28 at 1056 ("The question of whether the Treaty and statute

The first is text of the quoted phrase within the general context of Article XXIV(1).[59]

The point of this Article is that the US shall provide a foreign tax credit to avoid double taxation. That purpose is evidenced by the words "double taxation shall be avoided as follows" and "United States shall allow as a credit against the United States tax."[60] Thus, any limitations under US domestic law must respect that general principle. Denying a credit and allowing double taxation certainly does not.

Second, this interpretation best supports the expectations of the two signatories to the Treaty, which is a primary goal of treaty interpretation.[61] Undoubtedly, Canada would not have signed a Convention with the US if the US has the unilateral and unfettered power to limit what income taxes paid to Canada were creditable.

Third, the 1981 Technical Commentary to the Treaty indicated that the limitations under US domestic law that are imported into the Treaty were intended to be narrow, technical rules. The Commentary refers to "provisions such as Code sections 901(c), 904, 905, 907, 908, and 911 apply for purposes of computing the allowable credit under paragraph 1."[62] The cited provisions refer to technical ways to allocate the credit rather than a broader discussion of whether the credit is available. For instance, Code section 904 refers to the basket system which involves a categorization of income types rather than a limitation of the credit.[63]

---

can be harmonized as the government suggests is an extremely close one. It is not, however, a question that we need resolve").

[59] *United States v. Stuart*, *supra* note 46 at 365 ("The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories").

[60] Treaty, *supra* note 1 at art. XXIV(1).

[61] *United States v. Stuart*, *supra* note 46 at 365 ("The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories").

[62] TREASURY DEPARTMENT TECHNICAL EXPLANATION OF THE CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON, D.C. ON SEPTEMBER 26, 1980, AS AMENDED BY THE PROTOCOL SIGNED AT OTTAWA ON JUNE 14, 1983 AND THE PROTOCOL SIGNED AT WASHINGTON ON MARCH 28, 1984., https://www.irs.gov/pub/irs-trty/canatech.pdf [hereinafter Treasury Department Technical Explanation].

[63] 26 U.S.C. § 904.

The basket system is designed to protect the use of the foreign tax credit against cross-crediting, because cross-crediting would eliminate US taxation on income that is not in fact double taxed. That is, the basket system is a safeguard against low foreign taxation, and not a limitation of credit in the case of actual double taxation as is the case at hand. The basket system appropriately disallows the pooling of income which is taxed at a foreign rate in excess of the US rate with income that is taxed at a rate lower than the US rate. It does so to prevent crediting highly-taxed foreign income in excess of the domestic tax that would apply to such income in the absence of the credit. This "overall limitation" is a general principle of income tax creditability because such creditability is supposed to relieve double taxation, and not to offset US tax against a higher foreign tax rate. The effect of the Net Investment Income Tax is to increase the effective domestic US tax rate on specified income items which are taxed in Canada at the normal Canadian tax rate. Accordingly, the Treaty expressly limits US creditability of the Canadian tax to that which would otherwise apply under US domestic law, and that which would apply to the relevant income under current US domestic law is the Chapter 1 tax plus the Chapter 2A tax.

Fourth, the Model US Tax Treaty makes clear that the underlying general principle of Article XXIV(2) is the "allowance of a credit." [64] The Supreme Court affirms that the Executive Branch's interpretation of a treaty "is entitled to great weight."[65]

Fifth, other US tax treaties interpret the phrase this way. Other treaties are an accepted interpretative tool. In fact, the only US treaty in force that defines the term "general principle hereof" for purposes of the equivalent of Article 23(2) is the U.S.-Germany treaty which provides that the term refers to the "avoidance of double taxation by allowing a credit."[66]

---

[64] U.S. MODEL TECHNICAL EXPLANATION ACCOMPANYING THE U.S. MODEL INCOME TAX CONVENTION OF NOVEMBER 15, 2006, at art. 23(2) (U.S. DEP'T OF THE TREASURY 2006) [hereinafter MODEL TECHNICAL EXPLANATION], https://www.treasury.gov/press-center/press-releases/Documents/hp16802.pdf ("The credits allowed under paragraph 2 are allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of the Article, that is, the allowance of a credit, is retained"(*emphasis added*)).
[65] *Abbot v. Abbot*, 130 S.Ct.1983, 1993 (2010). *See also Kolovrat v. Oregon*, 81 S.Ct. 922, 926 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight").
[66] Convention Between the Federal Republic of Germany and the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital and to Certain Other Taxes, Ger.-U.S., Aug. 29, 1989, 1708 U.N.T.S. 3 at art. 23(2).

20

Sixth, the OECD treaty commentary, a frequently relied-upon source for US treaty interpretation,[67] supports the view that a full foreign tax credit should be granted for tax paid to another state.[68]

Finally, the historical evolution of the US foreign tax credit shows that it has always adhered to the general principle that a dollar for dollar credit is warranted, again subject to the overall limitation discussed above, which is designed to prevent cross-crediting.[69]

Taken together, these arguments demonstrate that while US domestic law may be used to limit the Treaty credit to prevent creditability in cases where there is no effective double taxation, those limitations cannot derogate from the idea that the US agreed to provide a foreign tax credit to avoid double taxation. Disallowing the Taxpayer's credit against Net Investment Income Tax would in fact cause unrelieved double taxation, not in accordance with the Treaty.

    *(ii)*    <u>*Paragraphs XXIV(4)-(6) narrow the domestic law limitation*</u>

A further restriction on the US domestic law limitation is that the limitation is itself restricted. It must be in accordance with Treaty Articles XXIV(4) and XXIV(5). Recall that the text of Article XXIV(1) indicates that the entire article (including the domestic law limitation portion) is "subject to the provisions of paragraphs 4, 5, and 6."[70] Paragraphs 4 through 6 then explain the application of this provision in respect of situations involving US citizens resident in Canada.

This reading of Treaty Article XXIV(1) is supported by two authoritative sources. First, the 1980 Treaty Technical Commentary reads, "The rules of paragraph 1 are modified in certain respects by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of

---

[67] *See National Westminster Bank, PLC v. United States*, 512 F.3d 1347 (Fed. Cir. 2008). *See also United States v. A.L. Burbank & Co., Ltd.*, 525 F.2d 9, 15-17 (2d Cir. 1975), cert. denied, 426 U.S. 934(1976). *See also Taisei Fire & Marine Ins. Co. v. Commissioner*, 104 T.C. 535, 557 (1995).

[68] MODEL TAX CONVENTION ON INCOME AND ON CAPITAL CONDENSED VERSION (ORG. FOR ECON. COOPERATION & DEV. 2017) at 399 ("A number of conventions, therefore, contain a reference to the domestic laws of the Contracting States and further provide that such domestic rules shall not affect the principle laid down in Article 23 B. […] The amount of foreign tax for which a credit has to be allowed is the tax effectively paid in accordance with the Convention in the other Contracting State").

[69] See Fadi Shaheen, *How Reform-Friendly Are U.S. Tax Treaties?*, 41 Brook. J. Int'l L. 1243, 1266 (2016) (arguing that "the general principle of allowing a credit in the meaning of Article 23(2) refers to the principle of a dollar-for-dollar reduction in the amount of U.S. tax on U.S.-taxable foreign-source income by the amount of foreign taxes paid, applied on an overall basis, item-by-item basis, or any basis in between").

[70] Treaty, *supra* note 1 at art. XXIV(4) and (5).

21

Canada."[71] Second, the DC Circuit stated indirectly in distinguishing the Canada-U.S. Tax Treaty from the U.S.-German Tax Treaty, "The U.S.-Canada Treaty provision we examined contained a clause subjecting its tax credit to limitations of U.S. law, but it also explicitly conditioned the tax credit and arguably the limitation itself on subsequent paragraphs of the treaty."[72]

Below, it is established that the meaning of Treaty Article XXIV(4)(b) is to guarantee a Canadian resident US citizen a US foreign tax credit for tax paid to Canada with a view to avoiding double taxation.[73] Consequently, because the limitation under US domestic law is subject to the restrictions of Treaty Articles XXIV(4), this limitation cannot be used to deny a foreign tax credit for tax paid to Canada to a Canadian resident US citizen.

The reason for this is obvious: Canadian resident US citizens are subject to a high risk of double taxation because both countries seek to tax the same taxpayer on their worldwide income. From a policy perspective, making the limitation of the treaty credit subject to paragraphs 4, 5, and 6 demonstrates the goal of the treaty signatories to take extra care to ensure that Canadian resident US citizens are not double taxed. Denying the Taxpayer a credit for tax paid to Canada, and subjecting him to double tax when the US increases its effective domestic tax rate on the same income, does not further that goal but expressly contradicts it.

Next, consider the meaning of Article XXIV(4)(b) which guarantees a credit to Canadian resident US citizens for tax paid to Canada.

(iii)    *Article XXIV(4)(b) provides a credit against the Net Investment Income Tax*

Article XXIV(4)(b) broadly guarantees a credit to a Canadian resident US citizen for tax paid to Canada including against the Net Investment Income Tax.[74] Article XXIV(4)(b) is important in two ways. First, it informs the restriction of the US domestic law limitation discussed above. Second, arguably Article XXIV(4)(b) provides an independent basis for the credit against the Net Investment Income Tax. As the Letter of Submittal accompanying the Treaty explains that "In

---

[71] Treasury Department Technical Explanation, *supra* note 65 at art. XXIV(1).
[72] *Haver v. Comm'r*, *supra* note 35 at 659.
[73] Treaty, *supra* note 1 at art. XXIV(4)(b).
[74] *Id.*

addition to the normal rules for the avoidance of double taxation, the Convention contains a rule not found in either the model or the existing convention for eliminating double taxation of United States citizens who are residents in Canada."[75]

The Taxpayer's interpretation of Article XXIV(4)(b) is confirmed by:

- The plain meaning of Article XXIV(4) which states that there should be a credit;
- Various technical commentary which support the position that there should be a credit; and
- Article XXIV(4)(b) which is a substantive provision and not merely a resourcing provision.

Consider each argument in turn followed by a conclusion.

   a. _The plain meaning of Treaty Article XXIV(4) provides that there should be a credit against the Net Investment Income Tax_

To start out, consider the plain meaning of Article XXIV(4) which reads in full:

Where a United States citizen is a resident of Canada, the following rules shall apply:

(a) Canada shall allow a deduction from the Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income or gains which arise (within the meaning of paragraph 3) in the United States, except that such deduction need not exceed the amount of the tax that would be paid to the United States if the resident were not a United States citizen; and

(b) for the purposes of computing the United States tax, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after

---

[75] Convention with Respect to Taxes on Income and on Capital, U.S.- Can., Sep. 26, 1980, March 28, 1984 (see Letter of Submittal by Edmund S. Muskie, Washington, 15 October 1980), https://www.irs.gov/pub/irs-trty/canada.pdf [hereinafter Letter of Submittal].

the deduction referred to in subparagraph (a). The credit so allowed shall not reduce that portion of the United States tax that is deductible from Canadian tax in accordance with subparagraph (a).[76]

While paragraph 4(a) refers only to Canadian foreign tax credits on US source income, paragraph 4(b) is broader. It generally mandates that a US citizen in Canada gets a foreign tax credit against US tax for tax paid to Canada after the application of paragraph 4(a). If the value of the credit in paragraph 4(a) is zero, then the credit in paragraph 4(b) is not limited. There is no limitation to US source income in the text of Article XXIV(4)(b). Nor is there a limitation on the credit in the text of the Treaty. Instead, it affirms the Treaty-based availability of a credit against Canadian income tax in the case of US citizens resident in Canada. From a policy perspective, this makes sense. Canadian resident US citizens face a very high risk of double taxation, because they are subject to tax on their worldwide income by two different countries. Thus, it is logical that the Treaty would provide a special assurance that double taxation must be avoided.

Article XXIV(4) is a Treaty-based credit provision that is not in other US treaties and is "in addition to the normal rules for double taxation elimination," as explained in the Letter of Submittal.[77] Absent Article XXIV(4), the only double tax relief available to a Canadian resident US citizen with Canadian source income would be the domestic rules under section 901. The inclusion of Article XXIV(4)(b) in the Treaty thus expressly ensures the broader application of income tax creditability beyond that specifically covered by section 901 or other provisions of the Code. Recall above the general principle from *United States v. Stuart* that the plain meaning of a Treaty controls unless it results in a meaning inconsistent with the goals of its signatories.[78] The offered reading of the plain text Article XXIV(4)(b) results in the elimination of double taxation on income–the overriding goal of the Treaty. Thus, per *United States v. Stuart*, that should end the inquiry.

> b. _Technical Commentary supports the position that Treaty Article XXIV(4) provides a credit against the Net Investment Income Tax_

---

[76] Treaty, *supra* note 1 at art. XXIV(4).
[77] Letter of Submittal, *supra* note 79.
[78] *United States v. Stuart*, *supra* note 46.

Moving past the plain text, technical commentary to the Treaty supports this reading. First, the Technical Explanation to the 1980 Treaty[79] states, "The second step, as provided in paragraph 4(b), is that the United States allows as a credit against United States tax, the income tax paid or accrued to Canada."[80] There is no limitation of the credit in Article XXIV(4)(b) to US source income.

Second, the same principle is found in the Technical explanation to the 1984 Protocol[81], which reads in relevant part, "Paragraphs 4 and 5 of Article XXIV of the Convention provide double taxation relief rules, for both the United States and Canada […] *They also oblige the United States to allow the U.S. citizen a credit for any income tax paid to Canada on the remainder of his income.*"[82]

Third, the 1981 by Joint Committee on Taxation explanation of the Treaty states: "The proposed treaty also contains special rules for U.S. citizens who are residents of Canada… The United States will allow the citizen a credit against his U.S. tax for any tax paid to Canada after Canada has allowed the credit for U.S. taxes."[83]

---

[79] Treasury Department Technical Explanation, *supra* note 65 at art. XXIV ("The rules of paragraph 1 are modified in certain respects by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada. Paragraph 4 provides two steps for the elimination of double taxation in such a case. First, paragraph 4(a) provides that Canada shall allow a deduction from (credit against) Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income, or gains which arise in the United States (within the meaning of paragraph 3(a)); the deduction against Canadian tax need not, however, exceed the amount of income tax that would be paid or accrued to the United States if the individual were not a U.S. citizen, after taking into account any relief available under the Convention. The second step, as provided in paragraph 4(b), is that the United States allows as a credit against United States tax, subject to the rules of paragraph 1, the income tax paid or accrued to Canada after the Canadian credit for U.S. tax provided by paragraph 4(a). The credit so allowed by the United States is not to reduce the portion of the United States tax that is creditable against Canadian tax in accordance with paragraph 4(a)").

[80] *Id.*

[81] *Id.* at art. 12 (The excerpt reads in full: "Paragraphs 4 and 5 of Article XXIV of the Convention provide double taxation relief rules, for both the United States and Canada, with respect to U.S. source income derived by a U.S. citizen who is resident in Canada. These rules address the fact that a U.S. citizen resident in Canada remains subject to U.S. tax on his worldwide income at ordinary progressive rates, and may, therefore, be subject to U.S. tax at a higher rate than a resident of Canada who is not a U.S. citizen. In essence, these paragraphs limit the foreign tax credit that Canada is obliged to allow such a U.S. citizen to the amount of tax on his U.S. source income that the United States would be allowed to collect from a Canadian resident who is not a U.S. citizen. They also oblige the United States to allow the U.S. citizen a credit for any income tax paid to Canada on the remainder of his income. Paragraph 4 deals with items of income other than dividends, interest, and royalties and is not changed by the Protocol").

[82] *Id.*

[83] JCS-48-81, *supra* note 27 at 12.

25

Technical commentary to the Treaty is an accepted interpretative aid if the plain text is unclear.[84] The Taxpayer's view is that the plain text. Therefore, the Treaty clearly grants full creditability against the Net Investment Income Tax. However, to the extent there may be uncertainty, taken together, these comments support the interpretation that the credit provided by Article XXIV(4)(b) goes beyond US source income and includes any US tax imposed on net investment income.

### c.   *XXIV(4) is not a resourcing provision*

It may be contended that Treaty paragraphs XXIV(4), XXIV(5), and XXIV(6), are not substantive in nature and are merely ordering provisions or re-sourcing provisions.[85] This claim is incorrect.

Certainly, paragraphs XXIV(3) and XXIV(6) are simple re-sourcing provisions as that is what their text indicates. But the same is not true for paragraphs XXIV(4) and XXIV(5). These paragraphs provide a credit that is unavailable under the Code to a US citizen resident in Canada, and they do so explicitly in order to prevent double taxation where it is otherwise unaddressed. To illustrate, paragraph XXIV(5) allows a Canadian resident US citizen a US foreign tax credit against Canadian tax on dividends received from US companies.[86] Paragraph XXIV(6) provides the required re-sourcing to allow the credit in paragraph XXIV(5) to function properly.[87] Thus, it is incorrect to refer to paragraphs XXIV(4) and XXIV(5) as simply "re-sourcing" provisions.  They are separate, independent paragraphs that provide for credits which are not provided for in the Code.  As above, this is confirmed by the Submittal letter to the Treaty.

This is important for both the proper interpretation of paragraph XXIV(4) and for the interpretation of XXIV(1).

### d.  *Conclusion: Article XXIV(4)(b) provides a credit.*

Article XXIV(4)(b) is not limited to guaranteeing a US citizen in Canada a foreign tax credit on US source income. The plain text of the provision contains no express limitation of the credit to

---

[84] *United States v. Stuart*, *supra* note 46 at 368 (illustrates the US Supreme Court's use of Treasury Department technical explanations).
[85] Treaty, *supra* note 1 at art. XXIV.
[86] *Id*. at art. XXIV(5).
[87] *Id*. at art. XXIV(6)

US source income. Instead, it is broadly worded. Although that should be sufficient to end the inquiry, three separate, authoritative, technical commentaries support this reading. Finally, Article XXIV(4) cannot be dismissed as a mere re-sourcing provision because it provides the basis for an independent credit that is not available under the Code alone. As such, Article XXIV(4)(b) provides both an independent basis to claim a credit against the Net Investment Income Tax and narrows the scope of the US domestic law limitation.

(iv) <u>The Code does not limit the Treaty credit against the Net Investment Income Tax</u>

Above, it is established that the restrictions under US domestic law on the treaty credit must be narrowly construed because such limitations must accord with the general principle that a credit is allowed as per the text of paragraphs XXIV(4), XXIV(5), and XXIV(6). Even without regard to this narrow construction, the Code does not attempt to limit the Treaty foreign tax credit against the Net Investment Income Tax. To be clear, there is no credit provided for under the Code alone. The Taxpayer is in agreement that under the provisions of the Code alone, a statutory change to sections 27 and 901 would be required in order to claim a credit against the Net Investment Income Tax. But there is no discussion of the *Treaty* credit in the Code. Code section 1411 does not explicitly prevent a Treaty credit. Instead, it is simply silent as to restrictions on the Treaty credit. Similarly, section 901 simply provides a foreign tax credit to taxes enacted under Chapter 1. It does not expressly limit the application of a Treaty credit to the Net Investment Income Tax. No other section of the Code limits the Treaty credit. The relevant provisions in the Treaty are expansive, and not limited to Chapter 1 taxes. Instead, the relevant provisions cover any income taxes, whether enacted prior to the time of entry of Treaty into force or subsequent thereto. It is clearly possible for the US to provide a Treaty-based credit against the Net Investment Income Tax, in accordance with the provisions and subject to the limitations of US domestic law, without a specific statutory provision affirming such a credit.

It may be contended that such a limitation on the Treaty credit is accomplished under Treas. Reg. 1.1411-1(e).[88] This cannot be. The jurisprudence is clear is that it is the intent or expectations of the signatories which control as to the application of treaty language, and as such, the

---

[88] 26 C.F.R. § 1.1411-1(e), *supra* note 3.

Appx405

determination must be made on a specific per-treaty basis.[89] Further, Article VI of the Constitution clearly provides that federal law and treaties are both the "supreme law of the land."[90] Code section 7852(d) also provides that "for purposes of determining the relationship between a provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being a treaty or law."[91] Thus, just as a regulation could not override the Code, it cannot override the Treaty.

In short, the domestic law limitation under Article XXIV(1) cannot be used to deny the Treaty credit against the Net Investment Income Tax, because the Code attempts no such limitation on the Treaty credit. Failure to provide a credit under the Code is different than restricting the Treaty credit. Because of their subordinate status to the Treaty, Regulations cannot be used to override the Treaty credit either.

        *(v)*       *The IRS interpretation of the domestic law limitation leads to absurd results*

It may be contented that the Treaty credit only follows the credit under the Code.
This, and other statements, suggest that the IRS is of the view that the Treaty credit is determined solely by reference to the credit under the Code, including any limitations whether existing or subsequently adopted. As a matter of principle, this cannot be the case. Such a principle leads to absurd results. Assume, for the sake of argument, that Congress passed a revision to section 901 that, without an explicit treaty override, limited the foreign tax credits to 5% of foreign tax paid. Would it then follow that the Treaty would only provide a 5% credit for taxes paid to Canada? Such an interpretation renders the Treaty superfluous and is contrary to the fundamental principles of statutory interpretation.[92] It also undermines the bilateral nature of the Treaty. Why would Canada or any country sign a Convention under which either party could unilaterally and arbitrarily refuse to uphold the commitments it made in bilateral negotiation? Admittedly, this is a hypothetical scenario with an absurd result. But it is the logical outcome of the IRS position. And if that principle is obviously absurd in the hypothetical context, then it is obviously absurd when in the context of the Net Investment Income Tax.

---

[89] *United States v. Stuart, supra* note 46 at 365-66.
[90] US Const art VI, § 2, cl 2.
[91] 26 U.S.C. § 7852(d).
[92] *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543 (1940).

Case 1:23-cv-10656-MPC Document 80-7 Page 354 Filed 02/24/14 10/20/2025 of 33

       *(vi)*     <u>*Conclusion – scope of the domestic law limitation*</u>

Article XXIV(1) imports into the Treaty certain restrictions on the foreign tax credit that are found in US domestic law.[93]

In turn, the domestic law limitation is narrowed in two key ways: 1) Any domestic law limitation must not derogate from the general principle that a credit is available; and 2) The US domestic law limitation is subject to Articles XXIV(4), XXIV(5), and XXIV(6).

The plain meaning and all relevant authorities suggest that the "general principle" is that a credit must be available to avoid double taxation. Denying a credit against the Net Investment Income Tax further exacerbates double taxation. Thus, denying the credit is not in accordance with the "general principle".

Article XXIV(4)(b) is a substantive provision that ensures a credit is available to Canadian resident US citizens because of their unique double taxation exposure. Since denying the credit against the Net Investment Income Tax worsens double tax exposure for Canadian resident US citizens, this cannot be within the scope of the domestic law limitation.

Setting aside these two limitations, the Code does not attempt to limit the Treaty credit against the Net Investment Income Tax and so it is questionable whether there is even a domestic law limitation in the first place. Certainly, the Code alone does not provide a credit as credits under the Code alone are limited to taxes imposed under Chapter 1. But that is not a restriction on the credit under the Treaty. Efforts to restrict the Treaty credit under regulations are unavailing due to their subordinate legal status to the Treaty and the Code.

The IRS's view that the Treaty credit goes hand in hand with the Code credit leads to absurd results. Assume Congress set the limitation on the foreign tax credit at 5%. If the Treaty merely followed the Code, Canadian resident US citizens would face 95% double taxation. What would

---

[93] Treaty, *supra* note 1 at art. XXIV(1).

be the purpose of the Treaty at that point? And if that principle is obviously absurd in the hypothetical context, then it is obviously absurd when applied here.

Rather than import a concept antithetical to the purpose of the Treaty, the domestic law limitation is more properly read to import technical mechanisms into the Treaty to allocate the credit such as the basket system under Code section 904.[94] The basket system is designed to protect the use of the foreign tax credit against cross-crediting, because cross-crediting would eliminate US taxation on income that is not in fact double taxed. The basket system is a safeguard against low foreign taxation. It is not a limitation of credit in the case of actual double taxation, such as the case of the Taxpayer in this request for assistance.

For these reasons, the domestic law limitation cannot be read to deny a foreign tax credit against the Net Investment Income Tax.

### (v)    Conclusion – reading the Code and Treaty harmoniously

Canada and the US entered into the Treaty with the express purpose of avoiding double taxation. Despite the clear purpose of the Treaty, the Taxpayer is nevertheless faced with the harmful prospect of double taxation. The OECD Treaty commentary states:

> International juridical double taxation can be generally defined as the imposition of comparable taxes in two (or more) States on the same taxpayer in respect of the same subject matter and for identical periods. Its harmful effects on the exchange […] so well known that it is scarcely necessary to stress the importance of removing the obstacles that double taxation presents to the development of economic relations between countries.[95]

The Taxpayer's situation fits the OECD definition of juridical double taxation. The Taxpayer had Canadian sourced income on which more tax was paid to Canada than he would owe the US, and yet he still somehow owes Net Investment Income Tax to the US. As per the language of the

---

[94] 26 U.S.C. § 904.
[95] MODEL CONVENTION WITH RESPECT TO TAXES ON INCOME AND CAPITAL (ORG. FOR ECON. COOPERATION & DEV. 2008) at 7.

OECD, the Taxpayer is paying comparable tax in the US and Canada in 'respect of the same subject matter and for identical periods'. This goes against the express purpose of the Treaty.

Recall that the general principle of US treaty interpretation is that where possible the Code and Treaty should be read harmoniously to give effect to both. Here, it is possible and thus necessary to read the Treaty and the Code harmoniously. Recall that the Code is silent as to the availability of a treaty foreign tax credit against the Net Investment Income Tax (although the Code does not provide a credit). The Treaty, by contrast, provides a credit against the Net Investment Income Tax under both Article XXIV(4) and XXIV(1). The limitation under US domestic law is narrow. It only imports technical credit allocation mechanisms into the Treaty and cannot be used to simply deny the credit.

The Treaty simply provides a credit against the Net Investment Income Tax that is available to the subset of US taxpayers who are US citizens resident in Canada that is not available to the broader base of US taxpayers who do not qualify for benefits under the Treaty. Such a reading is the only one that accomplishes the Treaty's fundamental purpose of avoiding double taxation. It is also generally consistent with how treaties are supposed to work. They provide benefits, not available under the Code alone, to a small subset of taxpayers (either domestic or foreign) to accomplish specific goals. As the Letter of Submittal accompanying the Treaty stated, "In addition to the normal rules for the avoidance of double taxation, the Convention contains a rule not found in either the model or the existing convention for eliminating double taxation of United States citizens who are residents in Canada."[96]

In closing, recall the dictum from *United States v. Stuart* that "[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred."[97]

The Taxpayer's view is that the authorities overwhelmingly point to a credit against the Net Investment Income Tax under the Treaty. But even if a compelling, competing interpretation is

---

[96] Letter of Submittal, *supra* note 79.
[97] *United States v. Stuart*, *supra* note 46 at 368.

**Appx409**

offered, *United States v. Stuart* demands that the one that grants more rights (that the Treaty provides a credit) be favored.

### d. THE CONTENT OF ANY RELATED REQUESTS FOR ASSISTANCE SUBMITTED TO THE FOREIGN COMPETENT AUTHORITY

The Taxpayer has submitted a copy of this request to the Canadian Competent Authority along with a request for assistance from Canada.

**2.2 PRIOR OR CURRENT U.S. COMPETENT AUTHORITY ASSISTANCE**:

No prior US Competent Authority assistance has been sought.

**2.3 PRE-FILING INFORMATION:**

There was no pre-filing assistance.

**PART 3. ASSISTANCE REQUEST AND REQUIRED STATEMENTS**

**3.1 COORDINATION WITH OTHER PROCEEDINGS**

The Taxpayer seeks an SAP review of whether the Treaty provides for a foreign tax credit against the Net Investment Income Tax. The date of the opening appeals conference was February 14, 2019 with IRS Appeals agent Lance Rodrigues.

**3.2 ACAP YEARS:**

N/A

**3.3 ANCILLARY ISSUES**

N/A

**3.4 ATTACHMENTS NOT INCLUDED:**

N/A.

32




**Department of the Treasury**
**Internal Revenue Service**
**Large Business and International**
1999 Broadway, MS 4355DEN
Denver, CO  80202

**Date:**
   07/13/2018
**Taxpayer ID number (last 4 digits):**
   ████
**Form:**
   1040
**Tax periods ended:**          **Claim amount:**
   12/31/2016                   $7,745
**Date claim received:**
   October 31, 2017
**Person to contact:**
   Kimberly Slack
**Employee ID number:**
   0442697
**Contact telephone number:**
   303-603-4975
**Last date to respond to this letter:**
   August 15, 2018

Paul Bruyea
c/o 707 Fort Street, #301
Victoria, BC  V8W 3G3
CANADA

Dear Mr. Bruyea:

We examined your claim and propose:

☐ Partial disallowance, as shown in the enclosed examination report. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and Form 3363, *Acceptance Form.*

☒ Full disallowance, as shown in the enclosed examination report or at the end of this letter. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and Form 3363, *Acceptance Form.*

☐ Full disallowance with additional tax due, as shown in the enclosed examination report. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and the examination report.

*Note: If your claim involves a joint return, both taxpayers must sign the form(s).*

If you are a "C" Corporation filer, Section 6621(c) of the Internal Revenue Code provides for an interest rate 2% higher than the standard interest rate on deficiencies of $100,000 or more.

If you don't agree with our findings, you may request a meeting or telephone conference with the supervisor of the person identified in the heading of this letter. If you still don't agree with our findings, we recommend that you request a conference with our Appeals Office. If you request a conference, we will forward your request to the Appeals Office and they will contact you to schedule an appointment.

If the proposed change to tax is:

• $25,000 or less for *each* referenced tax period; you may send us a letter requesting Appeals consideration, indicating what you don't agree with and the reasons why you don't agree.

• More than $25,000 for *any* referenced tax period; you must submit a formal protest.

The requirements for filing a formal protest are explained in the enclosed Publication 3498, *The Examination Process.* Publication 3498 also includes information on your *Rights as a Taxpayer* and the *IRS Collection Process.*

If you don't respond by the date shown in the heading of this letter, we will process your case based on the adjustments shown in the enclosed examination report or the explanations given at the end of this letter.

**Letter 569 (Rev. 1-2017)**
Catalog Number 40248G

**Appx467**

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter. Thank you for your cooperation.

Sincerely,

Kimberly Slack
Team Manager

Enclosures:
Examination Report
Form 2297
Form 3363
Publication 3498
Envelope

**Appx468**

Form **4549**
(Rev. May 2008)

Department of the Treasury-Internal Revenue Service

## Income Tax Examination Changes

Page __2__ of __2__

| Name of Taxpayer<br>PAUL BRJYEA | Taxpayer Identification Number | Return Form No.:<br>1040 |
|---|---|---|

| 17. Penalties/ Code Sections | Period End<br>12/31/2015 | Period End<br>12/31/2016 | Period End |
|---|---|---|---|
| a. | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | |
| l. | | | |
| m. | | | |
| n. | | | |
| **18. Total Penalties** | | | |
| Underpayment attributable to negligence: *(1981-1987)*<br>*A tax addition of 50 percent of the interest due on the*<br>*underpayment will accrue until it is paid or assessed.* | | | |
| Underpayment attributable to fraud: *(1981-1987)*<br>*A tax addition of 50 percent of the interest due on the*<br>*underpayment will accrue until it is paid or assessed.* | | | |
| Underpayment attributable to Tax Motivated Transactions *(TMT)*.<br>The interest will accrue and be assessed at 120% of the under-<br>payment rate in accordance with IRC §6621(c) | 0.00 | 0.00 | |
| **19. Summary of Taxes, Penalties and Interest:** | | | |
| a. Balance due or *(Overpayment)* Taxes - (Line 16, Page 1) | 0.00 | 0.00 | |
| b. Penalties *(Line 18)* - computed to 07/05/2018 | | | |
| c. Interest *(IRC § 6601)* - computed to 08/04/2018 | 0.00 | 0.00 | |
| d. TMT Interest - computed to 08/04/2018 *(on TMT underpayment)* | 0.00 | 0.00 | |
| e. Amount due or *(refund)* - (sum of Lines a, b, c and d) | 0.00 | 0.00 | |

Other Information:

On 11/25/2016 you filed Form 1040X for refund of $263,523 for 2015. As the result of our examination, we have disallowed your claim. Foreign tax credit cannot be claimed to offset the Net Investment Income Tax (NIIT) calculated on the Taxpayers Canadian source investment income.

On 10/31/2017 you filed Form 1040X for refund of $7,745 for 2016. As the result of our examination, we have disallowed your claim. Foreign tax credit cannot be claimed to offset the Net Investment Income Tax (NIIT) calculated on the Taxpayers Canadian source investment income.

| Examiner's Signature:<br>Debra Pratum *Debra Pratum* | Employee ID:<br>076062 | Office:<br>Seattle, WA | Date:<br>07/05/2018 |
|---|---|---|---|

Consent to Assessment and Collection- I do not wish to exercise my appeal rights with the Internal Revenue Service or to contest in the United States Tax Court the findings in this report. Therefore, I give my consent to the immediate assessment and collection of any increase in tax and penalties, and accept any decrease in tax and penalties shown above, plus additional interest as provided by law. It is understood that this report is subject to acceptance by the Area Director, Area Manager, Specialty Tax Program Chief, or Director of Field Operations.

**PLEASE NOTE:** *If a joint return was filed.* ***BOTH*** *taxpayers must sign*

| Signature of Taxpayer | Date: | Signature of Taxpayer | Date: |
|---|---|---|---|
| By: | | Title: | Date: |

Catalog Number 23105A

Form 4549 (Rev. 5-2008)



Max Reed LLB, BCL
Cross-Border Tax Lawyer
(British Columbia & New York)
max@skltax.com
T: +1 604 732 1515 x 221 · F: +1 604 733 1311
224-2211 West 4th Avenue · Vancouver, British Columbia · V6K 4S2

August 16, 2018,

Kimberly Slack
Department of Treasury
Internal Revenue Service
Large Business and International
1999 Broadway, MS 4355DEN
Denver, CO 80202

RE: Paul Bruyea Protest

By Fax and Mail

Dear Ms. Slack,

Pursuant to your extension granted on August 7, 2018, please find enclosed a protest on behalf of our client Paul Bruyea. We have also included the IRS correspondence in this matter.

Please let us know if you require anything further.

Kind regards,

Max Reed



Max Reed LLB, BCL
Cross-Border Tax Lawyer
(British Columbia & New York)
max@skltax.com
T: +1 604 732 1515 x 221 · F: +1 604 733 1311
224-2211 West 4th Avenue · Vancouver, British Columbia · V6K 4S2

August 16, 2018,

Kimberly Slack
Department of Treasury
Internal Revenue Service
Large Business and International
1999 Broadway, MS 4355DEN
Denver, CO 80202

Ms. Slack,

This letter is a formal written protest in response to Letter 569, dated July 13, 2018, to request an

appeal of IRS redeterminations related to tax years 2015 and 2016 of Paul Bruyea of Victoria,

Canada (the "Taxpayer"). We are U.S. qualified lawyers and we act for the Taxpayer. To prevent

double taxation, Canada and the United States have enacted the *Convention Between Canada and*

*the United States of America with Respect to Taxes on Income and Capital* (the "Treaty"). Indeed,

the preamble to the Treaty reads, "Canada and the United States of America, desiring to conclude

a Convention for the avoidance of double taxation [...] with respect to taxes on income." The

Taxpayer has double tax exposure – to Canada by virtue of his residency and to the United States

by virtue of his citizenship. The Taxpayer files this appeal to claim a foreign tax credit as provided

in the Treaty, such that he is not subject to double tax in Canada and the United States on the same

Canadian sourced income for 2015 and 2016.

As set out below, the Taxpayer's position accords with the express text and purpose of the Treaty.

To prevent double taxation, the Taxpayer must be allowed to offset his Net Investment Income

Tax ("NIIT") using a foreign tax credit. Having already paid this tax twice, the Taxpayer now relies on the Treaty to claim a refund.

Before outlining the argument, we outline the background to the appeal.

## 1. **Background**

In tax year 2015, the Taxpayer disposed of real estate located in Canada for total proceeds of $9,403,517 and a gain of $7,074,236. The Taxpayer's total income for 2015 as shown on his tax return was $7,059,823. In tax year 2016, the Taxpayer's total income was $328,809, consisting of interest, dividends, and capital gains arising from trades in his investment account. On this income, the Taxpayer paid $263,523 of NIIT in 2015, and $7,745 of NIIT in 2016. The Taxpayer then subsequently timely filed amended 2015 and 2016 tax returns to claim a refund of NIIT paid, on the basis of a foreign tax credit claimed pursuant to Article XXIV(1) and (4) of the Treaty. The Taxpayer's claims for refund were timely filed with Form 1040X and disclosed his Treaty-based return position as required under section 6114.

The Taxpayer had sufficient foreign tax credits available in tax years 2015 and 2016 to fully offset his NIIT liability.

Specifically, in 2015, the Taxpayer had an available pool of carryover passive foreign tax credits of $96,443, and paid Canadian income tax of $1,953,513, such that his total available pool of passive foreign tax credits for 2015 was $2,049,956. With his originally filed 2015 tax return, the Taxpayer claimed $1,398,571 of foreign tax credit, such that he had a remaining passive foreign tax credit pool of $651,385. With his timely filed Form 1040X claim for refund, the Taxpayer then applied $263,523 of this remaining pool against his NIIT liability by applying the Treaty based foreign tax credit under Articles XXIV(1) and (4).

In 2016, the Taxpayer then had an available pool of carryover passive foreign tax credits of $387,862, and paid foreign income tax of $22,102, such that his total available pool of passive foreign tax credits for 2016 was $409,964. With his originally filed 2016 tax return, the Taxpayer claimed $39,385 of foreign tax credit, such that he had a remaining passive foreign tax credit pool of $370,579. With his timely filed Form 1040X claim for refund, the Taxpayer then applied $7,745 of this remaining pool against his NIIT liability by applying the Treaty based foreign tax credit under Articles XXIV(1) and (4).

As requested by the IRS, the Taxpayer has provided copies of his 2015 and 2016 Canadian tax return (T1) and related schedules evidencing his Canadian tax liability on this income. The IRS agent did not challenge these conclusions.

The Taxpayer's claims for refund were disallowed in error by the IRS. Specifically, on Form 4549 Income Tax Examination Changes attached to Letter 569, the IRS erred on line 8.a, by disallowing the additional foreign tax credit claimed, resulting in an incorrect total tax liability as reflected on line 11 for both tax years 2015 and 2016. The background documentation is attached as appendices to this protest.

The Taxpayer now appeals this denial of the foreign tax credit.

2. **Outline of argument and basic principles**

Long-established case law holds that where possible, the Code and the Treaty should be read harmoniously to give effect to both. [1] Where there is no conflict, the last-in-time rule is inapplicable. [2] Generally, a conflict occurs where the Code overrides the Treaty. These overrides are possible. However, the Supreme Court has held that such overrides must be explicit[3] and that legislative silence does not constitute an override. [4]  Consistent with this rule, such overrides elsewhere in the Code are explicit. Consider for example:

- Code section 7874(f) which specifically overrides treaty obligations in the case of inversions.
- Code section 884(e) which clearly overrides treaties with respect to the Branch Profits Tax.
- Code section 894(c) which denies treaty benefits to certain hybrid entities.

Unlike these sections, section 1411 is silent with respect to the interaction between Code and the Treaty. The lack of an explicit override means that the Treaty and Code are not in conflict. That means that they must, if possible, be read harmoniously.

The Treaty provides a credit against the NIIT. It applies to the NIIT because the NIIT is an income tax. Articles XXIV(1) and XXIV(4) each provide an independent basis for the Taxpayer to claim a foreign tax credit against the NIIT for Canadian tax paid on Canadian source income. Without an express restriction, Article XXIV(4) provides Canadian resident U.S. citizens with the ability

---

[1] Whitney v. Robertson, 124 U.S. 190, 194 (1888). Pekar v. Commissioner, 113 T.C. 158, 161 (1999). ("the Code and the treaty should be read harmoniously, to give effect to each.")
[2] Chae Chan Ping v. United States, supra at 600; Whitney v. Robertson, supra at 194.
[3] Cook v. United States, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed").
[4] Roeder v. Islamic Republic of Iran, 195 F. Supp. 2d at 169. ("The Supreme Court has unequivocally held that legislative silence is not sufficient to abrogate a treaty or a bilateral executive international agreement. When a later statute conflicts with an earlier agreement, and Congress has neither mentioned the agreement in the text of the statute nor in the legislative history of the statute, the Supreme Court has conclusively held that it cannot find the requisite Congressional intent to abrogate. (quoting Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. at 252) (citations omitted))").

4

to claim a credit for tax paid to Canada. Article XXIV(1) provides a similar credit, but it is subject to the limitations of U.S. domestic law. That restriction is, however, quite narrow in scope. The only interpretation that provides for a harmonious reading of the Treaty and the Code giving effect to both is to allow Canadian resident U.S. citizens, such as the Taxpayer, a credit against the NIIT. Having outlined the argument, which will be developed fully below, turn to the first topic which is whether the Treaty applies to the NIIT.

### 3. <u>The Treaty applies to the NIIT</u>

The NIIT is an income tax and is thus subject to the Treaty. Article II(1) of the Treaty specifies that the Treaty "shall apply to taxes on income and on capital imposed on behalf of each Contracting State, irrespective of the manner in which they are levied." For even greater certainty, Article XXIV(2) and (3) then together provide that the Treaty shall apply to U.S. tax imposed under the Internal Revenue Code of 1986 as existing on March 17, 1995, and also to any taxes identical or substantially similar which are imposed after March 17, 1995.

Under all available definitions, the NIIT is a U.S. income tax. The OECD Model Convention, defines a tax on income to include "all taxes imposed on total income, …, or on elements of income…, including taxes on gains from the alienation of movable or immovable property."[5] Further, if the NIIT were a foreign tax it would qualify as an income tax that is creditable under Code section 901 and the definitions under Treas. Reg. 1.901-2. Further, it is substantially similar to those income taxes imposed under the Internal Revenue Code of 1986, as existing on March 17, 1995.

---

[5] OECD Model Convention with Respect to Taxes on Income and on Capital, Art. II(2).

4. **The income was Canadian source**

In both 2015 and 2016, all of the Taxpayer's income was Canadian source and Canadian tax was paid on it. In 2015, the Taxpayer's primary source of income was the sale of Canadian real property. Per section 862(a)(5), gains, profits, and income from the sale or exchange of real property located without the U.S. is treated as income from sources without the U.S. Similarly, under Article XIII, gains derived from the alienation of real property is sourced to the country in which the real property is located. As noted above, the Taxpayer paid considerable Canadian tax on this sale. Therefore, the Taxpayer's income arising from the sale of the rental property located in Canada was Canadian sourced and Canadian tax was paid on this income.

The same is true in 2016. The Taxpayer is a Canadian resident under Article IV(2)(a) of the Treaty as his permanent home is located in Canada. In 2016, the Taxpayer's income consisted of interest, dividends, and capital gains from trades in his investment accounts. Per section 862(a)(1) and consistent with Treaty Article XI, $1,853 of the Taxpayer's total interest income of $1,891 was Canadian sourced from the Bank of Nova Scotia; similarly, per section 862(a)(2) and consistent with Treaty Article X, the Taxpayer's total dividend income of $168,620 received from the Taxpayer's Canadian investments were Canadian sourced; and finally, per section 865(a)(1) and consistent with Treaty Article XIII(4), the Taxpayer's total capital gains income of $158,298 was Canadian sourced. As noted above, the Taxpayer paid a considerable amount of Canadian tax on this income.

In short, the income at issue is Canadian source and sufficient Canadian tax was paid on it to fully offset the NIIT. Having established that the income was Canadian source and subject to

Canadian tax, next consider whether Article XXIV(4) provides a credit against the NIIT for Canadian tax on Canadian source income.

### 5.   Article XXIV(4) provides a credit against the NIIT

Article XXIV(4) grants a Canadian resident U.S. citizen, such as the Taxpayer, a full credit for tax paid to Canada. The text of Article XXIV(4) reads in full:

> Where a United States citizen is a resident of Canada, the following rules shall apply:
> (a) Canada shall allow a deduction from the Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income or gains which arise (within the meaning of paragraph 3) in the United States, except that such deduction need not exceed the amount of the tax that would be paid to the United States if the resident were not a United States citizen; and
>
> (b) for the purposes of computing the United States tax, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a). The credit so allowed shall not reduce that portion of the United States tax that is deductible from Canadian tax in accordance with subparagraph (a).

While paragraph 4(a) refers only to a Canadian deduction on U.S. source income, paragraph 4(b) is broader. It generally mandates that a U.S. citizen in Canada receives a foreign tax credit against U.S. tax for tax paid to Canada after the application of paragraph 4(a). If the value of the deduction in paragraph 4(a) is zero, then the credit in paragraph 4(b) is not limited. There is express or implied limitation in paragraph 4(b) to U.S. source income. It applies regardless. The Technical Explanation to the 1980 Treaty[6] confirms this:

> The rules of paragraph 1 are modified in certain respects by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada. Paragraph 4 provides two steps for the elimination of double taxation in such a case. First, paragraph 4(a)

---

[6] Paragraph XXIV(4) has not been amended since the 1980 Treaty so this commentary remains relevant.

provides that Canada shall allow a deduction from (credit against) Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income, or gains which arise in the United States (within the meaning of paragraph 3(a)); the deduction against Canadian tax need not, however, exceed the amount of income tax that would be paid or accrued to the United States if the individual were not a U.S. citizen, after taking into account any relief available under the Convention.

The second step, as provided in paragraph 4(b), is that the United States allows as a credit against United States tax, subject to the rules of paragraph 1, the income tax paid or accrued to Canada after the Canadian credit for U.S. tax provided by paragraph 4(a). The credit so allowed by the United States is not to reduce the portion of the United States tax that is creditable against Canadian tax in accordance with paragraph 4(a).

Taken on its face, the Technical Commentary supports the view that Article XXIV(4) provides a credit to a U.S. citizen who lives in Canada for tax paid to Canada. The technical example that follows in the commentary shows that the U.S. must provide a credit for Canadian tax on Canadian source income, but after the Canadian credit on U.S. source income where applicable. If the Canadian credit would be zero, as here where the Taxpayer has no U.S. source income, then the U.S. would be obligated to provide a full credit for tax paid to Canada by a U.S. citizen resident in Canada. In short, the express text of Article XXIV(4) provides a credit for Canadian tax paid on the NIIT. Next, consider the application of Article XXIV(1) which provides for the same result.

### 6.  <u>Treaty Article XXIV(1) Provides a credit against the NIIT</u>

Article XXIV(1) of the Treaty provides that a U.S. citizen may claim a foreign tax credit against the U.S. tax imposed on income, for the appropriate amount of income tax paid to Canada. Specifically, the Treaty provision provides that,

In the case of the United States, subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows: In accordance with the

8

provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States, or to a company electing to be treated as a domestic corporation, as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada.

Breaking down the provision into its component parts, the Article XXIV(1) mandates a credit where:

- The goal is avoiding double taxation.

- The income was Canadian source and tax is paid to Canada on that income with a view to avoiding double taxation;

- Paragraphs 4, 5, 6 do not limit the credit; and

- There is no limitation on the credit under U.S. domestic law.

All three requirements are met here. Take each in turn. The first three can be disposed of easily:

- *The goal is avoiding double taxation.* There is double tax exposure here.

- *The income was Canadian source and tax is paid to Canada on that income with a view to avoiding double taxation.* As noted above, there is Canadian tax on Canadian source income.

- *Paragraphs 4, 5, 6 do not limit the credit.* As noted above, paragraph 4 explicitly grants the credit. Paragraphs 5 and 6 are inapplicable in the present case as they relate to the application of the Treaty credit on U.S. source income, and Taxpayer's income on which the credit is being claimed was entirely Canadian sourced.

The only applicable restriction is a limitation under U.S. domestic law. Next, consider why this is limitation does not restrict the credit.

### a. The Internal Revenue Code does not impose a limitation

There is no restriction under U.S. domestic law for a Treaty credit against the NIIT because:

- The limitation of the Article XXIV(1) credit cannot be used to narrow the credit;

- Regardless, the Code does not provide for an express limitation;

- The IRS has explicitly recognized that there is no explicit limitation.

Take each point in turn.

### i. The limitation on the credit in Article XXIV(1) is a narrow one

Two aspects of the plain meaning of Article XXIV(1) makes clear that any limitation imposed on the Treaty credit by U.S. domestic law must be a narrow one that is restricted to technical matters. First, the use of U.S. domestic law to limit the Treaty credit has to be done in a way that does not "change the general principle hereof". This means that any limitation imposed by U.S. domestic law cannot alter the general principle that the Treaty provides a foreign tax credit for Canadian tax paid. Instead, and the Technical Commentary to the 1980 Treaty makes clear, the limitation is referring to technical limitations on the credit such as the basket limitations under Code section 904.

Second, the U.S. domestic law limitation has to be in accordance with Treaty Articles XXIV(4) and XXIV(5). Recall that the text of Article XXIV(1) indicates that the entire article (including the domestic law limitation portion) is "subject to the provisions of paragraphs 4, 5, and 6." This reading of Article XXIV(1) is supported by two authoritative interpretations. First, the 1980 Treaty Technical Commentary reads, "The rules of paragraph 1 are modified in certain respects by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada." Second, the DC Circuit stated indirectly in distinguishing the Canada-U.S. Tax Treaty from the U.S.-German Tax Treaty, "The U.S.-Canada Treaty provision we examined contained a clause

subjecting its tax credit to limitations of U.S. law, but it also explicitly conditioned the tax credit and arguably the limitation itself on subsequent paragraphs of the treaty."[7] As noted above, the plain meaning of paragraph XXIV(4) is to provide a credit to Canadian resident U.S. citizens for tax paid to Canada – full stop. On the plain meaning of Article XXIV(1), then, any limitations under U.S. domestic law should not be used to limit the availability of a foreign tax credit. In short, the limitation under U.S. domestic law must be construed very narrowly and it cannot be used to override a credit. Next, it will be shown that even within this narrow framework, the Code does not attempt to restrict the credit.

### b.   The Code does not limit the Treaty credit against the NIIT

Above, it is established that the restrictions under U.S. domestic law must be narrowly construed. Even without regard to this narrow construction, the Code does not limit the Treaty foreign tax credit against the NIIT.  Code section 1411 does not explicitly prevent a Treaty credit. Instead, it is simply silent. Similarly, section 901 simply provides a foreign tax credit to taxes enacted under Chapter 1. It does not expressly limit the application of a Treaty credit to the NIIT. No other section of the Code limits the Treaty credit.  As noted above, restrictions on Treaty benefits need to be explicit and elsewhere in the Code they are. Even if an override is implied, in instances of inconsistency, the Treaty prevails.[8] That means that the Code's silence cannot be read, even without regard to the restriction discussed above, as limitation on the Treaty credit under Article XXIV(1).

---

[7] <u>Haver</u> v. <u>Commissioner</u>, 444 F.3d 656, 659, 370 U.S. App. D.C. 311, 314 (D.C. Cir. 2006).
[8] Protocol 3 Amending the 1980 Canada-U.S. Tax Treaty (April 24, 1995).

### 7. __Reading the Treaty and Code harmoniously mandates that the credit be provided__

Recall that the general principle is that where possible the Code and Treaty should be read harmoniously to give effect to both. Here, it is possible and thus necessary to read the Treaty and the Code harmoniously. Recall that the Code is silent as to the availability of a foreign tax credit against the NIIT. The Treaty, by contrast, provides a credit against the NIIT under both Article XXIV(4) and XXIV(1). The Treaty simply provides a credit against the NIIT that is available to the subset of U.S. taxpayers who are U.S. citizens resident in Canada that is not available to the broader base of U.S. taxpayers who do not qualify for benefits under the Treaty. Such a reading is the only one that accomplishes the Treaty's fundamental purpose of avoiding double taxation.

This reading is also consistent with the general context of Article XXIV which provide foreign tax credits that are not available under the Code. There are two examples. First, paragraph XXIV(5) provides a U.S. citizen living in Canada with a U.S. tax credit on certain U.S. source income. That would not be available under the Code alone. Second, Article XXIV(7) provides a credit for taxes paid to political subdivisions. Referring to Article XXIV(7), The 1980 Technical Commentary to the Treaty notes, "Paragraph 1 provides a credit for these specified taxes whether or not they qualify as creditable under Code section 901 or 903."

Perhaps the ultimate sign that the Code and Treaty are not in conflict is that Treasury itself has acknowledged this. In the preamble to the regulations under Code section 1411, Treasury specifically recognized that there is no conflict between the Code and the Treaty with respect to the availability of a foreign tax credit. Specifically, TD 9644 notes:

> The Treasury Department and the IRS also received comments asking whether United States income tax treaties may provide an independent basis to credit foreign income taxes against the section 1411 tax. The Treasury Department and the IRS do not believe that these regulations are an appropriate vehicle for guidance with respect to specific treaties.

> An analysis of each United States income tax treaty would be required to
> determine whether the United States would have an obligation under that
> treaty to provide a credit against the section 1411 tax for foreign income
> taxes paid to the other country.

This statement clearly indicates that the availability of a foreign tax credit against the NIIT would depend on the terms of the treaty. Were it the case that section 1411 contains a general treaty override, such case-by-case analysis of each treaty would not be required. As noted above, the Canada-U.S. Treaty provides for such a credit.

## 8. <u>Conclusion</u>

The OECD Treaty commentary states, "International juridical double taxation can be generally defined as the imposition of comparable taxes in two (or more) States on the same taxpayer in respect of the same subject matter and for identical periods. Its harmful effects on the exchange [...] so well known that it is scarcely necessary to stress the importance of removing the obstacles that double taxation presents to the development of economic relations between countries." [9] Recognizing this fact, Canada and the United States entered into the Treaty with the express purpose of avoiding double taxation. Despite this, the Taxpayer is nevertheless faced with this prospect. He had Canadian sourced income on which more tax was paid to Canada than he would owe the United States, but still somehow owes NIIT to the United States.

Longstanding U.S. case law mandates that the Treaty and Code be read harmoniously and that the Code may not override the Treaty unless it does so explicitly. Unless there is a conflict between Code and Treaty, the later-in-time rule does not apply. Here, even the IRS recognized that there is

---

[9] Model Treaties Full Text, OECD Model Treaty (2008)

13

no conflict between the Code and the Treaty. This makes sense. The Code is silent as to whether there is a foreign tax credit available against the NIIT. The Treaty, in contrast, provides a credit independently under both Article XXIV(1) and Article XXIV(4). To reconcile the two, the only harmonious reading is to allow the credit against the NIIT for U.S. citizens in Canada. That both respects the text of both Code and Treaty, but also accomplishes the Treaty's fundamental purpose to avoid double taxation. As a result, the IRS erred on line 8 of Form 4549 (Income Tax Examination Changes) by disallowing this credit and therefore denying the Taxpayer's claim for refund.

We submit this formal written protest and accompanying documents on the Taxpayer's behalf as his representatives. The facts stated in this protest and accompanying documents are as the Taxpayer has relayed and represented to us to be true and correct.

Yours very truly,

Max Reed, Esq.

PAGE 1  OF 4

# INTERNAL REVENUE SERVICE



## FAX TRANSMISSION
### Cover Sheet

Date: August 07, 2018

## To: Max Reed

Address/Organization: _____

Fax Number: __(604) 733-1311_____     Office Number: _6047321515_____

## From: Kim Slack

Address/Organization: _Internal Revenue Service_____

Fax Number: _888-673-5335_____     Office Number: _303-603-4975_____

Number of pages:  [ 4 ]    *Including cover page*

**Subject:** Extension for submitting protest

Per our conversation this morning, additional time has been allowed for you to submit a protest on behalf of your client.

This communication is intended for the sole use of the individual to whom it is addressed and may contain confidential information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited by the provisions of the Internal Revenue code.  If you have received this communication in error, please contact the sender immediately by telephone. Thank you.

# FAX Transmission
# Cover Sheet

Date: 08/07/2018

**To:** Max Reed _____ Mail Stop: _____

Address/Organization: Suite 224, 2211 W 4th Avenue  Vancouver, BC  Canada

FAX Number: 604-733-1311 _____ Office Phone: 604-732-1515

**From:** Kim Slack _____ Mail Stop: 4355DEN

Address/Organization: IRS  1999 Broadway  Denver, CO  80202

FAX Number: 888-673-5335 _____ Office Phone: 303-603-4975

Number of pages:    3    _Including cover sheet_

Per our discussion, please see attached L-686 allowing additional time for you to respond.
Should you have additional questions, please do not hesitate to contact me.  Thank you.

_____
_____
_____
_____
_____
_____
_____

_Please visit us on the intranet at **http://publish.no.irs.gov** to obtain information about every nationally numbered product published by the Internal Revenue Service.  If you are not an IRS employee, visit the IRS homepage at **www.irs.gov** to obtain current information about the IRS and its service._

This communication is intended for the sole use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this communication is not the intended recipient or the employee or agent for delivering the communication to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication may be strictly prohibited.  If you have received this communication in error, please notify the sender immediately by telephone call, and return the communication at the address above via the United States Postal Service.  Thank you.

Form **10321** (3-2007)          Catalog Number 23436C          Department of the Treasury-Internal Revenue Service
publish.no.irs.gov

08/07/2018 3:04:46 PM −0500 IRS                                    PAGE 3   OF 4

 **Department of the Treasury
Internal Revenue Service
Large Business and International
1999 Broadway, MS 4355DEN**
Denver, CO 80202

Date:
08/07/2018
Taxpayer ID number (last 4 digits):
███

Taxpayer name:
Paul Bruyea
Form number:
1040
Years:
2015 and 2016
Person to contact:
Kimberly Slack
Employee ID number:
0442697
Contact telephone number:
303-603-4975
Contact fax number:
888-673-5335

Max Reed
Suite 224, 2211 W 4th Avenue
Vancouver, British Columbia
Canada   V6K 4S2

Dear Mr. Reed:

We are sending the enclosed material under the provisions of your power of attorney or other authorization we have on file. For your convenience, we have listed the name of the taxpayer to whom this material relates in the heading above.

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

Sincerely,

*Kimberly Slack*

Kimberly Slack
Team Manager

Enclosures:
☒ Letters 686
☐ Reports
☐ Copy of Determination Letter
☐ Other

**Letter 937 (Rev. 3-2017)**
Catalog Number 30760X

08/07/2018  3:04:46 PM  −0500  IRS

**Internal Revenue Service**
**Large Business and International**

1999 Broadway, MS 4355DEN
Denver, CO  80202

**Department of the Treasury**

Tax Form:
   1040

Tax Period Ended:
   12/31/2015    12/31/2016

Time extended to:
   August 31, 29018

Date: August 7, 2018

Contact Person:
   Kimberly Slack

Employee Identification Number:
   0442697

Paul Bruyea
707 Fort Street, Apt 301
Victoria, British Columbia  V8W 3G3
CANADA

Telephone Number:
   303-603-4975

Dear Paul Bruyea:

Thank you for letting us know that you need more time to:

☐    Send us the information we requested.

☐    Come in for an interview.

☒    Send us a written protest.

☒    Request a hearing with the Appeals office.

☐

As you can see above, we've extended your time to respond.  We hope that this extension will give you sufficient time to attend to the matter.

Please call us with any questions you may have.  Thank you for your cooperation.

Sincerely,

Kimberly Slack

Kimberly Slack
Team Manager

Letter 686(DO) (Rev. 7-2001)
Catalog Number 40303U

Appx507



ENTERED
JUL 2 0 2018

RECEIVED
JUL 2 0 2018



**Department of the Treasury**
**Internal Revenue Service**
**Large Business and International**
**1999 Broadway, MS 4355DEN**
Denver, CO 80202

Date:
07/13/2018

Taxpayer ID number (last 4 digits):
▮▮▮▮

Taxpayer name:
Paul Bruyea

Form number:
1040

Years:
December 31, 2015
December 31, 2016

Person to contact:
Kimberly Slack

Employee ID number:
0442697

Contact telephone number:
303-603-4975

Contact fax number:
888-673-5335

Angus Izard
301 - 707 Fort Street
Victoria, BC V8W 3G3
CANADA

Dear Angus Izard:

We are sending the enclosed material under the provisions of your power of attorney or other authorization we have on file. For your convenience, we have listed the name of the taxpayer to whom this material relates in the heading above.

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

Sincerely,

*Kimberly Slack*

Kimberly Slack
Team Manager

Enclosures:
☒ Letters 569
☐ Reports
☐ Copy of Determination Letter
☒ Other Forms 2297, 3363, 4549-A

**Letter 937 (Rev. 3-2017)**
Catalog Number 30760X



ENTERED
JUL 2 0 2018



**Department of the Treasury**
**Internal Revenue Service**
**Large Business and International**
1999 Broadway, MS 4355DEN
Denver, CO 80202

**Date:**
07/13/2018
**Taxpayer ID number (last 4 digits):**
████
**Form:**
1040
**Tax periods ended:**    **Claim amount:**
12/31/2016          $7,745
**Date claim received:**
October 31, 2017
**Person to contact:**
Kimberly Slack
**Employee ID number:**
0442697
**Contact telephone number:**
303-603-4975
**Last date to respond to this letter:**
August 15, 2018

Paul Bruyea
c/o 707 Fort Street, #301
Victoria, BC V8W 3G3
CANADA

Dear Mr. Bruyea:

We examined your claim and propose:

☐ Partial disallowance, as shown in the enclosed examination report. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and Form 3363, *Acceptance Form.*

☒ Full disallowance, as shown in the enclosed examination report or at the end of this letter. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and Form 3363, *Acceptance Form.*

☐ Full disallowance with additional tax due, as shown in the enclosed examination report. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and the examination report.

*Note: If your claim involves a joint return, both taxpayers must sign the form(s).*

If you are a "C" Corporation filer, Section 6621(c) of the Internal Revenue Code provides for an interest rate 2% higher than the standard interest rate on deficiencies of $100,000 or more.

If you don't agree with our findings, you may request a meeting or telephone conference with the supervisor of the person identified in the heading of this letter. If you still don't agree with our findings, we recommend that you request a conference with our Appeals Office. If you request a conference, we will forward your request to the Appeals Office and they will contact you to schedule an appointment.

If the proposed change to tax is:

- $25,000 or less for *each* referenced tax period; you may send us a letter requesting Appeals consideration, indicating what you don't agree with and the reasons why you don't agree.

- More than $25,000 for *any* referenced tax period; you must submit a formal protest.

The requirements for filing a formal protest are explained in the enclosed Publication 3498, *The Examination Process.* Publication 3498 also includes information on your *Rights as a Taxpayer* and the *IRS Collection Process.*

If you don't respond by the date shown in the heading of this letter, we will process your case based on the adjustments shown in the enclosed examination report or the explanations given at the end of this letter.

**Letter 569 (Rev. 1-2017)**
Catalog Number 40248G

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter. Thank you for your cooperation.

Sincerely,

Kimberly Slack

Kimberly Slack
Team Manager

Enclosures:
Examination Report
Form 2297
Form 3363
Publication 3498
Envelope

Letter 569 (Rev. 1-2017)
Catalog Number 40248G



 **Department of the Treasury
Internal Revenue Service
Large Business and International**
1999 Broadway, MS 4355DEN
Denver, CO 80202

**Date:**
07/13/2018
**Taxpayer ID number (last 4 digits):**
▉▉▉▉

**Form:**
1040

**Tax periods ended:**    **Claim amount:**
12/31/2015                $263,523

**Date claim received:**
November 26, 2016

**Person to contact:**
Kimberly Slack

**Employee ID number:**
0442697

**Contact telephone number:**
303-603-4975

**Last date to respond to this letter:**
August 15, 2018

Paul Bruyea
c/o 707 Fort Street, #301
Victoria, BC V8W 3G3
CANADA

Dear Mr. Bruyea:

We examined your claim and propose:

☐ Partial disallowance, as shown in the enclosed examination report. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and Form 3363, *Acceptance Form.*

☒ Full disallowance, as shown in the enclosed examination report or at the end of this letter. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and Form 3363, *Acceptance Form.*

☐ Full disallowance with additional tax due, as shown in the enclosed examination report. If you accept our findings, please sign and return the enclosed Form 2297, *Waiver Form* and the examination report.

*Note: If your claim involves a joint return, both taxpayers must sign the form(s).*

If you are a "C" Corporation filer, Section 6621(c) of the Internal Revenue Code provides for an interest rate 2% higher than the standard interest rate on deficiencies of $100,000 or more.

If you don't agree with our findings, you may request a meeting or telephone conference with the supervisor of the person identified in the heading of this letter. If you still don't agree with our findings, we recommend that you request a conference with our Appeals Office. If you request a conference, we will forward your request to the Appeals Office and they will contact you to schedule an appointment.

If the proposed change to tax is:

- $25,000 or less for *each* referenced tax period; you may send us a letter requesting Appeals consideration, indicating what you don't agree with and the reasons why you don't agree.

- More than $25,000 for *any* referenced tax period; you must submit a formal protest.

The requirements for filing a formal protest are explained in the enclosed Publication 3498, *The Examination Process.* Publication 3498 also includes information on your *Rights as a Taxpayer* and the *IRS Collection Process.*

If you don't respond by the date shown in the heading of this letter, we will process your case based on the adjustments shown in the enclosed examination report or the explanations given at the end of this letter.

**Letter 569 (Rev. 1-2017)**
Catalog Number 40248G

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter. Thank you for your cooperation.

Sincerely,

Kimberly Slack
Team Manager

Enclosures:
Examination Report
Form 2297
Form 3363
Publication 3498
Envelope

| Form **4549** (Rev. May 2008) | Department of the Treasury-Internal Revenue Service **Income Tax Examination Changes** | | | Page 1 of 2 |
|---|---|---|---|---|

| Name and Address of Taxpayer | Taxpayer Identification Number | | Return Form No.: 1040 |
|---|---|---|---|
| PAUL BRUYEA<br>C/o 707 Fort Street, #301<br>Victoria BC V8W 3G3 | Person with whom examination changes were discussed. | Name and Title:<br>PAUL BRUYEA | |

| 1. Adjustments to Income | Period End<br>12/31/2015 | Period End<br>12/31/2016 | Period End |
|---|---|---|---|
| a. | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | |
| l. | | | |
| m. | | | |
| n. | | | |
| o. | | | |
| p. | | | |
| 2. Total Adjustments | 0.00 | 0.00 | |
| 3. Taxable Income Per Return or as Previously Adjusted | 7,052,273.00 | 240,505.00 | |
| 4. Corrected Taxable Income | 7,052,273.00 | 240,505.00 | |
|     Tax Method | SCHEDULE D | SCHEDULE D | |
|     Filing Status | Married Separate | Married Separate | |
| 5. Tax | 1,398,683.00 | 39,385.00 | |
| 6. Additional Taxes / Alternative Minimum Tax | 10,183.00 | | |
| 7. Corrected Tax Liability | 1,408,866.00 | 39,385.00 | |
| 8. Less Credits   a. Foreign Tax Credit | 1,398,571.00 | 39,385.00 | |
|     b. | | | |
|     c. | | | |
|     d. | | | |
| 9. Balance (Line 7 less Lines 8a through 8d) | 10,295.00 | 0.00 | |
| 10. Plus Other Taxes   a. Net Investment Income Tax | 263,523.00 | 7,745.00 | |
|     b. | | | |
|     c. | | | |
|     d. | | | |
| 11. Total Corrected Tax Liability (Line 9 plus Lines 10a through 10d) | 273,818.00 | 7,745.00 | |
| 12. Total Tax Shown on Return or as Previously Adjusted | 273,818.00 | 7,745.00 | |
| 13. Adjustments to: a. | | | |
|     b. | | | |
|     c. | | | |
| 14. Deficiency-Increase in Tax or (Overassessment-Decrease in Tax) (Line 11 less Line 12 adjusted by Lines 13a through 13c) | 0.00 | 0.00 | |
| 15. Adjustments to Prepayment Credits - Increase (Decrease) | | | |
| 16. Balance Due or (Overpayment) - (Line 14 adjusted by Line 15) (Excluding interest and penalties) | 0.00 | 0.00 | |

The Internal Revenue Service has agreements with state tax agencies under which information about federal tax, including increases or decreases, is exchanged with the states. If this change affects the amount of your state income tax, you should amend your state return by filing the necessary forms.

You may be subject to backup withholding if you underreport your interest, dividend, or patronage dividend income you earned and do not pay the required tax. The IRS may order backup withholding (withholding of a percentage of your dividend and/or interest income) if the tax remains unpaid after it has been assessed and four notices have been issued to you over a 120-day period.

Catalog Number 23105A      www.irs.gov      Form **4549** (Rev. 5-2008)

| Form **4549**<br>(Rev. May 2008) | Department of the Treasury-Internal Revenue Service<br>**Income Tax Examination Changes** | | | Page 2 of 2 |
|---|---|---|---|---|
| Name of Taxpayer<br>PAUL BRUYEA | | Taxpayer Identification Number | | Return Form No.:<br>1040 |

| 17. Penalties/ Code Sections | Period End<br>12/31/2015 | Period End<br>12/31/2016 | Period End |
|---|---|---|---|
| a. | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | |
| l. | | | |
| m. | | | |
| n. | | | |
| **18. Total Penalties** | | | |
| Underpayment attributable to negligence: *(1981-1987)*<br>A tax addition of 50 percent of the interest due on the<br>underpayment will accrue until it is paid or assessed. | | | |
| Underpayment attributable to fraud: *(1981-1987)*<br>A tax addition of 50 percent of the interest due on the<br>underpayment will accrue until it is paid or assessed. | | | |
| Underpayment attributable to Tax Motivated Transactions *(TMT)*.<br>The interest will accrue and be assessed at 120% of the under-<br>payment rate in accordance with IRC §6621(c) | 0.00 | 0.00 | |
| **19. Summary of Taxes, Penalties and Interest:** | | | |
| a. Balance due or *(Overpayment)* Taxes - *(Line 16, Page 1)* | 0.00 | 0.00 | |
| b. Penalties *(Line 18)* - computed to 07/05/2018 | | | |
| c. Interest *(IRC § 6601)* - computed to 08/04/2018 | 0.00 | 0.00 | |
| d. TMT Interest - computed to 08/04/2018 *(on TMT underpayment)* | 0.00 | 0.00 | |
| e. Amount due or *(refund)* - *(sum of Lines a, b, c and d)* | 0.00 | 0.00 | |

**Other Information:**

On 1*/25/2016 you filed Form 1040X for refund of $263,523 for 2015. As the result of our examination, we have disallowed your claim. Foreign tax credit cannot be claimed to offset the Net Investment Income Tax (NIIT) calculated on the Taxpayers Canadian source investment income.

On 10/31/2017 you filed Form 1040X for refund of $7,745 for 2016. As the result of our examination, we have disallowed your claim. Foreign tax credit cannot be claimed to offset the Net Investment Income Tax (NIIT) calculated on the Taxpayers Canadian source investment income.

| Examiner's Signature:<br>Debra Pratum | Employee ID:<br>076062 | Office:<br>Seattle, WA | Date:<br>07/05/2018 |
|---|---|---|---|

Consent to Assessment and Collection- I do not wish to exercise my appeal rights with the Internal Revenue Service or to contest in the United States Tax Court the findings in this report. Therefore, I give my consent to the immediate assessment and collection of any increase in tax and penalties, and accept any decrease in tax and penalties shown above, plus additional interest as provided by law. It is understood that this report is subject to acceptance by the Area Director, Area Manager, Specialty Tax Program Chief, or Director of Field Operations.

| *PLEASE NOTE: If a joint return was filed, BOTH taxpayers must sign* | | | |
|---|---|---|---|
| Signature of Taxpayer | Date: | Signature of Taxpayer | Date: |
| By: | | Title: | Date: |

Catalog Number 23105A   www.irs.gov   Form **4549** (Rev. 5-2008)

Appx514

| Name of Taxpayer: | PAUL BRUYEA | | 07/05/2018 |
|---|---|---|---|
| Identification Number: | | Total | 19.20.00 |

### 2015 - Form 6251 - Alternative Minimum Tax Computation

1. If filing Schedule A, enter taxable income before exemptions;
   otherwise, enter adjusted gross income   7,059,823.00
2. Total adjustment and preferences (excluding any NOL deduction)   0.00
3. Net operating loss deduction   0.00
4. Alternative tax net operating loss deduction   0.00
5. Alternative minimum taxable income (combine lines 1 thru 4)   7,101,523.00
6. Exemption amount   0.00
7. Subtract line 6 from line 5 (if zero or less, enter zero)   7,101,523.00
8. If capital gains are reported, use the amount from line 29 of the continuation page
   (If FEIT worksheet for AMT is used, enter amount from line 6 of that worksheet instead)
   All others, multiply line 7 by 28% and subtract $ 1,854 from the result   1,416,105.00
9. Alternative minimum tax foreign tax credit   1,405,810.00
10. Tentative minimum tax (line 8 less line 9)   10,295.00
11. Regular tax less foreign tax credit plus excess advance premium tax credit repayment
    (if Schedule J was used to figure tax, use the refigured
    amount for line 44 of Form 1040 without using Schedule J)   112.00
12. Alternative minimum tax   10,183.00

### Exemption Worksheet (line 6 above)

A. Exemption amount based on filing status   41,700.00
B. Alternative minimum taxable income   7,101,523.00
C. Enter amount based on filing status   79,450.00
D. Subtract line C from line B   7,022,073.00
E. Multiply line D by 25%   1,755,518.00
F. Subtract line E from line A (if zero or less, enter zero)   0.00

| Name of Taxpayer: | PAUL BRUYEA | | |
|---|---|---|---|
| Identification Number: | ▮▮▮▮▮ | Total | 07/05/2018 |
| | | | 19.20.00 |

### 2015 - Form 6251 - Continuation, Tax Computation Using Maximum Capital Gain Rates

1. Amount from Form 6251 report, line 7 — 7,101,523.00
   (If FEIT worksheet for AMT was used, enter amount from line 3 of that worksheet instead)
2. Amount from line 6 Qualified Dividends and Capital Gain Tax Worksheet
   or line 13 Schedule D Tax Worksheet (refigured for AMT) — 7,011,678.00
3. Amount from Schedule D line 19 (refigured for AMT) — 0.00
4. Amount from line 2 if no Schedule D worksheet; otherwise, the smaller of
   the sum of line 2 and line 3 or Schedule D worksheet line 10 (refigured for AMT) — 7,011,678.00
5. Smaller of line 1 or line 4 — 7,011,678.00
6. Subtract line 5 from line 1 — 89,845.00
7. Multiply line 6 by 26% and subtract $ 0 from the result — 23,360.00
8. Enter amount based on filing status — 37,450.00
9. Amount from line 7 Qualified Dividends and Capital Gain Tax Worksheet or amount from
   line 14 Schedule D Tax Worksheet, whatever applies (as figured for regular tax).
   If neither worksheet applies, use taxable income (but not less than zero).
   If Form 2555 was filed, see instructions — 40,595.00
10. Subtract line 9 from line 8 (if zero or less, enter zero) — 0.00
11. Smaller of line 1 or line 2 — 7,011,678.00
12. Smaller of line 10 or line 11; This amount is taxed at 0%. — 0.00
13. Subtract line 12 from line 11 — 7,011,678.00
14. Enter amount based on filing status — 232,425.00
15. Amount from line 10 — 0.00
16. Amount from line 7 Qualified Dividends and Capital Gain Tax Worksheet or amount from
    line 19 Schedule D Tax Worksheet, whatever applies (as figured for regular tax).
    If neither worksheet applies, use taxable income (but not less than zero).
    If Form 2555 was filed, see instructions — 40,595.00
17. Add lines 15 and 16 — 40,595.00
18. Subtract line 17 from line 14 (if zero or less, enter zero) — 191,830.00
19. Smaller of line 13 or line 18 — 191,830.00
20. Multiply line 19 by 15% — 28,775.00
21. Add lines 12 and 19 — 191,830.00
22. Subtract line 21 from line 11 — 6,819,848.00
23. Multiply line 22 by 20% — 1,363,970.00
24. Add lines 6, 21, and 22 — 0.00
25. Subtract line 24 from line 1 — 0.00
26. Multiply line 25 by 25% — 0.00
27. Total of lines 7, 20, 23, and 26 — 1,416,105.00
28. Multiply line 1 by 28% and subtract $ 1,854 from the result — 1,986,572.00
29. Smaller of line 27 or line 28. Enter here and on line 8 of Form 6251 report — 1,416,105.00

| Name of Taxpayer: PAUL BRUYEA | | 07/05/2018 |
|---|---|---|
| Identification Number: ▮▮▮▮▮▮▮ | Total | 19.20.00 |

## 2015 - Form 8801 - Credit for Prior Year Minimum Tax

### Part I - Net Minimum Tax on Exclusion Items

| | |
|---|---|
| 1. Taxable income (loss) from prior year Form 6251 | 0.00 |
| 2. Adjustments and preferences treated as exclusion items | 0.00 |
| 3. Minimum tax credit net operating loss deduction | 0.00 |
| 4. Combine lines 1 through 3 (if more than $ 242,450 and married filing separate for prior year - see instructions) | 0.00 |
| 5. Exemption amount from prior year Form 6251 | 41,050.00 |
| 6. Phase-out exemption from prior year Form 6251 | 78,250.00 |
| 7. Subtract line 6 from line 4 (if zero or less, enter -0-) | 0.00 |
| 8. Multiply line 7 by 25% | 0.00 |
| 9. Subtract line 8 from line 5 (if zero or less, enter -0-) | 0.00 |
| 10. Subtract line 9 from line 4 (if zero or less, enter -0-) | 0.00 |
| 11. Line 11 computation (if filing Form 2555/2555-EZ for prior year, enter amount from page 3) or, (if capital gains for prior year, enter amount from Part III, line 55); otherwise, multiply line 10 by 0% and subtract $ 0 from the result | 0.00 |
| 12. Minimum tax foreign tax credit on exclusion items | 0.00 |
| 13. Tentative minimum tax on exclusion items (line 11 less line 12) | 0.00 |
| 14. Regular tax before credits minus foreign tax credit (line 34 of prior year Form 6251) | 0.00 |
| 15. Net minimum tax on exclusion items (line 13 less line 14) | 0.00 |

### Part II - Minimum Tax Credit and Carryforward to Subsequent Year

| | |
|---|---|
| 16. Line 35 of prior year Form 6251 | 0.00 |
| 17. Amount from line 15 above | 0.00 |
| 18. Adjusted net minimum tax (line 16 less line 17) | 0.00 |
| 19. Carryforward of minimum tax credit from prior year | 0.00 |
| 20. Prior year unallowed qualified electric vehicle credit | 0.00 |
| 21. Combine lines 18 through 20 | 0.00 |
| 22. Current year regular income tax plus excess advance premium tax credits repayment less allowable credits | 0.00 |
| 23. Current year tentative minimum tax (line 33 of Form 6251) | 0.00 |
| 24. Subtract line 23 from line 22 (if zero or less, enter -0-) | 0.00 |
| 25. Minimum tax credit (smaller of line 21 or line 24) | 0.00 |
| 26. Credit carryforward (subtract line 25 from line 21) | 0.00 |

| Name of Taxpayer: PAUL BRUYEA | | 07/05/2018 |
| Identification Number: ▮▮▮▮▮ | Total | 19.20.00 |

### Part III - Tax Computation Using Maximum Capital Gains Rates

27. Amount from line 10
    (If FEIT worksheet for F8801 was used,
    enter amount from line 3 of that worksheet insteac)    0.00
28. Amount from prior year line 6 of Qualified Dividends Worksheet or
    prior year line 13 of Schedule D Tax Worksheet, whichever applies    0.00
29. Amount from prior year Schedule D, line 19    0.00
30. Add lines 28 and 29, and enter smaller of that result
    or the amount from line 10 of Schedule D Tax Worksheet    0.00
31. Smaller of line 27 or line 30    0.00
32. Subtract line 31 from line 27    0.00
33. Multiply line 32 by 0 % and subtract $ 0 from the result    0.00
34. Enter amount based on prior year filing status    36,900.00
35. Amount from prior year line 7 of Qualified Dividends Worksheet or
    line 14 of Schedule D Tax Worksheet, whichever applies. If neither
    was used, enter the prior year's taxable income    0.00
36. Subtract line 35 from line 34. If zero or less, enter -0-    0.00
37. Smaller of line 27 or line 28    0.00
38. Smaller of line 36 or line 37    0.00
39. Subtract line 38 from line 37    0.00
40. Enter amount based on prior year filing status    228,800.00
41. Amount from line 36    0.00
42. Amount from prior year line 7 of Qualified Dividends Worksheet or
    prior year line 19 of Schedule D Tax Worksheet, whichever applies.
    If neither was used, enter the prior year's taxable income
    (If FEIT worksheet was used, enter amount from line 3 instead)    0.00
43. Add lines 41 and 42    0.00
44. Subtract line 43 from line 40. If zero or less, enter -0-    0.00
45. Smaller of line 39 or line 44    0.00
46. Multiply line 45 by 15%    0.00
47. Add lines 38 and 45    0.00
48. Subtract line 47 from line 37    0.00
49. Multiply line 48 by 20%    0.00
50. Add lines 32, 47, and 48    0.00
51. Subtract line 50 from line 27    0.00
52. Multiply line 51 by 25%    0.00
53. Add lines 33, 46, 49, and 52    0.00
54. Multiply line 27 by 0 % and subtract $ 0 from the result    0.00
55. Smaller of line 53 or line 54 (enter here and on line 11 above)
    (If FEIT worksheet for F8801 was used,
    enter amount from line 4 of that worksheet instead)    0.00

| Name of Taxpayer: | PAUL BRUYEA | | 07/05/2018 |
| Identification Number: | ▮▮▮▮▮▮ | Total | 19.20.00 |

### 2015 - FOREIGN EARNED INCOME TAX WORKSHEET for PRIOR YEAR MINIMUM TAX

1. Enter amount from Form 8801, line 10 — 0.00

2a. Enter amount from prior year Form 2555, lines 45 & 50,
   or Form 2555-EZ, line 18 — 0.00

2b. Enter the total amount of unclaimed itemized deductions
   or exclusions related to excluded income — 0.00

2c. Subtract line 2b from line 2a. If zero or less, enter -0- — 0.00

3. Add lines 1 and 2c — 0.00

4. Tax on amount on line 3.
   If capital gains or qualified dividends are reported for prior year,
   enter amount from line 3 on Form 8801, line 27.
   Complete Form 8801, Part III and enter amount from line 55 here.
   All others: multiply line 3 by 26% and subtract $   0     from the result — 0.00

5. Tax on amount on line 2c.
   Multiply line 2c by 26% and subtract $   0    from the result — 0.00

6. Subtract line 5 from line 4. If zero or less, enter -0-
   (enter amount here and on line 11 of page 1) — 0.00

NOTE: Computations include capital gain excess determination
and any necessary modifications to Form 8801, Part III

| Name of Taxpayer: | PAUL BRUYEA | | 07/05/2018 |
|---|---|---|---|
| Icentification Number: | ▓▓▓▓▓ | Total | 19.20.00 |

## 2015 - Qualified Dividends and Capital Gain Tax Worksheet

1. Enter the taxable income from Form 1040, line 43, or the amount from
Foreign Earned Income Tax Worksheet, line 3, if filing Form 2555 or 2555-EZ                     7,052,273.00
2. Enter the qualified dividends from Form 1040, line 9b                     1,600.00
3. If filing Schedule D, enter the smaller line 15 or line 16 of Schedule D, but do not enter
less than -0-. Otherwise, enter the amount from Form 1040, line 13                     7,010,078.00
4. Add lines 2 and 3                     7,011,678.00
5. If filing Form 4952, enter the amount, if any, from line 4g of Form 4952. Otherwise, enter -0-                     0.00
6. Subtract line 5 from line 4. If zero or less, enter -0-                     7,011,678.00
7. Subtract line 6 from line 1. If zero or less, enter -0-                     40,595.00
8. Enter:
$ 37,450 if single or married filing separately;
$ 74,900 if married filing jointly or qualifying widow(er); or
$ 50,200 if head of household                     37,450.00
9. Enter the smaller of line 1 or line 8                     37,450.00
10. Enter the smaller of line 7 or line 9                     37,450.00
11. Subtract line 10 from line 9. This amount is taxed at 0%                     0.00
12. Enter the smaller of line 1 or line 6                     7,011,678.00
13. Enter the amount from line 11                     0.00
14. Subtract line 13 from line 12                     7,011,678.00
15. Enter:
$ 413,200 if single;
$ 232,425 if married filing separately;
$ 464,850 if married filing jointly or qualifying widow(er); or
$ 439,000 if head of household                     232,425.00
16. Enter the smaller of line 1 or line 15                     232,425.00
17. Add lines 7 and 11                     40,595.00
18. Subtract line 17 from line 16. If zero or less, enter -0-                     191,830.00
19. Enter the smaller of line 14 or line 18                     191,830.00
20. Multiply line 19 by 15% (.15)                     28,775.00
21. Add lines 11 and 19                     191,830.00
22. Subtract line 21 from line 12                     6,819,848.00
23. Multiply line 22 by 20% (.20)                     1,363,970.00
24. Figure the tax on the amount on line 7. If the amount on line 7 is less than $100,000,
use the Tax Table to figure this tax. If the amount on line 7 is $100,000 or more,
use the Tax Computation Worksheet                     5,938.00
25. Add lines 20, 23, and 24                     1,398,683.00
26. Figure the tax on the amount on line 1. If the amount on line 1 is less than $100,000,
use the Tax Table to figure this tax. If the amount on line 1 is $100,000 or more,
use the Tax Computation Worksheet                     2,765,658.00
27. Tax on all taxable income. Enter the smaller of line 25 or line 26
Also include this amount on Form 1040, line 44, or
Foreign Earned Income Tax Worksheet, line 4, if applicable                     1,398,683.00

| | | |
|---|---|---|
| Name of Taxpayer: | PAUL BRUYEA | 07/05/2018 |
| Identification Number: ████████ | Total | 19.20.00 |

## 2015 - PERSONAL EXEMPTION WORKSHEET

1. Multiply $4,000 by the total number of exemptions claimed .................................... 4,000.00
2. Adjusted gross income .................................................................................. 7,059,823.00
3. Limitation based on filing status .................................................................... 154,950.00

    NOTE: If line 2 is not greater than line 3, STOP;

    enter amount from line 1 on line 8 below

4. Subtract line 3 from line 2 ............................................................................. 6,904,873.00

    If line 4 is less than zero or more than $122,500 ($61,250 if married filing separately),

    then STOP; enter 0.00 on line 8

5. Divide line 4 by $2,500 ($1,250 if married filing separately) ................................. 0.00

    (If result is not a whole number, increase to next whole number)

6. Multiply line 5 by 2% and enter the result as a decimal ..................................... 0.00
7. Multiply line 1 by line 6 ............................................................................... 0.00
8. Deduction for exemptions ............................................................................ 0.00

    (subtract line 7 from line 1; or amount from line 1 or 0.00, if applicable)

Bruyea, Paul, T5
2018-01-30 18:24

Paul Bruyea

Enter the amount from line E.

Capital gains deferral from qualifying dispositions of eligible small business corporation shares (included in number 3) | 161 | 7,948,196 99 | F

Line F minus line G | | 7,948,196 99 | G

Farming and fishing income eligible for the capital gains deduction from the disposition of eligible capital property made **before April 21, 2015** (for details, see Form T657) | 276 | | I

Farming and fishing income eligible for the capital gains deduction from the disposition of eligible capital property made **after April 20, 2015** (for details, see Form T657) | | | J

Farming and fishing income eligible for the capital gains deduction from the disposition of eligible capital property for the year | Line I plus line J | 173 | | K

T5, T5013, and T4PS information slips – Capital gains (or losses) | 174 | | L

T3 information slips – Capital gains (or losses) | 176 | | M

Capital loss from a reduction in your business investment loss | Add lines H, L, and M. | | 7,948,196 99 | N

| 178 | | O

Reserves from line 6706 of Form T2017 | Total of all gains (or losses) before reserves: line N minus line O | 191 | 7,948,196 99 | P

| 192 | | Q

| Total capital gains (or losses): line P plus line Q | 197 | 7,948,196 99 | R

Multiply the amount on line 197 by 50%.
Enter the taxable capital gains on line 127 of your return.
If it is a net capital loss, see line 127 in the guide. | Taxable capital gains (or net capital loss) in 2015 | 199 | 3,974,098 50

5000-S3

See the privacy notice on your return.

*Exhibit 2*

**Appx522**

Bruyea, Paul.115
2018-01-30 18:24

Paul Bruyea

Protected B when completed

## Schedule 1 - Page 2

### Step 2 – Federal tax on taxable income

Enter your taxable income from line 260 of your return. ......................... 5,511,669 76 **36**

| Complete the appropriate column depending on the amount on line 36. | Line 36 is $44,701 or less | Line 36 is more than $44,701 but not more than $89,401 | Line 36 is more than $89,401 but not more than $138,586 | Line 36 is more than $138,586 | |
|---|---|---|---|---|---|
| Enter the amount from line 36. | | | | 5,511,669 76 | **37** |
| Line 37 minus line 38 (cannot be negative) | 0 00 | 44,701 00 | 89,401 00 | 138,586 00 | **38** |
| | | | | 5,373,083 76 | **39** |
| Multiply line 39 by line 40. | 15 % | 22 % | 26 % | 29 % | **40** |
| | | | | 1,558,194 29 | **41** |
| Add lines 41 and 42. | 0 00 | 6,705 00 | 16,539 00 | 29,327 00 | **42** |
| | | | | 1,587,521 29 | **43** |

### Step 3 – Net federal tax

| | | | | | |
|---|---|---|---|---|---|
| Enter the amount from line 43. | | | 1,587,521 29 | | **44** |
| Federal tax on split income (from line 5 of Form T1206) | | **424** | | • | **45** |
| Add lines 44 and 45. | | **404** | 1,587,521 29 ▶ | 1,587,521 29 | **46** |
| Enter your total federal non-refundable tax credits from line 35 on the previous page. | | **350** | 3,698 10 | | **47** |
| Family tax cut (attach Schedule 1-A) | | **423** | | • | **48** |
| Federal dividend tax credit | | **425** | | • | **49** |
| Overseas employment tax credit (attach Form T626) | | **426** | | | **50** |
| Minimum tax carryover (attach Form T691) | | **427** | | • | **51** |
| Add lines 47 to 51. | | | 3,698 10 ▶ | 3,698 10 | **52** |
| Line 46 minus line 52 (if negative, enter "0") | Basic federal tax | **429** | | 1,583,823 19 | **53** |
| Federal foreign tax credit (attach Form T2209) | | **405** | | 306 89 | **54** |
| Line 53 minus line 54 (if negative, enter "0") | Federal tax | **406** | | 1,583,516 30 | **55** |
| Total federal political contributions (attach receipts) | **409** | | 56 | | |
| Federal political contribution tax credit (use the federal worksheet) | (maximum $650) | **410** | | • | **57** |
| Investment tax credit (attach Form T2038(IND)) | | **412** | | • | **58** |
| Labour-sponsored funds tax credit   Net cost **413** | Allowable credit **414** | | | • | **59** |
| Add lines 57, 58, and 59. | | **416** | ▶ | | **60** |
| Line 55 minus line 60 (if negative, enter "0") If you have an amount on line 45 above, see Form T1206. | | **417** | | 1,583,516 30 | **61** |
| Working income tax benefit advance payments received (box 10 of the RC210 slip) | | **415** | | • | **62** |
| Special taxes (see line 418 in the guide) | | **418** | | | **63** |
| Add lines 61, 62, and 63. | | | | | |
| Enter this amount on line 420 of your return. | Net federal tax | **420** | | 1,583,516 30 | **64** |

Exhibit 3
401-18

5000-S1

See the privacy notice on your return.

Appx523

Bruyea, Paul.115
2018-01-30 18:24

Paul Bruyea

## Step 3 – British Columbia tax *(continued)*

Enter the amount from line 65 on the previous page.     914,582 | 10   **66**

**British Columbia political contribution tax credit**

Enter your British Columbia political contributions made in 2015.   **6040** |     **67**

Credit calculated for line 68 on the *Provincial Worksheet*    (maximum $500)     **68**

Line 66 minus line 68 (if negative, enter "0")     914,582 | 10   **69**

**British Columbia employee investment tax credits**

Enter your employee share ownership plan tax credit from Certificate ESOP 20.   **6045** |   • **70**

Enter your employee venture capital tax credit from Certificate EVCC 30.   **6047** |   • **71**

Add lines 70 and 71.    (maximum $2,000)    ▶     **72**

Line 69 minus line 72 (if negative, enter "0")     914,582 | 10   **73**

**British Columbia mining flow-through share tax credit**

Enter the tax credit amount calculated on Form T1231.   **6881** |   • **74**

Line 73 minus line 74 (if negative, enter "0")

Enter the result on line 428 of your return.     **British Columbia tax**     914,582 | 10   **75**

See the privacy notice on your return.

Exhibit 4

Bruyea, Paul.115
2018-01-30  18:24

Paul Bruyea

## Refund or balance owing

Protected B when completed **4**

| | | | |
|---|---|---|---|
| Net federal tax: enter the amount from line 64 of Schedule 1 (attach Schedule 1, even if the result is "0") | **420** | 1,583,516 | 30 |
| CPP contributions payable on self-employment and other earnings (attach Schedule 8 or Form RC381, whichever applies) | **421** | | |
| Employment insurance premiums payable on self-employment and other eligible earnings (attach Schedule 13) | **430** | | |
| Social benefits repayment (amount from line 235) | **422** | | |
| Provincial or territorial tax (attach Form 428, even if the result is "0") | **428** | 914,582 | 10 |
| Add lines 420, 421, 430, 422, and 428. This is your total payable. | **435** | 2,498,098 | 40 |

| | | | | |
|---|---|---|---|---|
| Total income tax deducted | **437** | | • | |
| Refundable Quebec abatement | **440** | | • | |
| CPP overpayment (enter your excess contributions) | **448** | | • | |
| Employment insurance overpayment (enter your excess contributions) | **450** | | • | |
| Refundable medical expense supplement (use the federal worksheet) | **452** | | • | |
| Working income tax benefit (WITB) (attach Schedule 6) | **453** | | • | |
| Refund of investment tax credit (attach Form T2038(IND)) | **454** | | • | |
| Part XII.2 trust tax credit (box 38 of all T3 slips) | **456** | | • | |
| Employee and partner GST/HST rebate (attach Form GST370) | **457** | | • | |
| Children's fitness tax credit  Eligible fees **458**  x 15% | **459** | | • | |
| Tax paid by instalments | **476** | 110,000 | 00 | |
| Provincial or territorial credits (attach Form 479 if it applies) | **479** | | • | |
| Add lines 437 to 479. These are your total credits. | **482** | 110,000 | 00 | ▶ 110,000 00 |

| | | | |
|---|---|---|---|
| Line 435 minus line 482 This is your refund or balance owing. | | 2,388,098 | 40 |

If the result is negative, you have a refund. If the result is positive, you have a balance owing.

Enter the amount below on whichever line applies.

Generally, we do not charge or refund a difference of $2 or less.

Refund **484** | | Balance owing **485** | 2,388,098 | 40 | •

For more information on how to make your payment, see line 485 in the guide or go to **www.cra.gc.ca/payments**. Your payment is due no later than April 30, 2016.

### Direct deposit – Enrol or update (see line 484 in the guide)

**You do not have to complete this area every year.** Do not complete it this year if your direct deposit information has not changed.

To enrol for direct deposit, to update your banking information, or to request that all of your CRA payments you may be receiving or owed be deposited into the same account as your T1 refund, complete lines 460, 461, and 462 below.

By providing my banking information **I authorize** the Receiver General to deposit in the bank account number shown below any amounts payable to me by the CRA, until otherwise notified by me. I understand that this authorization will replace all of my previous direct deposit authorizations.

Branch number **460**  (5 digits)    Institution number **461**  (3 digits)    Account number **462**  (maximum 12 digits)

Prepared without audit from information supplied by the taxpayer

I certify that the information given on this return and in any documents attached is correct and complete and fully discloses all my income. | **490** | If a fee was charged for preparing this return, complete the following:

**Sign here** | Name of preparer: Cameron Izard Snell

It is a serious offence to make a false return. | Telephone: (250) 381-2288

Telephone  Date 2018-01-30 | EFILE number (if applicable): **489** F2037

Personal information is collected under the *Income Tax Act* to administer tax, benefits, and related programs. It may also be used for any purpose related to the administration or enforcement of the Act such as audit, compliance and the payment of debts owed to the Crown. It may be shared or verified with other federal, provincial/territorial government institutions to the extent authorized by law. Failure to provide this information may result in interest payable, penalties or other actions. Under the *Privacy Act*, individuals have the right to access their personal information and request correction if there are errors or omissions. Refer to Info Source www.cra.gc.ca/gncy/tp/nfsrc/nfsrc-eng.html, personal information bank CRA PPU 005.

Do not use this area | **487** | **488** | | **486** |

5000-R
RC-15-103

*Exhibit 5*

Appx525

| Form **1116** | **Foreign Tax Credit** | OMB No. 1545-0121 |
|---|---|---|
| Department of the Treasury Internal Revenue Service (99) | (Individual, Estate, or Trust) ▶ Attach to Form 1040, 1040NR, 1041, or 990-T. ▶ Information about Form 1116 and its separate instructions is at *www.irs.gov/form1116*. | **2015** Attachment Sequence No. **19** |

| Name | Identifying number as shown on page 1 of your tax return |
|---|---|
| Paul Bruyea | ▓▓▓▓▓▓▓▓▓▓ |

Use a separate Form 1116 for each category of income listed below. See **Categories of Income** in the instructions. Check only one box on each Form 1116. Report all amounts in U.S. dollars except where specified in Part II below.

a [X] Passive category income    c ☐ Section 901(j) income    e ☐ Lump-sum distributions
b ☐ General category income    d ☐ Certain income re-sourced by treaty

f Resident of (name of country) ▶ **Canada**

Note: *If you paid taxes to only one foreign country or U.S. possession, use column A in Part I and line A in Part II. If you paid taxes to more than one foreign country or U.S. possession, use a separate column and line for each country or possession.*

| **Part I** | Taxable Income or Loss From Sources Outside the United States (for Category Checked Above) | | | |
|---|---|---|---|---|

| | | Foreign Country or U.S. Possession | | | Total (Add cols. A, B, and C.) |
|---|---|---|---|---|---|
| | | A | B | C | |
| g | Enter the name of the foreign country or U.S. possession | Canada | Other Countries | | |
| 1a | Gross income from sources within country shown above and of the type checked above: | | | | |
| | | 4,117,790. | | | 1a 4,117,790. |
| b | Check if line 1a is compensation for personal services as an employee, your total compensation from all sources is $250,000 or more, and you used an alternative basis to determine its source (see instructions) ▶ ☐ | | | | |
| | **Deductions and losses (Caution: See instructions):** | | | | |
| 2 | Expenses definitely related to the income on line 1a (attach statement) | 552,881. | | | |
| 3 | Pro rata share of other deductions not definitely related: | | | | |
| a | Certain itemized deductions or standard deduction | 7,550. | 7,550. | | |
| b | Other deductions (attach statement) | | | | |
| c | Add lines 3a and 3b | 7,550. | 7,550. | | |
| d | Gross foreign source income | 8,276,230. | | | |
| e | Gross income from all sources | 8,277,830. | 8,277,830. | | |
| f | Divide line 3d by line 3e | .99981 | .00000 | | |
| g | Multiply line 3c by line 3f | 7,549. | | | |
| 4 | Pro rata share of interest expense: | | | | |
| a | Home mortgage interest (use the Worksheet for Home Mortgage Interest in the instructions) | | | | |
| b | Other interest expense | | | | |
| 5 | Losses from foreign sources | | | | |
| 6 | Add lines 2, 3g, 4a, 4b, and 5 | 560,430. | | | 6 560,430. |
| 7 | Subtract line 6 from line 1a. Enter the result here and on line 15, page 2 | | | ▶ 7 | 3,557,360. |

| **Part II** | Foreign Taxes Paid or Accrued | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| Country | Credit is claimed for taxes (you must check one) | | In foreign currency | | | | In U.S. dollars | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | (h) ☐ Paid (i) [X] Accrued | (j) Date paid or accrued | Taxes withheld at source on: | | | (n) Other foreign taxes paid or accrued | Taxes withheld at source on: | | | (r) Other foreign taxes paid or accrued |
| | | | (k) Dividends | (l) Rents and royalties | (m) Interest | | (o) Dividends | (p) Rents and royalties | (q) Interest | (s) Total foreign taxes paid or accrued (add cols. (o) through (r)) |
| A | | 12/31/15 | | 2498098 | | | | 1953513 | | 1953513. |
| B | | | | | | | | | | |
| C | | | | | | | | | | |
| 8 | Add lines A through C, column (s). Enter the total here and on line 9, page 2 | | | | | | | | ▶ 8 | 1953513. |

LHA    For Paperwork Reduction Act Notice, see instructions.        Form **1116** (2015)

511501
11-30-15

*Exhibit 6*

12050501 137560 AB010      2015.03040 Bruyea, Paul

**Appx526**

Form 1116 (2015)  Paul Bruyea

Page 2

**Part III | Figuring the Credit**

| | | | |
|---|---|---|---|
| 9 Enter the amount from line 8. These are your total foreign taxes paid or accrued for the category of income checked above Part I | 9 | 1,953,513. | |
| 10 Carryback or carryover (attach detailed computation)  **See Statement 10** | 10 | 96,443. | |
| 11 Add lines 9 and 10 | 11 | 2,049,956. | |
| 12 Reduction in foreign taxes | 12 | | |
| 13 Taxes reclassified under high tax kickout | 13 | | |
| 14 Combine lines 11, 12, and 13. This is the total amount of foreign taxes available for credit | 14 | | 2,049,956. |
| 15 Enter the amount from line 7. This is your taxable income or (loss) from sources outside the United States (before adjustments) for the category of income checked above Part I | 15 | 3,557,360. | |
| 16 Adjustments to line 15 | 16 | 303. | |
| 17 Combine the amounts on lines 15 and 16. This is your net foreign source taxable income. (If the result is zero or less, you have no foreign tax credit for the category of income you checked above Part I. Skip lines 18 through 22. However, if you are filing more than one Form 1116, you must complete line 20.) | 17 | 3,557,663. | |
| 18 **Individuals:** Enter the amount from Form 1040, line 41, or Form 1040NR, line 39. **Estates and trusts:** Enter your taxable income without the deduction for your exemption  **See Statement 9** | 18 | 3,557,965. | |
| **Caution:** *If you figured your tax using the lower rates on qualified dividends or capital gains, see instructions.* | | | |
| 19 Divide line 17 by line 18. If line 17 is more than line 18, enter "1" | 19 | | .99992 |
| 20 **Individuals:** Enter the amounts from Form 1040, lines 44 and 46. If you are a nonresident alien, enter the amounts from Form 1040NR, lines 42 and 44. **Estates and trusts:** Enter the amount from Form 1041, Schedule G, line 1a, or the total of Form 990-T, lines 36 and 37 | 20 | | 1,398,683. |
| **Caution:** *If you are completing line 20 for separate category e (lump-sum distributions), see instructions.* | | | |
| 21 Multiply line 20 by line 19 (maximum amount of credit) | 21 | | 1,398,571. |
| 22 Enter the **smaller** of line 14 or line 21. If this is the only Form 1116 you are filing, skip lines 23 through 27 and enter this amount on line 28. Otherwise, complete the appropriate line in Part IV ▶ | 22 | | 1,398,571. |

**Part IV | Summary of Credits From Separate Parts III**

| | | | |
|---|---|---|---|
| 23 Credit for taxes on passive category income | 23 | 1,398,571. | |
| 24 Credit for taxes on general category income | 24 | | |
| 25 Credit for taxes on certain income re-sourced by treaty | 25 | | |
| 26 Credit for taxes on lump-sum distributions | 26 | | |
| 27 Add lines 23 through 26 | 27 | | 1,398,571. |
| 28 Enter the **smaller** of line 20 or line 27 | 28 | | 1,398,571. |
| 29 Reduction of credit for international boycott operations | 29 | | |
| 30 Subtract line 29 from line 28. This is your **foreign tax credit**. Enter here and on Form 1040, line 48; Form 1040NR, line 46; Form 1041, Schedule G, line 2a; or Form 990-T, line 40a ▶ | 30 | | 1,398,571. |

Form 1116 (2015)

511511
11-30-15

*Exhibit 7*

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010__1

**Appx527**

| Form **8960** | **Net Investment Income Tax -** | OMB No. 1545-2227 |
|---|---|---|
| | **Individuals, Estates, and Trusts** | **2015** |
| Department of the Treasury Internal Revenue Service (99) | ▶ Attach to your tax return. ▶ Information about Form 8960 and its separate instructions is at *www.irs.gov/form8960*. | Attachment Sequence No. 72 |

Name(s) shown on your tax return
Paul Bruyea

Your social security number or EIN

**Part I**   **Investment Income**

- ☐ Section 6013(g) election (see instructions)
- ☐ Section 6013(h) election (see instructions)
- ☐ Regulations section 1.1411-10(g) election (see instructions)

| | | | | | |
|---|---|---|---|---|---|
| 1 | Taxable interest (see instructions) | | | 1 | 648. |
| 2 | Ordinary dividends (see instructions) | | | 2 | 1,600. |
| 3 | Annuities (see instructions) | | | 3 | |
| 4a | Rental real estate, royalties, partnerships, S corporations, trusts, etc. (see instructions) | 4a | 47,497. | | |
| b | Adjustment for net income or loss derived in the ordinary course of a non-section 1411 trade or business (see instructions) | 4b | | | |
| c | Combine lines 4a and 4b | | | 4c | 47,497. |
| 5a | Net gain or loss from disposition of property (see instructions) | 5a | 7,010,078. | | |
| b | Net gain or loss from disposition of property that is not subject to net investment income tax (see instructions) | 5b | | | |
| c | Adjustment from disposition of partnership interest or S corporation stock (see instructions) | 5c | | | |
| d | Combine lines 5a through 5c | | | 5d | 7,010,078. |
| 6 | Adjustments to investment income for certain CFCs and PFICs (see instructions) | | | 6 | |
| 7 | Other modifications to investment income (see instructions) | | | 7 | |
| 8 | **Total investment income.** Combine lines 1, 2, 3, 4c, 5d, 6, and 7 | | | 8 | 7,059,823. |

**Part II**   **Investment Expenses Allocable to Investment Income and Modifications**

| | | | | | |
|---|---|---|---|---|---|
| 9a | Investment interest expenses (see instructions) | 9a | | | |
| b | State, local, and foreign income tax (see instructions) | 9b | | | |
| c | Miscellaneous investment expenses (see instructions) | 9c | | | |
| d | Add lines 9a, 9b, and 9c | | | 9d | |
| 10 | Additional modifications (see instructions) | | | 10 | |
| 11 | Total deductions and modifications. Add lines 9d and 10 | | | 11 | |

**Part III**   **Tax Computation**

| | | | | | |
|---|---|---|---|---|---|
| 12 | Net investment income. Subtract Part II, line 11 from Part I, line 8. Individuals complete lines 13-17. Estates and trusts complete lines 18a-21. If zero or less, enter -0- | | | 12 | 7,059,823. |
| | **Individuals:** | | | | |
| 13 | Modified adjusted gross income (see instructions) | 13 | 7,059,823. | | |
| 14 | Threshold based on filing status (see instructions) | 14 | 125,000. | | |
| 15 | Subtract line 14 from line 13. If zero or less, enter -0- | 15 | 6,934,823. | | |
| 16 | Enter the smaller of line 12 or line 15 | | | 16 | 6,934,823. |
| 17 | Net investment income tax for individuals. Multiply line 16 by 3.8% (.038). Enter here and include on your tax return (see instructions) | | | 17 | 263,523. |
| | **Estates and Trusts:** | | | | |
| 18a | Net investment income (line 12 above) | 18a | | | |
| b | Deductions for distributions of net investment income and deductions under section 642(c) (see instructions) | 18b | | | |
| c | Undistributed net investment income. Subtract line 18b from 18a (see instructions). If zero or less, enter -0- | 18c | | | |
| 19a | Adjusted gross income (see instructions) | 19a | | | |
| b | Highest tax bracket for estates and trusts for the year (see instructions) | 19b | | | |
| c | Subtract line 19b from line 19a. If zero or less, enter -0- | 19c | | | |
| 20 | Enter the smaller of line 18c or line 19c | | | 20 | |
| 21 | Net investment income tax for estates and trusts. Multiply line 20 by 3.8% (.038). Enter here and include on your tax return (see instructions) | | | 21 | |

LHA   **For Paperwork Reduction Act Notice, see your tax return instructions.**          Form **8960** (2015)

523121 12-10-15

12050501 137560 AB010          2015.03040 Bruyea, Paul          AB010    1

*Exhibit 8*

Form **3363**
(Rev. November 1983)

Department of the Treasury — Internal Revenue Service

# Acceptance of Proposed Disallowance of Claim for Refund or Credit

Name(s), SSN or EIN, and address of taxpayer(s) *(Number, Street, City or Town, State, ZIP Code)*

Paul Bruyea
c/o 707 Fort Street, #301
Victoria, BC V8W 3G3
Canada

| Year or Period | Date Claim Filed | Kind of Tax | Amount of Claim | Amount of Claim Disallowed | Amount of Claim Allowed |
|---|---|---|---|---|---|
| 201512 | 11/25/2016 | Income | $273,818.00 | $273,818.00 | $0.00 |
| 201612 | 10/31/2017 | Income | $7,745.00 | $7,745.00 | $0.00 |
| | | | | | |
| | | | | | |

I accept the proposal of the Internal Revenue Service to disallow the claim(s) to the extent described above. This means only that I do not want the Service to consider the claim(s). It does not waive my right to file suit on the disallowance.

If you file this acceptance for a joint return, both you and your spouse must sign the original and duplicate of this form. Sign your name exactly as it appears on the return. If you are acting under power of attorney for your spouse, you may sign as agent for him or her.

For an agent or attorney acting under a power of attorney, a power of attorney must be sent with this form if not previously filed.

For a partnership with excise or employment tax liability, all partners must sign. However, one partner may sign with appropriate evidence of authorization to act for the partnership.

For a person acting in a fiduciary capacity (executor, administrator, trustee), file Form 56, Notice Concerning Fiduciary Relationship, with this form if not previously filed.

For a corporation, enter the name of the corporation followed by the signature and title of the officer(s) authorized to sign.

**Your Signature** ▶ _____
(Date)

**Spouse's Signature If A Joint Return Was Filed** ▶ _____
(Date)

**Taxpayer's Representative Sign Here** ▶ _____
(Date)

**Partnership/ Corporate Name** ▶ _____

**Partners/ Corporate Officers Sign Here** ▶ _____
(Title) _____ (Date)

_____
(Title) _____ (Date)

Form **3363** (Rev. 11-1983)  Catalog Number 22240Y  www.irs.gov  Department of the Treasury - Internal Revenue Service

| Form **2297**<br>(Rev. March 1982) | Department of the Treasury-Internal Revenue Service<br>**Waiver of Statutory Notification of Claim Disallowance** |
| --- | --- |

I, Paul Bruyea                                                of  c/o 707 Fort Street #301, Victoria, BC, V8W 3G3, Canada

*(Name, SSN or EIN)*                                          *(Number, Street, City or Town, State, ZIP Code)*

waive the requirement under Internal Revenue Code section 6532(a)(1 ) that a notice of claim disallowance be sent to me by certified or registered mail for the claims for credit or refund shown in column (d), below.

I understand that the filing of this waiver is irrevocable and it will begin the 2-year period for filing suit for refund of the claims disallowed as if the notice of disallowance had been sent by certified or registered mail.

### Claims

| (a)<br>Taxable Period Ended | (b)<br>Kind of Tax | (c)<br>Amount of Claim | (d)<br>Amount of Claim Disallowed |
| --- | --- | --- | --- |
| 201512 | Income | $273,818.00 | $273,818.00 |
| 201612 | Income | $7,745.00 | $7,745.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

If you file this waiver for a joint return, both you and your spouse must sign the original and duplicate of this form. Sign your name exactly as it appears on the return. If you are acting under power of attorney for your spouse, you may sign as agent for him or her.

For an agent or attorney acting under a power of attorney, a power of attorney must be sent with this form if not previously filed.

For a partnership with excise or employment tax liability, all partners must sign. However, one partner may sign with appropriate evidence of authorization to act for the partnership.

For a person acting in a fiduciary capacity (executor, administrator, trustee). file Form 56, Notice Concerning Fiduciary Relationship, with this form if not previously filed.

For a corporation, enter the name of the corporation followed by the signature and title of the officer(s) authorized to sign.

Your Signature ▶ _____
                                                        *(Date signed)*

Spouse's Signature If A Joint Return Was Filed ▶ _____
                                                        *(Date signed)*

Taxpayer's Representative Sign Here _____
                                                        *(Date signed)*

Partnership/ Corporate Name: _____

Partners/ Corporate Officers Sign Here ▶ _____
                                        *(Title)*                 *(Date signed)*

▶ _____
                                        *(Title)*                 *(Date signed)*

NOTE - Filing this waiver within 6 months from the date the claim was filed will not permit filing a suit for refund before the 6-month period has elapsed unless a decision is made by the Service within that time disallowing the claims.

Appx530

 **Department of the Treasury
Internal Revenue Service
Independent Office of Appeals**
915 Second Avenue
Room 2790, MS W680EJ
Seattle, WA 98174

| | |
|---|---|
| **Date:** | SEP 11 2023 |

**Person to contact:**
Name: Edwin S Jhun
Employee ID Number: 1000899242
Phone: (206) 946-3094
Fax: (855) 211-4921
Email: edwin.jhun@irs.gov
Hours: 7:00AM-3:30PM (Pacific)

**Re:**
Income

**Tax periods ended:**
12/2015 12/2016

**Form number:**
1040

**Amount of claim:**
2015: $263,523
2016: $7,745

**Date claim received:**
11/25/2016: 2015 Form 1040-X IRS
received date

06/24/2017: 2016 Form 1040-X IRS
received date

**Taxpayer ID number:**
████████

PAUL BRUYEA
C/O 707 FORT STREET APT 301
VICTORIA, BC V8W 3G3
CANADA

**Registered Mail**    RA 339 654 829 US

Dear Paul Bruyea:

We considered your protest and the evidence and arguments submitted in support of the above claim for refund of tax. We can't allow the above claim for an adjustment to your tax for the following reasons:

The tax periods in question include 2015 and 2016. These years were previously considered by the United States Competent Authority's (US-CA) office. The issues that were to be decided by US-CA (prior to its termination of the CA issues on 08/15/2023) was whether: 1) A dual US-Canadian citizen can utilize FTC to offset NIIT (for investment income sourced in Canada); 2) or alternatively, if such a citizen is exempt from NIIT pursuant to the US-CA Social Security Totalization Agreement.

Appeals and US-CA were recently made aware that you had filed a refund suit with the U.S. Federal Claims Court on 05/23/2023 (Bruyea v. USA, 1:2023cv00766, U.S. Federal Claims Court, Filed May 25, 2023). As noted in the US-CA closing letter (dated 08/15/2023) that was issued to you, the US-CA "will not accept or continue to consider a taxpayer's competent authority request regarding (a) any competent authority issue and taxable period designated for litigation with respect to the same taxpayer, or (b) any competent authority issue and taxable period that are pending in a U.S. federal court and that were under IRS Appeals jurisdiction with respect to the same taxpayer before the commencement of the litigation." Accordingly, US-CA terminated any ongoing consideration of your competent authority request as of 08/15/2023.

Under IRM 8.7.1.8.1, Appeals is instructed to issue the notice of claim disallowance upon receiving notice that a suit has been filed. Appeals will forward the file to the Account and Processing Support (APS) unit "who will complete the appropriate actions and promptly send the file administrative file, including the return, to Counsel."

**Appx532**

We based our decision on the provisions of the IRS laws and regulations. This letter is your legal notice that we fully disallowed your claim.

If you want to bring suit or proceedings for the recovery of any tax, penalties or other moneys shown on this disallowance notice, you can file suit with the United States District Court having jurisdiction or with the United States Court of Federal Claims. Generally, the law requires you to file suit within two years from the mailing date of this letter. However, if you signed Form 2297, Waiver of Statutory Notification of Claim Disallowance, the two-year period in which to bring suit began on the date you filed the waiver.

For additional overpayment interest, you must file suit within six years from the date of the original scheduled overpayment, in accordance with Title 28 of the United States Code Sections 2401, Time for Commencing Action Against the United States, and 2501, Time for Filing Suit. Your six-year period hasn't been shortened or extended by the filing of your claim.

If you have questions, contact the person at the top of this letter.

Sincerely,

*Jacklyn Cho*

Digitally signed by Jacklyn H. Cho
Date: 2023.08.27 16:09:23 -07'00'

Jacklyn H. Cho
Acting Appeals Team Manager

Enclosures:
IRS Appeals Survey

cc: Max Reed (Power of Attorney)

**Appx533**

taxnotes
DOC 2017-84262

# 1980 Income and Capital Tax Convention, as amended through 2007

Posted on Sep. 26, 1980

## CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL

The United States of America and Canada,

Desiring to conclude a Convention for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income and on capital,

Have agreed as follows:

## Article I
## Personal Scope

Compare OECD Article

Article Summary

This Convention is generally applicable to persons who are residents of one or both of the Contracting States.

## Article II
## Taxes Covered

Compare OECD Article

Article Summary

1. This Convention shall apply to taxes on income and on capital imposed on behalf of each Contracting State, irrespective of the manner in which they are levied.

2. Notwithstanding paragraph 1, the taxes existing on March 17, 1995 to which the Convention shall apply are:

(a) In the case of Canada, the taxes imposed by the Government of Canada under the Income Tax Act; and

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(b) In the case of the United States, the Federal income taxes imposed by the Internal Revenue Code of 1986. However, the Convention shall apply to:

(i) The United States accumulated earnings tax and personal holding company tax, to the extent, and only to the extent, necessary to implement the provisions of paragraphs 5 and 8 of Article X (Dividends);

(ii) The United States excise taxes imposed with respect to private foundations, to the extent, and only to the extent, necessary to implement the provisions of paragraph 4 of Article XXI (Exempt Organizations);

(iii) The United States social security taxes, to the extent, and only to the extent, necessary to implement the provisions of paragraph 2 of Article XXIV (Elimination of Double Taxation) and paragraph 4 of Article XXIX (Miscellaneous Rules); and

(iv) The United States estate taxes imposed by the Internal Revenue Code of 1986, to the extent, and only to the extent, necessary to implement the provisions of paragraph 3(g) of Article XXVI (Mutual Agreement Procedure) and Article XXIX B (Taxes Imposed by Reason of Death).

3. The Convention shall apply also to:

(a) Any taxes identical or substantially similar to those taxes to which the Convention applies under paragraph 2; and

(b) Taxes on capital;

which are imposed after March 17, 1995 in addition to, or in place of, the taxes to which the Convention applies under paragraph 2.

# Article III
## General Definitions

Compare OECD Article

Article Summary

1. For the purposes of this Convention, unless the context otherwise requires:

(a) When used in a geographical sense, the term "Canada" means the territory of Canada, including any area beyond the territorial seas of Canada which, in accordance with international law and the laws of Canada, is an area within which Canada may exercise rights with respect to the seabed and subsoil and their natural resources;

(b) The term "United States" means:

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(i) The United States of America, but does not include Puerto Rico, the Virgin Islands, Guam or any other United States possession or territory; and

(ii) When used in a geographical sense, such term also includes any area beyond the territorial seas of the United States which, in accordance with international law and the laws of the United States, is an area within which the United States, may exercise rights with respect to the seabed and subsoil and their natural resources;

(c) The term "Canadian tax" means the taxes referred to in Article II (Taxes Covered) that are imposed on income by Canada;

(d) The term "United States tax" means the taxes referred to in Article II (Taxes Covered), other than in subparagraph (b)(i) to (iv) of paragraph 2 thereof, that are imposed on income by the United States;

(e) The term "person" includes an individual, an estate, a trust, a company and any other body of persons;

(f) The term "company" means any body corporate or any entity which is treated as a body corporate for tax purposes;

(g) The term "competent authority" means:

(i) In the case of Canada, the Minister of National Revenue or his authorized representative; and

(ii) In the case of the United States, the Secretary of the Treasury or his delegate;

(h) The term "international traffic" with references to a resident of a Contracting State means any voyage of a ship or aircraft to transport passengers or property (whether or not operated or used by that resident) except where the principal purpose of the voyage is to transport passengers or property between places within the other Contracting State;

(i) The term "State" means any national State, whether or not a Contracting State;

(j) The term "the 1942 Convention" means the Convention and Protocol between the United States and Canada for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion in the case of Income Taxes signed at Washington on March 4, 1942, as amended by the Convention signed at Ottawa on June 12, 1950, by the Convention signed at Ottawa on August 8, 1956 and by the Supplementary Convention signed at Washington on October 25, 1966; and

(k) The term "national" of a Contracting State means:

(i) Any individual possessing the citizenship or nationality of that State; and

(ii) Any legal person, partnership or association deriving its status as such from the laws in force in that State.

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

2. As regards the application of the Convention by a Contracting State any term not defined therein shall, unless the context otherwise requires and subject to the provisions of Article XXVI (Mutual Agreement Procedure), have the meaning which it has under the law of that State concerning the taxes to which the Convention applies.

## Article IV
## Residence

Compare OECD Article

Article Summary

1. For the purposes of this Convention, the term "resident" of a Contracting State means any person that, under the laws of that State, is liable to tax therein by reason of that person's domicile, residence, citizenship, place of management, place of incorporation or any other criterion of a similar nature, but in the case of an estate or trust, only to the extent that income derived by the estate or trust is liable to tax in that State, either in its hands or in the hands of its beneficiaries. For the purposes of this paragraph, an individual who is not a resident of Canada under this paragraph and who is a United States citizen or an alien admitted to the United States for permanent residence (a "green card" holder) is a resident of the United States only if the individual has a substantial presence, permanent home or habitual abode in the United States, and that individual's personal and economic relations are closer to the United States than to any third State. The term "resident" of a Contracting State is understood to include:

(a) The Government of that State or a political subdivision or local authority thereof or any agency or instrumentality of any such government, subdivision or authority, and

(b)

(i) A trust, organization or other arrangement that is operated exclusively to administer or provide pension, retirement or employee benefits; and

(ii) A not-for-profit organization

that was constituted in that State and that is, by reason of its nature as such, generally exempt from income taxation in that State.

2. Where by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, then his status shall be determined as follows:

(a) He shall be deemed to be a resident of the Contracting State in which he has a permanent home available to him; if he has a permanent home available to him in both States or in neither State, he shall be deemed to be a resident of the Contracting State with which his personal and economic relations are closer (centre of vital interests);

(b) If the Contracting State in which he has the centre of vital interests cannot be determined, he shall be deemed to be a resident of the Contracting State in which he has an habitual abode;

(c) If he has an habitual abode in both States or in neither State, he shall be deemed to be a resident of the Contracting State of which he is a citizen; and

(d) If he is a citizen of both States or of neither of them, the competent authorities of the Contracting States shall settle the question by mutual agreement.

3. Where by reason of the provisions of paragraph 1, a company is a resident of both Contracting States, then

(a) If it is created under the laws in force in a Contracting State, but not under the laws in force in the other Contracting State, it shall be deemed to be a resident only of the first-mentioned State; and

(b) In any other case, the competent authorities of the Contracting States shall endeavor to settle the question of residency by mutual agreement and determine the mode of application of this Convention to the company. In the absence of such agreement, the company shall not be considered a resident of either Contracting State for purposes of claiming any benefits under this Convention.

4. Where by reason of the provisions of paragraph 1 an estate, trust or other person (other than an individual or a company) is a resident of both Contracting States, the competent authorities of the States shall by mutual agreement endeavor to settle the question and to determine the mode of application of the Convention to such person.

5. Notwithstanding the provisions of the preceding paragraphs, an individual shall be deemed to be a resident of a Contracting State if:

(a) The individual is an employee of that State or of a political subdivision, local authority or instrumentality thereof rendering services in the discharge of functions of a governmental nature in the other Contracting State or in a third State; and

(b) The individual is subjected in the first-mentioned State to similar obligations in respect of taxes on income as are residents of the first-mentioned State.

The spouse and dependent children residing with such an individual and meeting the requirements of subparagraph (b) above shall also be deemed to be residents of the first-mentioned State.

6. An amount of income, profit or gain shall be considered to be derived by a person who is a resident of a Contracting State where:

(a) The person is considered under the taxation law of that State to have derived the amount through an entity (other than an entity that is a resident of the other Contracting State); and

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(b) By reason of the entity being treated as fiscally transparent under the laws of the first-mentioned State, the treatment of the amount under the taxation law of that State is the same as its treatment would be if that amount had been derived directly by that person.

7. An amount of income, profit or gain shall be considered not to be paid to or derived by a person who is a resident of a Contracting State where:

(a) The person is considered under the taxation law of the other Contracting State to have derived the amount through an entity that is not a resident of the first-mentioned State, but by reason of the entity not being treated as fiscally transparent under the laws of that State, the treatment of the amount under the taxation law of that State is not the same as its treatment would be if that amount had been derived directly by that person; or

(b) The person is considered under the taxation law of the other Contracting State to have received the amount from an entity that is a resident of that other State, but by reason of the entity being treated as fiscally transparent under the laws of the first-mentioned State, the treatment of the amount under the taxation law of that State is not the same as its treatment would be if that entity were not treated as fiscally transparent under the laws of that State.

# Article V
# Permanent Establishment

[Compare OECD Article]

[Article Summary]

  1. For the purposes of this Convention, the term "permanent establishment" means a fixed place of business through which the business of a resident of a Contracting State is wholly or partly carried on.

  2. The term "permanent establishment" shall include especially:

(a) A place of management;

(b) A branch;

(c) An office;

(d) A factory;

(e) A workshop; and

(f) A mine, an oil or gas well, a quarry or any other place of extraction of natural resources.


DOC 2017-84262

3. A building site or construction or installation project constitutes a permanent establishment if, but only if, it lasts more than 12 months.

4. The use of an installation or drilling rig or ship in a Contracting State to explore for or exploit natural resources constitutes a permanent establishment if, but only if, such use is for more than three months in any twelve-month period.

5. A person acting in a Contracting State on behalf of a resident of the other Contracting State -- other than an agent of an independent status to whom paragraph 7 applies -- shall be deemed to be a permanent establishment in the first-mentioned State if such person has, and habitually exercises in that State, an authority to conclude contracts in the name of the resident.

6. Notwithstanding the provisions of paragraphs 1, 2, 5 and 9, the term "permanent establishment" shall be deemed not to include a fixed place of business used solely for, or a person referred to in paragraph 5 engaged solely in, one or more of the following activities:

(a) The use of facilities for the purpose of storage, display or delivery of goods or merchandise belonging to the resident;

(b) The maintenance of a stock of goods or merchandise belonging to the resident for the purpose of storage, display or delivery;

(c) The maintenance of a stock of goods or merchandise belonging to the resident for the purpose of processing by another person;

(d) The purchase of goods or merchandise, or the collection of information, for the resident; and

(e) Advertising, the supply of information, scientific research or similar activities which have a preparatory or auxiliary character, for the resident.

7. A resident of a Contracting State shall not be deemed to have a permanent establishment in the other Contracting State merely because such resident carries on business in that other State through a broker, general commission agent or any other agent of an independent status, provided that such persons are acting in the ordinary course of their business.

8. The fact that a company which is a resident of a Contracting State controls or is controlled by a company which is a resident of the other Contracting State, or which carries on business in that other State (whether through a permanent establishment or otherwise), shall not constitute either company a permanent establishment of the other.

9. Subject to paragraph 3, where an enterprise of a Contracting State provides services in the other Contracting State, if that enterprise is found not to have a permanent establishment in that other State by virtue of the preceding paragraphs of this Article, that enterprise shall be deemed to provide those services through a permanent establishment in that other State if and only if:

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

DOC 2017-84262

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



(a) Those services are performed in that other State by an individual who is present in that other State for a period or periods aggregating 183 days or more in any twelve-month period, and, during that period or periods, more than 50 percent of the gross active business revenues of the enterprise consists of income derived from the services performed in that other State by that individual; or

(b) The services are provided in that other State for an aggregate of 183 days or more in any twelve-month period with respect to the same or connected project for customers who are either residents of that other State or who maintain a permanent establishment in that other State and the services are provided in respect of that permanent establishment. 10. For the purposes of this Convention, the provisions of this Article shall be applied in determining whether any person has a permanent establishment in any State.

## Article VI
## Income From Real Property

Compare OECD Article

Article Summary

1. Income derived by a resident of a Contracting State from real property (including income from agriculture, forestry or other natural resources) situated in the other Contracting State may be taxed in that other State.

2. For the purposes of this Convention, the term "real property" shall have the meaning which it has under the taxation laws of the Contracting State in which the property in question is situated and shall include any option or similar right in respect thereof. The term shall in any case include usufruct of real property, rights to explore for or to exploit mineral deposits, sources and other natural resources and rights to amounts computed by reference to the amount or value of production from such resources; ships and aircraft shall not be regarded as real property.

3. The provisions of paragraph 1 shall apply to income derived from the direct use, letting or use in any other form of real property and to income from the alienation of such property.

## Article VII
## Business Profits

Compare OECD Article

Article Summary

1. The business profits of a resident of a Contracting State shall be taxable only in that State unless the resident carries on business in the other Contracting State through a permanent establishment situated therein. If the resident carries on, or has carried on, business as aforesaid,

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

the business profits of the resident may be taxed in the other State but only so much of them as is attributable to that permanent establishment.

2. Subject to the provisions of paragraph 3, where a resident of a Contracting State carries on, or has carried on, business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the business profits which it might be expected to make if it were a distinct and separate person engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the resident and with any other person related to the resident (within the meaning of paragraph 2 of Article IX (Related Persons)).

3. In determining the business profits of a permanent establishment, there shall be allowed as deductions expenses which are incurred for the purposes of the permanent establishment, including executive and general administrative expenses so incurred, whether in the State in which the permanent establishment is situated or elsewhere. Nothing in this paragraph shall require a Contracting State to allow the deduction of any expenditure which, by reason of its nature, is not generally allowed as a deduction under the taxation laws of that State.

4. No business profits shall be attributed to a permanent establishment of a resident of a Contracting State by reason of the use thereof for either the mere purchase of goods or merchandise or the mere provision of executive, managerial or administrative facilities or services for such resident.

5. For the purposes of the preceding paragraphs, the business profits to be attributed to a permanent establishment shall be determined by the same method year by year unless there is good and sufficient reason to the contrary.

6. Where business profits include items of income which are dealt with separately in other Articles of this Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.

7. For the purposes of the Convention, the business profits attributable to a permanent establishment shall include only those profits derived from the assets or activities of the permanent establishment.

## Article VIII
## Transportation

Compare OECD Article

Article Summary

1. Notwithstanding the provisions of Articles VII (Business Profits), XII (Royalties) and XIII (Gains), profits derived by a resident of a Contracting State from the operation of ships or aircraft in

taxnotes
DOC 2017-84262

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

international traffic, and gains derived by a resident of a Contracting State from the alienation of ships, aircraft or containers (including trailers and related equipment for the transport of containers) used principally in international traffic, shall be exempt from tax in the other Contracting State.

2. For the purposes of this Convention, profits derived by a resident of a Contracting State from the operation of ships or aircraft in international traffic include profits from:

(a) The rental of ships or aircraft operated in international traffic;

(b) The use, maintenance or rental of containers (including trailers and related equipment for the transport of containers) used in international traffic; and

(c) The rental of ships, aircraft or containers (including trailers and related equipment for the transport of containers) provided that such profits are incidental to profits referred to in paragraph 1, 2(a) or 2(b).

3. Notwithstanding the provisions of Article VII (Business Profits), profits derived by a resident of a Contracting State from a voyage of a ship where the principal purpose of the voyage is to transport passengers or property between places in the other Contracting State may be taxed in that other State.

4. Notwithstanding the provisions of Articles VII (Business Profits) and XII (Royalties), profits of a resident of a Contracting State engaged in the operation of motor vehicles or a railway as a common carrier or a contract carrier derived from:

(a) The transportation of passengers or property between a point outside the other Contracting State and any other point; or

(b) The rental of motor vehicles (including trailers) or railway rolling stock, or the use, maintenance or rental of containers (including trailers and related equipment for the transport of containers) used to transport passengers or property between a point outside the other Contracting State and any other point.

shall be exempt from tax in that other Contracting State.

5. The provisions of paragraphs 1, 3 and 4 shall also apply to profits or gains referred to in those paragraphs derived by a resident of a Contracting State from the participation in a pool, a joint business or an international operating agency.

6. Notwithstanding the provisions of Article XII (Royalties), profits derived by a resident of a Contracting State from the use, maintenance or rental of railway rolling stock, motor vehicles, trailers or containers (including trailers and related equipment for the transport of containers) used in the other Contracting State for a period or periods not expected to exceed in the aggregate 183 days in any twelve-month period shall be exempt from tax in the other Contracting State except to the extent



that such profits are attributable to a permanent establishment in the other State and liable to tax in the other State by reason of Article VII (Business Profits).

## Article IX
## Related Persons

Compare OECD Article

Article Summary

1. Where a person in a Contracting State and a person in the other Contracting State are related and where the arrangements between them differ from those which would be made between unrelated persons, each State may adjust the amount of the income, loss or tax payable to reflect the income, deductions, credits or allowances which would, but for those arrangements, have been taken into account in computing such income, loss or tax.

2. For the purposes of this Article, a person shall be deemed to be related to another person if either person participates directly or indirectly in the management or control of the other, or if any third person or persons participate directly or indirectly in the management or control of both.

3. Where an adjustment is made or to be made by a Contracting State in accordance with paragraph 1, the other Contracting State shall (notwithstanding any time or procedural limitations in the domestic law of that other State) make a corresponding adjustment to the income, loss or tax of the related person in that other State if:

(a) It agrees with the first-mentioned adjustment; and

(b) Within six years from the end of the taxable year to which the first-mentioned adjustment relates, the competent authority of the other State has been notified of the first-mentioned adjustment. The competent authorities, however, may agree to consider cases where the corresponding adjustment would not otherwise be barred by any time or procedural limitations in the other State, even if the notification is not made within the six-year period.

4. In the event that the notification referred to in paragraph 3 is not given within the time period referred to therein, and the competent authorities have not agreed to otherwise consider the case in accordance with paragraph 3(b), the competent authority of the Contracting State which has made or is to make the first-mentioned adjustment may provide relief from double taxation where appropriate.

5. The provisions of paragraphs 3 and 4 shall not apply in the case of fraud, willful default or neglect or gross negligence.

## Article X
## Dividends

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



DOC 2017-84262

Compare OECD Article

Article Summary

1. Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of such dividends, the tax so charged shall not exceed:

(a) 5 percent of the gross amount of the dividends if the beneficial owner is a company which owns at least 10 percent of the voting stock of the company paying the dividends (for this purpose, a company that is a resident of a Contracting State shall be considered to own the voting stock owned by an entity that is considered fiscally transparent under the laws of that State and that is not a resident of the Contracting State of which the company paying the dividends is a resident, in proportion to the company's ownership interest in that entity);

(b) 15 per cent of the gross amount of the dividends in all other cases.

This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3. For the purposes of this Article, the term "dividends" means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subjected to the same taxation treatment as income from shares under the laws of the State of which the payer is a resident.

4. The provisions of paragraph 2 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on, or has carried on, business in the other Contracting State of which the company paying the dividends is a resident, through a permanent establishment situated therein, and the holding in respect of which the dividends are paid is effectively connected to such permanent establishment. In such case, the provisions of Article VII (Business Profits) shall apply.

5. Where a company is a resident of a Contracting State, the other Contracting State may not impose any tax on the dividends paid by the company, except insofar as such dividends are paid to a resident of that other State or insofar as the holding in respect of which the dividends are paid is effectively connected with a permanent establishment situated in that other State, nor subject the company's undistributed profits to a tax, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in such other State.

6. Nothing in this Convention shall be construed as preventing a Contracting State from imposing a tax on the earnings of a company attributable to permanent establishments in that State, in

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



addition to the tax which would be chargeable on the earnings of a company which is a resident of that State, provided that any additional tax so imposed shall not exceed 5 per cent of the amount of such earnings which have not been subjected to such additional tax in previous taxation years. For the purposes of this paragraph, the term "earnings" means the amount by which the business profits attributable to permanent establishments in a Contracting State (including gains from the alienation of property forming part of the business property of such permanent establishments) in a year and previous years exceeds the sum of:

(a) Business losses attributable to such permanent establishments (including losses from the alienation of property forming part of the business property of such permanent establishments) in such year and previous years;

(b) All taxes, other than the additional tax referred to in this paragraph, imposed on such profits in that State;

(c) The profits reinvested in that State, provided that where that State is Canada, such amount shall be determined in accordance with the existing provisions of the law of Canada regarding the computation of the allowance in respect of investment in property in Canada, and any subsequent modification of those provisions, which shall not affect the general principle hereof; and

(d) Five hundred thousand Canadian dollars ($500,000) or its equivalent in United States currency, less any amounts deducted by the company, or by an associated company with respect to the same or a similar business, under this subparagraph (d); for the purposes of this subparagraph (d) a company is associated with another company if one company directly or indirectly controls the other, or both companies are directly or indirectly controlled by the same person or persons, or if the two companies deal with each other not at arm's length.

    7. Notwithstanding the provisions of paragraph 2,

(a) Dividends paid by a company that is a resident of Canada and a non-resident-owned investment corporation to a company that is a resident of the United States, that owns at least 10 per cent of the voting stock of the company paying the dividends and that is the beneficial owner of such dividends, may be taxed in Canada at a rate not exceeding 10 per cent of the gross amount of the dividends;

(b) Paragraph 2(b) and not paragraph 2(a) shall apply in the case of dividends paid by a resident of the United States that is a Regulated Investment Company; and

(c) Subparagraph 2(a) shall not apply to dividends paid by a resident of the United States that is a Real Estate Investment Trust (REIT), and subparagraph 2(b) shall apply only if:

(i) The beneficial owner of the dividends is an individual holding an interest of not more than 10 percent in the REIT;

(ii) The dividends are paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent in any class of the

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



DOC 2017-84262

REIT's stock; or

(iii) The beneficial owner of the dividends is a person holding an interest of not more than 10 percent in the REIT and the REIT is diversified.

Otherwise, the rate of tax applicable under the domestic law of the United States shall apply. Where an estate or testamentary trust acquired its interest in a REIT as a consequence of an individual's death, for purposes of this subparagraph the estate or trust shall for the five-year period following the death be deemed with respect to that interest to be an individual.

   8. Notwithstanding the provisions of paragraph 5, a company which is a resident of Canada and which has income subject to tax in the United States (without regard to the provisions of the Convention) may be liable to the United States accumulated earnings tax and personal holding company tax but only if 50 per cent or more in value of the outstanding voting shares of the company is owned, directly or indirectly, throughout the last half of its taxable year by citizens and residents of the United States (other than citizens of Canada who do not have immigrant status in the United States or who have not been residents in the United States for more than three taxable years) or by residents of a third State.

## Article XI
## Interest

Compare OECD Article

Article Summary

   1. Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State may be taxed only in that other State.

   2. The term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums or prizes attaching to such securities, bonds or debentures, as well as income assimilated to income from money lent by the taxation laws of the Contracting State in which the income arises. However, the term "interest" does not include income dealt with in Article X (Dividends).

   3. The provisions of paragraph 1 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on, or has carried on, business in the other Contracting State in which the interest arises, through a permanent establishment situated therein, and the debt-claim in respect of which the interest is paid is effectively connected with such permanent establishment. In such case the provisions of Article VII (Business Profits) shall apply.

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



4. For the purposes of this Article, interest shall be deemed to arise in a Contracting State when the payer is that State itself, or a political subdivision, local authority or a resident of that State. Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a State other than that of which he is a resident a permanent establishment in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment, then such interest shall be deemed to arise in the State in which the permanent establishment is situated and not in the State of which the payer is a resident.

5. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

6. Notwithstanding the provisions of paragraph 1:

(a) Interest arising in the United States that is contingent interest of a type that does not qualify as portfolio interest under United States law may be taxed by the United States but, if the beneficial owner of the interest is a resident of Canada, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article X (Dividends);

(b) Interest arising in Canada that is determined with reference to receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor or a related person or to any dividend, partnership distribution or similar payment made by the debtor to a related person may be taxed by Canada, and according to the laws of Canada, but if the beneficial owner is a resident of the United States, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article X (Dividends); and

(c) Interest that is an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit may be taxed by each State in accordance with its domestic law.

7. Where a resident of a Contracting State pays interest to a person other than a resident of the other Contracting State, that other State may not impose any tax on such interest except insofar as it arises in that other State or insofar as the debt-claim in respect of which the interest is paid is effectively connected with a permanent establishment situated in that other State.

## Article XII
## Royalties

[Compare OECD Article](#)



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

<u>Article Summary</u>

1. Royalties arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in that other State.

2. However, such royalties may also be taxed in the Contracting State in which they arise, and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of such royalties, the tax so charged shall not exceed 10 per cent of the gross amount of the royalties.

3. Notwithstanding the provisions of paragraph 2,

(a) Copyright royalties and other like payments in respect of the production or reproduction of any literary, dramatic, musical or artistic work (other than payments in respect of motion pictures and works on film, videotape or other means of reproduction for use in connection with television);

(b) Payments for the use of, or the right to use, computer software;

(c) Payments for the use of, or the right to use, any patent or any information concerning industrial, commercial or scientific experience (but not including any such information provided in connection with a rental or franchise agreement); and

(d) Payments with respect to broadcasting as may be agreed for the purposes of this paragraph in an exchange of notes between the Contracting States;

arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

4. The term "royalties" as used in this Article means payments of any kind received as a consideration for the use of, or the right to use, any copyright of literary, artistic or scientific work (including motion pictures and works on film, videotape or other means of reproduction for use in connection with television), any patent, trademark, design or model, plan, secret formula or process, or for the use of, or the right to use, tangible personal property or for information concerning industrial, commercial or scientific experience, and, notwithstanding the provisions of Article XIII (Gains), includes gains from the alienation of any intangible property or rights described in this paragraph to the extent that such gains are contingent on the productivity, use or subsequent disposition of such property or rights.

5. The provisions of paragraphs 2 and 3 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on, or has carried on, business in the other Contracting State in which the royalties arise, through a permanent establishment situated therein, and the right or property in respect of which the royalties are paid is effectively connected to such permanent establishment. In such case the provisions of Article VII (Business Profits) shall apply.

6. For the purposes of this Article,

(a) Royalties shall be deemed to arise in a Contracting State when the payer is a resident of that State. Where, however, the person paying the royalties, whether he is a resident of a Contracting State or not, has in a State a permanent establishment in connection with which the obligation to pay the royalties was incurred, and such royalties are borne by such permanent establishment, then such royalties shall be deemed to arise in the State in which the permanent establishment is situated and not in any other State of which the payer is a resident; and

(b) Where subparagraph (a) does not operate to treat royalties as arising in either Contracting State and the royalties are for the use of, or the right to use, intangible property or tangible personal property in a Contracting State, then such royalties shall be deemed to arise in that State.

   7. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to the use, right or information for which they are paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

   8. Where a resident of a Contracting State pays royalties to a person other than a resident of the other Contracting State, that other State may not impose any tax on such royalties except insofar as they arise in that other State or insofar as the right or property in respect of which the royalties are paid is effectively connected with a permanent establishment situated in that other State.

## Article XIII
## Gains

Compare OECD Article

Article Summary

   1. Gains derived by a resident of a Contracting State from the alienation of real property situated in the other Contracting State may be taxed in that other State.

   2. Gains from the alienation of personal property forming part of the business property of a permanent establishment which a resident of a Contracting State has or had (within the twelve-month period preceding the date of alienation) in the other Contracting State, including such gains from the alienation of such a permanent establishment, may be taxed in that other State.

   3. For the purposes of this Article the term "real property situated in the other Contracting State"

(a) In the case of real property situated in the United States, means a United States real property interest and real property referred to in Article VI (Income from Real Property) situated in the United

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

States, but does not include a share of the capital stock of a company that is not a resident of the United States; and

(b) In the case of real property situated in Canada means:

(i) Real property referred to in Article VI (Income from Real Property) situated in Canada;

(ii) A share of the capital stock of a company that is a resident of Canada, the value of whose shares is derived principally from real property situated in Canada; and

(iii) An interest in a partnership, trust or estate, the value of which is derived principally from real property situated in Canada.

    4. Gains from the alienation of any property other than that referred to in paragraphs 1, 2 and 3 shall be taxable only in the Contracting State of which the alienator is a resident.

    5. The provisions of paragraph 4 shall not affect the right of a Contracting State to levy, according to its domestic law, a tax on gains from the alienation of any property derived by an individual who is a resident of the other Contracting State if:

(a) The individual was a resident of the first-mentioned State:

(i) For at least 120 months during any period of 20 consecutive years preceding the alienation of the property; and

(ii) At any time during the 10 years immediately preceding the alienation of the property; and

(b) The property (or property for which such property was substituted in an alienation the gain on which was not recognized for the purposes of taxation in the first-mentioned State):

(i) Was owned by the individual at the time the individual ceased to be a resident of the first-mentioned State; and

(ii) Was not a property that the individual was treated as having alienated by reason of ceasing to be a resident of the first-mentioned State and becoming a resident of the other Contracting State.

    6. Where an individual (other than a citizen of the United States) who was a resident of Canada became a resident of the United States, in determining his liability to United States taxation in respect of any gain from the alienation of a principal residence in Canada owned by him at the time he ceased to be a resident of Canada, the adjusted basis of such property shall be no less than its fair market value at that time.

    7. Where at any time an individual is treated for the purposes of taxation by a Contracting State as having alienated a property and is taxed in that State by reason thereof, the individual may elect to be treated for the purposes of taxation in the other Contracting State, in the year that includes that



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

time and all subsequent years, as if the individual had, immediately before that time, sold and repurchased the property for an amount equal to its fair market value at that time.

8. Where a resident of a Contracting State alienates property in the course of a corporate or other organization, reorganization, amalgamation, division or similar transaction and profit, gain or income with respect to such alienation is not recognized for the purpose of taxation in that State, if requested to do so by the person who acquires the property, the competent authority of the other Contracting State may agree, in order to avoid double taxation and subject to terms and conditions satisfactory to such competent authority, to defer the recognition of the profit, gain or income with respect to such property for the purpose of taxation in that other State until such time and in such manner as may be stipulated in the agreement.

9. Where a person who is a resident of a Contracting State alienates a capital asset which may in accordance with this Article be taxed in the other Contracting State and

(a) That person owned the asset on September 26, 1980 and was resident in the first-mentioned State on that date; or

(b) The asset was acquired by that person in an alienation of property which qualified as a non-recognition transaction for the purposes of taxation in that other State;

the amount of the gain which is liable to tax in that other State in accordance with this Article shall be reduced by the proportion of the gain attributable on a monthly basis to the period ending on December 31 of the year in which the Convention enters into force, or such greater portion of the gain as is shown to the satisfaction of the competent authority of the other State to be reasonably attributable to that period. For the purposes of this paragraph the term "non-recognition transaction" includes a transaction to which paragraph 8 applies and, in the case of taxation in the United States, a transaction that would have been a non-recognition transaction but for Sections 897(d) and 897(e) of the Internal Revenue Code. The provisions of this paragraph shall not apply to

(c) An asset that on September 26, 1980 formed part of the business property of a permanent establishment of a resident of a Contracting State situated in the other Contracting State;

(d) An alienation by a resident of a Contracting State of an asset that was owned at any time after September 26, 1980 and before such alienation by a person who was not at all times after that date while the asset was owned by such person a resident of that States; or

(e) An alienation of an asset that was acquired by a person at any time after September 26, 1980 and before such alienation in a transaction other than a non-recognition transaction.

## Article XIV
## Independent Personal Services

Compare OECD Article


DOC 2017-84262

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

[Article Summary]

[Deleted.]

# Article XV
# Income From Employment

[Compare OECD Article]

[Article Summary]

1. Subject to the provisions of Articles XVIII (Pensions and Annuities) and XIX (Government Service), salaries, wages and other remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2. Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

(a) Such remuneration does not exceed ten thousand dollars ($10,000) in the currency of that other State; or

(b) The recipient is present in that other State for a period or periods not exceeding in the aggregate 183 days in any twelve-month period commencing or ending in the fiscal year concerned, and the remuneration is not paid by, or on behalf of, a person who is a resident of that other State and is not borne by a permanent establishment in that other State.

3. Notwithstanding the provisions of paragraphs 1 and 2, remuneration derived by a resident of a Contracting State in respect of an employment regularly exercised in more than one State on a ship, aircraft, motor vehicle or train operated by a resident of that Contracting State shall be taxable only in that State.

# Article XVI
# Artistes and Athletes

[Compare OECD Article]

[Article Summary]



1. Notwithstanding the provisions of Articles VII (Business Profits) and XV (Income From Employment), income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio or television artiste, or a musician, or as an athlete, from his personal activities as such exercised in the other Contracting State, may be taxed in that other State, except where the amount of the gross receipts derived by such entertainer or athlete, including expenses reimbursed to him or borne on his behalf, from such activities do not exceed fifteen thousand dollars ($15,000) in the currency of that other State for the calendar year concerned.

2. Where income in respect of personal activities exercised by an entertainer or an athlete in his capacity as such accrues not to the entertainer or athlete but to another person, that income may, notwithstanding the provisions of Articles VII (Business Profits), and XV (Income From Employment), be taxed in the Contracting State in which the activities of the entertainer or athlete are exercised. For the purposes of the preceding sentence, income of an entertainer or athlete shall be deemed not to accrue to another person if it is established that neither the entertainer or athlete, nor person related thereto, participate directly or indirectly in the profits of such other person in any manner, including the receipt of deferred remuneration, bonuses, fees, dividends, partnership distributions or other distributions.

3. The provisions of paragraphs 1 and 2 shall not apply to the income of:

(a) An athlete in respect of his activities as an employee of a team which participates in a league with regularly scheduled games in both Contracting State; or

(b) A team described in subparagraph (a).

4. Notwithstanding the provisions of Articles VII (Business Profits) and XV (Income From Employment) an amount paid by a resident of a Contracting State to a resident of the other Contracting State as an inducement to sign an agreement relating to the performance of the services of an athlete (other than an amount referred to in paragraph 1 of Article XV (Income From Employment)) may be taxed in the first-mentioned State, but the tax so charged shall not exceed 15 per cent of the gross amount of such payment.

## Article XVII
## Withholding of Taxes in Respect of Personal Services

Article Summary

[Deleted.]

## Article XVIII
## Pensions and Annuities

Compare OECD Article

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

Appx556



DOC 2017-84262

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

[Article Summary]

1. Pensions and annuities arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in that other State, but the amount of any such pension that would be excluded from taxable income in the first-mentioned State if the recipient were a resident thereof shall be exempt from taxation in that other State.

2. However:

(a) Pensions may also be taxed in the Contracting State in which they arise and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of a periodic pension payment, the tax so charged shall not exceed 15 per cent of the gross amount of such payment; and

(b) Annuities may also be taxed in the Contracting State in which they arise and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of an annuity payment, the tax so charged shall not exceed 15 per cent of the portion of such payment that would not be excluded from taxable income in the first-mentioned State if the beneficial owner were a resident thereof.

3. For the purposes of this Convention:

(a) The term "pensions" includes any payment under a superannuation, pension or other retirement arrangement, Armed Forces retirement pay, war veterans pensions and allowances and amounts paid under a sickness, accident or disability plan, but does not include payments under an income-averaging annuity contract or, except for the purposes of Article XIX (Government Service), any benefit referred to in paragraph 5; and

(b) The term "pensions" also includes a Roth IRA, within the meaning of section 408A of the Internal Revenue Code, or a plan or arrangement created pursuant to legislation enacted by a Contracting State after September 21, 2007 that the competent authorities have agreed is similar thereto. Notwithstanding the provisions of the preceding sentence, from such time that contributions have been made to the Roth IRA or similar plan or arrangement, by or for the benefit of a resident of the other Contracting State (other than rollover contributions from a Roth IRA or similar plan or arrangement described in the previous sentence that is a pension within the meaning of this subparagraph), to the extent of accretions from such time, such Roth IRA or similar plan or arrangement shall cease to be considered a pension for purposes of the provisions of this Article.

4. For the purposes of this Convention:

(a) The term "annuity" means a stated sum paid periodically at stated times during life or during a specified number of years, under an obligation to make the payments in return for adequate and full consideration (other than services rendered), but does not include a payment that is not a periodic payment or any annuity the cost of which was deductible for the purposes of taxation in the Contracting State in which it was acquired; and

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(b) An annuity or other amount paid in respect of a life insurance or annuity contract (including a withdrawal in respect of the cash value thereof) shall be deemed to arise in a Contracting State if the person paying the annuity or other amount (in this subparagraph referred to as the "payer") is a resident of that State. However, if the payer, whether a resident of a Contracting State or not, has in a State other than that of which the payer is a resident a permanent establishment in connection with which the obligation giving rise to the annuity or other amount was incurred, and the annuity or other amount is borne by the permanent establishment, then the annuity or other amount shall be deemed to arise in the State in which the permanent establishment is situated and not in the State of which the payer is a resident.

5. Benefits under the social security legislation in a Contracting State (including tier 1 railroad retirement benefits but not including unemployment benefits) paid to a resident of the other Contracting State shall be taxable only in that other State, subject to the following conditions:

(a) a benefit under the social security legislation in the United States paid to a resident of Canada shall be taxable in Canada as though it were a benefit under the Canada Pension Plan, except that 15 per cent of the amount of the benefit shall be exempt from Canadian tax; and

(b) a benefit under the social security legislation in Canada paid to a resident of the United States shall be taxable in the United States as though it were a benefit under the Social Security Act, except that a type of benefit that is not subject to Canadian tax when paid to residents of Canada shall be exempt from United States tax.

6. Alimony and other similar amounts (including child support payments) arising in a Contracting State and paid to a resident of the other Contracting State shall be taxable as follows:

(a) Such amounts shall be taxable only in that other State;

(b) Notwithstanding the provisions of subparagraph (a), the amount that would be excluded from taxable income in the first-mentioned State if the recipient were a resident thereof shall be exempt from taxation in that other State.

7. A natural person who is a citizen or resident of a Contracting State and a beneficiary of a trust, company, organization or other arrangement that is a resident of the other Contracting State, generally exempt from income taxation in that other State and operated exclusively to provide pension or employee benefits may elect to defer taxation in the first-mentioned State, subject to rules established by the competent authority of that State, with respect to any income accrued in the plan but not distributed by the plan, until such time as and to the extent that a distribution is made from the plan or any plan substituted therefor.

8. Contributions made to, or benefits accrued under, a qualifying retirement plan in a Contracting State by or on behalf of an individual shall be deductible or excludible in computing the individual's taxable income in the other Contracting State, and contributions made to the plan by the individual's employer shall be allowed as a deduction in computing the employer's profits in that other State, where:

(a) The individual performs services as an employee in that other State the remuneration from which is taxable in that other State;

(b) The individual was participating in the plan (or another similar plan for which this plan was substituted) immediately before the individual began performing the services in that other State;

(c) The individual was not a resident of that other State immediately before the individual began performing the services in that other State;

(d) The individual has performed services in that other State for the same employer (or a related employer) for no more than 60 of the 120 months preceding the individual's current taxation year;

(e) The contributions and benefits are attributable to the services performed by the individual in that other State, and are made or accrued during the period in which the individual performs those services; and

(f) With respect to contributions and benefits that are attributable to services performed during a period in the individual's current taxation year, no contributions in respect of the period are made by or on behalf of the individual to, and no services performed in that other State during the period are otherwise taken into account for purposes of determining the individual's entitlement to benefits under, any plan that would be a qualifying retirement plan in that other State if paragraph 15 of this Article were read without reference to subparagraphs (b) and (c) of that paragraph.

This paragraph shall apply only to the extent that the contributions or benefits would qualify for tax relief in the first-mentioned State if the individual was a resident of and performed the services in that State.

9. For the purposes of United States taxation, the benefits granted under paragraph 8 to a citizen of the United States shall not exceed the benefits that would be allowed by the United States to its residents for contributions to, or benefits otherwise accrued under, a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States.

10. Contributions made to, or benefits accrued under, a qualifying retirement plan in a Contracting State by or on behalf of an individual who is a resident of the other Contracting State shall be deductible or excludible in computing the individual's taxable income in that other State, where:

(a) The individual performs services as an employee in the firstmentioned state the remuneration from which is taxable in that State and is borne by an employer who is a resident of that State or by a permanent establishment which the employer has in that State; and

(b) The contributions and benefits are attributable to those services and are made or accrued during the period in which the individual performs those services.

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

DOC 2017-84262

This paragraph shall apply only to the extent that the contributions or benefits qualify for tax relief in the first-mentioned State.

11. For the purposes of Canadian taxation, the amount of contributions otherwise allowed as a deduction under paragraph 10 to an individual for a taxation year shall not exceed the individual's deduction limit under the law of Canada for the year for contributions to registered retirement savings plans remaining after taking into account the amount of contributions to registered retirement savings plans deducted by the individual under the law of Canada for the year. The amount deducted by an individual under paragraph 10 for a taxation year shall be taken into account in computing the individual's deduction limit under the law of Canada for subsequent taxation years for contributions to registered retirement savings plans.

12. For the purposes of United States taxation, the benefits granted under paragraph 10 shall not exceed the benefits that would be allowed by the United States to its residents for contributions to, or benefits otherwise accrued under, a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States. For purposes of determining an individual's eligibility to participate in and receive tax benefits with respect to a pension or retirement plan or other retirement arrangement established in and recognized for tax purposes by the United States, contributions made to, or benefits accrued under, a qualifying retirement plan in Canada by or on behalf of the individual shall be treated as contributions or benefits under a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States.

13. Contributions made to, or benefits accrued under, a qualifying retirement plan in Canada by or on behalf of a citizen of the United States who is a resident of Canada shall be deductible or excludible in computing the citizen's taxable income in the United States, where:

(a) The citizen performs services as an employee in Canada the remuneration from which is taxable in Canada and is borne by an employer who is a resident of Canada or by a permanent establishment which the employer has in Canada; and

(b) The contributions and benefits are attributable to those services and are made or accrued during the period in which the citizen performs those services.

This paragraph shall apply only to the extent that the contributions or benefits qualify for tax relief in Canada.

14. The benefits granted under paragraph 13 shall not exceed the benefits that would be allowed by the United States to its residents for contributions to, or benefits otherwise accrued under, a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States. For purposes of determining an individual's eligibility to participate in and receive tax benefits with respect to a pension or retirement plan or other retirement arrangement established in and recognized for tax purposes by the United States, contributions made to, or benefits accrued under, a qualifying retirement plan in Canada by or on behalf of the individual shall

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.





(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

be treated as contributions or benefits under a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States.

15. For purposes of paragraphs 8 to 14, a qualifying retirement plan in a Contracting State means a trust, company, organization or other arrangement:

(a) That is a resident of that State, generally exempt from income taxation in that State and operated primarily to provide pension or retirement benefits;

(b) That is not an individual arrangement in respect of which the individual's employer has no involvement; and

(c) Which the competent authority of the other Contracting State agrees generally corresponds to a pension or retirement plan established in and recognized for tax purposes by that other State.

16. For purposes of this Article, a distribution from a pension or retirement plan that is reasonably attributable to a contribution or benefit for which a benefit was allowed pursuant to paragraph 8, 10 or 13 shall be deemed to arise in the Contracting State in which the plan is established.

17. Paragraphs 8 to 16 apply, with such modifications as the circumstances require, as though the relationship between a partnership that carries on a business, and an individual who is a member of the partnership, were that of employer and employee.

# Article XIX
# Government Service

Compare OECD Article

Article Summary

Remuneration, other than a pension, paid by a Contracting State or a political subdivision or local authority thereof to a citizen of that State in respect of services rendered in the discharge of functions of a governmental nature shall be taxable only in the State. However, the provisions of Article VII (Business Profits), XV (Income From Employment) or XVI (Artistes and Athletes), as the case may be, shall apply, and the preceding sentence shall not apply, to remuneration paid in respect of services rendered in connection with a trade or business carried on by a Contracting State or a political subdivision or local authority thereof.

# Article XX
# Students

Compare OECD Article



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

[Article Summary](#)

Payments received by an individual who is a student, apprentice, or business trainee, and is, or was immediately before visiting a Contracting State, a resident of the other Contracting State, and who is present in the first-mentioned State for the purpose of the individual's full-time education or full-time training, shall not be taxed in that State, provided that such payments arise outside that State, and are for the purpose of the maintenance, education or training of the individual. The provisions of this Article shall apply to an apprentice or business trainee only for a period of time not exceeding one year from the date the individual first arrives in the first-mentioned State for the purpose of the individual's training.

## Article XXI
## Exempt Organizations

[Article Summary](#)

1. Subject to the provisions of paragraph 4, income derived by a religious, scientific, literary, educational or charitable organization shall be exempt from tax in a Contracting State if it is resident in the other Contracting State, but only to the extent that such income is exempt from tax in that other State.

2. Subject to the provisions of paragraph 4, income referred to in Articles X (Dividends) and XI (Interest) derived by a trust, company, organization or other arrangement that is a resident of a Contracting State, generally exempt from income taxation in a taxable year in that State and operated exclusively to administer or provide pension, retirement or employee benefits shall be exempt from income taxation in that taxable year in the other Contracting State.

3. Subject to the provisions of paragraph 4, income referred to in Articles X (Dividends) and XI (Interest) derived by a trust, company, organization or other arrangement that is a resident of a Contracting State, generally exempt from income taxation in a taxable year in that State and operated exclusively to earn income for the benefit of one or more of the following:

(a) An organization referred to in paragraph 1; or

(b) A trust, company, organization or other arrangement referred to in paragraph 2;

shall be exempt from income taxation in that taxable year in the other Contracting State.

4. The provisions of paragraphs 1, 2 and 3 shall not apply with respect to the income of a trust, company, organization or other arrangement from carrying on a trade or business or from a related person other than a person referred to in paragraphs 1, 2 or 3.

5. A religious, scientific, literary, educational or charitable organization which is resident in Canada and which has received substantially all of its support from persons other than citizens or

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

residents of the United States shall be exempt in the United States from the United States excise taxes imposed with respect to private foundations.

6. For the purposes of United States taxation, contributions by a citizen or resident of the United States to an organization which is resident in Canada, which is generally exempt from Canadian tax and which could qualify in the United States to receive deductible contributions if it were resident in the United States shall be treated as charitable contributions; however, such contributions (other than such contributions to a college or university at which the citizen or resident or a member of his family is or was enrolled) shall not be deductible in any taxable year to the extent that they exceed an amount determined by applying the percentage limitations of the laws of the United States in respect of the deductibility of charitable contributions to the income of such citizen or resident arising in Canada. The preceding sentence shall not be interpreted to allow in any taxable year deductions for charitable contributions in excess of the amount allowed under the percentage limitations of the laws of the United States in respect of the deductibility of charitable contributions. For the purposes of this paragraph, a company that is a resident of Canada and that is taxable in the United States as if it were a resident of the United States shall be deemed to be a resident of the United States.

7. For the purposes of Canadian taxation, gifts by a resident of Canada to an organization that is a resident of the United States, that is generally exempt from United States tax and that could qualify in Canada as a registered charity if it were a resident of Canada and created or established in Canada, shall be treated as gifts to a registered charity; however, no relief from taxation shall be available in any taxation year with respect to such gifts (other than such gifts to a college or university at which the resident or a member of the resident's family is or was enrolled) to the extent that such relief would exceed the amount of relief that would be available under the Income Tax Act if the only income of the resident for that year were the resident's income arising in the United States. The preceding sentence shall not be interpreted to allow in any taxation year relief from taxation for gifts to registered charities in excess of the amount of relief allowed under the percentage limitations of the laws of Canada in respect of relief for gifts to registered charities.

# Article XXII
## Other Income

Compare OECD Article

Article Summary

1. Items of income of a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State, except that if such income arises in the other Contracting State it may also be taxed in that other State.

2. To the extent that income distributed by an estate or trust is subject to the provisions of paragraph 1, then, notwithstanding such provisions, income distributed by an estate or trust which is a resident of a Contracting State to a resident of the other Contracting State who is a beneficiary of



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

the estate or trust may be taxed in the first-mentioned State and according to the laws of that State, but the tax so charged shall not exceed 15 per cent of the gross amount of the income; provided, however, that such income shall be exempt from tax in the first-mentioned State to the extent of any amount distributed out of income arising outside that State.

3. Losses incurred by a resident of a Contracting State with respect to wagering transactions the gains on which may be taxed in the other Contracting State shall, for the purpose of taxation in that other State, be deductible to the same extent that such losses would be deductible if they were incurred by a resident of that other State.

4. Notwithstanding the provisions of paragraph 1, compensation derived by a resident of a Contracting State in respect of the provision of a guarantee of indebtedness shall be taxable only in that State, unless such compensation is business profits attributable to a permanent establishment situated in the other Contracting State, in which case the provisions of Article VII (Business Profits) shall apply.

## Article XXIII
## Capital

[Compare OECD Article](#)

[Article Summary](#)

1. Capital represented by real property, owned by a resident of a Contracting State and situated in the other Contracting State, may be taxed in that other State.

2. Capital represented by personal property forming part of the business property of a permanent establishment which a resident of a Contracting State has in the other Contracting State may be taxed in that other State.

3. Capital represented by ships and aircraft operated by a resident of a Contracting State in international traffic, and by personal property pertaining to the operation of such ships and aircraft, shall be taxable only in that State.

4. All other elements of capital of a resident of a Contracting State shall be taxable only in that State.

## Article XXIV
## Elimination of Double Taxation

[Compare OECD Article](#)

[Article Summary](#)

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

1. In the case of the United States, subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows: In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States, or to a company electing to be treated as a domestic corporation, as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada; and, in the case of a company which is a resident of the United States owning at least 10 per cent of the voting stock of a company which is a resident of Canada from which it receives dividends in any taxable year, the United States shall allow as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada by that company with respect to the profits out of which such dividends are paid.

2. In the case of Canada, subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows:

(a) Subject to the provisions of the law of Canada regarding the deduction from tax payable in Canada of tax paid in a territory outside Canada and to any subsequent modification of those provisions (which shall not affect the general principle hereof)

(i) Income tax paid or accrued to the United States on profits, income or gains arising in the United States, and

(ii) In the case of an individual, any social security taxes paid to the United States (other than taxes relating to unemployment insurance benefits) by the individual on such profits, income or gains

shall be deducted from any Canadian tax payable in respect of such profits, income or gains;

(b) In the case of a company which is a resident of Canada owning at least 10 percent of the voting stock of a company which is a resident of the United States from which it receives dividends in any taxable year, Canada shall allow as a credit against the Canadian tax on income the appropriate amount of income tax paid or accrued to the United States by the second company with respect to the profits out of which the dividends are paid.

(c) Notwithstanding the provisions of subparagraph (a), where Canada imposes a tax on gains from the alienation of property that, but for the provisions of paragraph 5 of Article XIII (Gains), would not be taxable in Canada, income tax paid or accrued to the United States on such gains shall be deducted from any Canadian tax payable in respect of such gains.

3. For the purposes of this Article:

(a) Profits, income or gains (other than gains to which paragraph 5 of Article XIII (Gains) applies) of a resident of a Contracting State which may be taxed in the other Contracting State in accordance with the Convention (without regard to paragraph 2 of Article XXIX (Miscellaneous Rules)) shall be deemed to arise in that other State; and

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(b) Profits, income or gains of a resident of a Contracting State which may not be taxed in the other Contracting State in accordance with the Convention (without regard to paragraph 2 of Article XXIX (Miscellaneous Rules)) or to which paragraph 5 of Article XIII (Gains) applies shall be deemed to arise in the first-mentioned State.

4. Where a United States citizen is a resident of Canada, the following rules shall apply:

(a) Canada shall allow a deduction from the Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income or gains which arise (within the meaning of paragraph 3) in the United States, except that such deduction need not exceed the amount of the tax that would be paid to the United States if the resident were not a United States citizen; and

(b) For the purposes of computing the United States tax, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a). The credit so allowed shall not reduce that portion of the United States tax that is deductible from Canadian tax in accordance with subparagraph (a).

5. Notwithstanding the provisions of paragraph 4, where a United States citizen is a resident of Canada, the following rules shall apply in respect of the items of income referred to in Article X (Dividends), XI (Interest) or XII (Royalties) that arise (within the meaning of paragraph 3) in the United States and that would be subject to United States tax if the resident of Canada were not a citizen of the United States, as long as the law in force in Canada allows a deduction in computing income for the portion of any foreign tax paid in respect of such items which exceeds 15 per cent of the amount thereof:

(a) The deduction so allowed in Canada shall not be reduced by any credit or deduction for income tax paid or accrued to Canada allowed in computing the United States tax on such items;

(b) Canada shall allow a deduction from Canadian tax on such items in respect of income tax paid or accrued to the United States on such items, except that such deduction need not exceed the amount of the tax that would be paid on such items to the United States if the resident of Canada were not a United States citizen; and

(c) For the purposes of computing the United States tax on such items, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (b). The credit so allowed shall reduce only that portion of the United States tax on such items which exceeds the amount of tax that would be paid to the United States on such items if the resident of Canada were not a United States citizen.

6. Where a United States citizen is a resident of Canada, items of income referred to in paragraph 4 or 5 shall, notwithstanding the provisions of paragraph 3, be deemed to arise in Canada to the extent necessary to avoid the double taxation of such income under paragraph 4(b) or paragraph 5(c).



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

7. For the purposes of this Article, any reference to "income tax paid or accrued" to a Contracting State shall include Canadian tax and United States tax, as the case may be, and taxes of general application which are paid or accrued to a political subdivision or local authority of that State, which are not imposed by that political subdivision or local authority in a manner inconsistent with the provisions of the Convention and which are substantially similar to the Canadian tax or United States tax, as the case may be.

8. Where a resident of a Contracting State owns capital which, in accordance with the provisions of the Convention, may be taxed in the other Contracting State, the first-mentioned State shall allow as a deduction from the tax on the capital of that resident an amount equal to the capital tax paid in that other State. The deduction shall not, however, exceed that part of the capital tax, as computed before the deduction is given, which is attributable to the capital which may be taxed in that other State.

9. The provisions of this Article relating to the source of profits, income or gains shall not apply for the purpose of determining a credit against United States tax for any foreign taxes other than income taxes paid or accrued to Canada.

10. Where in accordance with any provision of the Convention income derived or capital owned by a resident of a Contracting State is exempt from tax in that State, such State may nevertheless, in calculating the amount of tax on other income or capital, take into account the exempted income or capital.

# Article XXV
# Non-Discrimination

[Compare OECD Article](#)

[Article Summary](#)

1. Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances, particularly with respect to taxation on worldwide income, are or may be subjected. This provision shall also apply to individuals who are not residents of one or both of the Contracting States.

2. In determining the taxable income or tax payable of an individual who is a resident of a Contracting State, there shall be allowed as a deduction in respect of any other person who is a resident of the other Contracting State and who is dependent on the individual for support the amount that would be so allowed if that other person were a resident of the first-mentioned State.

3. Where a married individual who is a resident of Canada and not a citizen of the United States has income that is taxable in the United States pursuant to Article XV (Income from Employment), the United States tax with respect to such income shall not exceed such proportion of the total United


DOC 2017-84262

States tax that would be payable for the taxable year if both the individual and his spouse were United States citizens as the individual's taxable income determined without regard to this paragraph bears to the amount that would be the total taxable income of the individual and his spouse. For the purposes of this paragraph,

(a) The "total United States tax" shall be determined as if all the income of the individual and his spouse arose in the United States; and

(b) A deficit of the spouse shall not be taken into account in determining taxable income.

   4. Any company which is a resident of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which other similar companies of the first-mentioned State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of a third State, are or may be subjected.

   5. Notwithstanding the provisions of Article XXIV (Elimination of Double Taxation), the taxation on a permanent establishment which a resident of a Contracting State has in the other Contracting State shall not be less favorable levied in the other State than the taxation levied on residents of the other State carrying on the same activities. This paragraph shall not be construed as obliging a Contracting State:

(a) To grant to a resident of the other Contracting State any personal allowances, reliefs and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents; or

(b) To grant to a company which is a resident of the other Contracting State the same tax relief that it provides to a company which is a resident of the first-mentioned State with respect to dividends received by it from a company.

   6. Except where the provisions of paragraph 1 of Article IX (Related Persons), paragraph 7 of Article XI (Interest) or paragraph 7 of Article XII (Royalties) apply, interest, royalties and other disbursements paid by a resident of a Contracting State to a resident of the other Contracting State shall, for the purposes of determining the taxable profits of the first-mentioned resident, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State. Similarly, any debts of a resident of a Contracting State to a resident of the other Contracting State shall, for the purposes of determining the taxable capital of the first-mentioned resident, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State.

   7. The provisions of paragraph 7 shall not affect the operation of any provision of the taxation laws of a Contracting State:

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.


DOC 2017-84262

(a) Relating to the deductibility of interest and which is in force on the date of signature of this Convention (including any subsequent modification of such provisions that does not change the general nature thereof); or

(b) Adopted after such date by a Contracting State and which is designed to ensure that a person who is not a resident of that state does not enjoy, under the laws of that State, a tax treatment that is more favorable than that enjoyed by residents of that State.

8. Expenses incurred by a citizen or resident of a Contracting State with respect to any convention (including any seminar, meeting, congress or other function of a similar nature) held in the other Contracting State shall, for the purposes of taxation in the first-mentioned State, be deductible to the same extent that such expenses would be deductible if the convention were held in the first-mentioned State.

9. Notwithstanding the provisions of Article II (Taxes Covered), this Article shall apply to all taxes imposed by a Contracting State.

## Article XXVI
## Mutual Agreement Procedure

Compare OECD Article

Article Summary

1. Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States, present his case in writing to the competent authority of the Contracting State of which he is a resident or, if he is a resident of neither Contracting State, of which he is a national.

2. The competent authority of the Contracting State to which the case has been presented shall endeavor, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention. Except where the provisions of Article IX (Related Persons) apply, any agreement reached shall be implemented notwithstanding any time or other procedural limitations in the domestic law of the Contracting States, provided that the competent authority of the other Contracting State has received notification that such a case exists within six years from the end of the taxable year to which the case relates.

3. The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular, the competent authorities of the Contracting States may agree:

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

taxnotes®
DOC 2017-84262

(a) To the same attribution of profits to a resident of a Contracting State and its permanent establishment situated in the other Contracting State;

(b) To the same allocation of income, deductions, credits or allowances between persons;

(c) To the same determination of the source, and the same characterization, of particular items of income;

(d) To a common meaning of any term used in the Convention;

(e) To the elimination of double taxation with respect to income distributed by an estate or trust;

(f) To the elimination of double taxation with respect to a partnership;

(g) To provide relief from double taxation resulting from the application of the estate tax imposed by the United States or the Canadian tax as a result of a distribution or disposition of property by a trust that is a qualified domestic trust within the meaning of section 2056A of the Internal Revenue Code, or is described in subsection 70(6) of the Income Tax Act or is treated as such under paragraph 5 of Article XXIX B (Taxes Imposed by Reason of Death), in cases where no relief is otherwise available; or

(h) To increases in any dollar amounts referred to in the Convention to reflect monetary or economic developments.

They may also consult together for the elimination of double taxation in cases not provided for in the Convention.

4. Each of the Contracting States will endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto. However, nothing in this paragraph shall be construed as imposing on either of the Contracting States the obligation to carry out administrative measures of a different nature from those used in the collection of its own tax or which would be contrary to its public policy (ordre public).

5. The competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement in the sense of the preceding paragraphs.

6. Where, pursuant to a mutual agreement procedure under this Article, the competent authorities have endeavored but are unable to reach a complete agreement in a case, the case shall be resolved through arbitration conducted in the manner prescribed by, and subject to, the requirements of paragraph 7 and any rules or procedures agreed upon by the Contracting States by notes to be exchanged through diplomatic channels, if:

(a) Tax returns have been filed with at least one of the Contracting States with respect to the taxable years at issue in the case;

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.


DOC 2017-84262

(b) The case:

(i) Is a case that:

(A) Involves the application of one or more Articles that the competent authorities have agreed in an exchange of notes shall be the subject of arbitration; and

(B) Is not a particular case that the competent authorities agree, before the date on which arbitration proceedings would otherwise have begun, is not suitable for determination by arbitration; or

(ii) Is a particular case that the competent authorities agree is suitable for determination by arbitration; and

(c) All concerned persons agree according to the provisions of subparagraph 7(d).

7. For the purposes of paragraph 6 and this paragraph, the following rules and definitions shall apply:

(a) The term "concerned person" means the presenter of a case to a competent authority for consideration under this Article and all other persons, if any, whose tax liability to either Contracting State may be directly affected by a mutual agreement arising from that consideration;

(b) The "commencement date" for a case is the earliest date on which the information necessary to undertake substantive consideration for a mutual agreement has been received by both competent authorities;

(c) Arbitration proceedings in a case shall begin on the later of:

(i) Two years after the commencement date of that case, unless both competent authorities have previously agreed to a different date, and

(ii) The earliest date upon which the agreement required by subparagraph (d) has been received by both competent authorities;

(d) The concerned person(s), and their authorized representatives or agents, must agree prior to the beginning of arbitration proceedings not to disclose to any other person any information received during the course of the arbitration proceeding from either Contracting State or the arbitration board, other than the determination of such board;

(e) Unless a concerned person does not accept the determination of an arbitration board, the determination shall constitute a resolution by mutual agreement under this Article and shall be binding on both Contracting States with respect to that case; and

(f) For purposes of an arbitration proceeding under paragraph 6 and this paragraph, the members of the arbitration board and their staffs shall be considered "persons or authorities" to whom

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

information may be disclosed under Article XXVII (Exchange of Information) of this Convention.

# Article XXVI A
## Assistance in Collection

Compare OECD Article

Article Summary

1. The Contracting States undertake to lend assistance to each other in the collection of taxes referred to in paragraph 9, together with interest, costs, additions to such taxes and civil penalties, referred to in this Article as a "revenue claim".

2. An application for assistance in the collection of a revenue claim shall include a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

3. A revenue claim of the applicant State that has been finally determined may be accepted for collection by the competent authority of the requested State and, subject to the provisions of paragraph 7, if accepted shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes.

4. Where an application for collection of a revenue claim in respect of a taxpayer is accepted

(a) By the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received; and

(b) By Canada, the revenue claim shall be treated by Canada as an amount payable under the Income Tax Act, the collection of which is not subject to any restriction.

5. Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State, based on any such rights that may be available under the laws of either Contracting State. If, at any time pending execution of a request for assistance under this Article, the applicant State loses the right under its internal law to collect the revenue claim, the competent authority of the applicant State shall promptly withdraw the request for assistance in collection.

6. Subject to this paragraph, amounts collected by the requested State pursuant to this Article shall be forwarded to the competent authority of the applicant State. Unless the competent authorities of the Contracting States otherwise agree, the ordinary costs incurred in providing

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

collection assistance shall be borne by the requested State and any extraordinary costs so incurred shall be borne by the applicant State.

7. A revenue claim of an applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested State.

8. No assistance shall be provided under this Article for a revenue claim in respect of a taxpayer to the extent that the taxpayer can demonstrate that

(a) Where the taxpayer is an individual, the revenue claim relates either to a taxable period in which the taxpayer was a citizen of the requested State or, if the taxpayer became a citizen of the requested State at any time before November 9, 1995 and is such a citizen at the time the applicant State applies for collection of the claim, to a taxable period that ended before November 9, 1995; and

(b) Where the taxpayer is an entity that is a company, estate or trust, the revenue claim relates to a taxable period in which the taxpayer derived its status as such an entity from the laws in force in the requested State.

9. Notwithstanding the provisions of Article II (Taxes Covered), the provisions of this Article shall apply to all categories of taxes collected, and to contributions to social security and employment insurance premiums levied, by or on behalf of the Government of a Contracting State.

10. Nothing in this Article shall be construed as:

(a) Limiting the assistance provided for in paragraph 4 of Article XXVI (Mutual Agreement Procedure); or

(b) Imposing on either Contracting State the obligation to carry out administrative measures of a different nature from those used in the collection of its own taxes or that would be contrary to its public policy (ordre public).

11. The competent authorities of the Contracting States shall agree upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States.

# Article XXVII
# Exchange of Information

Compare OECD Article

Article Summary

1. The competent authorities of the Contracting States shall exchange such information as may be relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

States concerning taxes to which this Convention applies insofar as the taxation thereunder is not contrary to this Convention. The exchange of information is not restricted by Article I (Personal Scope). Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the taxation laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment or collection of, the administration and enforcement in respect of, or the determination of appeals in relation to the taxes to which this Convention applies or, notwithstanding paragraph 4, in relation to taxes imposed by a political subdivision or local authority of a Contracting State that are substantially similar to the taxes covered by this Convention under Article II (Taxes Covered). Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions. The competent authorities may release to an arbitration board established pursuant to paragraph 6 of Article XXVI (Mutual Agreement Procedure) such information as is necessary for carrying out the arbitration procedure; the members of the arbitration board shall be subject to the limitations on disclosure described in this Article.

2. If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall use its information gathering measures to obtain the requested information, even though that other State may not need such information for its own tax purposes. The obligation contained in the preceding sentence is subject to the limitations of paragraph 3 but in no case shall such limitations be construed to permit a Contracting State to decline to supply information because it has no domestic interest in such information.

3. In no case shall the provisions of paragraph 1 and 2 be construed so as to impose on a Contracting State the obligation:

(a) To carry out administrative measures at variance with the laws and administrative practice of that State or of the other Contracting State;

(b) To supply information which is not obtainable under the laws or in the normal course of the administration of that State or of the other Contracting State; or

(c) To supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public).

4. For the purposes of this Article, this Convention shall apply, notwithstanding the provisions of Article II (Taxes Covered):

(a) To all taxes imposed by a Contracting State; and

(b) To other taxes to which any other provision of this Convention applies, but only to the extent that the information may be relevant for the purposes of the application of that provision.

5. In no case shall the provisions of paragraph 3 be construed to permit a Contracting State to decline to supply information because the information is held by a bank, other financial institution,



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

nominee or person acting in an agency or a fiduciary capacity or because it relates to ownership interests in a person.

6. If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, and writings).

7. The requested State shall allow representatives of the requesting State to enter the requested State to interview individuals and examine books and records with the consent of the persons subject to examination.

## Article XXVIII
## Diplomatic Agents and Consular Officers

Compare OECD Article

Article Summary

Nothing in this Convention shall affect the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements.

## Article XXIX
## Miscellaneous Rules

Article Summary

1. The provisions of this Convention shall not restrict in any manner any exclusion, exemption, deduction, credit or other allowances now or hereafter accorded by the laws of a Contracting State in the determination of the tax imposed by that State.

2. (a) Except to the extent provided in paragraph 3, this Convention shall not affect the taxation by a Contracting State of its residents (as determined under Article IV (Residence)) and, in the case of the United States, its citizens and companies electing to be treated as domestic corporations.

(b) Notwithstanding the other provisions of this Convention, a former citizen or former long-term resident of the United States, may, for the period of ten years following the loss of such status, be taxed in accordance with the laws of the United States with respect to income from sources within the United States (including income deemed under the domestic law of the United States to arise from such sources).

3. The provisions of paragraph 2 shall not affect the obligations undertaken by a Contracting State:

taxnotes®
DOC 2017-84262

(a) Under paragraphs 3 and 4 of Article IX (Related Persons), paragraphs 6 and 7 of Article XIII (Gains), paragraphs 1, 3, 4, 5, 6(b), 7, 8, 10 and 13 of Article XVIII (Pensions and Annuities), paragraph 5 of Article XXIX (Miscellaneous Rules), paragraphs 1, 5, and 6 of Article XXIX B (Taxes Imposed by Reason of Death), paragraphs 2, 3, 4, and 7 of Article XXIX B (Taxes Imposed by Reason of Death) as applied to estates of persons other than former citizens referred to in paragraph 2 of this Article, paragraphs 3 and 5 of Article XXX (Entry into Force), and Articles XIX (Government Service), XXI (Exempt Organizations), XXIV (Elimination of Double Taxation), XXV (Non-Discrimination) and XXVI (Mutual Agreement Procedure);

(b) Under Article XX (Students), toward individuals who are neither citizens of, nor have immigrant status in, that State.

4. With respect to taxable years not barred by the statute of limitations ending on or before December 31 of the year before the year in which the Social Security Agreement between Canada and the United States (signed in Ottawa on March 11, 1981) enters into force, income from personal services not subject to tax by the United States under the Convention or the 1942 Convention shall not be considered wages or net earnings from self-employment for purposes of social security taxes imposed under the Internal Revenue Code.

5. Where a person who is a resident of Canada and a shareholder of a United States S corporation requests the competent authority of Canada to do so, the competent authority may agree, subject to terms and conditions satisfactory to such competent authority, to apply the following rules for the purposes of taxation in Canada with respect to the period during which the agreement is effective:

(a) The corporation shall be deemed to be a controlled foreign affiliate of the person;

(b) All the income of the corporation shall be deemed to be foreign accrual property income;

(c) For the purposes of subsection 20(11) of the Income Tax Act, the amount of the corporation's income that is included in the person's income shall be deemed not to be income from a property; and

(d) Each dividend paid to the person on a share of the capital stock of the corporation shall be excluded from the person's income and shall be deducted in computing the adjusted cost base to the person of the share.

6. For purposes of paragraph 3 of Article XXII (Consultation) of the General Agreement on Trade in Services, the Contracting States agree that:

(a) A measure falls within the scope of the Convention only if:

(i) The measure relates to a tax to which Article XXV (Non-Discrimination) of the Convention applies; or

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



(ii) The measure relates to a tax to which Article XXV (Non-Discrimination) of the Convention does not apply and to which any other provision of the Convention applies, but only to the extent that the measure relates to a matter dealt with in that other provision of the Convention; and

(b) Notwithstanding paragraph 3 of Article XXII (Consultation) of the General Agreement on Trade in Services, any doubt as to the interpretation of subparagraph (a) will be resolved under paragraph 3 of Article XXVI (Mutual Agreement Procedure) of the Convention or any other procedure agreed to by both Contracting States.

7. The appropriate authority of a Contracting State may request consultations with the appropriate authority of the other Contracting State to determine whether change to the Convention is appropriate to respond to changes in the law or policy of that other State. Where domestic legislation enacted by a Contracting State unilaterally removes or significantly limits any material benefit otherwise provided by the Convention, the appropriate authorities shall promptly consult for the purpose of considering an appropriate change to the Convention.

# Article XXIX A
# Limitation on Benefits

[Compare OECD Article]

[Article Summary]

1. For the purposes of the application of this Convention by a Contracting State,

(a) a qualifying person shall be entitled to all of the benefits of this Convention; and

(b) except as provided in paragraphs 3, 4 and 6, a person that is not a qualifying person shall not be entitled to any benefits of this Convention.

2. For the purposes of this Article, a qualifying person is a resident of a Contracting State that is:

(a) a natural person;

(b) a Contracting State or a political subdivision or local authority thereof, or any agency or instrumentality of any such State, subdivision or authority;

(c) a company or trust whose principal class of shares or units (and any disproportionate class of shares or units) is primarily and regularly traded on one or more recognized stock exchanges;

(d) a company, if five or fewer persons each of which is a company or trust referred to in subparagraph (c) own directly or indirectly more than 50 percent of the aggregate vote and value of the shares and more than 50 percent of the vote and value of each disproportionate class of shares

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(in neither case including debt substitute shares), provided that each company or trust in the chain of ownership is a qualifying person;

(e) (i) a company, 50 percent or more of the aggregate vote and value of the shares of which and 50 percent or more of the vote and value of each disproportionate class of shares (in neither case including debt substitute shares) of which is not owned, directly or indirectly, by persons other than qualifying persons; or

(ii) a trust, 50 percent or more of the beneficial interest in which and 50 percent or more of each disproportionate interest in which, is not owned, directly or indirectly, by persons other than qualifying persons;

where the amount of the expenses deductible from gross income (as determined in the State of residence of the company or trust) that are paid or payable by the company or trust, as the case may be, for its preceding fiscal period (or, in the case of its first fiscal period, that period) directly or indirectly, to persons that are not qualifying persons is less than 50 percent of its gross income for that period;

(f) an estate;

(g) a not-for-profit organization, provided that more than half of the beneficiaries, members or participants of the organization are qualifying persons;

(h) a trust, company, organization or other arrangement described in paragraph 2 of Article XXI (Exempt Organizations) and established for the purpose of providing benefits primarily to individuals who are qualifying persons, or persons who were qualifying persons within the five preceding years; or

(i) a trust, company, organization or other arrangement described in paragraph 3 of Article XXI (Exempt Organizations) provided that the beneficiaries of the trust, company, organization or other arrangement are described in subparagraph (g) or (h).

   3. Where a person is a resident of a Contracting State and is not a qualifying person, and that person, or a person related thereto, is engaged in the active conduct of a trade or business in that State (other than the business of making or managing investments, unless those activities are carried on with customers in the ordinary course of business by a bank, an insurance company, a registered securities dealer or a deposit-taking financial institution), the benefits of this Convention shall apply to that resident person with respect to income derived from the other Contracting State in connection with or incidental to that trade or business (including any such income derived directly or indirectly by that resident person through one or more other persons that are residents of that other State), but only if that trade or business is substantial in relation to the activity carried on in that other State giving rise to the income in respect of which benefits provided under this Convention by that other State are claimed.

4. A company that is a resident of a Contracting State shall also be entitled to the benefits of Articles X (Dividends), XI (Interest) and XII (Royalties) if:

(a) Its shares that represent more than 90 percent of the aggregate vote and value of all of its shares and at least 50 percent of the vote and value of any disproportionate class of shares (in neither case including debt substitute shares) are owned, directly or indirectly, by persons each of whom is a qualifying person or a person who:

(i) Is a resident of a country with which the other Contracting State has a comprehensive income tax convention and is entitled to all of the benefits provided by that other State under that convention;

(ii) Would qualify for benefits under paragraphs 2 or 3 if that person were a resident of the first-mentioned State (and, for the purposes of paragraph 3, if the business it carried on in the country of which it is a resident were carried on by it in the firstmentioned State); and

(iii) Would be entitled to a rate of tax in the other Contracting State under the convention between that person's country of residence and that other State, in respect of the particular class of income for which benefits are being claimed under this Convention, that is at least as low as the rate applicable under this Convention; and

(b) The amount of the expenses deductible from gross income (as determined in the company's State of residence) that are paid or payable by the company for its preceding fiscal period (or, in the case of its first fiscal period, that period) directly or indirectly to persons that are not qualifying persons is less than 50 percent of the company's gross income for that period.

5. For the purposes of this Article,

(a) The term "debt substitute share" means:

(i) A share described in paragraph (e) of the definition "term preferred share" in the Income Tax Act, as it may be amended from time to time without changing the general principle thereof; and

(ii) Such other type of share as may be agreed upon by the competent authorities of the Contracting States.

(b) The term "disproportionate class of shares" means any class of shares of a company resident in one of the Contracting States that entitles the shareholder to disproportionately higher participation, through dividends, redemption payments or otherwise, in the earnings generated in the other State by particular assets or activities of the company;

(c) The term "disproportionate interest in a trust" means any interest in a trust resident in one of the Contracting States that entitles the interest holder to disproportionately higher participation in, or claim to, the earnings generated in the other State by particular assets or activities of the trust;

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.


DOC 2017-84262

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(d) The term "not-for-profit organization" of a Contracting State means an entity created or established in that State and that is, by reason of its not-for-profit status, generally exempt from income taxation in that State, and includes a private foundation, charity, trade union, trade association or similar organization;

(e) The term "principal class of shares" of a company means the ordinary or common shares of the company, provided that such class of shares represents the majority of the voting power and value of the company. If no single class of ordinary or common shares represents the majority of the aggregate voting power and value of the company, the "principal class of shares" are those classes that in the aggregate represent a majority of the aggregate voting power and value of the company; and

(f) The term "recognized stock exchange" means:

(i) The NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the Securities and Exchange Commission as a national securities exchange for purposes of the Securities Exchange Act of 1934;

(ii) Canadian stock exchanges that are "prescribed stock exchanges" or "designated stock exchanges" under the Income Tax Act; and

(iii) Any other stock exchange agreed upon by the Contracting States in an exchange of notes or by the competent authorities of the Contracting States.

6. Where a person that is a resident of a Contracting State is not entitled under the preceding provisions of this Article to the benefits provided under this Convention by the other Contracting State, the competent authority of that other State shall, upon that person's request, determine on the basis of all factors including the history, structure, ownership and operations of that person whether:

(a) Its creation and existence did not have as a principal purpose the obtaining of benefits under this Convention that would not otherwise be available; or

(b) It would not be appropriate, having regard to the purpose of this Article, to deny the benefits of this Convention to that person.

The person shall be granted the benefits of this Convention by that other State where the competent authority determines that subparagraph (a) or (b) applies.

7. It is understood that this Article shall not be construed as restricting in any manner the right of a Contracting State to deny benefits under this Convention where it can reasonably be concluded that to do otherwise would result in an abuse of the provisions of this Convention.

## Article XXIX B
## Taxes Imposed by Reason of Death



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

Article Summary

1. Where the property of an individual who is a resident of a Contracting State passes by reason of the individual's death to an organization that is referred to in paragraph 1 of Article XXI (Exempt Organizations) and that is a resident of the other Contracting State,

(a) If the individual is a resident of the United States and the organization is a resident of Canada, the tax consequences in the United States arising out of the passing of the property shall apply as if the organization were a resident of the United States; and

(b) If the individual is a resident of Canada and the organization is a resident of the United States, the tax consequences in Canada arising out of the passing of the property shall apply as if the individual had disposed of the property for proceeds equal to an amount elected on behalf of the individual for this purpose (in a manner specified by the competent authority of Canada), which amount shall be no less than the individual's cost of the property as determined for purposes of Canadian tax and no greater than the fair market value of the property.

2. In determining the estate tax imposed by the United States, the estate of an individual (other than a citizen of the United States) who was a resident of Canada at the time of the individual's death shall be allowed a unified credit equal to the greater of

(a) The amount that bears the same ratio to the credit allowed under the law of the United States to the estate of a citizen of the United States as the value of the part of the individual's gross estate that at the time of the individual's death is situated in the United States bears to the value of the individual's entire gross estate wherever situated; and

(b) The unified credit allowed to the estate of a nonresident not a citizen of the United States under the law of the United States.

The amount of any unified credit otherwise allowable under this paragraph shall be reduced by the amount of any credit previously allowed with respect to any gift made by the individual. A credit otherwise allowable under subparagraph (a) shall be allowed only if all information necessary for the verification and computation of the credit is provided.

3. In determining the estate tax imposed by the United States on an individual's estate with respect to property that passes to the surviving spouse of the individual (within the meaning of the law of the United States) and that would qualify for the estate tax marital deduction under the law of the United States if the surviving spouse were a citizen of the United States and all applicable elections were properly made (in this paragraph and paragraph 4 referred to as "qualifying property"), a non-refundable credit computed in accordance with the provisions of paragraph 4 shall be allowed in addition to the unified credit allowed to the estate under paragraph 2 or under the law of the United States, provided that

(a) The individual was at the time of death a citizen of the United States or a resident of either Contracting State;



(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

(b) The surviving spouse was at the time of the individual's death a resident of either Contracting State;

(c) If both the individual and the surviving spouse were residents of the United States at the time of the individual's death, one or both was a citizen of Canada; and

(d) The executor of the decedent's estate elects the benefits of this paragraph and waives irrevocably the benefits of any estate tax marital deduction that would be allowed under the law of the United States on a United States Federal estate tax return filed for the individual's estate by the date on which a qualified domestic trust election could be made under the law of the United States.

4. The amount of the credit allowed under paragraph 3 shall equal the lesser of

(a) The unified credit allowed under paragraph 2 or under the law of the United States (determined without regard to any credit allowed previously with respect to any gift made by the individual), and

(b) The amount of estate tax that would otherwise be imposed by the United States on the transfer of qualifying property.

The amount of estate tax that would otherwise be imposed by the United States on the transfer of qualifying property shall equal the amount by which the estate tax (before allowable credits) that would be imposed by the United States if the qualifying property were included in computing the taxable estate exceeds the estate tax (before allowable credits) that would be so imposed if the qualifying property were not so included. Solely for purposes of determining other credits allowed under the law of the United States, the credit provided under paragraph 3 shall be allowed after such other credits.

5. Where an individual was a resident of the United States immediately before the individual's death, for the purposes of subsections 70(5.2) and (6) of the Income Tax Act, both the individual and the individual's spouse shall be deemed to have been resident in Canada immediately before the individual's death. Where a trust that would be a trust described in subsection 70(6) of that Act, if its trustees that were residents or citizens of the United States or domestic corporations under the law of the United States were residents of Canada, requests the competent authority of Canada to do so, the competent authority may agree, subject to terms and conditions satisfactory to such competent authority, to treat the trust for the purposes of that Act as being resident in Canada for such time and with respect to such property as may be stipulated in the agreement.

6. In determining the amount of Canadian tax payable by an individual who immediately before death was a resident of Canada, or by a trust described in subsection 70(6) of the Income Tax Act (or a trust which is treated as being resident in Canada under the provisions of paragraph 5), the amount of any Federal or state estate or inheritance taxes payable in the United States (not exceeding, where the individual was a citizen of the United States or a former citizen referred to in paragraph 2 of Article XXIX (Miscellaneous Rules), the amount of estate and inheritance taxes that would have been payable if the individual were not a citizen or former citizen of the United States) in respect of property situated within the United States shall,

Case 3:25-cv-05663-MMC Document 80 Page 452 03/20/24 10/20/2025 of 51 taxnotes<br>DOC 2017-84262

(a) To the extent that such estate or inheritance taxes are imposed upon the individual's death, be allowed as a deduction from the amount of any Canadian tax otherwise payable by the individual for the taxation year in which the individual died on the total of

(i) Any income, profits or gains of the individual arising (within the meaning of paragraph 3 of Article XXIV (Elimination of Double Taxation)) in the United States in that year, and

(ii) Where the value at the time of the individual's death of the individual's entire gross estate wherever situated (determined under the law of the United States) exceeded 1.2 million U.S. dollars or its equivalent in Canadian dollars, any income, profits or gains of the individual for that year from property situated in the United States at that time, and

(b) To the extent that such estate or inheritance taxes are imposed upon the death of the individual's surviving spouse, be allowed as a deduction from the amount of any Canadian tax otherwise payable by the trust for its taxation year in which that spouse dies on any income, profits or gains of the trust for that year arising (within the meaning of paragraph 3 of Article XXIV (Elimination of Double Taxation)) in the United States or from property situated in the United States at the time of death of the spouse.

For purposes of this paragraph, property shall be treated as situated within the United States if it is so treated for estate tax purposes under the law of the United States as in effect on March 17, 1995, subject to any subsequent changes thereof that the competent authorities of the Contracting States have agreed to apply for the purposes of this paragraph. The deduction allowed under this paragraph shall take into account the deduction for any income tax paid or accrued to the United States that is provided under paragraph 2(a), 4(a) or 5(b) of Article XXIV (Elimination of Double Taxation).

7. In determining the amount of estate tax imposed by the United States on the estate of an individual who was a resident or citizen of the United States at the time of death, or upon the death of a surviving spouse with respect to a qualified domestic trust created by such an individual or the individual's executor or surviving spouse, a credit shall be allowed against such tax imposed in respect of property situated outside the United States, for the federal and provincial income taxes payable in Canada in respect of such property by reason of the death of the individual or, in the case of a qualified domestic trust, the individual's surviving spouse. Such credit shall be computed in accordance with the following rules:

(a) A credit otherwise allowable under this paragraph shall be allowed regardless of whether the identity of the taxpayer under the law of Canada corresponds to that under the law of the United States.

(b) The amount of a credit allowed under this paragraph shall be computed in accordance with the provisions and subject to the limitations of the law of the United States regarding credit for foreign death taxes (as it may be amended from time to time without changing the general principle hereof), as though the income tax imposed by Canada were a creditable tax under that law.

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.


DOC 2017-84262

(c) A credit may be claimed under this paragraph for an amount of federal or provincial income tax payable in Canada only to the extent that no credit or deduction is claimed for such amount in determining any other tax imposed by the United States, other than the estate tax imposed on property in a qualified domestic trust upon the death of the surviving spouse.

8. Provided that the value, at the time of death, of the entire gross estate wherever situated of an individual who was a resident of Canada (other than a citizen of the United states) at the time of death does not exceed 1.2 million U.S. dollars or its equivalent in Canadian dollars, the United States may impose its estate tax upon property forming part of the estate of the individual only if any gain derived by the individual from the alienation of such property would have been subject to income taxation by the United States in accordance with Article XIII (Gains).

**Article XXX
Entry Into Force**

Compare OECD Article

Article Summary

1. This Convention shall be subject to ratification in accordance with the applicable procedures of each Contracting State and instruments of ratification shall be exchanged at Ottawa as soon as possible.

2. The Convention shall enter into force upon the exchange of instruments of ratification and, subject to the provisions of paragraph 3, its provisions shall have effect:

(a) For tax withheld at the source on income referred to in Articles X (Dividends), XI (Interest), XII (Royalties) and XVIII (Pensions and Annuities), with respect to amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;

(b) For other taxes, with respect to taxable years beginning on or after the first day of January next following the date on which the Convention enters into force; and

(c) Notwithstanding the provisions of subparagraph (b), for the taxes covered by paragraph 4 of Article XXIX (Miscellaneous Rules) with respect to all taxable years referred to in that paragraph.

3. For the purposes of applying the United States foreign tax credit in relation to taxes paid or accrued to Canada:

(a) Notwithstanding the provisions of paragraph 2(a) of Article II (Taxes Covered), the tax on 1971 undistributed income on hand imposed by Part IX of the Income Tax Act of Canada shall be considered to be an income tax for distributions made on or after the first day of January 1972 and before the first day of January 1979 and shall be considered to be imposed upon the recipient of a

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.



distribution, in the proportion that the distribution out of undistributed income with respect to which the tax has been paid bears to 85 per cent of such undistributed income;

(b) The principles of paragraph 6 of Article XXIV (Elimination of Double Taxation) shall have effect for taxable years beginning on or after the first day of January 1976; and

(c) The provisions of paragraph 1 of Article XXIV shall have effect for taxable years beginning on or after the first day of January 1981.

Any claim for refund based on the provisions of this paragraph may be filed on or before June 30 of the calendar year following that in which the Convention enters into force, notwithstanding any rule of domestic law to the contrary.

4. Subject to the provisions of paragraph 5, the 1942 Convention shall cease to have effect for taxes for which this Convention has effect in accordance with the provisions of paragraph 2.

5. Where any greater relief from tax would have been afforded by any provision of the 1942 Convention than under this Convention, any such provision shall continue to have effect for the first taxable year with respect to which the provisions of this Convention have effect under paragraph 2(b).

6. The 1942 Convention shall terminate on the last date on which it has effect in accordance with the preceding provisions of this Article.

7. The Exchange of Notes between the United States and Canada dated August 2 and September 17, 1928, providing for relief from double income taxation on shipping profits, is terminated. Its provisions shall cease to have effect with respect to taxable years beginning on or after the first day of January next following the date on which this Convention enters into force.

8. The provisions of the Convention between the Government of Canada and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on the Estates of Deceased Persons signed at Washington on February 17, 1961 shall continue to have effect with respect to estates of persons deceased prior to the first day of January next following the date on which this Convention enters into force but shall cease to have effect with respect to estates of persons deceased on or after that date. Such Convention shall terminate on the last date on which it has effect in accordance with the preceding sentence.

## Article XXXI
## Termination

Compare OECD Article

Article Summary

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

**Appx585**


DOC 2017-84262

1. This Convention shall remain in force until terminated by a Contracting State.

2. Either Contracting State may terminate the Convention at any time after 5 years from the date on which the Convention enters into force provided that at least 6 months' prior notice of termination has been given through diplomatic channels.

3. Where a Contracting State considers that a significant change introduced in the taxation laws of the other Contracting State should be accommodated by a modification of the Convention, the Contracting States shall consult together with a view to resolving the matter; if the matter cannot be satisfactorily resolved, the first-mentioned State may terminate the Convention in accordance with the procedures set forth in paragraph 2, but without regard to the 5 year limitation provided therein.

4. In the event the Convention is terminated, the Convention shall cease to have effect:

(a) For tax withheld at the source on income referred to in Articles X (Dividends), XI (Interest), XII (Royalties), XVIII (Pensions and Annuities) and paragraph 2 of Article XXII (Other Income), with respect to amounts paid or credited on or after the first day of January next following the expiration of the 6 months' period referred to in paragraph 2; and

(b) For other taxes, with respect to taxable years beginning on or after the first day of January next following the expiration of the 6 months' period referred to in paragraph 2.

In witness whereof, the undersigned, being duly authorized thereto by their respective Governments, have signed this Convention.

Done in two copies at Washington this twenty-sixth day of September, 1980, in the English and French languages, each text being equally authentic.

(C) Tax Analysts 2023. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

UNITED STATES - CANADA INCOME TAX CONVENTION

*Convention Signed at Washington, D.C. on September 26,1980;*
*Protocol Signed at Ottawa June 14, 1983;*
*Protocol Signed at Washington, D.C., March 28,1984;*
*Ratification Advised by the Senate of the United States of America on June 28, 1984;*
*Entered into Force August 16, 1984.*

GENERAL EFFECTIVE DATE UNDER ARTICLE XXX: 1 JANUARY 1985

TABLE OF ARTICLES

ARTICLE I-----------------------------Personal Scope
ARTICLE II----------------------------Taxes Covered
ARTICLE III---------------------------General Definitions
ARTICLE IV----------------------------Residence
ARTICLE V-----------------------------Permanent Establishment
ARTICLE VI----------------------------Income from Real Property
ARTICLE VII---------------------------Business Profits
ARTICLE VIII--------------------------Transportation
ARTICLE IX----------------------------Related Persons
ARTICLE X-----------------------------Dividends
ARTICLE XI----------------------------Interest
ARTICLE XII---------------------------Royalties
ARTICLE XIII--------------------------Gains
ARTICLE XIV---------------------------Independent Personal Services
ARTICLE XV----------------------------Dependent Personal Services
ARTICLE XVI---------------------------Artistes and Athletes
ARTICLE XVII--------------------------Withholding of Taxes in Respect of Independent
                                      Personal Services
ARTICLE XVIII-------------------------Pensions and Annuities
ARTICLE XIX---------------------------Government Service
ARTICLE XX --------------------------Students
ARTICLE XXI---------------------------Exempt Organizations
ARTICLE XXII--------------------------Other Income
ARTICLE XXIII-------------------------Capital
ARTICLE XXIV--------------------------Elimination of Double Taxation
ARTICLE XXV---------------------------Non-Discrimination
ARTICLE XXVI--------------------------Mutual Agreement Procedure
ARTICLE XXVII-------------------------Exchange of Information
ARTICLE XXVIII------------------------Diplomatic Agents and Consular Officers
ARTICLE XXIX--------------------------Miscellaneous Rules

Appx587

ARTICLE XXX------------------------Entry into Force
ARTICLE XXXI------------------------Termination
Notes of Exchange----------------------of 26 September, 1980
Letter of Submittal----------------------of 16 October, 1980
Letter of Transmittal--------------------of 12 November, 1980
Protocol 1------------------------------of 14 June, 1983
Notes of Exchange-(Protocol 1)-------of 14 June, 1983
Letter of Submittal-(Protocol 1)-------of 2 September, 1983
Letter of Transmittal-(Protocol 1)-----of 21 September, 1983
Protocol 2-------------------------------of 28 March, 1984
Letter of Submittal-(Protocol 2--------of 2 April, 1984
Letter of Transmittal-(Protocol 2)-----of 18 April, 1984
Protocol 3-------------------------------of 17 March, 1995
Letter of Submittal-(Protocol 3)-------of 12 April, 1995
Letter of Transmittal-(Protocol 3)-----of 24 April, 1995
Protocol 4-------------------------------of 29 July, 1997
Letter of Submittal-(Protocol 4)-------of 12 August, 1997
Letter of Transmittal-(Protocol 4)-----of 23 September, 1997
The "Saving Clause"--------------------Paragraph 2 of Article XXIX

CONVENTION WITH CANADA WITH RESPECT
TO TAXES ON INCOME AND CAPITAL

MESSAGE

FROM

THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

A CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND CANADA WITH
RESPECT TO TAXES ON INCOME AND CAPITAL, SIGNED AT WASHINGTON ON
SEPTEMBER 26, 1980, WITH A RELATED EXCHANGE OF NOTES

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, October 16, 1980.*

Appx588

THE PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you, with a view to its transmission to the Senate for advice and consent to ratification, a Convention between the United States of America and Canada with respect to Taxes on Income and Capital (the Convention), signed at Washington on September 26, 1980, and a related exchange of notes signed on the same day.

The existing income tax convention with Canada, which was signed in 1942 and amended for supplementary conventions in 1950, 1956 and 1966, is the second oldest United States tax convention in force. The new Convention revises the existing convention by accommodating changes in United States and Canadian law, with particular reference to Canada's 1971 tax reform, as well as changes in treaty policy.

The Convention is based, in general, on the United States and OECD model conventions. It deviates from the models, however, in a number of important respects in order to take account of particular features of Canadian law and its interaction with United States law, the unique economic relationship between the United States and Canada, and the provisions of the existing convention.

Like the existing convention, the new Convention provides that the business profits of a resident of one Contracting State will not be subject to tax by the other State except to the extent that they are attributable to a permanent establishment which the resident has in the other State. The definition of a permanent establishment in the new Convention is more comprehensive than that in the existing convention and is very similar to the definition in the United States model.

The Convention follows the normal practice of providing reciprocal exemption for international shipping and air transport income. It goes beyond the model, however, by exempting on a reciprocal basis, as in the existing convention, income from the international operation of motor vehicles. It also adds an exemption for railroad operating income and a limited exemption for income from the rental of railway equipment, motor vehicles, trailers, and containers.

The Convention establishes maximum reciprocal rates of withholding at source for dividends, interest. and royalties. Although the rates exceed those in the United States model for several types of income, there are a number of significant reductions in withholding rates in comparison with the existing convention.

Portfolio dividends remain subject to a maximum 15 percent rate of tax at source. The maximum rate of tax at source on direct investment dividends is, however, reduced to 10 percent, from the 15 percent rate provided in the existing convention. This reduced rate also applies to the Canadian tax on branch profits, presently being imposed at a rate of 15 percent. Unlike the existing convention, the Convention preserves for the United States its right to impose tax on dividends paid by a Canadian

corporation where at least 50 percent of the gross income of that corporation is attributable to a United States permanent establishment of that corporation.

As in the existing convention, the maximum rate of withholding tax at source on interest is set at 15 percent. However, the new Convention provides several exceptions to that rule under which interest is exempt at source. Interest derived, guaranteed, or insured by a Contracting State, political subdivision, local authority, or instrumentality is exempt at source, as is interest paid by an entity not subject to tax in the source State and interest on trade credits between persons dealing at arm's length.

Artistic royalties, other than motion picture royalties, continue to be exempt at source. All other royalties are subject to a maximum source country tax rate of 10 percent, as compared to 15 percent under the existing convention.

Under the existing convention gains from the sale or exchange of capital assets are generally exempt from tax in the source State. The new Convention introduces a number of important modifications to that rule. As in the United States model, gains from the alienation of real property and property forming part of a permanent establishment may be taxed where the property or permanent establishment is situated. Consistent with current United States treaty policy, but not reflected in the United States model. the Convention further provides that gain from the alienation of shares in a corporation or interest in a partnership, estate, or trust, the property of which consists principally of real property, may be taxed by the country where the property is situated. A number of special rules are also provided which relate to specific aspects of Canadian tax treatment of capital gains when property is transferred by gift or when an individual gives up Canadian residence. These rules are designed to mesh the United States and Canadian tax systems in such cases.

In general, the rules in the Convention relating to the treatment of personal services income follow the pattern of the United States model. There are, however, some exceptions. In addition to the normal tests for the exemption of income from dependent personal services in the country where such services are rendered, a dollar threshold of $10,000 is provided. A special rule, not found in other United States conventions, is provided for reduced withholding, under certain circumstances, on remuneration from independent personal services.

The new Convention provides, as in the existing convention and United States model, that pensions and annuities are generally taxable in the State of residence of the recipient. However, it also provides that taxation by the residence State shall not exceed the amount that would be taxable if the recipient were a resident of the other State: and taxation is allowed in the State in which the payments arise, at a rate not in excess of 15 percent.

The Convention repeats, with certain modifications and refinements, the rules in the existing convention providing for reciprocal exemption of income derived by charitable organization of the other State and for the deductibility of contributions by residents of one State to such organizations in the other.

As in the model, items of income not dealt with elsewhere in the Convention are taxable in the State of residence of the recipient. However, in the Convention, such income is also taxable in the other State if it arises there.

In addition to the normal rules for the avoidance of double taxation, the Convention contains a rule not found in either the model or the existing convention for eliminating double taxation of United States citizens who are residents in Canada. Under Canadian law, the credit for foreign taxes on dividends, interest, and royalties is limited to 15 percent. Though the United States withholding rates under the Convention on these forms of income do not exceed 15 percent, United States citizens are subject to United States tax at normal progressive rates. Under the new Convention the United States agrees to give Canada the primary right to any tax on such income in excess of 15 percent, with the United States retaining only a residual right to tax.

The nondiscrimination protection of the Convention is somewhat narrower than the United States model, but is broader than the protection in the existing convention. In a rule not found in any other United States income tax treaty, expenses incurred by a resident of a Contracting State with respect to a convention or conference held in the other State are deductible to the same extent as if the convention were held in the State of residence.

Under the mutual agreement procedures of the Convention, if one State adjusts the accounts of a taxpayer the other State may make a corresponding adjustment (to the benefit of the taxpayer) even after the statute of limitations has run, if that other State has received notice of the case within six years from the end of the year to which the case relates. No such waiver of the statute is provided for in the existing convention. If, on the other hand, appropriate notice is not given, and the case involves an adjustment of arrangements between related persons, the first State agrees to withdraw the adjustment.

The Convention provides a number of transitional rules to protect taxpayer rights in going from the existing to the new convention.

The Convention provides for the termination of the United States-Canada estate tax convention of 1961. That convention is presently operative only on the United States side, because Canada has repealed its Federal estate tax. A 1928 note between the United States and Canada, providing relief from double taxation of shipping profits, is also terminated by the terms of the new Convention.

In an exchange of notes signed at the time of the signing of the Convention, it is agreed that the competent authorities of the two States will work out procedures for certifying the eligibility of organizations to receive tax exempt income and deductible contributions. The note also recognizes Canada's objections to the so-called "unitary apportionment" system used in several states of the United States to assess the income of corporations doing business in the state.

The Convention is subject to ratification. It will enter into force upon the exchange of instruments of ratification. Subject to transitional rules, the Convention will have effect, for taxes withheld at the source, for amounts paid or credited on or after the first day of the second month following entry into force; and for other taxes, for taxable years beginning on or after the first of January following entry into force.

The Convention will remain in force indefinitely unless terminated by one of the Contracting States. It may be terminated, on six months diplomatic notice, after five years from its entry into force, or earlier in the event of significant changes in the law of either country which cannot be accommodated through negotiations.

A technical memorandum explaining in detail the provisions of the Convention is being prepared by the Department of the Treasury and will be submitted to the Senate Committee on Foreign Relations.

The Department of the Treasury, with the cooperation of the Department of State, was primarily responsible for the negotiation of the Convention. It has the approval of both Departments.

Respectfully submitted,

EDMUND S. MUSKIE.

LETTER OF TRANSMITTAL

THE WHITE HOUSE. *November 12, 1980.*

.
*To the Senate of the United States:*

I transmit herewith, for Senate advice and consent to ratification, a Convention between the United States of America and Canada with respect to Taxes on Income and Capital (the Convention), signed at Washington on September 26, 1980, and a related exchange of notes for the information of the Senate. I also transmit the report of the Department of State with respect to the Convention.

The Convention will replace the existing tax convention with Canada, signed in 1942, as amended by supplementary conventions signed in 1950, 1956 and 1966. It is based, in general, on the United States and OECD model conventions but deviates from the models in a number of important respects in order to take account of particular features of Canadian law and its interaction with United States law, the unique economic relationship between the United States and Canada, and the provisions of the existing convention.

As in the existing convention, the new Convention provides that the business profits of a resident of one Contracting State will not be subject to tax by the other State except to the extent that they are attributable to a permanent establishment which the resident has in the other State. The definition of a

permanent establishment in the Convention is more comprehensive than that in the existing convention and is very similar to the definition in the United States model.

The Convention establishes maximum reciprocal rates of withholding at source for dividends, interest, and royalties. Although the rates exceed those in the United States model for several types of income, there are a number of significant reductions in withholding rates in comparison with the existing convention.

I recommend that the Senate give early and favorable consideration to the Convention and give advice and consent to its ratification.

JIMMY CARTER

CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND
CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL

The United States of America and Canada,

Desiring to conclude a Convention for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income and on capital,

Have agreed as follows:

ARTICLE I
Personal Scope

This Convention is generally applicable to persons who are residents of one or both of the Contracting States.

ARTICLE II
Taxes Covered

1. This Convention shall apply to taxes on income and on capital imposed on behalf of each Contracting State, irrespective of the manner in which they are levied,

2. The existing taxes to which the Convention shall apply are:
    (a) In the case of Canada, the taxes imposed by the Government of Canada under Parts I, XIII and XIV of the Income Tax Act; and
    (b) In the case of the United States, the Federal income taxes imposed by the Internal Revenue Code.

3. The Convention shall apply also to:

    (a) Any identical or substantially similar taxes on income; and

    (b) Taxes on capital, which are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes.

4. Notwithstanding the provisions of paragraphs 2(b) and 3, the Convention shall apply to:

    (a) The United States accumulated earnings tax and personal holding company tax, to the extent, and only to the extent, necessary to implement the provisions of paragraphs 5 and 8 of Article X (Dividends);

    (b) The United States excise taxes imposed with respect to private foundations, to the extent; and only to the extent, necessary to implement the provisions of paragraph 4 of Article XXI (Exempt Organizations); and

    (c) The United States social security taxes, to the extent, and only to the extent, necessary to implement the provisions of paragraph 4 of Article XXIX (Miscellaneous Rules).


## ARTICLE III
### General Definitions

1. For the purposes of this Convention, unless the context otherwise requires:

    (a) When used in a geographical sense, the term "Canada" means the territory of Canada, including any area beyond the territorial seas of Canada which, in accordance with international law and the laws of Canada, is an area within which Canada may exercise rights with respect to the seabed and subsoil and their natural resources;

    (b) The term "United States" means:

        (i) The United States of America, but does not include Puerto Rico, the Virgin Islands, Guam or any other United States possession or territory; and

        (ii) When used in a geographical sense, such term also includes any area beyond the territorial seas of the United States which, in accordance with international law and the laws of the United States, is an area within which the United States may exercise rights with respect to the seabed and subsoil and their natural resources;

    (c) The term "Canadian tax" means the Canadian taxes referred to in paragraphs 2(a) and 3(a) of Article II (Taxes Covered);

    (d) The term "United States tax" means the United States taxes referred to in paragraphs 2(b) and 3(a) of Article II (Taxes Covered);

    (e) The term "person" includes an individual, an estate, a trust, a company and any other body of persons;

    (f) The term "company" means any body corporate or any entity which is treated as a body corporate for tax purposes;

    (g) The term "competent authority" means:

(i) In the case of Canada, the Minister of National Revenue or his authorized representative; and

(ii) In the case of the United States, the Secretary of the Treasury or his delegate;

(h) The term "international traffic" means any voyage of a ship or aircraft to transport passengers or property except where the principal purpose of the voyage is to transport passengers or property between places within a Contracting State;

(i) The term "State" means any national State, whether or not a Contracting State; and

(j) The term "the 1942 Convention" means the Convention and Protocol between the United States and Canada for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion in the case of Income Taxes signed at Washington on March 4, 1942, as amended by the Convention signed at Ottawa on June 12, 1950, by the Convention signed at Ottawa on August 8, 1956 and by the Supplementary Convention signed at Washington on October 25, 1966.

2. As regards the application of the Convention by a Contracting State any term not defined therein shall, unless the context otherwise requires and subject to the provisions of Article XXVI (Mutual Agreement Procedures), have the meaning which it has under the law of that State concerning the taxes to which the Convention applies.

ARTICLE IV
<u>Residence</u>

1. For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation or any other criterion of a similar nature, but in the case of an estate or trust, only to the extent that income derived by such estate or trust is liable to tax in that State, either in its hands or in the hands of its beneficiaries.

2. Where by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, then his status shall be determined as follows:

(a) He shall be deemed to be a resident of the Contracting State in which he has a permanent home available to him; if he has a permanent home available to him in both States or in neither State, he shall be deemed to be a resident of the Contracting State with which his personal and economic relations are closer (centre of vital interests);

(b) If the Contracting State in which he has his centre of vital interests cannot be determined, he shall be deemed to be a resident of the Contracting State in which he has an habitual abode;

(c) If he has an habitual abode in both States or in neither State, he shall be deemed to be a resident of the Contracting State of which he is a citizen; and

(d) If he is a citizen of both States or of neither of them, the competent authorities of the Contracting States shall settle the question by mutual agreement.

3. Where by reason of the provisions of paragraph 1 a company is a resident of both Contracting States, then if it was created under the laws in force in a Contracting State, it shall be deemed to be a resident of that State.

4. Where by reason of the provisions of paragraph 1 an estate, trust or other person (other than an individual or a company) is a resident of both Contracting States, the competent authorities of the States shall by mutual agreement endeavor to settle the question and to determine the mode of application of the Convention to such person.

5. Notwithstanding the provisions of the preceding paragraphs, an individual shall be deemed to be a resident of a Contracting State if:

      (a) The individual is an employee of that State or of a political subdivision, local authority or instrumentality thereof rendering services in the discharge of functions of a governmental nature in the other Contracting State or in a third State; and

      (b) The individual is subjected in the first-mentioned State to similar obligations in respect of taxes on income as are residents of the first-mentioned State.

The spouse and dependent children residing with such an individual and meeting the requirements of subparagraph (b) above shall also be deemed to be residents of the first-mentioned State.

## ARTICLE V
### Permanent Establishment

1. For the purposes of this Convention, the term "permanent establishment" means a fixed place of business through which the business of a resident of a Contracting State is wholly or partly carried on.

2. The term "permanent establishment" shall include especially:

      (a) A place of management;

      (b) A branch;

      (c) An office;

      (d) A factory;

      (e) A workshop; and

      (f) A mine, an oil or gas well, a quarry or any other place of extraction of natural resources.

3. A building site or construction or installation project constitutes a permanent establishment if, but only if, it lasts more than 12 months.

4. The use of a drilling rig or ship in a Contracting State to explore for or exploit natural resources constitutes a permanent establishment if, but only if, such use is for more than 3 months in any twelve-month period.

5. A person acting in a Contracting State on behalf of a resident of the other Contracting State-other than an agent of an independent status to whom paragraph 7 applies-shall be deemed to be a permanent establishment in the first-mentioned State if such person has, and habitually exercises in that State, an authority to conclude contracts in the name of the resident.

6. Not withstanding the provisions of paragraphs 1, 2, and 5, the term "permanent establishment" shall be deemed not to include a fixed place of business used solely for, or a person referred to in paragraph 5 engaged solely in, one or more of the following activities:

> (a) The use of facilities for the purpose of storage, display or delivery of goods or merchandise belonging to the resident;
>
> (b) The maintenance of a stock of goods or merchandise belonging to the resident for the purpose of storage, display or delivery;
>
> (c) The maintenance of a stock of goods or merchandise belonging to the resident for the purpose of processing by another person;
>
> (d) The purchase of goods or merchandise, or the collection of information, for the resident; and
>
> (e) Advertising, the supply of information, scientific research or similar activities which have a preparatory or auxiliary character, for the resident.

7. A resident of a Contracting State shall not be deemed to have a permanent establishment in the other Contracting State merely because such resident carries on business in that other State through a broker, general commission agent or any other agent of an independent status, provided that such persons are acting in the ordinary course of their business.

8. The fact that a company which is a resident of a Contracting State controls or is controlled by a company which is a resident of the other Contracting State, or which carries on business in that other State (whether through a permanent establishment or otherwise), shall not constitute either company a permanent establishment of the other.

9. For the purposes of the Convention, the provisions of this Article shall be applied in determining whether any person has a permanent establishment in any State.

## ARTICLE VI
### Income from Real Property

1. Income derived by a resident of a Contracting State from real property (including from agriculture or forestry) situated in the other Contracting State may be taxed in that other State.

2. For the purposes of this Convention, the term "real property" shall have the meaning which it has under the taxation laws of the Contracting State in which the property in question is situated and shall include any option or similar right in respect thereof. The term shall in any case include usufruct of real property and rights to explore for or to exploit mineral deposits, sources and other natural resources; ships and aircraft shall not be regarded as real property.

3. The provisions of paragraph 1 shall apply to income derived from the direct use, letting or use in any other form of real property and to income from the alienation of such property.

## ARTICLE VII
### Business Profits

1. The business profits of a resident of a Contracting State shall be taxable only in that State unless the resident carries on business in the other Contracting State through a permanent establishment situated therein. If the resident carries on, or has carried on, business as aforesaid, the business profits of the resident may be taxed in the other State but only so much of them as is attributable to that permanent establishment.

2. Subject to the provisions of paragraph 3, where a resident of a Contracting State carries on business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the business profits which it might be expected to make if it were a distinct and separate person engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the resident and with any other person related to the resident (within the meaning of paragraph 2 of Article IX (Related Persons)).

3. In determining the business profits of a permanent establishment, there shall be allowed as deductions expenses which are incurred for the purposes of the permanent establishment, including executive and general administrative expenses so incurred, whether in the State in which the permanent establishment is situated or elsewhere. Nothing in this paragraph shall require a Contracting State to allow the deduction of any expenditure which, by reason of its nature, is not generally allowed as a deduction under the taxation laws of that State.

4. No business profits shall be attributed to a permanent establishment of a resident of a Contracting State by reason of the use thereof for either the mere purchase of goods or merchandise or the mere provision of executive, managerial or administrative facilities or services for such resident.

5. For the purposes of the preceding paragraphs, the business profits to be attributed to a permanent establishment shall be determined by the same method year by year unless there is good and sufficient reason to the contrary.

6. Where business profits include items of income which are dealt with separately in other Articles of this Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.

7. For the purposes of the Convention the business profits attributable to a permanent establishment shall include only those profits derived from the assets or activities of the permanent establishment

ARTICLE VIII
Transportation

1. Notwithstanding the provisions of Articles VII (Business Profits) and XIII (Gains), profits derived by a resident of a Contracting State from the operation of ships or aircraft in international traffic, and gains derived by a resident of a Contracting State from the alienation of ships or aircraft used principally in international traffic, shall be exempt from tax in the other Contracting State.

2. For the purposes of this Convention, profits derived by a resident of a Contracting State from the operation of ships or aircraft in international traffic include profits from:
    (a) The rental of ships or aircraft operated in international traffic;
    (b) The use, maintenance or rental of containers (including trailers and related equipment for the transport of containers) used in international traffic; and
    (c) The rental of ships, aircraft or containers (including trailers and related equipment for the transport of containers) provided that such profits are incidental to profits referred to in paragraph 1, 2(a) or 2(b).

3. Notwithstanding the provisions of Article VII (Business Profits), profits derived by a resident of a Contracting State from a voyage of a ship where the principal purpose of the voyage is to transport passengers or property between places in the other Contracting State may be taxed in that other State.

4. Notwithstanding the provisions of Articles VII (Business Profits) and XII (Royalties), profits of a resident of a Contracting State engaged in the operation of motor vehicles or a railway as a common carrier or a contract carrier derived from:
    (a) The transportation of passengers or property between a point outside the other Contracting State and any other point; or
    (b) The rental of motor vehicles (including trailers) or railway rolling stock, or the use, maintenance or rental of containers (including trailers and related equipment for the transport of containers) used to transport passengers or property between a point outside the other Contracting State and any other point shall be exempt from tax in that other Contracting State.

5. The provisions of paragraphs 1, 3 and 4 shall also apply to profits or gains referred to in those paragraphs derived by a resident of a Contracting State from the participation in a pool, a joint business or an international operating agency.

6. Notwithstanding the provisions of Article XII (Royalties), profits derived by a resident of a Contracting State from the use, maintenance or rental of railway rolling stock, motor vehicles, trailers or containers (including trailers and related equipment for the transport of containers) used in the other Contracting State for a period or periods not expected to exceed in the aggregate 183 days in any twelve-month period shall be exempt from tax in the other Contracting State except to the extent that such profits are attributable to a permanent establishment in the other State and liable to tax in the other State by reason of Article VII (Business Profits).

## ARTICLE IX
### Related Persons

1. Where a person in a Contracting State and a person in the other Contracting State are related and where the arrangements between them differ from those which would be made between unrelated persons, each State may adjust the amount of the income, loss or tax payable to reflect the income, deductions, credits or allowances which would, but for those arrangements, have been taken into account in computing such income, loss or tax.

2. For the purposes of this Article, a person shall be deemed to be related to another person if either person participates directly or indirectly in the management or control of the other, or if any third person or persons participate directly or indirectly in the management or control of both.

3. Where an adjustment is made or to be made by a Contracting State in accordance with paragraph 1, the other Contracting State shall (notwithstanding any time or procedural limitations in the domestic law of that other State) make a corresponding adjustment to the income, loss or tax of the related person in that other State if:
> (a) It agrees with the first-mentioned adjustment; and
> (b) Within six years from the end of the taxable year to which the first-mentioned adjustment relates, the competent authority of the other State has been notified of the first-mentioned adjustment.

4. In the event that the notification referred to in paragraph 3 is not given within the time period referred to therein, and if the person to whom the first-mentioned adjustment relates has not received, at least six months prior to the expiration of such time period, notification of such adjustment from the Contracting State which has made or is to make such adjustment that State shall, notwithstanding the provisions of paragraph 1, not make the first-mentioned adjustment to the extent that such adjustment would give rise to double taxation.

5. The provisions of paragraphs 3 and 4 shall not apply in the case of fraud, willful default or neglect or gross negligence.

## ARTICLE X
Dividends

1. Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other state.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of such dividends, the tax so charged shall not exceed:
> (a) 10 per cent of the gross amount of the dividends if the beneficial owner is a company which owns at least 10 per cent of the voting stock of the company paying the dividends;
> (b) 15 per cent of the gross amount of the dividends in all other cases.
This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3. The term "dividends" as used in this Article means income from shares or other rights, not being debt-claims, participating in profits, as well as income subjected to the same taxation treatment as income from shares by the taxation laws of the State of which the company making the distribution is a resident.

4. The provisions of paragraph 2 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State of which the company paying the dividends is a resident, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the holding in respect of which the dividends are paid is effectively connected with such permanent establishment of fixed base. In such case, the provisions of Article VII (Business Profits) or Article XIV (Independent Personal Services), as the case may be, shall apply.

5. Where a company is a resident of a Contracting State, the other contracting State may not impose any tax on the dividends paid by the company, except insofar as such dividends are paid to a resident of that other State or insofar as the holding in respect of which the dividends are paid is effectively connected with a permanent establishment or a fixed base situated in that other State, nor subject the company's undistributed profits to a tax, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in such other State.

6. Nothing in this Convention shall be construed as preventing a Contracting State from imposing a tax on the earnings of a company attributable to permanent establishments in that State, in addition to the tax which would be chargeable on the earnings of a company which is a resident of that State, provided that any additional tax so imposed shall not exceed 10 per cent of the amount of such earnings which have not been subjected to such additional tax in previous taxation years. For the purposes of this

**Appx601**

paragraph, the term "earnings" means the amount by which the business profits attributable to permanent establishments in a Contracting State (including gains from the alienation of property forming part of the business property of such permanent establishments) in a year and previous years exceeds the sum of:

> (a) Business losses attributable to such permanent establishments (including losses from the alienation of property forming part of the business property of such permanent establishments) in such year and previous years;

> (b) All taxes, other than the additional tax referred to in this paragraph, imposed on such profits in that State;

> (c) The profits reinvested in that State, provided that where that State is Canada, such amount shall be determined in accordance with the existing provisions of the law of Canada regarding the computation of the allowance in respect to investment in property in Canada, and any subsequent modification of those provisions which shall not affect the general principle hereof; and

> (d) Five hundred thousand Canadian dollars ($500,000) or its equivalent in United States currency, less any amounts deducted by the company, or by an associated company with respect to the same or a similar business, under this subparagraph (d); for the purposes of this subparagraph (d) a company is associated with another company if one company directly or indirectly controls the other, or both companies are directly or indirectly controlled by the same person or persons, or if the two companies deal with each other not at arm's length.

7. Notwithstanding the provisions of paragraph 5, a Contracting State, other than a Contracting State that imposes the additional tax on earnings referred to in paragraph 6, may tax a dividend paid by a company to the extent that the dividend is attributable to profits earned in taxable years beginning after the date of signature of the Convention if, for the three-year period ending with the close of the company's taxable period preceding the declaration of the dividend (or for such part of that three-year period as the company has been in existence, or for the first taxable year if the dividend was declared in that taxable year), at least 50 per cent of such company's gross income from all sources was included in the computation of the business profits attributable to a permanent establishment which such company had in that State; provided that
where a resident of the other Contracting State is the beneficial owner of such dividend any tax so imposed on the dividend shall be subject to the limitations of paragraph 2 or the rules of paragraph 4, as the case may be.

8. Notwithstanding the provisions of paragraph 5, a company which is a resident of Canada and which has income subject to tax in the United States (without regard to the provisions of the Convention) may be liable to the United States accumulated earnings tax and personal holding company tax but only if 50 per cent or more in value of the outstanding voting shares of the company is owned, directly or indirectly, throughout the last half of its taxable year by citizens or residents of the United States (other than citizens of Canada who do not have immigrant status in the United States or who have not been residents in the United States for more than three taxable years) or by residents of a third State.

ARTICLE XI
Interest

1. Interest arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in that other State.

2. However, such interest may also be taxed in the Contracting State in which it arises, and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of such interest, the tax so charged shall not exceed 15 per cent of the gross amount of the interest.

3. Notwithstanding the provisions of paragraph 2, interest arising in a Contracting State shall be exempt from tax in that State if:

    (a) The interest is beneficially owned by the other Contracting State, a political subdivision or local authority thereof or an instrumentality of such other State, subdivision or authority, and is not subject to tax by that other State;

    (b) The interest is beneficially owned by a resident of the other Contracting State and is paid with respect to debt obligations issued at arm's length and guaranteed or insured by that other State or a political subdivision thereof or an instrumentality of such other State or subdivision which is not subject to tax by that other State;

    (c) The interest is beneficially owned by a resident of the other Contracting State and is paid by the first-mentioned State, a political subdivision or local authority thereof or an instrumentality, of such first-mentioned State, subdivision or authority which is not subject to tax by that first-mentioned State;

    (d) The interest is beneficially owned by a seller who is a resident of the other Contracting State and is paid by a purchaser in connection with the sale on credit of any equipment, merchandise or services, except where the sale is made between persons dealing with each other not at arm's length; or

    (e) The interest is paid by a company created under the laws in force in the other Contracting State with respect to an obligation entered into before the date of signature of this Convention, provided that such interest would have been exempt from tax in the first-mentioned State under Article XII of the 1942 Convention.

4. The term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums and prizes attaching to such securities, bonds or debentures, as well as income assimilated to income from money lent by the taxation laws of the Contracting State in which the income arises. However, the term "interest" does not include income dealt with in Article X (Dividends).

5. The provisions of paragraph 2 and 3 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State in which the interest

arises, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the debt-claim in respect of which the interest is paid is effectively connected with such permanent establishment or fixed base. In such case, the provisions of Article VII (Business Profits) or Article XIV (Independent Personal Services), as the case may be, shall apply.

6. For the purposes of this Article, interest shall be deemed to arise in a Contracting State when the payer is that State itself, or a political subdivision, local authority or resident of that State. Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a State other than that of which he is a resident a permanent establishment or a fixed base in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment or fixed base, then such interest shall be deemed to arise in the State in which the permanent establishment or fixed base is situated and not in the State of which the payer is a resident.

7. Where, by reason by a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of the Convention.

8. Where a resident of a Contracting State pays interest to a person other than a resident of the other Contracting State, that other State may not impose any tax on such interest except insofar as it arises in that other State or insofar as the debt-claim in respect of which the interest is paid effectively connected with a permanent establishment or a fixed base situated in that other State.


ARTICLE XII
Royalties

1. Royalties arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in that other State.

2. However, such royalties may also be taxed in the Contracting State in which they arise, and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of such royalties, the tax so charged shall not exceed 10 per cent of the gross amount of the royalties.

3. Notwithstanding the provisions of paragraph 2, copyright royalties and other like payments in respect of the production or reproduction of any literary, dramatic, musical or artistic work (but. not including royalties in respect of motion picture films and works on film or videotape for use in connection with television) arising in a Contracting State and beneficially owned

by a resident of the other Contracting State shall be taxable only in that other State.

4. The term "royalties" as used in this Article means payments of any kind received as a consideration for the use of, or the right to use, any copyright of literary, artistic or scientific work (including motion picture films and works on film or videotape for use in connection with television), any patent, trademark, design or model, plan, secret formula or process, or for the use of, or the right to use, tangible personal property or for information concerning industrial, commercial or scientific experience, and, notwithstanding the provisions of Article XIII (Gains), includes gains from the alienation of any intangible property or rights described in this paragraph to the extent that such gains are contingent on the productivity, use or subsequent disposition of such property or rights.

5. The provisions of paragraphs 2 and 3 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State in which the royalties arise, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the right or property in respect of which the royalties are paid is effectively connected with such permanent establishment or fixed base. In such case the provisions of Article VII (Business Profits) or Article XIV. (Independent Personal Services), as the case may be, shall apply.

6. For the purposes of this Article, royalties shall be deemed to arise in a Contracting State when the payer is that State itself, or a political subdivision, local authority or resident of that State. However:

(a) Except as provided in subparagraph (b), where the person paying the royalties, whether he is a resident of a Contracting State or not, has in a State other than that of which he is a resident a permanent establishment or a fixed base in connection with which the obligation to pay the royalties was incurred, and such royalties are borne by such permanent establishment or fixed base, then such royalties shall be deemed to arise in the State in which the permanent establishment or fixed base is situated and not in the State of which the payer is a resident; and

(b) Where the royalties are for the use of intangible property or tangible personal property in a Contracting State, then such royalties shall be deemed to arise in that State and not in the State of which the payer is a resident.

7. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to the use, right or information for which they are paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

8. Where a resident of a Contracting State pays royalties to a person other than a resident of the other Contracting State, that other State may not impose any tax on such royalties except insofar as they

arise in that other State or insofar as the right or property in respect of which the royalties are paid is effectively connected with a permanent establishment or a fixed base situated in that other State.

## ARTICLE XIII
### Gains

1. Gains derived by a resident of a Contracting State from the alienation of real property situated in the other Contracting State may be taxed in that other State.

2. Gains from the alienation of personal property forming part of the business property of a permanent establishment which a resident of a Contracting State has or had (within the twelve-month period preceding the date of alienation) in the other Contracting State or of personal property pertaining to a fixed base which is or was available (within the twelve-month period preceding the date of alienation) to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services, including such gains from the alienation of such a permanent establishment or of such a fixed base, may be taxed in that other State.

3. Gains derived by a resident of a Contracting State from the alienation of:

> (a) Shares forming part of a substantial interest in the capital stock of a company which is not a resident of that State the value of which shares is derived principally from real property situated in the other Contracting State; or

> (b) An interest in a partnership, trust or estate the value of which is derived principally from real property situated in the other Contracting State

may be taxed in that other State, provided that the laws in force in the first-mentioned State at the time of such alienation would, in comparable circumstances, subject to taxation gains derived by a resident of that other State. For the purposes of this paragraph,

> (c) The term "real property" includes the shares of a company the value of which shares is derived principally from real property or an interest in a partnership, trust or estate referred to in subparagraph (b), but does not include property (other than mines, oil or gas wells, rental property or property used for agriculture or forestry) in which the business of the company, partnership, trust or estate is carried on; and

> (d) A substantial interest exists when the resident and persons related thereto own 10 per cent or more of the shares of any class of the capital stock of a company.

4. Gains from the alienation of any property other than that referred to in paragraphs 1, 2 and 3 shall be taxable only in the Contracting State of which the alienator is a resident.

5. The provisions of paragraph 4 shall not affect the right of a Contracting State to levy a tax on gains from the alienation of property derived by an individual who is a resident of the other Contracting State if such individual:

(a) Was a resident of the first-mentioned State for 120 months during any period of 20 consecutive years; and

(b) Was a resident of the first-mentioned State at any time during the ten years immediately preceding the alienation of the property.

6. Where an individual (other than a citizen of the United States) who was a resident of Canada became a resident of the United States, in determining his liability to United States taxation in respect of any gain from the alienation of a principal residence in Canada owned by him at the time he ceased to be a resident of Canada, the adjusted basis of such property shall be no less than its fair market value at that time.

7. Where at any time an individual is treated for the purposes of taxation by a Contracting State as having alienated a property and is taxed in that State by reason thereof and the domestic law of the other Contracting State at such time defers (but does not forgive) taxation, that individual may elect in his annual return of income for the year of such alienation to be liable to tax in the other Contracting State in that year as if he had, immediately before that time, sold and repurchased such property for an amount equal to its fair market value at that time.

8. Where a resident of a Contracting State alienates property in the course of a corporate organization, reorganization, amalgamation, division or similar transaction and profit, gain or income with respect to such alienation is not recognized for the purpose of taxation in that State, if requested to do so by the person who acquires the property, the competent authority of the other Contracting State may agree, in order to avoid double taxation and subject to terms and conditions satisfactory to such competent authority, to defer the recognition of the profit, gain or income with respect to such property for the purpose of taxation in that other State until such time and in such manner as may be stipulated in the agreement.

9. Where a resident of a Contracting State alienates property which may in accordance with this Article be taxed in the other Contracting State and which was owned by a resident of the first-mentioned State on the date of signature of this Convention, the amount of the gain which is liable to tax in that other State in accordance with this Article shall be reduced by the proportion of the gain attributable (on a monthly basis), or such greater portion of the gain as is shown to the satisfaction of the competent authority of the other State to be reasonably attributable, to the period ending on December 31 of the year in which the Convention enters into force; the provisions of this paragraph shall not apply to property which on the date of signature of the Convention formed part of the business property of a permanent establishment or pertained to a fixed base in the other Contracting State.

ARTICLE XIV
Independent Personal Services

Income derived by an individual who is a resident of a Contracting State in respect of independent personal services may be taxed in that State. Such income may also be taxed in the other Contracting State if the individual has or had a fixed base regularly available to him in that other State but only to the extent that the income is attributable to the fixed base.


ARTICLE XV
Dependent Personal Services

1. Subject to the provisions of Articles XVIII (Pensions and Annuities) and XIX (Government Service), salaries, wages and other similar remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2. Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in a calendar year in the other Contracting State shall be taxable only in the first-mentioned State if:
(a) Such remuneration does not exceed ten thousand dollars ($10,000) in the currency of that other State; or
(b) The recipient is present in the other Contracting State for a period or periods not exceeding in the aggregate 183 days in that year and the remuneration is not borne by an employer who is a resident of that other State or by a permanent establishment or a fixed base which the employer has in that other State.

3. Notwithstanding the provisions of paragraphs 1 and 2, remuneration derived by a resident of a Contracting State in respect of an employment regularly exercised in more than one State on a ship, aircraft, motor vehicle or train operated by a resident of that Contracting State shall be taxable only in that State.


ARTICLE XVI
Artistes and Athletes

1. Notwithstanding the provisions of Articles XIV (Independent Personal Services) and XV (Dependent Personal Services), income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio or television artiste, or a musician, or as an athlete, from his personal activities as such exercised in the other Contracting State, may be taxed in that other State, except where the amount of the gross receipts derived by such entertainer or athlete, including expenses reimbursed to him or borne on his behalf, from such activities do not exceed fifteen thousand dollars ($15,000) in the currency of that other State for the calendar year concerned.

2. Where income in respect of personal activities exercised by an entertainer or an athlete in his capacity as such accrues not to the entertainer or athlete but to another person, that income may, notwithstanding the provisions of Articles VII (Business Profits), XIV (Independent Personal Services) and XV (Dependent Personal Services), be taxed in the Contracting State in which the activities of the entertainer or athlete are exercised. For the purposes of the preceding sentence, income of an entertainer or athlete shall be deemed not to accrue to another person if it is established that neither the entertainer or athlete, nor persons related thereto, participate directly or indirectly in the profits of such other person in any manner, including the receipt of deferred remuneration, bonuses, fees, dividends, partnership distributions or other distributions.

3. The provisions of this Article shall not apply to the income of an athlete in respect of an employment with a team which participates in a league with regularly schedule games in both Contracting States.

## ARTICLE XVII
### Withholding of Taxes in Respect of Independent Personal Services

1. Deduction and withholding of tax on account of the tax liability for a taxable year on remuneration paid to an individual who is a resident of a Contracting State (including an entertainer or athlete) in respect of the performance of independent personal services in the other Contracting State may be required by that other State, but with respect to the first five thousand dollars ($5,000) in the currency of that other State, paid as remuneration in that taxable year by each payer, such deduction and withholding shall not exceed 10 per cent of the payment.

2. Where the competent authority of a Contracting State considers that an amount that would otherwise be deducted or withheld from any amount paid or credited to an individual who is a resident of the other Contracting State in respect of the performance of independent personal services in the first-mentioned State is excessive in relation to the estimated tax liability for the taxable year of that individual in the first-mentioned State, it may determine that a lesser amount will be deducted or withheld.

3. The provisions of this Article shall not affect the liability of a resident of a Contracting State referred to in paragraph 1 or 2 for tax imposed by the other Contracting State.

## ARTICLE XVIII
### Pensions and Annuities

1. Pensions and annuities arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in that other State, but the amount of any pension included in income for

the purposes of taxation in that other State shall not exceed the amount that would be included in the first-mentioned State if the recipient were a resident thereof.

2. However:

(a) Pensions may also be taxed in the Contracting State in which they arise and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of a periodic pension payment, the tax so charged shall not exceed 15 per cent of the gross amount of such payment; and

(b) Annuities may also be taxed in the Contracting State in which they arise and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of an annuity payment, the tax so charged shall not exceed 15 per cent of the portion of such payment that is liable to tax in the first-mentioned State.

3. For the purposes of this Convention, the term "pensions" includes any payment under a superannuation, pension or retirement plan, Armed Forces retirement pay, war veterans pensions and allowances and amounts paid under a sickness, accident or disability plan, but does not include payments under an income-averaging annuity contract or any benefit referred to in paragraph 5.

4. For the purposes of the Convention, the term "annuities" means a stated sum paid periodically at stated times during life or during a specified number of years, under an obligation to make the payments in return for adequate and full consideration (other than services rendered), but does not include a payment that is not a periodic payment or any annuity the cost of which was deductible for the purposes of taxation in the Contracting State in which it was acquired.

5. Benefits under the social security legislation in a Contracting State paid to a resident of the other Contracting State or a citizen of the United States shall be taxable only in the first-mentioned State.

6. Alimony and other similar amounts (including child support payments) arising in a Contracting State and paid to a resident of the other Contracting State shall be taxable only in that other State, but the amount included in income for the purposes of taxation in that other State shall not exceed the amount that would be included in income in the first-mentioned State if the recipient were a resident thereof.


ARTICLE XIX
Government Service

Remuneration, other than a pension, paid by a Contracting State or a political subdivision or local authority thereof to a citizen of that State in respect of services rendered in the discharge of functions of a governmental nature shall be taxable only in that State. However, the provisions of Article XIV, (Independent Personal Services), XV (Dependent Personal Services), or XVI (Artistes and Athletes), as the case may be, shall apply, and the preceding sentence shall not apply to remuneration paid in

respect of services rendered in connection with a trade or business carried on by a Contracting State or a political subdivision or local authority thereof.

## ARTICLE XX
### Students

Payments which a student, apprentice or business trainee, who is or was immediately before visiting a Contracting State a resident of the other Contracting State, and who is present in the first-mentioned State for the purpose of his full-time education or training, receives for the purpose of his maintenance, education or training shall not be taxed in that State provided that such payments are made to him from outside that State.

## ARTICLE XXI
### Exempt Organizations

1. Subject to the provisions of paragraph 3, income derived by a religious, scientific, literary, educational or charitable organization shall be exempt from tax in a Contracting State if it is resident in the other Contracting State but only to the extent that such income is exempt from tax in that other State.

2. Subject to the provisions of paragraph 3, income referred to in Articles X (Dividends) and XI (Interest) derived by a trust, company or other organization constituted and operated exclusively to administer or provide benefits under one or more funds or plans established to provide pension, retirement or other employee benefits shall be exempt from tax in a Contracting State if it is resident in the other Contracting State and its income is generally exempt from tax in that other State.

3. The provisions of paragraphs 1 and 2 shall not apply with respect to the income of a trust, company or other organization from carrying on a trade or business or from a related person other than a person referred to in paragraph 1 or 2.

4. A religious, scientific, literary, educational or charitable organization which is resident in Canada and which has received substantially all of its support from persons other than citizens or residents of the United States shall be exempt in the United States from the United States excise taxes imposed with respect to private foundations.

5. For the purposes of United States taxation, contributions by a citizen or resident of the United States to an organization which is resident in Canada, which is generally exempt from Canadian tax and which could qualify in the United States to receive deductible contributions if it were resident in the United States shall be treated as charitable contributions; however, such contributions (other than such contributions to a college or university at which the citizen or resident or a member of his family is or

was enrolled) shall not be deductible in any taxable year to the extent that they exceed an amount determined by applying the percentage limitations of the laws of the United States in respect of the deductibility of charitable contributions to the income of such citizen or resident arising in Canada. The preceding sentence shall not be interpreted to allow in any taxable year deductions for charitable contributions in excess of the amount allowed under the percentage limitations of the laws of the United States in respect of the deductibility of charitable contributions.

6. For the purposes of Canadian taxation, gifts by a resident of Canada to an organization which is resident in the United States, which is generally exempt from United States tax and which could qualify in Canada to receive deductible gifts if it were created or established and resident in Canada shall be treated as gifts to a registered charity; however, such gifts (other than such gifts to a college or university at which the resident or a member of his family is or was enrolled) shall not be deductible in any taxable year to the extent that they exceed an amount determined by applying the percentage limitations of the laws of Canada in respect of the deductibility of gifts to registered charities to the income of such resident arising in the United States. The preceding sentence shall not be interpreted to allow in any taxable year deductions for gifts to registered charities in excess of the amount allowed under the percentage limitations of the laws of Canada in respect of the deductibility of gifts to registered charities

## ARTICLE XXII
### Other Income

1. Items of income of a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State, except that if such income arises in the other Contracting State it may also be taxed in that other State.

2. To the extent that income distributed by an estate or trust is subject to the provisions of paragraph 1, then, notwithstanding such provisions, income distributed by an estate or trust which is a resident of a Contracting State to a resident of the other Contracting State who is a beneficiary of the estate or trust may be taxed in the first-mentioned State and according to the laws of that State, but the tax so charged shall not exceed 15 per cent of the gross amount of the income; provided, however, that such income shall be exempt from tax in the first-mentioned State to the extent of any amount distributed out of income arising outside that State.

## ARTICLE XXIII
### Capital

1. Capital represented by real property, owned by a resident of a Contracting State and situated in the other Contracting State, may be taxed in that other State.

2. Capital represented by personal property forming part of the business property of a permanent establishment which a resident of a Contracting State has in the other Contracting State, or by personal property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services, may be taxed in that other State.

3. Capital represented by ships and aircraft operated by a resident of a Contracting State in international traffic, and by personal property pertaining to the operation of such ships and aircraft, shall be taxable only in that State.

4. All other elements of capital of a resident of a Contracting State shall be taxable only in that State.

ARTICLE XXIV
Elimination of Double Taxation

1. In the case of the United States, subject to the provisions of paragraphs 4, 5, and 6, double taxation shall be avoided as follows: In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States, or to a company electing to be treated as a domestic corporation, as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada; and, in the case of a company which is a resident of the United States owning at least 10 percent of the voting stock of a company which is a resident of Canada from which it receives dividends in any taxable year, the United States shall allow as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada by that company with respect to the profits out of which such dividends are paid. Such appropriate amount shall be based upon the amount of income tax paid or accrued to Canada, but shall not exceed that proportion of the United States tax that taxable income arising in Canada bears to the entire taxable income.

2. In the case of Canada, subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows:

(a) Subject to the provisions of the law of Canada regarding the deduction from tax payable in Canada of tax paid in a territory outside Canada and to any subsequent modification of those provisions (which shall not affect the general principle hereof), and unless a greater deduction or relief is provided under the law of Canada, income tax paid or accrued to the United States on profits, income or gains arising in the United States shall be deducted from any Canadian tax payable in respect of such profits, income or gains; and

(b) Subject to the provisions of the law of Canada regarding the determination of the exempt surplus of a foreign affiliate and to any subsequent modification of those provisions (which shall not affect the general principle hereof), for the purposes of computing Canadian tax, a company which is a resident of Canada shall be allowed to deduct in computing its taxable

income any dividend received by it out of the exempt surplus of a foreign affiliate which is a resident of the United States.

3. For the purposes of this Article:

(a) Profits, income or gains (other than gains to which paragraph 5 of Article XIII (Gains) applies) of a resident of a Contracting State which may be taxed in the other Contracting State in accordance with the Convention (without regard to paragraph 2 of Article XXIX (Miscellaneous Rules)) shall be deemed to arise in that other State; and

(b) Profits, income or gains of a resident of a Contracting State which may not be taxed in the other Contracting State in accordance with the Convention (without regard to paragraph 2 of Article XXIX (Miscellaneous Rules)) or to which paragraph 5 of Article XIII (Gains) applies shall be deemed to arise in the first-mentioned State.

4. Where a United States citizen is a resident of Canada, the following rules shall apply:

(a) Canada shall allow a deduction from the Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income or gains which arise (within the meaning of paragraph 3) in the United States, except that such deduction need not exceed the amount of the tax that would be paid to the United States if the resident were not a United States citizen; and

(b) For the purposes of computing the United States tax, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a). The credit so allowed shall not; reduce that portion of the United States tax that is deductible from Canadian tax in accordance with subparagraph (a).

5. Notwithstanding the provisions of paragraph 4, where a United States citizen is a resident of Canada, the following rules shall apply in respect of the items of income referred to in Article X (Dividends), XI (Interest) or XII (Royalties) which arise (within the meaning of paragraph 3) in the United States, as long as the law in force in Canada allows a deduction in computing income for the portion of any foreign tax paid in respect of such items which exceeds 15 percent of the amount thereof:

(a) The deduction so allowed in Canada shall not be reduced by any credit or deduction for income tax paid or accrued to Canada allowed in computing the United States tax on such items;

(b) Canada shall allow a deduction from the Canadian tax in respect of the income tax paid or accrued to the United States on such items, except that such deduction need not exceed 15 per cent of the gross amount of such items that has been included in computing the income of the citizen for Canadian tax purposes; and

(c) For the purposes of computing the United States tax on such items, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (b). The credit so allowed shall reduce only that portion of the United States tax on such items which exceeds 15 per cent of the amount thereof included in computing United States taxable income.

6. Where a United States citizen is a resident of Canada, items of income referred to in paragraph 4 or 5 shall, not-withstanding the provisions of paragraph 3, be deemed to arise in Canada to the extent necessary to avoid the double taxation of such income under paragraph 4(b) or paragraph 5(c).

7. For the purposes of this Article, any reference to "income tax paid or accrued" to a Contracting State shall include Canadian tax and United States tax, as the case may be, and taxes of general application which are paid or accrued to a political subdivision or local authority of that State, which are not imposed by that political subdivision or local authority in a manner inconsistent with the provisions of the Convention and which are substantially similar to the taxes of that State referred to in paragraphs 2 and 3(a) of Article II (Taxes Covered).

8. Where a resident of a Contracting State owns capital which, in accordance with the provisions of the Convention, may be taxed in the other Contracting State, the first-mentioned State shall allow as a deduction from the tax on the capital of that resident an amount equal to the capital tax paid in that other State. The deduction shall not, however, exceed that part of the capital tax, as computed before the deduction is given, which is attributable to the capital which may be taxed in that other State.


## ARTICLE XXV
### Non-Discrimination

1. Citizens of a Contracting State, who are residents of the other Contracting State, shall not be subjected in that other State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which citizens of that other State in the same circumstances are or may be subjected.

2. Citizens of a Contracting State, who are not residents of the other Contracting State, shall not be subjected in that other State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which citizens of any third State in the same circumstances (including State of residence) are or may be subjected.

3. In determining the taxable income of an individual who is a resident of a Contracting State there shall be allowed as a deduction in respect of any other person who is a resident of the other Contracting State and who is dependent on the individual for support the amount that would be so allowed if that other person were a resident of the first-mentioned State.

4. Where a married individual who is a resident of Canada and not a citizen of the United States has income that is taxable in the United States pursuant to Article XV (Dependent Personal Services), the United States tax with respect to such income shall not exceed such proportion of the total United States tax that would be payable for the taxable year if both the individual and his spouse were United States citizens as the individual's taxable income determined without regard to this paragraph bears to

the amount that would be the total taxable income of the individual and his spouse. For the purposes of this paragraph;

> (a) The "total United States tax" shall be determined as if all the income of the individual and his spouse arose in the United States; and

> (b) A deficit of the spouse shall not be taken into account in determining taxable income.

5. Any company which is a resident of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which other similar companies of the first-mentioned State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of a third State, are or may be subjected.

6. Notwithstanding the provisions of Article XXIV (Elimination of Double Taxation), the taxation on a permanent establishment which a resident of a Contracting State has in the other Contracting State shall not be less favorably levied in the other State than the taxation levied on residents of the other State carrying on the same activities. This provision shall not be construed as obliging a Contracting State to grant to residents of the other Contracting State any personal allowances, reliefs and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents.

7. Except where the provisions of paragraph 1 of Article IX (Related Persons), paragraph 7 of Article XI (Interest) or paragraph 7 of Article XII (Royalties) apply, interest, royalties and other disbursements paid by a resident of a Contracting State to a resident of the other Contracting State shall, for the purposes of determining the taxable profits of the first-mentioned resident, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State. Similarly, any debts of a resident of a Contracting State to a resident of the other Contracting State shall, for the purposes of determining the taxable capital of the first-mentioned resident, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State.

8. The provisions of paragraph 7 shall not affect the operation of any provision of the taxation laws of a Contracting State:

> (a) Relating to the deductibility of interest and which is in force on the date of signature of this Convention (including any subsequent modification of such provisions that does not change the general nature thereof); or

> (b) Adopted after such date by a Contracting State and which is designed to ensure that a person who is not a resident of that State does not enjoy, under the laws of that State, a tax treatment that is more favorable than that enjoyed by residents of that State.

9. Expenses incurred by a citizen or resident of a Contracting State with respect to any convention (including any seminar, meeting, congress or other function of a similar nature) held in the other Contracting State shall, for the purposes of taxation in the first-mentioned State, be deductible to the

same extent that such expenses would be deductible if the convention were held in first-mentioned State.

10. Notwithstanding the provisions of Article II (Taxes Covered), this Article shall apply:

(a) In the case of Canada, to all taxes imposed under the Income Tax Act; and

(b) In the case of the United States, to all taxes imposed under the Internal Revenue Code.


## ARTICLE XXVI
### Mutual Agreement Procedure

1. Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States, present his case in writing to the competent authority of the Contracting State of which he is a resident or, if he is a resident of neither Contracting State, or which he is a national.

2. The competent authority of the Contracting State to which the case has been presented shall endeavor, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention. Except where the provisions of Article IX (Related Persons) apply, any agreement reached shall be implemented notwithstanding any time or other procedural limitations in the domestic law of the Contracting States, provided that the competent authority of the other Contracting State has received notification that such a case exists within six years from the end of the taxable year to which the case relates.

3. The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular, the competent authorities of the Contracting States may agree:

(a) To the same attribution of profits to a resident of a Contracting State and its permanent establishment situated in the other Contracting State;

(b) To the same allocation of income, deductions, credits or allowances between persons;

(c) To the same determination of the source, and the same characterization, of particular items of income;

(d) To a common meaning of any term used in the Convention;

(e) To the elimination of double taxation with respect to income distribution by an estate or trust;

(f) To the elimination of double taxation with respect to a partnership; or

  (g) To increases in any other amounts referred to in the Convention to reflect monetary or economic developments.

They may also consult together for the elimination of double taxation in cases not provided for in the Convention.

 4. Each of the Contracting States will endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not enure to the benefit of persons not entitled thereto. However, nothing in this paragraph shall be construed as imposing on either of the Contracting States the obligation to carry out administrative measures of a different nature from those used in the collection of its own tax or which would be contrary to its public policy (ordre public).

 5. The competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement in the sense of the proceeding paragraphs.

## ARTICLE XXVII
### Exchange of Information

 1. The competent authorities of the Contracting States shall exchange such information as is necessary for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention insofar as the taxation thereunder is not contrary to the Convention. The exchange of information is not restricted by Article I (Personal Scope). Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the taxation laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment or collection of, the administration and enforcement in respect of, or the determination of appeals in relation to, the taxes covered by the Convention. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions.

 2. If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall endeavor to obtain the information to which the request relates in the same way as if its own taxation was involved notwithstanding the fact that the other State does not, at that time, need such information. If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall endeavor to provide information under this Article in the form requested, such as depositions of witnesses and copies of unedited original documents (including books, papers, statements, records, accounts or writings), to the same extent such depositions and documents can be obtained under the laws and administrative practices of that other State with respect to its own taxes.

 3. In no case shall the provisions of paragraphs 1 and 2 be construed so as to impose on a Contracting State the obligation:

(a) To carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

(b) To supply information which is not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State; or

(c) To supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public).

4. Notwithstanding the provisions of Article II (Taxes Covered), for the purposes of this Article the Convention shall apply:

(a) In the case of Canada, to all taxes imposed by the Government of Canada on estates and gifts and under the Income Tax Act; and

(b) In the case of the United States, to all taxes imposed under the Internal Revenue Code.


## ARTICLE XXVIII
### Diplomatic Agents and Consular Officers

Nothing in this Convention shall affect the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements.


## ARTICLE XXIX
### Miscellaneous Rules

1. The provisions of this Convention shall not restrict in any manner any exclusion, exemption, deduction, credit or other allowance now or hereafter accorded by the laws of a Contracting State in the determination of the tax imposed by that State.

2. Except as provided in paragraph 3, nothing in the Convention shall be construed as preventing a Contracting State from taxing its residents (as determined under Article IV (Residence)) and, in the case of the United States, its citizens (including a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of income tax, but only for a period of ten years following such loss) and companies electing to be treated as domestic corporations, as if there were no convention between the United States and Canada with respect to taxes on income and on capital.

3. The provisions of paragraph 2 shall not affect the obligations undertaken by a Contracting State:

(a) Under paragraphs 3 and 4 of Article IX (Related Persons), paragraphs 6 and 7 of Article XIII (Gains), paragraph 5 of Article XXIX (Miscellaneous Rules), paragraphs 3 and 5 of Article XXX (Entry into Force), and Articles XVIII (Pensions and Annuities), XIX

(Government Service), XXI (Exempt Organizations), XXIV (Elimination of Double Taxation), XXV (Non-Discrimination) and XXVI (Mutual Agreement Procedure); and

    (b) Under Article XX (Students), toward individuals who are neither citizens of, nor have immigrant status in, that State.

4. With respect to taxable years not barred by the statute of limitations ending on or before December 31 of the year in which the Convention enters into force, income from personal services not subject to tax by the United States under the 1942 Convention shall not be considered wages or net earnings from self-employment for purposes of social security taxes imposed under the Internal Revenue Code.

5. A United States citizen who is a resident of Canada and a beneficiary of a Canadian registered retirement savings plan may elect, under rules established by the competent authority of the United States, to defer United States taxation with respect to any income accrued in the plan but not distributed by the plan, until such time as a distribution is made from such plan, or any plan substituted therefor.

6. If 25 per cent or more of the capital of a company which is a resident of a Contracting State is owned directly or indirectly by individuals who are not residents of that State, and if by reason of special measures the tax imposed in that State on that company with respect to dividends (other than dividends referred to in paragraph 2(a) of Article X (Dividends)), interest or royalties arising in the other Contracting State is substantially less than the tax generally imposed by the first-mentioned State on corporate business profits, then, notwithstanding the provisions of Article X (Dividends), XI (Interest) or XII (Royalties), that other State may tax such dividends, interest or royalties as if there were no convention between the United States and Canada with respect to taxes on income and on capital.

## ARTICLE XXX
### Entry into Force

1. This Convention shall be subject to ratification in accordance with the applicable procedures of each Contracting State and instruments of ratification shall be exchanged at Ottawa as soon as possible.

2. The Convention shall enter into force upon the exchange of instruments of ratification and, subject to the provisions of paragraph 3, its provisions shall have effect:

    (a) For tax withheld at the source on income referred to in Articles X (Dividends), XI (Interest), XII (Royalties) and XVIII (Pensions and Annuities), with respect to amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;

    (b) For other taxes, with respect to taxable years beginning on or after the first day of January next following the date on which the Convention enters into force; and

(c) Notwithstanding the provisions of subparagraph (b), for the taxes covered by paragraph 4 of Article XXIX (Miscellaneous Rules) with respect to all taxable years referred to in that paragraph.

3. For the purpose of applying the United States foreign tax credit in relation to taxes paid or accrued to Canada:

(a) Notwithstanding the provisions of paragraph 2(a) of Article II (Taxes Covered), the tax on 1971 undistributed income on hand imposed by Part IX of the Income Tax Act of Canada shall be considered to be an income tax for distributions made on or after the first day of January 1972 and before the first day of January 1979, and shall be considered imposed upon the recipient of a distribution, in the proportion that the distribution out of undistributed income with respect to which the tax has been paid bears to 85 per cent of such undistributed income; and

(b) The principles of paragraph 6 of Article XXIV (Elimination of Double Taxation) shall have effect for taxable years beginning on or after the first day of January 1976.

Any claim for refund based on the provisions of this paragraph may be filed on or before June 30 of the calendar year following that in which the Convention enters into force, notwithstanding any rule of domestic law to the contrary.

4. Subject to the provisions of paragraph 5, the 1942 Convention shall cease to have effect for taxes for which this Convention has effect in accordance with the provisions of paragraph 2.

5. Where any greater relief from tax would have been afforded by any provision of the 1942 Convention than under this Convention, any such provision shall continue to have effect for the first taxable year with respect to which the provisions of this Convention have effect under paragraph 2(b).

6. The 1942 Convention shall terminate on the last date on which it has effect in accordance with the preceding provisions of this Article.

7. The Exchange of Notes between the United States and Canada dated August 2 and September 17, 1928, providing for relief from double income taxation on shipping profits, is terminated. Its provisions shall cease to have effect with respect to taxable years beginning on or after the first day of January next following the date on which this Convention enters into force.

8. The provisions of the Convention between the Government of Canada and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on the Estates of Deceased Persons signed at Washington on February 17, 1961 shall continue to have effect with respect to estates of persons deceased prior to the first day of January next following the date on which this Convention enters into force but shall cease to have effect with respect to estates of persons deceased on or after that date. Such Convention shall terminate on the last date on which it has effect in accordance with the preceding sentence.

ARTICLE XXXI
Termination

1. This Convention shall remain in force until terminated by a Contracting State.

2. Either Contracting State may terminate the Convention at any time after 5 years from the date on which the Convention enters into force provided that at least 6 months prior notice of termination has been given through diplomatic channels.

3. Where a Contracting State considers that a significant change introduced in the taxation laws of the other Contracting State should be accommodated by a modification of the Convention, the Contracting States shall consult together with a view to resolving the matter; if the matter cannot be satisfactorily resolved, the first-mentioned State may terminate the Convention in accordance with the procedures set forth in paragraph 2, but without regard to the 5 year limitation provided therein.

4. In the event the Convention is terminated, the Convention shall cease to have effect:
>   (a) For tax withheld at the source on income referred to in Articles X (Dividends), XI (Interest), XII (Royalties), XVIII (Pensions and Annuities) and paragraph 2 of Article XXII (Other Income), with respect to amounts paid or credited on or after the first day of January next following the expiration of the 6 months period referred to in paragraph 2; and
>   (b) For other taxes, with respect to taxable years beginning on or after the first day of January next following the expiration of the 6 months' period referred to in paragraph 2.

In witness whereof, the undersigned, being duly authorized thereto by their respective Governments, have signed this Convention.

Done in two copies at Washington this twenty-sixth day of September, 1980, in the English and French languages, each text being equally authentic.

For the Government of the United States of America:

G. WILLIAM MILLER.

For the Government of Canada:

ALLAN J. MACEACHERN.

NOTES OF EXCHANGE

WASHINGTON D.C., *September 26, 1980*.

Appx622

HON. G. WILLIAM MILLER,
*Secretary of the Treasury,*
*Washington, D.C.*

SIR: I have the honour to refer to the Convention between Canada and the United States of America with Respect to Taxes on Income and on Capital, signed today, and to confirm certain understandings reached between the two Governments with respect to the Convention.

1. In French, the term "société" also means a "corporation" within the meaning of Canadian law.

2. The competent authorities of each of the Contracting States shall review the procedures and requirements for an organization of the other Contracting State to establish its status as a religious, scientific, literary, educational or charitable organization entitled to exemption under paragraph 1 of Article XXI (Exempt Organizations), or as an eligible recipient of the charitable contributions or gifts referred to in paragraphs 5 and 6 of Article XXI, with a view to avoiding duplicate application by such organizations to the administering agencies of both Contracting States. If a Contracting State determines that the other Contracting State maintains procedures to determine such status and rules for qualification that are compatible with such procedures and rules of the first-mentioned Contracting State, it is contemplated that such first-mentioned Contracting State shall accept the certification of the administering agency of the other Contracting State as to such status for the purpose of making the necessary determinations under paragraphs 1, 5 and 6 of Article XXI.

It is further agreed that the term "family", as used in paragraphs 5 and 6 of Article XXI, means an individual's brothers and sisters (whether by whole or half-blood, or by adoption), spouse, ancestors, lineal descendants and adopted descendants.

3. It is the position of Canada that the so-called "unitary apportionment" method used by certain states of the United States to allocate income to United States offices or subsidiaries of Canadian companies results in inequitable taxation and imposes excessive administrative burdens on Canadian companies doing business in those states. Under that method the profit of a Canadian company on its United States business is not determined on the basis of arm's-length relations but is derived from a formula taking account of the income of the Canadian company and its worldwide subsidiaries as well as the assets, payroll and sales of all such companies. For a Canadian multinational company with many subsidiaries in different countries to have to submit its books and records for all of these companies to a state of the United States imposes a costly burden. It is understood that the Senate of the United States has not consented to any limitation on the taxing jurisdiction of the states by a treaty and that a provision which would have restricted the use of unitary apportionment in the case of United Kingdom corporations was recently rejected by the Senate. Canada continues to be concerned about this issue as it affects Canadian multinationals. If an acceptable provision on this subject can be devised, the United States agrees to reopen discussions with Canada on this subject.

4. I have the honour to propose to you that the present Note and your reply thereto shall constitute an agreement between our two Governments on these matters.

Accept, Sir, the assurances of my highest consideration.

ALLAN J. MacEachern,
*Deputy Prime Minister and*
*Minister of Finance of Canada.*


SEPTEMBER 26, 1980.

Hon. ALLAN J. MacEachern,
*Deputy Prime Minister and*
*Minister of Finance of Canada.*

Sir: I have the honor to acknowledge receipt of your Note of September 26, 1980, which reads as follows:

"I have the honour to refer to the Convention between Canada and the United States of America with Respect to Taxes on Income and on Capital, signed today, and to confirm certain understandings reached between the two Governments with respect to the Convention.

1. In French, the term " société" also means a "corporation" within the meaning of Canadian law.

2. The competent authorities of each of the Contracting States shall review the procedures and requirements for an organization of the other Contracting State to establish its status as a religious, scientific, literary, educational or charitable organization entitled to exemption under paragraph 1 of Article XXI (Exempt Organizations), or as an eligible recipient of the charitable contributions or gifts referred to in paragraphs 5 and 6 of Article XXI. with a view to avoiding duplicate application by such organizations to the administering agencies of both Contracting States.

If a Contracting State determines that the other Contracting State maintains procedures to determine such status and rules for qualification that are compatible with such procedures and rules of the first-mentioned Contracting State, it is contemplated that such first-mentioned Contracting State shall accept the certification of the administering agency of the other Contracting State as to such status for the purpose of making the necessary determinations under paragraphs 1, 5 and 6 of Article XXI.

It is further agreed that the term "family," as used in paragraphs 5 and 6 of Article XXI means an individual's brothers and sisters (whether by whole or half-blood, or by adoption), spouse, ancestors, lineal descendants and adopted descendants.

3. It is the position of Canada that the so-called "unitary apportionment" method used by certain states of the United States to allocate income to United States offices or subsidiaries of Canadian companies results in inequitable taxation and imposes excessive administrative burdens on Canadian companies doing business in those states. Under that method the profit of a Canadian company on its United States business is not determined on the basis of arm's-length relations but is derived from a formula taking account of the income of the Canadian company and its world-wide subsidiaries as well as the assets, payroll and sales of all such companies. For a Canadian multinational company with many subsidiaries in different countries to have to submit its books and records for all of these companies to a state of the United States imposes a costly burden. It is understood that the Senate of the United States has not consented to any limitation on the taxing jurisdiction of the states by a treaty and that a provision which would have restricted the use of unitary apportionment in the case of United Kingdom corporations was recently rejected by the Senate. Canada continues to be concerned about this issue as it affects Canadian multinationals. If an acceptable provision on this subject can be devised, the United States agrees to reopen discussions with Canada on this subject.

4. I have the honour to propose to you that the present Note and your reply thereto shall constitute an agreement between our two Governments on these matters."

I confirm these understandings on behalf of the Government of the United States of America. These understandings constitute an agreement between our two Governments on this matter, which will enter into force on the date of entry into force of the Convention between the Government of the United States of America and the Government of Canada with Respect to Taxes on Income and on Capital which was signed today.

Accept, Sir, the renewed assurances of my highest consideration.

J. WILLIAM MILLER.

PROTOCOL 1

PROTOCOL AMENDING THE 1980 TAX CONVENTION
WITH CANADA

MESSAGE

FROM

THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

Appx625

A PROTOCOL AMENDING THE 1980 CONVENTION BETWEEN THE
UNITED STATES OF AMERICA AND CANADA WITH RESPECT
TO TAXES ON INCOME AND ON CAPITAL, SIGNED AT OTTAWA
ON JUNE 14, 1983, WITH A RELATED EXCHANGE OF NOTES

LETTER OF SUBMITTAL (PROTOCOL 1)

DEPARTMENT OF STATE,
*Washington, September 2, 1983.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you, with a view to its transmission to the Senate for advice and consent to ratification, the Protocol amending the Convention between the United States and Canada with respect to taxes on income and on capital, signed at Washington on September 26. 1980, which Protocol was signed at Ottawa on June 14, 1983. Also submitted for transmission to the Senate is a related exchange of notes.

The Convention was transmitted to the Senate on November 12, 1980, but Senate consideration of the Convention was delayed until certain technical problems in the text had been resolved. The Protocol resolves these technical problems by clarifying the language of the Convention to assure that its original intent is fulfilled. In addition, the Protocol introduces new rules not previously considered.

A necessary change is found in Articles IX and XIII of the Protocol. Paragraph 3 of Article IX amends paragraph 6 of Article XVIII (Pensions and Annuities) of the Convention by splitting the rule in the paragraph relating to the taxation of alimony and child support payments into two subparagraphs. This is done to permit proper cross-referencing in paragraph 3(a) of Article XXIX (Miscellaneous Rules) of the Convention. Article XIII of the Protocol amends Article XXIX to assure that the United States will preserve its full right to tax pensions, annuities, and alimony received by United States citizens who are resident in Canada.

Article VI of the Protocol makes some significant changes to Article XIII (Gains) of the Convention. Paragraph 3 of Article XIII has been rewritten to enable the United States to exercise its full taxing right under the Foreign Investment in Real Property Tax Act (section 897 of the Internal Revenue Code of 1954, as amended). Further, paragraph 9 of Article XIII has been modified to clarify the circumstances under which a resident of one Contracting State, upon alienating a capital asset, is entitled to an exemption from tax in the other State with respect to appreciation prior to the Conventions entry into force.

Paragraph 2 of Article VII of the Protocol introduces a new paragraph 4 to Article XVI (Artistes and Athletes) of the Convention, through which a bonus paid as inducement to an athlete resident in one State to sign a contract with an employer resident in the other State may be taxed in the latter State. but at a rate not to exceed 15 percent of the amount of the bonus. In the convention, as signed, the treatment of such bonuses in the State of residence of the employer is unclear, and, in any event, recipients of bonuses are not protected by a limit on the rate of tax in such State.

The Protocol is subject to ratification and will enter into force upon the exchange at Washington of instruments of ratification and shall thereupon have effect in accordance with Article XXX (Entry into Force) of the Convention.

An exchange of notes dealing with tax rates for natural resource royalties is also transmitted. Although a limit on such rates was set by the 1942 Convention, the pending Convention does not set such a limit. This exchange of notes assures that, in the event either State significantly raises its statutory tax rates, negotiations to provide an appropriate limit to such tax rate will be resumed at the request of either.

A technical memorandum explaining in detail the provisions of the Protocol is being prepared by the Department of the Treasury and will be submitted to the Senate Committee on Foreign Relations.

The Department of the Treasury, with the cooperation of the Department of State, was primarily responsible for the negotiation of the Protocol. It has the approval of both Departments.

Respectively submitted,

GEORGE P. SHULTZ.

LETTER OF TRANSMITTAL (PROTOCOL 1)

THE WHITE HOUSE, *September 21, 1983.*

*To the Senate of the United States:*

I transmit herewith, for Senate advice and consent to ratification, a Protocol signed at Ottawa on June 14, 1983, amending the Convention between the United States and Canada with respect to taxes on income and on capital, signed at Washington on September 26, 1980. I also transmit a related exchange of notes and the report of the Department of State with respect to the Protocol.

Senate consideration of the Convention, which was transmitted for advice and consent to ratification by letter dated November 12, 1980, has been delayed pending the correction of certain technical problems in its text. The Protocol resolves these technical problems by clarifying the language of the Convention to assure that its original intent is fulfilled.

In addition, the Protocol makes a necessary change regarding pensions, annuities and alimony and amends the Convention to permit the United States to exercise its full taxing right, under the Foreign Investment in Real Property Act, section 897 of the Internal Revenue Code. The Protocol also includes a new rule which affects an athlete resident in one State who is a recipient of a bonus from an employer resident in another State. The new rule protects such a recipient by limiting the rate of tax in the State of the employer.

It is most desirable that this Protocol, together with the Convention, be considered by the Senate as soon as possible and that the Senate give advice and consent to ratification of both instruments.

RONALD REAGAN.

PROTOCOL AMENDING THE CONVENTION BETWEEN THE UNITED STATES OF' AMERICA AND CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980

The United States of America and Canada,

Desiring to conclude a Protocol to amend the Convention with respect to Taxes on Income and on Capital signed at Washington on September 26,1980 (hereinafter referred to as "the Convention"),

Have Agreed as Follows:

## ARTICLE 1

Subparagraph 1(h) of Article III (General Definitions) of the Convention shall be deleted and replaced by the following:

> "(h) The term "international traffic" with reference to a resident of a Contracting State means any voyage of a ship or aircraft to transport passengers or property (whether or not operated or used by that resident) except where the principal purpose of the voyage is to transport passengers or property between places within the other Contracting State;"

## ARTICLE II

Paragraph 4 of Article V (Permanent Establishment) shall be deleted and replaced by the following:
"4. The use of an installation or drilling rig or ship in a Contracting State to explore for or exploit natural resources constitutes a permanent establishment if, but only if, such use is for more than three months in any twelve-month period."

Appx628

## ARTICLE III

Article VI (Income from Real Property) shall be deleted and replaced by the following:

"1. Income derived by a resident of a Contracting State from real property (including income from agriculture, forestry or other natural resources) situated in the other Contracting State may be taxed in that other State.

2. For the purposes of this Convention, the term "real property" shall have the meaning which it has under the taxation laws of the Contracting State in which the property in question is situated and shall include any option or similar right in respect thereof. The term shall in any case include usufruct of real property, rights to explore for or to exploit mineral deposits, sources and other natural resources and rights to amounts computed by reference to the amount or value of production from such resources; ships and aircraft shall not be regarded as real property.

3. The provisions of paragraph 1 shall apply to income derived from the direct use, letting or use in any other form of real property and to income from the alienation of such property."

## ARTICLE IV

Paragraph 1 of Article VIII (Transportation) shall be deleted and replaced by the following:

"1. Notwithstanding the provisions of Articles VII (Business Profits), XII (Royalties) and XIII (Gains), profits derived by a resident of a Contracting State from the operation of ships or aircraft in international traffic, and gains derived by a resident of a Contracting State from the alienation of ships, aircraft or containers (including trailers and related equipment for the transport of containers) used principally in international traffic, shall be exempt from tax in the other Contracting State."

## ARTICLE V

1. Paragraph 3 of Article XII (Royalties) shall be deleted; and replaced by the following:

"3. Notwithstanding the provisions of paragraph 2, copyright royalties and other like payments in respect of the production or reproduction of any literary, dramatic, musical or artistic work (but not including royalties in respect of motion pictures and works on film, videotape or other means of reproduction for use in connection with television) arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State."

2. Paragraph 4 of Article XII (Royalties) shall be deleted and replaced by the following:

"4. The term "royalties" as used in this Article means payments of any kind received as a consideration for the use of, or the right to use, any copyright of literary, artistic or scientific work (including motion pictures and works on film, videotape or other means of reproduction for use in connection with television), any patent, trade mark, design or model, plan, secret formula or process, or

Appx629

for the use of, or the right to use, tangible personal property or for information concerning industrial, commercial or scientific experience, and, notwithstanding the provisions of Article XIII (Gains), includes gains from the alienation of any intangible property or rights described in this paragraph to the extent that such gains are contingent on the productivity, use or subsequent disposition of such property or rights."

3. Subparagraph 6(b) of Article XII (Royalties) shall be deleted and replaced by the following:
"(b) Where the royalties are for the use of, or the right to use, intangible property or tangible personal property in a Contracting State, then such royalties shall be deemed to arise in that State and not in the State of which the payer is a resident."

## ARTICLE VI

1. Paragraph 3 of Article XIII (Gains) shall be deleted and replaced by the following:
"3. For the purposes of this Article the term real property situated in the other Contracting State
(a) In the case of real property situated in the United States, means a United States real property interest and real property referred to in Article VI (Income from Real Property) situated in the United States; and
(b) In the case of real property situated in Canada means:
(i) Real property referred to in Article VI (Income from Real Property) situated in Canada;
(ii) A share of the capital stock of a company, the value of whose shares is derived principally from real property situated in Canada; and
(iii) An interest in a partnership, trust or estate, the value of which is derived principally from real property situated in Canada."

2. Paragraph 5 of Article XIII (Gains) shall be deleted and replaced by the following:
"5. The provisions of paragraph 4 shall not affect the right of a Contracting State to levy tax on gains from the alienation of property derived by an individual who is a resident of the other Contracting State if such individual:
(a) Was a resident of the first-mentioned State for 120 months during any period of 20 consecutive years preceding the alienation of the property; and
(b) Was a resident of the first-mentioned State at any time during the ten years immediately preceding the alienation of the property;
and if such property (or property for which such property was substituted in an alienation the gain on which was not recognized for the purposes of taxation in the first-mentioned State) was owned by the individual at the time he ceased to be a resident of the first-mentioned State."

3. Paragraph 9 of Article XIII (Gains) shall be deleted and replaced by the following:
"9. Where a person who is a resident of a Contracting State alienates a capital asset which may in accordance with this Article be taxed in the other Contracting State and

Appx630

(a) That person owned the asset on September 26, 1980 and was resident in the first-mentioned State on that date; or

(b) The asset was acquired by that person in an alienation of property which qualified as a non-recognition transaction for the purposes of taxation in that other State;

the amount of the gain which is liable to tax in that other State in accordance with this Article shall be reduced by the proportion of the gain attributable on a monthly basis to the period ending on December 31 of the year in which the Convention enters into force, or such greater portion of the gain as is shown to the satisfaction of the competent authority of the other State to be reasonably attributable to that period. For the purposes of this paragraph the term "non-recognition transaction" includes a transaction to which paragraph 8 applies and, in the case of taxation in the United States, a transaction that would have been a non-recognition transaction but for Sections 897(d) and 897(e) of the Internal Revenue Code. The provisions of this paragraph shall not apply to

(c) An asset that on September 26, 1980 formed part of the business property of a permanent establishment or pertained to a fixed base of a resident of a Contracting State situated in the other Contracting State;

(d) An alienation by a resident of a Contracting State of an asset that was owned at any time after September 26, 1980 and before such alienation by a person who was not at all times after that date while the asset was owned by such person a resident of that State; or

(e) An alienation of an asset that was acquired by a person at any time after September 26, 1980 and before such alienation in a transaction other than a non-recognition transaction."

## ARTICLE VII

1. Paragraph 3 of Article XVI (Artistes and Athletes) shall be deleted and replaced by the following:

"3. The provisions of paragraphs 1 and 2 shall not apply to the income of:

(a) An athlete in respect of his activities as an employee of a team which participates in a league with regularly schedule games in both Contracting States; or

(b) A team described in subparagraph (a)."

2. There shall be added to Article XVI (Artistes and Athletes) a new paragraph 4, as follows:

"4. Notwithstanding the provisions of Articles XIV (Independent Personal Services) and XV (Dependent Personal Services) an amount paid by a resident of a Contracting State to a resident of the other Contracting State as an inducement to sign an agreement relating to the performance of the services of an athlete (other than an amount referred to in paragraph 1 of Article XV (Dependent Personal Services)) may be taxed in the first-mentioned State, but the tax so charged shall not exceed 15 per cent of the gross amount of such payment."

## ARTICLE VIII

# Appx631

1. The Title of Article XVII shall be deleted and replaced by the following:
"Withholding of Taxes in Respect of Personal Services"

2. Paragraph 2 of Article XVII (Withholding of Taxes in Respect of Personal Services) shall be deleted and replaced by the following:
"2. Where the competent authority of a Contracting State considers that an amount that would otherwise be deducted or withheld from any amount paid or credited to an individual who is a resident of the other Contracting State in respect of the performance of personal services in the first-mentioned State is excessive in relation to the estimated tax liability for the taxable year of that individual in the first-mentioned State, it may determine that a lesser amount will be deducted or withheld."

ARTICLE IX

1. Paragraph 1 of Article XVIII (Pensions and Annuities) shall be deleted and replaced by the following:
"1. Pensions and annuities arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in that other State, but the amount of any such pension that would be excluded from taxable income in the first-mentioned State if the recipient were a resident thereof shall be exempt from taxation in that other State."

2. Subparagraph 2(b) of Article XVIII (Pensions and Annuities) shall be deleted and replaced by the following:
"(b) Annuities may also be taxed in the Contracting State in which they arise and according to the laws of that State; but if a resident of the other Contracting State is the beneficial owner of an annuity payment, the tax so charged shall not exceed 15 per cent of the portion of such payment that would not be excluded from taxable income in the first-mentioned State if the beneficial owner were a resident thereof."

3. Paragraph 6 of Article XVIII (Pensions and Annuities) shall be deleted and replaced by the following:
"6. Alimony and other similar amounts (including child support payments) arising in a Contracting State and paid to a resident of the other Contracting State shall be taxable as follows:
(a) Such amounts shall be taxable only in that other State;
(b) Notwithstanding the provisions of subparagraph (a), the amount that would be excluded from taxable income in the first-mentioned State if the recipient were a resident thereof shall be exempt from taxation in that other State."

ARTICLE X

Appx632

Paragraph 2 of Article XXI (Exempt Organizations) shall be deleted and replaced by the following:

"2. Subject to the provisions of paragraph 3 income referred to in Article X (Dividends) and XI (Interest) derived by:

(a) A trust, company or other organization which is resident in a Contracting State, generally exempt from tax in a taxable year in that State and constituted and operate exclusively to administer or provide benefits under one or more funds or plans established to provide pension, retirement or other employee benefits; or

(b) A trust, company or other organization which is resident in Contracting State, not taxed in a taxable year in that State and constituted and operated exclusively to earn income for the benefit of an organization referred to in subparagraph (a); shall be exempt from tax in the taxable year in the other Contracting State."

## ARTICLE XI

1. Paragraph 1 of Article XXIV (Elimination of Double Taxation) shall be deleted and replaced by the following:

"1. In the case of the United States subject to the provisions of paragraph 4, 5 and 6, double taxation shall be avoided as follows: In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States, or to a company electing to be treated as a domestic corporation, as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada; and, in the case of a company which is a resident of the United States owning at least 10 per cent of the voting stock of a company which is a resident of Canada from which it receives dividends in any taxable year, the United States shall allow as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada by that company with respect to the profits out of which such dividends are paid."

2. Paragraph 2 of Article XXIV (Elimination of Double Taxation) shall be deleted and replaced by the following:

"2. In the case of Canada, subject to the provisions of paragraphs 4, 5 and 6, double taxation shall be avoided as follows:

(a) Subject to the provisions of the law of Canada regarding the deduction from tax payable in Canada of tax paid in a territory outside Canada and to any subsequent modification of those provisions (which shall not affect the general principle hereof), and unless a greater deduction or relief is provided under the law of Canada, income tax paid or accrued to the United States on profits, income or gains arising in the United States shall be deducted from any Canadian tax payable in respect of such profits, income or gains;

(b) Subject to the provisions of the law of Canada regarding the determination of the exempt surplus of a foreign affiliate and to any subsequent modification of those provisions (which shall not affect the general principle hereof), for the purposes of computing Canadian tax,

a company which is a resident of Canada shall be allowed to deduct in computing its taxable income any dividend received by it out of the exempt surplus of a foreign affiliate which is a resident of the United States; and

(c) Notwithstanding the provisions of subparagraph (a), where Canada imposes a tax on gains from the alienation of property that, but for the provisions of paragraph 5 of Article XIII (Gains), would not be taxable in Canada, income tax paid or accrued to the United States on such gains shall be deducted from any Canadian tax payable in respect of such gains."

3. There shall be added to Article XXIV (Elimination of Double Taxation) a new paragraph 9, as follows:

"9 The provisions of this Article relating to the source of profits, income or gains shall not apply for the purpose of determining a credit against United States tax for any foreign taxes other than income taxes paid or accrued to Canada."

## ARTICLE XII

Paragraph 6 of Article XXV (Non-Discrimination) shall be deleted and replaced by the following:

"6. Notwithstanding the provisions of Article XXIV (Elimination of Double Taxation), the taxation on a permanent establishment which a resident of a Contracting State has in the other Contracting State shall not be less favorably levied in the other State than the taxation levied on residents of the other State carrying on the same activities. This paragraph shall not be construed as obliging a Contracting State:

(a) To grant to a resident of the other Contracting State any personal allowances, reliefs and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents; or

(b) To grant to a company which is a resident of the other Contracting State the same tax relief that it provides to a company which is a resident of the first-mentioned State with respect to dividends received by it from a company."

## ARTICLE XIII

1. Paragraph 2 of Article XXIX (Miscellaneous Rules) shall be deleted and replaced by the following:

"2. Except as provided in paragraph 3, nothing in the Convention shall be construed as preventing a Contracting State from taxing its residents (as determined under Article IV (Residence)) and, in the case of the United States, its citizens (including a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of tax, but only for a period of ten years following such loss) and companies electing to be treated as domestic corporations, as if there were no convention between the United States and Canada with respect to taxes on income and on capital."

2. Subparagraph 3(a) of Article XXIX (Miscellaneous Rules) shall be deleted and replaced by the following:

"(a) Under paragraphs 3 and 4 of Article IX (Related Persons), paragraphs 6 and 7 of Article XIII (Gains), paragraphs 1, 3, 4, and 6(b) of Article XVIII (Pensions and Annuities), paragraph 5 of Article XXIX (Miscellaneous Rules), paragraphs 3 and 5 of Article XXX (Entry into Force), and Articles XIX (Government Service), XXI (Exempt Organizations), XXIV (Elimination of Double Taxation), XXV (Non-Discrimination) and XXVI (Mutual Agreement Procedure); and"

3. Paragraph 4 of Article XXIX (Miscellaneous Rules) shall be deleted and replaced by the following:

"4. With respect to taxable years not barred by the statute of limitations ending on or before December 31 of the year before the year in which the Social Security Agreement between Canada and the United States (signed in Ottawa on March 11, 1981) enters into force, income from personal services not subject to tax by the United States under this Convention or the 1942 Convention shall not be considered wages or net earnings from self-employment for purposes of social security taxes imposed under the Internal Revenue Code."

4. Paragraph 5 of Article XXIX (Miscellaneous Rules) shall be deleted and replaced by the following:

"5. A beneficiary of a Canadian registered retirement savings plan may elect, under rules established by the competent authority of the United States, to defer United States taxation with respect to any income accrued in the plan but not distributed by the plan, until such time as a distribution is made from such plan, or any plan substituted therefor. The provisions of the preceding sentence shall not apply to income which is reasonably attributable to contributions made to the plan by the beneficiary while he was not a resident of Canada."

5. Paragraph 6 of Article XXIX (Miscellaneous Rules) shall be deleted and replaced by the following:

"6. Notwithstanding any other provision of the Convention,

(a) Where profits, income or gains derived by a trust is to be treated for the purposes of the Convention as income of a resident of a Contracting State, and a principal purpose for the establishment, acquisition or maintenance of the trust was to obtain a benefit under the Convention or the 1942 Convention for persons who are not residents of that State, Articles VI (Income from Real Property) through XXIV (Elimination of Double Taxation) shall not apply in relation to the profits, income or gains of the trust; and

(b) Articles VI (Income from Real Property) through XXIV (Elimination of Double Taxation) shall not apply to non-resident-owned investment corporations as defined under section 133 of the Income Tax Act of Canada, or under any similar provision enacted by Canada after the date of signature of the Protocol."

Appx635

## ARTICLE XIV

Paragraph 3 of Article XXX (Entry into Force) shall be deleted and replaced by the following:

"3. For the purposes of applying the United States foreign tax credit in relation to taxes paid or accrued to Canada:

(a) Notwithstanding the provisions of paragraph 2(a) of Article II (Taxes Covered), the tax on 1971 undistributed income on hand imposed by Part IX of the Income Tax Act of Canada shall be considered to be an income tax for distributions made on or after the first day of January 1972 and before the first day of January 1979 and shall be considered to be imposed upon the recipient of a distribution, in the proportion that the distribution out of undistributed income with respect to which the tax has been paid bears to 85 per cent of such undistributed income;

(b) The principles of paragraph 6 of Article XXIV (Elimination of Double Taxation) shall have effect for taxable years beginning on or after the first day of January 1976; and

(c) The provisions of paragraph 1 of Article XXIV shall have effect for taxable years beginning on or after the first day of January 1981.

Any claim for refund based on the provisions of this paragraph may be filed on or before June 30 of the calendar year following that in which the Convention enters into force, notwithstanding any rule of domestic law to the contrary."

## ARTICLE XV

1. This Protocol shall be subject to ratification in accordance with the applicable procedures of Canada and the United States and instruments of ratification shall be exchanged at Washington as soon as possible.

2. The Protocol shall enter into force upon the exchange of instruments of ratification and shall have effect in accordance with Article XXX (Entry into Force) of the Convention.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

Done in two copies at Ottawa this 14th day of June, 1983, in the English and French languages, each text being equally authentic.

FOR THE GOVERNMENT
OF CANADA
    (s) Marc Lalonde

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA
    (s) Paul H. Robinson, Jr.

## NOTES OF EXCHANGE (PROTOCOL 1)

Appx636

OTTAWA, ONTARIO, *June 14,1983.*

His Excellency PAUL H. ROBINSON, Jr.,
*Ambassador of the United States of America,*
*Ottawa, Ontario.*

EXCELLENCY: The Convention between Canada and the United States of America, with Respect to Taxes on Income and on Capital signed at Washington on September 26, 1980, as amended by the Protocol signed today, provides that income from real property, including natural resources, may be taxed by the Contracting State in which the real property is situated under the statutory rules of that State. This rule is the international standard, consistent with the OECD Model Double Taxation Convention on Income and on Capital and with recent tax conventions of both countries.

The 1942 Convention provides a 15% limit on the statutory rate of tax at which royalties including natural resource royalties may be taxed. Concern has been expressed by persons receiving natural resource royalties that the new Convention provides no limitation in the tax rate that either country may impose. Canada and the United States agree that if either country increases the statutory tax rate which now applies to such natural resource royalties paid to non-residents (25% in Canada and 30% in the United States), negotiations will be resumed promptly upon request by either country with a view to considering an amendment to the Convention to provide an appropriate limit to the rate at which such royalties may be taxed.

Accept, Excellency, the assurances of my highest consideration.

MARC LALONDE
*Minister of Finance.*

OTTAWA, *June 14, 1983.*

Hon. MARC LALONDE,
*Minister of Finance.*

SIR: The Convention between Canada and the United States of America, with Respect to Taxes on Income and on Capital signed at Washington on September 26, 1980, as amended by the Protocol signed today, provides that income from real property, including natural resources; may be taxed by the Contracting State in which the real property is situated under the statutory rules of the State. This rule is the international standard, consistent with the OECD Model Double Taxation Convention on Income and on Capital and with recent tax conventions of both countries.

Appx637

The 1942 Convention provides a 15 percent limit on the statutory rate of tax at which royalties including natural resource royalties may be taxed. Concern has been expressed by persons receiving natural resource royalties that the new Convention provides no limitation in the tax rate that either country may impose. Canada and the United States agree that if either country increases the statutory tax rate which now applies to such natural resource royalties paid to non-residents (25 percent in Canada and 30 percent in the United States), negotiations will be resumed promptly upon request by either country with a view to considering an amendment to the Convention to provide an appropriate limit to the rate at which such royalties may be taxed.

Accept, Sir, the assurances of my highest consideration.

(s) PAUL H. ROBINSON, Jr.,

I certify that this is an accurate copy of the original.

MARIO RUGGIA,
*Vice Consul, U.S. Embassy,*
*Ottawa, Canada.*

PROTOCOL 2

A SECOND PROTOCOL AMENDING THE 1980 TAX CONVENTION WITH CANADA

MESSAGE

FROM

THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

A SECOND PROTOCOL, SIGNED AT WASHINGTON ON MARCH 28, 1984, AMENDING THE CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980, AS AMENDED BY THE PROTOCOL SIGNED AT OTTAWA ON JUNE 14, 1983

LETTER OF SUBMITTAL (PROTOCOL 2)

DEPARTMENT OF STATE,
*Washington, April 2, 1984.*

THE PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you, with a view to its transmission to the Senate for advice and consent to ratification, the Second Protocol Amending the Convention between the United States of America and Canada with Respect to Taxes on Income and on Capital, signed at Washington on September 26, 1980, as amended by the Protocol signed at Ottawa on June 14, 1983. The second protocol was signed at Washington on March 28, 1984. The convention and first protocol are awaiting consideration by the Senate.

Since the convention and first protocol were negotiated, new social security legislation has been enacted. The Social Security Amendments of 1983 (Pub. L. 98-21, 97 Stat. 65, Apr. 20, 1983) provide in part that social security benefits paid to nonresident aliens henceforth will be subject to an effective 15 percent withholding tax. As the legislative history makes clear, however, Congress did not intend to override the treatment of such benefits in existing income tax treaties *(1983 U.S. Code Cong. & Adm. News 143, 169).* The Canadian government has requested that the pending income tax convention be amended to exempt Canadian residents from such withholding.

Under the second protocol, each party agrees not to tax social security benefits it pays to residents of the other country. The United States, however, will exempt only those Canadian residents who are not United States citizens; United States citizens will continue to be taxable to the extent provided under United States law. In addition, each party agrees to tax its own residents on only one half the social security benefits they derive from the other country.

The second protocol, like the convention and the first protocol, is subject to ratification. It will enter into force upon the exchange of instruments of ratification, which will take place at Ottawa. and shall thereupon have effect in accordance with Article XXX (Entry into Force) of the convention.

A technical memorandum explaining in detail the provisions of the second protocol is being prepared by the Department of the Treasury and will be submitted separately to the Senate Committee on Foreign Relations.

The Department of the Treasury, with the cooperation of the Department of State, was primarily responsible for the negotiation of the second protocol. It has the approval of both Departments.

Respectfully submitted,

GEORGE P. SHULTZ.

LETTER OF TRANSMITTAL (PROTOCOL 2)

THE WHITE HOUSE, *April 18, 1984.*

*To the Senate of the United States:*

I transmit herewith, for Senate advice and consent to ratification, a Second Protocol, signed at Washington on March 28, 1984, Amending the Convention between the United States and Canada with Respect to Taxes on Income and on Capital, signed at Washington on September 26, 1980, as amended by a Protocol signed at Ottawa on June 14, 1983. I also transmit the report of the Department of State with respect to the second protocol.

The Social Security Amendments of 1983 were enacted since the negotiation of the convention and first protocol. They provide in part that social security benefits paid to nonresident aliens henceforth will be subject to an effective 15 percent withholding tax. The Canadian Government has requested that the pending convention be amended to exempt Canadian residents from such withholding.

The second protocol would amend Article XVIII (Pensions and Annuities) of the convention, so as to provide that social security benefits paid by one party to residents of the other "shall be taxable only in that other State." However, United States citizens resident in Canada will continue to be taxable to the extent provided under United States law.

It is most desirable that this second protocol, together with the convention and first protocol, be considered by the Senate as soon as possible and that the Senate give advice and consent to ratification of the convention and two amending protocols.

RONALD REAGAN.

SECOND PROTOCOL AMENDING THE CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980, AS AMENDED BY THE PROTOCOL SIGNED AT OTTAWA ON JUNE 14, 1983

The United States of America and Canada,

Desiring to conclude a second Protocol to amend the Convention with respect to Taxes on Income and on Capital signed at Washington on September 26, 1980, as amended by the Protocol signed at Ottawa on June 14, 1983 (hereinafter referred to as "the Convention"),

Have agreed as follows:

## ARTICLE I

Paragraph 5 of Article XVIII (Pensions and Annuities) of the Convention shall be deleted and replaced by the following:

"5. Benefits under the social security legislation in a Contracting State paid to a resident of the other Contracting State shall be taxable as follows:

(a) Such benefits shall be taxable only in that other State;

(b) Notwithstanding the provisions of subparagraph (a), one-half of the total amount of any such benefit paid in a taxable year shall be exempt from taxation in that other State."

## ARTICLE II

1. Subparagraph 3(a) of Article XXIX (Miscellaneous Rules) of the Convention shall be deleted and replaced by the following:

"(a) Under paragraphs 3 and 4 of Article IX (Related Persons), paragraphs 6 and 7 of Article XIII (Gains), paragraphs 1, 3, 4, 5(b), and 6(b) of Article XVIII (Pensions and Annuities), paragraphs 5 and 7 of Article XXIX (Miscellaneous Rules), paragraphs 3 and 5 of Article XXX (Entry into Force), and Articles XIX (Government Service), XXI (Exempt Organizations), XXIV (Elimination of Double Taxation), XXV (Non-Discrimination), and XXVI (Mutual Agreement Procedure); and"

2. There shall be added to Article XXIX (Miscellaneous Rules) of the Convention a new paragraph 7, as follows:

"7. One-half of the total amount of benefits under the social security legislation in Canada paid in a taxable year to a resident of Canada who is a citizen of the United States shall be exempt from taxation in the United States."

## ARTICLE III

1. This Protocol shall be subject to ratification in accordance with the applicable procedures of the United States and Canada and instruments of ratification shall be exchanged as soon as possible.

2. The Protocol shall enter into force upon the exchange of instruments of ratification and shall have effect in accordance with the provisions of Article XXX (Entry into Force) of the Convention.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Government, have signed this Protocol.

DONE in duplicate at Washington, this 28th day of March 1984, in the English and French languages, the two texts being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA
    (s) Kenneth W. Dam

FOR THE GOVERNMENT OF
CANADA
    (s) Allan E. Gotlieb

## PROTOCOL 3

### A REVISED PROTOCOL AMENDING THE 1980
### TAX CONVENTION WITH CANADA

### MESSAGE

### FROM

### THE PRESIDENT OF THE UNITED STATES

### TRANSMITTING

### A REVISED PROTOCOL AMENDING THE CONVENTION BETWEEN THE UNITED STATES AND CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980, AS AMENDED BY THE PROTOCOLS SIGNED ON JUNE 14, 1983 AND MARCH 28, 1984

### LETTER OF SUBMITTAL (PROTOCOL 3)

DEPARTMENT OF STATE,
*Washington, April 12, 1995.*

THE PRESIDENT,
*The White House*.

THE PRESIDENT: I have the honor to submit to you, with a view to its transmission to the Senate for advice and consent to ratification, a revised Protocol Amending the Convention between the United States and Canada with Respect to Taxes on Income and on Capital signed at Washington on September 26, 1980, as amended by the Protocols signed on June 14, 1983 and March 28, 1984. The revised Protocol would replace the Protocol to the Convention between the United States and Canada signed at Washington on August 31, 1994, which was transmitted to the Senate with a message from

the President dated September 14, 1994, and which is now pending in the Committee on Foreign Relations. The Protocol makes a number of amendments to the Convention. The most significant amendments are described below, in the order in which they appear in the Protocol. The revised Protocol makes technical changes intended to clarify the operation of some of the death tax provisions and to ensure that certain rules for entry into force operate properly.

The Convention currently provides for adjustments to related party transactions to reflect the amounts of income and expense that would have been reported in unrelated party transactions. It also provides for the other Contracting State to make correlative adjustments. However, unlike most of the United States tax treaties, the present Convention requires the State making the first adjustment to withdraw it if the initial adjustment has not been reported to the other Contracting State within six years of the year to which the first adjustment relates. This has created a potential for abuse. The Protocol will remove the obligation of the first-mentioned State to withdraw its adjustment in those circumstances.

The Protocol also reduces the withholding rates charged by one country on payments of certain classes of dividends, interest and royalties to residents of the other country. The withholding rate on dividends is reduced from 10 to 5 percent, phased in over two years, for a corporate shareholder that owns at least 10 percent of the voting stock of the paying company and is the beneficial owner of the dividends. The Protocol adds, in what has become established U.S. tax treaty policy, a rule to ensure that dividends paid by non-taxable "conduit" entities, such as U.S.-regulated investment companies (RICs) and real estate investment trusts (REITs), will not receive unjustified treaty benefits. In addition, the small individual shareholder benefits for REITs will be allowed to the estate of such an individual for up to five years.

The general withholding rate on interest will be reduced from 15 to 10 percent. The exemption in the present treaty for interest on trade credits will be broadened to include not only interest received by the seller but also interest received by other holders of trade credits. Real estate mortgage investment conduit (REMIC) excess inclusions will be taxable by the United States at full statutory rates. Most classes of royalties, including software royalties, will be exempt from withholding by the country in which the royalty arises.

Social security benefits, under the Protocol, are subject to tax only in the country making the payment. This change reflects U.S. tax treaty policy.

The scope of the non-discrimination article is broadened to include all national-level taxes in both Contracting States. Under the present Convention, the non-discrimination provisions are limited, with respect to taxes imposed by Canada, to taxes imposed under the Canadian Income Tax Act.

The Protocol strengthens levels of cooperation between the tax authorities of the Contracting States. It provides that the Contracting States may, by mutual agreement, implement an arbitration procedure for the resolution of disputes under the Convention. The Protocol also adds a detailed set of rules under which each State will assist the other in the collection of its taxes.

The information exchange provision is also broadened to include all national taxes. With respect to Canadian taxes, the present Convention covers only taxes imposed under the Income Tax Act and any national taxes on estates and gifts. The Protocol also provides for consultation and, if appropriate, renegotiation (subject to the usual ratification procedures) where future domestic legislation materially conflicts with treaty provisions.

The present Convention has no general anti-treaty-shopping rules. The comprehensive "limitations on benefits" provisions add to the treaty by the Protocol are, at Canada's request, primarily unilateral. These provisions protect the United States against use of the treaty by "treaty shoppers" seeking to gain unintended U.S. treaty benefits through Canada.

The Protocol adds rules to the Convention concerning taxation at death. The United States and Canada have different methods for imposing taxation at death. The United States imposes an estate tax, while Canada imposes an income tax on certain gains deemed realized at death. The Protocol contains many provisions which reduce the impact of taxes imposed at death by one Contracting State on residents of the other. First, the Protocol provides a limited U.S. estate tax waiver for small estates of Canadian resident decedents. Second, it provides a *pro rata* unified credit by the United States for estates of Canadian resident decedents. Third, it allows a limited U.S. "marital credit" for estates of Canadian resident decedents and of Canadian-citizen decedents resident in the United States. Fourth, the Protocol allows a credit against U.S. estate tax for Canadian income tax on certain income, profits, and gains realized in the year of death and on certain gains deemed realized at death by Canadian residents, and vice versa. Fifth, certain U.S. qualified domestic trusts" would be allowed to qualify as Canadian spousal trusts for purposes of Canadian law. Finally, relief would be provided for certain cross-border charitable bequests. The revised Protocol clarifies certain aspects of the computation and coordination of these provisions concerning taxation at death.

The Protocol requires the appropriate authorities of the Contracting States to consult within three years of its entry into force regarding further reductions in withholding rates and the application of the anti-treaty-shopping rules. The appropriate authorities are instructed to consult after three years regarding implementation of the arbitration procedure. The Protocol enters into force upon the exchange of instruments of ratification.

A technical memorandum explaining in detail the provisions of the revised Protocol will be prepared by the Department of the Treasury and will be submitted separately to the Senate Committee on Foreign Relations.

The Department of the Treasury and the Department of State cooperated in the negotiation of the revised Protocol. It has the full approval of both Departments.

Respectfully submitted,

PETER TARNOFF.

LETTER OF TRANSMITTAL (PROTOCOL 3)

THE WHITE HOUSE, *April 24, 1995.*

*To the Senate of the United States:*

I transmit herewith for Senate advice and consent to ratification, a revised Protocol Amending the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980, as Amended by the Protocols Signed on June 14, 1983, and March 28, 1984. This revised Protocol was signed at Washington on March 17, 1995. Also transmitted for the information of the Senate is the report of the Department of State with respect to the revised Protocol. The principal provisions of the Protocol, as well as the reasons for the technical amendments made in the revised Protocol, are explained in that document.

It is my desire that revised Protocol transmitted herewith be considered in place of the Protocol to the Income Tax Convention with Canada signed at Washington on August 31, 1994, which was transmitted to the Senate with my message dated September 14, 1994, and which is now pending in the Committee on Foreign Relations. I desire, therefore, to withdraw from the Senate the Protocol signed in August 1994.

I recommend that the Senate give early and favorable consideration to the revised Protocol and give its advice and consent to ratification.

WILLIAM J. CLINTON.

PROTOCOL AMENDING THE CONVENTION BETWEEN THE UNITED STATES OF AMERICA AND CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980, AS AMENDED BY THE PROTOCOLS SIGNED ON JUNE 14, 1983 AND MARCH 28, 1984

The United States of America and Canada, desiring to conclude a Protocol to amend the Convention with Respect to Taxes on Income and on Capital signed at Washington on September 26, 1980, as amended by the Protocols signed on June 14, 1983 and March 28, 1984 (hereinafter referred to as "the Convention"), have agreed as follows:

ARTICLE 1

Appx645

Paragraphs 2 to 4 of Article II (Taxes Covered) of the Convention shall be deleted and replaced by the following:

"2. Notwithstanding paragraph 1, the taxes existing on *March 17, 1995* to which the Convention shall apply are:

(a) In the case of Canada, the taxes imposed by the Government of Canada under the Income Tax Act; and

(b) In the case of the United States, the Federal income taxes imposed by the Internal Revenue Code of 1986. However, the Convention shall apply to:

(i) The United States accumulated earnings tax and personal holding company tax, to the extent, and only to the extent, necessary to implement the provisions of paragraphs 5 and 8 of Article X (Dividends);

(ii) The United States excise taxes imposed with respect to private foundations, to the extent, and only to the extent, necessary to implement the provisions of paragraph 4 of Article XXI (Exempt Organizations);

(iii) The United States social security taxes, to the extent, and only to the extent, necessary to implement the provisions of paragraph 2 of Article XXIV (Elimination of Double Taxation) and paragraph 4 of Article XXIX (Miscellaneous Rules); and

(iv) The United States estate taxes imposed by the Internal Revenue Code of 1986, to the extent, and only to the extent, necessary to implement the provisions of paragraph 3(g) of Article XXVI (Mutual Agreement Procedure) and Article XXIX B (Taxes Imposed by Reason of Death).

3. The Convention shall apply also to:

(a) Any taxes identical or substantially similar to those taxes to which the Convention applies under paragraph 2; and

(b) Taxes on capital; which are imposed after *March 17, 1995* in addition to, or in place of, the taxes to which the Convention applies under paragraph 2."

ARTICLE 2

Subparagraphs (c) and (d) of paragraph 1 of Article III (General Definitions) of the Convention shall be deleted and replaced by the following:

"(c) The term "Canadian tax" means the taxes referred to in Article II (Taxes Covered) that are imposed on income by Canada;

(d) The term "United States tax" means the taxes referred to in Article II (Taxes Covered), other than in subparagraph (b)(i) to (iv) of paragraph 2 thereof, that are imposed on income by the United States;"

ARTICLE 3

Appx646

1. Paragraph I of Article IV (Residence) of the Convention shall be deleted and replaced by the following:

"1. For the purposes of this Convention, the term "resident" of a Contracting State means any person that, under the laws of that State, is liable to tax therein by reason of that person's domicile, residence, citizenship, place of management, place of incorporation or any other criterion of a similar nature, but in the case of an estate or trust, only to the extent that income derived by the estate or trust is liable to tax in that State, either in its hands or in the hands of its beneficiaries. For the purposes of this paragraph, an individual who is not a resident of Canada under this paragraph and who is a United States citizen or an alien admitted to the United States for permanent residence (a "green card" holder) is a resident of the United States only if the individual has a substantial presence, permanent home or habitual abode in the United States, and that individual's personal and economic relations are closer to the United States than to any third State. The term "resident" of a Contracting State is understood to include:

(a) The Government of that State or a political subdivision or local authority thereof or any agency or instrumentality of any such government, subdivision or authority, and

(b)     (i) A trust, organization or other arrangement that is operated exclusively to administer or provide pension, retirement or employee benefits; and

(ii) A not-for-profit organization that was constituted in that State and that is, by reason of its nature as such, generally exempt from income taxation in that State."

2. A new sentence shall be added at the end of paragraph 3 of Article IV (Residence) of the Convention as follows:

" Notwithstanding the preceding sentence, a company that was created in a Contracting State, that is a resident of both Contracting States and that is continued at any time in the other Contracting State in accordance with the corporate law in that other State shall be deemed while it is so continued to be a resident of that other State."

ARTICLE 4

Paragraphs 3 and 4 of Article IX (Related Persons) of the Convention shall be deleted and replaced by the following:

"3. Where an adjustment is made or to be made by a Contracting State in accordance with paragraph 1, the other Contracting State shall (notwithstanding any time or procedural limitations in the domestic law of that other State) make a corresponding adjustment to the income, loss or tax of the related person in that other State if:

(a) It agrees with the first-mentioned adjustment; and

(b) Within six years from the end of the taxable year to which the first-mentioned adjustment relates, the competent authority of the other State has been notified of the first-mentioned adjustment. The competent authorities, however, may agree to consider cases where the corresponding adjustment would not otherwise be barred by any time or procedural limitations in the other State, even if the notification is not made within the six-year period.

Appx647

4. In the event that the notification referred to in paragraph 3 is not given within the time period referred to therein, and the competent authorities have not agreed to otherwise consider the case in accordance with paragraph 3(b), the competent authority of the Contracting State which has made or is to make the first-mentioned adjustment may provide relief from double taxation where appropriate."

## ARTICLE 5

1. The references in paragraphs 2(a) and 6 of Article X (Dividends) of the Convention to a rate of tax of "10 per cent" shall be deleted and replaced by references to a rate of tax of "5 per cent".

2. Paragraph 7 of Article X (Dividends) of the Convention shall be deleted and replaced by the following:
"7. Notwithstanding the provisions of paragraph 2,
(a) Dividends paid by a company that is a resident of Canada and a non-resident-owned investment corporation to a company that is a resident of the United States, that owns at least 10 per cent of the voting stock of the company paying the dividends and that is the beneficial owner of such dividends, may be taxed in Canada at a rate not exceeding 10 percent of the gross amount of the dividends;
(b) Paragraph 2(b) and not paragraph 2(a) shall apply in the case of dividends paid by a resident of the United States that is a Regulated Investment Company; and
(c) Paragraph 2(a) shall not apply to dividends paid by a resident of the United States that is a Real Estate Investment Trust, and paragraph 2(b) shall apply only where such dividends are beneficially owned by an individual holding an interest of less than 10 per cent in the trust; otherwise the rate of tax applicable under the domestic law of the United States shall apply. Where an estate or a testamentary trust acquired its interest in a Real Estate Investment Trust as a consequence of an individual's death, for the purposes of the preceding sentence the estate or trust shall for the five-year period following the death be deemed with respect to that interest to be an individual."

## ARTICLE 6

1. The reference in paragraph 2 of Article XI (Interest) of the Convention to "15 per cent" shall be deleted and replaced by a reference to "10 per cent".

2. Paragraph 3(d) of Article XI (Interest) of the Convention shall be deleted and replaced by the following:
"(d) The interest is beneficially owned by a resident of the other Contracting State and is paid with respect to indebtedness arising as a consequence of the sale on credit by a resident of

that other State of any equipment, merchandise or services except where the sale or indebtedness was between related persons; or"

3. A new paragraph 9 shall be added to Article XI (Interest) of the Convention as follows:

"9. The provisions of paragraphs 2 and 3 shall not apply to an excess inclusion with respect to a residual interest in a Real Estate Mortgage Investment Conduit to which Section 860 G of the United States Internal Revenue Code, as it may be amended from time to time without changing the general principle thereof, applies."

## ARTICLE 7

1. Paragraph 3 of Article XII (Royalties) of the Convention shall be deleted and replaced by the following:

"3. Notwithstanding the provisions of paragraph 2,

(a) Copyright royalties and other like payments in respect of the production or reproduction of any literary, dramatic, musical or artistic work (other than payments in respect of motion pictures and works on film, videotape or other means of reproduction for use in connection with television);

(b) Payments for the use of, or the right to use, computer software;

(c) Payments for the use of, or the right to use, any patent or any information concerning industrial, commercial or scientific experience (but not including any such information provided in connection with a rental or franchise agreement); and

(d) Payments with respect to broadcasting as may be agreed for the purposes of this paragraph in an exchange of notes between the Contracting States;

arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State."

2. Paragraph 6 of Article XII (Royalties) of the Convention shall be deleted and replaced by the following:

"6. For the purposes of this Article,

(a) Royalties shall be deemed to arise in a Contracting State when the payer is a resident of that State. Where, however, the person paying the royalties, whether he is a resident of a Contracting State or not, has in a State a permanent establishment or a fixed base in connection with which the obligation to pay the royalties was incurred, and such royalties are borne by such permanent establishment or fixed base, then such royalties shall be deemed to arise in the State in which the permanent establishment or fixed base is situated and not in any other State of which the payer is a resident; and

(b) Where subparagraph (a) does not operate to treat royalties as arising in either Contracting State and the royalties are for the use of, or the right to use, intangible property or tangible personal property in a Contracting State, then such royalties shall be deemed to arise in that State."

## ARTICLE 8

Paragraph 8 of Article XIII (Gains) of the Convention shall be deleted and replaced by the following:

"8. Where a resident of a Contracting State alienates property in the course of a corporate or other organization, reorganization, amalgamation, division or similar transaction and profit, gain or income with respect to such alienation is not recognized for the purpose of taxation in that State, if requested to do so by the person who acquires the property, the competent authority of the other Contracting State may agree, in order to avoid double taxation and subject to terms and conditions satisfactory to such competent authority, to defer the recognition of the profit, gain or income with respect to such property for the purpose of taxation in that other State until such time and in such manner as may be stipulated in the agreement."

## ARTICLE 9

1. Paragraph 3 of Article XVI II (Pensions and Annuities) of the Convention shall be deleted and replaced by the following:

"3. For the purposes of this Convention, the term "pensions" includes any payment under a superannuation, pension or other retirement arrangement, Armed Forces retirement pay, war veterans pensions and allowances and amounts paid under a sickness, accident or disability plan, but does not include payments under an income-averaging annuity contract or any benefit referred to in paragraph 5."

2. Paragraph 5 of Article XVIII (Pensions and Annuities) of the Convention shall be deleted and replaced by the following:

"5. Benefits under the social security legislation in a Contracting State (including tier 1 railroad benefits but not including unemployment benefits) paid to a resident of the other Contracting State (and in the case of Canadian benefits, to a citizen of the United States) shall be taxable only in the first-mentioned State."

3. A new paragraph 7 shall be added to Article XVIII (Pensions and Annuities) of the Convention as follows:

"7. A natural person who is a citizen or resident of a Contracting State and a beneficiary of a trust, company, organization or other arrangement that is a resident of the other Contracting State, generally exempt from income taxation in that other State and operated exclusively to provide pension, retirement or employee benefits may elect to defer taxation in the first-mentioned State, under rules established by the competent authority of that State, with respect to any income accrued in the plan but not distributed by the plan, until such time as and to the extent that a distribution is made from the plan or any plan substituted therefor."

# ARTICLE 10

1. Paragraphs 2 and 3 of Article XXI (Exempt Organizations) of the Convention shall be deleted and replaced by the following:

"2. Subject to the provisions of paragraph 3, income referred to in Articles X (Dividends) and XI (Interest) derived by:

(a) A trust, company, organization or other arrangement that is a resident of a Contracting State, generally exempt from income taxation in a taxable year in that State and operated exclusively to administer or provide pension, retirement or employee benefits; or

(b) A trust, company, organization or other arrangement that is a resident of a Contracting State, generally exempt from income taxation in a taxable year in that State and operated exclusively to earn income for the benefit of an organization referred to in subparagraph (a);

shall be exempt from income taxation in that taxable year in the other Contracting State.

3. The provisions of paragraphs 1 and 2 shall not apply with respect to the income of a trust, company, organization or other arrangement from carrying on a trade or business or from a related person other than a person referred to in paragraph 1 or 2."

2. A new sentence shall be added at the end of paragraph 5 of Article XXI (Exempt Organizations) of the Convention as follows:

"For the purposes of this paragraph, a company that is a resident of Canada and that is taxable in the United States as if it were a resident of the United States shall be deemed to be a resident of the United States."

3. Paragraph 6 of Article XXI (Exempt Organizations) of the Convention shall be deleted and replaced by the following:

"6. For the purposes of Canadian taxation, gifts by a resident of Canada to an organization that is a resident of the United States, that is generally exempt from United States tax and that could qualify in Canada as a registered charity if it were a resident of Canada and created or established in Canada, shall be treated as gifts to a registered charity; however, no relief from taxation shall be available in any taxation year with respect to such gifts (other than such gifts to a college or university at which the resident or a member of the resident's family is or was enrolled) to the extent that such relief would exceed the amount of relief that would be available under the Income Tax Act if the only income of the resident for that year were the resident's income arising in the United States. The preceding sentence shall not be interpreted to allow in any taxation year relief from taxation for gifts to registered charities in excess of the amount of relief allowed under the percentage limitations of the laws of Canada in respect of relief for gifts to registered charities."

# ARTICLE 11

A new paragraph 3 shall be added to Article XXII (Other Income) of the Convention as follows:

"3. Losses incurred by a resident of a Contracting State with respect to wagering transactions the gains on which may be taxed in the other Contracting State shall, for the purpose of taxation in that other State, be deductible to the same extent that such losses would be deductible if they were incurred by a resident of that other State."

## ARTICLE 12

1. Paragraphs 2(a) and 2(b) of Article XXIV (Elimination of Double Taxation) of the Convention shall be deleted and replaced by the following:

"(a) Subject to the provisions of the law of Canada regarding the deduction from tax payable in Canada of tax paid in a territory outside Canada and to any subsequent modification of those provisions (which shall not affect the general principle hereof)

(i) Income tax paid or accrued to the United States on profits, income or gains arising in the United States, and

(ii) In the case of an individual, any social security taxes paid to the United States (other than taxes relating to unemployment insurance benefits) by the individual on such profits, income or gains

shall be deducted from any Canadian tax payable in respect of such profits, income or gains;

(b) Subject to the existing provisions of the law of Canada regarding the taxation of income from a foreign affiliate and to any subsequent modification of those provisions - which shall not affect the general principle hereof - for the purpose of computing Canadian tax, a company which is a resident of Canada shall be allowed to deduct in computing its taxable income any dividend received by it out of the exempt surplus of a foreign affiliate which is a resident of the United States; and"

2. Paragraph 5 of Article XXIV (Elimination of Double Taxation) of the Convention shall be deleted and replaced by the following:

"5. Notwithstanding the provisions of paragraph 4, where a United States citizen is a resident of Canada, the following rules shall apply in respect of the items of income referred to in Article X (Dividends), XI (Interest) or XII (Royalties) that arise (within the meaning of paragraph 3) in the United States and that would be subject to United States tax if the resident of Canada were not a citizen of the United States, as long as the law in force in Canada allows a deduction in computing income for the portion of any foreign tax paid in respect of such items which exceeds 15 per cent of the amount thereof:

(a) The deduction so allowed in Canada shall not be reduced by any credit or deduction for income tax paid or accrued to Canada allowed in computing the United States tax on such items;

(b) Canada shall allow a deduction from Canadian tax on such items in respect of income tax paid or accrued to the United States on such items, except that such deduction need not exceed the amount of the tax that would be paid on such items to the United States if the resident of Canada were not a United States citizen; and

(c) For the purposes of computing the United States tax on such items, the United States shall allow as a credit against United States tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (b). The credit so allowed shall reduce only that portion of the United States tax on such items which exceeds the amount of tax that would be paid to the United States on such items if the resident of Canada were not a United States citizen."

3. Paragraph 7 of Article XXIV (Elimination of Double Taxation) of the Convention shall be deleted and replaced by the following:

"7. For the purposes of this Article, any reference to "income tax paid or accrued" to a Contracting State shall include Canadian tax and United States tax, as the case may be, and taxes of general application which are paid or accrued to a political subdivision or local authority of that State, which are not imposed by that political subdivision or local authority in a manner inconsistent with the provisions of the Convention and which are substantially similar to the Canadian tax or United States tax, as the case may be."

4. A new paragraph 10 shall be added to Article XXIV (Elimination of Double Taxation) of the Convention as follows:

"10. Where in accordance with any provision of the Convention income derived or capital owned by a resident of a Contracting State is exempt from tax in that State, such State may nevertheless, in calculating the amount of tax on other income or capital, take into account the exempted income or capital."

## ARTICLE 13

1. Paragraph 3 of Article XXV (Non-Discrimination) of the Convention shall be deleted and replaced by the following:

"3. In determining the taxable income or tax payable of an individual who is a resident of a Contracting State, there shall be allowed as a deduction in respect of any other person who is a resident of the other Contracting State and who is dependent on the individual for support the amount that would be so allowed if that other person were a resident of the first-mentioned State."

2. Paragraph 10 of Article XXV (Non-Discrimination) of the Convention shall be deleted and replaced by the following:

"10. Notwithstanding the provisions of Article II (Taxes Covered), this Article shall apply to all taxes imposed by a Contracting State."

ARTICLE 14

1. Paragraphs 3(f) and (g) of Article XXVI (Mutual Agreement Procedure) of the Convention shall be deleted and replaced by the following:

"(f) To the elimination of double taxation with respect to a partnership;

(g) To provide relief from double taxation resulting from the application of the estate tax imposed by the United States or the Canadian tax as a result of a distribution or disposition of property by a trust that is a qualified domestic trust within the meaning of section 2056 A of the Internal Revenue Code, or is described in subsection 70(6) of the Income Tax Act or is treated as such under paragraph 5 of Article XXIX B (Taxes Imposed by Reason of Death), in cases where no relief is otherwise available; or

(h) To increases in any dollar amounts referred to in the Convention to reflect monetary or economic developments."

2. A new paragraph 6 shall be added to Article XXVI (Mutual Agreement Procedure) of the Convention as follows:

"6. If any difficulty or doubt arising as to the interpretation or application of the Convention cannot be resolved by the competent authorities pursuant to the preceding paragraphs of this Article, the case may, if both competent authorities and the taxpayer agree, be submitted for arbitration, provided that the taxpayer agrees in writing to be bound by the decision of the arbitration board. The decision of the arbitration board in a particular case shall be binding on both States with respect to that case. The procedures shall be established in an exchange of notes between the Contracting States. The provisions of this paragraph shall have effect after the Contracting States have so agreed through the exchange of notes."

ARTICLE 15

A new Article XXVI A (Assistance in Collection) shall be added to the Convention as follows:

"Article XXVI A
Assistance in Collection

1. The Contracting States undertake to lend assistance to each other in the collection of taxes referred to in paragraph 9, together with interest, costs, additions to such taxes and civil penalties, referred to in this Article as a "revenue claim".

2. An application for assistance in the collection of a revenue claim shall include a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the

applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

3. A revenue claim of the applicant State that has been finally determined may be accepted for collection by the competent authority of the requested State and, subject to the provisions of paragraph 7, if accepted shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes.

4. Where an application for collection of a revenue claim in respect of a taxpayer is accepted
    (a) By the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received; and
    (b) By Canada, the revenue claim shall be treated by Canada as an amount payable under the Income Tax Act, the collection of which is not subject to any restriction.

5. Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State, based on any such rights that may be available under the laws of either Contracting State. If, at any time pending execution of a request for assistance under this Article, the applicant State loses the right under its internal law to collect the revenue claim, the competent authority of the applicant State shall promptly withdraw the request for assistance in collection.

6. Subject to this paragraph, amounts collected by the requested State pursuant to this Article shall be forwarded to the competent authority of the applicant State. Unless the competent authorities of the Contracting States otherwise agree, the ordinary costs incurred in providing collection assistance shall be borne by the requested State and any extraordinary costs so incurred shall be borne by the applicant State.

7. A revenue claim of an applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested State.

8. No assistance shall be provided under this Article for a revenue claim in respect of a taxpayer to the extent that the taxpayer can demonstrate that
    (a) Where the taxpayer is an individual, the revenue claim relates to a taxable period in which the taxpayer was a citizen of the requested State, and
    (b) Where the taxpayer is an entity that is a company, estate or trust, the revenue claim relates to a taxable period in which the taxpayer derived its status as such an entity from the laws in force in the requested State.

9. Notwithstanding the provisions of Article II (Taxes Covered), the provisions of this Article shall apply to all categories of taxes collected by or on behalf of the Government of a Contracting State.

10. Nothing in this Article shall be construed as:

    (a) Limiting the assistance provided for in paragraph 4 of Article XXVI (Mutual Agreement Procedure); or

    (b) Imposing on either Contracting State the obligation to carry out administrative measures of a different nature from those used in the collection of its own taxes or that would be contrary to its public policy (ordre public).

11. The competent authorities of the Contracting States shall agree upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States."

## ARTICLE 16

1. Paragraph 1 of Article XXVII (Exchange of Information) of the Convention shall be deleted and replaced by the following:

"1. The competent authorities of the Contracting States shall exchange such information as is relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes to which the Convention applies insofar as the taxation thereunder is not contrary to the Convention. The exchange of information is not restricted by Article I (Personal Scope). Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the taxation laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment or collection of, the administration and enforcement in respect of, or the determination of appeals in relation to the taxes to which the Convention applies or, notwithstanding paragraph 4, in relation to taxes imposed by a political subdivision or local authority of a Contracting State that are substantially similar to the taxes covered by the Convention under Article II (Taxes Covered). Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions. The competent authorities may release to an arbitration board established pursuant to paragraph 6 of Article XXVI (Mutual Agreement Procedure) such information as is necessary for carrying out the arbitration procedure; the members of the arbitration board shall be subject to the limitations on disclosure described in this Article."

2. Paragraph 4 of Article XXVI I (Exchange of Information) of the Convention shall be deleted and replaced by the following:

"4. For the purposes of this Article, the Convention shall apply, notwithstanding the provisions of Article II (Taxes Covered):

    (a) To all taxes imposed by a Contracting State; and

    (b) To other taxes to which any other provision of the Convention applies, but only to the extent that the information is relevant for the purposes of the application of that provision."

ARTICLE 17

1. Paragraph 3(a) of Article XXIX (Miscellaneous Rules) of the Convention shall be deleted and replaced by the following:

"(a) Under paragraphs 3 and 4 of Article IX (Related Persons), paragraphs 6 and 7 of Article XIII (Gains), paragraphs 1, 3, 4, 5, 6(b) and 7 of Article XVIII (Pensions and Annuities), paragraph 5 of Article XXIX (Miscellaneous Rules), paragraphs 1, 5 and 6 of Article XXIX B (Taxes Imposed by Reason of Death), paragraphs 2, 3, 4 and 7 of Article XXIX B (Taxes Imposed by Reason of Death) as applied to the estates of persons other than former citizens referred to in paragraph 2 of this Article, paragraphs 3 and 5 of Article XXX (Entry into Force), and Articles XIX (Government Service), XXI (Exempt Organizations), XXIV (Elimination of Double Taxation) , XXV (Non-Discrimination) and XXVI (Mutual Agreement Procedure);"

2. Paragraphs 5 to 7 of Article XXIX (Miscellaneous Rules) of the Convention shall be deleted and replaced by the following:

"5. Where a person who is a resident of Canada and a shareholder of a United States S corporation requests the competent authority of Canada to do so, the competent authority may agree, subject to terms and conditions satisfactory to such competent authority, to apply the following rules for the purposes of taxation in Canada with respect to the period during which the agreement is effective:

(a) The corporation shall be deemed to be a controlled foreign affiliate of the person;

(b) All the income of the corporation shall be deemed to be foreign accrual property income;

(c) For the purposes of subsection 20(11) of the Income Tax Act, the amount of the corporation's income that is included in the person's income shall be deemed not to be income from a property; and

(d) Each dividend paid to the person on a share of the capital stock of the corporation shall be excluded from the person's income and shall be deducted in computing the adjusted cost base to the person of the share.

6. For purposes of paragraph 3 of Article XXII (Consultation) of the General Agreement on Trade in Services, the Contracting States agree that:

(a) A measure falls within the scope of the Convention only if:

(i) The measure relates to a tax to which Article XXV (Non-Discrimination) of the Convention applies; or

(ii) The measure relates to a tax to which Article XXV (Non-Discrimination) of the Convention does not apply and to which any other provision of the Convention applies, but only to the extent that the measure relates to a matter dealt with in that other provision of the Convention; and

(b) Notwithstanding paragraph 3 of Article XXII (Consultation) of the General Agreement on Trade in Services, any doubt as to the interpretation of subparagraph (a) will be

**Appx657**

resolved under paragraph 3 of Article XXVI (Mutual Agreement Procedure) of the Convention or any other procedure agreed to by both Contracting States.

7. The appropriate authority of a Contracting State may request consultations with the appropriate authority of the other Contracting State to determine whether change to the Convention is appropriate to respond to changes in the law or policy of that other State. Where domestic legislation enacted by a Contracting State unilaterally removes or significantly limits any material benefit otherwise provided by the Convention, the appropriate authorities shall promptly consult for the purpose of considering an appropriate change to the Convention."

ARTICLE 18

A new Article XXIX A (Limitation on Benefits) shall be added to the Convention as follows:

"Article XXIX A
Limitation on Benefits

1. For the purposes of the application of this Convention by the United States,
 (a) A qualifying person shall be entitled to all of the benefits of this Convention, and
 (b) Except as provided in paragraphs 3, 4 and 6, a person that is not a qualifying person shall not be entitled to any benefits of the Convention.

2. For the purposes of this Article, a qualifying person is a resident of Canada that is:
 (a) A natural person;
 (b) The Government of Canada or a political subdivision or local authority thereof, or any agency or instrumentality of any such government, subdivision or authority;
 (c) A company or trust in whose principal class of shares or units there is substantial and regular trading on a recognized stock exchange;
 (d) A company more than 50 per cent of the vote and value of the shares (other than debt substitute shares) of which is owned, directly or indirectly, by five or fewer persons each of which is a company or trust referred to in subparagraph (c), provided that each company or trust in the chain of ownership is a qualifying person or a resident or citizen of the United States;
 (e) (i) A company 50 per cent or more of the vote and value of the shares (other than debt substitute shares) of which is not owned, directly or indirectly, by persons other than qualifying persons or residents or citizens of the United States, or
  (ii) A trust 50 per cent or more of the beneficial interest in which is not owned, directly or indirectly, by persons other than qualifying persons or residents or citizens of the United States,
 where the amount of the expenses deductible from gross income that are paid or payable by the company or trust, as the case may be, for its preceding fiscal period (or, in the

case of its first fiscal period, that period) to persons that are not qualifying persons or residents or citizens of the United States is less than 50 per cent of its gross income for that period;

(f) An estate;

(g) A not-for-profit organization, provided that more than half of the beneficiaries, members or participants of the organization are qualifying persons or residents or citizens of the United States; or

(h) An organization described in paragraph 2 of Article XXI (Exempt Organizations) and established for the purpose of providing benefits primarily to individuals who are qualifying persons, persons who were qualifying persons within the five preceding years, or residents or citizens of the United States.

3. Where a person that is a resident of Canada and is not a qualifying person of Canada, or a person related thereto, is engaged in the active conduct of a trade or business in Canada (other than the business of making or managing investments, unless those activities are carried on with customers in the ordinary course of business by a bank, an insurance company, a registered securities dealer or a deposit-taking financial institution), the benefits of the Convention shall apply to that resident person with respect to income derived from the United States in connection with or incidental to that trade or business, including any such income derived directly or indirectly by that resident person through one or more other persons that are residents of the United States. Income shall be deemed to be derived from the United States in connection with the active conduct of a trade or business in Canada only if that trade or business is substantial in relation to the activity carried on in the United States giving rise to the income in respect of which benefits provided under the Convention by the United States are claimed.

4. A company that is a resident of Canada shall also be entitled to the benefits of Articles X (Dividends), XI (Interest) and XII (Royalties) if

(a) Its shares that represent more than 90 per cent of the aggregate vote and value represented by all of its shares (other than debt substitute shares) are owned, directly or indirectly, by persons each of whom is a qualifying person, a resident or citizen of the United States or a person who

(i) Is a resident of a country with which the United States has a comprehensive income tax convention and is entitled to all of the benefits provided by the United States under that convention;

(ii) Would qualify for benefits under paragraphs 2 or 3 if that person were a resident of Canada (and, for the purposes of paragraph 3, if the business it carried on in the country of which it is a resident were carried on by it in Canada); and

(iii) Would be entitled to a rate of United States tax under the convention between that person's country of residence and the United States, in respect of the particular class of income for which benefits are being claimed under this Convention, that is at least as low as the rate applicable under this Convention; and

(b) The amount of the expenses deductible from gross income that are paid or payable by the company for its preceding fiscal period (or, in the case of its first fiscal period, that

period) to persons that are not qualifying persons or residents or citizens of the United States is less than 50 per cent of the gross income of the company for that period.

5. For the purposes of this Article,

    (a) The term "recognized stock exchange" means:

        (i) The NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the Securities and Exchange Commission as a national securities exchange for purposes of the Securities Exchange Act of 1934;

        (ii) Canadian stock exchanges that are "prescribed stock exchanges" under the Income Tax Act; and

        (iii) Any other stock exchange agreed upon by the Contracting States in an exchange of notes or by the competent authorities of the Contracting States;

    (b) The term "not-for-profit organization" of a Contracting State means an entity created or established in that State and that is, by reason of its not-for-profit status, generally exempt from income taxation in that State, and includes a private foundation, charity, trade union, trade association or similar organization; and

    (c) The term "debt substitute share" means:

        (i) A share described in paragraph (e) of the definition "term preferred share" in the Income Tax Act, as it may be amended from time to time without changing the general principle thereof; and

        (ii) Such other type of share as may be agreed upon by the competent authorities of the Contracting States.

6. Where a person that is a resident of Canada is not entitled under the preceding provisions of this Article to the benefits provided under the Convention by the United States, the competent authority of the United States shall, upon that person's request, determine on the basis of all factors including the history, structure, ownership and operations of that person whether

    (a) Its creation and existence did not have as a principal purpose the obtaining of benefits under the Convention that would not otherwise be available; or

    (b) It would not be appropriate, having regard to the purpose of this Article, to deny the benefits of the Convention to that person.

The person shall be granted the benefits of the Convention by the United States where the competent authority determines that subparagraph (a) or (b) applies.

7. It is understood that the fact that the preceding provisions of this Article apply only for the purposes of the application of the Convention by the United States shall not be construed as restricting in any manner the right of a Contracting State to deny benefits under the Convention where it can reasonably be concluded that to do otherwise would result in an abuse of the provisions of the Convention."

ARTICLE 19

A new Article XXIX B (Taxes Imposed by Reason of Death) shall be added to the Convention as follows:

"Article XXIX B
Taxes Imposed by Reason of Death

1. Where the property of an individual who is a resident of a Contracting State passes by reason of the individual's death to an organization referred to in paragraph 1 of Article XXI (Exempt Organizations), the tax consequences in a Contracting State arising out of the passing of the property shall apply as if the organization were a resident of that State.

2. In determining the estate tax imposed by the United States, the estate of an individual (other than a citizen of the United States) who was a resident of Canada at the time of the individual's death shall be allowed a unified credit equal to the greater of
    (a) The amount that bears the same ratio to the credit allowed under the law of the United States to the estate of a citizen of the United States as the value of the part of the individual's gross estate that at the time of the individual's death is situated in the United States bears to the value of the individual's entire gross estate wherever situated; and
    (b) The unified credit allowed to the estate of a nonresident not a citizen of the United States under the law of the United States.
The amount of any unified credit otherwise allowable under this paragraph shall be reduced by the amount of any credit previously allowed with respect to any gift made by the individual. A credit otherwise allowable under subparagraph (a) shall be allowed only if all information necessary for the verification and computation of the credit is provided.

3. In determining the estate tax imposed by the United States on an individual's estate with respect to property that passes to the surviving spouse of the individual (within the meaning of the law of the United States) and that would qualify for the estate tax marital deduction under the law of the United States if the surviving spouse were a citizen of the United States and all applicable elections were properly made (in this paragraph and paragraph 4 referred to as "qualifying property"), a non-refundable credit computed in accordance with the provisions of paragraph 4 shall be allowed in addition to the unified credit allowed to the estate under paragraph 2 or under the law of the United States, provided that
    (a) The individual was at the time of death a citizen of the United States or a resident of either Contracting State;
    (b) The surviving spouse was at the time of the individual's death a resident of either Contracting State;
    (c) If both the individual and the surviving spouse were residents of the United States at the time of the individual's death, one or both was a citizen of Canada; and
    (d) The executor of the decedent's estate elects the benefits of this paragraph and waives irrevocably the benefits of any estate tax marital deduction that would be allowed under

the law of the United States on a United States Federal estate tax return filed for the individual's estate by the date on which a qualified domestic trust election could be made under the law of the United States.

4. The amount of the credit allowed under paragraph 3 shall equal the lesser of

(a) The unified credit allowed under paragraph 2 or under the law of the United States (determined without regard to any credit allowed previously with respect to any gift made by the individual), and

(b) The amount of estate tax that would otherwise be imposed by the United States on the transfer of qualifying property.

The amount of estate tax that would otherwise be imposed by the United States on the transfer of qualifying property shall equal the amount by which the estate tax (before allowable credits) that would be imposed by the United States if the qualifying property were included in computing the taxable estate exceeds the estate tax (before allowable credits) that would be so imposed if the qualifying property were not so included. Solely for purposes of determining other credits allowed under the law of the United States, the credit provided under paragraph 3 shall be allowed after such other credits.

5. Where an individual was a resident of the United States immediately before the individual's death, for the purposes of subsection 70(6) of the Income Tax Act, both the individual and the individual's spouse shall be deemed to have been resident in Canada immediately before the individual's death. Where a trust that would be a trust described in subsection 70(6) of that Act, if its trustees that were residents or citizens of the United States or domestic corporations under the law of the United States were residents of Canada, requests the competent authority of Canada to do so, the competent authority may agree, subject to terms and conditions satisfactory to such competent authority, to treat the trust for the purposes of that Act as being resident in Canada for such time as may be stipulated in the agreement.

6. In determining the amount of Canadian tax payable by an individual who immediately before death was a resident of Canada, or by a trust described in subsection 70(6) of the Income Tax Act (or a trust which is treated as being resident in Canada under the provisions of paragraph 5), the amount of any Federal or state estate or inheritance taxes payable in the United States (not exceeding, where the individual was a citizen of the United States or a former citizen referred to in paragraph 2 of Article XXIX (Miscellaneous Rules), the amount of estate and inheritance taxes that would have been payable if the individual were not a citizen or former citizen of the United States) in respect of property situated within the United States shall,

(a) To the extent that such estate or inheritance taxes are imposed upon the individual's death, be allowed as a deduction from the amount of any Canadian tax otherwise payable by the individual for the taxation year in which the individual died on the total of

(i) Any income, profits or gains of the individual arising (within the meaning of paragraph 3 of Article XXIV (Elimination of Double Taxation)) in the United States in that year, and

(ii) Where the value at the time of the individual's death of the individual's entire gross estate wherever situated (determined under the law of the United States) exceeded 1.2 million U.S. dollars or its equivalent in Canadian dollars, any income, profits or gains of the individual for that year from property situated in the United States at that time, and

(b) To the extent that such estate or inheritance taxes are imposed upon the death of the individual's surviving spouse, be allowed as a deduction from the amount of any Canadian tax otherwise payable by the trust for its taxation year in which that spouse dies on any income, profits or gains of the trust for that year arising (within the meaning of paragraph 3 of Article XXIV (Elimination of Double Taxation)) in the United States or from property situated in the United States at the time of death of the spouse.

For purposes of this paragraph, property shall be treated as situated within the United States if it is so treated for estate tax purposes under the law of the United States as in effect on *March 17, 1995,* subject to any subsequent changes thereof that the competent authorities of the Contracting States have agreed to apply for the purposes of this paragraph. The deduction allowed under this paragraph shall take into account the deduction for any income tax paid or accrued to the United States that is provided under paragraph 2(a), 4(a) or 5(b) of Article XXIV (Elimination of Double Taxation).

7. In determining the amount of estate tax imposed by the United States on the estate of an individual who was a resident or citizen of the United States at the time of death, or upon the death of a surviving spouse with respect to a qualified domestic trust created by such an individual or the individual's executor or surviving spouse, a credit shall be allowed against such tax imposed in respect of property situated outside the United States, for the federal and provincial income taxes payable in Canada in respect of such property by reason of the death of the individual or, in the case of a qualified domestic trust, the individual's surviving spouse. Such credit shall be computed in accordance with the following rules:

(a) A credit otherwise allowable under this paragraph shall be allowed regardless of whether the identity of the taxpayer under the law of Canada corresponds to that under the law of the United States.

(b) The amount of a credit allowed under this paragraph shall be computed in accordance with the provisions and subject to the limitations of the law of the United States regarding credit for foreign death taxes (as it may be amended from time to time without changing the general principle hereof), as though the income tax imposed by Canada were a creditable tax under that law.

(c) A credit may be claimed under this paragraph for an amount of federal or provincial income tax payable in Canada only to the extent that no credit or deduction is claimed for such amount in determining any other tax imposed by the United States, other than the estate tax imposed on property in a qualified domestic trust upon the death of the surviving spouse.

8. Provided that the value, at the time of death, of the entire gross estate wherever situated of an individual who was a resident of Canada (other than a citizen of the United States) at the time of death

does not exceed 1.2 million U.S. dollars or its equivalent in Canadian dollars, the United States may impose its estate tax upon property forming part of the estate of the individual only if any gain derived by the individual from the alienation of such property would have been subject to income taxation by the United States in accordance with Article XIII (Gains)."

## ARTICLE 20

1. The appropriate authorities of the Contracting States shall consult within a three year period from the date on which this Protocol enters into force with respect to further reductions in withholding taxes provided in the Convention, and with respect to the rules in Article XXIX A (Limitation on Benefits) of the Convention.

2. The appropriate authorities of the Contracting States shall consult after a three-year period from the date on which the Protocol enters into force in order to determine whether it is appropriate to make the exchange of notes referred to in Article XXVI (Mutual Agreement Procedure) of the Convention.

## ARTICLE 21

1. This Protocol shall be subject to ratification in accordance with the applicable procedures in Canada and the United States and instruments of ratification shall be exchanged as soon as possible.

2. The Protocol shall enter into force upon the exchange of instruments of ratification, and shall have effect:

(a) For tax withheld at the source on income referred to in Articles X (Dividends), XI (Interest), XII (Royalties) and XVIII (Pensions and Annuities) of the Convention, except on income referred to in paragraph 5 of Article XVIII of the Convention (as it read before the entry into force of this Protocol), with respect to amounts paid or credited on or after the first day of the second month next following the date on which the Protocol enters into force, except that the reference in paragraph 2(a) of Article X (Dividends) of the Convention, as amended by the Protocol, to "5 per cent" shall be read, in its application to amounts paid or credited on or after that first day:

(i) Before 1996, as "7 per cent"; and

(ii) After 1995 and before 1997, as "6 per cent"; and

(b) For other taxes, with respect to taxable years beginning on or after the first day of January next following the date on which the Protocol enters into force, except that the reference in paragraph 6 of Article X (Dividends) of the Convention, as amended by the Protocol, to "5 per cent" shall be read, in its application to taxable years beginning on or after that first day and ending before 1997, as "6 per cent".

3. Notwithstanding the provisions of paragraph 2, Article XXVI A (Assistance in Collection) of the Convention shall have effect for revenue claims finally determined by a requesting State after the date that is 10 years before the date on which the Protocol enters into force.

4. Notwithstanding the provisions of paragraph 2, paragraphs 2 through 8 of Article XXIX B (Taxes Imposed by Reason of Death) of the Convention (and paragraph 2 of Article II (Taxes Covered) and paragraph 3(a) of Article XXIX (Miscellaneous Rules) of the Convention, as amended by the Protocol, to the extent necessary to implement paragraphs 2 through 8 of Article XXIX B (Taxes Imposed by Reason of Death) of the Convention) shall, notwithstanding any limitation imposed under the law of a Contracting State on the assessment, reassessment or refund with respect to a person's return, have effect with respect to deaths occurring after the date on which the Protocol enters into force and, provided that any claim for refund by reason of this sentence is filed within one year of the date on which the Protocol enters into force or within the otherwise applicable period for filing such claims under domestic law, with respect to benefits provided under any of those paragraphs with respect to deaths occurring after November 10, 1988.

5. Notwithstanding the provisions of paragraph 2, paragraph 2 of Article 3 of the Protocol shall have effect with respect to taxable years beginning on or after the first day of January next following the date on which the Protocol enters into force.

IN WITNESS WHEREOF, the undersigned, duly authorized thereto by their respective Governments, have signed this Protocol.

Done in two copies at Washington this _seventeenth_ day of _March,_ 1995, in the English and French languages, each text being equally authentic.

| For the Government of the | For The Government of |
|---|---|
| United States of America: | Canada |
| (s) Richard E. Hecklinger | (s) Robert C. Wright |

PROTOCOL 4

PROTOCOL AMENDING TAX CONVENTION
WITH CANADA

MESSAGE

FROM

THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

PROTOCOL AMENDING THE CONVENTION BETWEEN THE UNITED STATES OF
AMERICA AND CANADA WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL
SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980 AS AMENDED BY THE
PROTOCOLS SIGNED ON JUNE 14, 1983, MARCH 28, 1984, AND MARCH 17, 1995,
SIGNED AT OTTAWA ON JULY 29, 1997

LETTER OF SUBMITTAL (PROTOCOL 4)

DEPARTMENT OF STATE,
*Washington, August 12, 1997.*

THE PRESIDENT: I have the honor to submit to you, with a view to its transmission to the Senate for advice and consent to ratification, the Protocol Amending the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980 as Amended by the Protocols Signed on June 14, 1983, March 28, 1984 and March 17, 1995, signed at Ottawa on July 29, 1997 ("the proposed Protocol"). The proposed Protocol to the Convention addresses two issues: the taxation of gains from the sale of shares of foreign real-property holding companies and the taxation of social security benefits.

Article 1 of the proposed Protocol deletes and replaces paragraphs 3(a) and 3(b)(ii) of Article XIII of the Convention, which addresses the taxation of capital gains. The revised provisions would define real property situated in the United States and real property situated in Canada in such a way as to deny each country the right under this Convention to tax foreign persons on their income from the sale of the stock of foreign corporations whose assets consist primarily of domestic real estate. Both the United States and Canada currently tax foreign persons on the proceeds from the sale of both domestic real estate and the stock of domestic corporations whose assets consist primarily of domestic real estate. The current Convention also permits the taxation of income from the sale of stock of foreign companies whose assets consist primarily of domestic real estate. The new limitation on each country's right to tax gains from the sale of shares of real-property holding companies would be retroactively effective to April 26, 1995.

Article 2 addresses taxation of social security benefits. The treatment of social security benefits by the United States and Canada was last modified by the Protocol Amending the Convention between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980, as Amended by the Protocols Signed on June 14, 1983 and March 28, 1984, signed at Washington, March 17, 1995 ("the 1995 Protocol"), which applies to social security benefits paid on or after January 1, 1996. The 1995 Protocol amended the Convention to move from residence-based taxation to a system under which social security benefits are taxed by the country paying the benefits ("the source country") - at a statutory rate of 25.5 percent by the United

Appx666

States and 25.0 percent by Canada. In addition, Canada permits U.S. recipients of Canadian benefits to file a Canadian tax return and pay tax at lower graduated rates on net income, enabling low-income U.S. recipients of Canadian social security to pay little or no tax on their benefits. However, the United States taxes at the 25.5 percent rate permitted by the 1995 Protocol. Thus, many Canadian recipients of U.S. benefits found their benefits reduced by 25.5 percent after January 1, 1996.

Article 2 of the proposed Protocol returns to the system of residence-based taxation in place before the 1995 Protocol. Social security benefits will be taxable in only the country in which the recipient lives ("the country of residence"). This, under the proposed Protocol, U.S. social security benefits paid to a resident of Canada would be taxed only by Canada, and, a benefit paid by Canada under its social security legislation to a U.S. resident would be taxed only by the United States. Benefits would be taxed on a net basis at graduated rates, and low-income recipients would not pay any tax. Furthermore, the taxation of benefits by the country of residence takes into account the way the benefits would have been taxed in the source country. For example, since the United States includes only 85 percent of U.S. social security benefits in taxable income, only 85 percent of the U.S. benefits received by Canadians would be subject to Canadian tax.

Article 2 of the proposed Protocol will apply to amounts paid on or after January 1, 1996, the date the current rule took effect. Thus, social security recipients may receive a refund of taxes previously paid although some high-income recipients may be required to pay additional taxes to their country of residence. If, however, as a result of the change, the tax of the country of residence exceeds the amount of the refund there will be neither a refund of source-country tax nor additional tax by the country of residence. Consequently, no one will be subject to a higher rate of tax for the retroactive period. (Nonetheless, in the future, some high-income recipients of benefits will be subject to a higher rate of tax if their average tax rate on these benefits in their country of residence is higher than the current rate of source-country withholding tax.) The proposed Protocol also outlines the rules that the United States and Canada will follow in giving effect to the retroactive application of the changes to the taxation of social security benefits.

The Department of the Treasury and the Department of State cooperated in the negotiation of the proposed Protocol. It has the full approval of both Departments.

Respectfully submitted,

MADELEINE ALBRIGHT.

LETTER OF TRANSMITTAL (PROTOCOL 4)

THE WHITE HOUSE, *September 23, 1997.*

\

*To the Senate of the United States:*

I transmit herewith for Senate advice and consent to ratification the Protocol Amending the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington on September 26, 1980 as Amended by the Protocols signed on June 14, 1983, March 28, 1984 and March 17, 1995, signed at Ottawa on July 29, 1997. This Protocol modified the taxation of social security benefits and the taxation of gams from the sale of shares of foreign real-property holding companies.

I recommend that the Senate give early and favorable consideration to this Protocol and give its advice and consent to ratification.

WILLIAM J. CLINTON.

PROTOCOL

AMENDING THE CONVENTION BETWEEN

THE UNITED STATES OF AMERICA AND CANADA

WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL

SIGNED AT WASHINGTON ON SEPTEMBER 26, 1980

AS AMENDED BY THE PROTOCOLS SIGNED ON JUNE 14,1983,

MARCH 28, 1984 AND MARCH 17, 1995

The United States of America and Canada, desiring to conclude a protocol to amend the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital signed at Washington on September 26, 1980, as amended by the Protocols signed on June 14, 1983, March 28, 1984 and March 17, 1995 (hereinafter referred to as "the Convention"), have agreed as follows:

ARTICLE 1

1. Paragraph 3 (a) of Article XIII (Gains) of the Convention shall be deleted and replaced by the following:

"(a) In the case of real property situated in the United States, means a United States real property interest and real property referred to in Article VI (Income from Real

Appx668

Property) situated in the United States, but does not include a share of the capital stock of a company that is not a resident of the United States; and"

2. Paragraph 3(b)(ii) of Article XIII (Gains) of the Convention shall be deleted and replaced by the following:

"(ii) A share of the capital stock of a company that is a resident of Canada, the value if whose shares is derived principally from real property situated in Canada; and"

## ARTICLE 2

1. Paragraph 3 of Article XVIII (Pensions and Annuities) of the Convention shall be deleted and replaced by the following:

"3. For the purposes of this Convention, the term "pensions" includes any payment under a superannuation, pension or other retirement arrangement, Armed Forces retirement pay, war veterans pensions and allowances and amounts paid under a sickness, accident or disability plan. but does not include payments under an income-averaging annuity contract or, except for the purposes of Article XIX (Government Service), any benefit referred to in paragraph 5."

2. Paragraph 5 of Article XVIII (Pensions and Annuities) of the Convention shall be deleted and replaced by the following:

"5. Benefits under the social security legislation in a Contracting State (including tier I railroad retirement benefits but not including unemployment benefits) paid to a resident of the other Contracting State shall be taxable only in that other State, subject to the following conditions:

(a) a benefit under the social security legislation in the United States paid to a resident of Canada shall be taxable in Canada as though it were a benefit under the Canada Pension Plan, except that 15 per cent of the amount of the benefit shall be exempt from Canadian tax; and

(b) a benefit under the social security legislation in Canada paid to a resident of the United States shall be taxable in the United States as though it were a benefit under the Social Security Act, except that a type of benefit that is not subject to Canadian tax when paid to residents of Canada shall be exempt from United States tax."

## ARTICLE 3

1. This Protocol shall be subject to ratification in accordance with the applicable procedures in the United States and Canada and instruments of ratification shall be exchanged as soon as possible.

2. This Protocol shall enter into force upon the exchange of instruments of ratification, and shall have effect as follows:

(a) Article 1 of this Protocol shall have effect as of April 26, 1995; and

(b) Article 2 of this Protocol shall have effect with respect to amounts paid or credited to a resident of the other Contracting State after 1995, except that where a Contracting State has, in accordance with the Convention read without reference to this Protocol, imposed a tax on benefits paid or credited under the social security legislation in that State, and those benefits are paid or credited after 1995 and

(i) before the calendar year in which this Protocol enters into force, if this Protocol enters into force before September 1 of that year, or

(ii) before the end of the calendar year in which this Protocol enters into force, if this Protocol enters into force after August 31 of that year,

Article 2 shall only have effect with respect to such benefits (referred to in this Article as "source-taxed benefits") as described in paragraphs 3, 4 and 5.

3. With respect to source-taxed benefits paid by a Contracting State to a resident of the other Contracting State, Article 2 applies only if the resident has, within three years after the date on which this protocol enters into force, applied to the competent authority of the first-mentioned Contracting State for a refund of the tax imposed on the benefits. However, with respect to source-taxed benefits paid by the United States to a resident of Canada, the competent authority of Canada shall:

(a) apply for and receive such refund on behalf or the resident;

(b) remit to the resident, in accordance with the law of Canada governing refunds of income tax overpayments, such refund less any tax imposed in Canada on the benefits in accordance with Article 2 of this Protocol; and

(c) make the application referred to in subparagraph (a) only if the additional tax that would be imposed in Canada on the benefits, on the assumption that Article 2 of this Protocol applied, would be less than the tax imposed in the United States on the benefits as a result of paragraph 5 of Article XVIII (pensions and Annuities) of the Convention read without reference to this protocol.

4. All taxes refunded as a result of this Protocol shall be refunded without interest and interest on any taxes of a resident of a Contracting State assessed as a result of this protocol shall be computed as though those taxes became payable no earlier than December 31 of the year following the year in which this Protocol enters into force.

5. The competent authorities of the Contracting States shall establish procedures for making or revoking the application referred to in paragraph 3 and shall agree on such additional procedures as are necessary to ensure the appropriate implementation of this Protocol.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

Done at Ottawa in duplicate, in the English and French languages, both texts being equally authentic, this _29th_ day of _July_, 1997.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:
    (s) Vladimir Sambaiew

FOR THE GOVERNMENT OF
CANADA:
(s) Michael Leir

[JOINT COMMITTEE PRINT]

**EXPLANATION OF PROPOSED
INCOME TAX TREATY BETWEEN
THE UNITED STATES AND CANADA**

———

Prepared for the Use of the

COMMITTEE ON FOREIGN RELATIONS
UNITED STATES SENATE

by the staff of the

JOINT COMMITTEE ON TAXATION



SEPTEMBER 22, 1981

U.S. GOVERNMENT PRINTING OFFICE
83-237 O WASHINGTON : 1981 JCS-48-81

# INTRODUCTION

This pamphlet provides an explanation of the proposed income tax treaty between the United States and Canada. The proposed treaty was signed on September 26, 1980, and was amplified by an exchange of notes signed the same date. A similar treaty between two countries, effective since 1942, is currently in force. The proposed treaty has been scheduled for a public hearing on September 24, 1981, by the Senate Committee on Foreign Relations.

The proposed treaty is similar to other recent U.S. income tax treaties, the U.S. model income tax treaty, and the model income tax treaty of the Organization of Economic Cooperation and Development (OECD). However, there are certain important deviations from the U.S. model, in part, reflecting the close economic and physical ties between the two countries.

The first part of the pamphlet is the summary of the applicable provisions of the proposed treaty. The second part provides an overview of U.S. tax rules relating to international trade and investment and U.S. tax treaties in general. This is followed by a detailed, article-by-article explanation of the proposed treaty.

(1)

# I. SUMMARY

*In General*

The principal purposes of the proposed income tax treaty between the United States and Canada is to reduce or eliminate double taxation of income earned by citizens and residents of either country from sources within the other country, and to prevent avoidance or evasion of the income taxes of the two countries. The proposed treaty is intended to continue to promote close economic cooperation between the two countries and to eliminate possible barriers to trade caused by overlapping taxing jurisdictions of the two countries. It is intended to enable the countries to cooperate in preventing avoidance and evasion of taxes.

As in other U.S. tax treaties, these objectives are principally achieved by each country agreeing to limit, in certain specified situations, its right to tax income derived from its territory by residents of the other. For example, the treaty contains the standard tax treaty provision that neither country will tax the business income derived from sources within that country by residents of the other unless the business activities of the taxing country are substantial enough to constitute a permanent establishment or fixed base (Articles VII or XIV). Similarly, the treaty contains the standard "commercial visitor" exemptions under which residents of one country performing personal services in the other will not be required to file tax returns and pay tax in the other unless their contact with the other exceeds certain specified minimums (Articles XIV, XV, XVI, and XVII). The proposed treaty provides that dividends, interest, royalties, capital gains and certain other income derived by a resident of either country from sources within the other country generally may be taxed by both countries (Articles X, XI, XII, and XIII). Generally, however, dividends, interests, and royalties received by a resident of one country from sources within the other country are to be taxed on a restricted basis (Articles X, XI, and XII).

In situations where the country of source retains the right under the proposed treaty to tax income derived by residents of the other country, the treaty generally provides for the relief of the potential double taxation by the country of residence allowing a foreign tax credit or, in a limited case, a partial exemption.

This treaty contains the standard provision (the "saving clause") contained in U.S. tax treaties that each country retains the right to tax its citizens and residents as if the treaty had not come into effect (Article XXIX). In addition, it contains the standard provision that the treaty will not be applied to deny any taxpayer any benefits he would be entitled to under the domestic law of the country or under any other agreement between the two countries (Article XXIX); that is, the treaty will only be applied to the benefit of taxpayers.

(8)

The treaty differs in certain respects from many U.S. income tax treaties and the U.S. model. It also differs in significant respects from the present treaty. Many of these differences accrue to the benefit of U.S. businesses.

(1) The proposed treaty does not generally cover U.S. citizens who are not also U.S. residents. The U.S. model does cover such U.S. citizens. However, the U.S. has rarely been able to negotiate coverage for nonresident citizens.

(2) The proposed treaty does not contain a definition of the term "business profits," although certain categories of business profits are defined in other articles. This leaves to local law the definition of that term in some cases, and accordingly the profits that must be attributed to a permanent establishment before those profits can be taxed by the country of source. Most U.S. treaties, and the U.S. model, define the term business profits.

(3) The transportation article, Article VIII, covers income from the operation or rental of motor vehicles and railway cars. Income derived by a common carrier which is a resident of one country from the carriage of passengers or freight from the country of residence to the other country is taxable only in the country of the carrier's residence. Also, the countries give up the right to tax income that a resident of the other country earns from the short-term (183 days or less) use or lease of rolling stock or motor vehicles in the host country. This provision reflects Canada's physical proximity to the United States.

(4) The limit on the dividend withholding tax that the country of source may impose is 10 percent in the case of a direct investor and 15 percent in all other cases (Article X). The United States generally seeks a 5 percent limit on direct dividends. The present treaty, however, allows a 15 percent rate.

(5) The treaty does not permit U.S. shareholders in Canadian corporations any relief similar to the imputation credit allowed Canadian shareholders. The United States has obtained relief in the United Kingdom and French treaties.

(6) The withholding tax on interest is limited to 15 percent (Article XI), the same as under the present treaty. Exemptions are provided in some limited cases such as commercial credit. The U.S. model exempts interest from tax at source (provides a zero rate). A zero rate is not generally achieved in many treaties, but is at times achieved for interest earned by banks on loans made to the source country.

(7) The withholding tax on royalties is limited to 10 percent generally and is eliminated for certain copyright royalties (Article XII). Movies and certain television royalties are not copyright royalties and thus may be taxed at source at 10 percent. The present treaty allows a 15 percent rate generally, and also exempts copyright royalties from tax at source. The U.S. model exempts royalties from tax at source. It does not distinguish between copyright and other royalties.

(8) The language of the capital gains provisions (Article XIII) would limit the situations in which Canadian investors in U.S. corporations and other entities hold U.S. real estate would be taxed under the recently enacted legislation taxing foreign investors on their gains from the sale of real estate. On its face it would also give Canadians who owned U.S. real estate on the date the treaty is signed

5

a step-up in basis for purposes of computing gain on the sale of the property to the effective date of the treaty. Also, the treaty states that the United States to tax Canadians on certain dispositions of U.S. real property interests only as long as Canada would tax U.S. persons on similar interests in Canadian real property. The present treaty is the only U.S. treaty that exempts gains from the sale of real property from tax.

(9) The treaty permits a resident of one country a charitable contribution deduction for donations to charities of the other country (Article XXI). This provision is not found in the U.S. model or most other U.S. income tax treaties. It is contained in the present treaty.

(10) The nondiscrimination provision is more limited than the model provisions and other provisions found in many treaties. For example, it does not cover residents of one country who own stock in a corporation of the other country. The provision is, however, considerably broader than the very limited provision in the present treaty.

(11) An organization exempt from tax in one country may be exempt from tax in the other country. An exemption from tax at source is also provided for dividends and interest paid to pension plans resident in the other country. An exemption from the U.S. excise tax on private foundations is provided a Canadian exempt organization that receives substantially all of its support from non-U.S. persons.

(12) Residents of one country may, under certain condition treat a contribution to a charity of the other country as a deductible charitable contribution.

### Specific Issues

The proposed treaty presents the following specific issues:

(1) *Nondiscrimination.*—Canada's tax system evidently contains certain provisions that discriminate against foreign investors as opposed to Canadian investors. For example, it is understood that in certain cases Canadian corporations receive a surtax exemption if they are owned by Canadians but not if they are owned by foreign persons. Another area of concern in this regard is Canadian natural resource taxation.

The United States generally insists that its tax treaties contain a broad nondiscrimination provision that would prohibit the treaty partner from discriminating against U.S. investors. At the insistence of Canada, the nondiscrimination provision in the proposed treaty is not as comprehensive as that sought by the United States or as that contained in the U.S. or the OECD model treaties or the U.N. guidelines. On the other hand, the nondiscrimination provision in the proposed treaty is much broader than that contained in the present treaty with Canada which only applies to individual U.S. citizens resident in Canada. We understand that the provision is the broadest agreed to by Canada in any of its treaties.

This raises the issue of whether the United States should enter into a treaty that countenances the right of a developed country to discriminate against U.S. investors in circumstances not generally permitted in tax treaties. At the present, staff does not have sufficient information to identify and evaluate the provisions of Canadian tax law

6

which may be viewed as discriminating against U.S. investors but which would be permitted under the proposed treaty language.

(2) *Mineral royalties.*—The present treaty contains an overall 15-percent limit on the rate of tax that either country can impose on investment income paid to residents of the other country. The proposed treaty removes this overall limitation but replaces it with limitations on the level of source basis taxation of various types of investment income. There is, however, no limitation on taxation of mineral rents and royalties. Accordingly, the Canadian tax on mineral royalties will be increased to the 25 percent of gross Canadian statutory rate. The U.S. rate will increase to the statutory 30 percent rate. The U.S. and OECD models do not contain a limitation on the taxation of mineral royalties.

(3) *Real property.*—The proposed treaty contains special rules for Canadian residents investing in U.S. real property that differ from U.S. real estate legislation. (The proposed treaty was negotiated before the real estate legislation was enacted.) Among the more important of these differences is that it states that Canadian investors get a step-up in the basis of their U.S. real property (for purposes of computing the U.S. tax on sale of the property) to the effective date of the new treaty. Other differences include various limitations on the situations where the United States can tax Canadians on their sales, their interest in U.S. corporations, and other entities whose assets include U.S. real estate. Also the treaty contains a provision which states that either country can tax gains on the sale of real property holding companies by residents of the other unless the other country would tax foreign investors in its real property holding companies in comparable circumstances. The purpose of this last limitation is not clear. Some may argue that Canadian investors should not be allowed such preferential treatment on their U.S. real estate investments. Conversely, others may argue that the limitations on taxing real estate related gains should be expanded to protect U.S. investors in Canada from Canadian tax.

The present treaty exempts gain from tax at source. Accordingly, it can be argued that a step-up in basis would be a reasonable transition rule.

(4) *Exempt organizations.*—Unlike other U.S. tax treaties, the proposed treaty would exempt charitable organizations of either country from tax imposed by the other. In addition, Canadian private foundations which receive substantially all their support from non-U.S. persons would be exempt from the 4-percent U.S. excise tax on income of private foundations. An exemption is also provided for pension funds but the exemption is limited to interest and dividends received from sources within the other country.

(5) *Conventions.*—The proposed treaty contains a provision that would permit U.S. persons to deduct expenses incurred in attending business conventions in Canada. At the time this provision was negotiated, deductions for conventions held in all foreign countries, including Canada, were subject to substantial restrictions pursuant to amendments to the Code made by the 1976 Act. However, the Code was amended in 1980 to permit deductions for conventions in Canada and Mexico on the same basis as those held in United States and its possessions. Accordingly, the treaty provision would no longer have

7

any impact on U.S. taxpayers attending Canadian conventions. Unless a contrary intention is expressed by the Senate, however, the inclusion of this provision in the treaty could be taken as precedent for other negotiations. (The Jamaican protocol, discussed below, also contains a convention provision.) It should be noted that Canada also has statutory provisions denying Canadian taxpayers deductions for attending foreign business conventions, so the principal impact of the provision is to allow Canadians deductions for Canadian tax purposes for attending business conventions in the United States.

(6) *Foreign tax credit.*—The U.S. foreign tax credit provided for by the treaty is to be applied on a per-country basis: that is, Canadian taxes will only be permitted to offset U.S. tax imposed on Canadian income. This contrasts with the Code limitation which is computed on an overall, worldwide basis. The interaction between the treaty limitation and the limitations provided by the Internal Revenue Code is complex, and a number of questions arise as to exactly how the two overlapping systems are to be applied. Also, there appears to be some uncertainty as to the application of the treaty per country limitation where income is resource to Canada under the treaty. However, the treaty rules are used only if the taxes are not creditable under the Code.

Another issue is which Canadian taxes are creditable for U.S. purposes. Treasury's technical explanation says that the Canadian general corporate tax will continue to be creditable even if Canada imposes a flat rate tax on natural resource income that is not deductible in computing the general corporate tax. The technical explanation refers to a possible 8-percent tax, but it is now possible that the tax will be significantly higher. This issue is relevant only to persons realizing income from natural resources.

(7) *Imputation credit.*—Canada has a modified "imputation" corporate tax system that provides some relief to resident shareholders from dual corporate-shareholder tax. Individual shareholders resident in Canada who receive dividends from a Canadian corporation must gross up to that dividend by 50 percent of the dividend. The full dividend plus the gross-up is included in income and is taxed. However, he may credit an amount equal to one-half of the dividends against his tax liability. Nonresident shareholders do not get the imputation credit. Accordingly, nonresident shareholders may be subject to a higher combined corporate and personal tax than a Canadian shareholder would be. Relief is granted under U.S. treaties with France and the United Kingdom. The issue raised is whether the United States should insist on complete relief for its shareholders in Canadian companies. The reduction of the dividend withholding tax does provide some relief.

## II. OVERVIEW OF UNITED STATES TAXATION OF INTERNATIONAL TRADE AND INVESTMENT AND TAX TREATIES

### A. United States Tax Rules

The United States taxes U.S. citizens and residents and U.S. corporations on their worldwide income. The United States generally taxes nonresident alien individuals and foreign corporations only on their U.S. source income.

Income of a nonresident alien or foreign corporation which is effectively connected with the conduct of a trade or business in the United States is subject to tax at the normal graduated rates on the basis of net taxable income. Deductions are allowed in computing effectively connected taxable income, but only if and to the extent they are connected with income which is effectively connected.

U.S. source fixed or determinable, annual or periodical income (e.g. interest, dividends, rents, salaries, wages, premiums, annuities) which is not effectively connected with a U.S. trade or business is subject to tax at a rate of 30 percent of the gross amount paid to the nonresident alien or foreign corporation. This gross tax on fixed or determinable income is often reduced or eliminated in the case of payments to residents of countries with which the U.S. has an income tax treaty. The 30-percent (or lower treaty rate) tax imposed on U.S. source noneffectively connected income paid to foreign persons is collected by means of withholding (hence they are often called withholding taxes).

Certain exemptions from the gross tax are provided. Bank account interest is defined as foreign source interest and, therefore, is exempt. Exemptions are also provided for certain original issue discount and for income of a foreign government from investments in U.S. securities. Our treaties also provide for exemption from tax in certain cases.

Net U.S. source capital gains are also subject to the 30 percent tax but only in the case of a nonresident alien who is present in the United States for at least 183 days during the taxable year. Otherwise foreign corporations and nonresident aliens are only subject to U.S. taxation (at the graduated rates) on those capital gains that are effectively connected with the conduct of a trade or business in the United States.

Prior to June 18, 1980, noneffectively connected capital gains from the sale of U.S. real estate were subject to U.S. taxation only if received by a nonresident alien who was present in the United States for at least 183 days. However, in the Omnibus Reconciliation Act of 1980 a provision was added to the Internal Revenue Code that the sale, exchange or disposition of U.S. real estate by a foreign corporation or a nonresident alien would be taxed as effectively connected income. Also taxable under the legislation are dispositions by foreign investors

(8)

9

of their interests in certain U.S. corporations and other entities whose assets include U.S. real property and associated personal property.

The source of income received by nonresident aliens and foreign corporations is determined under special rules contained in the Internal Revenue Code. Under these rules interest and dividends paid by a U.S. citizen or resident or by a U.S. corporation are considered U.S. source income. However, if the U.S. corporation derives more than 80 percent of its gross income from foreign sources, then dividends and interest paid by such corporation will be foreign source rather than U.S. source. Conversely, dividends and interest paid by a foreign corporation, which has at least 50 percent of its income as effectively connected income, are U.S. source to the extent of the ratio of its effectively connected income to total income.

Rents and royalties paid for the use of property in the United States is considered U.S. source income. The property use can be either tangible property or intangible property (e.g., patents, secret processes and formulas, franchises and other like property).

Since it taxes U.S. persons on their worldwide income, double taxation of income can arise because income earned abroad by a U.S. person will be taxed by the country in which the income is earned and also by the United States. The United States seeks to mitigate this double taxation by allowing U.S. taxpayers to credit their foreign income taxes against the U.S. tax imposed on their foreign source income. A fundamental premise of the foreign tax credit is that it may not offset the U.S. tax on U.S. source income. Therefore, the foreign tax credit provisions contain a limitation that insures that the foreign tax credit only offset the U.S. tax on foreign source income. This limitation is computed on a world-wide consolidated bases. Hence, all income taxes paid to all foreign countries are combined to offset U.S. taxes on all foreign income. Separate limitations on the foreign tax credit are provided for certain interest. DISC dividends, and oil income.

A U.S. corporation that owns 10 percent or more of the stock of a foreign corporation may credit foreign income taxes paid or deemed paid by that foreign corporation on earnings that are received as dividends. These deemed paid taxes are included in total foreign taxes paid for the year the dividend is received and go into the general pool of taxes to be credited.

### B. United States Tax Treaties—In General

The traditional objectives of U.S. tax treaties have been the avoidance of international double taxation and the prevention of tax avoidance and evasion. To a large extent, the treaty provisions designed to carry out these objectives supplement Code provisions having the same objectives, modifying the generally applicable statutory rules with provisions which take into account the particular tax system of the treaty country. Given the diversity of tax systems in the world, it would be virtually impossible to develop in the Code rules which unilaterally achieve these objectives for all countries.

Notwithstanding the unilateral relief measures of the United States and our treaty partners, double taxation might arise because of differences in source rules between the United States and the other coun-

10

try. Likewise, if both countries consider the same deduction allocable to foreign sources, double taxation can result. Significant problems arise in the determination of whether a foreign tax qualifies for the U.S. foreign tax credit. Also, double taxation may arise in those limited situations where a corporation or individual may be treated as a resident of both countries and be taxed on a worldwide basis by both.

In addition, there may be significant problems involving "excess" taxation—situations where either country taxes income received by nonresidents at rates which exceed the rates imposed on residents. This is most likely to occur in the case of income taxed at a flat rate on a gross income basis. (Most countries, like the United States, generally tax domestic source income on a gross income basis when it is received by nonresidents who are not engaged in business in the country.) In many situations the gross income tax is imposed at a rate which exceeds the tax which would have been paid under the net income tax system applicable to residents.

Another related objective of U.S. tax treaties is the removal of barriers to trade, capital flows, and commercial travel caused by overlapping tax jurisdictions and the burdens of complying with the tax laws of a jurisdiction where the contacts with, and income derived from, that jurisdiction are minimal.

The objective of limiting double taxation is generally accomplished in treaties by the agreement of each country to limit, in certain specified situations, its right to tax income earned from its territory by residents of the other country. For the most part, the various rate reductions and exemptions by the source country provided in the treaties are premised on the assumption that the country of residence will tax the income in any event at levels comparable to those imposed by the source country on its residents. The treaties also provide for the elimination of double taxation by requiring the residence country to allow a credit for taxes which the source country retains the right to impose under the treaty. In some cases, the treaties may provide for exemption by the residence country of income taxed by the source country pursuant to the treaty.

Treaties first seek to eliminate double taxation by defining the term "resident" so that an individual or corporation generally will not be subject to tax as a resident by each of the two countries. The treaty also provides that neither country will tax business income derived from sources within it by residents of the other country unless the business activities in the taxing jurisdiction are substantial enough to constitute a branch or other permanent establishment or fixed base. The treaties contain commercial visitation exemptions under which individual residents of one country performing personal services in the other will not be required to file tax returns and pay tax in that other country unless their contacts exceed certain specified minimums, for example, presence for a set number of days or earnings of over a certain fixed dollar amount.

The treaties deal with passive income such as dividends, interest, or royalties, from sources within one country derived by residents of the other country by either providing that they are taxed only in the country of residence or by providing that the with-

11

holding tax generally imposed on those payments is reduced. As described above, the U.S. generally imposes a 30 percent tax and seeks to reduce this tax in some cases on some income to zero in its tax treaties.

In its treaties, the United States, as a matter of policy, retains the right to tax its citizens and residents on their worldwide income as if the treaty had not come into effect, and provides this in the treaties in the so-called "saving clause." Double taxation can therefore still arise. Double taxation can also still arise because most countries will not exempt passive income from tax at source.

This double taxation is further mitigated either by granting a credit for income taxes paid to the other country, or, in the case of some of our treaty partners, by providing that income will be exempt from tax in the country of residence. The United States provides in its treaties that it will allow a credit against United States tax for income taxes paid to the treaty partners, subject to the limitations of U.S. law. An important function of the treaty is to define the taxes to which it applies or provide that they will be considered creditable income taxes for purposes of the treaty.

The treaties also provide for administrative cooperation between the countries. This cooperation includes a competent authority mechanism to resolve double taxation problems arising in individual cases, or more generally, by consultation between tax officials of the two governments.

Administrative cooperation also includes provision for an exchange of tax-related information to help the United States and its treaty partners administer their tax laws. The treaties generally provide for the exchange of information between the tax authorities of the two countries where such information is necessary for carrying out the provisions of the treaty or of their domestic tax laws. The obligation to exchange information under the treaties typically does not require either country to carry out measures contrary to its laws or administrative practices or to supply information not obtainable under its laws or in the normal course of its administration, or to supply information which would disclose trade secrets or other information the disclosure of which would be contrary to public policy.

The provisions generally result in an exchange of routine information, such as the names of U.S. residents receiving investment income. The IRS (and the treaty partner's tax authorities) also can request specific tax information from a treaty partner. This can include information to be used in a criminal investigation or prosecution.

### III. EXPLANATION OF PROPOSED TAX TREATY

A detailed, article-by-article explanation of the proposed income tax treaty between the United States and Canada is presented below.

### *Article I. Personal Scope*

The personal scope Article describes the persons who may claim the benefits of the treaty.

The proposed treaty applies generally to residents of the United States and to residents of Canada, with specific exceptions designated in other articles. This follows other U.S. income tax treaties, the U.S. model income tax treaty, and the OECD model income tax treaty. The treaty also applies, in limited cases, to persons who are residents of neither Canada nor the United States. The term "resident" is defined in Article IV.

### *Article II. Taxes Covered*

The proposed treaty applies to taxes on income and capital which are imposed by either country. At present, neither Canada nor the United States imposes a tax on capital.

In the case of the United States, the proposed treaty applies to the Federal income taxes imposed by the Internal Revenue Code. In addition, the proposed treaty applies to certain U.S. taxes for specified limited purposes. The proposed treaty applies to the U.S. accumulated earnings tax and the personal holding company tax, only to the extent provided in Article X (Dividends). The proposed treaty applies to the excise tax imposed by the United States on private foundations but only to the extent necessary to implement the special provisions of Article XXI(4), relating to exempt organizations. It also applies to the social security tax but only to the extent necessary to implement the rules in Article XXIX(4) (Miscellaneous Rules).

In the case of Canada, the treaty applies to the income taxes imposed by the Federal Government of Canada under Parts I, XIII, and XIV of the Income Tax Act. These taxes will be treated as creditable income taxes for purposes of the U.S. foreign tax credit granted by Article XXIV(1) (Relief from Double Taxation).

The proposed treaty also contains a provision generally found in U.S. income tax treaties to the effect that it will apply to substantially similar taxes which either country may subsequently impose. It also contains a provision that it will apply to taxes on capital that either country may later impose.

It is understood that the Treasury and the government of Canada agreed that the general Canadian corporate tax would be considered a substantially similar tax if Canada were to enact a low flat-rate tax on natural resource revenues even though that tax is not deductible in computing income under the general rules of Part I of the Canadian

(12)

35

to a Canadian college or university attended by the donor or a member of his family. Similar rules apply to donations by Canadian residents to U.S. charities.

### Article XXII. Other Income

As a general rule, items of income not otherwise dealt with in the proposed treaty which are derived by residents of either country shall be taxable only by the country of residence. However, if the income is sourced in the other country, it may also be taxed by that country. The source of an item of income is determined under the domestic laws of the two countries unless the treaty contains a rule. This provision, for example, gives the United States the sole right to tax income sourced in a third country and paid to a resident of the United States.

Income distributed by an estate or trust to a resident of the other country that is not dealt with elsewhere in the treaty may be taxed in the country of residence of the estate or trust if the income is from sources within that country. However, the tax is limited to 15 percent of the gross amount of the income. Accordingly, Canada can tax distributions of income by a Canadian resident estate to a U.S. resident out of income arising in Canada, but the rate of tax cannot exceed 15 percent of the gross amount of the distribution. This provision does not affect U.S. estates.

### Article XXIII. Capital

Many countries impose a tax on capital in addition to imposing a tax on income. As a general rule, capital taxes are imposed when the income from the capital would be taxed by the country imposing the capital tax. Neither the United States nor Canada currently imposes a capital tax. However, under Article II (Taxes Covered), such a tax would be covered by the treaty if later enacted by one of the countries. The rules in Article XXIII would then apply to that tax.

Under the proposed treaty, capital could be taxed by the country in which located if it is real property or personal property forming part of the business property of a permanent establishment or fixed base maintained by a resident of the other country. The owner's country of residence could also tax that property. The country of residence would have the exclusive right to tax ships and aircraft and related personal property operated by a resident in international traffic. All other elements of capital would also be taxed only by the country of residence.

### Article XXIV. Relief from Double Taxation

*Background*

One of the two principal purposes for entering into an income tax treaty is to limit double taxation of income earned by a resident of one of the countries that may be taxed by the other country. The United States seeks to unilaterally mitigate double taxation by allowing U.S. taxpayers to credit the foreign income taxes that they pay against the U.S. tax imposed on their foreign source income. A fundamental premise of the foreign tax credit is that it may not offset the U.S. tax on U.S. source income. Therefore, the foreign tax credit provisions contain a limitation that insures that the foreign tax credit only offset U.S. tax on foreign source income. This limitation is computed

36

on a worldwide consolidated basis. Hence, all income taxes paid to all foreign countries are combined to offset U.S. taxes on all foreign income. Separate limitations on the foreign tax credit are provided for certain interest, DISC dividends, and oil income.

A U.S. corporation that owns 10 percent or more of the stock of a foreign corporation may credit foreign taxes paid or deemed paid by that foreign corporation on earnings that are received as dividends (deemed paid credit). These deemed paid taxes are included in the U.S. shareholder's total foreign taxes paid for the year the dividend is received and go into the general pool of taxes to be credited.

Unilateral efforts to limit double taxation are imperfect. Because of differences in rules as to when a person may be taxed on business income, a business may be taxed by two countries as if it were engaged in business to both countries. Also, a corporation or individual may be treated as a resident of more than one country and be taxed on a worldwide basis by both.

Part of the double tax problem was dealt with in previous articles that limited the right of a source country to tax income, and that coordinated the source rules. This article provides further relief where both Canada and the United States will still tax the same item of income.

The present treaty provides for relief from double taxation by each country permitting a credit against its tax for the appropriate amount of taxes paid to the other country on income from sources within that other country. The credit is provided, however, only to the extent permitted under domestic law.

The proposed treaty provides separate rules for relief of double taxation by the United States and Canada. In addition, it provides special rules covering U.S. citizens resident in Canada.

*United States*

The proposed treaty contains the provision found in many U.S. income tax treaties that the United States will allow a citizen or resident a foreign tax credit for income taxes paid or accrued to Canada. The credit is to be computed in accordance with the provisions of and subject to the limitations of U.S. law. The credit is limited to the proportion of the U.S. tax that taxable income arising in Canada bears to the taxpayer's entire taxable income. The credit is allowed to certain Canadian companies that have elected to be treated as domestic U.S. companies for purposes of being included in a consolidated return of a U.S. group of corporations (this election is permitted by section 1504(d)).

The proposed treaty also allows the U.S. indirect credit (section 902) to U.S. corporate shareholders of Canadian corporations receiving dividends from those corporations if the U.S. company owns 10 percent or more of the rating stock of the Canadian corporation. The credit is allowed for Canadian income taxes paid by the Canadian corporation on the profits out of which the dividends are paid.

By making a taxpayer subject to both the Code and the treaty limitation, the taxpayer who uses the treaty credit gets to credit the lesser of the per country limitation or the worldwide overall limitation. For purposes of computing the treaty per country rule, the Code separate limitations are to be applied. For example, for purposes of computing

**Appx685**

the treaty per country rule, the separate limitation for oil and gas income (section 907) would be applied in addition to the per country limitation. There appears to be some uncertainty as to the application of the treaty per country limitation where income is resourced to Canada under the treaty.

It should be noted that the additional per country limitation only applies if the taxpayer is claiming benefits under the treaty not available under the code; for example, claiming a credit for a Canadian tax not creditable under the code.

*Canada*

Canada will allow a credit against Canadian tax for income taxes paid to the United States on income arising in the United States. This credit is available subject to the provisions of Canadian law relating to the foreign tax credit, as they may be modified. If Canadian law provides a greater deduction or relief, then the taxpayer may use Canadian rules.

Relief from double taxation is provided a corporation resident in Canada by permitting it to deduct any dividends received by it out of exempt surplus of a foreign affiliate which is resident in the United States. This deduction is to be based on the provisions of Canadian law, as they may be modified without changing their general principal.

*Other provisions*

The proposed treaty in the various articles dealing with specific items of income provides source rules for determining when an item of income arises in one of the countries. These rules are used for credit or exemption purposes. In general, an item of income of a resident of one country that may be taxed in the other country under the treaty is considered to arise in that other country. Accordingly, income taxes paid to that other country on that income will be creditable (subject to any relevant limitations). Income that may not be taxed in the source country is deemed to arise in the residence country.

The Treasury technical explanation explaining the proposed treaty contains a detailed explanation of how the Treasury views the foreign tax credit rules in the proposed treaty as working. It is understood that these rules only represent the current views of the Treasury and, accordingly, they do not foreclose the Treasury from modifying those interpretations in the future should it deem it advisable to do so. Here, however, the Canadian government has reviewed the technical explanation and approved it.

Generally, under U.S. law foreign taxes paid or owned in a taxable year that exceed the foreign tax credit limitation may be carried back and then forward to be used in other years if the foreign taxes paid in those other years do not eliminate U.S. tax on foreign income. While not specifically provided in the treaty, it is understood that the general carryover rules in the treaty will apply. For example, if taxes paid in a year in which the treaty is being used are carried to a year in which the treaty is not being used, the treaty limitation is used in the later year to determine whether the taxes may be credited against U.S. taxes in that later year.

The proposed treaty also provides that any reference to income tax paid or accrued to a country includes Canadian tax and United States

38

tax. Accordingly, those taxes, which are defined in Article II (Taxes Covered) are creditable under the treaty. In addition, the proposed treaty provides a credit for local taxes of general application provided the local authority does not impose the taxes in a manner inconsistent with the provisions of the treaty and the taxes are substantially similar to the taxes of the countries described in Article II. Thus, for example, Canada would allow a credit for a State income tax that was similar to the U.S. Federal income tax. Likewise, the United States will allow a credit for a provincial income tax that is imposed in a manner consistent with the provisions of the proposed treaty if it is substantially similar to the Canadian Federal income tax.

The proposed treaty also contains special rules for U.S. citizens who are residents of Canada. Under the first rule, Canada will permit the U.S. citizen a credit against Canadian tax imposed on certain income that arises in the United States. This credit is limited to the tax that the citizen would have paid if he were not a U.S. citizen. In addition, the United States will allow the citizen a credit against his U.S. tax for any tax paid to Canada after Canada has allowed the credit for U.S. taxes. The credit comes after the Canadian tax is reduced by the deduction for U.S. taxes.

A further special rule is provided for dividends, interest and royalties arising in the United States and beneficially owned by a citizen of the United States resident in Canada. Under this rule, Canada will permit a deduction of any U.S. tax paid on the dividends, interest and royalties but not reduced by Canadian taxes creditable for U.S. purposes in computing the U.S. net tax due. Canada will also allow a credit for U.S. tax imposed on that income, but Canada may limit the credit to 15 percent of the gross amount of those items included in income for Canadian tax purposes. The United States will allow a credit against U.S. tax imposed on that income for Canadian tax after the credit allowed for U.S. taxes paid or accrued on the income. The United States does not have to allow the credit to the extent it reduces U.S. tax below 15 percent of the gross amount of the interest, dividends, and royalties.

The proposed treaty provides for a limited resourcing of income to give effect to the special rules for U.S. citizens resident in Canada.

Finally, a credit is provided for capital taxes imposed by one country on capital of a resident of the other country.

*Article XXV. Nondiscrimination*

The proposed treaty contains a nondiscrimination provision relating to all income taxes of every kind imposed at the national level. It is similar to provisions which have been embodied in other recent U.S. income tax treaties. There are, however, some important differences.

Under the provision, neither country can discriminate by imposing more burdensome taxes (or other requirements connected with taxes) on citizens of the other country resident in the host country than it imposes on its own citizens who are in the same circumstances.

The proposed treaty provides that citizens of one country not resident in the other country cannot be subjected in that other country to more burdensome taxes (or requirements connected with taxes) than a similarly situated citizen of a third country would be subject to. The

**Appx687**

# TAX TREATIES

## HEARING

### BEFORE THE

## COMMITTEE ON FOREIGN RELATIONS
## UNITED STATES SENATE

### NINETY-SEVENTH CONGRESS

#### FIRST SESSION

##### ON

#### VARIOUS TAX TREATIES

**(EX. T, 96–2), (EX. M, 96–2), (EX. C, 94–2), (EX. U, 96–2), (EX. H, 95–2), (EX. O, 96–2), (EX. Z, 96–2), (97–1), (EX. E, 96–2), (97–10), (EX. Y, 96–2), (EX. C, 95–1)**

#### SEPTEMBER 24, 1981

Printed for the use of the Committee on Foreign Relations



**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON : 1982**

85–401 O

S 381-15

Appx688

# CONTENTS

|  | Page |
|---|---|
| Hearing day: | |
| September 24, 1981 | 1 |
| Statement of— | |
| Chapoton, Hon. John E., Assistant Secretary of the Treasury, Tax Policy, accompanied by Alan W. Granwell, international tax counsel, Department of the Treasury | 3, 65 |
| Cohen, Sheldon S., Esq., on behalf of U.S. Border Broadcasters, Washington, D.C. | 59 |
| Corrada, Hon. Baltasar, Resident Commissioner of Puerto Rico | 109 |
| de Lugo, Hon. Ron, Delegate to the U.S. Congress from the Virgin Islands | 106 |
| Ellis, Dennis J., director of taxes, Viacom International, Inc., accompanied by John Berna, tax attorney, New York, N.Y | 62 |
| Finnerty, Peter J., vice president, public affairs, Sea-Land Industries, Inc., Edison, N.J | 102 |
| Gordon, Richard A., international tax counsel, Joint Committee on Taxation, accompanied by David H. Brockway, Deputy Chief of Staff, Joint Committee on Taxation, and Thomas Joyce, accountant, Joint Committee on Taxation | 39, 77 |
| Hawkins, William M., vice president, finance and taxation, Air Transport Association of America, Washington, D.C | 99 |
| Insertions for the record: | |
| Prepared statement of Hon. John E. Chapoton | 6, 69 |
| Provisions of the Internal Revenue Code overridden by the tax treaty—submitted by the Department of the Treasury | 29 |
| Revenue effect of the increase in the tax on resource royalties—submitted by the Department of the Treasury | 34 |
| Prepared statement of Richard A. Gordon | 42, 82 |
| Letter from Senators Percy and Mathias, as well as letter to Senator Percy from Representative Dan Rostenkowski, chairman, Committee on Ways and Means, U.S. House of Representatives, dated September 24, 1981, concerning tax treaties | 53 |
| Biographical data of Sheldon S. Cohen | 59 |
| Prepared statement of Sheldon S. Cohen | 60 |
| Biographical data of Dennis J. Ellis | 61 |
| Letter to Senator Percy from Assistant Secretary Chapoton, dated September 15, 1981, requesting delay of certain tax treaties | 76 |
| Antiabuse provision in the proposed treaty with Argentina—submitted by the Department of the Treasury | 78 |
| Prepared statement of William M. Hawkins | 101 |
| Prepared statement of Hon. Baltasar Corrada | 110 |
| Prepared statement of Samuel L. Hayden, president, Council of the Americas | 111 |
| Department of the Treasury's response to an additional question submitted by Senator Pressler | 113 |
| Department of the Treasury's responses to additional questions submitted by Senator Pell | 114 |

## APPENDIX

| I. Technical explanation of the convention between the Government of the United States of America and: | |
|---|---|
| Canada | 117 |
| The Government of the Argentine Republic | 175 |

(III)

# APPENDIX I: TECHNICAL EXPLANATIONS

TECHNICAL EXPLANATION OF THE CONVENTION
BETWEEN THE UNITED STATES OF AMERICA
AND CANADA WITH RESPECT TO TAXES ON INCOME
AND ON CAPITAL SIGNED AT WASHINGTON, D.C.
ON SEPTEMBER 26, 1980

INTRODUCTION

    In this technical explanation of the Convention between
the United States and Canada signed on September 26, 1980
("the Convention"), references are made to the Convention and
Protocol between Canada and the United States with respect to
Income Taxes signed on March 4, 1942, as amended by the
Convention signed on June 12, 1950, the Convention signed on
August 8, 1956 and the Supplementary Convention signed on
October 25, 1966 (the "1942 Convention"). These references
are intended to put various provisions of the Convention into
context. The technical explanation does not, however,
provide a complete comparison between the Convention and the
1942 Convention. Moreover, neither the Convention nor the
technical explanation is intended to have implications for
the interpretation of the 1942 Convention.

    The technical explanation is an official guide to the
Convention. It reflects policies behind particular Conven-
tion provisions, as well as understandings reached with
respect to the interpretation and application of the Con-
vention.

Article I. PERSONAL SCOPE

    Article I provides that the Convention is generally
applicable to persons who are residents of either Canada or
the United States or both Canada and the United States. The
word "generally" is used because certain provisions of the
Convention apply to persons who are residents of neither
Canada nor the United States.

Article II. TAXES COVERED

    Paragraph 1 states that the Convention applies to taxes
"on income and on capital" imposed on behalf of Canada and
the United States, irrespective of the manner in which such
taxes are levied. As of September 26, 1980 neither Canada
nor the United States imposed taxes on capital. Paragraph 1
is not intended either to broaden or to limit paragraph 2,
which provides that the Convention shall apply, in the case
of Canada, to the taxes imposed by the Government of Canada

(117)

## Article XXIII.  CAPITAL

Although neither Canada nor the United States currently has national taxes on capital, Article XXIII provides rules for the eventuality that such taxes might be enacted in the future.  Paragraph 1 provides that capital represented by real property (as defined in paragraph 2 of Article VI (Income From Real Property)) owned by a resident of a Contracting State and situated in the other Contracting State may be taxed in that other State.

Paragraph 2 provides that capital represented by either personal property forming part of the business property of a permanent establishment or personal property pertaining to a fixed base in a Contracting State may be taxed in that State.

Paragraph 3 provides that capital represented by ships and aircraft operated by a resident of a Contracting State in international traffic and by personal property pertaining to the operation of such ships and aircraft are taxable only in the Contracting State of residence.

Paragraph 4 provides that all elements of capital other than those covered by paragraphs 1, 2, and 3 are taxable only in the Contracting State of residence.  Thus, capital represented by motor vehicles or railway cars, not pertaining to a permanent establishment or fixed base in a Contracting State, would be taxable only in the Contracting State of which the taxpayer is a resident.

## Article XXIV.  ELIMINATION OF DOUBLE TAXATION

Paragraph 1 provides the general rules that will apply under the Convention with respect to foreign tax credits for Canadian taxes paid or accrued.  The United States undertakes to allow to a citizen or resident of the United States, or to a company electing under Code section 1504(d) to be treated as a domestic corporation, a credit against the Federal income taxes imposed by the Code for the appropriate amount of income tax paid or accrued to Canada.  In the case of a company which is a resident of the United States owning 10 percent or more of the voting stock of a company which is a resident of Canada (which for this purpose does not include a company electing under Code section 1504(d) to be treated as a domestic corporation), and from which it receives dividends in a taxable year, the United States shall allow as a credit against income taxes imposed by the Code the appropriate amount of income tax paid or accrued to Canada by the Canadian company with respect to the profits out of which such company paid the dividends.

The direct and deemed-paid credits allowed by paragraph 1 are subject to the limitations of the Code as they may be amended from time to time without changing the general principle of paragraph 1. Thus, as is generally the case under U.S. income tax conventions, provisions such as Code sections 901(c), 904, 905, 907, 908, and 911 apply for purposes of computing the allowable credit under paragraph 1.

The term "income tax paid or accrued" is defined in paragraph 7 of Article XXIV to include certain specified taxes which are paid or accrued. Paragraph 1 provides a credit for these specified taxes whether or not they qualify as creditable under Code section 901 or 903. However, if any portion of the Canadian taxes creditable under the Convention does not qualify as income taxes or "in lieu" taxes under the Code, the amount of direct and deemed-paid credit that may be claimed under the Convention may not exceed the proportion of the Federal income taxes imposed by the Code that the taxpayer's taxable income arising in Canada bears to the taxpayer's worldwide taxable income. In other words, Canadian taxes made creditable solely by paragraph 1 are creditable only to the extent of a per country limitation computed with respect to Canada pursuant to the special source rules set forth in paragraphs 3 and 6, subject to U.S. limitation rules (e.g., Code sections 904(b)(2) and 904(f)). If, after application of these rules, a person has paid or accrued an amount to Canada in excess of the amount creditable against U.S. tax for a given year, the excess may be carried over to other years to offset U.S. tax on income arising in Canada under the Convention.

A taxpayer may, for any year, claim a credit pursuant to the rules of the Code. In such case, the taxpayer would be subject to the limitations established in the Code. In addition, any Canadian taxes covered by paragraph 1 which are not creditable under the Code would not be credited.

The Convention only provides a credit for amounts paid or accrued. The determination of whether an amount is paid or accrued is made under the Code.

The general rule for avoiding double taxation in Canada is provided in paragraph 2. Pursuant to paragraph 2(a) Canada undertakes to allow to a resident of Canada a credit against income taxes imposed under the Income Tax Act for the appropriate amount of income taxes paid or accrued to the United States. Paragraph 2(b) provides for the deduction by a Canadian company, in computing taxable income, of any dividend received out of the exempt surplus of a U.S. company which is an affiliate. The provisions of paragraph 2 are subject to the provisions of the Income Tax Act as they may be amended from time to time without changing the general principle of paragraph 2.

Paragraph 3 provides source rules for purposes of applying Article XXIV. Profits, income, or gains of a resident of a Contracting State which may be taxed in the other Contracting State in accordance with the Convention, for reasons other than the saving clause of paragraph 2 of Article XXIX (Miscellaneous Rules) (e.g., pensions and annuities taxable where arising pursuant to Article XVIII (Pensions and Annuities)), are deemed to arise in the latter State. This rule does not, however, apply to gains taxable under paragraph 5 of Article XIII (Gains) (i.e., gains taxed by a Contracting State derived from the alienation of property by a former resident of that State). Gains from such an alienation arise, pursuant to paragraph 3(b), in the State of which the alienator is a resident. Thus, if in accordance with paragraph 5 of Article XIII, Canada imposes tax on certain gains of a U.S. resident such gains are deemed, pursuant to paragraphs 2 and 3(b) of Article XXIV, to arise in the United States for purposes of computing the deduction against Canadian tax for the U.S. tax on such gain. Under the Convention such gains arise in the United States for purposes of the United States foreign tax credit. Paragraph 3(b) also provides that profits, income, or gains arise in the Contracting State of which a person is a resident if they may not be taxed in the other Contracting State under the provisions of the Convention (e.g., alimony), other than the "saving clause" of paragraph 2 of Article XXIX.

The rules of paragraph 1 are modified in certain respects by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada. Paragraph 4 provides two steps for the elimination of double taxation in such a case. First, paragraph 4(a) provides that Canada shall allow a deduction from (credit against) Canadian tax in respect of income tax paid or accrued to the United States in respect of profits, income, or gains which arise in the United States (within the meaning of paragraph 3(a)); the deduction against Canadian tax need not, however, exceed the amount of income tax that would be paid or accrued to the United States if the individual were not a U.S. citizen, after taking into account any relief available under the Convention.

The second step, as provided in paragraph 4(b), is that the United States allows as a credit against United States tax, subject to the rules of paragraph 1, the income tax paid or accrued to Canada after the Canadian credit for U.S. tax provided by paragraph 4(a). The credit so allowed by the United States is not to reduce the portion of the United States tax that is creditable against Canadian tax in accordance with paragraph 4(a).

The following example illustrates the application of
paragraph 4.

Example A

-- A U.S. citizen who is a resident of Canada earns
   $175 of income from the performance of independent
   personal services, of which $100 is derived from
   services performed in Canada and $75 from services
   performed in the United States. That is his total
   world-wide income.

-- If he were not a U.S. citizen, the United States
   could tax $75 of that amount under Article XIV
   (Independent Personal Services). By reason of
   paragraph 3(a), the $75 that may be taxed by the
   United States under Article XIV is deemed to arise
   in the United States. Assume that the U.S. tax on
   the $75 is $25.

-- However, since the individual is a U.S. citizen,
   he is subject to U.S. tax on his worldwide income
   of $175. After excluding $75 under section 911,
   his taxable income is $100 and his U.S. tax is
   $40.

-- Because he is a resident of Canada, he is also
   subject to Canadian tax on his worldwide income.
   Assume that Canada taxes the $175 at $75.

-- Canada will credit against its tax of $75 the U.S.
   tax at source of $25, leaving a net Canadian tax
   of $50.

-- The United States will credit against its tax of
   $40 the Canadian tax net of credit, but without
   reducing its source basis tax of $25; thus, the
   allowable credit is $40 - $25 = $15.

-- To use a credit of $15 requires Canadian source
   taxable income of $37.50 ($37.50/$100 x $40 =
   $15). Without any special treaty rule, Canadian
   source taxable income would be only $25 ($100 less
   the section 911 exclusion of $75). Paragraph 6
   provides for resourcing an additional $12.50 of
   income to Canada, so that the credit of $15 can be
   fully used.

Paragraph 5 provides special rules for the elimination
of double taxation in the case of dividends, interest, and
royalties earned by a U.S. citizen resident in Canada. These

**Appx697**

rules apply notwithstanding the provisions of paragraph 4, but only as long as the law in Canada allows a deduction in computing income for the portion of any foreign tax paid in respect of dividends, interest, or royalties which exceeds 15 percent of the amount of such items of income, and only with respect to those items of income. The rules of paragraph 4 apply with respect to other items of income; moreover, if the law in force in Canada regarding the deduction for foreign taxes changes, the provisions of paragraph 5 shall not apply and the U.S. foreign tax credit for Canadian taxes and the Canadian credit for U.S. taxes will be determined solely pursuant to the provisions of paragraph 4.

The calculations under paragraph 5 are as follows. First, the deduction allowed in Canada in computing income shall be made with respect to U.S. tax on the dividends, interest, and royalties before any foreign tax credit by the United States with respect to income tax paid or accrued to Canada. Second, Canada shall allow a deduction from (credit against) Canadian tax for U.S. tax paid or accrued with respect to the dividends, interest, and royalties, but such credit need not exceed 15 percent of the gross amount of such items of income that have been included in computing income for Canadian tax purposes. (The credit may, however, exceed the amount of tax that the United States would be entitled to levy under the Convention upon a Canadian resident who is not a U.S. citizen.) Third, for purposes of computing the U.S. tax on such dividends, interest, and royalties, the United States shall allow as a credit against the U.S. tax the income tax paid or accrued to Canada after the 15 percent credit against Canadian tax for income tax paid or accrued to the United States. The United States is in no event obliged to give a credit for Canadian income tax which will reduce the U.S. tax below 15 percent of the amount of the dividends, interest, and royalties.

The rules of paragraph 5 are illustrated by the following simplified example.

Example B

--   A U.S. citizen who is a resident of Canada has $100 of royalty income arising in the United States. The tentative U.S. tax before foreign tax credit is $40.

--   Canada, under its law, allows a deduction for the U.S. tax in excess of 15 percent or, in this case, a deduction of $25 ($40 - $15). The Canadian taxable income is $75 and the Canadian tax on that amount is $35.

-- Canada gives a credit of $15 (the maximum credit allowed is 15 percent of the gross royalty taken into Canadian income) and collects a net tax of $20.

-- The United States allows a credit for the net Canadian tax against its tax in excess of 15 percent. Thus, the maximum credit is $25 ($40 - $15). But since the net Canadian tax paid was $20, the usable credit is $20.

-- To be able to use a credit of $20 requires Canadian source taxable income of $50 (50% of the U.S. tentative tax of $40). Under paragraph 6, $50 of the U.S. royalty is resourced to be of Canadian source. The credit of $20 may then be offset against the U.S. tax of $40, leaving a net U.S. tax of $20.

-- The combined tax paid to both countries is $40, $20 to Canada and $20 to the United States.

    Paragraph 6 is necessary to implement the objectives of paragraphs 4(b) and 5(c). Paragraph 6 provides that where a U.S. citizen is a resident of Canada, items of income referred to in paragraph 4 or 5 are deemed for the purposes of Article XXIV to arise in Canada to the extent necessary to avoid double taxation of income by Canada and the United States consistent with the objectives of paragraphs 4(b) and 5(c). Paragraph 6 can override the source rules of paragraph 3 to permit a limited resourcing of income. The principles of paragraph 6 have effect, pursuant to paragraph 3(b) of Article XXX (Entry Into Force), for taxable years beginning on or after January 1, 1976. See the discussion of Article XXX below.

    Paragraph 7 provides that any reference to "income tax paid or accrued" to Canada or the United States includes Canadian tax or United States tax, as the case may be. The terms "Canadian tax" and "United States tax" are defined in paragraphs 1(c) and 1(d) of Article III (General Defini- tions). References to income taxes paid or accrued also include taxes of general application paid or accrued to a political subdivision or local authority of Canada or the United States which are not imposed by such political sub- division or local authority in a manner inconsistent with the provisions of the Convention and which are substantially similar to taxes of Canada or the United States referred to in paragraphs 2 and 3(a) of Article II (Taxes Covered).

In order for a tax imposed by a political subdivision or local authority to fall within the scope of paragraph 7, such tax must apply to individuals, companies, or other persons generally, and not only to a particular class of individuals or companies or a particular type of business. The tax must also be substantially similar to the national taxes referred to in paragraphs 2 and 3(a) of Article II. Finally, the political subdivision or local authority must apply its tax in a manner not inconsistent with the provisions of the Convention. For example, the political subdivision or local authority must not impose its tax on a resident of the other Contracting State earning business profits within the political subdivision or local authority but not having a permanent establishment there.

Paragraph 8 relates to the provisions of Article XXIII (Capital). It provides that where a resident of a Contracting State owns capital which, in accordance with the provisions of Article XXIII, may be taxed in the other Contracting State, the State of residence shall allow as a deduction from (credit against) its tax on capital an amount equal to the capital tax paid in the other Contracting State. The deduction is not, however, to exceed that part of the capital tax, computed before the deduction, which is attributable to capital which may be taxed in the other State.

Article XXV.  NON-DISCRIMINATION

Paragraphs 1 and 2 of Article XXV protect individual citizens of a Contracting State from discrimination by the other Contracting State in taxation matters. Paragraph 1 provides that a citizen of a Contracting State who is a resident of the other Contracting State may not be subjected in that other State to any taxation or requirement connected with taxation which is other or more burdensome than the taxation and connected requirements imposed on similarly situated citizens of the other State.

Paragraph 2 assures protection in a case where a citizen of a Contracting State is not a resident of the other Contracting State. Such a citizen may not be subjected in the other State to any taxation or requirement connected to taxation which is other or more burdensome than the taxation and connected requirements to which similarly situated citizens of any third State are subjected. The reference to citizens of a third State "in the same circumstances" includes consideration of the State of residence. Thus, pursuant to paragraph 2, the Canadian taxation with respect to a citizen of the United States resident in, for example, the United Kingdom may not be more burdensome than the taxation of a U.K. citizen resident in the United Kingdom. Any benefits

# TAX MANAGEMENT
# PORTFOLIOS™

### FOREIGN INCOME

## The Foreign Tax Credit Limitation Under Section 904

U.S. Attorney's Office
District of Columbia

NOV 1 7

Law Library

by
**Dirk J.J. Suringa, Esq.**
**Covington & Burling LLP**
**Washington, D.C.**

Dirk Suringa is a Partner in the Washington, D.C. law firm of Covington & Burling LLP, practicing in the areas of international and corporate taxation. Mr. Suringa graduated from Princeton University (B.A. 1992, Phi Beta Kappa) and Harvard Law School (J.D. 1996, *magna cum laude*), where he served as editor of the *Harvard Law Review.* Mr. Suringa clerked for the Honorable Gerald B. Tjoflat, Chief Judge of the U.S. Court of Appeals for the Eleventh Circuit, from 1996 to 1997.

Mr. Suringa served as Attorney-Advisor in the Office of International Tax Counsel of the Department of the Treasury, from 2000 to 2003. Mr. Suringa is a member of the American Bar Association, the International Fiscal Association, and the American College of Tax Counsel.

This Portfolio revises and supersedes 904-2nd T.M., *The Foreign Tax Credit Limitation Under Section 904.* Portfolio 904-2nd should be discarded.

U.S. Department of Justice

NOV 2 8 2016

Tax Library

© 2016 TAX MANAGEMENT INC., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-151-6

(i)

# TAX MANAGEMENT
# PORTFOLIOS™

## FOREIGN INCOME

# The Foreign Tax Credit Limitation Under Section 904

### PORTFOLIO DESCRIPTION

Tax Management Portfolio 6060 T.M., *The Foreign Tax Credit Limitation Under Section 904*, discusses one part of the U.S. foreign tax credit mechanism — the foreign tax credit limitation under § 904. The basic purpose of the limitation is to ensure that the United States does not allow foreign taxes to be used as a credit against U.S. tax on U.S.-source income.

This Portfolio discusses in general terms the computation of the taxpayer's foreign tax credit limitation. This computation involves: (1) determining the taxpayer's gross income; (2) separating the taxpayer's gross income into U.S.-source and foreign-source income; (3) separating the taxpayer's foreign-source gross income into foreign tax credit limitation categories (e.g., passive category income or general category income); (4) determining the expenses allowed to be deducted in determining the taxpayer's total U.S. taxable income; (5) allocating and apportioning the allowable deductions to the taxpayer's U.S.-source gross income and foreign-source income; (6) deducting the allocated and apportioned deductions; (7) determining final total taxable income by deducting net operating loss carryovers; (8) offsetting separate limitation gains with separate limitation losses; and (9) determining the taxpayer's foreign tax credit limitation for each separate limitation category by multiplying the taxpayer's total U.S. tax by the ratio that the final separate limitation income determined for each category bears to the total taxable income.

This Portfolio also addresses the impact of capital gains and losses on the computation of the foreign tax credit limitation, the special re-sourcing rules in § 904(h), and the special rules established to prevent taxpayers from avoiding the foreign tax credit limitation rules through deconsolidation.

This Portfolio may be cited as Suringa, 6060 T.M., *The Foreign Tax Credit Limitation Under Section 904*.

This Tax Management Portfolio is not intended to provide legal, accounting, or tax advice for any purpose and does not apply to any particular person or factual situation. Neither the author nor the publisher assumes responsibility for the reader's reliance on information or opinions expressed in it, and the reader is encouraged to verify all items by reviewing the original sources.

Appx767

DETAILED ANALYSIS

# DETAILED ANALYSIS

## I. Introduction

The United States taxes its citizens and residents on the basis of their worldwide income. U.S. citizens and residents, however, also may be subject to foreign tax on their income outside the United States. Assume that a U.S. citizen lives and works abroad, in Country A. The United States imposes tax on the U.S. citizen's worldwide income, which includes income from working in Country A. Country A, however, may impose tax on the income of individuals working within its boundaries. Therefore, the income earned by the U.S. citizen is potentially subject to tax in both the United States and Country A.

Double taxation of the same income potentially could impose a significant burden on international commerce. If the U.S. citizen working in Country A earns $100 and is subject to tax in the United States at an effective rate of 35%, then the resulting U.S. tax is $35. If the same income is subject to tax in Country A at a rate of 30%, then the resulting Country A tax is $30. Unless the United States or Country A offers some form of relief from double taxation, the U.S. citizen would face a cumulative tax of $65, or 65% of the income earned from working abroad. This could make the foreign assignment prohibitively expensive.

To mitigate this potential disincentive to international commerce, the United States and other countries generally provide one or more mechanisms for the relief of double taxation. The first question that arises in structuring such mechanisms is *who* must offer the relief and thereby cede taxing jurisdiction to the other country. As a matter of historical practice, most countries grant primary taxing rights to the country where the income is earned or considered to be earned — the "source country." Thus, the country where the taxpayer resides generally retains only residual taxing rights. The obligation to provide relief from double taxation generally falls to this "residence country."

The second question that arises is *how* a country should provide relief from double taxation. Most countries offer, pursuant to domestic law, one of two types of mechanisms for the relief of double taxation: they exempt foreign-source income from domestic taxation; or they provide a credit against domestic taxes for foreign taxes paid.

Countries with an exemption system generally impose tax upon all income earned from domestic sources (as well as certain types of passive income earned abroad), regardless of the residence of the taxpayer. Under such systems, income earned from foreign sources is generally exempt from tax. For example, if the United States were to adopt an exemption system, it generally would not tax the personal services income of a U.S. citizen living and working in Country A. The U.S. citizen would owe only the $30 of Country A tax on $100 of income and would owe no U.S. tax.

A taxpayer resident in an exemption jurisdiction may be able to reduce the taxpayer's effective tax rate by operating in a jurisdiction with a rate lower than that of the residence jurisdiction. Under an exemption system, however, a taxpayer generally cannot offset foreign losses against domestic income. To prevent base erosion, most developed countries with an exemption system also employ anti-avoidance regimes to prevent their residents from shifting passive income to low- or no-tax foreign jurisdictions.

The United States and certain other countries use a foreign tax credit system as their primary method of relieving double taxation. The United States imposes tax on both foreign-source income and U.S.-source income but then in principle allows a dollar-for-dollar credit against the U.S. tax for non-U.S. taxes imposed on that income. Thus, the U.S. citizen above owes $35 of U.S. tax on the $100 but receives a $30 credit against that tax for the Country A tax imposed on the same income, As a result, the United States collects only the residual $5 of tax ($35 of tax, less $30 of credit).[1]

This simple example can be used to present a basic problem with the computation of the foreign tax credit — the problem that is the subject of this Portfolio. If the Country A tax rate were 40% instead of 30%, then the U.S. citizen working in Country A would owe $40 to Country A instead of $30. Were the United States to provide a credit for the entire $40 of Country A tax, the U.S. citizen would be able to offset not only the $35 of U.S. tax on the Country A-source income, but also $5 of other U.S. taxes — including U.S. taxes on U.S.-source income. Instead of relieving double taxation, the United States in effect would be ceding its primary taxing right over U.S.-source income to Country A. To prevent that outcome, Congress in 1921 enacted a limitation on the foreign tax credit.

The foreign tax credit limitation is found in § 904[2] of the Internal Revenue Code. This Portfolio addresses that Code section and related provisions. In its simplest terms, the foreign tax credit limitation restricts the amount of the U.S. foreign tax credit to the amount of the potential U.S. tax on a taxpayer's foreign-source income. The purpose of the foreign tax credit limitation is to prevent the foreign tax credit from relieving a taxpayer of the U.S. tax that would otherwise be payable on U.S.-source income.[3] In the example above, the foreign tax credit limitation would cap the credit at $35, the amount of the

---

[1] In theory, the United States could offer a deduction for the foreign tax, rather than a credit, in a manner analogous to the deduction for State taxes. According to the legislative history, Congress enacted a credit because that would provide a more complete relief from double taxation and thereby encourage foreign trade. H.R. Rep. No. 65-767, at 91 (1918).

[2] All section references are to the Internal Revenue Code of 1986, as amended, and the regulations thereunder, unless otherwise specified.

[3] *Associated Tel. & Tel. Co. v. United States*, 306 F.2d 824, 832 (2d Cir. 1962); *Theo K. Davies & Co., Ltd. v. Commissioner*, 75 T.C. 443, 450 (1980), *aff'd*, 678 F.2d 1367 (9th Cir. 1982); *Motors Ins. Corp. v. United States*, 530 F.2d 864, 869 (Ct. Cl. 1976); *Grunebaum v. Commissioner*, 50 T.C. 710, 717 (1968), *aff'd*, 420 F.2d 332 (2d Cir.); *Missouri Pac. R.R. v. United States*, 392 F.2d 592, 601 (Ct. Cl. 1968).

**Changes and Analysis of New Developments appear in the front of this Portfolio.**
© 2016 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA
ISBN 978-1-63359-151-6

potential U.S. tax on the Country A-source income. The U.S. citizen therefore receives a credit of $35 and pays no residual U.S. tax. However, the U.S. citizen, rather than the U.S. government, bears the economic burden of the additional $5 of Country A tax.

While straightforward in concept, the foreign tax credit limitation has long suffered from a variety of technical problems. One problem is that it relies upon the often arbitrary rules for determining the source of income. For example, certain sales of inventory property outside the United States generate foreign-source income, which may not be subject to foreign taxation. Nevertheless, this untaxed foreign-source income may increase a taxpayer's foreign tax credit limitation. The sourcing rules also can work against taxpayers. The sourcing rules for the allocation and apportionment of interest expense, for example, may reduce a U.S. group's foreign-source income, thereby reducing artificially its foreign tax credit limitation.[4]

Another significant technical problem associated with the foreign tax credit limitation is cross-crediting. Cross-crediting refers to the practice of averaging high and low rates of foreign taxes together to bring the overall rate of foreign tax below the U.S. effective tax rate. This practice erodes the impact of the foreign tax credit limitation, which otherwise might deny a portion of the credit for the highly taxed income.

For example, assume as before that the Country A tax rate is 40% and that the taxpayer earns $100 from performing

personal services in Country A. The net result is $40 of Country A tax. The foreign tax credit limitation would cap the foreign tax credit at $35. Assume further that the U.S. citizen has a Country A bank account, which generates tax-free interest income of $15 per year. In the absence of a prohibition against cross-crediting, the U.S. citizen could credit the full amount of the Country A tax without paying any additional foreign tax. A simplified foreign tax credit limitation would limit the credit to the potential U.S. tax on the foreign-source income, $40.25 ($115 of foreign-source income, multiplied by 35% U.S. tax rate). Because the total Country A tax of $40 is less than the limitation amount of $40.25, the U.S. citizen can credit the entire Country A tax, again without actually paying any more foreign tax. In effect, the U.S. citizen has used the untaxed interest income to average down the foreign effective rate from 40% to 35%.

Over time, Congress has tried a variety of approaches to deal with this issue. In the early years of the foreign tax credit, Congress took a relatively sympathetic view toward cross-crediting.[5] The Tax Reform Act of 1986 took a much less tolerant view. It required taxpayers to apply § 904 separately to several categories of income, for which foreign tax rates were expected to differ.

In 2004, Congress simplified § 904 by reducing the number of separate categories to the two current categories and enacting certain other reforms. In 2010, however, the pendulum began to swing back to added complexity with the enactment of a new separate category for income re-sourced under U.S. income tax treaties. The enactment in the same year of § 901(m) and § 909, although not directly relevant to the foreign tax credit limitation, have increased the overall level of complexity in computing the foreign tax credit.

---

[4] These rules have been modified, prospectively, by § 401 of the American Jobs Creation Act of 2004 (2004 Act), Pub. L. No. 108-357, 118 Stat. 1418 (2004). The legislative changes, however, do not take effect until taxable years beginning after 2020. *See id.* § 401(c), 118 Stat. 1491, as amended by the Housing and Economic Recovery Act of 2008 (2008 Act), Pub. L. No. 110-289, by the Worker, Homeownership, and Business Assistance Act of 2009 (2009 Act), Pub. L. No. 111-92, and by the Hiring Incentives to Restore Employment (HIRE) Act, Pub. L. No. 111-147. The 2008 Act deferred the 2004 Act rules and added a transition rule in § 864(f)(7) providing that for the first taxable year of the worldwide method the increase (if any) in the amount of interest expense allocable to U.S. sources by reason of § 864(f) is to be 30% of the increase that would otherwise apply under that method. The 2009 Act deferred the effective date of the 2004 Act rules further and struck the transition rule. The HIRE Act deferred the 2004 Act rules even further into the future.

[5] *See, e.g.,* H.R. Rep. No. 86-1358, at 3 (1960) (explaining that Congress allowed taxpayers to elect an overall limitation instead of the per-country limitation in part because "more frequently taxpayers find themselves in situations where averaging out the high and low taxes of different foreign countries in which they operate would be more advantageous."); S. Rep. No. 86-1393, at 4 (1960) (same).

**Changes and Analysis of New Developments appear in the front of this Portfolio.**
© 2016 Tax Management Inc., a subsidiary of The Bureau of National Affairs, Inc., Arlington, VA

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

# TAX PRACTICE

*tax notes federal*

# Demystifying the Saving Clause and Re-Sourcing Rules in Treaties

**by Lori Hellkamp and Alden DiIanni-Morton**





Lori Hellkamp     Alden DiIanni-Morton

Lori Hellkamp is a partner and Alden DiIanni-Morton is an associate in the Washington office of Jones Day.

In this article, Hellkamp and DiIanni-Morton explore two lesser-known provisions in U.S. income tax treaties that can cause unexpected challenges for taxpayers trying to claim treaty benefits.

The views and opinions expressed in this article are solely the authors' and do not necessarily reflect those of Jones Day.

In a global economy, it is not uncommon for businesses to operate with an international footprint or for individuals to live and work in multiple countries over the course of their careers. The network of income tax treaties in place around the world can ease some of the tax frictions inevitable to this reality. The United States currently has income tax treaties with 68 countries.[1] Significantly, these treaties seek to facilitate cross-border investment and movement by, among other things, reducing or eliminating the excess (double) taxation that can otherwise result. That said, U.S. taxpayers and even tax professionals sometimes fail to appreciate some of the impediments to this goal inherent in many U.S. treaties. While countless articles have discussed the "limitation on benefits" clause in U.S. treaties — perhaps the most well-known potential roadblock to treaty access — this article focuses on two other, less-known (or at least, less-understood) provisions: the presence of a saving clause and the absence of a re-sourcing provision. These two dry and technical provisions, which are usually buried within the dense text of other articles, can pose a trap for the unwary by producing unexpected, and generally unfavorable, tax results for U.S. taxpayers — including sometimes turning off treaty benefits entirely.

## I. Overview

A primary goal of U.S. income tax treaties is to alleviate double taxation when each country views a taxpayer as its own resident or claims the right to tax the same income. The United States' magnanimity has limits, however. U.S. treaties typically contain a saving clause, which can add significant complexity to the determination of a U.S. person's tax liability by essentially turning off, in whole or in part, otherwise available treaty benefits. Similarly, the absence of a (sufficiently robust) re-sourcing provision can sometimes render ineffective the U.S. foreign tax credit by which double taxation is supposed to be relieved.

---

[1] While negotiations are ongoing and several new treaties have been signed in recent years, few protocols and no new treaties have been ratified since 2010 because of political impediments in the Senate.

Appx770

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

**TAX PRACTICE**

## A. Saving Clause

All U.S. tax treaties have a saving clause[2] permitting the United States to continue to tax its own citizens and residents[3] — and in many cases, former citizens and noncitizen residents[4] — as if the treaty were not in effect.[5] Translated into plain English, this means that the United States, subject to some exceptions discussed below, can impose U.S. tax on U.S. persons (and some former U.S. persons) despite anything to the contrary in the relevant treaty. Fundamentally, treaties do not alter the U.S. system of worldwide taxation, and U.S. persons remain subject to U.S. income tax even if they are foreign residents under a treaty's tiebreaker provision or have (only) foreign operations and income. Further, U.S. citizens residing abroad will not be entitled to all the treaty benefits allowed to other, similarly situated residents of the same foreign country because of the operation of the saving clause.

The saving clause is most often (but not always) found in the general scope, personal scope, or miscellaneous articles of U.S. tax treaties. For example, the current U.S. model treaty has a saving clause in the general scope provision,[6] while the relevant language in the treaties with Canada and France is in the miscellaneous provision.[7] Regardless of where it is located, a typical saving clause will generally contain language similar to this:

> *Notwithstanding any provision of the Convention*, a Contracting State may tax its residents (as determined under [the Residence article]), and by reason of citizenship may tax its citizens, as if the Convention had not come into effect.[8]

The saving clause is, however, typically tempered by exempting specific provisions from its application — although which ones are carved out varies from treaty to treaty and can sometimes further vary depending on the relevant U.S. person's citizenship or immigration status.[9] U.S. treaties generally exempt three core articles from the saving clause: (1) relief from double taxation, (2) nondiscrimination, and (3) access to mutual agreement procedures. Perhaps the most important among these, and the most relevant for purposes of this article, is the relief from double taxation (or sometimes the elimination of double taxation) provision, without which the utility of a treaty would be significantly diminished.[10]

Many treaties exempt additional benefits beyond these three core articles from the saving clause.[11] For example, the U.K.-U.S. treaty also exempts the articles on associated enterprises, pensions, social security, annuities, alimony and child support, pension schemes, government service, students, teachers, diplomatic agents, and consular officers.[12] On the other hand, the Morocco-U.S. treaty offers additional exemptions

---

[2] While the treaty with Pakistan, signed in 1957, does not contain a traditional saving clause, U.S. citizens and corporations are excluded from the definition of "resident of Pakistan," thus essentially producing a similar effect as a saving clause. *See* Pakistan-U.S. treaty, article 2(1)(i).

[3] Generally, a noncitizen is treated as a U.S. resident under domestic law if the person (1) is a lawful permanent resident (*i.e.*, a green card holder), (2) meets the substantial presence test, or (3) otherwise elects to be so treated under section 7701(b). *See* section 7701(b)(1)(A). Most U.S. tax treaties have tiebreaker rules to prevent an individual from being treated as a resident of both the United States and the other country under the treaty. *See, e.g.*, Australia-U.S. treaty, article 4(2), and 2016 U.S. model treaty, article 4(3). This determination can have a limited effect in some situations, however, because these rules are trumped by the saving clause.

[4] Certain former citizens and former long-term residents are often brought within the scope of the saving clause to allow the United States to impose tax under section 877. *See, e.g.*, 2016 U.S. model treaty, article 1(4) ("Notwithstanding the other provisions of this Convention, a former citizen or former long-term resident of a Contracting State may be taxed in accordance with the laws of that Contracting State.").

[5] *See, e.g.*, Netherlands-U.S. treaty, article 24(1); U.K.-U.S. treaty, article 1(4); and 2016 U.S. model treaty, article 1(4).

[6] 2016 U.S. model treaty, article 1(4).

---

[7] Canada-U.S. treaty, article 29(2), and France-U.S. treaty, article 29(2).

[8] Ireland-U.S. treaty, article 1(4) (emphasis added).

[9] *See, e.g.*, Mexico-U.S. treaty, article 1(5); *see also* 2016 U.S. model treaty, article 1(5).

[10] As discussed in more detail in the next section, even though the saving clause does not apply to (and thus does not override) the relief from double taxation article, U.S. taxpayers will still need to navigate the gauntlet of domestic law requirements and limitations to claim a U.S. FTC.

[11] *See* 2016 U.S. model treaty, article 1(5).

[12] U.K.-U.S. treaty, article 1(5).

Appx771

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

for only visiting students, trainees, and government employees, while the Greece-U.S. treaty contains no exemptions.[13]

## B. Re-Sourcing Income

Also relevant, and just as capable of potentially turning off treaty benefits, are the re-sourcing rules — or rather, some treaties' lack thereof.

While U.S. tax treaties seek to prevent double taxation, the principal mechanism for actually relieving double tax generally remains subject to U.S. domestic law. Specifically, the relief from double taxation article typically provides that the United States will allow an FTC to a U.S. person against their U.S. federal income tax liability for taxes paid or accrued to a foreign treaty country to prevent double taxation. In general, the FTC granted by a treaty is not broader than the FTC permitted by U.S. domestic law and is made available only "in accordance with the provisions and subject to the limitations of" domestic U.S. law.[14]

Because the U.S. FTC permitted by a treaty remains subject to domestic law requirements and limitations, when a treaty allows the foreign country to tax income that is viewed, under U.S. law, as U.S.-source income, the U.S. taxpayer may be unable to claim a U.S. FTC unless that income is re-sourced to the foreign country. In other words, when the income in question is not viewed as foreign-source income by the United States, U.S. FTCs may not be available to offset all the foreign taxes borne, despite the existence of the treaty and the benefits purportedly conferred under its relief from double taxation article. This

is because under U.S. domestic law, FTCs are generally available only for foreign taxes paid on foreign-source (not U.S.-source) income.[15] Therefore, the re-sourcing provisions come into play when there is a discrepancy between the relevant sourcing rules of the code and the assignment of taxing rights under the treaty. The application of a re-sourcing provision can allow U.S.-source income subjected to foreign tax by the foreign country under the terms of the treaty to be considered foreign-source income for U.S. FTC purposes.

For example, the key re-sourcing language in the 2016 U.S. model treaty provides:

> For the purposes of applying [the relief from double taxation paragraph granting a U.S. FTC], an item of gross income . . . derived by a resident of the United States that, under this Convention, may be taxed in [foreign treaty country] shall be deemed to be income from sources in [foreign treaty country].[16]

The specifics of the re-sourcing language can vary significantly from treaty to treaty, but the language is typically contained in the relief from double taxation article.[17] Some treaties contain comprehensive re-sourcing rules, which generally ensure that any income the other country is permitted to tax in accordance with the treaty will be deemed foreign-source income for U.S. FTC purposes.[18] These broad provisions are the most helpful for U.S. taxpayers. This approach also

---

[13]Morocco-U.S. treaty, article 20(4), and Greece-U.S. treaty, article 14(1). An interesting variation on this is the China-U.S. treaty, which appears to contain no exemptions from the saving clause for U.S. citizens. *See* 1984 Protocol to China-U.S. treaty, section 2. The technical explanation (TE) clarifies, however, that it is understood that the benefits of the core provisions (relief from double taxation, nondiscrimination, and MAP) are not subject to the saving clause. *See* China-U.S. treaty TE, article 1.

[14]*See, e.g.*, Netherlands-U.S. treaty, article 25(4); Switzerland-U.S. treaty, article 23(2); and 2016 U.S. model treaty, article 23(2). Because of the U.S. system of worldwide taxation, it generally falls on the United States (rather than the treaty partner) to provide a credit against U.S. tax to relieve double taxation resulting from a person's U.S. citizenship. *But see* 1992 Protocol to Russia-U.S. treaty, section 8(a) (credit required to be granted by Russia against the Russian tax on income generally includes a credit for U.S. income taxes paid by U.S. citizens imposed solely by reason of their U.S. citizenship).

[15]This is a simplification, but a detailed discussion of the section 904 mechanics, particularly when a taxpayer has multiple sources of foreign income, is beyond the scope of this article.

[16]2016 U.S. model treaty, article 23(3).

[17]*See, e.g.*, 2016 U.S. model treaty, article 23. There is also sometimes sourcing language in operative provisions specific to the type of income being addressed (*see, e.g.*, Spain-U.S. treaty, article 11(5)) or in dedicated sourcing provisions in older treaties (*see, e.g.*, Israel-U.S. treaty, article 4, and South Korea-U.S. treaty, article 6). Most of these provisions are subject to the saving clause, however, which is why the re-sourcing language contained in (or incorporated by cross-reference into) the relief from double taxation article can be important, as then it is insulated from the effects of the saving clause and clearly intended to be available for U.S. FTC purposes. *See, e.g.*, TE to 2006 Protocol to Germany-U.S. treaty, article 12.

[18]*See, e.g.*, Mexico-U.S. treaty, article 24(3) and (4)(c); Germany-U.S. treaty, article 23(2) and (5)(c); and Japan-U.S. treaty, article 23(2) and (3)(c).

Appx772

For more *Tax Notes® Federal* content, please visit www.taxnotes.com.

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

**TAX PRACTICE**

seems to be Treasury's current preferred approach based on the 2006 and 2016 model treaties.[19] Many older U.S. treaties, however, still contain more limited re-sourcing rules, which apply in only some of the circumstances in which a foreign treaty country is permitted to tax amounts potentially viewed as U.S.-source income under the code.[20] Commonly, these provisions are limited to providing relief in situations in which the affected U.S. taxpayer is a U.S. citizen resident in the foreign treaty country and do not address situations in which the U.S. taxpayer is a U.S. citizen resident in the United States or a corporation.

There are also some treaties containing re-sourcing rules that are made expressly "subject to" domestic source rules.[21] These treaties are the subject of much debate, as a re-sourcing provision that is literally subject to, and thus possibly trumped by, domestic source rules could be read to mean that any conflicting domestic sourcing rules (for example, sections 861-865) apply instead of the treaty. Under this reading, a treaty would defer to the code in the event of any sourcing conflict, effectively rendering the treaty re-sourcing rules moot. Presumably this is not the intent.[22] Finally, there are also treaties with no re-sourcing language at all.[23]

This discussion would be incomplete without highlighting a couple of additional, practical points. First, even when treaty re-sourcing is available for the relevant income, it is still generally the section 901 FTC that is the mechanism by which double taxation relief is granted. Consequently, just as is so often the case outside of the treaty context, there will frequently be at least some leakage because of the various requirements and limitations of section 904 (for example, separate basket limitations, required expense allocations, etc.). Also, any item of income re-sourced by a treaty is generally subject to its own special, separate basket limitation and cannot be cross-credited.[24]

Second, when re-sourcing is unavailable under the relevant treaty and double taxation results, a taxpayer can still seek recourse by pursuing competent authority relief. Practically, however, this can be costly and take significant time to resolve. Requesting competent authority assistance also does not provide any guarantee of a favorable outcome. Alternatively, if no U.S. FTC is available, the foreign taxes paid may be deductible under section 164 (although a deduction is generally less favorable than a credit).

Finally, a few code-based re-sourcing elections may be available in narrow circumstances under section 865(h) (certain gains from the sale of stock and certain intangibles), section 904(h)(10) (certain dividends and interest),[25] and section

---

[19]2016 U.S. model treaty, article 23(3) and (4)(c); and 2006 U.S. model treaty, article 23(3) and (4)(c).

[20]See, e.g., Denmark-U.S. treaty, article 23(2)(c); France-U.S. treaty, article 24(2)(b); Switzerland-U.S. treaty, article 23(3)(c); South Africa-U.S. treaty, article 23(2)(c); Pakistan-U.S. treaty, article 15(3); and Netherlands-U.S. treaty, article 25(6)(c) and (7).

[21]See, e.g., India-U.S. treaty, article 25(3); Luxembourg-U.S. treaty, article 25(4); Sweden-U.S. treaty, article 23(4); Austria-U.S. treaty, article 22(4); and Thailand-U.S. treaty, article 25(3).

[22]It seems far more likely Treasury negotiated the "subject to domestic source laws" language to accommodate only the special and limited sourcing rules in section 904, specifically section 904(h) (previously codified at section 904(g)). Indeed, the better answer, and the one that more closely aligns with Treasury's stated treaty policy of preventing double taxation, is that the "subject to" language should not cause domestic sourcing rules to override a treaty's re-sourcing concessions in every instance of conflict but rather in only the narrow and specific instances clearly contemplated by Congress under the source maintenance rules of section 904(h). See, e.g., New York State Bar Association, "Report on Treaty Re-Sourcing Rules," at 28-30 (Nov. 24, 2014); Warren Crowdus, "The Interaction of Treaty and Code Source Rules," J. Int'l Tax'n (Apr. 2002). Guidance from Treasury confirming this interpretation would certainly be well received by the tax bar, however.

[23]See, e.g., Hungary-U.S. treaty; U.S.-Venezuela treaty; Morocco-U.S. treaty; Poland-U.S. treaty; and Greece-U.S. treaty.

[24]See section 904(d)(6). Although a discussion of the domestic FTC rules is beyond the scope of this article, there may be situations in which a taxpayer chooses not to use an available treaty re-sourcing benefit because of the effect of section 904(d)(6) on the taxpayer's FTC calculations.

[25]Although the better answer is that this election is also available when a treaty's relief from double taxation provision is made expressly subject to domestic source rules, the TE to the Luxembourg-U.S. treaty casts some doubt on this interpretation (albeit rather unpersuasively) by asserting that a section 904(h)(10) election is unavailable. See TE to Luxembourg-U.S. treaty, article 25; but see TEs to each of the other treaties with this "subject to" language, supra note 22 (containing no language precluding the election). Further, many authorities explicitly contemplate permitting the election in the treaty context. See, e.g., reg. section 1.904-5(m)(7)(i); TE to 2006 U.S. model treaty, article 23(3); TE to 2006 Protocol to Germany-U.S. treaty, article 12(2); TE to Belgium-U.S. treaty, article 22(3); and TE to Japan-U.S. treaty, article 23(2).

---

**Appx773**

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

245(a)(10) (certain dividends), if the relevant income is taxed by a foreign country under an applicable treaty but would be considered U.S.-source income in the absence of re-sourcing relief.

## II. Examples

Broadly speaking, U.S. income tax treaties can, and do, successfully operate to ensure that U.S. taxpayers qualifying for treaty benefits are taxed only once on most (if not all) of their income. There are, however, situations in which the interaction of treaty provisions and U.S. domestic law can undermine the availability of treaty benefits that would otherwise theoretically be available — and that many assume are available. That is why when these issues arise, both the taxpayers trying to claim treaty benefits and their advisers can be caught by surprise. In practice, problems most commonly occur when the U.S. income tax rate exceeds the applicable foreign rate or the absence of re-sourcing relief means income taxed by the foreign country is characterized as U.S.-source income under domestic law. The following examples are intended to illustrate these potential issues in some common fact patterns.

**Example 1:** Assume the U.S. income tax treaty with Country A generally permits the imposition of tax on capital gains by only the country of residence and contains a traditional saving clause and a tiebreaker clause to determine residency for purposes of the treaty. John, a U.S. citizen living in Country A and a Country A resident under the treaty, owns stock in a U.S. company (US Co.). John is exempt from Country A taxes on certain capital gains under a Country A tax holiday regime. While the holiday is still in effect, John sells all his US Co. stock and assumes that, as a resident of Country A, he is not subject to U.S. tax on the resulting gain because the treaty exempts Country A residents from U.S. capital gains tax. However, John is incorrect: The saving clause overrides the treaty's capital gains article. Accordingly, all of John's gain is subject to U.S. income tax, and no U.S. FTC is available because no Country A taxes were paid on the gain. Further, even if Country A had imposed some amount of tax on John's gain, to the extent that tax was less than the applicable U.S. tax rate, John would still generally be required to pay the

difference to the United States because the available FTC would be less than the applicable U.S. tax.[26]

**Example 2:** Assume the U.S. income tax treaty with Country B permits the imposition of tax by Country B on certain shareholders for the gain attributable to the sale of stock in a company if that company is itself resident in Country B or holds material Country B real estate.[27] Further assume that the treaty with Country B contains a traditional saving clause and has either no re-sourcing provision or a very limited re-sourcing provision. Holdco, a Delaware corporation and U.S. resident for purposes of the Country B-U.S. treaty, owns stock in Country B Corp. (B Co.). B Co. holds significant rental real estate, most of which is in Country B. When Holdco sells its B Co. stock, Holdco is subject to Country B income tax on the gain in accordance with the treaty. Under U.S. domestic law, all that gain is generally U.S.-source income under section 865(a) and would be subject to U.S. corporate income tax. Accordingly, if this gain is not able to be re-sourced under the Country B-U.S. treaty, double taxation could result — although Holdco may be able to make an affirmative section 865(h) election.

**Example 3:** Assume the U.S. income tax treaty with Country C generally permits the imposition of tax on a resident's wages and other services income by only the country of residence and contains (1) a tiebreaker clause to determine residency for purposes of the treaty, (2) a traditional saving clause, and (3) limited or no re-sourcing provisions. Alice, a U.S. citizen and resident of Country C under the terms of the Country C-U.S. treaty, lives in Country C and is

---

[26]For similar facts, *see, e.g., Cole v. Commissioner*, T.C. Summ. Op. 2016-22 (Israel-U.S. treaty's capital gain exemption does "not stand alone, and its effect is completely eliminated here under the saving clause . . . since petitioner is a United States citizen" (citing *Filler v. Commissioner*, 74 T.C. 406, 410 (1980))).

[27]Most U.S. treaties in effect generally allow the foreign treaty country to impose tax on gains from the sale of shares in a company if the assets of that company consist of significant real ("immovable") property located in that country. (This is essentially a reverse-FIRTPA right.) *See, e.g.*, France-U.S. treaty, article 13(2)(b); Australia-U.S. treaty, article 13(2)(b); and Netherlands-U.S. treaty, article 14(1)(b). Some treaties also permit taxation of a U.S. person by the other country on gain attributable to the sale of stock in a company resident in that foreign country if the U.S. seller meets (or met) a prescribed ownership threshold (*see, e.g.*, China-U.S. treaty, article 12(5); Israel-U.S. treaty, article 15(1)(e); and Kazakhstan-U.S. treaty, article 13(3)) or if the other country's domestic law would otherwise permit taxation of that gain (*see, e.g.*, India-U.S. treaty, article 13).

TAX PRACTICE

© 2021 Tax Analysts. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

employed by a Country C employer. Occasionally, Alice travels to the United States to perform work for her employer. While the income from employment article of the Country C-U.S. treaty generally exempts her wage income from U.S. income tax (which is taxed by Country C) because she is a Country C resident, the saving clause overrides this article.[28] Accordingly, Alice is still (also) subject to U.S. income tax on all her wage income[29] and must rely on the U.S. FTC to avoid double taxation — and will still generally be subject to U.S. taxation to the extent of any difference between the Country C rate and applicable U.S. income tax rate (if the U.S. rate is higher). Further, if there is no re-sourcing provision or the treaty's re-sourcing provision does not apply to the portion of her wages attributable to her work performed in the United States, she has double taxation exposure because those amounts are generally U.S.-source income under section 861(a)(3).[30]

**Example 4:** Assume the U.S. income tax treaty with Country D permits withholding on royalties that, under the treaty, are generally deemed to arise in the country of the payer's residence.[31] The Country D-U.S. treaty also contains a traditional saving clause but limited or no re-sourcing rules. IP Co., a U.S. corporation, licenses U.S. intellectual property rights to a resident of Country D, for which a royalty is paid to IP Co.

Under the royalties article in the Country D-U.S. treaty, Country D withholding (at the prescribed reduced rate) is permitted. IP Co. may, however, have difficulty taking a U.S. FTC for the Country D tax withheld unless re-sourcing relief is available, as the tax would generally be viewed for U.S. tax purposes as having been imposed on U.S.-source income under section 861(a)(4).

### III. Conclusion

U.S. income tax treaties are an important tool for helping taxpayers manage cross-border taxation in a global economy. In most cases, the U.S. treaty network provides an adequate framework for ensuring that taxpayers avoid double taxation and enjoy nondiscriminatory tax treatment and access to administrative procedures for resolving issues that arise. However, it is always important to take into consideration the potential effect of the saving clause and whether re-sourcing relief is or may be available, because failure to do so can lead to unpleasant surprises when taxpayers try to take advantage of treaty benefits they thought were available. ∎

---

[28] *See also* 2020 Competent Authority Agreement, Italy-U.S. treaty, article 19 ("Pursuant to the saving clause . . . the United States retains its right to tax the income of its citizens and lawful permanent residents as if there were no convention. . . . As such, a U.S. citizen or lawful permanent resident would not be entitled to claim the benefit of [the relevant treaty provision] to exempt remuneration from U.S. federal income tax. Rather the individual would be subject to tax in both the United States and Italy." (Internal quotations omitted.)); *Abrahamsen v. Commissioner*, 142 T.C. 405, 410-411 (2014) (saving clause overrides relevant treaty article for U.S. person); *Savary v. Commissioner*, T.C. Summ. Op. 2010-150, at 4-5 (same); *Filler*, 74 T.C. 406 (same); LTR 9628024 (same); FSA 1999-792 (May 20, 1993) (same).

[29] Subject to any foreign earned income able to be excluded under section 911.

[30] *See also Savary*, T.C. Summ. Op. 2010-150, at 9-10 (no U.S. FTC available for U.S.-source income earned by U.S. citizen resident in France). Similar re-sourcing complications can arise if a U.S. citizen or resident performs services in the United States as a director of a foreign company because some U.S. treaties do not limit the foreign country's right to tax directors' fees to only compensation for services performed in that foreign country. *See, e.g.*, Denmark-U.S. treaty, article 16, and Switzerland-U.S. treaty, article 16. In these situations, the foreign country and the United States may both seek to tax the U.S. person on those fees. To the extent they are attributable to services performed in the United States, such fees would generally be U.S.-source income for FTC purposes under section 861 unless re-sourcing relief is available.

[31] *See, e.g.*, Italy-U.S. treaty, article 12(6).

Appx775

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Appx776

# Table of Contents

D. Re-Sourcing

U.S. International Portfolios
  Provisions Applicable to U.S. and Foreign Persons
    Portfolio 6875-2nd: U.S. Income Tax Treaties — Benefits Provided by a Country to Its Own Residents and Citizens
      Detailed Analysis
        III. Relief From Double Taxation

# D. Re-Sourcing

### 1. General Re-Sourcing Issue and Types of Re-Sourcing Provisions —

Given that the United States (and in many cases the treaty partner) already provides a foreign tax credit mechanism, Article 23's double taxation relief would be essentially superfluous except in cases where the treaty in question permits the treaty partner to tax U.S.-source income of U.S. citizens or residents; or, conversely, permits the United States to tax treaty partner-source income of treaty partner residents. That is, as discussed in III.A., above, even without a treaty, U.S. income tax law provides a tax credit for foreign taxes paid with respect to foreign-source income earned by a U.S. resident or citizen, subject to the limitations of §904 and other Code provisions. But in some cases a foreign government will assert taxing authority over income that U.S. tax law defines as U.S. source. Indeed, a tax treaty may cede primary taxing jurisdiction over such income to the foreign country. If such income is not recharacterized as foreign-source income — commonly referred to as "re-sourced" income — the taxpayer would not be protected from double taxation.

For a case illustrating how the absence of a re-sourcing provision in the applicable treaty results in double taxation, see *Filler v. Commissioner*.[97] That case involved a U.S. citizen who was a resident of and employed in France. He spent a few days a year on business in the United States, resulting in an allocation of a small portion of his income to U.S. sources under domestic U.S. tax law. France asserted the right to tax his entire income on the basis of residence, and under Article 15 (the personal services article) of the then-applicable treaty,[98] would have had sole jurisdiction to tax his income because he was not resident of the United States. However, due to the Saving Clause,[99] the Tax Court held that the United States retained the right to tax him as a U.S. citizen. The Tax Court further held that the relief from double taxation article of the treaty neither prevented the United States from taxing the income, nor required a credit for French taxes paid on the U.S.-source income.

[97] 74 T.C. 406 (1980). The applicable treaty was the U.S.-France Income Tax Treaty of 1967, as amended by the 1970 protocol.

[98] Under that provision, standing alone, the United States would not have had the power to tax such income because the taxpayer was not present in the United States for a period exceeding 183 days.



© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

[99] *See* II., above.

[T]he effect of [the Saving Clause] is to reserve the right of the United States to tax its citizens and residents on the basis of the provisions of the Internal Revenue Code without regard to the provisions of the treaty… . Since the savings clause does not include article 15 among the articles which take precedence over the savings clause, the savings clause has the effect of providing that the source of income allocation rules found in the Internal Revenue Code are applicable to U.S. citizens, rather than the provisions of article 15.

* * *

It is true that the savings clause does not affect the convention rules on relief from double taxation, found in article 23. However, a fair reading of this provision indicates that petitioner is entitled to a tax credit from France, and not the United States, in respect of compensation for services performed in the United States. … It is reasonable to infer that since the convention contemplated the use of a per-country limitation (as was then provided in section 904(a)(1) of the Code), it was also assumed that the related Code sections determining the source of income (including section 861(a)(3)) would also be applicable, as those source of income provisions are necessary for application of a per-country limitation on the credit… . *Thus, it seems clear that in Article 23 of the Convention, the United States consented only to provide a foreign tax credit on income attributable to sources in France, as determined under the source of income rules of the Internal Revenue Code, and not to income from United States sources.* [100]

[100] 74 T.C. at 410–13 (footnotes and citations omitted, emphasis added).

Thus, the court implicitly rejected the position that income should be re-sourced to avoid double taxation in the absence of a specific treaty provision to that effect.[101]

[101] Subsequent treaties, including the U.S. model treaties, have addressed the specific issue arising in *Filler*, that is, the double tax that can arise when a U.S. citizen is a resident of a treaty partner. *See* III.D.6., below. The U.S.-France Treaty rules have also undergone significant modification. *GCM 38792* (Aug. 28, 1981) refused to imply a re-sourcing provision more liberal than that literally applying under the amended U.S.-France Treaty re-sourcing rule in order to relieve a U.S. citizen resident in France from double taxation on alimony income — alimony not being a type of income specifically included in the applicable re-sourcing provision of the treaty.

The implication of such a holding is that a treaty, in effect, gives no further protection from double taxation — at least to a U.S. citizen or resident — than is afforded under the Code itself. The unfortunate taxpayer's only remaining remedy would be to seek competent authority relief on a case-by-case basis.[102]

[102] *See* VII., below. In addition to case-by-case resolution, competent authorities sometimes enter into general agreements designed to address recurring instances of double taxation. For example, a 1997 agreement between the U.S. and French competent authorities alleviates double taxation for compensation received for services rendered to the French government by a U.S. permanent resident; the agreement requires the United States to grant a foreign tax credit for French taxes on such compensation, even though the income would be considered U.S. source under U.S. domestic law. Announcement 97-61.

U.S. model treaties and many U.S. treaties in force have adopted a variety of explicit re-sourcing provisions to avoid this result. Although varying in specifics, such re-sourcing provisions generally attempt to avoid double taxation by sourcing the income in question consistently with the treaty's assignment of primary taxing jurisdiction, thereby enabling the

**Bloomberg Law**®

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

taxpayer to claim a foreign tax credit with respect to the income.

Very generally, there are four types of re-sourcing provisions in U.S. treaties.[103] The first type of re-sourcing provision in U.S. treaties uses a general (or blanket) re-sourcing approach. With respect to U.S. Model Treaties, as noted in III.D.3., III.D.4., and III.D.5, below, a version of this type of re-sourcing provision first appeared in the 1981 U.S. Model, was dropped from the 1996 U.S. Model Treaty, and returned in the 2006 U.S. Model Treaty. The Technical Explanation to Article 23(3) of the 2006 U.S. Model Treaty explains that such an approach is "intended to ensure that a U.S. resident can obtain an appropriate amount of U.S. foreign tax credit for income taxes paid to the other Contracting State when the Convention assigns to the other Contracting State primary taxing rights over an item of gross income." This general re-sourcing provision is also contained in the 2016 U.S. Model Treaty, and U.S. income tax treaties with China, Germany, Japan, and the United Kingdom.[104]

---

[103] *See* N.Y. State Bar Ass'n Tax Section, *Report on Treaty Re-Sourcing Rules*, Nov. 24, 2014, *available at* http://www.nysba.org/Sections/Tax/Tax_Section_Reports/Tax_Reports_2014/Tax_ Section_Report_1313.html (2014 NYSBA Report) (discussing the four types of treaty re-sourcing provisions in U.S. treaties).

[104] *See* 2016 U.S. Model Treaty, art. 23; U.S.-China Treaty, art. 22; U.S.-Japan Treaty, art. 23; U.S.-Germany Treaty, art. 23; U.S.-U.K. Treaty, art. 6, art. 13, art. 24. The U.S.-U.K. Treaty, art. 13(6), provides that one Contracting State may tax income from the disposition of property of taxpayers who have resided within that Contracting State within the prior six years, notwithstanding the general "state of residence" rule for personal property in art. 13(5). The U.S.-Australia Treaty contains a modified version of the general re-sourcing provision. See U.S.-Australia Treaty, art. 27 and its accompanying Treasury Department technical explanation ("Paragraph 1 [of Article 27 of the U.S.-Australia Treaty] provides source rules. Income derived by a resident of the United States, which, under the Convention, may be taxed by Australia, is deemed to have its source in Australia … . With respect to U.S. citizens who are residents of Australia, to the extent that income which they derive is taxed by the United States by virtue of paragraph 3 of Article 1 (Personal Scope), such income is deemed to have its source in Australia for purposes of giving [e]ffect to paragraph 4 of Article 22 (Relief from Double Taxation).").

In addition, Article 23 of the 2013 proposed U.S.-Poland Income Tax Treaty and Article 24 of the 2015 proposed U.S.-Vietnam Income Tax Treaty contain a general re-sourcing provision.

---

The second type of re-sourcing provision in U.S. treaties re-sources only income earned by U.S. citizens residing in the treaty partner country. U.S. treaties containing this type of re-sourcing provision include treaties with Denmark, France, Italy, South Africa, and Switzerland.[105] The problem with such a re-sourcing provision can be illustrated as follows. Assume that a U.S. individual does not reside in the applicable treaty country (e.g., Italy), but instead resides in the United States. If, in accordance with the U.S.-Italy Treaty, an item of income is subject to Italian tax, but is U.S. source under the Code, no relief from double taxation generally is available to such U.S. individual because the United States limits its obligation to provide a foreign tax credit.[106]

---

[105] *See* U.S.-Denmark Income Tax Treaty, art. 23, Aug. 19, 1999, as amended by Protocol, May 2, 2006 (U.S.-Denmark Treaty); U.S.-France Treaty, art. 24; U.S.-Italy Income Tax Treaty, art. 23, Aug. 25, 1999 (U.S.-Italy Treaty); U.S.-South Africa Income Tax Treaty, art. 23, Feb. 17, 1997 (U.S.-South Africa Treaty); U.S.-Switzerland Income Tax Treaty, art. 23, Oct. 2, 1996, as amended by Protocol, Sept. 23, 2009 (U.S.-Switzerland Treaty).

[106] *See, e.g.*, U.S.-Italy Technical Explanation, art. 23, ¶2 ("The credit under the Convention is allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained. Thus, although the Convention provides for a foreign tax credit, the terms of

> the credit are determined by the provisions, at the time a credit is given, of the U.S. statutory credit.").

The third type of re-sourcing provision in U.S. treaties contains a re-sourcing rule, but it is subject to those domestic sourcing rules of the treaty partners that apply for purposes of limiting the foreign tax credit. [107] U.S. treaties containing this type of re-sourcing provision include treaties with Austria, Estonia, Latvia, Luxembourg, and Sweden.[108]

---

[107] *See, e.g.,* U.S.-Latvia Income Tax Treaty, art. 24(3), Jan. 15, 1998 (U.S.-Latvia Treaty) ("For the purposes of allowing relief from double taxation pursuant to this Article, and subject to such source rules in the domestic laws of the Contracting States as apply for purposes of limiting the foreign tax credit, income derived by a resident of a Contracting State which may be taxed in the other Contracting State in accordance with this Convention (other than solely by reason of citizenship in accordance with paragraph 4 of Article 1 (General Scope)) shall be deemed to arise in that other State.").

[108] *See* U.S.-Austria Income Tax Treaty, art. 22, May 31, 1996 (U.S.-Austria Treaty); U.S.-Estonia Income Tax Treaty, art. 23, Jan. 15, 1998 (U.S.-Estonia Treaty); U.S.-Latvia Treaty, art. 24; U.S.-Luxembourg Treaty, art. 25; U.S.-Sweden Income Tax Treaty, art. 23, Sept. 1, 1994, as amended by Protocol, Sept. 30, 2005 (U.S.-Sweden Treaty).

---

The fourth type of re-sourcing provision is found in certain older U.S. treaties, and is a location-of-sale test for sourcing sales of personal property. U.S. treaties containing this type of re-sourcing provision include treaties with Cyprus, Egypt, Indonesia, Israel, Jamaica, Korea, Morocco, and Norway.[109] These treaties generally provide sourcing rules for various types of income. Two key exceptions to these four categories of re-sourcing rules are the U.S. income tax treaties with India and Thailand.[110]

---

[109] *See* U.S.-Cyprus Income Tax Treaty, art. 6, Mar. 19, 1984 (U.S.-Cyprus Treaty); U.S.-Egypt Treaty, art. 4; U.S.-Indonesia Income Tax Treaty, art. 7, July 11, 1988, as amended by Protocol, July 24, 1996 (U.S.-Indonesia Treaty); U.S.-Israel Income Tax Treaty, art. 4, Nov. 20, 1975, as amended by Protocols, May 30, 1980, Jan. 26, 1993 (U.S.-Israel Treaty); U.S.-Jamaica Income Tax Treaty, art. 24, May 21, 1980, as amended by Protocol, July 17, 1981 (U.S.-Jamaica Treaty); U.S.-Republic of Korea Treaty, art. 6, June 4, 1976 (U.S.-Republic of Korea Treaty); U.S.-Morocco Income Tax Treaty, art. 5, Aug. 1, 1977 (U.S.-Morocco Treaty); U.S.-Norway Income Tax Treaty, art. 24, Dec. 3, 1971, as amended by Protocol, Sept. 19, 1980 (U.S.-Norway Treaty).

[110] *See* U.S.-India Income Tax Treaty, art. 25, Sept. 12, 1989 (U.S.-India Treaty); U.S.-Thailand Income Tax Treaty, art. 25, Nov. 26, 1996 (U.S.-Thailand Treaty). For example, Treasury's Technical Explanation to Article 25 of the U.S.-India Treaty explains that

> [p]aragraph 3 [of Article 25] provides rules for determining the source of income for purposes of the treaty foreign tax credit. The general rule is (1) that income of a resident of a Contracting State is deemed to arise in the other Contracting State, if that other State is given the right to tax that income by the Convention, so long as that taxing right is not solely on the basis of citizenship in accordance with the saving clause of paragraph 3 of Article 1 (General Scope); and (2) if a resident of a Contracting State derives income which, in accordance with the Convention, may not be taxed in the other State, the income is deemed, for purposes of the credit, to be sourced in the first-mentioned Contracting State. If, however, the rules in the laws of a Contracting State for the determination of source of income for foreign tax credit purposes differ from the general rule stated above, the statutory rule will apply. This granting of precedence of statutory source rules over the treaty source rule, however, does not apply to determining the source for

---

**Bloomberg Law**®　　　© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

credit purposes of royalties and fees for included services dealt within Article 12 (Royalties and Fees for Included Services).

*See also* 2014 NYSBA Report; Shefali Goradio & Carol P. Tello, *Conflicts and Issues Under the U.S.-India Tax Treaty*, 10 Int'l Tax'n 35 (Jan. 2014).

## 2. **Additional Source-Mismatch Examples** —

Although in most instances a treaty's assignment of primary taxing jurisdiction will be consistent with U.S. domestic tax law sourcing rules, the mismatch problem can arise under a variety of circumstances. In each of these cases, the mismatch could result in double taxation in the absence of a treaty with an applicable re-sourcing provision.

*Example 1:* Individual I is a U.S. citizen who is a resident of Country X. I is the beneficiary of several U.S. trusts that hold marketable securities consisting primarily of publicly traded stocks. I does not have any non-U.S.-source income other than through these trusts.

Under Country X's tax law, a capital gains tax is imposed upon Country X resident-beneficiaries arising from the deemed disposition of the trust assets. I is subject to the Country X tax because I resides in Country X. Assume that the Country X capital gains tax rate is 35%; however, on such a deemed disposition, the capital gains tax is based only on asset appreciation from a certain date and not the assets' actual historical cost. Also, assume that the Country X capital gains tax is a creditable foreign tax for U.S. federal income tax purposes, and that the Country X tax rules treat the gain as Country X-source income.

As discussed above, the §904 limitation may disallow a foreign tax credit that would have otherwise eliminated double taxation of income. Section 865(a)(2) provides the general rule that income from the sale of personal property is sourced outside the United States if sold by a nonresident of the United States (such as I). Section 865(g)(2), however, further provides that a U.S. citizen (such as I) will not be treated as a nonresident of the United States with respect to the gain on the sale of personal property unless "an income tax equal to at least 10% of the gain derived from such sale is actually paid to a foreign country with respect to that gain."[111] This requirement presents two potential issues with respect to I:

> [111] *See also* §865(e)(1) (providing similar sourcing rules and a minimum 10% foreign country income tax for sales of personal property by a U.S. citizen attributable to an office or other fixed pace of business in a foreign country).

(1) will the effective rate of Country X tax be at least 10% of the gain realized under U.S. tax principles? and

(2) will the tax be considered imposed on the "sale" for U.S. tax purposes?

As to the first issue, in order to meet the requirements of §865(g)(2), the Country X tax must be at least 10%, applying U.S. tax principles.[112] For example, if the Country X tax imposed had a nominal rate of 35% of the taxable gain under Country X tax principles, but the effective rate of tax amounted only to 5% of the gain as computed under U.S. tax principles (i.e., without the special Country X rule that counts only gain after a certain date), there would be significant doubt as to whether the Country X tax would meet the "10% or more" tax requirement of §865(g)(2).

> [112] *See, e.g.*, PLR 9735014 (for purposes of §865, a U.S. citizen or resident is treated as a nonresident if such individual (1) maintains a tax home outside the United States and (2) pays an income tax equal to at least 10% of the gain realized under U.S. tax principles to a foreign country); Notice 88-35 (U.S. citizens will be treated as U.S. residents for purposes of §865 unless

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

[145] For purposes of crediting the Country A tax, I would have $200 of foreign-source income and the foreign tax credit limitation would be $70, derived as explained above. Therefore, the $25 of Country A tax would be fully covered. For purposes of crediting the Country B tax, however, I would be considered to have only $100 of foreign-source income, meaning that the foreign tax credit limitation applicable to Country B tax would be $35. As I paid $45 of Country B tax, there would be double taxation with respect to $10.

Most U.S. tax treaties that contain a general re-sourcing provision apply the latter approach, making it clear that re-sourcing applies only for purposes of eliminating double taxation with respect to taxes imposed by the treaty partner, not a third country. For example, the U.S.-Canada Treaty provides: "The provisions of this Article relating to the source of profits, income or gains shall not apply for the purpose of determining a credit against United States tax for any foreign taxes other than income taxes paid or accrued to Canada."[146] The 2006 and 2016 U.S. Model Treaties, however, do not contain such a provision, nor do several other treaties in force. Thus, it may be possible to argue, under treaties lacking such a provision, that the general re-sourcing provision applies for purposes of applying the U.S. foreign tax credit with respect to the entirety of the affected taxpayer's foreign taxes.

[146] U.S.-Canada Treaty, art. XXIV(9) (as added by art. XI(3) of Protocol, June 14, 1983); *see similarly* U.S.-Austria Treaty, art. 22(4); U.S.-India Treaty, art. 25(3) (virtually identical to the Austrian treaty language); U.S.-Sweden Treaty, art. 23(3)(c) (same); U.S.-Thailand Treaty, art. 25(3) (same); U.S.-New Zealand Income Tax Treaty, art. 22(4), July 23, 1982, as amended by Protocol, Dec. 1, 2008 (U.S.-New Zealand Treaty) (same).

However, the introductory phrase to each of the 2006 and 2016 U.S. Model Treaties' general re-sourcing provision states that the provision applies "[f]or the purposes of applying paragraph 2 of this Article" (i.e., the general provision granting double tax relief to U.S. citizens or residents via a credit for taxes paid to the treaty partner). Arguably, this phrase achieves the same result as more explicit language such as contained in the U.S.-Canada Income Tax Treaty and similar treaties. That is, the re-sourcing provision applies for the purpose of granting double tax relief with respect to taxes paid to the particular treaty partner, not for taxes paid to other countries.[147] However, this intended result would be clearer if specific language to that effect were added, or even if the introductory phrase read "*Solely* for the purpose … ."[148]

[147] This argument gains force from the bilateral treaty context; the IRS could forcefully argue that an agreement between two sovereign states should not have any effect on tax credits granted with respect to taxes paid to a third country.

[148] Compare the language in the specific re-sourcing provision applicable to United States citizens residing in the Other Contracting State, discussed in III.D.6., below, which applies "for the exclusive purpose" of relieving double taxation between the two treaty partners, with re-sourcing applied "to the extent necessary" to prevent such double taxation.

6. **U.S. Citizens Resident in the Other Contracting State** —

Article 23(4) of the 2006 and 2016 U.S. Model Treaties provides a special rule regarding U.S. citizens who are residents of the Other Contracting State, thus directly addressing the problem presented in the *Filler* case.[149] This rule is necessitated by the fact that the United States taxes its citizens on their worldwide income, regardless of their residence. The Saving Clause,[150] discussed in II., above, preserves the right of the United States to tax its citizens in accordance with U.S. domestic tax law even if they are residents of the treaty partner, and thus under the treaty would otherwise be eligible for treaty relief from (or eligible for a lower rate of) U.S. tax on U.S.-source income. The language of Article 23(4) is somewhat confusing, but its purpose is to enable the United States and the treaty partner to provide tax credits to prevent double tax while preserving the United States' right to tax its citizens on worldwide income. The

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

policy underlying Article 23(4) is that the United States, and not the treaty partner, should bear the burden of providing double tax relief in cases where double taxation results from the U.S. imposition of tax solely on the basis of U.S. citizenship.[151]

[149] *Filler v. Commissioner*, 74 T.C. 406 (1980); see discussion of *Filler* in III.D.1., above.

[150] 2016 U.S. Model Treaty, art. 1(4).

[151] This provision provides a result that is the opposite of the Tax Court's conclusion in *Filler* that the French government erred by refusing to provide a French tax credit against the U.S. tax imposed on the taxpayer's U.S.-source income.

Article 23(4)(a) provides that the Other Contracting State need not provide tax credits for U.S. taxes paid by a U.S. citizen who is a resident of that Other Contracting State in excess of the amount of tax the United States could impose if that person were not a U.S. citizen, and thus not precluded from treaty benefits under the Saving Clause. For example, if the relevant treaty provided a 10% rate for withholding on U.S.-source dividends, but the United States imposed a rate of 33%, the Other Contracting State's tax credit need not exceed 10%.

Of course, under such circumstances, the U.S. citizen would be subject to double taxation if the Other Contracting State's tax rate exceeded 10%.[152] To alleviate this double taxation, Article 23(4)(b) of each of the 2006 and 2016 U.S. Model Treaties states that the United States will provide a tax credit for the Other Contracting State's tax remaining after the credit provided in Article 23(4)(a). Such credit, however, may not reduce the U.S. tax creditable against the Other Contracting State's tax under Article 24(4)(a), meaning that the United States need not offset U.S. tax to the extent it could be collected from a non-U.S. citizen resident of the Other Contracting State.

[152] Thus, for example, if the Other Contracting State had a 30% tax rate, U.S. Citizen would pay a combined rate of 55% — 35% U.S. tax plus 30% for that Other Contracting State's tax, less a 10% credit.

Finally, in order to provide the appropriate double tax relief, Article 23(4)(c) provides that the items of income described in Article 23(4)(a) are deemed to arise in the Other Contracting State, thus re-sourcing them. As discussed above, such re-sourcing is necessary to avoid double taxation, permitting the United States to credit foreign taxes paid on such income without violating U.S. rules.

*Examples*: The following two examples from the 2006 Technical Explanation illustrate the application of Article 23(4) in the case of a U.S.-source portfolio dividend received by a U.S. citizen resident of the Other Contracting State (FC). In both examples, the U.S. rate of tax on residents of FC under Article 10(2)(b) of the 2006 U.S. Model Treaty is 15%. In both examples, the U.S. income tax rate on the U.S. citizen is 35%. In Example 1, the income tax rate of FC on its residents (i.e., the U.S. citizen) is 25% (below the U.S. rate), and in Example 2, the rate on its residents is 40% (above the U.S. rate).

|  | Example 1 | Example 2 |
|---|---|---|
| **Paragraph 4(a)** |  |  |
| U.S. dividend declared | $100.00 | $100.00 |
| Notional U.S. withholding tax |  |  |
| per Article 10(2)(b) | 15.00 | 15.00 |
| FC taxable income | 100.00 | 100.00 |
| FC tax before credit | 25.00 | 40.00 |
| FC foreign tax credit | 15.00 | 15.00 |

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

| | | |
|---|---|---|
| Net post-credit FC tax | 10.00 | 25.00 |
| | | |
| **Paragraphs 4(b) and (c)** | | |
| U.S. pre-tax income | $100.00 | $100.00 |
| U.S. pre-credit citizenship tax | 35.00 | 35.00 |
| Notional U.S. withholding tax | 15.00 | 15.00 |
| U.S. tax available for credit | 20.00 | 20.00 |
| Tax paid to FC | 10.00 | 25.00 |
| Income re-sourced from U.S. to FC * In Example 1, the amount resourced is the net post-credit FC tax ($10) divided by the U.S. tax rate (35%). In Example 2, because the FC tax rate exceeds the U.S. tax rate, the amount re-sourced is the maximum amount of the U.S. tax available for credit ($25) divided by the U.S. tax rate (35%). The 1996 Technical Explanation, art. 23, ¶3, containing a similar example based on a 36% tax rate, explains that: In order for a U.S. credit to be allowed for the full amount of the [FC] tax, an appropriate amount of the income must be resourced. The amount that must be resourced depends on the amount of [FC] tax for which the U.S. citizen is claiming a U.S. foreign tax credit. In example I, the [FC] tax was $10.00. In order for this amount to be creditable against U.S. tax, $27.77 ($10 divided by .36) must be resourced as foreign source. When the [FC] tax is credited against the U.S. tax on the resourced income, there is a net U.S. tax of $11.00 due after credit. In example II, [FC] tax was $25 but, because the amount available for credit is reduced under subparagraph 3(c) by the amount of the U.S. source tax, only $21.00 is eligible for credit. Accordingly, the amount that must be resourced is limited to the amount necessary to ensure a foreign tax credit for $21 of [FC] tax, or $58.33 ($21 divided by .36). Thus, even though [FC] tax was $25.00 and the U.S. tax available for credit was $21.00, there is no excess credit available for carryover. | 28.57 | 57.14 |
| U.S. tax on re-sourced income | 10.00 | 20.00 |
| U.S. credit for FC tax | 10.00 | 20.00 |
| Net post-credit U.S. tax | 10.00 | 0.00 |
| Total U.S. tax | 25.00 | 15.00 |

## 7. **Hybrid Entities and Re-Sourcing** —

As discussed above, the 2006 and 2016 U.S. Model Treaties (as well as many treaties in force) provide for re-sourcing of what would otherwise be U.S.-source income to the extent such income is taxed by the treaty partner in order to

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

No. 23-766-T

(Judge Matthew H. Solomson)

PAUL BRUYEA,

Plaintiff,

v.

THE UNITED STATES,

Defendant

_____

REPLY BRIEF

_____

April 26, 2024

/s/ Stuart E. Horwich
Horwich Law LLP
20 Old Bailey, 5th Floor
London  EC4M 7AD
United Kingdom
011 44 20 8057 8013
seh@horwichlaw.co.uk


/s/ Max Reed
Polaris Tax Counsel
Suite 900
1788 West Broadway
Vancouver, British Columbia
Canada
V6J 1Y1
604-283-9301
max@polaristax.com

Attorneys for Plaintiff

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . ii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Defendant Makes No Meaningful Attempt to Establish the Shared Expectations
of the Treaty Partners………...……………………….…..………………….…..…….…..….4

II. Defendant's View Is Not Entitled to Deference………..………….………………….…….…..8

   A. Supreme Court Precedent Unequivocally Requires a Liberal Interpretation of
Treaties………..………...……...………………….…………………………...…9

   B. The Enactment of the NIIT After the Ratification of the Canada Treaty Does Not
Demonstrate Congressional Intent to Disallow a Foreign Tax Credit Under the
Canada Treaty………………………………………………………...……………11

   C. The Absence of Specific Rules for Computing a Foreign Tax Credit Under the
Canada Treaty Does Not Have the Effect of Disallowing Such Credit…..….………13

III. The Plain Meaning of the Canada Treaty Provides Plaintiff a Treaty-Based Foreign
Tax Credit…………….…………………………………...……………………….…..…14

   A. The Plain Text of Article XXIV(1) Provides a Treaty-Based Foreign Tax Credit….15

   B. Article XXIV(4) through Article XXIV(6) are Standalone Provisions that Allow
for a Treaty-Based Foreign Tax Credit Irrespective of Any Other Treaty
Limitation……………………………………………………………………………18

IV. CONCLUSION . . . .. . . . . . .. . . . . . . . . . . . . . . . . .…..………... . . . . . . .. . . . . . . . . 23

**Appx803**

TABLE OF AUTHORITIES

**Case Law**

*Abbott v. Abbott*, 560 U.S. 1 (2010)……………..………..……………………….……..10, 13

*Air France v. Saks* 470 U.S. 392 (1985)……………………...…...……………..…………4

*Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 585 U.S. 33 (2018)……….5

*Bacardi Corp of Am. v. Domenech,* 311 U.S. 150 (1940) ……………….…...……………8

*Baturin v. Comm'r*, 31 F.4th 170 (4th Cir. 2022)…………………..……..…………..……9

*BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25 (2014)………………………….……..4

*Canada (Attorney General) v. Kubicek Estate,* (1997)
    CanLII 5515 (Canadian Federal Court of Appeal)………..…………………………...…..6

*Christensen v. United States,* 168 Fed. Cl. 263 (2023), *appeal pending*,
    No. 24-1284 (Fed. Cir. Dec. 22, 2023)……………………….….................……....*passim*

*El Al Israeli Airlines v. Tseng*, 525 U.S. 155 (1999) ……..…………….…..……….……..…8

*Eshel v. Comm'r*, 831 F.2d 512 (D.C. Cir. 2016) ………………...………………………10

*Golan v. Saada,* 596 U.S. 666 (2022)……………..……..…………………………...…..14

*Haver v. Comm'r*, 444. F.3d 656 (D.C. Cir. 2006)...…..…………………………………...18

*Iceland Steamship Co. Eimskip v. U.S. Dep't of the Army*, 201 F.3d 451 (D.C. Cir. 2000)......9

*Jordan v. Tashiro,* 278 U.S. 123, 128 (1928)……………………….……..……………..……8

*Kappus v. Comm'r*, 337 F.3d 1053 (D.C. Cir. 2003)…..………………………………………18

*Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961)…………………………….…..………..…8

*Lozano v. Montoya Alvarez,* 572 U.S. 1, 19 (2014)………………………………..……...10

*North West Life Insurance Co. of Canada v. Comm'r*, 107 T.C. 363 (1996)…………..…..8

*O'Connor v. United States*, 479 U.S. 27 (1986) …………………………………..……...19

*Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140
    (D.D.C. 2002), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003)……..……………..……..……....11

ii

**Case Law (continued)**

*Snap-On Tools, Inc. v. United States*, 26 Cl. Ct. 1045
(Cl. Ct.1992), *aff'd*, 26 F.3d. 137 (Fed. Cir. 1994)…………………………....……......7

*Sumitomo Shoji America Inc. v. Avagliano*, 457 U.S. 176 (1982)…………....………..8, 14

*Toulouse v. Comm'r*, 157 T.C. 49, 57 (2021)……………..…..…………..…..………...15

*Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243 (1984)……………....………12

*United States v. Chocktaw Nation*, 179 U.S. 494 (1900)……………………………...….……4

*United States v. Stuart*, 489 U.S. 353 (1989)…………..……………..…..…..……… *passim*

*Whitney v.  Robertson*, 124 U.S. 190 (1888)…..……………………....……....……….12

*Wright v. Henkel*, 190 U.S. 40 (1903)…………………………….…....………………10

*Xerox v. United States*, 41 F.3d 647 (Fed Cir. 1994)……………....…………..….……9, 10

**Treaties and Treaty Materials**

*Convention Between The United States Of America And Canada With Respect To Taxes On Income And Capital, Signed At Washington On September 26, 1980, as amended by Protocols signed on June 14, 1983, March 28, 1984, March 17, 1995, July 29, 1997, and September 21, 2007*

      Article II……………….…..………………………………….…..…...…................6
      Article XIII…………..…..…………………………………………….......…..14
      Article XXIV…..……..………………..………………………………………*passim*
      Article XXVI………..…..………………..………………………………...…..……2, 5, 6

*Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital*, (French Treaty) Fr.-U.S., Aug 31, 1994, 1963 U.N.T.S. 67, as supplemented by Protocols dated Dec. 8, 2004 and
Jan. 13, 2009…………………………………………………………...………………4, 14, 23

*Convention Between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income*……....................…………7

*Convention Between the Government of the United States of America and the Government of the Republic of Croatia for the Avoidance of Double Taxation and the Prevention of Tax Evasion with Respect to Taxes on Income*…………......…………………………….…………17

**Appx805**

## Treaties and Treaty Materials (continued)

Treasury Department Technical Explanation of the Convention between the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington D.C. on September 26, 1980, As Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984……………..……..…… *passim*

## Statutes

2 U.S.C. Section 644………………………………………………………………12

Internal Revenue Service Codes of 1986 (26 U.S.C):

      § 27…………..…………………………………………………………..6
      § 901……………………..……………………………………………6, 16
      § 902……………………..………………………………………………7
      § 904……………………..…………………………………………16, 19, 21
      § 905………………………………………………………………………16
      § 907………………………………………………………………….....16
      § 908……………………..…………………………………………………16
      § 911……………………..……………………………………16, 19, 21, 22
      § 1411………..…………………..…………………………………………11
      § 7852…..…………..……………..…...……………………………… 12

## Treasury Regulations and Other Taxation Materials

Treas. Regs. § 1.1411-8(g)(1)……………….……………….………………......……13

Treasury Decision 9644, 78 FR 72393-72449, December 2, 2013,
      as corrected by 79 FR 18161, April 1, 2014………….…..………………..……..11

H.R. Rep. 100-1104 1988 (Conf. Rep.), p.12………..……………………......…………12

## Appx806

## ARGUMENT

In his Opening Brief, Plaintiff argued that under the terms of the Canada Treaty,[1] in order to avoid double taxation, he should be entitled to offset certain U.S. income taxes, including the net investment income tax (the "NIIT"), with a treaty-based foreign tax credit for Canadian federal and British Columbian provincial taxes he incurred. The Defendant disagrees, asserting that the Internal Revenue Code (26 U.S.C. – the "Code") does not provide for a foreign tax credit to offset the NIIT and that the Canada Treaty does not modify that result.

The Defendant acknowledges that the Canadian taxes incurred by Plaintiff are creditable under both the Code and the Canada Treaty. The Defendant also agrees that the NIIT is a United States tax covered by the Canada Treaty. The Defendant recognizes that one of the principal purposes of the Canada Treaty is to avoid double taxation of income, precisely the situation with which Plaintiff is confronted.[2]

Nevertheless, in order to achieve its desired policy result, the Defendant advances a series of inconsistent arguments that wholly disregard the plain text of the Canada Treaty as well as the clearly expressed views of the Canadian Government. The Defendant has constructed an interpretive framework that demands slavish deference to its self-serving terms. In doing so, the

---

[1]    *Convention Between The United States Of America And Canada With Respect To Taxes On Income And Capital,* Signed At Washington On September 26, 1980, as amended by Protocols signed on June 14, 1983, March 28, 1984, March 17, 1995, July 29, 1997, and September 21, 2007.

[2]    The Defendant maintains that no double taxation occurs as the NIIT is not comparable to Canadian Taxes as the two levies are computed on a different income base and at different rates. (Def. Br. at 48.) The same could be said about provincial and local taxes (lower rates), capital gains taxes (different income base), the alternative minimum tax (lower rate and different income tax base), yet the Defendant does not (and cannot) argue these levies somehow fall outside the scope of the Canada Treaty's provisions aiming to eliminate double taxation. Once the Defendant admits, as it has, that the NIIT is a covered tax under Articles II(2) and (3) of the Canada Treaty, the Article XXIV language does not support the distinction the Defendant attempts to draw.

1

Defendant ignores the Treaty's text and more than a century of Supreme Court case law setting out the principle that a treaty must be interpreted to achieve the *shared expectations* of the treaty signatories. In the present case, the Court is fortunate to have the clearly expressed view of the Canadian Government that the Canada Treaty provides that the NIIT can be offset by a foreign tax credit.

In support of its position, the Defendant contends that the Canadian Government's view of the relevant Treaty provisions with respect to the NIIT was confirmed by the Technical Explanation issued by the U.S. Department of Treasury in 1984[3] – more than a quarter century before the enactment of the NIIT and over thirty years before the Canadian Government formally expressed its position on the matter. The Defendant's assertion entirely disregards the mutual agreement procedure ("MAP") set out in Article XXVI of the Canada Treaty, which provides a process by which Canada and the United States should attempt to interpret the Canada Treaty to avoid double taxation.

Plaintiff showed in his Opening Brief that the plain text of Article XXIV(1) and Article XXIV(4) provide a treaty-based foreign tax credit to relieve double taxation. According to Supreme Court precedents, because such a reading of the plain text achieves a primary purpose of the Canada Treaty – the elimination of double taxation – that interpretation should resolve the case in Plaintiff's favor. Yet, instead of looking to the plain text of the Canada Treaty and its purpose, the Defendant fashions a contradictory argument almost entirely rooted in a misinterpretation of the Technical Explanation. That reliance is misplaced for two independent reasons. First, while it

---

[3] Treasury *Department Technical Explanation of the Convention between the United States of America and Canada with Respect to Taxes on Income and on Capital* Signed at Washington D.C. on September 26, 1980, As Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984.

2

**Appx808**

can be an important extrinsic aid to interpret the Treaty, the Technical Explanation is not a substitute for analyzing the Treaty's plain text. Moreover, as demonstrated below, the Technical Explanation does not support the Defendant's position. Instead, the examples set out in the Technical Explanation (wholly ignored by the Defendant) all reach a conclusion contrary to Defendant's position and confirm that a treaty-based foreign tax credit may be used to offset the NIIT.

It is common ground that: (a) Canada had the first right to tax Plaintiff's gain on his sale of Canadian real property; (b) the Canadian taxes Plaintiff incurred on this gain are creditable taxes under the terms of the Canada Treaty; (c) the NIIT is a United States tax covered under the Treaty; and (d) a principal purpose of the Canada Treaty is to prevent double taxation. From there, the Defendant makes numerous arguments that do not withstand scrutiny:

1. The Defendant makes no meaningful attempt to ascertain the shared expectations of the Treaty partners, instead making the remarkable assertion that the Canadian Government official responsible for the interpretation of the Canada Treaty does not correctly represent the Canadian Government's views;

2. The Defendant asserts that its views are entitled to deference even though they are at odds with the text and a principal purpose of the Canada Treaty;

3. The Defendant implies that Congress intended to override the provisions of the Canada Treaty despite having no evidence to support that position and a clear statement to the contrary in a Treasury Department decision that promulgated regulations under the NIIT;

Appx809

4. The Defendant ignores the plain language of the Canada Treaty, which this Court has found in a parallel case involving the French Treaty[4] does allow for a treaty-based foreign tax credit to offset the NIIT; and

5. The Defendant erroneously argues that the Technical Explanation supports its views, making a series of assertions that directly contradict the examples contained therein.

The simple interpretation is the correct one: a United States tax covered under the Canada Treaty can be offset by a treaty-based foreign tax credit and, as such, Plaintiff should be entitled to offset the NIIT with the Canadian taxes he incurred.

I.    **The Defendant Makes No Meaningful Attempt to Establish The Shared Expectations of the Treaty Partners.**

The Defendant starts out on the wrong foot with respect to the principles of treaty interpretation by ignoring their fundamental aim: to achieve the shared expectations of the parties to a bilateral treaty. (Def. Br. at 18-20.) In fact, the Defendant's brief has almost no discussion of the *shared expectations* of the Treaty partners despite a century of Supreme Court cases mandating reference to this overarching consideration in any treaty dispute.

As Plaintiff's Opening Brief sets out in more detail, it is axiomatic that, in interpreting a treaty between the United States and another sovereign government, the treaty represents a contract between the two nations and should be interpreted to fulfil the "shared expectations" of the treaty partners. *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014); *Air France v. Saks*, 470 U.S. 392, 394 (1985); *United States v. Chocktaw Nation*, 179 U.S. 494 (1900). The Canada Treaty represents a reciprocal agreement between the two sovereign nations in which each nation agrees

---

[4]    *Christensen v. United States*, 168 Fed. Cl. 263 (2023), *appeal pending*, No. 24-1284 (Fed Cir. Dec. 22, 2023); *Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital*, (French Treaty) Fr.-U.S., Aug 31, 1994, 1963 U.N.T.S. 67, as supplemented by Protocols dated Dec. 8, 2004 and Jan. 13, 2009.

**Appx810**

to relinquish certain domestic taxing rights in exchange for similar concessions by the other, with a principal aim of eliminating double taxation.

It should come as no surprise then that the Canadian Government's expectation, as summarized by the official responsible for the interpretation of the Canada Treaty, is that the NIIT is a covered United States tax that may be offset by Canadian taxes on Canadian source income. The Canadian Government states as follows:

> The position of the Canadian competent authority in this regard is that Canada, as the country of source, has the right to tax the gain, while the US, as the country which has residual taxation rights, must provide relief in accordance with Article XXIV of the Convention." (Dkt. 18-6.)

The best the Defendant can muster in response is to call Canada's position "vague" (Def. Br. at p. 38), which clearly it is not, and to assert that the very Canadian Government official responsible for the administration and interpretation of the Canada Treaty does not correctly represent the Canadian Government's views as to its expectations with respect to the creditability of the NIIT.[5] This is somewhat ironic after the United States and Canada engaged in four years of negotiations on this issue under the MAP contained in Article XXVI of the Canada Treaty.

The Defendant compounds its error by relying on case law to the effect that a U.S. court need not accept a foreign government's views at face value regarding the interpretation of its own laws. *See, e.g., Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 585 U.S. 33, 43 (2018). While undoubtedly that principle may apply to a legal conclusion drawn by the Canadian Government about its own laws, it has no application to the Canadian Government's views about

---

[5]     The Defendant states that the negotiations between the two countries are ongoing and suggests that this may produce a negotiated settlement with respect to this case, an assertion that borders on the frivolous. The Defendant has had four years to negotiate a resolution with Canada and has steadfastly refused to do so (as is evidenced by its position in this litigation) and the Canadian Government disagrees with the Defendant's position (the parties are "far apart").

Appx811

the meaning of a term in a bilateral treaty with the United States.  The Defendant's statement that the Canadian competent authority's view "has no value to this Court's interpretive inquiry" (Def. Br. at 39) is legally erroneous and diplomatically offensive.

The Defendant nevertheless seeks to justify its assertion regarding the Canadian Government's views by reference to the Technical Explanation issued in 1984.  (Def. Br. at 39.) As a preliminary matter, it should be noted that the Technical Explanation is a U.S.-authored document that under Canadian law does not bind the Canadian Government's position. (*Canada (Attorney General) v. Kubicek Estate*, 1997 CanLII 5515 (Canadian Federal Court of Appeal).[6] Indeed, if the Technical Explanation were to bind the Canadian Government, it would render irrelevant the MAP contained in Article XXVI(3) ("The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. * * *  They may also consult together for the elimination of double taxation in cases not provided for in the Convention.").

In any event, the Technical Explanation was drafted more than a quarter century prior to the NIIT's enactment.  At that time, any "United States tax" as defined in Article II(2) and referred to in Article XXIV(7) was eligible to be offset by a foreign tax credit under Code Secs. 27 and 901.  The Technical Explanation simply did not address, let alone definitively establish, the shared expectations of the Treaty partners as to whether Article XXIV would allow a treaty-based foreign tax credit for a future enacted tax covered by the Treaty that was not creditable under the Code.

---

[6]     *See* Appendix A.  ("The Technical Explanation is a domestic American document. True, it is stated to have the endorsement of the Canadian Minister of Finance, but in order to bind Canada it would have to amount to another convention, which it does not. From the Canadian viewpoint, it has about the same status as a Revenue Canada interpretation bulletin, of interest to a Court but not necessarily decisive of an issue.")

This Court's decision in *Snap-On Tools, Inc. v. United States*, 26 Cl. Ct. 1045 (Cl. Ct. 1992), *aff'd*, 26 F.3d. 137 (Fed. Cir. 1994) is instructive. Here, a question arose as to whether a dividend must be attributed to profits arising in prior years under the so-called "60-day rule" codified in Code Sec. 902(c) (since repealed). At issue was the entitlement under the U.S./U.K. income tax treaty to credit certain U.K. taxes based on the application of the 60-day rule that attributes dividend payments arising within the first 60 days of a tax year to historic earnings and profits. The taxpayer in *Snap-On Tools* provided evidence that the treaty signatories had not discussed the application of the 60-day rule. In refusing to accede to language in the technical explanation of the U.S./U.K. treaty regarding the 60-day rule, this Court held:

> In the case at hand, the clear intent of both parties should not be ascertained from the Technical Explanation to the United States-United Kingdom Income Tax Convention on which the defendant relies so heavily in support of its position. There simply is not the evidence in the record, as is discussed more fully below, to support the notion that the British government was aware that the words of the United States-United Kingdom Income Tax Convention were intended to change the 60-day rule.

26 Cl. Ct. at 1066. So, too, in this case, it is impossible to conclude, based on a Technical Explanation issued over a quarter of a century earlier, that the Canadian Government somehow agreed to the interpretation advocated by the Defendant, especially given the Canadian Government's current and clearly expressed statement to the contrary. The situation today is that the Treaty partners disagree whether a treaty-based foreign tax credit is available to offset the NIIT, thereby confirming that the shared expectations of the Treaty partners cannot be ascertained from the Technical Explanation written decades before the NIIT was enacted.

Under these circumstances, the question therefore before the Court is the proper interpretation of the Treaty, in light of the actual text used and the Treaty's underlying purpose. The interpretation urged by the Defendant, which is directly contrary to the text and to a principal purpose of the Canada Treaty, does not accord with the shared expectations that the Treaty text

Appx813

would eliminate double taxation and, for the reasons set forth below, should not be given any deference.

**II.**     **Defendant's View Is Not Entitled to Deference.**

As a general rule, the Department of Treasury's interpretation of an income tax treaty is presumptively entitled to significant deference. *Sumitomo Shoji America Inc. v. Avagliano,* 457 U.S. 176 (1982); *El Al Israeli Airlines v. Tseng*, 525 U.S. 155, 168 (1999); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961). Normally, such deference accords with the "shared expectation" of the sister sovereign signatory of the treaty. Where such interpretation does not reflect the shared expectation, contradicts the purpose of the treaty, and restricts the scope of the relief provided, such deference falls away. *Jordan v. Tashiro*, 278 U.,S. 123, 128 (1928); *Bacardi Corp of Am. v. Domenech*, 311 U.S. 150, 163 (1940); *United States v. Stuart*, *supra*; *North West Life Insurance Co. of Canada v. Comm'r*, 107 T.C. 363 (1966). Here, the purpose of the Canada Treaty is to avoid the evil of double taxation, yet the Defendant interprets the Treaty in order to achieve just that result.

The Defendant advances a number of theories to justify deference to its unilateral views, arguing that: (1) a liberal interpretation of the Canada Treaty is not called for, in part as such an interpretation would be inconsistent with statutory rules regarding strict construction of tax credit rules; (2) Congress' enactment of the NIIT post-dated the ratification of the Canada Treaty and thus the Treaty should be interpreted to reflect later Congressional intent; and (3) a treaty-based foreign tax credit would require additional guidance to determine its application. These arguments do not withstand scrutiny.

### A. Supreme Court Precedent Unequivocally Requires A Liberal Interpretation of Treaties.

Despite the Defendant acknowledging that as a general rule, treaties should be liberally interpreted to achieve their purposes, the Defendant makes the unfounded assertion that such liberal interpretation doctrine does not apply to tax treaties.[7] (Def. Br. 42-44.) In *United States v. Stuart*, 489 U.S. 353 (1989), involving a prior version of the Canadian income tax treaty and as quoted (in part) by the Defendant, the Supreme Court held that the Canadian tax treaty should be "[c]onstrued * * * liberally to give effect to the purpose which animates it and that, [e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred [cites omitted]." Similarly, *Xerox Corp. v. United States*, 41 F 3d. 647, 652 (Fed. Cir. 1994) states that "[i]n construing a treaty, the terms are given their ordinary meaning in the context of the treaty and are interpreted in accordance with that meaning, in the way that best fulfils the purpose of the treaty."

Plaintiff is not aware of, and the Defendant has not cited, any Supreme Court cases that provide different rules for interpreting tax treaties as opposed to other kinds of treaties. Nevertheless, the Defendant asserts that different rules should apply to the interpretation of tax treaties, as these involve a sovereign power of the United States Government (namely, to tax its citizens).

The Defendant's theory raises the question what treaty the United States could enter into that did not involve a sovereign power, whether over trade and commerce (*Iceland Steamship Co. Ltd. Eimskip v. U.S. Dept. of the Army*, 201 F.3d 451 (D.C. Cir. 2000)), the custody of U.S. citizen

---

[7]     The Defendant cites *Baturin v. Comm'r*, 31 F.4th 170, 176 (4th Cir. 2022) for the proposition that a liberal interpretation of a tax treaty should not apply where it would provide for unintended benefits.  Plaintiff agrees.  However, the avoidance of double taxation in this case is hardly the stuff of "unintended benefits."  It is rather the specific benefit sought by the Treaty.

children in an international context (*Abbott v. Abbott*, 560 U.S. 1 (2010)), the extradition of U.S. citizens (*Wright v. Henkel*, 190 U.S. 40 (1903)) or any other matter over which the United States has the sovereign power to negotiate by treaty. The Defendant does not explain any basis upon which a treaty entered into by the United States involving taxation rights is of a different nature or priority as compared with a treaty involving any other of United States' sovereign powers, nor does the Defendant explain why a tax treaty should be strictly, rather than liberally, interpreted.[8]

In this context, the Defendant's statement (Def. Br. at 43) that a liberal interpretation of a tax treaty conflicts with ordinary rules of U.S. statutory construction, in which tax credits and exemptions are narrowly construed in favor of the government, again simply flies in the face of applicable Supreme Court precedent. This is not a case involving statutory interpretation; it is a case involving *treaty* interpretation, where the rules for interpreting statutes do not apply. *Lozano v. Alvarez*, 572 U.S. 1, 19 (2014) (U.S. principles of statutory construction "have no proper role in the interpretation of treaties unless that principle is shared by the parties * * *."); *Eshel v. Comm'r*, 831 F.2d 512, 518 (D.C. Cir. 2016) ("it is inappropriate to make the United States' maxims for statutory construction unilaterally dispositive."). Instead, the Canada Treaty should be liberally interpreted based on the uncontested "shared expectations" of the sovereign Treaty partners to achieve a principal purpose of the treaty – the avoidance of double taxation. Thus, even if the Defendant's interpretation would be plausible (it is not), the liberal interpretation advocated by Plaintiff, which analyzes the plain meaning of the text of the Canada Treaty to realize one of its

---

[8]     The Defendant notes that this Court need not weigh into the debate of whether a tax treaty should be liberally construed, a point with which Plaintiff fully agrees. This Court is bound by Supreme Court precedents in this area, including the *Stuart* decision, and Federal Circuit rulings, including *Xerox*, and these decisions, applying a liberal interpretation of tax treaties, preclude any purported distinction proposed by the Defendant.

principal aims, supports the conclusion that treaty-based foreign tax credits may be applied to offset the NIIT.

**B. The Enactment of the NIIT After the Ratification of the Canada Treaty Does Not Demonstrate Congressional Intent To Disallow a Foreign Tax Credit Under the Canada Treaty.**

The parties agree that no U.S. statutory credit is allowed for the NIIT and that the NIIT is a covered tax under the terms of the Canada Treaty. However, the Defendant argues (Def. Br. at 32) that, since the NIIT was enacted after the ratification of the Canada Treaty and no statutory foreign tax credit is allowed, Congress must also have intended that no treaty-based foreign tax credit should apply. This position is at odds with the Treasury Department's own statements on this subject, as well as judicial and statutory pronouncements that favor harmonizing treaty and statutory provisions.

The Treasury Department indicated in Treasury Decision 9644, 78 FR 72393-72449 (Dec. 2, 2013), as corrected by 79 FR 18161 (Apr. 1, 2014), that "[a]n analysis of each United States income tax treaty would be required to determine whether the United States would have an obligation under that treaty to provide a credit against the section 1411 tax [the NIIT] for foreign income taxes paid to the other country." It follows that no such analysis would be required in the event that Congress intended to deny treaty-based foreign tax credits to offset the NIIT.

Moreover, as stated in Plaintiff's Opening Brief (Pl. Br. at 17-19), no treaty override has occurred in this case – Congress did not explicitly abrogate the Canada Treaty or any part of it. Binding case law here is clear: "[w]hen a later statute conflicts with an earlier agreement, and Congress has neither mentioned the agreement in the text of the statute nor in the legislative history of the statute, the Supreme Court has conclusively held that it cannot find the requisite intent to abrogate [a treaty]." *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 175 (D.D.C. 2002),

Appx817

*aff'd*, 333 F.3d 228 (D.C. Cir. 2003), *citing Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243 (1984).[9]

The Defendant goes on to claim that a 1988 amendment to Code Sec. 7852(d) provides a different set of rules for interpreting tax treaties, when in fact this amendment does nothing of the sort. (Def. Br. at 32.) The 1988 amendment provides that neither a treaty nor the Code has preferential status over the other, which is a restatement of the language of the Supremacy Clause as interpreted by the Supreme Court.[10] Congress did not, by amending Code Sec. 7852(d), modify the Supremacy Clause (in any case beyond its power), and two hundred years of judicial precedent interpreting the Supremacy Clause was not altered by the Code Sec. 7852(d) amendment. Treaties and statutes are of equal status and a repeal of a treaty by implication is not favored, a proposition that is equally true whether the treaty covers revenue or other matters. Indeed, the Conference Report discussing the amendment to Code Sec. 7852(d) states that this section "adds no operative rules to be applied in determining the relation of the Code (or other tax law) and a treaty, but rather states the constitutional principle that such determinations are relevant in determining tax liabilities." H.R. Rep. 100-1104 1988) (Conf. Rep.), p. 12.

---

[9] The NIIT was enacted through the budget reconciliation process requiring a simple majority vote in the Senate. Under the so-called "Byrd amendment" codified in 2 U.S.C. Sec. 644, in order to override the Canada Treaty, a three-fifths Senate majority would have been required (which did not exist). As a result, there can be no basis for asserting that there has been any treaty override.

[10] *Whitney v. Robertson*, 124 U.S. 190, 194 (1888) ("By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other.")

## C. The Absence of Specific Rules for Computing a Foreign Tax Credit Under the Canada Treaty Does Not Have the Effect of Disallowing Such a Credit.

The Defendant argues that detailed and complex rules would have to be drafted to allow for a foreign tax credit to be applicable to offset the NIIT under the terms of the Canada Treaty and, therefore, the absence of such rules means that no such credit is allowed. (Def. Br. at 45-46.) As a preliminary matter, if this proposition were accepted at face value, it would allow the Treasury Department to deny any treaty right granted to a taxpayer simply by failing, or worse, refusing, to issue rules governing its implementation.

Taxpayers are often confronted with situations that do not have detailed or specific rules and explanations. With respect to the NIIT itself, a taxpayer may incur a deductible expense that is allocable against both income that is subject to the NIIT and income outside the scope of the NIIT ("excluded income"). Neither the Code nor any administrative statement specifies how such a deduction should be apportioned; instead, the applicable regulations simply provide that "the portion of the deduction that is properly allocated to net investment income may be determined by the taxpayers using any reasonable method." Treas. Regs. Sec. 1.1411-8(g)(1).

In the case at bar, Plaintiff incurred significantly more Canadian tax on the same item of income – the sale of a single piece of Canadian real property – than the combined amount of the regular U.S. capital gains tax and NIIT.[11] Moreover, an allocation determined by a "reasonable method," like that otherwise used in computing the NIIT itself, to determine the "appropriate amount" of Canadian taxes to offset the United States tax, accords with the purpose of the Canada

---

[11] The parties have agreed at this stage to defer any computational issues pending the outcome of this motion for partial summary judgment. If the Defendant is serious about contesting Plaintiff's method of allocating a treaty-based foreign tax credit in the case at bar because it would impact the refund that Plaintiff seeks, the Defendant will have the opportunity to raise the point in subsequent proceedings.

Treaty and does not reward the Department of Treasury for failing or refusing to implement its terms.

### III.   The Plain Meaning of the Canada Treaty Provides Plaintiff a Treaty-Based Foreign Tax Credit.

Defendant accepts the basic principle that "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." *Golan v. Saada*, 596 U.S. 666, 676 (2022) (quoting *Abbott v. Abbott*, *supra*); *see also*, *United States v. Stuart*, *supra*; U.S. 353, 365-66 (1989) (quoting *Sumitomo*, *supra*). (Def. Br. at 18-19.) The plain text of Article XXIV(4) of the Canada Treaty answers the inquiry (as this Court held regarding a parallel provision of the French Treaty in *Christensen v. United States*, *supra*) as it unequivocally provides that:

> Where a United States citizen is a resident of Canada, *the following rules shall apply*:
>
> * * *
>
> (b) for the purposes of computing the United States tax, *the United States shall allow as a credit against the United States tax* the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a) * * *.

(Emphasis added.)

The parties agree that Plaintiff is a U.S. citizen resident of Canada, that the United States did not have source-based taxing rights (Article XIII(1)), that United States income tax includes the NIIT and, for purposes of this partial motion for summary judgment, that the Canadian taxes exceeded all United States income taxes levied against Plaintiff, including the NIIT. The parties further agree that, as a general matter, a principal purpose of the Canada Treaty is to avoid double taxation (Pl. Br. at 13, Def. Br. at 46). As Plaintiff's interpretation of the ordinary meaning accomplishes that goal, this should end the inquiry and resolve this case.

The Defendant offers two challenges to this straightforward reading of the text of the Canada Treaty: (i) Article XXIV(1) precludes a treaty-based foreign tax credit and (ii) purported

14

**Appx820**

limitations under Article XXIV(1) apply to a treaty-based foreign tax credit claimed pursuant to XXIV(4). As demonstrated below, both of the Defendant's assertions are unsound.

### A. The Plain Text of Article XXIV(1) Provides A Treaty-Based Foreign Tax Credit.

As discussed in Plaintiff's Opening Brief (Pl. Br. at 28 *et seq*.), Article XXIV(1) provides for a treaty-based foreign tax credit. The language of Article XXIV(1) states:

> In the case of the United States * * * double taxation shall be avoided as follows:
> In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or resident of the United States, * * * as a credit against the United States tax on income the appropriate amount of income tax paid or accrued to Canada * * *.

The parties agree the NIIT is a "United States tax". (Def. Br. at 22.) For the reasons discussed below, the general principle of allowing a treaty-based foreign tax credit against the NIIT is preserved in Article XXIV(1).

Quoting the unsound decision in *Toulouse v. Comm'r*, 157 T.C. 49, 57 (2021), the Defendant states that a treaty-based foreign tax credit "must be determined in accordance with the Code and is limited by the Code's provision of a credit." (Def Br. at 23.) The Defendant claims that the parenthetical to the condition, "as it may be amended from time to time without changing the general principle hereof" means that the United States is free to change its foreign tax credit rules at will, short of outright repeal." (Def. Br. at 25.) The Defendant reaches this conclusion by claiming that "[b]y definition, the general principle cannot be broader than the language it follows in paragraph (1), which requires the United States to provide foreign-tax-credit relief in accordance with its own domestic law." *Id.*

The Defendant's position is not supported by the text. Article XXIV(1) refers to the bedrock Treaty principle of avoiding double taxation ("[i]n the case of the United States * * *

double taxation shall be avoided as follows").  The "general principle" to which Article XXIV(1) refers is the avoidance of double taxation.  The text further provides that the treaty-based foreign tax credit is allowed for "the appropriate amount of income tax paid or accrued to Canada."  The "appropriate amount" of Canadian tax that can be credited is determined "in accordance with the provisions and subject to the limitations of the laws of the United States."  This interpretation accords with the Technical Explanation, which states:

> Paragraph 1 provides the general rules that will apply under the Convention to foreign tax credits for Canadian taxes paid or accrued.  The United States undertakes to allow a citizen or resident of the United States * * * a credit against the Federal income taxes imposed by the Code for the **appropriate amount** of income tax paid or accrued to Canada. (Emphasis added.)

The Technical Explanation then incorporates U.S. rules under the Code relevant to determining the "appropriate amount" of creditable Canadian tax, such as:

- The timing of when a Canadian tax arises is addressed in the Technical Explanation (Doc 18-3 at 37), stating "the determination of whether an amount is paid or accrued is made under the Code."

- Specifying certain amounts of Canadian taxes that are restricted or disallowed by application of the Code, stating the "provisions such as Code sections 901(c), 904, 905, 907, 908, and 911 apply for purposes of computing the allowable credit under paragraph 1."  (Technical Explanation Doc. 18-3 at 37.)

These references to the Code go to calculating the "appropriate amount" of Canadian tax to be credited against United States tax; they do not cover which United States taxes can be offset once the appropriate amount of Canadian tax has been determined.

In this respect, the Defendant errs in asserting that Article XXIV(1) has no independent purpose in the Treaty other than to allow a taxpayer the use of the mutual assistance procedures. (Def. Br. at 26.)  Had eliminating a general entitlement to a treaty-based foreign tax credit been

the intention of the Treaty parties, they could have provided this in unequivocal terms in the text of the Treaty, as was done in the newly drafted double taxation agreement with Croatia.[12]

In summary, Article XXIV(1)'s language "in accordance with the provisions and subject to the limitations of United States law (as amended from time to time without changing the general principle thereof)" language in Article XXIV(1) focuses on the appropriate amount of Canadian tax that may be credited against United States tax. Through the Code, the United States can change the method by which the "appropriate amount" of tax can be determined (country-by-country, separate limitation categories, foreign exchange translation rates, etc.). However, once the appropriate amount of Canadian tax is determined, it must be allowed as an offset against any treaty-defined United States taxes, including the NIIT.

Plaintiff notes that although Article XXIV(1) provides an independent basis for Plaintiff to claim a treaty-based foreign tax credit, a separate and wholly distinct set of provisions in the Canada Treaty also allow the foreign tax credit relief that Plaintiff seeks. Article XXIV(4) through (6), which do not cross-reference Article XXIV(1), provide a standalone basis for Plaintiff's claim for a treaty-based foreign tax credit to offset the NIIT.

---

[12] The Defendant's assertion that the Croatia language reflects the natural evolution of treaty language over time is disingenuous. Every treaty negotiated between the time of the Canada Treaty and the enactment of the NIIT had language substantially identical to the relevant language in the Canada Treaty. The Croatia Treaty is the first treaty to be negotiated after the NIIT came into effect and provided that the United States shall allow a foreign tax credit "to the extent allowed under the laws of the United States (as it may be amended from time to time)." This is hardly "evolving language." It is instead a tacit admission that a treaty-based credit is available for the NIIT under the language used in prior U.S. treaties.

**B.      Articles XXIV(4) through (6) are Standalone Provisions that Allow for
A Treaty-Based Foreign Tax Credit
Irrespective of Any Other Treaty Limitations.**

In his Opening Brief, Plaintiff argued, in accordance with this Court's ruling in *Christensen*, that Article XXIV(4) is independent from the provisions contained in Article XXIV(1).   Plaintiff's position, like the decision in *Christensen*, finds support in the Court of Appeals decisions in *Haver v. Comm'r*, 444 F.3d 656 (D.C. Cir 2006) and *Kappus v. Comm'r*, 337 F.3d 1053 (D.C. Cir. 2003), which recognized that Article XXIV(4) could be interpreted to provide a credit independent of Article XXIV(1), although not deciding the case on that issue.   Applying the plain language of Article XXIV(4)(b), Plaintiff, a U.S. citizen resident in Canada, is entitled to offset the NIIT using treaty-based foreign tax credits corresponding to Canadian taxes of an "appropriate amount".

Article XXIV(4)(b) states that "[f]or the purposes of computing the United States tax, the United States shall allow as a credit against the United States tax the income tax paid or accrued to Canada * * *."  Plaintiff paid Canadian tax in excess of the U.S. capital gains tax and the NIIT arising on the sale of Canadian real property and the Defendant agrees that the plain text of Article XXIV(4)(b) would provide the relief Plaintiff seeks in this case.   The Defendant contends, however, that reading Article XXIV(4)(b) "in isolation completely ignores paragraph (6)."  (Def. Br. at 28.)  The Defendant argues that "the drafters' inclusion of a special re-sourcing provision in paragraph (6) shows that they understood that the paragraph (1) language restricting the foreign tax credit ('in accordance with the provisions and subject to the limitation of the law of the United States') applied to the credits referenced in paragraph 4(b) as well."[13]  *Id.*

---

[13]      Although the Defendant does not, and cannot, point to any textual language in the Canada Treaty for this assertion, the Defendant argues that "[t]he failure of the Treaty to repeat [the Article

Article XXIV(6) states that re-sourcing shall occur "to the extent necessary to avoid the double taxation of such income under paragraph 4(b) or paragraph 5(c)." The Defendant maintains that "the only reason this re-sourcing rule would be necessary is if the drafters believed that the credit against U.S. tax referenced in subparagraph 4(b) was subject to the Code's § 904 limitation in the first place." (Def. Br. at 29.) The Defendant asserts that "[h]ad the drafters believed, as plaintiff contends, that paragraph 4(b) provides an independent credit unrestricted by the limitations of the Code, there would have been no reason to include paragraph (6) in the Treaty." (Def. Br. at 30.) The Defendant concludes that any other interpretation would produce "anomalous results" that are "unprecedented" and "could not have been intended by the contracting parties," including results such as a U.S. citizen resident in Canada being able to:

- Claim foreign tax credits against U.S. tax on U.S.-sourced income, despite the clear and longstanding policy behind the foreign-tax-credit limitation under § 904;

- Evade the § 904 limitation by cross-crediting foreign tax on general basket income against U.S. tax on passive basket income; and

- Obtain a double benefit by claiming credits for foreign taxes paid on income excluded from U.S. tax by the foreign-earned income exclusion, a windfall that would normally be precluded by § 911(d)(6).

*See*, Def. Br. at 33-34.

---

XXIV(1) limiting language] is inconsequential when the full text of Article XXIV is considered", citing *O'Connor v. United States*, 479 U.S. 27 (1986). (Def. Br. at 30.) The Defendant, however, does not apply the logic of the *O'Connor* decision, where the Supreme Court held that it would be inconceivable for the United States to surrender taxing rights on a U.S. citizen living in Panama when reciprocal taxing rights are not surrendered by the Panama authorities. Here, the Defendant argues that although the Canadian Government must permit the NIIT as a credit when the United States has primary taxing rights, the United States will not provide a reciprocal credit to offset the NIIT when Canada has primary taxing rights. Rather than the usual "your sovereignty for mine" bargain where the United States and Canada agree to relinquish reciprocal taxing rights, the Defendant urges that this treaty provides a unilateral taxing right for the United States Government (a position with which the Canada competent authority unsurprisingly disagrees). The logic of *O'Connor* does not support the Defendant's position that it is inconsequential that Article XXIV(4) did not include the Article XXIV(1) limiting language.

The Defendant points to no authority for this conjecture, and none exists. In fact, the examples contained in the Technical Explanation discussing the operation of Articles XXIV(4) through (6) unequivocally reach precisely the opposite conclusion, namely, that Article XXIV(1) does not apply. Simply put, as this Court found in *Christensen*, Articles XXXIV(4) through (6) are standalone provisions that operate without regard to Article XXIV(1) and the "anomalous" or "unprecedented" results that the Defendant argues "could not have been intended by the contracting parties" do in fact result from the proper application of these provisions. Moreover, these results accord with the shared expectations of the Treaty partners as set forth in the Technical Explanation.

The Technical Explanation (Doc. 18-3 at pp. 44-45, Exs. C and D) analyzes the case of a Canadian resident U.S. citizen receiving $100 of U.S. source royalty income and $200 of Canadian (*i.e.* foreign source) personal service income, and further assumes:

i.    <u>The United States Tax on the Royalty Income</u>. The U.S. source royalty income incurs $41.82 of U.S. tax before taking into account any treaty-based foreign tax credit based on the U.S. citizen's worldwide income. Applying the first bite rule, Article XXIV(4)(a) reduces the United States' primary taxing rights to $15.00 (*i.e.* 15 percent of $100), the amount of tax that a Canadian resident who is not a U.S. citizen would have incurred. Thus, the United States has the first bite of tax of $15.00. Applying the second bite rule, the remaining $26.82 of U.S. tax may be offset by Canadian taxes.

ii.    <u>The Canadian Tax on the Royalty Income</u>. The example computes the amount of Canadian tax attributable to the royalty income to be $30.80. Because the Canadian tax exceeds the remaining amount of U.S. tax ($26.82), the excess Canadian tax

**Appx826**

($3.98), while giving rise to a credit, is not currently applied and instead "is a foreign

tax credit carryover for U.S. purposes, *subject to the limitations of* [Treaty Article

XXIV] *paragraph 5*." (Emphasis added)

Under the terms of paragraph 5, the $3.98 could be used against future lower taxed royalties

(whether active or passive) arising in a later year, even though Code Secs. 904(d)(1) and (6) would

preclude the use of these credits in the future.[14] Quite simply, as shown in this Technical

Explanation example, the provisions of the Canada Treaty override the Code.

That the Technical Explanation contemplates the Canada Treaty overriding the Code is

even more apparent in the treatment of the $200 of foreign source personal services income. The

example assumes:

    i.    <u>The United States Tax on Canada Personal Services Income</u>. The $200 of Canada

        source personal service income is subject to the foreign earned income exclusion of

        Code Sec. 911, pursuant to which the U.S. citizen may exclude $80 from U.S. tax.

        The U.S. tax on the remaining $120 of income is $50.18. Because the relevant

        income is Canadian source, the United States does not have a "first bite" of tax. As

        a result, the entire $50.18 may be offset by foreign tax credits.

    ii.    <u>The Canadian Tax on the Personal Services Income</u>. The Canadian tax on the same

        $200 of personal services income is $84.20.[15] Because the Canadian tax exceeds the

        remaining amount of U.S. tax ($50.18), the Canadian tax over the remaining United

---

[14]    Code Sec. 904(d)(1) would require a determination of whether the royalty arose in the active conduct of the taxpayer's business or as a passive investment. Code Sec. 904(d)(6) provides that if a treaty provides for a foreign tax credit against U.S. source income, the foreign taxes cannot be used as a credit against other items of income arising in later years.

[15]    The Canadian tax is significantly higher since, although the U.S. citizen may deduct $80 from the $200 of personal services income under the U.S. "foreign earned income exclusion", the Canadian rules do not allow for the deduction and the full $200 is taxable in Canada.

States tax ($34.02) while giving rise to a credit, is not currently applied and instead "is a foreign tax credit carryover for U.S. purposes, *subject to the limitations of* [Treaty Article XXIV] *paragraph 5*." (Emphasis added)

Under the Code's foreign earned income exclusion rules, because the taxpayer excluded the $80 of Canadian income, the taxpayer may not claim a credit for Canadian taxes that arise on such $80 of excluded income. Code Sec. 911(d)(6).[16] Significantly, the example provides for no reduction of Canadian taxes (the $34.02 carryover), even though $80 of income (on which the taxpayer incurred Canadian tax) was subject to the foreign earned income exclusion – a result directly contrary to the statutory mandate contained in Code Sec. 911(d)(6).

The Technical Explanation examples and their results are substantially different from what would result by applying the Code. These are, in fact, the very results the Defendant has characterized as "anomalous" and "unprecedented", specifically allowing the "double benefit by claiming credits for foreign taxes paid on income excluded from U.S. tax by the foreign-earned income exclusion, a windfall that would normally be precluded by § 911(d)(6)." (Def Br. at 34.) No doubt to the Defendant's dismay, the Technical Explanation examples provide analysis and results that are expressly and unequivocally *not* "in accordance with the provisions and subject to the limitations of the laws of the United States."

It follows from the Technical Explanation examples differing materially from what would have occurred under the Code, that the Defendant is mistaken in asserting that the drafters must have intended to incorporate Article XXIV(1) into the operation of Article XXIV(4) through (6). Consistent with this Court's holding in *Christensen* with respect to a parallel provision in the

---

[16]    A reduction of the ratio of excluded income to total foreign earned income (80/200) multiplied by the Canadian tax on the foreign earned income ($84.20), or $33.68, would be required.

**Appx828**

French Treaty, Plaintiff, a U.S. citizen resident in Canada, is allowed to take a treaty-based foreign tax credit to offset the NIIT under Article XXIV(4).

## IV.    __Conclusion.__

Plaintiff advocates a simple, logical interpretation of the plain text of the Canada Treaty, consistent with one of its principal objectives – the elimination of double taxation.  The Canadian Government agrees with this interpretation.  That should end the inquiry.

The Defendant rests most of its case on the 1984 Technical Explanation, the authority of which is subordinate to the negotiated text of the Canada Treaty.  Yet, even the Technical Explanation supports Plaintiff's case.  Its examples demonstrate how a U.S. citizen who is Canadian tax resident enjoys benefits under the Treaty that are not in accordance with the Code.

The rationale of the signatories to the Treaty here is straightforward.  United States citizens who are Canadian tax residents are faced with double exposure to worldwide taxation.  Consistent with one of the Canada Treaty's primary purposes, to eliminate double taxation, the treaty signatories negotiated a nuanced and detailed set of terms that go beyond what is available under each country's domestic laws in order to achieve this purpose.  A liberal interpretation of these provisions gives effect to the shared expectation of *both* parties to the Canada Treaty.

The Defendant seeks a different result which it perversely argues is required to avoid "a distinct tax advantage that results from [Plaintiff's] Canadian residency."  (Def. Br. at 49.)  Yet, there is no tax advantage as the Defendant describes the position; rather, the starting point is that Plaintiff has been doubly taxed.  By its position in this case, the Defendant seeks to maintain this double taxation contrary to the bargain negotiated with Canada.  That bargain states in the clearest possible terms the parties' intention to prevent such a result, terms that can be read and applied in a plain and ordinary manner to do just that.

**Appx829**

The Defendant argues it would be anomalous that a U.S. resident taxpayer is subject to both the U.S. income tax contained in Chapter 1 of the Code and the NIIT, whereas a Canadian resident U.S. citizen could receive a treaty-based foreign tax credit against the NIIT. Such a Canadian resident U.S. citizen, however, would have had to incur sufficient Canadian tax to offset both the Chapter 1 regular U.S. income tax and the NIIT, so from such a taxpayer's perspective, the worldwide taxation incurred simply is the greater of the United States or the Canadian taxes. Always paying the greater of the two countries' taxes cannot be said to be a "distinct tax advantage" that flows to the taxpayer. What appears to be an anomalous result or a distinct tax advantage in the eyes of the Defendant is, in fact, no more than the operation of a tax treaty between the United States and Canada that allocates this worldwide taxation between the two sovereign nations in order to avoid double taxation.

For the reasons explained above, Plaintiff respectfully asks this Court to grant its motion for partial summary judgment, deny the Defendant's motion for partial summary judgment and grant any other relief that the Court determines is just and proper.

Respectfully submitted,

/s/ Stuart E. Horwich
Horwich Law LLP
20 Old Bailey, 5th Floor
London  EC4M 7AD
United Kingdom
011 44 20 8057 8013
seh@horwichlaw.co.uk

/s/ Max Reed
Polaris Tax Counsel
1788 West Broadway, Suite 900
Vancouver, British Columbia
Canada
604-283-9301
max@polaristax.com

Attorneys for Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

(Judge Matthew J. Solomson)

PAUL BRUYEA,                              )
                                          )
                                          )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )          Case No. 23-766 T
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
        Defendant.                        )
_____ )


——————————

**BRIEF OF THE UNITED STATES IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE
TO PLAINTIFFS' PARTIAL SUMMARY JUDGMENT MOTION**

——————————

DAVID A. HUBBERT
  Deputy Assistant Attorney General

DAVID I. PINCUS
 Chief, Court of Federal Claims Section
MARY M. ABATE
 Assistant Chief
JASON BERGMANN
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Washington, D.C. 20044
202-616-3425 (v)
202-514-9440 (f)
jason.bergmann@usdoj.gov

i

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

STATEMENT OF THE CASE..................................................................................................4

LEGAL BACKGROUND ........................................................................................................7

    A. The Structure of the Internal Revenue Code of 1986 ........................................7

    B. The Foreign Tax Credit and Foreign Earned Income Exclusion
       Under the Code ..................................................................................................9

    C. The Net Investment Income Tax....................................................................13

    D. Article XXIV of the U.S.-Canada Income Tax Treaty ...................................14

LEGAL STANDARD GOVERNING INTERPRETATION OF TAX TREATIES....................18

ARGUMENT ........................................................................................................................21

    A. The Internal Revenue Code Does Not Allow Foreign Tax Credits Against
       the NIIT...........................................................................................................21

    B. Article XXIV(1) of the Treaty Does Not Override the Internal Revenue
       Code to Allow Foreign Tax Credits to Be Applied Against the NIIT. ............22

       1. Paragraph (1) allows foreign tax credits only "in accordance with
          the provisions" and "subject to the limitations of" the Code......................22

       2. The Court should accord deference to the Treasury Department's
          construction of paragraph (1).....................................................................27

    C. Article XXIV(4) of the Treaty Does Not Require an Independent Foreign
       Tax Credit Against the NIIT. ...........................................................................27

       1. The text and the context of Article XXIV make clear that
          paragraph (4) does not allow an unlimited foreign tax credit for U.S.
          citizens residing in Canada. ......................................................................27

       2. The Treasury Department's technical explanations confirm that
          the government's position on the effect of paragraph (4)(b) is correct. .....34

# Appx842

## TABLE OF CONTENTS

Page

D. Plaintiff's Arguments to the Contrary Are Without Merit..................................................38

    1.  The letter purportedly stating the current position of the Canadian competent authority, on which plaintiff relies, does not reflect the signatories' shared understanding of the Treaty nor does it overcome the U.S. executive branch's interpretation, which is consistent with that shared understanding. ..........................................................................38

    2.  The Court need not adopt plaintiff's interpretation even if the Court were obliged to interpret the Treaty liberally (it is not)................................................42

E. To Interpret the Treaty as Creating an Independent Credit Against the NIIT Would Require New, Complex Ordering Rules to Preclude Duplicative Credits ........................................................................................................45

F. The Court May Not Broaden the Terms of the Treaty to Reduce Double Taxation, as Plaintiff Proposes...........................................................................................46

CONCLUSION ......................................................................................................50

# APPENDIX: TABLE OF CONTENTS

**Original Treaty & Protocols**

A. "Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital," as amended through 2007, Tax Notes Doc. 2017-84262 (the "Treaty").

B. United States - Canada Income Tax Convention: Convention signed September 26, 1980; Protocol 1 signed June 14, 1983; Protocol 2 signed March 28, 1984; Protocol 3 signed March 15, 1995; Protocol 4 signed July 29, 1997 [available at: https://www.irs.gov/businesses/international-businesses/canada-tax-treaty-documents].

C. Protocol 5, signed September 21, 2007 [available at: https://www.irs.gov/businesses/international-businesses/canada-tax-treaty-documents].

**Technical Explanations & Senate Ratification Documents**

D. Excerpts, Jt. Comm. on Tax'n, Explanation of Proposed Income Tax Treaty Between the United States and Canada, JCS-48-81 (Sept. 22, 1981).

E. Excerpts, Tax Treaties, Hearing Before the S. Comm. on Foreign Relations, 97th Cong. (Sept. 24, 1981).

F. Excerpts, S. Exec. Rep. No. 98-22 (May 21, 1984).

G. Excerpts, Treasury Department Technical Explanation of the Convention Between the Government of the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington, D.C. on September 26, 1980, as Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984 [available at: https://www.irs.gov/businesses/international-businesses/canada-tax-treaty-documents] ("1984 Tech. Exp.").

**U.S. Model Income Tax Conventions**

H. Excerpts, United States Model Income Tax Convention of June 16, 1981.

I. Excerpts, United States Model Income Tax Convention of September 20, 1996.

J. Excerpts, United States Model Income Tax Convention of November 15, 2006.

K. Excerpts, United States Model Income Tax Convention of September 20, 1996: Technical Explanation

L. Excerpts, United States Model Technical Explanation Accompanying the United States Model Income Tax Convention of November 15, 2006.

# Appx844

**APPENDIX: TABLE OF CONTENTS (Continued)**

**Other Documents**

M. Excerpts, Tables of Contents, Internal Revenue Code (26 U.S.C.) (2015).

N. Excerpts, Dirk Suringa, *The Foreign Tax Credit Limitation Under Section 904*, 6060 Tax Mgmt. (BNA 2016).

O. Lori Hellkamp & Alden Dilanni-Morton, *Demystifying the Saving Clause and Re-Sourcing Rules in Treaties*, Tax Notes Federal, vol. 172, August 16, 2021.

P. Kellar and Browne Jr., 6875-2nd T.M., *U.S. Income Tax Treaties—Benefits Provided by a Country to Its Own Residents and Citizens*.

Q. Excerpts, American Law Institute, The International Aspects of U.S. Income Taxation: Volume Two (Proposals of the American Law Institute on U.S. Income Tax Treaties) (1992).

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbott v. Abbott*, 560 U.S. 1 (2010)............................................................ *passim*

*Adams Challenge v. Commissioner*, 156 T.C. 16 (2021).......................................40n

*Air Canada v. U.S. Dep't of Transp.*, 843 F.2d 1483 (D.C. Cir. 1989)............................ 41-42

*Air France v. Saks*, 470 U.S. 392 (1985)......................................................... 18-19

*Animal Sci. Prods., Inc. v Hebei Welcome Pharm. Co., Ltd.*, 585 U.S. 33 (2018)...............40

*Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150 (1940) ...............................42, 42n

*Baturin v. Commissioner*, 31 F.4th 170 (4th Cir. 2022) ....................................43, 44

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ..........................................................44

*Carey v. United States*, 192 Ct. Cl. 536 (1972) ......................................................9

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001) ........................................44

*Christensen v. United States*, 168 Fed. Cl. 263 (2023),
   *appeal docketed*, No. 24-1284 (Fed. Cir. Dec. 22. 2023)........................................ *passim*

*Clayton v. United States*, 33 Fed. Cl. 628 (1995) .................................................20

*Clear Air Council v, United States Steel Corp.*, 4 F.4th 204 (3d Cir. 2021) ....................32-33

*Eastern Airlines v. Floyd*, 499 U.S. 530 (1991).....................................................42

*El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155 (1999).........................................20

*Eshel v. Commissioner*, 831 F.3d 512 (2016)......................................................37

*Filler v. Commissioner*, 74 T.C. 406 (1980)..................................................9, 17n

*Golan v. Saada*, 596 U.S. 666 (2022)...............................................................18

*Great-West Life Assurance Co. v. United States*, 230 Ct. Cl. 477 (1982)...............................20

*Haver v. Commissioner*, 444 F.3d 656 (D.C. Cir. 2006)........................................31

*Iceland Steamship Co. v. U.S. Dept. of the Army*, 201 F.3d 451 (D.C. Cir. 2000)...... 36-37, 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases (Continuation):**

*Jamieson v. Commissioner*, 584 F.3d 1074 (D.C. Cir. 2009) .................................................48

*Jefferson Branch Bank v. Skelly*, 66 U.S. 436 (1861) ........................................................43n

*Kappus v. Commissioner*, 337 F.3d 1053 (D.C. Cir. 2003) ............................................31, 32

*Kim v. United States*, 664 F. Supp. 3d 1062 (C.D. Cal. 2023) ....................................2, 23, 27

*Kolovrat v Oregon*, 366 U.S. 187 (1961) .......................................................................... 19-20

*Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634 (5th Cir. 1994) ...................... 43-44

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804) ......................................................32n

*National Westminster Bank, PLC v. United States*, 512 F.3d 1347 (Fed. Cir. 2008) .. 37-38, 41

*North West Life Assurance Co. v. Commissioner*, 107 T.C. 363 (1996) ..................................6

*O'Connor v. United States*, 479 U.S. 27 (1986) ............................................................20, 30

*Pekar v. Commissioner*, 113 T.C. 158 (1999) ........................................................... 31n, 47-48

*Philadelphia Energy Sols. Ref. and Mktg., LLC v. United States*,
    159 Fed. Cl. 230 (2022) ................................................................................................ 9-10

*Providence Bank v. Billings*, 29 U.S. 514 (1830) ...............................................................43n

*Schumacher v. United States*, 931 F.2d 650 (10th Cir. 1991) .................................................43

*Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982) .........................3, 19, 27, 36

*Sunoco, Inc. v. United States*, 129 Fed. Cl. 322 (2016) ...........................................................9

*Toulouse v. Commissioner*, 157 T.C. 49 (2021) ....................................................... 2, 22-23, 47

*United States v. McFerrin*, 570 F.3d 672 (5th Cir. 2009) ...............................................10, 43

*United States v. Stuart*, 489 U.S. 353 (1989) ....................................................... 42, 42-43n

*Vento v. Commissioner*, 147 T.C. 198 (2016) ..................................................................9, 11n

*Whitney v. Robertson*, 124 U.S. 190 (1888) .........................................................................32

*Xerox Corp. v. United States*, 41 F.3d 647 (Fed. Cir. 1994) ...........................................19, 37

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes:**

Internal Revenue Code of 1986 (26 U.S.C):

§ 1 ...................................................................................................................20

§ 27 ........................................................................................................... *passim*

§ 871 .............................................................................................................17n

§ 901 .......................................................................................................... *passim*

§ 904 .......................................................................................................... *passim*

§ 911 ............................................................................................................9, 10

§ 954 ......................................................................................................... 10-11

§ 1411 ........................................................................................................ *passim*

§ 3101 ..............................................................................................................8

§ 3301 ..............................................................................................................8

§ 3302 ..............................................................................................................8

§ 6511 .............................................................................................................33

§ 7852 ...........................................................................................................32n

Health Care and Education Reconciliation Act of 2010, P.L. 111-152, § 1402,
124 Stat. 1029, 1060 (2010) .......................................................................13

**Treaties:**

Convention Between the United States of America and Canada with Respect
to Taxes on Income and on Capital," as amended through 2007, Tax Notes
Doc. 2017-84262 ................................................................................... *passim*

United States - Canada Income Tax Convention: Convention signed
September 26, 1980; Protocol 1 signed June 14, 1983; Protocol 2 signed
March 28, 1984; Protocol 3 signed March 15, 1995; Protocol 4 signed July
29, 1997 ....................................................................................................14, 15

Protocol Amending the Convention Between the United States of America
and Canada with Respect to Taxes on Income and on Capital Done at
Washington on 26 September 1980 as Amended by the Protocols Done on
14 June 1983, 28 March 1984, 17 March 1995 and 29 July 1997 (signed
September 21, 2007) ...................................................................................14, 15

# TABLE OF AUTHORITIES

Page(s)

**Treaties (Continuation):**

Convention Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital Gains (signed July 24, 2001 ..................................................................................................22n

**Executive Branch Documents:**

Treasury Regulation (26 C.F.R.) § 1.1411-1(e)........................................................21

Final Regulations, Net Investment Income Tax, 78 Fed. Reg. 72394-01 (Dec. 2, 2013), *as corrected by* 79 Fed. Reg. 18161 (April 21, 2014)..................................26, 27

Treasury Department Technical Explanation of the Convention Between the Government of the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington, D.C. on September 26, 1980, as Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984 .............. *passim*

United States Model Income Tax Convention of June 16, 1981 ............................................16

United States Model Income Tax Convention of September 20, 1996 ..........................16, 18n

United States Model Income Tax Convention of November 15, 2006................ 16, 18n, 25-26

United States Model Income Tax Convention of September 20, 1996: Technical Explanation ........................................................................................16

United States Model Technical Explanation Accompanying the United States Model Income Tax Convention of November 15, 2006............................................16, 18n

Rev. Proc. 2015-40, 2015-35 I.R.B. 236 (Aug. 31, 2015)........................................................7

**Legislative Documents:**

H.R. Rep. No. 108-755 (2004).................................................................................11n

Jt. Comm. on Tax'n, Explanation of Proposed Income Tax Treaty Between the United States and Canada, JCS-48-81 (1981)........................................................15, 34

Jt. Comm. on Tax'n, Gen'l Explanation of the Tax Reform Act of 1986, JCS-10-87 (1987).................................................................................................12

Appx849

# TABLE OF AUTHORITIES

**Page(s)**

**Legislative Documents (Continuation):**

S. Budget Comm., *Tax Expenditures: Compendium of Background Material on Individual Provisions*, S. Prt. 111-58 (Comm. Print 2010) .........................................13

S. Exec. Rep. No. 98-22 (1984) ............................................................14, 15, 36, 46

S. Rep. No. 100-445 (1988) ..................................................................................32n

Tax Treaties, Hearing Before the S. Comm. on Foreign Relations, 97th Cong. (1981) .................................................................................15, 35, 36

**Other Authorities:**

American Law Institute, The International Aspects of U.S. Income Taxation: Volume Two (Proposals of the American Law Institute on U.S. Income Tax Treaties) (1992) ..............................................................................................38

Dirk Suringa, *The Foreign Tax Credit Limitation Under Section 904*, 6060 Tax Mgmt. (BNA 2016). ............................................. 10-11, 11n, 12, 12n

Kellar and Browne Jr., 6875-2nd T.M., *U.S. Income Tax Treaties—Benefits Provided by a Country to Its Own Residents and Citizens* (BNA 2024) ........................36n

Lori Hellkamp & Alden Dilanni-Morton, *Demystifying the Saving Clause and Re-Sourcing Rules in Treaties*, Tax Notes Federal, vol. 172 (August 16, 2021) .................................................................................................36n

OECD Model Tax Convention on Income and Capital (2017) ................................................48

Rebecca M. Kysar, *Interpreting Tax Treaties*, 101 Iowa L. Rev. 1387 (2016)................40, 43

Restatement (Second) of Foreign Relations Law § 147, cmt. b. (1965)...............................42n

Restatement (Third) of Foreign Relations Law § 325 (1987)...........................................42n

Restatement (Fourth) of Foreign Relations Law § 306 (2018)..........................................42n

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————

No. 23-766 T

(Judge Matthew J. Solomson)

PAUL BRUYEA,

Plaintiff,

v.

THE UNITED STATES,

Defendant

———————

**BRIEF OF THE UNITED STATES IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE
TO PLAINTIFFS' PARTIAL SUMMARY JUDGMENT MOTION**

———————

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This is a tax case. Plaintiff Paul Bruyea seeks a refund of $263,523 of "net investment income tax" ("NIIT") paid to the United States in 2015, claiming that he may use foreign tax credits to reduce his liability for that tax. But the Internal Revenue Code ("the Code") does not allow foreign tax credits against the NIIT, because §§ 27 and 901(a) allow foreign tax credits only "against the tax imposed by" Chapter 1, and Congress placed the NIIT in Chapter 2A, a different subdivision of the Code.[1] Plaintiff concedes this, agreeing that because the NIIT "falls outside" Chapter 1, "no credit is allowed under [U.S.] domestic law." (P. Memo. at 11.)

Plaintiff nonetheless contends that a Treaty[2] between the United States and Canada authorizes "a standalone treaty-based foreign tax credit against the NIIT." (*Id.* at 20.) This claim

---

[1] Unless otherwise indicated, all citations are to sections of the Internal Revenue Code of 1986 (the "Code") [26 U.S.C.], in effect during 2015, the tax year at issue.

[2] The treaty at issue is the "Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital," as amended (hereinafter, "the Treaty"). The full text of the Treaty in effect during 2015 is in the Appendix as **Exhibit A**.

is based on two provisions of Article XXIV of the Treaty: paragraph (1), which requires the United States to "allow to a citizen or resident of the United States" as "a credit against the United States tax on income" the "appropriate amount of income tax paid or accrued to Canada"; and paragraph (4), which applies special rules "[w]here a U.S. citizen is a resident of Canada." (**Ex. A** at 29-32.)

However, paragraph (1) allows a foreign tax credit only "[i]n accordance with the provisions and subject to the limitations of the law of the United States." (*Id.* at 30.) As courts have held when interpreting the same language in three other U.S. tax treaties (with France, Italy, and South Korea), "there is no independent, treaty-based credit" against the NIIT under these "express terms," because "[t]here is no Code provision for a foreign tax credit against the net investment income tax." *Toulouse v. Commissioner*, 157 T.C. 49, 58 & 61-62 (2021) (France & Italy); *see also Kim v. United States*, 664 F. Supp. 3d 1062, 1080-86 (C.D. Cal. 2023) (South Korea); *Christensen v. United States*, 168 Fed. Cl. 263, 326-329 (2023) (France), *appeal docketed*, No. 24-1284 (Fed. Cir. Dec. 22. 2023). The Court should reach the same result here.

Plaintiff also misreads paragraph (4). That provision is an integral part of the ordering rules in the Treaty—colloquially referred to as the "three-bite rule"—that coordinate relief from double taxation provided by the two countries to U.S. citizens residing in Canada. As the text and the context of Article XXIV confirm, paragraph (4) modifies the application of paragraph (1) in certain limited circumstances, but it does not operate independently. Nor, as plaintiff asserts, does paragraph (4) provide a foreign tax credit that is exempt from any Code limitations at all, a proposition that would render portions of Article XXIV superfluous. Moreover, as defendant will show, plaintiff's interpretation of paragraph (4) would produce anomalous results and undermine Congressional intent underlying the foreign-tax-credit framework in the Code.

Defendant's interpretations of paragraph (1) and paragraph (4) in this case are not merely litigating positions. They are consistent with longstanding Treasury Department interpretations of those provisions in "technical explanations" submitted to the Senate during the process of ratifying the Treaty and protocols, the first of which was shared with (and approved by) Canada. The technical explanations are significant, because "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982).

Defendant acknowledges the decision in *Christensen v. United States*, 168 Fed. Cl. at 332, that a provision in the U.S.-France treaty that is similar in application to paragraph (4) allowed foreign tax credits to be taken against the NIIT, interpreting the French treaty provision to be "not bound by the restrictions on foreign tax credit availability set forth in the [Code]." Defendant respectfully disagrees with that portion of the *Christensen* opinion, and a Federal Circuit appeal is pending. As the Court has already noted in this case, "Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that Court," and the Court may chart a different course here. Dkt. 12 at 1 (citing *E&I Glob. Energy Servs., Inc. v. United States*, 152 Fed. Cl. 524, 532 n.5 (2021)). Moreover, the tax treaty with Canada differs from the French treaty, as do those treaties' technical explanations and, for that reason, the two treaties must be interpreted independently.

This Brief begins with a statement of the case. The Brief next presents legal background regarding the structure of the Internal Revenue Code, the foreign tax credit and foreign earned income exclusion, the NIIT, and the U.S.-Canada income-tax treaty. The Brief then discusses the legal standard for interpreting tax treaties, before turning to the argument that follows. Finally, the Brief attaches an Appendix of materials on which the government relies.

– 3 –

## STATEMENT OF THE CASE

During 2015, plaintiff Paul Bruyea was a married dual U.S./Canadian citizen who resided in Canada. Dkt. 1, ¶¶ 1, 10. Plaintiff filed an original Form 1040, U.S. Individual Income Tax Return for the 2015 year, as a married taxpayer filing separately. *Id.*, ¶¶ 1, 5; *see* Dkt. 1-3. On his original U.S. income tax return, plaintiff reported the following categories of income (Form 1040, lines 8, 9, 13, 17, 20 & Form 1116, U.S. and Foreign Source Income Summary):

| | |
|---|---|
| Foreign-source passive income — the sum of taxable interest, capital gains/losses, and rental real-estate income | $7,058,223 |
| U.S.-source dividend income | $1,600 |
| U.S.-source social-security income | $20,421 |

Dkt. 1-3 at 1 & 41.[3] Plaintiff excluded $20,421 of U.S. social-security income from his taxable income under Article XVIII(5) of the Treaty. *Id.* at 1 & 3. Plaintiff then made a deduction of $7,550 to reduce his taxable income to $7,052,273. *Id.* at 2 (Form 1040, lines 40 & 43). Based on that taxable income, plaintiff reported a regular U.S. income tax of $1,398,683 and an alternative minimum tax of $10,183. *Id.* at 2 (Form 1040, lines 44 & 45).

Plaintiff applied $1,398,571 of foreign tax credits against his income-tax liabilities under Chapter 1 of the Code. *Id.* at 2 (Form 1040, line 48). Plaintiff computed the allowable foreign tax credits on two separate Forms 1116, one providing for a "passive category income" foreign tax credit of $1,398,571, and the other providing for a "general category income" foreign tax credit of $0. *Id.* at 12-15 (Forms 1116, lines 22). The passive-category foreign tax credit was based on $1,953,513 in tax paid or accrued to Canadian federal and provincial governments, plus $96,443

---

[3] In his opening memorandum, plaintiff erroneously characterizes his 2015 income as arising solely from "the sale of Canadian real property." (*See* P. Memo. at 23, 33.) As his tax return confirms, plaintiff's taxable income included various other items—sourced in both Canada and the United States—including interest, dividends, rental real-estate income, U.S. social-security income, and capital gains/losses from the sale of securities. Dkt. 1-3 at 1 (Form 1040, lines 7, 9b, 13, 17, 20 & Schedules B, D, E).

of unused foreign taxes carried forward from prior years.[4] *Id.* at 12 (Form 1116, lines 8, 10). Plaintiff's passive-category credit was limited to $1,398,571, an amount computed as follows:

$$\text{Regular U.S. income tax liability [\$1,398,683]} \quad X \quad \frac{\text{Net foreign-source taxable income (adjusted to reflect lower rates on capital gains) [\$3,557,663]}}{\text{Total taxable income (adjusted to reflect lower rates on capital gains) [\$3,557,965]}}$$

*Id.* at 13 (Form 1116, lines 15-18). This limitation was applied pursuant to § 904, a Code provision that will be discussed in a later section of this Brief.

Plaintiff's original U.S. income tax return also reported a liability of $263,523 for the NIIT under Chapter 2A. *Id.* at 2 (Form 1040, line 62). That tax, computed on Form 8960 (lines 12-17), was 3.8% of $6,934,823, the sum of plaintiff's U.S.-source passive income and foreign-source passive income in 2015, less $125,000 (a threshold amount based on plaintiff's filing status). *Id.* at 28. Plaintiff did not attempt to apply any foreign tax credits to reduce the liability for the NIIT reported on his original return.

In November of 2016, plaintiff filed a Form 1120X, Amended U.S. Income Tax Return, seeking a refund of $263,523, the entire amount of NIIT plaintiff paid for the 2015 tax year. Complaint, ¶ 12; Dkt. 1-2 at 1. The amended return purported to seek relief "from double taxation that arises from Net Investment Income Tax," referencing "attached form 8833." Dkt. 1-2 at 2. Form 8833, Treaty-Based Return Position Disclosure, claimed "a foreign tax credit of $263,523 for Canadian taxes paid to offset the net investment tax calculated on Canadian

---

[4] Plaintiff's Canadian return for 2015 reported federal and provincial taxes totaling CAD 2,498,098.40, equivalent to $1,953,513 at applicable conversion rates. *See* Dkt. 18-9 at 7 (Income Tax and Benefit Return, line 435); Dkt. 1-3 at 12 (Form 1116, line 8). When plaintiff computed his Canadian tax, he claimed a "[f]ederal foreign tax credit" of CAN 306.89, computed as 15% of his U.S.-source dividend income of CAN 2045.94 ($1600 at applicable conversion rates). Dkt. 18-9 at 13, 40-43 (Form T1-2015, line 405 & Form T-2209).

source income." *Id.* at 5. In the amended return, plaintiff purported to use $263,523 of foreign

tax credits "to offset tax on Form 8960" and purported to eliminate $7,059,823 of net investment

income from Form 8960. *Id.* at 6-8 (handwritten notations).

On July 13, 2018, the IRS recommended disallowance of plaintiff's refund claim, stating

that a "[f]oreign tax credit cannot be claimed to offset the Net Investment Income Tax (NIIT)

calculated on the Taxpayers Canadian source investment income." Dkt. 18-10 at 1, 7. On August

16, 2018, plaintiff submitted a formal protest to IRS Appeals arguing that the U.S.-Canada

income tax treaty authorized plaintiff to claim a foreign tax credit against the NIIT. Dkt. 18-11.

In an undated submission, plaintiff requested competent-authority assistance under the

Mutual Agreement Procedure ("MAP") article of the Treaty. Dkt. 18-7. Article XXVI(1) allows

taxpayers to "present" their "case in writing" to the Canadian or U.S. competent authorities when

they "consider[] that the actions of one or both" countries result "in taxation not in accordance

with the provisions of the Treaty." (**Ex. A** at 34.) Plaintiff's case was accepted into the MAP

process, and the U.S. and Canadian competent authorities tried to reach a resolution through

bilateral negotiations under Article XXVI(2), which provides that the competent authorities shall

endeavor to "resolve the case by mutual agreement  . . . [to address] taxation which is not in

accordance with the Convention." (*Id.*) The MAP proceeding also implicated Article XXVI(3),

which provides that the two competent authorities "shall endeavor to resolve by mutual

agreement any difficulties or doubts arising as to the interpretation or application" of the Treaty,

either in the context of a particular case or as a general matter. (*Id.* at 34-35.)

In response to a request "for an update on the status of negotiations" between the two

competent authorities, Michael Jennings, the Director of the Competent Authority Services

Division of the Canada Revenue Agency, wrote plaintiff's representative on July 10, 2023. Dkt.

18-6. Among other things, the letter stated that "the position of the Canadian competent authority is that . . . the US, as the country which has residual taxation rights, must provide relief in accordance with Article XXIV of the Convention." *Id.* It stated further that "[d]iscussions with the US competent authority . . . are ongoing and our respective positions remain far apart." *Id.*

On September 11, 2023, the IRS formally disallowed plaintiff's administrative claim for refund. Dkt. 18-12. The disallowance letter explained that the U.S. competent authority could no longer consider plaintiff's competent authority request because plaintiff had filed this case. *Id.*; *see also* Rev. Proc. 2015-40, § 6.05(1) ("The U.S. competent authority will not . . . continue to consider a taxpayer's competent authority request regarding . . . any competent authority issue and taxable period that are pending in a U.S. federal court and that were under IRS Appeals jurisdiction with respect to the same taxpayer before the commencement of the litigation.").

## LEGAL BACKGROUND

### A.   The Structure of the Internal Revenue Code of 1986

The Code is divided into "subtitles," which are further divided into "chapters" and "subchapters." The chapters and subchapters then include Code "sections," which contain specific statutory language. For example, during 2015 (the year at issue), Subtitle A of the Code, entitled "Income Taxes," included six chapters numbered 1, 2, 2A, 3, 4, and 6. Chapter 1, entitled "Normal Taxes and Surtaxes," included numerous subchapters which, in turn, included sections 1 through 1400U-3. Chapter 2A, entitled "Unearned Income Medicare Contribution," included only one provision, § 1411, which imposes the tax on net investment income.[5]

The Internal Revenue Code imposes numerous distinct levies, many of which may apply concurrently to a single item of income earned by a taxpayer. For example, a single dollar of

---

[5] Tables of contents for the relevant subtitles and chapters of the 2015 version of the Internal Revenue Code appear in the Appendix as **Exhibit M**.

wages earned by a U.S. individual taxpayer may be subject to the regular income tax (§ 1) (or the alternative minimum tax (§ 55)), the Social Security tax to fund "Old-Age, Survivors, and Disability Insurance" (§ 3101(a)), and the Medicare tax to fund "Hospital Insurance" (§ 3101(b)), among others. A single dollar of investment income earned by a U.S. individual taxpayer may likewise be subject to multiple U.S. levies, such as the regular income tax (§ 1) (or the alternative minimum tax (§ 55)), and the net investment income tax (§ 1411), among others.

There are over a dozen separate chapters in the Code that impose levies on taxpayers. For example, Chapter 1 imposes the regular income tax (§ 1) and alternative minimum tax (§ 55). Chapter 2A imposes the net investment income tax (§ 1411). And Chapters 21 and 23 each impose separate taxes on "wages" (§§ 3101, 3111 & 3301). The tax bases on which the levies are imposed are not always identical. For example, while the regular income tax (§ 1) generally applies to the taxpayer's entire income, the NIIT (§ 1411) applies only to that portion of the Chapter 1 tax base that is "net investment income."

The distinct taxes imposed by separate chapters of the Code allow different deductions against the income included in the tax base and have different provisions for the credits that may be applied against the tax. For example, § 3301 (in Chapter 23) taxes every employer on wages it pays to employees. Section 3302 (also in Chapter 23) generally allows a credit against the tax imposed under § 3301 for amounts contributed to state unemployment compensation funds. That credit is allowed *only* against the § 3301 tax and is not allowed against the regular income tax imposed under § 1. This system of imposing different taxes and allowing different deductions and credits within the enumerated chapters as enacted by Congress is fundamental to the structure of the Internal Revenue Code.

**B.      The Foreign Tax Credit and Foreign Earned Income Exclusion Under the Code**

The United States taxes the worldwide income of its citizens and residents. *Filler v. Commissioner*, 74 T.C. 406, 410 (1980). By taxing worldwide income, "the U.S. tax regime creates a potential for foreign source income of U.S. taxpayers to be taxed by both the United States and the jurisdiction in which it is earned." *Vento v. Commissioner*, 147 T.C. 198, 203 (2016). The Code provides U.S. citizens living abroad with two primary methods of relief from double taxation—an exclusion from U.S. tax of certain foreign earned income (under § 911) and a credit for foreign income taxes paid or accrued (under §§ 901-909).

**The Foreign Earned Income Exclusion**. Section 911(a) allows a "qualified individual" to elect to exclude "foreign earned income" from his or her taxable income in the United States. A qualified individual includes a U.S. citizen who is a "bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year." § 911(d)(1)(A). Foreign earned income is "the amount received by such individual from sources within a foreign country . . . which constitute earned income attributable to services performed by such individual." § 911(b)(1)(A). Such income is exempt from U.S. income tax up to certain statutory limits. §§ 911(b)(2)(D), 911(c)(2). The exclusion's "purpose was to decrease the tax disadvantages of citizens of the United States working abroad," in the hope that "this would increase foreign trade by making living and working conditions abroad more attractive." *Carey v. United States*, 192 Ct. Cl. 536, 542 (1972). In contrast, foreign investment income does not qualify as exempt income.

**The Foreign Tax Credit**. Tax credits, like deductions, are "a matter of legislative grace, and taxpayers bear the burden of showing they are clearly entitled to them." *Sunoco, Inc. v. United States*, 129 Fed. Cl. 322, 331 (2016) (quoting *Schumacher v. United States*, 931 F.2d 650, 652 (10th Cir. 1991)), *aff'd*, 908 F.3d 710 (Fed. Cir. 2018); *Philadelphia Energy Sols. Ref. and*

**Appx859**

*Mktg., LLC v. United States*, 159 Fed. Cl. 230, 236 (2022) (quoting *Schumacher*, 931 F.2d at 652), *aff'd*, 89 F.4th 1364 (Fed. Cir. 2024). They are "narrowly construed." *United States v. McFerrin*, 570 F.3d 672, 675 (5th Cir. 2009).

The Code allows the foreign tax credit as a method of relieving double taxation. Among other things, the Code allows "a citizen of the United States" to credit against "the tax imposed by" Chapter 1 "the amount of any income, war profits, and excess profits taxes paid or accrued" to "any foreign country." §§ 901(a), (b)(1). But the right to use the foreign tax credit is not absolute, and the United States imposes numerous restrictions on the ability of taxpayers to apply foreign tax credits to reduce their income-tax liabilities. The bulk of those restrictions is codified in §§ 901 through 909, interpreted by lengthy Treasury regulations promulgated under those Code sections. The complex and highly articulated foreign-tax-credit system is based on policy judgments made at various times by both Congress and the Treasury Secretary that are incorporated into the statute and regulations.

There are many such restrictions. For example, § 901(j) denies foreign tax credits for taxes paid to certain foreign countries, including countries designated by the State Department as having supported acts of international terrorism. Among other things, §§ 901(k) and (l) deny foreign tax credits for withholding taxes on certain income related to securities or other property held for less than a minimum holding period. And, to deny "double benefits" to taxpayers, § 911(d)(6) bars any foreign tax credit (or deduction) allocable to foreign earned income that the taxpayer elects to exclude from gross income under § 911(a).

Section 904, "Limitation on Credit," is another notable restriction. "In its simplest terms," § 904 "restricts the amount of the U.S. foreign tax credit to the amount of the potential U.S. tax on a taxpayer's foreign source income." Dirk Suringa, *The Foreign Tax Credit Limitation Under*

*Section 904* (**Ex. N**), 6060 Tax Mgmt., at A-1 (BNA 2016).[6] "The purpose of the foreign tax credit limitation is to prevent the foreign tax credit from relieving a taxpayer of U.S. tax that would otherwise be payable against U.S.-source income." *Id.*[7]

For example, assume that a U.S. citizen working in Country A earned $100 of wage income, which is subject to income tax in the United States at an effective rate of 35% and subject to tax by Country A at an effective rate of 40%.

> Were the United States to provide a credit for the entire $40 of Country A tax, the U.S. citizen would be able to offset not only the $35 of U.S. tax on the Country A-source income, but also $5 of other U.S. taxes – including U.S. taxes on U.S. source income. Instead of relieving double taxation, the United States would in effect be ceding its primary taxing right over U.S.-source income to Country A. To prevent that outcome, Congress in 1921 enacted a limitation on the foreign tax credit.

Suringa, 6060 Tax Mgmt., at A-1. In this example, the § 904 "limitation would cap the credit at $35, the amount of the potential U.S. tax on the Country A-source income." *Id.* at A-1, A-2.

While the § 904 limitation may be "straightforward in concept" (*id.* at A-2), it can be complex when applied. One such complexity arises from the statutory requirement that a taxpayer compute the foreign-tax-credit limitation separately for various categories of income, known colloquially as "baskets." There were two such relevant baskets in 2015. One, for "passive category income," included dividends, interest, royalties, rents, annuities, and net gain

---

[6] Tax Management Portfolios are BNA publications, written by practicing tax attorneys and accountants, designed to assist tax practitioners on various subjects. There are more than four hundred such portfolios. This particular portfolio "discusses in general terms the computation of the taxpayer's foreign tax credit limitation," among other things. Dirk Suringa, *The Foreign Tax Credit Limitation Under Section 904*, 6060 Tax Mgmt., at iii (BNA 2016).

[7] *See also Vento*, 147 T.C. at 204-05 ("A taxpayer's overall section 904 limitation for a given year equals the portion of the taxpayer's precredit U.S. tax liability attributable to foreign source income. The limitation prevents taxpayers from using foreign tax credits to reduce their U.S. tax on U.S. source income."); H.R. Rep. No. 108-755 at 381 (2004) (Conf. Rep.) ("The foreign tax credit generally is limited to the U.S. tax liability on a taxpayer's foreign-source income, in order to ensure that the credit serves the purpose of mitigating double taxation of cross-border income without offsetting the U.S. tax on U.S.-source income.").

from certain transactions, among other things. §§ 904(d)(2)(A)(i), 904(d)(2)(B), 954(c). The

other, for "general category income," included all "income other than passive category income."

§ 904(d)(2)(A)(ii).

The segregation of income into baskets is intended to address a problem referred to as

"cross-crediting." "Cross-crediting refers to the practice of averaging high and low rates of

foreign taxes together to bring the overall rate of foreign tax below the U.S. effective tax rate.

This practice erodes the impact of the foreign tax credit limitation, which otherwise might deny a

portion of the credit for the highly taxed income." Suringa, 6060 Tax. Mgmt, at A-1.[8] Congress

feared that the availability of cross-crediting could "allow taxpayers to credit high foreign taxes

paid on one stream of income against the residual U.S. tax otherwise due on other, lightly taxed

foreign income." Jt. Comm. on Tax'n, Gen'l Explanation of the Tax Reform Act of 1986,

JCS-10-87, at 862 (1987).

Where, in a given year, a taxpayer's payment of foreign tax exceeds the amount

allowable under the § 904 limitation, a taxpayer may carry back the excess foreign tax credits

into "the first preceding taxable year" and into "any of the first 10 succeeding taxable years, in

---

[8] The Suringa monograph illustrates the point with an example (6060 Tax Mgmt. at A-2):
> [A]ssume as before that the Country A tax rate is 40% and the taxpayer earns $100 from performing personal services in Country A. The net result is $40 of Country A tax. The foreign tax credit limitation would cap the foreign tax credit at $35. Assume further that the U.S. citizen has a Country A bank account, which generates tax-free interest income of $15 per year. In the absence of a prohibition against cross-crediting, the U.S. citizen could credit the full amount of the Country A tax without paying any additional foreign tax. A simplified foreign tax credit limitation would limit the credit to the potential U.S. tax on the foreign source income, $40.25 ($115 of foreign-source income, multiplied by 35% U.S. tax rate). Because the total Country A tax of $40 is less than the limitation amount of $40.25, the U.S. citizen can credit the entire Country A tax, again without actually paying any more foreign tax. In effect, the U.S. citizen has used the untaxed interest income to average down the foreign effective rate from 40% to 35%.

that order." § 904(c). Excess credits may offset U.S. taxes on foreign-source income only in the basket from which they arise and only to the extent of that basket's § 904 limitation for the year into which the credits are carried.

## C.    The Net Investment Income Tax

Chapter 2A of the Code, entitled "Unearned Income Medicare Contribution," contains only one provision, § 1411, referred to as the "net investment income tax," or "NIIT." When Congress enacted this tax in § 1402 of the "Health Care and Education Reconciliation Act of 2010," it provided specifically for placement of the tax in a "new chapter" 2A of the Code, to be "insert[ed] after chapter 2." P.L. 111-152, 124 Stat. 1029, 1060 (2010). The NIIT "was enacted . . . in order to raise revenue that is intended to offset increased expenditures for expanded health insurance coverage" under the Affordable Care Act. S. Budget Comm., *Tax Expenditures: Compendium of Background Material on Individual Provisions*, S. Prt. 111-58, at 413 (Comm. Print 2010).

Section 1411(a)(1) imposes a 3.8% tax on individuals "in addition to any other tax imposed by [Subtitle A of Title 26, Income Taxes]." The tax is imposed on the lesser of net investment income or the excess, if any, of a taxpayer's modified adjusted gross income over $250,000 for married taxpayers, $125,000 for married taxpayers filing separately, and $200,000 for single taxpayers. §§ 1411(a)(1), (b). Net investment income is defined as gross income from interest, dividends, annuities, royalties, rents, other gross income derived from a passive activity or a trade or business of trading in financial instruments or commodities, and net gain attributable to the disposition of property in such an activity or trade or business, less deductions allowed by Subtitle A that are properly allocable to such gross income or net gain. § 1411(c).

The net investment income tax under Chapter 2A is a separate levy that is "in addition to" the regular income tax imposed under Chapter 1. (*See* P. Memo. at 11.) Each of those two levies

**Appx863**

has its own tax base, and each its own applicable deductions. For certain taxpayers, the NIIT may impose a second levy on investment income that is already subject to the Chapter 1 income tax. However, depending on the circumstances, investment income may be taxed under Chapter 1 but not subject to the NIIT, and investment income sometimes may be subject to the NIIT but be exempt from regular income tax.

**D.    Article XXIV of the U.S.-Canada Income Tax Treaty**

The current income-tax treaty between the United States and Canada is the product of six separate agreements between the countries. The original income-tax convention was signed on September 26, 1980, and was amended shortly thereafter by a protocol signed on June 14, 1983, and a second protocol signed on March 28, 1984. (**Ex. B** at 1.) The convention, as amended by the two protocols, was "similar to other recent U.S. income tax treaties, the proposed 1981 U.S. model income tax treaty, and the model income tax treaty of the Organization of Economic Cooperation and Development." S. Exec. Rep. No. 98-22 (**Ex. F**) at 2 (1984) (parentheticals omitted). Ratification of the convention and protocols was advised by the Senate on June 28, 1984, and they entered into force on August 16, 1984. (**Ex. B** at 1.)

The U.S.-Canada treaty was further amended by three additional protocols, signed March 17, 1995, July 29, 1997, and September 21, 2007, each ratified by the Senate thereafter. (**Ex. B** at 56-85; **Ex. C**.) The full text of the consolidated U.S.-Canada income-tax treaty, as amended, in effect for the year at issue (the "Treaty"), is in this Brief's Appendix as **Exhibit A**.[9]

Article XXIV of the Treaty, entitled "Elimination of Double Taxation," is the provision that plaintiff invokes here. The version in effect during the year at issue includes the language of

---

[9] The Treasury Department publishes the texts of the 1980 income-tax convention and all subsequent protocols, at the following url: https://www.irs.gov/businesses/ international-businesses/france-tax-treaty-documents. (*See* **Exs. B, C**.) Tax Notes publishes a version that consolidates the original convention and all five protocols into a single document. (*See* **Ex. A**.)

Article XXIV of the original convention, as amended by Article XI of the 1983 protocol, Article 12 of the 1995 protocol, and Article 19 of the 2007 protocol. (*See* **Ex. B** at 27-29, 47-48, 66-67; **Ex. C** at 22.) Although the three protocols revised various portions of Article XXIV, the relevant language in paragraphs (1) and (4) is unchanged from the original convention.

When the United States and Canada negotiated the original convention and later protocols, the Treasury Department prepared "technical explanations" of the various agreements. Technical explanations serve as "official guide(s) to the Convention" and "reflect the policies behind particular Convention provisions, as well as understandings reached with respect to the interpretation and application of the Convention." *See, e.g.,* 1984 Tech. Exp. (**Ex. G**) at 1.

The Treasury Department prepared a technical explanation for the original income-tax convention, which "contain[ed] a detailed explanation of how the Treasury view[ed] the foreign tax credit rules in the proposed treaty as working." Jt. Comm. on Tax'n, Explanation of Proposed Income Tax Treaty Between the United States and Canada, JCS-48-81 (**Ex. D**), at 37 (1981). That technical explanation was presented to the Senate Committee on Foreign Relations for a hearing on September 24, 1981. *See* Tax Treaties, Hearing Before the S. Comm. on Foreign Relations, 97th Cong., at 117 (1981) (**Ex. E**). At that time, the "Canadian government ha[d] reviewed the technical explanation and approved it." Jt. Comm. on Tax'n, JCS-48-81, at 37. In 1984, the Treasury Department updated the technical explanation to reflect changes to the original convention made by the 1983 and 1984 protocols. *See* 1984 Tech. Exp. at 1.

**The provisions and limitations of the Internal Revenue Code.** A core principle reflected in Article XXIV(1) is the requirement that credits provided by the United States for foreign taxes be "[i]n accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time, without changing the general

**Appx865**

principle hereof)." As the technical explanation makes clear:

> [T]he credits allowed by paragraph 1 are subject to the limitations of the Code as they may be amended from time to time without changing the general principle of paragraph 1. Thus, as is generally the case under U.S. income tax conventions, provisions such as Code sections 901(c), 904, 905, 907, 908, and 911 apply for purposes of computing the allowable credit under paragraph 1. In addition, *the United States is not required to maintain the overall limitation currently provided by U.S. law*.

1984 Tech. Exp., Art. XXIV (emphasis added). *See also* S. Exec. Rep. No. 98-22 at 40-41 (recognizing that foreign tax credit provided by United States under proposed treaty "is to be computed in accordance with the provisions of and subject to the limitations of U.S. law").

This principle is further reflected in model income-tax treaties published by the United States that impose the same condition. Over the history of the Treaty and its protocols, three U.S. model treaties were released, dated 1981, 1996, and 2006, which informed treaty negotiations between the United States and Canada. Article 23 of the three model treaties incorporates the "provisions" and "limitations" language and therefore imposes the same requirement. *See* 1981 U.S. Model Income Tax Convention (**Ex. H**), Art. 23(1); 1996 U.S. Model Income Tax Convention (**Ex. I**), art 23(1); 2006 U.S. Model Income Tax Convention (**Ex. J**), Art. 23(2). As the Treasury Department explained in model technical explanations to the U.S. model treaties:

> The credit under the Convention is allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained. *Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions, at the time a credit is given, of the U.S. statutory credit.*

Tech. Exp. to 1996 U.S. Model (**Ex. K**), Art. 23, ¶ 1; Tech Exp. to 2006 U.S. Model (**Ex. L**), Art. 23, ¶ 2 (emphasis added).

**The three-bite rule.** A second core principle of Article XXIV is its use of a framework, referred to colloquially as the "three-bite rule," that prioritizes the taxing rights of the two

– 16 –

## Appx866

countries on items of income earned by U.S. citizens who are tax residents of Canada under the Treaty. The three pertinent taxes, or "bites," are: (1) the Treaty-authorized U.S. tax on certain U.S.-source income earned by the Canadian resident;[10] (2) the Canadian tax on income earned by the Canadian resident; and (3) the U.S. tax on worldwide income imposed on the basis of U.S. citizenship that is preserved by the Treaty's saving clause.[11] Under the three-bite rule, the imposition of U.S. tax on certain U.S.-source income (principally investment income) has primacy (the *first* bite), followed by the Canadian income tax on its residents (the *second* bite), and then by the U.S. income tax on its citizens (the *third* bite). Under this framework, when Canada takes the second bite, it provides U.S. citizens with foreign tax credits for the first-bite U.S. tax applied to the U.S.-source income that the United States has the primary right to tax. And, when the United States takes the third bite, it provides its citizens with foreign tax credits for the second-bite income tax imposed by Canada based on Canadian residence (but the U.S. foreign tax credits may not reduce U.S. income tax below the first-bite U.S. tax claimed as a credit against the Canadian second bite).

    The Treaty incorporates the three-bite rule in the following manner:

---

[10] Under § 871(a), the United States imposes a 30% tax against "non-resident alien individuals" who receive certain passive income "from sources within the United States." For dividends earned by Canadian residents, the Treaty limits the tax rate to "5 percent of the gross amount of the dividends" in certain circumstances and "15 percent of the gross amount of the dividends in all other cases." Treaty, Art. X(2)(a). While the tax under § 871(a) applies by its terms only to non-U.S. citizens, non-resident U.S. citizens are still taxed on their U.S.-source passive income, but on a net-income basis rather than as a withholding tax.

[11] The authority of the United States to tax its citizens on their worldwide income is preserved by the Treaty's saving clause. *See* Treaty, Art. XXIX(2)(a) (providing, among other things, that the Treaty "shall not affect the taxation" by the United States of "its citizens."); *Filler*, 74 T.C. at 410 (explaining that the "United States insists on the inclusion of a 'savings clause' in its tax treaties; the effect of this clause is to reserve the right of the United States to tax its citizens and residents on the basis of the provisions of the Internal Revenue Code without regard to the provisions of the treaty"). The saving clause, however, does not affect "the obligations undertaken" by the United States under Article XXIV. *See* Treaty, Art. XXIX(3).

- To implement the second bite, paragraph (4)(a) requires Canada to grant a foreign tax credit for certain "profits, income or gains which arise . . . in the United States," and paragraph (5)(b) requires Canada to grant a foreign tax credit for certain dividends, interest, and royalties that "arise in the United States."

- To implement the third bite for profits, income, or gains, paragraph (4)(b) requires the United States to "allow as a credit against the United States income tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (a)," but clarifies that the credit for Canadian taxes would not affect "that portion of the United States income tax" imposed by the first bite.

- To implement the third bite for dividends, interest, and royalties, paragraph (5)(c) requires the United States to "allow as a credit against the United States income tax the income tax paid or accrued to Canada after the deduction referred to in subparagraph (b)," but clarifies that the credit for Canadian taxes would not affect "that portion of the United States income tax" imposed by the first bite.

- To properly account for the second-bite Canadian income tax when computing the § 904 limitation for the foreign tax credit allowed by the United States against its third bite, paragraph (6) provides a re-sourcing rule, under which "items of income referred to in paragraph 4 or 5 shall . . . be deemed to arise in Canada to the extent necessary to avoid the double taxation of such income under paragraph 4(b) or paragraph 5(c)."

The technical explanation explains the operation of the three-bite rule under these provisions.

*See* 1984 Tech. Exp., art XXIV (discussion of paragraphs (4), (5), (6) & Examples A-D.)[12]

### LEGAL STANDARD GOVERNING INTERPRETATION OF TAX TREATIES

"The interpretation of a treaty, like the interpretation of a statute, begins with its text."

*Golan v. Saada*, 596 U.S. 666, 676 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 10 (2010)). The

inquiry considers both "the text of the treaty and the context in which the written words are

---

[12] The three-bite rule is a common feature of income-tax treaties between the United States and other countries and is therefore included in U.S. model tax treaties. *See* 1996 U.S. Model Income Tax Convention, Art. 23(3); 2006 U.S. Model Income Tax Convention, Art. 23(4). The technical explanation to the 2006 U.S. model convention contains a lengthy explanation of the three-bite rule to "the tax treatment in both States of certain types of income derived from U.S. sources by U.S. citizens who are residents of the other Contracting State." Tech. Exp. to 2006 U.S. Model Convention, at 75-77 (discussion of Art. 23(4)). It also provides two examples that "illustrate the application of paragraph 4 in the case of a U.S.-source portfolio dividend received by a U.S. citizen resident in the other Contracting State." *Id.*

used." *Air France v. Saks*, 470 U.S. 392, 396-97 (1985). "The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *United States v. Stuart*, 489 U.S. 353, 365-66 (1989) (quoting *Sumitomo*, 457 U.S. at 180) (quotation marks omitted).

"However, extrinsic material is often helpful in understanding the treaty and its purposes, thus providing an enlightened framework for reviewing its terms." *Xerox Corp. v. United States*, 41 F.3d 647, 652 (Fed. Cir. 1994). Thus, "[n]ontextual sources," such as "a treaty's ratification history and its subsequent operation," "often assist" courts in "giving effect to the intent of the Treaty parties." *Stuart*, 489 U.S. at 366 (quoting *Sumitomo*, 457 U.S. at 185). Thus, when interpreting a provision in the 1942 income-tax treaty between the United States and Canada, the Supreme Court considered a Report by the Senate Committee on Foreign Relations, Senate floor debate, the President's message accompanying transmittal of the proposed treaty to the Senate, and the President's proclamation at the time the treaty was signed. *Id.* at 366-68. And, notably, when considering the "new United States-Canada Income Tax Convention [that] became effective August 16, 1984"—the *same* treaty at issue here—the Supreme Court examined the "hearing before the Senate Foreign Relations Committee," the "technical explanation of the new convention," and the "ratification debate in the Senate." *Id.* at 368 n.8.

Technical explanations may be particularly instructive, both because they evidence the treaties' ratification histories and because they reflect the views of the Treasury Department—the agency responsible for negotiating and enforcing tax treaties. In that regard, the Supreme Court has held consistently for decades that "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to *great weight*." *Sumitomo*, 457 U.S. at 185-86 (emphasis added). *See also Kolovrat v Oregon*, 366 U.S.

187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight"); *O'Connor v. United States*, 479 U.S. 27, 33 (1986) (holding that "the consistent application of" a treaty "by the Executive Branch" is "a factor" that "alone is entitled to great weight."); *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 168 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."). The "canon of deference" to the executive branch's interpretation of a treaty is "well established." *Abbott*, 560 U.S. at 15. Thus, both this Court and its predecessors have deferred to the Treasury Department's interpretations of tax treaties between the United States and Canada, including interpretations reflected in the treaties' technical explanations. *See Great-West Life Assurance Co. v. United States*, 230 Ct. Cl. 477, 491 (1982) (giving "great weight" to interpretations by the Departments of State and Treasury of the 1942 U.S.-Canada tax treaty); *Clayton v. United States*, 33 Fed. Cl. 628, 654-56 (1995) (consulting Treasury Department technical explanation to interpret the 1980 U.S.-Canada tax treaty).

In the Argument below, the government will show that these interpretive tools support its position that the Treaty does not authorize taxpayers to apply foreign tax credits against the NIIT. Defendant's position is well supported by both the text and the context of the Treaty, by the treaty's ratification history, and by technical explanations published by Treasury, the first of which was reviewed and approved by the Canadian government.

## ARGUMENT

### A.   The Internal Revenue Code Does Not Allow Foreign Tax Credits Against the NIIT.

Chapter 1 imposes the regular income tax on U.S. citizens. § 1. Congress has allowed several credits against the regular income tax in Chapter 1, Subchapter A, Part IV of Subtitle A of the Code, §§ 21-54AA. Relevant here is § 27, which allows a credit for income taxes

"imposed by foreign countries and possessions of the United States" against the "tax imposed by this chapter to the extent provided in section 901." Section 901(a), like § 27, makes clear that the foreign tax credit applies only to "the tax imposed by this chapter." Because §§ 27 and 901(a) provide that foreign tax credits reduce only the taxes imposed by Chapter 1, they cannot be used to offset a tax imposed by another chapter of the Code.

The NIIT is imposed by § 1411, which Congress chose to place not in Chapter 1, "Normal Taxes and Surtaxes," but rather in Chapter 2A, a newly-created chapter entitled "Unearned Income Medicare Contribution." Congress could have placed the NIIT at the very end of Chapter 1 in a new § 1400U-4, but it did not do so. Because the tax imposed by § 1411 on net investment income is not a Chapter 1 tax, the text and structure of the Code make clear that foreign tax credits are not allowed against it.

The governing Treasury Regulation further confirms "that the Code does not provide a foreign tax credit against the section 1411 tax." *Id.* Treas. Reg. § 1.1411-1(e) provides:

> Amounts that may be credited against only the tax imposed by chapter 1 of the Code may not be credited against the section 1411 tax imposed by chapter 2A of the Code unless specifically provided in the Code. For example, the foreign income, war profits, and excess profits taxes that are allowed as a foreign tax credit by section 27(a), section 642(a), and section 901, respectively, are not allowed as a credit against the section 1411 tax.

Thus, as they must, plaintiffs concede that "no credit is allowed under [U.S.] domestic law" here, because the NIIT "falls outside" of Chapter 1 of the Code. (P. Memo. at 11.)

**B.      Article XXIV(1) of the Treaty Does Not Override the Internal Revenue Code to Allow Foreign Tax Credits to Be Applied Against the NIIT.**

**1.      Paragraph (1) allows foreign tax credits only "in accordance with the provisions" and "subject to the limitations of" the Code.**

Plaintiff argues (at 28) that Article XXIV(1) of the Treaty "allows a treaty-based foreign tax credit in this case." Article XXIV(1) of the Treaty states, in part (emphasis added):

> [I]n accordance with the provisions and *subject to the limitations of the law of the United States* (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or a resident of the United States . . . as a credit against the United States income tax on income the appropriate amount of income tax paid or accrued to Canada . . . .

This paragraph provides for relief from double taxation in the form of a foreign tax credit, and the extent of a taxpayer's eligibility for the credit is determined "in accordance with the provisions" and "subject to the limitations of" U.S. domestic law. As discussed, under §§ 27 and 901, Congress allows foreign tax credits only against the taxes imposed under Chapter 1. Congress does not allow foreign tax credits against the tax imposed by Chapter 2A. Thus, to allow a credit against the NIIT would not be "[i]n accordance with the provisions . . . of the law of the United States," and would contravene both the Code and the text of paragraph (1).[13]

Notably, three courts resolving claims based on analogous provisions of other U.S. tax treaties have held that those treaties do not authorize foreign tax credits against the NIIT. While none of these cases is controlling, defendant respectfully suggests that their reasoning is sound, and the Court should follow them here.

In *Toulouse v. Commissioner*, 157 T.C. 49, 51 (2021), the Tax Court held that an individual was "not entitled to a foreign tax credit against the net investment income tax under the treaty provisions on which she relies." The taxpayer argued there that "article 24(2)(a) of the U.S.-France Treaty and article 23(2)(a) of the U.S.-Italy Treaty provide a foreign tax credit

---

[13] Defendant does not disagree with plaintiff's position (at 11-12) that the NIIT is a "covered tax" under Article II(3) of the Treaty. However, the Treaty does not by its terms require the United States to allow foreign tax credits against all covered U.S. taxes, but merely requires the United States to allow foreign tax credits in accordance with the provisions and subject to the limitations of U.S. law. And in the instances where the United States, by treaty, has provided foreign tax credits for foreign levies that would not necessarily be creditable under the Code, it expressed a clear intent to do so. For example, Article 23(4) of the U.S.-U.K. income-tax treaty provides for creditability of the U.K. petroleum revenue tax "notwithstanding subparagraph (a) of paragraph 1."

Appx872

independent of the Code." *Id.* at 57. The Tax Court rejected that argument. Under the "express terms of" article 24(2)(a) of the Treaty, "any allowable foreign tax credit must be determined in accordance with the Code and is limited by the Code's provision of a credit." *Id.* at 58. Thus, the Tax Court held that "there is no independent, treaty-based credit." *Id*. at 61-62.[14]

In *Kim v. United States*, 664 F. Supp. 3d 1062, 1080-86 (C.D. Cal. 2023), the district court held that "the NIIT does not qualify for [a] Foreign Tax Credit" under article 5 of the U.S.-South Korea treaty. That treaty, too, "unambiguously mandates that any allowed foreign tax credit must conform to the statutory foreign-tax-credit framework already in place." *Id.* at 1084. The court held that the decision by Congress "to place the NIIT into a new chapter" of the Code "is consistent" with that treaty's purpose to "limit[]" the "terms" of any foreign tax credit "to those contained within the Code itself." *Id.* at 1085.

Finally, *Christensen*, 168 Fed. Cl. at 329, held that article 24(2)(a) of the U.S.-France treaty "does not provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411."[15] That holding followed from the text of the treaty, which "subjects its allowance

---

[14] In a footnote (at 28 n.12), to support his arguments here plaintiff references critiques of the Tax Court's decision in *Toulouse* by certain commentators. Those "commentators" are private attorneys who generally represent taxpayers in disputes with the United States. It is not uncommon for members of the private tax bar to write articles advocating taxpayer-favorable positions regarding specific cases in an effort to market their services to the public. Such articles should generally be viewed skeptically, even when written with the best of intentions. That is because articles taking pro-taxpayer positions are almost never balanced by articles defending the government, which neither private practitioners nor government attorneys commonly write. And unlike peer-reviewed articles in law journals or formally published treatises, such articles are rarely reviewed rigorously.

[15] *Christensen* addressed claims for foreign tax credits under two subparagraphs of the U.S.-France treaty: article 24(2)(a), which is analogous to paragraph (1) of the Treaty at issue here, and article 24(2)(b), which is similar in application to paragraph (4). *Christensen* held that article 24(2)(a) "does not provide a foreign tax credit against the net investment income tax for the French income tax paid" by the taxpayers there, but also held that article 24(2)(b) "can provide a foreign tax credit against the net investment income tax imposed by I.R.C. § 1411 for the French income tax paid." 168 Fed. Cl. at 333. While the government agrees with the first

of foreign tax credits to the 'provisions' and 'limitations' of the I.R.C. relating to foreign tax credits, including the restrictions of I.R.C. §§ 27 and 901(a) that foreign tax credits apply only against 'the tax imposed by this chapter,' Chapter 1 of the I.R.C." *Id.*

Plaintiff argues that the Court should reach a different result here, based on language in the Treaty's technical explanation referencing certain Code provisions that "apply for purposes of computing the allowable credit under paragraph 1." 1984 Tech. Exp., Art. XXIV. But the technical explanation did not purport to provide an exhaustive list when it identified "provisions *such as* Code sections 901(c), 904, 905, 907, 908, and 911." *Id.* (emphasis added). There are numerous additional Code sections that regulate the boundaries of the foreign-tax-credit framework under U.S. law. Those provisions and limitations include not just §§ 27 and 901, which provide for foreign tax credits only against "the tax imposed by this chapter," but various other Code sections as well. *See, e.g.,* §§ 901(j), 901(k), 901(l).[16]

The fact that certain other provisions of the Treaty, such as Article XXIV(5), may in certain circumstances provide benefits to taxpayers that would not otherwise be allowed by the Code does not mean that the "provisions" and "limitations" language may be read out of paragraph (1). To the extent that plaintiff tries to invoke Article XXIV(1) to support his claim, he is bound by its terms. To be allowed under paragraph (1), "foreign tax credits" must be "'[i]n accordance with' the restrictions of I.R.C. §§ 27 and 901(a) to apply foreign tax credits only against taxes imposed by Chapter 1 of the I.R.C." *Christensen*, 168 Fed. Cl. at 328.

---

portion of *Christensen*, it respectfully disagrees with the second portion of the *Christensen* opinion, and a Federal Circuit appeal is pending.

[16] For example, as discussed above, § 901(j) denies credits for taxes paid to certain foreign countries; and, among other things, §§ 901(k) and (l) deny credits for withholding taxes on certain income related to property held for less than a minimum holding period.

Plaintiff also misinterprets the parenthetical in paragraph (1), which states that the "provisions" and "limitations" of U.S. law "may be amended from time to time without changing the general principle hereof." The parenthetical does not, as plaintiff argues (at 30-31), "ensure[]" that Canadian income taxes "may be credited against" any possible income tax that could conceivably be levied by the United States in the future. Nothing in the Treaty states any such "general principle." By definition, the general principle cannot be broader than the language it follows in paragraph (1), which requires the United States to provide foreign-tax-credit relief in accordance with its own domestic law. Paragraph (1) provides that the provisions and limitations of the Code "may be amended from time to time," and the technical explanation recognizes that the United States need not "maintain the overall limitation . . . provided by U.S. law when the Treaty was enacted." 1984 Tech. Exp., Art. XXIV. Thus, the Treaty affords the United States wide latitude, short of an outright repeal of the foreign-tax-credit framework, to decide the extent to which to allow the credit and any conditions to attach to it. Any credit claimed under the Treaty must comply with these conditions. The parenthetical does not require the United States to grant a foreign tax credit against every new levy Congress may enact.

Plaintiff is also wrong to suggest (at 31) that, "if [d]efendant's position were accepted," then paragraph (1) would have no "independent purpose or effect." As the U.S. model treaties show, the double-taxation provisions in tax treaties between the United States and its treaty partners follow a standard pattern, with one subsection providing for double-taxation relief by the United States and another providing for double-taxation relief by the other country. *See, e.g.*, 2006 Model Income Tax Convention, Art. 23 (**Ex. J**.) The subsection governing double-taxation relief by the United States contains standard language providing that such relief be "[i]n accordance with the provisions and subject to the limitations of the law of the United States . . ."

# Appx875

*Id.*, Art. 23(2). That model language does not necessarily provide U.S. taxpayers with rights beyond those already provided by the Code, but the same or similar language appears as a recitation of the double-taxation relief available under U.S. law, alongside the double-taxation relief provided by the treaty partner (which itself might not necessarily grant any new rights to taxpayers beyond those provided under that country's statutory laws). Article XXIV(1) of the Treaty need not provide rights to taxpayers beyond those in the Code to serve a purpose. Nevertheless, by affirming its foreign-tax-credit obligations in the text of the Treaty, the United States brought those obligations squarely within the scope of the MAP process, affording taxpayers a distinct remedy for foreign-tax-credit disputes through the competent authorities "irrespective of [other] remedies provided by the domestic law" of the United States. Treaty, Art. XXVI(1). Plaintiff himself invoked the MAP process in this very matter.[17]

## 2. The Court should accord deference to the Treasury Department's construction of paragraph (1).

In December of 2013, the Treasury Department published "final regulations under section 1411 of the Internal Revenue Code" to provide "guidance on the general application of the Net Investment Income Tax." Final Regulations, Net Investment Income Tax, 78 Fed. Reg. 72394-01 (Dec. 2, 2013), *as corrected by* 79 Fed. Reg. 18161 (April 21, 2014). Those regulations, issued after notice and comment, included Treas. Reg. § 1.1411-1(e), which provides that "[a]mounts that may be credited against only the tax imposed by chapter 1 of the Code may not be credited against the section 1411 tax imposed by chapter 2A of the Code unless specifically provided in

---

[17] The fact that the parenthetical's specific language differs from the double-taxation provision of a recent tax treaty signed by the United States and Croatia (but not yet ratified by the Senate) does not support plaintiff's interpretation of Article XXIV(1), as he suggests (at 33). The language in tax treaties between the United States and its treaty partners has naturally evolved over time, and the course of that evolution sheds no light on the meaning intended by the parenthetical when the drafters used it over forty years ago.

the Code." The Treasury Department had received comments "asking whether foreign income, war profits, and excess profits taxes ('foreign income taxes') are allowed under sections 27(a) and 901 as a credit against the section 1411 tax," but determined that such tax credits were not available, because the NIIT "is imposed by Chapter 2A of the Code." 78 Fed. Reg. at 72396.

The Treasury Department "also received comments asking whether United States income tax treaties may provide an independent basis to credit foreign income taxes against the section 1411 tax." *Id.* Although the Treasury Department stated that the regulations were not "an appropriate vehicle for guidance with respect to specific treaties," because "[a]n analysis of each treaty would be required," it did publish the following statement that is applicable here:

> If, however, a United States income tax treaty contains language similar to that in paragraph 2 of Article 23 (Relief from Double Taxation) of the 2006 United States Model Income Tax Convention, which refers to the limitations of United States law (which include sections 27(a) and 901), then such treaty would not provide an independent basis for a credit against the section 1411 tax.

*Id.* Article XXIV(1) of the U.S.-Canada Treaty includes such language and, thus, it falls within the scope of the statement. Pursuant to *Sumitomo,* 457 U.S. at 184-85, the Court should give "great weight" to this Treasury Department statement, as it reflects "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement." *See also Kim,* 664 F. Supp. 3d at 1084-85 (holding that Treas. Reg. § 1.1411-1(e) supported the district court's interpretation of the South Korea treaty).

**C.    Article XXIV(4) of the Treaty Does Not Require an Independent Foreign Tax Credit Against the NIIT.**

**1.    The text and the context of Article XXIV make clear that paragraph (4) does not allow an unlimited foreign tax credit for U.S. citizens residing in Canada.**

In paragraph (1) of Article XXIV, the United States agreed to allow a citizen or resident of the United States a credit against U.S. income tax for "the appropriate amount of income tax

paid or accrued to Canada." As shown, paragraph (1) is explicit that any such credit is allowed only "in accordance with the provisions and subject to the limitations of the law of the United States," which means that it cannot be applied against taxes imposed outside of Chapter 1 of Code, such as the NIIT.

Plaintiff argues that paragraph (4) "provides an independent foreign tax credit against the NIIT," "without limitation, . . . for tax paid to Canada by a Canadian resident U.S. citizen." (P. Memo. at 27.) According to plaintiff, paragraph (4) is "separate" from paragraph (1) and, accordingly, the "credit against United States tax" referred to in paragraph (4)(b) is not governed by the "provisions" and "limitations" of United States law as paragraph (1) requires. (*Id.* at 24.)

The flaw in plaintiff's argument is that it reads paragraph (4)(b) in isolation and completely ignores paragraph (6). As defendant will explain, the drafters' inclusion of a special re-sourcing provision in paragraph (6) shows that they understood that the paragraph (1) language restricting the foreign tax credit ("in accordance with the provisions and subject to the limitations of the law of the United States") applied to the credits referenced in paragraph 4(b) as well. As the drafters intended, the restricting language in paragraph (1) establishes the context for "the provisions of paragraphs 4, 5, and 6" to which paragraph (1) cross-refers, including for the "credit against United States tax" in paragraph (4)(b) on which plaintiff's claim is based.

As explained previously, paragraphs (4), (5), and (6) together establish ordering rules (the "three-bite rule") that govern the taxation of an individual who is both a resident of Canada and a U.S. citizen. In that situation, the United States as the source state has limited rights under the Treaty to tax the individual's income, Canada may then tax the individual's worldwide income based on residence, and the United States may further tax the individual's worldwide income based on citizenship (to the extent that such tax exceeds the residence-based tax imposed by

Appx878

Canada). Given the countries' competing rights to tax worldwide income, paragraphs (4) and (5) lay out the order and priority of the taxing rights and double-taxation relief that must be allowed by both countries.[18] These ordering provisions give first priority to the United States' right to tax certain U.S.-source income, and Canada must allow a credit for such U.S. tax against the Canadian income tax that it imposes based on the individual's residence. Treaty, Art. XXIV(4)(a), (5)(b). The United States must then allow a credit for the Canadian income tax paid when it computes the residual U.S. tax imposed on worldwide income based on the individual's U.S. citizenship. Treaty, Art. XXIV(4)(b), (5)(c). It is this latter credit that plaintiff contends is unrestricted by the limitations of the Code.

Paragraph (6), however, goes on to provide the re-sourcing rule critical to the proper interpretation of the credit referenced in paragraph (4)(b). Paragraph (6) says that the individual's U.S.-source income shall, contrary to the Treaty's general sourcing rule in paragraph (3), "be deemed to arise in Canada to the extent necessary to avoid the double taxation of such income under paragraph 4(b) or 5(c)." Treaty, Art. XXIV(6). This language reflects the signatories' understanding that, in order for the credits in paragraph (4)(b) "to avoid the double taxation of income," some portion of the individual's U.S.-source income may need to be "deemed to arise in Canada," *i.e.*, be re-sourced as foreign-source income. Crucially, the only reason this re-sourcing rule would be necessary is if the drafters believed that the credit against U.S. tax referenced in subparagraph (4)(b) was subject to the Code's § 904(a) limitation in the first place. That limitation, like the provisions restricting the application of foreign tax credits only to taxes "imposed by this chapter," §§ 27, 901(a), appears only in the Code and not in the Treaty. Under

---

[18] Paragraph (4) applies to "profits, income, and gains which arise . . . in the United States," and paragraph (5) applies to dividends, interest, and royalties "that arise . . . in the United States." Treaty, Art. XXIV(4), (5).

**Appx879**

that limitation, a foreign tax credit cannot reduce U.S. tax on U.S.-source income because § 904(a) limits the total amount of the credit to U.S. tax that would be imposed on foreign-source income. Consequently, the signatories included a special rule in paragraph (6) to re-source the individual's U.S.-source income as foreign-source income "to the extent necessary" to give effect to the credit against U.S. tax described in paragraph (4)(b). Had the drafters believed, as plaintiff contends, that paragraph (4)(b) provides an independent credit unrestricted by the limitations of the Code, there would have been no reason to include paragraph (6) in the Treaty.

The inclusion of the re-sourcing rule in paragraph (6) shows unmistakably that the contracting parties understood the "provisions" and "limitations" language in paragraph (1) to apply to the credit against U.S. tax referenced in subparagraph (4)(b). The failure of the Treaty to repeat that language in the paragraphs to which paragraph (1) cross-refers is inconsequential when the full context of Article XXIV is considered. *See O'Connor*, 479 U.S. at 30-31 (holding that tax exemption provided by Panama Canal Treaty did not apply to U.S. income tax, despite omission of "in the Republic of Panama" limitation from the applicable provision, where it was clear from the treaty's context that the limitation was intended to apply).

Plaintiff correctly notes (at 26) that *Christensen* reached a contrary interpretation of the similar provisions in the U.S.-France treaty, holding that the credit against United States tax for U.S. citizens residing in France "was distinct from" the treaty's requirement that foreign tax credits be subject to the "provisions" and "limitations" of the Code. *Christensen*, 168 Fed. Cl. at 333. But this aspect of the *Christensen* opinion is incorrect. The opinion acknowledged, but never addressed, the government's argument that interpreting the treaty there to allow an unrestricted foreign tax credit "would render meaningless the resourcing rule in subsection (2)(b)(ii), which is premised on the application of the foreign-tax-credit limitation in I.R.C.

**Appx880**

§ 904." *Id.* at 315. Rather than address the implications of the re-sourcing rule and its relation to the source-based limitation under § 904, the opinion instead said repeatedly that § 904's limitation on foreign tax credits was not relevant to the issues in that case—a significant analytical flaw. *See id.* at 300 n.23, 311.

Nor does *Kappus v. Commissioner*, 337 F.3d 1053 (D.C. Cir. 2003), support plaintiff's interpretation of paragraph (4)(b). *Kappus* was one of many cases addressing the enforceability of former § 59(a)(2), which limited the application of foreign tax credits to ninety percent of the alternative minimum tax. In those cases, the taxpayers argued that the double-taxation articles of the applicable treaties superseded § 59(a) of the Code. *See, e.g., Haver v. Commissioner*, 444 F.3d 656, 657-58 (D.C. Cir. 2006). Courts have held uniformly that the taxpayers could not obtain a credit under the applicable treaties where one was not available under the Code. As the D.C. Circuit explained in a case involving Article 23(1) of the U.S.-Germany tax treaty:

> Article 23(1) conditions the tax credits U.S. citizens receive on "the limitations of the law of the United States (as it may be amended from time to time without changing the general principles hereof)." The Treaty thus contemplates that the tax credit is not unlimited, because it expressly defers to other provisions of U.S. law.

*Haver*, 444 F.3d at 658. Because § 59(a) was a "limitation" imposed on the foreign tax credit by U.S. law, there was no conflict between treaty and statute and thus no treaty-based foreign tax credit against 100% of the alternative minimum tax.[19] *Id.*

In *Kappus*, 337 F.3d at 1056, the D.C. Circuit declined to resolve whether paragraph (4)(b) of the Treaty could be "harmonized" with the foreign-tax-credit limitation under § 59(a).

---

[19] *See also Pekar v. Commissioner*, 113 T.C. 158, 163 (1999) (holding that § 59(a) was consistent with U.S.-U.K. treaty where foreign tax credit under treaty was subject to "limitations provided by U.S. law," and with U.S.-Germany treaty where foreign tax credit "shall be determined . . . in accordance with the provisions and subject to the limitations of the law of the United States").

The D.C. Circuit characterized this as an "exceedingly close" question, which it declined to resolve because § 59(a) was the "last relevant provision" and, therefore, the statute would prevail in case of any conflict with the Treaty. *Id.* The D.C. Circuit's refusal to resolve the parties' disagreement over the proper interpretation of paragraph 4(b) cannot fairly be characterized as an endorsement of any interpretation, let alone the one for which plaintiff advocates.

Here, as well, the enactment of the NIIT after the Treaty was signed in a new Chapter 2A of the Code confirms the intent of Congress to exempt the NIIT from the allowance of a foreign tax credit, which would override any potentially inconsistent relief under the Treaty. The Supreme Court has interpreted the Supremacy Clause to mean that treaties and statutes have equal legal status. If a conflict results between the two, the second-enacted provision takes precedence over the first under a last-in-time rule.[20] *See Whitney v. Robertson*, 124 U.S. 190, 194-95 (1888) (holding that where "a treaty" and "an act of legislation" are "inconsistent, the one last in date will control the other").

Plaintiff tries (at 24) to support his construction of paragraph (4) with the text of paragraph (1), which notes that the avoidance of double taxation under that paragraph is "subject to the provisions of paragraphs 4, 5 and 6." In plaintiff's view, the phrase "subject to" establishes a "hierarchical order," under which the omission of the limiting language of paragraph (4) takes precedence over the inclusion of the language in paragraph (1). (P. Memo. at 24.) But "subject to" does not necessarily create a subordinate relationship. As the Third Circuit recently held, the

---

[20] Citing *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804), and other non-tax cases, plaintiff argues (at 17-19) that a Congressional intention to modify a treaty by statute must be clearly expressed. However, a different standard applies under the Code. Section 7852(d) provides that "[f]or purposes of determining the relationship between a provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being treaty or law." Thus, treaties have no preferential status over *tax* statutes, and there need be no explicit statement of Congressional intent that the Code will prevail in case of conflict with a treaty. *See* S. Rep. No. 100-445 at 325-26 (1988).

phrase may mean either "governed or affected by" or "obedient to," depending on context. *Clear Air Council v, United States Steel Corp.*, 4 F.4th 204, 209 (3d Cir. 2021). As shown, the context of Article XXIV makes quite clear the drafters' understanding that the "provisions" and "limitations" language of paragraph (1) applies to the tax credits in paragraphs (4)(a) and (5)(b).

Defendant does not disagree with the proposition that paragraphs (4), (5), and (6) modify certain aspects of paragraph (1), as they must for the re-sourcing rule to have any effect. Any tax credits allowed by the Treaty on income re-sourced from the United States to Canada would necessarily be unavailable under the Code. But the fact that paragraphs 4(b) and 5(c) provide double-taxation relief to taxpayers that they could not otherwise obtain under the Code—in certain, limited, circumstances—does not mean that those paragraphs provide such relief in *all* circumstances, as plaintiff suggests.[21] Nor does the recognition by § 6511(d)(3)(A) of the existence of treaty-based foreign-tax credits as a general matter mean that this *particular* Treaty provides such credits against the specific tax at issue, here the NIIT.

Finally, plaintiff's interpretation of paragraph 4(b) produces anomalous results that are unprecedented in any other U.S. income tax treaty and that could not have been intended by the contracting parties. For example, under plaintiff's interpretation, a U.S. citizen residing in Canada could theoretically, among other things:

- Claim foreign tax credits against U.S. tax on U.S.-sourced income, despite the clear and longstanding policy behind the foreign-tax-credit limitation under § 904;

- Evade the § 904 limitation by cross-crediting foreign tax on general basket income against U.S. tax on passive basket income; or,

---

[21] The MAP provisions of Article XXVI further support the view that paragraphs 4(b) and 5(c) of Article XXIV were not intended to resolve every instance of double taxation. Indeed, the Treaty expressly allows the competent authorities to consult together "for the elimination of double taxation in cases not provided for in the convention." Treaty, Art. XXVI(3).

**Appx883**

- Obtain a double benefit by claiming credits for foreign taxes paid on income excluded from U.S. tax by the foreign-earned income exclusion, a windfall that would normally be precluded by § 911(d)(6).

To construe paragraph 4(b) to sanction such bold departures from the Code's foreign-tax-credit framework would frustrate the foundation on which the framework was built. Plaintiff's interpretation would also provide U.S. citizens residing in Canada with a far more generous foreign tax credit than would be available to U.S. citizens residing in the United States, who would still be subject to the limitations of the Code under the general restricting language of paragraph (1). Still other issues that are dealt with by the Code would remain unanswered if the credit allowed under paragraph 4(b) were unmoored from the Code, such as the proper method for translating foreign taxes into U.S. dollars that is normally governed by § 986. For that reason, one would certainly expect such a construction of Article XXIV(4)(b) to be referenced in the Treaty's technical explanations. It is not, as the next section will discuss.

### 2. The Treasury Department's technical explanations confirm that the government's position on the effect of paragraph (4)(b) is correct.

As explained, the Treasury Department prepared technical explanations for the Senate prior to the ratification of the original convention and the first two protocols. The technical explanations served as "official guide(s) to the Convention" and "reflect[ed] the policies behind particular Convention provisions, as well as understandings reached with respect to the interpretation and application of the Convention." *See* 1984 Tech. Exp. at 1. The first was "reviewed" and "approved" by "the Canadian government," Jt. Comm. on Tax'n, JCS-48-81, at 3, and subsequent updates to the original technical explanation are consistent with respect to Article XXIV. Thus, the technical explanations are entitled to great weight not only as reflecting the interpretation of the Treaty by the U.S. executive branch, but they also evidence the signatories' *shared* understanding of the meaning of the Treaty at the time it was negotiated.

Here, the technical explanations fully support defendant's interpretation of Article XXIV. First, contrary to plaintiff's claim (at 24) that paragraph (4) is "separate" and "independent from" paragraph (1), the technical explanations make clear that "[t]he rules of paragraph 1 are *modified in certain respects* by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada." 1984 Tech. Exp., Art. XXIV; Tax Treaties, S. Hearing, at 157 (emphasis added). Thus, the special rules in paragraphs (4) and (5) function only as discrete modifications to paragraph (1). They do not purport to replace paragraph (1) in its entirety. That is, the Treaty does not present U.S. citizens resident in Canada a binary choice between paragraph (1) on one hand, and paragraph (4) on the other. Rather, paragraph (1) applies to these taxpayers as modified by paragraph (4).

The technical explanations then explicitly confirm that "the credit against United States tax" under paragraph (4)(b) is "subject to the rules of paragraph 1":

> The second step, as provided in paragraph 4(b), is that the United States allows as a credit against United States tax, *subject to the rules of paragraph 1*, the income tax paid or accrued to Canada after the Canadian credit for U.S. tax provided by paragraph 4(a). The credit so allowed by the United States is not to reduce the portion of the United States tax that is creditable against Canadian tax in accordance with paragraph 4(a).

Tax Treaties, S. Hearing, at 157; 1984 Tech. Exp., Art. XXIV (emphasis added). Accordingly, the "provisions" and "limitations" requirement in paragraph (1) applies expressly to the tax credit provided by paragraph (4)(b).

Finally, the technical explanations discuss the need for the re-sourcing rule in paragraph (6), a provision that would only be necessary to ensure that the paragraph (4)(b) credit would fit within the source-based limitation imposed by § 904(a) of the Code:

> Paragraph 6 is necessary to implement the objectives of paragraphs 4(b) and 5(c). Paragraph 6 provides that where a U.S. citizen is a resident of Canada, items of income referred to in paragraph 4 or 5 are deemed for the purposes of Article XXIV to arise in Canada to the extent necessary to

– 35 –

**Appx885**

avoid double taxation of income by Canada and the United States
consistent with the objectives of paragraphs 4(b) and 5(c). Paragraph 6 can
override the source rules of paragraph 3 to permit a limited resourcing of
income.

Tax Treaties, S. Hearing, at 160; 1984 Tech. Exp., Art. XXIV. Again, the re-sourcing rule in

paragraph (6) would have been unnecessary had the drafters believed that the credit referenced in

paragraph (4)(b) was free from the restrictions of the Code, as plaintiff contends. Treasury's

explanations confirm that the government's textual interpretation of paragraph (4)(b) set forth

above, including the applicability of the general restricting language of paragraph (1), is in fact

how both the United States and Canada understood the agreement when the Treaty was executed.

*See also* S. Exec. Rep. No. 98-22, at 40, 43 (recognizing the "fundamental premise" that a

foreign tax credit may not offset the U.S. tax on U.S source income," and explaining the purpose

of the re-sourcing rule "to give effect to the special rules for U.S. citizens residing in Canada"

when "calculating the overall limitation" under the Code.)[22]

Plaintiff's attempt to minimize the deference due to these materials is unpersuasive.

While executive-branch interpretations of treaties are not necessarily "conclusive," nor entitled

to "blind acceptance," they are given "great weight" nonetheless. *Sumitomo*, 457 U.S. at 185-86;

*North West Life Assurance Co. v. Commissioner*, 107 T.C. 363 (1996). In rare cases, courts

sometimes depart from such interpretations when circumstances require. Still, in the main, courts

will accept the treaty interpretations of the relevant government agencies. *E.g., Iceland*

---

[22] The government is not alone in this view. Tax practitioners and legal commentators
consistently share the same view that income re-sourcing provisions, such as that in paragraph
4(b), are necessary because the foreign tax credits permitted by U.S. tax treaties are subject to
U.S. domestic law requirements that limit the credit to foreign-source income. *See* Lori
Hellkamp & Alden Dilanni-Morton, *Demystifying the Saving Clause and Re-Sourcing Rules in
Treaties*, Tax Notes Federal, vol. 172, August 16, 2021, at 1105, 1107-08 & n.20 (**Ex. O**); Kellar
and Browne Jr., 6875-2nd T.M., *U.S. Income Tax Treaties—Benefits Provided by a Country to
Its Own Residents and Citizens*, ¶¶ III(D)(1), III(D)(6) (**Ex. P**).

**Appx886**

*Steamship Co. v. U.S. Dept. of the Army*, 201 F.3d 451, 460 (D.C. Cir. 2000) (deferring to interpretation of U.S.-Iceland Treaty to Facilitate Defense Relationship in diplomatic note issued by U.S. State Department). The outliers to which plaintiff refers do not change this "well-established canon of deference." *Abbott*, 560 U.S. at 15.

For example, plaintiff's reliance on *Eshel v. Commissioner*, 831 F.3d 512 (2016), is misplaced. There, the D.C. Circuit reversed and remanded a Tax Court interpretation of a totalization agreement between the U.S. and France, because the Tax Court had relied on "nontextual sources" such as "American dictionary definitions," that "did not purport to communicate the countries' official positions or shared expectations," rather than the plain text of the agreement which required interpreting undefined terms under French domestic law. *Id.* at 520, 522. There, as evidence of the views of U.S. government agencies, the Commissioner had presented only "a declaration of an individual in the Social Security Administration and a 1997 letter from the United States embassy, neither of which purport[ed] to offer an authoritative statement of the view of the United States." *Id.* at 520. Here, in contrast, the technical explanations communicate official positions of the United States, and the countries' shared expectations regarding those positions are reflected by Canada's approval of those documents.

*Xerox*, 41 F.3d at 655-56, and *National Westminster Bank, PLC v. United States*, 512 F.3d 1347, 1358 (Fed. Cir. 2008), are likewise distinguishable. In *Xerox*, the Federal Circuit disregarded "a position taken by Treasury" in a technical explanation, where the Senate had criticized that position in an Executive Report. Here, as shown, the Senate documents are fully consistent with the technical explanations and provide further support for the government's interpretation of Article XXIV. In *National Westminster*, the Federal Circuit declined to follow an interpretation first espoused by the Treasury Department nine years after a treaty was signed,

where the interpretation was inconsistent "with the expectations of the United States" when the

treaty had been negotiated. *Id.* at 1359. Here, in contrast, the technical explanations on which

defendant relies not only *predated* the ratification of the Treaty, but also were generally accepted

by the Canadian Department of Finance "as an accurate portrayal of the understandings and

context in which the treaty provisions were negotiated," a procedure outside the norm. *See*

American Law Institute, The International Aspects of U.S. Income Taxation: Volume Two

(Proposals of the American Law Institute on U.S. Income Tax Treaties), at 19 (1992) (**Ex. Q**).

**D.      Plaintiff's Arguments to the Contrary Are Without Merit.**

**1.      The letter purportedly stating the current position of the Canadian competent authority, on which plaintiff relies, does not reflect the signatories' shared understanding of the Treaty nor does it overcome the U.S. executive branch's interpretation, which is consistent with that shared understanding.**

Plaintiff asks the Court to disregard the text and the context of Article XXIV, as well as

the understandings expressed by the signatories during the negotiation and ratification of the

Treaty, based on a single letter from a Canadian official to one of plaintiff's attorneys roughly

six weeks after this case was filed. The letter vaguely states that, on the facts of this case, "the

US, as the country which has residual taxation rights, must provide relief in accordance with

Article XXIV of the Convention." Dkt. 18-6. Rather than endorse plaintiff's reading of Article

XXIV, however, it recognizes that "[r]elief from double taxation [under the Treaty] is granted in

accordance with *domestic laws* and the Convention." *Id.* (emphasis added). With respect to

Canada's position on whether relief under Article XXIV includes a credit against the NIIT,

notwithstanding the provisions and limitations of the Code, it is silent. It states only that

"[d]iscussions with the U.S. competent authority are ongoing . . . and [the Competent

Authorities'] respective positions remain far apart." *Id.* The statements were made against the

backdrop of Canada's prior acceptance of the United States interpretation of Article XXIV in the

technical explanation prepared by the Treasury Department when the treaty was actually negotiated. The letter essentially has *no* value to this Court's interpretive inquiry.

Even if plaintiff's position was supported by such a document, however, it would be entitled to far less weight than he urges. He argues that the Court must give "considerable weight" to "the opinions of our sister signatories" of a treaty, citing *Abbott*, 560 U.S. at 16. There, however, the treaty in question was the Hague Convention on the Civil Appeals of Child Abduction, a *multilateral* convention. In child custody cases, there is a "need for uniform international interpretation," and the opinions of sister signatories have "special force." There, the Supreme Court interpreted the Hague Convention consistent with "an emerging international consensus," one consistent with the negotiating and drafting history of the Convention, as well as the interpretation of the Convention by the U.S. executive branch. Moreover, the "opinions" of sister signatories referenced by the Supreme Court in *Abbott* were opinions by foreign *courts*, not foreign executives. Here, in contrast, the Treaty is a *bilateral* document between the United States and Canada alone and, thus, there are not multiple "sister signatories," nor any relevant international consensus. Here, if a Canadian official's letter truly reflected plaintiff's position, then the Canadian and U.S. interpretations would not align. And, here, that interpretation would not be rendered by a court and would be inconsistent with the negotiating and drafting history of the Treaty, as reflected in contemporaneous technical explanations that Canada approved. *Abbott* in no way requires this Court to give the letter any weight.

Additionally, plaintiff places no boundary on the "considerable weight" he claims the Court must afford Canada's interpretation. Plaintiff contends that deference can be given to the United States' interpretation only if it aligns with Canada's view. If adopted, plaintiff's construction would mean that U.S. courts must yield to the views of the U.S. treaty partner in

every case where the treaty partner and United States disagree. That cannot be the proper method to interpret treaties, especially when U.S. taxation is at issue. Indeed, U.S. courts need not take "a foreign state's views" at face value, and need not afford such deference to a foreign government's interpretation of its own laws. *Animal Science Prods., Inc. v Hebei Welcome Pharm. Co., Ltd.*, 585 U.S. 33, 43 (2018). "[T]he appropriate weight in each case will depend on the circumstances," and courts are "neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials." *Id.* Where, as here, the "foreign government makes conflicting statements," or "offers an account in the context of litigation," there "may be cause for caution in evaluating the foreign government's submission." *Id.*

It is important to note that the Treaty expressly recognizes that the United States and Canada may interpret its terms differently when applying it to their own taxes. The Treaty specifically provides in Article III(2) that, when the United States administers the Treaty with respect to its own taxpayers, it may apply to the Treaty's undefined terms "the meaning which [they] have under [its] law concerning the taxes to which the Convention applies." (**Ex. A** at 4.) The technical explanations explain that, in that circumstance, "the domestic tax law of the Contracting State applying the convention shall control" and, consequently, there could be "conflicting meanings." *See* 1984 Tech. Exp., art III(2). When U.S. tax is at issue, the opinion of the United States has primacy, even if that opinion may not be "shared" by Canada.[23]

It is not uncommon for tax treaties to "leav[e] terms vague" or "provide definitions that themselves employ undefined terms," and thereby invoke domestic law concepts. *See* Rebecca M. Kysar, *Interpreting Tax Treaties*, 101 Iowa L. Rev. 1387, 1412 (2016). When that occurs, the

---

[23] *See Adams Challenge v. Commissioner*, 156 T.C. 16, 58 (2021) ("[S]ince we are applying the Treaty to determine whether U.S. tax applies, we must ascertain the meaning that those terms have under U.S. law, particularly under U.S. tax law.").

treaty partners may either apply their own, conflicting definitions of a treaty's undefined terms or they may, under Article III(2), commence "competent authority procedures to attempt to avoid double taxation." *Id.* at 1413; *see, e.g.,* Treaty, Art. III(2). Such competent-authority procedures (which plaintiffs chose to pursue here but then abandoned) provide a means for the United States and Canada to resolve any disagreements regarding the effect (if any) of Article XXIV on the NIIT, in lieu of any judicial involvement in the interpretive dispute.

*National Westminster Bank* provides no support for plaintiff's reliance on the Canadian letter here. There, the U.S. executive branch asserted that a regulation interpreting a Code provision was consistent with its tax treaty with the United Kingdom. The regulation was arguably inconsistent with positions taken by both the U.S. and the U.K. when the treaty was negotiated and ratified, five years prior. 512 F.3d at 1359. There, because the U.S. opinion diverged from the treaty's ratification history, the Federal Circuit held that the interpretation was entitled to less deference, and the Federal Circuit followed the U.K. interpretation instead. But, here, the *opposite* occurred. Years after the Treaty was negotiated, a Canadian official now purportedly expresses a view that diverges from interpretations Canada accepted years before when the treaty was negotiated and, thus, it the Canadian official's purported position that is inconsistent with the signatories' shared understanding.

In *Iceland Steamship*, 201 F.3d at 456-57, the U.S. State Department exchanged diplomatic notes regarding the interpretation of a treaty where Iceland disagreed with the United States. Despite the signatories' disagreement, and the fact that courts may give "'somewhat less deference' where an agency and another country disagree on the meaning of a treaty," the D.C. Circuit nonetheless "defer[red] to the position of the U.S. Diplomatic Note." *Id.* at 458, 460. Similarly, *Air Canada v. U.S. Department of Transportation*, 843 F.2d 1483, 1487 (D.C. Cir.

Appx891

1989), deferred to the U.S. executive branch interpretation of a memorandum of understanding between the United States and Canada, despite Canada's disagreement. There, again, even though the disagreement entitled the U.S. interpretation to "somewhat less deference," it was entitled both to "wide latitude" and deference as a "reasonable interpretation." *Id.*

### 2. The Court need not adopt plaintiff's interpretation even if the Court were obliged to interpret the Treaty liberally (it is not).

Plaintiff asks the Court (at 15) to adopt his interpretation of Article XXIV because, he says, treaties must be construed liberally. While a liberal-construction canon has been applied as a historical matter in certain treaty-interpretation cases, *e.g., Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150 (1940), the canon is now used only intermittently, and it has limited, if any, vitality in modern tax cases.

The Supreme Court has referenced a liberal-interpretation canon in the majority only twice in the last forty years.[24] One case, *Eastern Airlines v. Floyd*, 499 U.S. 530, 535 (1991), did not require the broad construction of a treaty, but held merely that a treaty is "construed more liberally than private agreements," and courts may therefore "look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." The other, *United States v. Stuart*, 489 U.S. at 368 (quoting *Bacardi*, 311 U.S. at 163), did suggest that a treaty "generally" should be "[c]onstrued . . . liberally to give effect to the purpose which animates it," but that case did not involve a substantive question of tax law, a context in which a liberal-interpretation rule should be disfavored.[25]

---

[24] The restatements of foreign relations law have gone from criticizing the canon to omitting it altogether. *Compare* Restatement (Second) of Foreign Relations Law § 147, cmt. b. (1965) *with* Restatement (Third) of Foreign Relations Law § 325 (1987) and Restatement (Fourth) of Foreign Relations Law § 306 (2018).

[25] *Stuart* cited for that proposition a non-tax case involving a treaty among nine American Nation States regarding the protection of foreign trademarks. *See Bacardi*, 311 U.S. at 163.

The United States has the sovereign power to tax its own citizens in the manner authorized by Congress.[26] While the United States may cede that power to tax by treaty, any relinquishment of that sovereign right must be clearly expressed and may not be inferred from ambiguous text.[27] For that reason, a liberal presumption" in the "tax context" is "at odds with the notion of sovereignty," as one commentator has argued. *See* Kysar*, 101 Iowa L. Rev. at 1441. "Given the tie between taxation and the fisc, the relinquishing of taxing jurisdiction is not something that a sovereign would likely do implicitly or lightly." *Id.* Moreover, to apply a liberal-construction canon to substantive questions of tax law would run counter to a different interpretive rule, under which tax credits and exemptions are narrowly construed in favor of the government. *Schumacher*, 931 F.2d at 652; *McFerrin*, 570 F.3d at 675.

In the current legal landscape, the circuits have taken divergent approaches to the application of a liberal-construction rule in a treaty-interpretation case. For example, in *Baturin v. Commissioner*, 31 F.4th 170, 176 (4th Cir. 2022), the Fourth Circuit acknowledged the existence of a liberal-construction canon, but declined to apply it where it would "create unintended benefits," "effectively rewrite" the legislative history, or "ignore the actual intent" of the treaty. The Fifth Circuit took a different approach in *Kreimerman v. Casa Veerkamp, S.A. de*

---

*Stuart* involved the construction of the mutual assistance provisions of the Treaty, in the context of enforcement of summonses issued by the IRS to obtain information requested by Canadian taxing authorities for determining Canadian citizens' tax liabilities. 489 U.S. at 355-56. It did not involve issues of substantive tax law or affect the sovereign power of the United States to tax its own citizens.

[26] "The power of taxation is 'an incident of sovereignty;' and the government in whom it resides is alone competent, within its own jurisdiction, to judge and determine how, in what manner, and upon what objects that power shall be exercised." *Providence Bank v. Billings*, 29 U.S. 514, 544 (1830) (quoting *M'Culloch v. State of Maryland*, 17 U.S. 316, 429 (1819)).

[27] *See Jefferson Branch Bank v. Skelly*, 66 U.S. 436, 446 (1861) ("[N]either the right of taxation, nor any other power of sovereignty, will be held . . . to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken.") (quoted by *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1355 (Fed. Cir. 2001)).

*C.V.*, 22 F.3d 634, 638-39 (5th Cir. 1994), holding that a liberal-construction rule "does not mean" that "treaty provisions are construed broadly," but "merely reflects" the "willingness of courts" to go "beyond the words of the treaty" and consider extrinsic materials. The Fifth Circuit suggested "that treaty provisions should be construed narrowly rather than broadly," because "treaties establish restrictions or limitations on the exercise of sovereign rights" and ambiguities should be "interpreted to derogate minimally from the sovereign power of the State." *Id.*

Whatever its current scope, a liberal-construction rule is merely a substantive canon of interpretation—*i.e.*, a "rule[] of construction that advance[s] values external to a" text. *Biden v. Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J. concurring) (citing Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B. U. L. Rev. 109, 117 (2010)). Such canons are "not mandatory rules," and "are often countered" by "some maxim pointing in a different direction." *Chickasaw Nation v. United States*, 534 U.S. 84, 94-95 (2001) (citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001)). Here, for example, a liberal-interpretation canon runs counter to the rule requiring tax credits to be clearly expressed and, to apply both would require the Court to make an "assessment about the two canons' relative strength." *See id.* (declining to apply a canon requiring a statute to be interpreted "liberally in favor of" Native tribes, where it conflicted with the canon requiring strict construction of tax exemptions).

The Court need not weigh into this debate to resolve this particular case. As defendant has shown, the Treaty's text and its context, ratification history, and technical explanations unequivocally support the government's interpretation of Article XXIV. As in *Baturin*, 31 F.4th at 176, plaintiff's position here would effectively rewrite the ratification history of the Treaty and create unintended tax benefits, an obviously improper application of any liberal-treatment rule.

Appx894

**E.    To Interpret the Treaty as Creating an Independent Credit Against the NIIT Would Require New, Complex Ordering Rules to Preclude Duplicative Credits.**

As previously explained, the statutory and regulatory framework for computing and applying foreign tax credits under the Code is highly articulated. When Congress and the Treasury Secretary crafted that framework, they contemplated the application of foreign tax credits against income taxes under Chapter 1, but not against taxes imposed elsewhere in the Code. If the Court were to hold here that, independent of the Code, the Treaty itself allows taxpayers to apply foreign tax credits against the NIIT, a method of computing and applying that non-statutory credit would need to be developed, because there is no statute or regulation in effect that governs such a computation.

To the extent that a treaty-based foreign tax credit would be based on Article XXIV(1), plaintiff apparently concedes (at 30) that the § 904 limitation would apply. But, as plaintiff made no discernable attempt to apply the § 904 limitation when he claimed a foreign tax credit against the NIIT on his amended return, it is unclear precisely how plaintiff contends the limitation should be computed and coordinated with the Code-based foreign-tax-credit rules. Would taxpayers compute the foreign-tax-credit limitations for Chapter 1 income taxes and the NIIT separately, or would taxpayers prepare a single, combined computation for both?  If the § 904 limitation was applied to the NIIT separately, what quotient would be used to compute the amount of credit allowed against the NIIT? Would the numerator be the taxpayer's total foreign-source investment income, foreign-source modified adjusted investment income (under § 1411(d)), or something else? How would the denominator be computed? Neither the Code nor the Treaty provides any answers.

The foregoing discussion identifies just some of the many issues that would need to be resolved to craft a method of computing a Treaty-based foreign tax credit against the NIIT. To

– 45 –

**Appx895**

implement a Treaty-based allowance of foreign tax credits against the NIIT would require the creation of a brand new, parallel, foreign-tax credit regime not contemplated by the Code, to include new methods of calculating tax-credit limitations, as well as new carryover and loss-allocation and recapture rules, and then the coordination of the new, parallel, regime with the credits already allowed under the Code to prevent duplication. As just one example, because excess credits may be carried over to reduce the regular income tax in a different year, allowing a Treaty-based credit against the NIIT for the same foreign tax could result in duplicate credits for a single tax, beyond what might be needed to eliminate any perceived double taxation. To remedy such mischief would require a complex set of limiting rules not found in either the Code or the Treaty to prevent taxpayers from claiming a second credit against their Chapter 1, U.S. tax liability for the same dollar of foreign tax paid and applied to offset the NIIT. The absence of any such methodology in the Code suggests strongly that Congress did not contemplate the application of foreign tax credits against the NIIT.

**F. The Court May Not Broaden the Terms of the Treaty to Reduce Double Taxation, as Plaintiff Proposes.**

Plaintiff argues that a purpose of the Treaty is to "avoid double taxation," that he has been "subject[ed] to the exact type of double taxation . . . that the Canada Treaty was put in place to prevent," and that the "Treaty should be read in a way to excise that evil." (P. Memo. at 13, 16, 33.) While *one* of the Treaty's purposes is "to reduce or eliminate double taxation of income earned by residents of either country from sources within the other country," S. Exec. Rep. No. 98-22, at 2, it is not the only purpose. The Treaty is also intended "to prevent avoidance or evasion of the taxes of the two countries" and to "enable the countries to cooperate in preventing avoidance and evasion of taxes," among other things. *Id.* Those policies can work at cross purposes, and none is absolute. Therefore, simply observing those purposes is not instructive on

– 46 –

Appx896

how or to what extent the Treaty and the Code implement them. Further, those general policies do not override the specific Treaty language that the negotiators drafted and the Senate ratified.

Plaintiff is wrong to suggest that the Court must interpret the Treaty to add an entirely new foreign tax credit to achieve a general purpose of relieving double taxation. While the Treaty may aim to reduce, or even eliminate where appropriate, double taxation of citizens and residents of the United States and Canada nothing suggests that the two countries expected or even intended the provisions of Article XXIV to tailor the reduction or elimination of double taxation to any individual case.[28] To the extent that double-taxation relief is targeted through Article XXIV of the Treaty (rather than through the allocation of taxing rights), the Treaty is explicit that double-taxation relief has meaningful limits. This Treaty, like any other, must be applied according to its terms; if a treaty's operative provisions provide no specific relief for a particular instance of double taxation, courts may not override the treaty to effect a more absolute conception of that goal than the treaty negotiators themselves intended and drafted. A "general purpose" of a treaty may be "to reduce double taxation," but "the specific provisions of [the] treaty must be applied as written." *Toulouse*, 157 T.C. at 60.

Notably, many cases have held that treaties are not required to relieve all instances of double taxation. As discussed above, when § 59(a)(2) of the Code limited the application of foreign tax credits to ninety percent of the alternative minimum tax, the courts upheld that limitation, notwithstanding broad tax-treaty purposes to reduce double taxation. *See, e.g., Pekar*, 113 T.C. at 162 (acknowledging a treaty's general prohibition of double taxation but applying

---

[28] As stated, the provisions of Article XXVI allow taxpayers to present their cases to the United States and Canadian competent authorities if they believe they have been subject to taxation not in accordance with the Treaty, including claims of double taxation. Plaintiff invoked this MAP process and, until plaintiff filed this suit, the competent authorities endeavored to reach a bilateral resolution.

– 47 –

**Appx897**

"limits of law" under treaty's terms). There, the courts applied the specific provisions of the treaties as written, notwithstanding the treaties' general purposes to reduce double taxation. For example, in *Jamieson v. Commissioner*, 584 F.3d 1074 (D.C. Cir. 2009), the taxpayer argued that the foreign-tax-credit limitation in § 59(a)(2) of the Code was inconsistent with its claim of a general prohibition on double taxation under the treaty. The Court rejected that argument as "implausible." *Id.* at 1075.

Moreover, the imposition here of a net investment income tax by the United States and a regular income tax by Canada on the same dollar of earnings does not appear even to constitute "double taxation" in the traditional sense. "International juridical double taxation can generally be defined as the imposition of comparable taxes in two (or more) States on the same taxpayer in respect of the same subject matter and for identical periods." OECD Model Tax Convention on Income and Capital, Introduction, ¶ 1 (2017). While the Canadian income tax and the U.S. regular income tax may constitute "comparable taxes" whose dual imposition might properly be considered "double taxation," the United States NIIT and the Canadian income tax are not "comparable taxes" in that systemic sense. The NIIT applies to a far narrower tax base than do regular Canadian income taxes, and the rate of the NIIT is far lower as well.

Further, double taxation does not necessarily result from the disallowance of foreign tax credits against the tax imposed by § 1411. The Code's remedy for double taxation includes generous foreign-tax-credit carryover and carryback rules that permit excess credits to be carried over and used to reduce regular U.S. income tax in eleven additional tax years. To the extent that foreign income tax on the investment income were to exceed the Chapter 1 income tax on the same income, the excess credits would be eligible under § 904(c) to be carried back one year and

**Appx898**

forward ten years to reduce Chapter 1 taxes on other income in the carryover years. The generous foreign-tax-credit carryover rules provide a remedy for any potential double taxation.

It bears noting that here, even without a Treaty-based credit against the NIIT, plaintiff received substantial relief from double taxation. Although plaintiff earned worldwide income totaling $7,080,244 (Form 1040, the sum of lines 8a through 20a) in 2015, his original return reported total U.S. income-tax liabilities of only $273,818 (Form 1040, line 63), less than 4% of his total worldwide earnings. *See* Dkt. 1-3 at 1-2. Plaintiff was allowed: (1) a Treaty-based exclusion of U.S.-source social-security benefits from his United States taxable income (Form 1040, line 20a & Form 8833); and (2) a passive-basket foreign-tax credit of $1,398,571 based on foreign taxes paid in 2015, as well as foreign taxes carried forward from prior years (Form 1116, passive basket, line 22). *See id.* at 3, 12-13, 42-43. This confirms that the U.S. statutory foreign-tax-credit provisions referenced in article XXIV are, by any reasonable measure, consistent with an objective of reducing or eliminating double taxation.

Here, plaintiff is not asking the Court to put him in a position equivalent to that of U.S. taxpayers who do not live abroad, but rather is asking the Court to provide him with a distinct tax advantage that results from his Canadian residency. All U.S. taxpayers are subject to multiple distinct levies under the Code, and U.S. taxpayers with no foreign ties are potentially subject to *both* the regular U.S. income tax *and* the U.S. net investment income tax on the same dollar of investment income. Under the government's position in this case, a U.S. citizen residing in Canada could also be subject to two levies on the same dollar of investment income—both a regular Canadian income tax (instead of a regular U.S. income tax, offset by foreign tax credits) and a U.S. net investment income tax. U.S. taxpayers residing in the United States and U.S. citizens residing in Canada are generally treated equally under the government's position, while

**Appx899**

plaintiff's interpretation would advantage the taxpayer with Canadian ties over the purely local U.S. taxpayer. Multiple independent levies on the same item of income are a part of the tax system in the United States, a feature that Article XXIV of the Treaty does not purport to change.

## CONCLUSION

For the reasons explained above, the United States respectfully asks the Court to grant its cross-motion for summary judgment, and deny plaintiffs' motion for partial summary judgment, on the ground that neither the Code nor Article XXIV of the Treaty allows plaintiff to apply foreign tax credits to his liabilities for the NIIT. If the Court were to disagree, additional proceedings would be necessary, because the parties have reserved questions regarding the computation of a foreign tax credit until after the Court has resolved the parties' dispute regarding the availability of a foreign tax credit in any amount.

Respectfully submitted,

March 29, 2024

s/Jason Bergmann
JASON BERGMANN
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Washington, D.C. 20044
202-616-3425 (v)
202-514-9440 (f)
jason.bergmann@usdoj.gov

DAVID A. HUBBERT
 Deputy Assistant Attorney General
DAVID I. PINCUS
 Chief, Court of Federal Claims Section
MARY M. ABATE
 Assistant Chief

March 29, 2024

  s/Mary M. Abate
 Of Counsel

Attorneys for Defendant

– 50 –

Appx900

**PROTOCOL**
**AMENDING THE CONVENTION BETWEEN**
**THE UNITED STATES OF AMERICA AND CANADA**
**WITH RESPECT TO TAXES ON INCOME AND ON CAPITAL**
**DONE AT WASHINGTON ON 26 SEPTEMBER 1980**
**AS AMENDED BY THE PROTOCOLS DONE ON 14 JUNE 1983,**
**28 MARCH 1984, 17 MARCH 1995 AND 29 JULY 1997**

The United States of America and Canada, hereinafter referred to as the "Contracting States",

DESIRING to conclude a Protocol amending the Convention between the United States of America and Canada with Respect to Taxes on Income and on Capital done at Washington on 26 September 1980, as amended by the Protocols done on 14 June 1983, 28 March 1984, 17 March 1995 and 29 July 1997 (hereinafter referred to as the "Convention"),

HAVE AGREED as follows:

## Article 1

Paragraph 1 of Article III (General Definitions) of the Convention shall be amended by deleting the word "and" at the end of subparagraph (i), by replacing the period at the end of subparagraph (j) with "; and", and by adding the following subparagraph:

(k)     The term "national" of a Contracting State means:

(i)     Any individual possessing the citizenship or nationality of that State; and

(ii)     Any legal person, partnership or association deriving its status as such from the laws in force in that State.

## Article 2

1.     Paragraph 3 of Article IV (Residence) of the Convention shall be deleted and replaced by the following:

3.     Where by reason of the provisions of paragraph 1, a company is a resident of both Contracting States, then

(a)     If it is created under the laws in force in a Contracting State, but not under the laws in force in the other Contracting State, it shall be deemed to be a resident only of the first-mentioned State; and

(b)     In any other case, the competent authorities of the Contracting States shall endeavor to settle the question of residency by mutual agreement and determine the mode of application of this Convention to the company.  In the absence of such agreement, the company shall not be considered a resident of either Contracting State for purposes of claiming any benefits under this Convention.

2.     Article IV (Residence) of the Convention shall be amended by adding the following after paragraph 5:

6.      An amount of income, profit or gain shall be considered to be derived by a person who is a resident of a Contracting State where:

(a)      The person is considered under the taxation law of that State to have derived the amount through an entity (other than an entity that is a resident of the other Contracting State); and

(b)      By reason of the entity being treated as fiscally transparent under the laws of the first-mentioned State, the treatment of the amount under the taxation law of that State is the same as its treatment would be if that amount had been derived directly by that person.

7.      An amount of income, profit or gain shall be considered not to be paid to or derived by a person who is a resident of a Contracting State where:

(a)      The person is considered under the taxation law of the other Contracting State to have derived the amount through an entity that is not a resident of the first-mentioned State, but by reason of the entity not being treated as fiscally transparent under the laws of that State, the treatment of the amount under the taxation law of that State is not the same as its treatment would be if that amount had been derived directly by that person; or

(b)      The person is considered under the taxation law of the other Contracting State to have received the amount from an entity that is a resident of that other State, but by reason of the entity being treated as fiscally transparent under the laws of the first-mentioned State, the treatment of the amount under the taxation law of that State is not the same as its treatment would be if that entity were not treated as fiscally transparent under the laws of that State.

**Article 3**

1.    The first sentence of paragraph 6 of Article V (Permanent Establishment) of the Convention shall be amended by deleting the word "and" preceding the first reference to paragraph 5, inserting a comma, and adding the words "and 9," following that reference to paragraph 5.

2.    Paragraph 9 of Article V (Permanent Establishment) of the Convention shall be deleted and replaced by the following two paragraphs:

9.    Subject to paragraph 3, where an enterprise of a Contracting State provides services in the other Contracting State, if that enterprise is found not to have a permanent establishment in that other State by virtue of the preceding paragraphs of this Article, that enterprise shall be deemed to provide those services through a permanent establishment in that other State if and only if:

(a)    Those services are performed in that other State by an individual who is present in that other State for a period or periods aggregating 183 days or more in any twelve-month period, and, during that period or periods, more than 50 percent of the gross active business revenues of the enterprise consists of income derived from the services performed in that other State by that individual; or

(b)    The services are provided in that other State for an aggregate of 183 days or more in any twelve-month period with respect to the same or connected project for customers who are either residents of that other State or who maintain a permanent establishment in that other State and the services are provided in respect of that permanent establishment.

10.    For the purposes of this Convention, the provisions of this Article shall be applied in determining whether any person has a permanent establishment in any State.

**Article 4**

Paragraph 2 of Article VII (Business Profits) of the Convention shall be deleted and replaced by the following:

> 2.      Subject to the provisions of paragraph 3, where a resident of a Contracting State carries on, or has carried on, business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the business profits which it might be expected to make if it were a distinct and separate person engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the resident and with any other person related to the resident (within the meaning of paragraph 2 of Article IX (Related Persons)).

**Article 5**

1.      Subparagraph 2(a) of Article X (Dividends) of the Convention shall be deleted and replaced by the following:

> (a)      5 percent of the gross amount of the dividends if the beneficial owner is a company which owns at least 10 percent of the voting stock of the company paying the dividends (for this purpose, a company that is a resident of a Contracting State shall be considered to own the voting stock owned by an entity that is considered fiscally transparent under the laws of that State and that is not a resident of the Contracting State of which the company paying the dividends is a resident, in proportion to the company's ownership interest in that entity);

2.      Paragraph 3 of Article X (Dividends) of the Convention shall be deleted and replaced by the following:

3.      For the purposes of this Article, the term "dividends" means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subjected to the same taxation treatment as income from shares under the laws of the State of which the payer is a resident.

3.      Paragraph 4 of Article X (Dividends) of the Convention shall be deleted and replaced by the following:

4.      The provisions of paragraph 2 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on, or has carried on, business in the other Contracting State of which the company paying the dividends is a resident, through a permanent establishment situated therein, and the holding in respect of which the dividends are paid is effectively connected to such permanent establishment. In such case, the provisions of Article VII (Business Profits) shall apply.

4.      Paragraph 5 of Article X (Dividends) of the Convention shall be amended by deleting the words "or a fixed base" following the words "effectively connected with a permanent establishment".

5.      Subparagraph 7(c) of Article X (Dividends) of the Convention shall be deleted and replaced by the following:

(c)      Subparagraph 2(a) shall not apply to dividends paid by a resident of the United States that is a Real Estate Investment Trust (REIT), and subparagraph 2(b) shall apply only if:

(i)      The beneficial owner of the dividends is an individual holding an interest of not more than 10 percent in the REIT;

(ii)      The dividends are paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent in any class of the REIT's stock; or

(iii)     The beneficial owner of the dividends is a person holding an

interest of not more than 10 percent in the REIT and the REIT is

diversified.

Otherwise, the rate of tax applicable under the domestic law of the United States

shall apply.  Where an estate or testamentary trust acquired its interest in a REIT

as a consequence of an individual's death, for purposes of this subparagraph the

estate or trust shall for the five-year period following the death be deemed with

respect to that interest to be an individual.


**Article 6**

Article XI (Interest) of the Convention shall be deleted and replaced by the following:


Article XI

Interest

1.     Interest arising in a Contracting State and beneficially owned by a

resident of the other Contracting State may be taxed only in that other State.

2.     The term "interest" as used in this Article means income from

debt-claims of every kind, whether or not secured by mortgage, and whether or

not carrying a right to participate in the debtor's profits, and in particular,

income from government securities and income from bonds or debentures,

including premiums or prizes attaching to such securities, bonds or debentures,

as well as income assimilated to income from money lent by the taxation laws of

the Contracting State in which the income arises.  However, the term "interest"

does not include income dealt with in Article X (Dividends).

3.     The provisions of paragraph 1 shall not apply if the beneficial owner of

the interest, being a resident of a Contracting State, carries on, or has carried on,

business in the other Contracting State in which the interest arises, through a

permanent establishment situated therein, and the debt-claim in respect of which

the interest is paid is effectively connected with such permanent establishment. In such case the provisions of Article VII (Business Profits) shall apply.

4.      For the purposes of this Article, interest shall be deemed to arise in a Contracting State when the payer is that State itself, or a political subdivision, local authority or a resident of that State. Where, however, the person paying the interest, whether he is a resident of a Contracting State or not, has in a State other than that of which he is a resident a permanent establishment in connection with which the indebtedness on which the interest is paid was incurred, and such interest is borne by such permanent establishment, then such interest shall be deemed to arise in the State in which the permanent establishment is situated and not in the State of which the payer is a resident.

5.      Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount.  In such case the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

6.      Notwithstanding the provisions of paragraph 1:

(a)      Interest arising in the United States that is contingent interest of a type that does not qualify as portfolio interest under United States law may be taxed by the United States but, if the beneficial owner of the interest is a resident of Canada, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article X (Dividends);

(b)      Interest arising in Canada that is determined with reference to receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor

or a related person or to any dividend, partnership distribution or similar payment made by the debtor to a related person may be taxed by Canada, and according to the laws of Canada, but if the beneficial owner is a resident of the United States, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article X (Dividends); and

(c)     Interest that is an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit may be taxed by each State in accordance with its domestic law.

7.     Where a resident of a Contracting State pays interest to a person other than a resident of the other Contracting State, that other State may not impose any tax on such interest except insofar as it arises in that other State or insofar as the debt-claim in respect of which the interest is paid is effectively connected with a permanent establishment situated in that other State.

**Article 7**

1.     Paragraph 5 of Article XII (Royalties) of the Convention shall be deleted and replaced by the following:

5.     The provisions of paragraphs 2 and 3 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on, or has carried on, business in the other Contracting State in which the royalties arise, through a permanent establishment situated therein, and the right or property in respect of which the royalties are paid is effectively connected to such permanent establishment. In such case the provisions of Article VII (Business Profits) shall apply.

2.     Subparagraph 6(a) of Article XII (Royalties) of the Convention shall be deleted and replaced by the following:

(a)    Royalties shall be deemed to arise in a Contracting State when the payer

is a resident of that State. Where, however, the person paying the royalties,

whether he is a resident of a Contracting State or not, has in a State a permanent

establishment in connection with which the obligation to pay the royalties was

incurred, and such royalties are borne by such permanent establishment, then

such royalties shall be deemed to arise in the State in which the permanent

establishment is situated and not in any other State of which the payer is a

resident; and

3.    Paragraph 8 of Article XII (Royalties) of the Convention shall be amended by deleting

the words "or a fixed base" following the words "effectively connected with a permanent

establishment".


**Article 8**

1.    Paragraph 2 of Article XIII (Gains) of the Convention shall be deleted and replaced by

the following:

2.    Gains from the alienation of personal property forming part of the

business property of a permanent establishment which a resident of a

Contracting State has or had (within the twelve-month period preceding the date

of alienation) in the other Contracting State, including such gains from the

alienation of such a permanent establishment, may be taxed in that other State.

2.    Paragraph 5 of Article XIII (Gains) of the Convention shall be deleted and replaced by

the following:

5.    The provisions of paragraph 4 shall not affect the right of a Contracting

State to levy, according to its domestic law, a tax on gains from the alienation of

any property derived by an individual who is a resident of the other Contracting

State if:

(a)     The individual was a resident of the first-mentioned State:

    (i)     For at least 120 months during any period of 20 consecutive years preceding the alienation of the property; and

    (ii)     At any time during the 10 years immediately preceding the alienation of the property; and

(b)     The property (or property for which such property was substituted in an alienation the gain on which was not recognized for the purposes of taxation in the first-mentioned State):

    (i)     Was owned by the individual at the time the individual ceased to be a resident of the first-mentioned State; and

    (ii)     Was not a property that the individual was treated as having alienated by reason of ceasing to be a resident of the first-mentioned State and becoming a resident of the other Contracting State.

3.     Paragraph 7 of Article XIII (Gains) of the Convention shall be deleted and replaced by the following:

    7.     Where at any time an individual is treated for the purposes of taxation by a Contracting State as having alienated a property and is taxed in that State by reason thereof, the individual may elect to be treated for the purposes of taxation in the other Contracting State, in the year that includes that time and all subsequent years, as if the individual had, immediately before that time, sold and repurchased the property for an amount equal to its fair market value at that time.

4.     Subparagraph 9(c) of Article XIII (Gains) of the Convention shall be amended by deleting the words "or pertained to a fixed base" following the words "permanent establishment".

**Article 9**

Article XIV (Independent Personal Services) of the Convention shall be deleted and the succeeding Articles shall not be renumbered.

**Article 10**

1.      The title of Article XV (Dependent Personal Services) of the Convention shall be deleted and replaced by "Income from Employment".

2.      Paragraphs 1 and 2 of renamed Article XV (Income from Employment) of the Convention shall be deleted and replaced by the following:

1.      Subject to the provisions of Articles XVIII (Pensions and Annuities) and XIX (Government Service), salaries, wages and other remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2.      Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

(a)      Such remuneration does not exceed ten thousand dollars ($10,000) in the currency of that other State; or

(b)      The recipient is present in that other State for a period or periods not exceeding in the aggregate 183 days in any twelve-month period commencing or ending in the fiscal year concerned, and the remuneration is not paid by, or on behalf of, a person who is a resident of that other State and is not borne by a permanent establishment in that other State.

### Article 11

1.      Paragraph 1 of Article XVI (Artistes and Athletes) shall be amended by deleting the words "XIV (Independent Personal Services)" following the words "Notwithstanding the provisions of Articles" and replacing them with the words "VII (Business Profits)" and by deleting the words "XV (Dependent Personal Services)" and replacing them with the words "XV (Income from Employment)".

2.      Paragraph 2 of Article XVI (Artistes and Athletes) shall be amended by deleting the words "XIV (Independent Personal Services)" following the words "notwithstanding the provisions of Articles VII (Business Profits)," and by deleting the words "XV (Dependent Personal Services)" and replacing them with the words "XV (Income from Employment)".

3.      Paragraph 4 of Article XVI (Artistes and Athletes) shall be amended by deleting the words "XIV (Independent Personal Services)" following the words "Notwithstanding the provisions of Articles" and replacing them with the words "VII (Business Profits)" and by deleting the words "(Dependent Personal Services)" in both places they appear in the paragraph and replacing them with the words "(Income from Employment)".

### Article 12

Article XVII (Withholding of Taxes in Respect of Personal Services) of the Convention shall be deleted and the succeeding Articles shall not be renumbered.

### Article 13

1.      Paragraphs 3 and 4 of Article XVIII (Pensions and Annuities) of the Convention shall be deleted and replaced by the following:

    3.      For the purposes of this Convention:

(a)     The term "pensions" includes any payment under a superannuation, pension or other retirement arrangement, Armed Forces retirement pay, war veterans pensions and allowances and amounts paid under a sickness, accident or disability plan, but does not include payments under an income-averaging annuity contract or, except for the purposes of Article XIX (Government Service), any benefit referred to in paragraph 5; and

(b)     The term "pensions" also includes a Roth IRA, within the meaning of section 408A of the Internal Revenue Code, or a plan or arrangement created pursuant to legislation enacted by a Contracting State after September 21, 2007 that the competent authorities have agreed is similar thereto.  Notwithstanding the provisions of the preceding sentence, from such time that contributions have been made to the Roth IRA or similar plan or arrangement, by or for the benefit of a resident of the other Contracting State (other than rollover contributions from a Roth IRA or similar plan or arrangement described in the previous sentence that is a pension within the meaning of this subparagraph), to the extent of accretions from such time, such Roth IRA or similar plan or arrangement shall cease to be considered a pension for purposes of the provisions of this Article.

4.     For the purposes of this Convention:

(a)     The term "annuity" means a stated sum paid periodically at stated times during life or during a specified number of years, under an obligation to make the payments in return for adequate and full consideration (other than services rendered), but does not include a payment that is not a periodic payment or any annuity the cost of which was deductible for the purposes of taxation in the Contracting State in which it was acquired; and

(b)      An annuity or other amount paid in respect of a life insurance or annuity contract (including a withdrawal in respect of the cash value thereof) shall be deemed to arise in a Contracting State if the person paying the annuity or other amount (in this subparagraph referred to as the "payer") is a resident of that State.  However, if the payer, whether a resident of a Contracting State or not, has in a State other than that of which the payer is a resident a permanent establishment in connection with which the obligation giving rise to the annuity or other amount was incurred, and the annuity or other amount is borne by the permanent establishment, then the annuity or other amount shall be deemed to arise in the State in which the permanent establishment is situated and not in the State of which the payer is a resident.

2.      Paragraph 7 of Article XVIII (Pensions and Annuities) of the Convention shall be deleted and replaced by the following:

7.      A natural person who is a citizen or resident of a Contracting State and a beneficiary of a trust, company, organization or other arrangement that is a resident of the other Contracting State, generally exempt from income taxation in that other State and operated exclusively to provide pension or employee benefits may elect to defer taxation in the first-mentioned State, subject to rules established by the competent authority of that State, with respect to any income accrued in the plan but not distributed by the plan, until such time as and to the extent that a distribution is made from the plan or any plan substituted therefor.

3.      Article XVIII (Pensions and Annuities) of the Convention shall be amended by adding the following paragraphs:

8.      Contributions made to, or benefits accrued under, a qualifying retirement plan in a Contracting State by or on behalf of an individual shall be deductible or excludible in computing the individual's taxable income in the other Contracting State, and contributions made to the plan by the individual's

employer shall be allowed as a deduction in computing the employer's profits in that other State, where:

(a)    The individual performs services as an employee in that other State the remuneration from which is taxable in that other State;

(b)    The individual was participating in the plan (or another similar plan for which this plan was substituted) immediately before the individual began performing the services in that other State;

(c)    The individual was not a resident of that other State immediately before the individual began performing the services in that other State;

(d)    The individual has performed services in that other State for the same employer (or a related employer) for no more than 60 of the 120 months preceding the individual's current taxation year;

(e)    The contributions and benefits are attributable to the services performed by the individual in that other State, and are made or accrued during the period in which the individual performs those services; and

(f)    With respect to contributions and benefits that are attributable to services performed during a period in the individual's current taxation year, no contributions in respect of the period are made by or on behalf of the individual to, and no services performed in that other State during the period are otherwise taken into account for purposes of determining the individual's entitlement to benefits under, any plan that would be a qualifying retirement plan in that other State if paragraph 15 of this Article were read without reference to subparagraphs (b) and (c) of that paragraph.

This paragraph shall apply only to the extent that the contributions or benefits would qualify for tax relief in the first-mentioned State if the individual was a resident of and performed the services in that State.

9.      For the purposes of United States taxation, the benefits granted under paragraph 8 to a citizen of the United States shall not exceed the benefits that would be allowed by the United States to its residents for contributions to, or benefits otherwise accrued under, a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States.

10.      Contributions made to, or benefits accrued under, a qualifying retirement plan in a Contracting State by or on behalf of an individual who is a resident of the other Contracting State shall be deductible or excludible in computing the individual's taxable income in that other State, where:

(a)      The individual performs services as an employee in the first-mentioned state the remuneration from which is taxable in that State and is borne by an employer who is a resident of that State or by a permanent establishment which the employer has in that State;  and

(b)      The contributions and benefits are attributable to those services and are made or accrued during the period in which the individual performs those services.

This paragraph shall apply only to the extent that the contributions or benefits qualify for tax relief in the first-mentioned State.

11.      For the purposes of Canadian taxation, the amount of contributions otherwise allowed as a deduction under paragraph 10 to an individual for a taxation year shall not exceed the individual's deduction limit under the law of Canada for the year for contributions to registered retirement savings plans remaining after taking into account the amount of contributions to registered retirement savings plans deducted by the individual under the law of Canada for the year.  The amount deducted by an individual under paragraph 10 for a taxation year shall be taken into account in computing the individual's deduction

limit under the law of Canada for subsequent taxation years for contributions to registered retirement savings plans.

12. For the purposes of United States taxation, the benefits granted under paragraph 10 shall not exceed the benefits that would be allowed by the United States to its residents for contributions to, or benefits otherwise accrued under, a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States. For purposes of determining an individual's eligibility to participate in and receive tax benefits with respect to a pension or retirement plan or other retirement arrangement established in and recognized for tax purposes by the United States, contributions made to, or benefits accrued under, a qualifying retirement plan in Canada by or on behalf of the individual shall be treated as contributions or benefits under a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States.

13. Contributions made to, or benefits accrued under, a qualifying retirement plan in Canada by or on behalf of a citizen of the United States who is a resident of Canada shall be deductible or excludible in computing the citizen's taxable income in the United States, where:

> (a) The citizen performs services as an employee in Canada the remuneration from which is taxable in Canada and is borne by an employer who is a resident of Canada or by a permanent establishment which the employer has in Canada; and

> (b) The contributions and benefits are attributable to those services and are made or accrued during the period in which the citizen performs those services.

This paragraph shall apply only to the extent that the contributions or benefits qualify for tax relief in Canada.

14. The benefits granted under paragraph 13 shall not exceed the benefits that would be allowed by the United States to its residents for contributions to,

or benefits otherwise accrued under, a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States. For purposes of determining an individual's eligibility to participate in and receive tax benefits with respect to a pension or retirement plan or other retirement arrangement established in and recognized for tax purposes by the United States, contributions made to, or benefits accrued under, a qualifying retirement plan in Canada by or on behalf of the individual shall be treated as contributions or benefits under a generally corresponding pension or retirement plan established in and recognized for tax purposes by the United States.

15.     For purposes of paragraphs 8 to 14, a qualifying retirement plan in a Contracting State means a trust, company, organization or other arrangement:

> (a)     That is a resident of that State, generally exempt from income taxation in that State and operated primarily to provide pension or retirement benefits;

> (b)     That is not an individual arrangement in respect of which the individual's employer has no involvement; and

> (c)     Which the competent authority of the other Contracting State agrees generally corresponds to a pension or retirement plan established in and recognized for tax purposes by that other State.

16.     For purposes of this Article, a distribution from a pension or retirement plan that is reasonably attributable to a contribution or benefit for which a benefit was allowed pursuant to paragraph 8, 10 or 13 shall be deemed to arise in the Contracting State in which the plan is established.

17.     Paragraphs 8 to 16 apply, with such modifications as the circumstances require, as though the relationship between a partnership that carries on a business, and an individual who is a member of the partnership, were that of employer and employee.

## Article 14

Article XIX (Government Service) of the Convention shall be amended by deleting the words "XIV (Independent Personal Services)" and replacing them with the words "VII (Business Profits)" and by deleting the words "XV (Dependent Personal Services)" and replacing them with the words "XV (Income from Employment)".

## Article 15

Article XX (Students) of the Convention shall be deleted and replaced by the following:

Payments received by an individual who is a student, apprentice, or business trainee, and is, or was immediately before visiting a Contracting State, a resident of the other Contracting State, and who is present in the first-mentioned State for the purpose of the individual's full-time education or full-time training, shall not be taxed in that State, provided that such payments arise outside that State, and are for the purpose of the maintenance, education or training of the individual. The provisions of this Article shall apply to an apprentice or business trainee only for a period of time not exceeding one year from the date the individual first arrives in the first-mentioned State for the purpose of the individual's training.

## Article 16

1.     Paragraphs 4, 5 and 6 of Article XXI (Exempt Organizations) of the Convention shall be renumbered as paragraphs 5, 6 and 7 respectively.

2.     Paragraphs 1 through 3 of Article XXI (Exempt Organizations) of the Convention shall be deleted and replaced by the following four paragraphs:

1.     Subject to the provisions of paragraph 4, income derived by a religious, scientific, literary, educational or charitable organization shall be exempt from

tax in a Contracting State if it is resident in the other Contracting State, but only to the extent that such income is exempt from tax in that other State.

2. Subject to the provisions of paragraph 4, income referred to in Articles X (Dividends) and XI (Interest) derived by a trust, company, organization or other arrangement that is a resident of a Contracting State, generally exempt from income taxation in a taxable year in that State and operated exclusively to administer or provide pension, retirement or employee benefits shall be exempt from income taxation in that taxable year in the other Contracting State.

3. Subject to the provisions of paragraph 4, income referred to in Articles X (Dividends) and XI (Interest) derived by a trust, company, organization or other arrangement that is a resident of a Contracting State, generally exempt from income taxation in a taxable year in that State and operated exclusively to earn income for the benefit of one or more of the following:

   (a) An organization referred to in paragraph 1; or

   (b) A trust, company, organization or other arrangement referred to in paragraph 2;

shall be exempt from income taxation in that taxable year in the other Contracting State.

4. The provisions of paragraphs 1, 2 and 3 shall not apply with respect to the income of a trust, company, organization or other arrangement from carrying on a trade or business or from a related person other than a person referred to in paragraphs 1, 2 or 3.


**Article 17**

Article XXII (Other Income) of the Convention shall be amended by adding the following paragraph:

4.     Notwithstanding the provisions of paragraph 1, compensation derived by a resident of a Contracting State in respect of the provision of a guarantee of indebtedness shall be taxable only in that State, unless such compensation is business profits attributable to a permanent establishment situated in the other Contracting State, in which case the provisions of Article VII (Business Profits) shall apply.

**Article 18**

Paragraph 2 of Article XXIII (Capital) of the Convention shall be amended by deleting the phrase ", or by personal property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services,".

**Article 19**

Subparagraph 2(b) of Article XXIV (Elimination of Double Taxation) of the Convention shall be deleted and replaced with the following:

(b)     In the case of a company which is a resident of Canada owning at least 10 percent of the voting stock of a company which is a resident of the United States from which it receives dividends in any taxable year, Canada shall allow as a credit against the Canadian tax on income the appropriate amount of income tax paid or accrued to the United States by the second company with respect to the profits out of which the dividends are paid.

**Article 20**

1.      Paragraph 1 of Article XXV (Non-Discrimination) of the Convention shall be deleted and replaced by the following:

>      1.      Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances, particularly with respect to taxation on worldwide income, are or may be subjected.  This provision shall also apply to individuals who are not residents of one or both of the Contracting States.

2.      Paragraph 2 of Article XXV (Non-Discrimination) of the Convention shall be deleted, and paragraphs 3 to 10 of Article XXV shall be renumbered accordingly.

3.      Renumbered paragraph 3 of Article XXV (Non-Discrimination) of the Convention shall be amended by deleting the words "Article XV (Dependent Personal Services)" and replacing them with the words "Article XV (Income from Employment)".

**Article 21**

1.      Paragraph 6 of Article XXVI (Mutual Agreement Procedure) of the Convention shall be deleted and replaced by the following:

>      6.      Where, pursuant to a mutual agreement procedure under this Article, the competent authorities have endeavored but are unable to reach a complete agreement in a case, the case shall be resolved through arbitration conducted in the manner prescribed by, and subject to, the requirements of paragraph 7 and any rules or procedures agreed upon by the Contracting States by notes to be exchanged through diplomatic channels, if:

(a) Tax returns have been filed with at least one of the Contracting States with respect to the taxable years at issue in the case;

(b) The case:

(i) Is a case that:

(A) Involves the application of one or more Articles that the competent authorities have agreed in an exchange of notes shall be the subject of arbitration; and

(B) Is not a particular case that the competent authorities agree, before the date on which arbitration proceedings would otherwise have begun, is not suitable for determination by arbitration; or

(ii) Is a particular case that the competent authorities agree is suitable for determination by arbitration; and

(c) All concerned persons agree according to the provisions of subparagraph 7(d).

7. For the purposes of paragraph 6 and this paragraph, the following rules and definitions shall apply:

(a) The term "concerned person" means the presenter of a case to a competent authority for consideration under this Article and all other persons, if any, whose tax liability to either Contracting State may be directly affected by a mutual agreement arising from that consideration;

(b) The "commencement date" for a case is the earliest date on which the information necessary to undertake substantive consideration for a mutual agreement has been received by both competent authorities;

(c) Arbitration proceedings in a case shall begin on the later of:

(i) Two years after the commencement date of that case, unless both competent authorities have previously agreed to a different date, and

(ii)     The earliest date upon which the agreement required by subparagraph (d) has been received by both competent authorities;

(d)     The concerned person(s), and their authorized representatives or agents, must agree prior to the beginning of arbitration proceedings not to disclose to any other person any information received during the course of the arbitration proceeding from either Contracting State or the arbitration board, other than the determination of such board;

(e)     Unless a concerned person does not accept the determination of an arbitration board, the determination shall constitute a resolution by mutual agreement under this Article and shall be binding on both Contracting States with respect to that case; and

(f)     For purposes of an arbitration proceeding under paragraph 6 and this paragraph, the members of the arbitration board and their staffs shall be considered "persons or authorities" to whom information may be disclosed under Article XXVII (Exchange of Information) of this Convention.

### Article 22

1.     Subparagraph 8(a) of Article XXVI A (Assistance in Collection) of the Convention shall be deleted and replaced by the following:

(a)     Where the taxpayer is an individual, the revenue claim relates either to a taxable period in which the taxpayer was a citizen of the requested State or, if the taxpayer became a citizen of the requested State at any time before November 9, 1995 and is such a citizen at the time the applicant State applies for collection of the claim, to a taxable period that ended before November 9, 1995; and

2.      Paragraph 9 of Article XXVI A (Assistance in Collection) of the Convention
shall be deleted and replaced by the following:

9.      Notwithstanding the provisions of Article II (Taxes Covered), the
provisions of this Article shall apply to all categories of taxes collected, and to
contributions to social security and employment insurance premiums levied, by
or on behalf of the Government of a Contracting State.


**Article 23**

Article XXVII (Exchange of Information) of the Convention shall be deleted and replaced by
the following:

Article XXVII

Exchange of Information

1.      The competent authorities of the Contracting States shall exchange such
information as may be relevant for carrying out the provisions of this
Convention or of the domestic laws of the Contracting States concerning taxes
to which this Convention applies insofar as the taxation thereunder is not
contrary to this Convention. The exchange of information is not restricted by
Article I (Personal Scope). Any information received by a Contracting State
shall be treated as secret in the same manner as information obtained under the
taxation laws of that State and shall be disclosed only to persons or authorities
(including courts and administrative bodies) involved in the assessment or
collection of, the administration and enforcement in respect of, or the
determination of appeals in relation to the taxes to which this Convention
applies or, notwithstanding paragraph 4, in relation to taxes imposed by a
political subdivision or local authority of a Contracting State that are
substantially similar to the taxes covered by this Convention under Article II
(Taxes Covered). Such persons or authorities shall use the information only for

such purposes. They may disclose the information in public court proceedings or in judicial decisions. The competent authorities may release to an arbitration board established pursuant to paragraph 6 of Article XXVI (Mutual Agreement Procedure) such information as is necessary for carrying out the arbitration procedure; the members of the arbitration board shall be subject to the limitations on disclosure described in this Article.

2.      If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall use its information gathering measures to obtain the requested information, even though that other State may not need such information for its own tax purposes.  The obligation contained in the preceding sentence is subject to the limitations of paragraph 3 but in no case shall such limitations be construed to permit a Contracting State to decline to supply information because it has no domestic interest in such information.

3.      In no case shall the provisions of paragraph 1 and 2 be construed so as to impose on a Contracting State the obligation:

(a)      To carry out administrative measures at variance with the laws and administrative practice of that State or of the other Contracting State;

(b)      To supply information which is not obtainable under the laws or in the normal course of the administration of that State or of the other Contracting State; or

(c)      To supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public).

4.      For the purposes of this Article, this Convention shall apply, notwithstanding the provisions of Article II (Taxes Covered):

(a)      To all taxes imposed by a Contracting State; and

(b)     To other taxes to which any other provision of this Convention applies, but only to the extent that the information may be relevant for the purposes of the application of that provision.

5.     In no case shall the provisions of paragraph 3 be construed to permit a Contracting State to decline to supply information because the information is held by a bank, other financial institution, nominee or person acting in an agency or a fiduciary capacity or because it relates to ownership interests in a person.

6.     If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, and writings).

7.     The requested State shall allow representatives of the requesting State to enter the requested State to interview individuals and examine books and records with the consent of the persons subject to examination.

**Article 24**

1.     Paragraph 2 of Article XXIX (Miscellaneous Rules) of the Convention shall be deleted and replaced by the following:

2.     (a)     Except to the extent provided in paragraph 3, this Convention shall not affect the taxation by a Contracting State of its residents (as determined under Article IV (Residence)) and, in the case of the United States, its citizens and companies electing to be treated as domestic corporations.

(b)     Notwithstanding the other provisions of this Convention, a former citizen or former long-term resident of the United States, may, for

the period of ten years following the loss of such status, be taxed in

accordance with the laws of the United States with respect to income

from sources within the United States (including income deemed under

the domestic law of the United States to arise from such sources).

2.      Subparagraph 3(a) of Article XXIX (Miscellaneous Rules) shall be deleted and replaced

by the following:

(a)      Under paragraphs 3 and 4 of Article IX (Related Persons),

paragraphs 6 and 7 of Article XIII (Gains), paragraphs 1, 3, 4, 5, 6(b), 7,

8, 10 and 13 of Article XVIII (Pensions and Annuities), paragraph 5 of

Article XXIX (Miscellaneous Rules), paragraphs 1, 5, and 6 of Article

XXIX B (Taxes Imposed by Reason of Death), paragraphs 2, 3, 4, and 7

of Article XXIX B (Taxes Imposed by Reason of Death) as applied to

estates of persons other than former citizens referred to in paragraph 2 of

this Article, paragraphs 3 and 5 of Article XXX (Entry into Force), and

Articles XIX (Government Service), XXI (Exempt Organizations),

XXIV (Elimination of Double Taxation), XXV (Non-Discrimination)

and XXVI (Mutual Agreement Procedure);

**Article 25**

Article XXIX A (Limitation on Benefits) of the Convention shall be deleted and replaced by

the following:

Article XXIX A

Limitation on Benefits

1.      For the purposes of the application of this Convention by a Contracting

State,

(a)      a qualifying person shall be entitled to all of the benefits of this

Convention; and

(b)    except as provided in paragraphs 3, 4 and 6, a person that is not a qualifying person shall not be entitled to any benefits of this Convention.

2.    For the purposes of this Article, a qualifying person is a resident of a Contracting State that is:

(a)    a natural person;

(b)    a Contracting State or a political subdivision or local authority thereof, or any agency or instrumentality of any such State, subdivision or authority;

(c)    a company or trust whose principal class of shares or units (and any disproportionate class of shares or units) is primarily and regularly traded on one or more recognized stock exchanges;

(d)    a company, if five or fewer persons each of which is a company or trust referred to in subparagraph (c) own directly or indirectly more than 50 percent of the aggregate vote and value of the shares and more than 50 percent of the vote and value of each disproportionate class of shares (in neither case including debt substitute shares), provided that each company or trust in the chain of ownership is a qualifying person;

(e)    (i)    a company, 50 percent or more of the aggregate vote and value of the shares of which and 50 percent or more of the vote and value of each disproportionate class of shares (in neither case including debt substitute shares) of which is not owned, directly or indirectly, by persons other than qualifying persons; or

(ii)    a trust, 50 percent or more of the beneficial interest in which and 50 percent or more of each disproportionate interest in which, is not owned, directly or indirectly, by persons other than qualifying persons;

Appx930

where the amount of the expenses deductible from gross income (as determined in the State of residence of the company or trust) that are paid or payable by the company or trust, as the case may be, for its preceding fiscal period (or, in the case of its first fiscal period, that period) directly or indirectly, to persons that are not qualifying persons is less than 50 percent of its gross income for that period;

(f)     an estate;

(g)     a not-for-profit organization, provided that more than half of the beneficiaries, members or participants of the organization are qualifying persons;

(h)     a trust, company, organization or other arrangement described in paragraph 2 of Article XXI (Exempt Organizations) and established for the purpose of providing benefits primarily to individuals who are qualifying persons, or persons who were qualifying persons within the five preceding years; or

(i)     a trust, company, organization or other arrangement described in paragraph 3 of Article XXI (Exempt Organizations) provided that the beneficiaries of the trust, company, organization or other arrangement are described in subparagraph (g) or (h).

3.     Where a person is a resident of a Contracting State and is not a qualifying person, and that person, or a person related thereto, is engaged in the active conduct of a trade or business in that State (other than the business of making or managing investments, unless those activities are carried on with customers in the ordinary course of business by a bank, an insurance company, a registered securities dealer or a deposit-taking financial institution), the benefits of this Convention shall apply to that resident person with respect to income derived from the other Contracting State in connection with or incidental to that trade or business (including any such income derived directly or indirectly by that resident person through one or more other persons that are residents of that

other State), but only if that trade or business is substantial in relation to the activity carried on in that other State giving rise to the income in respect of which benefits provided under this Convention by that other State are claimed.

4.    A company that is a resident of a Contracting State shall also be entitled to the benefits of Articles X (Dividends), XI (Interest) and XII (Royalties) if:

(a)    Its shares that represent more than 90 percent of the aggregate vote and value of all of its shares and at least 50 percent of the vote and value of any disproportionate class of shares (in neither case including debt substitute shares) are owned, directly or indirectly, by persons each of whom is a qualifying person or a person who:

(i)    Is a resident of a country with which the other Contracting State has a comprehensive income tax convention and is entitled to all of the benefits provided by that other State under that convention;

(ii)    Would qualify for benefits under paragraphs 2 or 3 if that person were a resident of the first-mentioned State (and, for the purposes of paragraph 3, if the business it carried on in the country of which it is a resident were carried on by it in the first-mentioned State); and

(iii)    Would be entitled to a rate of tax in the other Contracting State under the convention between that person's country of residence and that other State, in respect of the particular class of income for which benefits are being claimed under this Convention, that is at least as low as the rate applicable under this Convention; and

(b)    The amount of the expenses deductible from gross income (as determined in the company's State of residence) that are paid or payable by the company for its preceding fiscal period (or, in the case of its first fiscal period, that period) directly or indirectly to persons that are not

32

Appx932

qualifying persons is less than 50 percent of the company's gross income for that period.

5.     For the purposes of this Article,

(a)     The term "debt substitute share" means:

(i)     A share described in paragraph (e) of the definition "term preferred share" in the Income Tax Act, as it may be amended from time to time without changing the general principle thereof; and

(ii)     Such other type of share as may be agreed upon by the competent authorities of the Contracting States.

(b)     The term "disproportionate class of shares" means any class of shares of a company resident in one of the Contracting States that entitles the shareholder to disproportionately higher participation, through dividends, redemption payments or otherwise, in the earnings generated in the other State by particular assets or activities of the company;

(c)     The term "disproportionate interest in a trust" means any interest in a trust resident in one of the Contracting States that entitles the interest holder to disproportionately higher participation in, or claim to, the earnings generated in the other State by particular assets or activities of the trust;

(d)     The term "not-for-profit organization" of a Contracting State means an entity created or established in that State and that is, by reason of its not-for-profit status, generally exempt from income taxation in that State, and includes a private foundation, charity, trade union, trade association or similar organization;

(e)     The term "principal class of shares" of a company means the ordinary or common shares of the company, provided that such class of shares represents the majority of the voting power and value of the

company. If no single class of ordinary or common shares represents the majority of the aggregate voting power and value of the company, the "principal class of shares" are those classes that in the aggregate represent a majority of the aggregate voting power and value of the company; and

(f)    The term "recognized stock exchange" means:

    (i)    The NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the Securities and Exchange Commission as a national securities exchange for purposes of the Securities Exchange Act of 1934;

    (ii)    Canadian stock exchanges that are "prescribed stock exchanges" or "designated stock exchanges" under the Income Tax Act; and

    (iii)    Any other stock exchange agreed upon by the Contracting States in an exchange of notes or by the competent authorities of the Contracting States.

6.    Where a person that is a resident of a Contracting State is not entitled under the preceding provisions of this Article to the benefits provided under this Convention by the other Contracting State, the competent authority of that other State shall, upon that person's request, determine on the basis of all factors including the history, structure, ownership and operations of that person whether:

(a)    Its creation and existence did not have as a principal purpose the obtaining of benefits under this Convention that would not otherwise be available; or

(b)    It would not be appropriate, having regard to the purpose of this Article, to deny the benefits of this Convention to that person.

The person shall be granted the benefits of this Convention by that other State where the competent authority determines that subparagraph (a) or (b) applies.

7.      It is understood that this Article shall not be construed as restricting in any manner the right of a Contracting State to deny benefits under this Convention where it can reasonably be concluded that to do otherwise would result in an abuse of the provisions of this Convention.


**Article 26**

1.      Paragraph 1 of Article XXIX B (Taxes Imposed by Reason of Death) of the Convention shall be deleted and replaced by the following:

1.      Where the property of an individual who is a resident of a Contracting State passes by reason of the individual's death to an organization that is referred to in paragraph 1 of Article XXI (Exempt Organizations) and that is a resident of the other Contracting State,

(a)      If the individual is a resident of the United States and the organization is a resident of Canada, the tax consequences in the United States arising out of the passing of the property shall apply as if the organization were a resident of the United States; and

(b)      If the individual is a resident of Canada and the organization is a resident of the United States, the tax consequences in Canada arising out of the passing of the property shall apply as if the individual had disposed of the property for proceeds equal to an amount elected on behalf of the individual for this purpose (in a manner specified by the competent authority of Canada), which amount shall be no less than the individual's cost of the property as determined for purposes of Canadian tax and no greater than the fair market value of the property.

2.      Paragraph 5 of Article XXIX B (Taxes Imposed by Reason of Death) of the Convention shall be deleted and replaced by the following:

    5.      Where an individual was a resident of the United States immediately before the individual's death, for the purposes of subsections 70(5.2) and (6) of the Income Tax Act, both the individual and the individual's spouse shall be deemed to have been resident in Canada immediately before the individual's death.  Where a trust that would be a trust described in subsection 70(6) of that Act, if its trustees that were residents or citizens of the United States or domestic corporations under the law of the United States were residents of Canada, requests the competent authority of Canada to do so, the competent authority may agree, subject to terms and conditions satisfactory to such competent authority, to treat the trust for the purposes of that Act as being resident in Canada for such time and with respect to such property as may be stipulated in the agreement.


**Article 27**

1.      This Protocol shall be subject to ratification in accordance with the applicable procedures in the United States and Canada. The Contracting States shall notify each other in writing, through diplomatic channels, when their respective applicable procedures have been satisfied.

2.      This Protocol shall enter into force on the date of the later of the notifications referred to in paragraph 1, or January 1, 2008, whichever is later.  The provisions of this Protocol shall have effect:

    (a)      In respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month that begins after the date on which this Protocol enters into force;

(b)     In respect of other taxes, for taxable years that begin after (or, if the later of the notifications referred to in paragraph 1 is dated in 2007, taxable years that begin in and after) the calendar year in which this Protocol enters into force.

3.     Notwithstanding paragraph 2,

(a)     Paragraph 1 of Article 2 of this Protocol shall have effect with respect to corporate continuations effected after September 17, 2000;

(b)     New paragraph 7 of Article IV (Residence) of the Convention as added by Article 2 of this Protocol shall have effect as of the first day of the third calendar year that ends after this Protocol enters into force;

(c)     Article 3 of this Protocol shall have effect as of the third taxable year that ends after this Protocol enters into force, but in no event shall it apply to include, in the determination of whether an enterprise is deemed to provide services through a permanent establishment under paragraph 9 of Article V (Permanent Establishment) of the Convention, any days of presence, services rendered, or gross active business revenues that occur or arise prior to January 1, 2010;

(d)     In applying Article 6 of this Protocol to interest paid or credited during the first two calendar years that end after entry into force of this Protocol, paragraph 1 of Article XI (Interest) of the Convention shall be read as follows:

1.     Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State may be taxed only in that other State. However, if the interest is not exempt under paragraph 3 of Article XI (Interest) as it read on January 1, 2007, and the payer of the interest and the beneficial owner of the interest are related, or would be deemed to be related if the provisions of paragraph 2 of Article IX (Related Persons) applied for this purpose, such interest may also be taxed in the Contracting State in which it arises, and according to the laws of that State, but the tax so charged shall not exceed the following percentage of the gross amount of the interest:

(a)     If the interest is paid or credited during the first calendar year that ends after entry into force of this paragraph, 7 percent; and

(b)     If the interest is paid or credited during the second calendar year that ends after entry into force of this paragraph, 4 percent;

(e)     Paragraphs 2 and 3 of Article 8 of this Protocol shall have effect with respect to alienations of property that occur (including, for greater certainty, those that are deemed under the law of a Contracting State to occur) after September 17, 2000;

(f)     Article 21 of this Protocol shall have effect with respect to

(i)     Cases that are under consideration by the competent authorities as of the date on which this Protocol enters into force; and

(ii)     Cases that come under such consideration after that time,

and the commencement date for a case described in subparagraph (f)(i) shall be the date on which the Protocol enters into force; and

(g)     Article 22 of this Protocol shall have effect for revenue claims finally determined by an applicant State after November 9, 1985.


IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Chelsea this twenty-first day of September 2007 in the English and French languages, each text being equally authentic.


FOR THE GOVERNMENT OF        FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:     CANADA:

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

(Judge Matthew H. Solomson)

|  |  |
|---|---|
| PAUL BRUYEA, | ) |
|  | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Defendant. | ) |
| _____ | ) |

_____

## REPLY OF THE UNITED STATES IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFF'S PARTIAL SUMMARY JUDGMENT MOTION

_____

DAVID A. HUBBERT
   Deputy Assistant Attorney General

DAVID I. PINCUS
 Chief, Court of Federal Claims Section
MARY M. ABATE
 Assistant Chief
JASON BERGMANN
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Washington, D.C. 20044
202-616-3425 (v)
202-514-9440 (f)
jason.bergmann@usdoj.gov

# TABLE OF CONTENTS

Page

REPLY OF THE UNITED STATES IN SUPPORT OF ITS CROSS-MOTION
FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFF'S
PARTIAL SUMMARY JUDGMENT MOTION .......................................................................1

ARGUMENT .........................................................................................................................2

    A.    The Treaty's Text and Context Confirm that Article XXIV Does Not
        Override the Internal Revenue Code to Allow Foreign Tax Credits
        Against the NIIT ........................................................................................................2

        1.    Article XXIV(1) allows foreign tax credits only "in accordance
            with the provisions" and "subject to the limitations of" the Code..........................2

        2.    Article XXIV(4) does not allow unlimited foreign tax credits for
            U.S. citizens residing in Canada ....................................................................7

    B.    Even if Article XXIV could be interpreted to allow foreign tax
        credits against the NIIT, contrary to the Code, the Code would control
        as the "last in date." ...............................................................................................12

    C.    Plaintiff's Counterarguments Do Not Hold Water .......................................................14

        1.    The Canadian letter does not reflect the signatories' shared
            expectations of the Treaty, nor does it overcome the Treasury
            Department's interpretation. ..........................................................................14

        2.    Plaintiff's invocation of a liberal-construction rule is misplaced .........................17

        3.    The Court may not broaden the Treaty's terms to reduce double
            taxation.......................................................................................................18

CONCLUSION......................................................................................................................20

Appx940

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Air Canada v. U.S. Department of Transportation*, 843 F.2d 1483 (D.C. Cir. 1989) .............16

*Air France Co. v. Saks*, 470 U.S. 392 (1985) ....................................................2, 15

*Animal Science Prods., Inc. v Hebei Welcome Pharm. Co., Ltd*., 585 U.S. 33 (2018) ...........15

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001) ........................................17

*Christensen v. United States*,168 Fed. Cl. 263 (2023),
 *appeal docketed*, No. 24-1284 (Fed. Cir. Dec. 22, 2023) ................................2, 4

*Clayton v. United States*, 33 Fed. Cl. 628 (1995) ....................................17

*Golan v. Saada*, 596 U.S. 666 (2022) ....................................................2

*Great-West Life Assurance Co. v. United States*, 230 Ct. Cl. 477 (1982) ...............17

*Haver v. Commissioner*, 444 F.3d 656 (D.C. Cir. 2006) ...............................9n

*Iceland Steamship Co. v. U.S. Dept. of the Army*, 201 F.3d 451 (D.C. Cir. 2000)..................5

*Jamieson v. Commissioner*, 584 F.3d 1074 (D.C. Cir. 2009) ...............................19n

*Jefferson Branch Bank v. Skelly*, 66 U.S. 436 (1861) ....................................1

*Kappus v. Commissioner*, 337 F.3d 1053 (D.C. Cir. 2003) .......................... 9n, 12-13, 19n

*Kim v. United States*, 664 F. Supp. 3d 1062 (C.D. Cal. 2023) .............................2, 7

*Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634 (5th Cir. 1994)...........................17

*O'Connor v. United States*, 479 U.S. 27 (1986) ....................................9, 10n

*Palmer v United States*, 6 Cl. Ct. 541 (1984) ....................................6n

*Pekar v. Commissioner*, 113 T.C. 158 (1999) ....................................19n

*Providence Bank v. Billings*, 29 U.S. 514 (1830) ....................................1, 17

*Schumacher v. United States*, 931 F.2d 650 (10th Cir. 1991) ....................................17

*Snap-On Tools, Inc. v. United States*, 26 Cl. Ct. 1045 (1992),
 *aff'd without op.*, 26 F.3d 137 (Fed. Cir. 1994)....................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases (Continuation):**

*Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982)............................................6

*Toulouse v. Commissioner*, 157 T.C. 49 (2021) .................................................. 2, 4, 13-14, 18

*United States v. McFerrin*, 570 F.3d 672 (5th Cir. 2009).......................................................17

*United States v. Stuart*, 489 U.S. 353 (1989).................................................................. 16-17

*Whitney v. Robertson*, 124 U.S. 190 (1888) ..............................................................12, 13

*Xerox Corp. v. United States*, 41 F.3d 647 (Fed. Cir. 1994)................................................16

**Statutes:**

Internal Revenue Code of 1986 (26 U.S.C):

§ 27.......................................................................................................................3, 3n
§ 901.................................................................................................................... *passim*
§ 904................................................................................................................ 7-8, 19n
§ 911....................................................................................................................8
§ 1411.................................................................................................................. *passim*
§ 7852..............................................................................................................13, 13n

**Treaties:**

"Convention Between the United States of America and Canada with Respect
to Taxes on Income and on Capital," as amended through 2007, Tax Notes
Doc. 2017-84262........................................................................................... *passim*

# TABLE OF AUTHORITIES

Page(s)

**Executive Branch Documents:**

Final Regulations, Net Investment Income Tax, 78 Fed. Reg. 72394-01 (Dec. 2, 2013), *as corrected by* 79 Fed. Reg. 18161 (April 21, 2014) .................................. 13-14

Treasury Department Technical Explanation of the Convention Between the Government of the United States of America and Canada with Respect to Taxes on Income and on Capital Signed at Washington, D.C. on September 26, 1980, as Amended by the Protocol Signed at Ottawa on June 14, 1983 and the Protocol Signed at Washington on March 28, 1984 ........... 4, 10-12

Rev. Proc. 2015-40, 2015-35 I.R.B. 236 (Aug. 31, 2015) ........................................................ 19

**Legislative Documents:**

Jt. Comm. on Tax'n, Explanation of Proposed Income Tax Treaty Between the United States and Canada, JCS-48-81 (1981) ............................................................. 10

S. Exec. Rep. No. 98-22 (1984) ............................................................................................ 10n, 17

S. Rep. No. 100-445 (1988) .................................................................................................... 13n

Tax Treaties, Hearing Before the S. Comm. on Foreign Relations, 97th Cong. (1981) ......................................................................................................... 10, 15

**Other Authorities:**

American Heritage Dictionary, Second College Edition (1982) ............................................... 5

American Law Institute, The International Aspects of U.S. Income Taxation: Volume Two (Proposals of the American Law Institute on U.S. Income Tax Treaties) (1992) ................................................................................ 10-11

Rebecca M. Kysar, *Interpreting Tax Treaties*, 101 Iowa L. Rev. 1387 (2016) ....................... 17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————

No. 23-766 T

(Judge Matthew H. Solomson)

PAUL BRUYEA,

Plaintiff,

v.

THE UNITED STATES,

Defendant

———————

**REPLY OF THE UNITED STATES IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE
TO PLAINTIFF'S PARTIAL SUMMARY JUDGMENT MOTION**

———————

The United States has the sovereign power to tax its citizens in the manner authorized by

Congress. *Providence Bank v. Billings*, 29 U.S. 514, 544 (1830). While the United States may

cede that power to tax by treaty, any relinquishment of that sovereign right must be clearly

expressed and may not be inferred from ambiguous text. *See Jefferson Branch Bank v. Skelly*,

66 U.S. 436, 446 (1861). Plaintiff's position in this case would require the Court to do exactly

that—to infer that the provision at issue here, Article XXIV of the United States-Canada income-

tax treaty, permits application of foreign tax credits against the net investment income tax under

§ 1411 ("NIIT"), despite Congress's express decision to prohibit any such credits.[1]

While Article XXIV(1) provides that the United States shall allow its citizens or residents

to apply foreign tax credits "against the United States tax on income" for "the appropriate

amount of income tax paid or accrued to Canada" (Dkt. 20-2 at 30), it allows foreign tax credits

only "[i]n accordance with the provisions and subject to the limitations of the law of the United

---

[1] Unless otherwise indicated, all citations are to sections of the Internal Revenue Code of
1986 (the "Code") [26 U.S.C.], in effect during 2015, the tax period at issue.

States." (*Id.*) And the law of the United States—the Internal Revenue Code—does not allow foreign tax credits against the NIIT. As courts have held when interpreting identical language in three other U.S. tax treaties (with France, Italy, and South Korea), "there is no independent, treaty-based credit" against the NIIT under these "express terms." *Toulouse v. Commissioner*, 157 T.C. 49, 58 & 61-62 (2021) (France & Italy); *see also Kim v. United States*, 664 F. Supp. 3d 1062, 1080-86 (C.D. Cal. 2023) (South Korea); *Christensen v. United States*, 168 Fed. Cl. 263, 326-329 (2023) (France), *appeal docketed*, No. 24-1284 (Fed. Cir. Dec. 22, 2023).

Nor does Article XXIV(4) provide a basis for the allowance of foreign tax credits against the NIIT. As its text and its context confirm, paragraph (4) modifies paragraph (1) in certain circumstances, but it does not operate independently. Plaintiff's claim that paragraph (4) provides foreign tax credits that are not subject to the provisions and limitations of the Code would render portions of Article XXIV superfluous and would produce anomalous results that undermine the policies underlying the Code's foreign-tax-credit framework. Plaintiff's interpretation is also inconsistent with the Treaty's 1981 technical explanation, a document entitled to great weight and whose contents were reviewed and accepted by Canada.

Congress's express intent to deny application of foreign tax credits against the NIIT is unambiguous. Plaintiff's claim, which is based solely on inference, should be rejected.

## ARGUMENT

**A. The Treaty's Text and Context Confirm that Article XXIV Does Not Override the Internal Revenue Code to Allow Foreign Tax Credits Against the NIIT.**

**1. Article XXIV(1) allows foreign tax credits only "in accordance with the provisions" and "subject to the limitations of" the Code.**

The analysis begins, as it must, with the Treaty's text and context. *See Golan v. Saada*, 596 U.S. 666, 676 (2022); *Air France Co. v. Saks*, 470 U.S. 392, 396-97 (1985). Paragraph (1) of Article XXIV states, in relevant part (emphasis added):

– 2 –

Appx945

> [I]n accordance with the provisions and subject to the limitations of the *law of the United States* (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a citizen or a resident of the United States . . . as a credit against the United States income tax on income the appropriate amount of income tax paid or accrued to Canada . . . .

There is no ambiguity here. Paragraph (1) provides for relief from double taxation in the form of a foreign tax credit, and application of the credit is determined "in accordance with the provisions" and "subject to the limitations of" U.S. domestic law. Under §§ 27 and 901(a), Congress allows foreign tax credits only against the taxes imposed under Chapter 1 of the Code.[2] Congress does not allow foreign tax credits against the tax imposed by Chapter 2A. Thus, to allow a credit against the NIIT would not be "[i]n accordance with the provisions . . . of the law of the United States," and would contravene both the Code and the text of paragraph (1).

There was good reason for the drafters to refer to "the law of the United States" in paragraph (1). As explained in defendant's opening brief (at 9-13), the statutory and regulatory framework for computing and applying foreign tax credits is highly articulated. When Congress and the Treasury Secretary crafted that framework, they contemplated the application of foreign tax credits against income taxes under Chapter 1, but not against taxes imposed elsewhere in the Code. If the Treaty means (as plaintiff contends) that taxpayers may credit foreign taxes against the NIIT independent of the Code, a method of computing and applying the non-statutory credit would need to be developed. That would require the creation and administration of a parallel, foreign-tax credit regime not contemplated by the Code, which would include new methods of calculating tax-credit limitations, as well as new carryover and loss-allocation and recapture rules. It would also require the coordination of the new, parallel, regime with the credits already

---

[2] Section 27 allows foreign tax credits to offset taxes imposed under "this chapter" (*i.e.,* Chapter 1), to the extent provided in § 901. Section 901(a) allows certain foreign taxes to be credited against "the tax imposed by this chapter" (again, Chapter 1).

allowed under the Code to, for example, ensure that the same dollar of foreign tax is not used twice, once as a credit against Chapter 1 taxes and again as a credit against the NIIT. (*See* Def. Br. at 45-46.) By expressly providing that United States foreign tax credits would be "in accordance with" and "subject to the limitations" of the Code, paragraph (1) ensures that any allowable tax credits would slot neatly into the foreign-tax-credit framework already in place, rendering complex new rules unnecessary.[3]

     Referencing the parenthetical in paragraph (1),[4] plaintiff argues (at 17) that the Treaty guarantees the allowance of foreign tax credits "as an offset against any treaty-defined United States taxes, including the NIIT." However, plaintiff's "reading of the 'general principle' language" from the parenthetical is "overbroad." *Christensen,* 168 Fed. Cl. at 328. "The 'provisions' and 'limitations' language incorporates [Internal Revenue Code] statutory restrictions on the availability of foreign tax credits, and the 'general principle' language, although modifying this incorporation, does not nullify the immediately preceding incorporation of the 'provisions' and 'limitations' of United States law." *Id.*; *see also Toulouse*, 154 T.C. at 60 ("Imposition of the net investment income tax is not a change to the general principles of U.S. tax laws."). Paragraph (1) recognizes that the provisions and limitations "may be amended from time to time," and the technical explanation recognizes that the United States need not "maintain

---

[3] By analogy to the Treasury regulations under § 1411, plaintiff suggests (at 13) that it would be relatively simple to apply a "reasonable method" approach to address the computational complexities defendant identified. However, while the allocation of *deductions* between taxable and non-taxable income may be a relatively simple endeavor, this case involves tax *credits*, for which the Code has a completely different structural framework. Moreover, the existing rules governing foreign tax credits are extremely complex, particularly with respect to tax-credit limitations, carryovers, and the allocation and recapture of foreign losses. Comprehensive rules addressing those issues for separate tax credits against the NIIT could not be accomplished under a reasonable-method approach.

[4] With respect to the "law of the United States," the parenthetical states: "(as it may be amended from time to time without changing the general principle hereof)."

the overall limitation . . . provided by U.S. law when the Treaty was enacted." 1984 Tech. Exp.,

Art. XXIV at 37 [Dkt. 20-8 at 3]. The Treaty does not require the United States to grant a foreign

tax credit against every new levy Congress may enact.[5]

Nor does the reference in paragraph (1) to a foreign tax credit in "the appropriate

amount" support plaintiff's position. Referencing those words, plaintiff asserts (at 16) that

paragraph (1) incorporates only Code provisions affecting the "calculat[ion]" of the "Canadian

tax to be credited against United States tax." But plaintiff concedes that paragraph (1)

incorporates Code provisions and limitations that operate to reduce the credit amount to zero

(such as § 901(c), and presumably §§ 901(j), (k), and (l)), denying foreign tax credits against

United States taxes in their entirety. However, plaintiff selectively omits §§ 27 and 901(a), from

the operation of paragraph (1), even though those Code provisions likewise deny foreign tax

credits against non-Chapter 1 taxes in their entirety. Nothing in the text supports plaintiff's

strained interpretation. But even if the incorporation by paragraph (1) of U.S. domestic law

limitation applied only to those provisions affecting the computation of a foreign tax credit's

"amount,"—they do not—§§ 27 and 901(a) would still qualify. Both provisions affect the

"appropriate amount" of foreign tax credits allowed under paragraph (1), by affixing the

allowable credit at zero for non-Chapter 1 taxes.

To satisfy the directive in paragraph (1) to allow foreign tax credits in an "appropriate"

amount, the United States need only provide credits where it would be "suitable," "proper," or

---

[5] The effect of the parenthetical is determined by the meaning intended by its drafters, as reflected in the Treaty's text and context and in the contemporaneously published technical explanations. The fact that the United States may have recently signed (but not ratified) a treaty with Croatia that uses different language says nothing about the meaning of *this* Treaty, signed between the United States and a *different* country more than *forty* years ago. Whatever the negotiators of the Croatia treaty may have intended by the language they chose is irrelevant to the construction of the Canada Treaty at issue here.

"fitting" to do so. American Heritage Dictionary, Second College Edition at 122 (1982) (definition of "appropriate"). Where, as here, §§ 27 and 901(a) bar the application of foreign tax credits against the NIIT, it would be neither suitable, proper, nor fitting under the provisions and limitations of U.S. domestic law for the United States to allow such credits.[6]

Plaintiff's assertion (at 16-17) that defendant's interpretation would deprive paragraph (1) of a purpose is also wrong. Paragraph (1) recites the double-taxation relief available under U.S. law, and paragraph (2) recites the double-taxation relief provided by Canada. While neither necessarily grants rights to taxpayers beyond those provided under the countries' statutory laws, they need not do so to serve a purpose. By affirming their foreign-tax-credit obligations in the Treaty itself, the U.S. and Canada brought them squarely within the scope of the Mutual Agreement Procedure process, affording taxpayers a distinct remedy for foreign-tax-credit disputes through the competent authorities, "irrespective of the remedies provided by the domestic law" of the two countries. Treaty, Art. XXVI(1) [Dkt. 20-2 at 34].

Finally, when applying paragraph (1) to this case, the Court should give "great weight" to interpretations by the Treasury Department that reflect "the meaning attributed to [that] treaty provision[] by the Government agenc[y] charged with [its] negotiation and enforcement." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982). That principle is dispositive here, where Treasury made clear its view, with respect to the NIIT specifically, that any treaty (such as the U.S.-Canada Treaty) whose double-taxation provision "refers to the

---

[6] In a different context, the Claims Court held that the United States had substantial discretion to determine whether a number was "appropriate." *Palmer v United States*, 6 Cl. Ct. 541 (1984) (citing *Bockoven v. Marsh,* 727 F.2d 1558 (Fed. Cir. 1984)). There, an Army Reserve officer challenged the failure of selection boards to grant him a promotion, alleging that the boards included an insufficient number of reserve officers. *Id.* at 543. At the time, 10 U.S.C. § 266(a) required each selection board to "include an appropriate number of Reserves . . ." The Claims Court held that the statute gave the Secretary of the Army "substantial discretion to determine what constitutes an 'appropriate number' of reservists." *Id.*

limitations of United States law," would "not provide an independent basis for a credit against the section 1411 tax." Final Regulations, Net Investment Income Tax, 78 Fed. Reg. 72394-01, 72396 (Dec. 2, 2013), *as corrected by* 79 Fed. Reg. 18161 (April 21, 2014); *see also Kim,* 664 F. Supp. 3d at 1084-85 (holding that Treas. Reg. § 1.1411-1(e) supported an interpretation of similar language in the South Korea treaty to disallow foreign tax credits against the NIIT).

### 2. Article XXIV(4) does not allow unlimited foreign tax credits for U.S. citizens residing in Canada.

Paragraph (4) applies where a U.S. citizen is a resident of Canada and has income subject to tax by both countries. It provides ordering rules for determining how to apply tax credits when the same income is subject to tax in each. Nonetheless, plaintiff argues (at 14) that "the plain text of Article XXIV(4) of the Canada Treaty" allows him to claim foreign tax credits against the NIIT for income taxes he paid to Canada. In plaintiff's view, "Article XXIV(4) is independent from the provisions contained in Article XXIV(1)" and, accordingly, the "credit against United States tax" referred to in paragraph (4)(b) is not governed by the "provisions" and "limitations" of United States law as paragraph (1) requires. (P. Reply at 18.) This is an intentional misreading of paragraph (4).

Contrary to plaintiff's contention (at 18), paragraph (4) is not a "standalone" provision that provides for foreign tax credits "irrespective of any other treaty limitations." It does not establish credits against U.S. tax that are completely exempt from the provisions and limitations of the Code. As pointed out in defendant's opening brief (at 33-34), and as plaintiff now concedes (at 20), certain consequences would "in fact result from" plaintiff's construction of paragraph (4). Plaintiff would allow U.S. citizens residing in Canada to claim foreign tax credits against U.S. tax on U.S.-sourced income and to cross-credit foreign tax on general basket income against U.S. tax on passive basket income, despite the foreign-tax-credit limitation under § 904

– 7 –

and the important tax policies that the limitation achieves. Plaintiff would also allow a U.S.

citizen residing in Canada to obtain a double benefit by claiming credits for foreign taxes paid on

income covered by the foreign-earned income exclusion, a windfall precluded by § 911(d)(6).

As explained in defendant's opening brief (at 9-13), the complex and highly-articulated

foreign-tax-credit system established by the Internal Revenue Code is based on policy judgments

made at various times by both Congress and the Treasury Secretary that are incorporated into the

statute and regulations. To construe paragraph (4) as consigning these provisions and limitations

to the dustbin would frustrate the foundation on which the foreign-tax-credit framework is built.

And it would unfairly provide U.S. citizens residing in Canada with a far more generous foreign

tax credit than is available to U.S. citizens residing in the United States. For that reason, one

would expect such a construction of paragraph (4) to have been stated clearly in the text of the

Treaty, the Treaty's technical explanations, and the Treaty's ratification history.

Plaintiff's interpretation has no support in the Treaty's text or context. As explained in

defendant's opening brief (at 16-18), paragraphs (4), (5), and (6) together establish a "three-bite

rule" for taxpayers that are both residents of Canada and U.S. citizens. Paragraphs (4) and (5) lay

out the order and priority of the taxing rights and double-taxation relief that both countries must

allow, in light of the countries' competing rights to tax worldwide income. Paragraph (6)

implements a special re-sourcing rule providing that such taxpayers' U.S.-source income shall

"be deemed to arise in Canada to the extent necessary to avoid the double taxation of such

income under paragraph 4(b) or 5(c)." Treaty, Art. XXIV(6).

The inclusion of the special re-sourcing provision in paragraph (6) shows that the treaty

partners understood that the "provisions" and "limitations" language of paragraph (1) applies to

the credits referenced in paragraph (4)(b). The only reason a re-sourcing rule would be necessary

is if the drafters believed that the credit against U.S. tax referenced in paragraph (4)(b) was subject to the Code's § 904(a) limitation. Had the drafters believed, as plaintiff contends, that paragraph (4)(b) provides a credit that is exempt from the provisions and limitations of the Code, there would have been no reason to include paragraph (6). Plaintiff's reply acknowledges this fact (at 18-19), but plaintiff never tries to reconcile his position with paragraph (6).[7]

*O'Connor v. United States*, 479 U.S. 27 (1986), held that a tax exemption provided in the Panama Canal Treaty did not apply to U.S. income taxes, despite the omission of limiting language from the applicable provision. Article XV(1) of that treaty included language referring to taxes paid "in the Republic of Panama," but the language was absent in Article XV(2). *Id.* at 29-30. The Supreme Court held that, despite the omission of the language from the second paragraph, the treaty's text and context made clear that "Article XV applied only to Panamanian taxes." *Id.* at 31. *O'Connor* held that the taxpayer's interpretation there was "utterly implausible," had "no foundation in the negotiations leading to the agreement," and was contrary to the interpretation of the U.S. executive branch. *Id.* at 31-33.

The same reasoning applies here with equal force. Paragraph (1) establishes the context for "the provisions of paragraphs 4, 5, and 6" to which paragraph (1) cross-refers, including for the "credit against United States tax" in paragraph (4)(b) on which plaintiff's claim is based. The

---

[7] Neither *Kappus v. Commissioner*, 337 F.3d 1053 (D.C. Cir. 2003), nor *Haver v. Commissioner*, 444 F.3d 656, 657-58 (D.C. Cir. 2006), supports plaintiff's interpretation of paragraph (4). *Kappus*, 337 F.3d at 1056, declined to resolve whether paragraph (4) of the Treaty could be "harmonized" with a particular foreign-tax-credit limitation in the Code. The refusal to resolve that interpretive dispute hardly constitutes an endorsement of plaintiff's interpretation here. *Haver*, 444 F.3d at 659, merely recognized that *Kappus* had "left unresolved the question of whether" provisions in the Canada Treaty "were inconsistent," and noted that "no analogous" issue arose for the Germany treaty at issue there. It, too, has no relevance here.

**Appx952**

fact that the "provisions" and "limitations" language is not repeated in paragraph (4) is

inconsequential when the full context of Article XXIV is considered.[8]

The Treaty's technical explanations consistently support defendant's interpretation of

Article XXIV. In particular, the technical explanations provide:

- "The rules of paragraph 1 are *modified in certain respects* by rules in paragraphs 4 and 5 for income derived by United States citizens who are residents of Canada";

- "The credit against United States tax" under paragraph (4)(b) is "subject to the rules of paragraph 1"; and,

- "Paragraph 6 is necessary to implement the objectives of paragraphs 4(b) and 5(c)" by "overrid[ing] the source rules of paragraph 3 to permit a limited resourcing of income."[9]

*See* Tax Treaties, Hearing Before the S. Comm. on Foreign Relations, 97th Cong., at 157, 160

(1981) (emphasis added); 1984 Tech. Exp., Art. XXIV at 43, 46 (emphasis added). Thus, the

special rules in paragraphs (4) and (5) function as modifications to paragraph (1), but they do not

purport to replace it. Paragraph (4) is itself "subject to" paragraph (1), including the requirement

that any credits allowed by the United States be subject to the "provisions" and "limitations" of

U.S. domestic law. Notably, the language quoted above appears in both the 1981 and 1984

revisions of the technical explanation, the first of which was "reviewed" and "approved" by "the

---

[8] Plaintiff argues (at 19 n.13) that "the logic of the *O'Connor* decision" suggests that treaties should be interpreted to provide "reciprocal taxing rights." It does not. *O'Connor* merely recognized, solely in the context of the U.S.-Panama Treaty, that it was implausible to suggest that the United States "would yield more sovereign prerogatives than it was asking Panama to forego," and that the taxpayer's interpretation there had "no foundation in the negotiations leading to the Agreement." 479 U.S. at 31. Here, by its terms the Canada Treaty distinguishes between the U.S. taxes that taxpayers may credit against their tax liabilities to Canada [Article XXIV(2)] with the U.S. taxes against which foreign tax credits may be taken in accordance with U.S. law [Article XXIV(1)]. The two are not necessarily the same.

[9] The Treaty's ratification history includes a similar explanation. *See* S. Exec. Rep. No. 98-22, at 40, 43 (1984) (recognizing the "fundamental premise" that "a foreign tax credit may not offset the U.S. tax on U.S source income," and explaining the purpose of the re-sourcing rule "to give effect to the special rules for U.S. citizens residing in Canada" when "calculating the overall limitation" under the Code).

Canadian government," and it thus evidences the signatories' shared expectations of the Treaty at the time it was signed. Jt. Comm. on Tax'n, Explanation of Proposed Income Tax Treaty Between the United States and Canada, JCS-48-81, at 3 (1981); *see also* American Law Institute, The International Aspects of U.S. Income Taxation: Volume Two (Proposals of the American Law Institute on U.S. Income Tax Treaties), at 19 (1992) (recognizing that Canada had accepted the 1981 technical explanation "as an accurate portrayal of the understandings and context in which the treaty provisions were negotiated").

Plaintiff contends (at 20-23) that the 1984 technical explanation "reach[es] precisely the opposite conclusion," referencing Example C to supposedly demonstrate that Article XXIV would allow tax credits that are not "in accordance with the provisions and subject to the limitations of the laws of the United States."[10] Defendant does not dispute that paragraphs (4) through (6) of Article XXIV allow foreign tax credits under the Treaty in certain, specific, circumstances when they would not otherwise be allowed by the Code. (*See* Def. Br. at 33.) But that does not mean that the tax credit provided by paragraph (4)(b) for U.S. citizens residing in Canada is exempt from *all* of the Code's provisions and limitations, as plaintiff asserts.

Other examples in the technical explanation make this plain. Examples A and B involve hypothetical "U.S. citizen[s] who [are] resident[s] of Canada." The two examples reflect the re-sourcing of U.S.-source income to Canada under paragraph (6) so that the credits under paragraph (4)(b) and (5)(c) could be "fully used." If the paragraph (4)(b) and (5)(c) credits were exempt from § 904, as plaintiff asserts, no resourcing would be necessary and there would be no need for Examples A and B to have computed the limitation under § 904(a). Example D, which "illustrate[s]" the "application of paragraph (6)," further confirms this. There, in order "to credit

---

[10] To the extent pertinent, Example C appears in the 1984 technical explanation but *not* the 1981 technical explanation that was approved by the Canadian Department of Finance.

$26.82 of Canadian taxes on royalty income that has a U.S. source under both paragraph (3) and the Internal Revenue Code," the Treaty needed to re-source $64.13 from the United States to Canada. Example D recognizes that this re-sourcing occurs "for purposes of determining the U.S. foreign tax credit limitation under the Convention with respect to Canadian taxes."

It is unclear from plaintiff's reply precisely how Example C would support the opposite conclusion. The example is complicated factually and includes at least one typographical error (referring to a tax credit on "services income" as being "subject to the limitations of paragraph 5," a provision covering dividends, interest, and royalties, but *not* services, which are covered by paragraph (4) instead). Plaintiff appears to rely on portions of the example that discuss the carryover of unused foreign tax credits to other years and note the theoretical availability of unused credits for carryover, but which do not reflect the application of those sums in a manner conflicting with the Code. Elsewhere, Example C applies the limitation under § 904(a) when it calculates the foreign tax credits allowed by the United States on the hypothetical taxpayer's royalty and services income. *See* 1984 Tech. Exp. at 46 ("the limitation on the services income is . . . $50.18) [Dkt. 20-8 at 12]. To read Example C to support plaintiff's interpretation would require the Court to disregard Examples A, B, and D, and the remainder of the technical explanations for Article XXIV, which consistently confirm that the provisions and limitations language of paragraph (1) applies to any tax credit provided by paragraph (4)(b).

**B.** **Even if Article XXIV could be interpreted to allow foreign tax credits against the NIIT, contrary to the Code, the Code would control as the "last in date."**

In *Whitney v. Robertson*, 124 U.S. 190, 194-95 (1888) (emphasis added), the Supreme Court established a last-in-date rule to resolve conflicts between statutes and treaties. *See also Kappus*, 337 F.3d at 1058-60 (holding that, to the extent of any conflict between former Code § 59(a)(2) and article XXIV of the Treaty, the statute would prevail under the last-in-date rule).

– 12 –

**Appx955**

As *Whitney* makes clear, the last-in-date rule applies only when a statute and a treaty conflict—
*i.e.,* when courts are not able to "construe them to give effect to both" without "violating the
language of either." 124 U.S. at 194. When a treaty and a statute can be harmonized, no conflict
exists, and both may be enforced simultaneously.

Plaintiff is wrong to assert (at 11-12) that, when there is a potential conflict between a
treaty and a later-enacted provision of the Internal Revenue Code, courts may enforce the statute
only where Congressional intent to modify the treaty is clearly expressed. While that may be the
rule for non-tax statutes, § 7852(d)(1) makes clear that no such rule applies "[f]or purposes of
determining the relationship between a provision of a treaty and any law of the United States
affecting revenue."[11] The authorities plaintiff cites for the proposition that an express statement
is necessary either predate the 1988 amendment to § 7852(d)(1) or concern non-revenue statutes
and are inapposite.

When Congress enacts a tax statute whose terms are inconsistent with a prior treaty, the
text and context of the statute themselves are sufficient to demonstrate the intent of Congress to
override the treaty. Here, Congress intentionally placed the NIIT outside of Chapter 1,
demonstrating its clear intent that the new levy be ineligible for foreign tax credits under §§ 27
and 901(a). *Toulouse*, 157 T.C. at 60 (holding that such placement is a "clear expression of

---

[11] Section 7852(d)(1) was intended to aid the resolution of any "conflicts between treaties
and other acts of Congress affecting revenue" that "may be found or alleged to exist in the future,
either with respect to existing or future treaties and statutes." S. Rep. 100-445 at 321 (1988). In
the legislative history of that provision, the Senate Finance Committee found "it disturbing that
some assert that a treaty prevails over later enacted conflicting legislation in the absence of an
explicit statement of congressional intent to override the treaty; that it is treaties, not legislation,
that will prevail in the event of a conflict absent an explicit and specific legislative override," and
stated its belief that "this view" had no "foundation in present law." *Id.* at 325. The Committee's
concern was amplified by the fact that "it is not possible for Congress to assure itself that all
conflicts, actual or potential, between existing treaties and proposed legislation have been
identified during the legislative process." *Id.*

congressional intent"). To construe the Treaty to allow such credits would conflict directly with §§ 27 and 901(a). Such a construction would also violate the condition in Article XXIV(1) that a credit be allowed only "in accordance with the provisions and subject to the limitations of the law of the United States."

The Treasury statement that "an analysis of each United States income tax treaty would be required to determine" whether any particular treaty would require the United States to allow foreign tax credits against the NIIT does not change this. Whether statute or treaty is last-in-date will naturally vary from one treaty to another, as may the language of any particular treaty. Nonetheless, as the Treasury statement provides, where (as here) a treaty includes a double-taxation provision that "refers to the limitations of United States law" the treaty and the statute can be harmonized and there is no "independent basis for a credit against the section 1411 tax." 78 Fed. Reg. at 72396.

### C.   Plaintiff's Counterarguments Do Not Hold Water.

#### 1.   The Canadian letter does not reflect the signatories' shared expectations of the Treaty, nor does it overcome the Treasury Department's interpretation.

In support of his interpretation of Article XXIV, plaintiff relies heavily on a letter from a Canadian official (Director of the Canadian Competent Authority Services Division) to one of plaintiff's attorneys roughly six weeks after this case was filed. Plaintiff characterizes the letter as reflecting a "clearly expressed view of the Canadian government" (at 2) and evidencing the "shared expectations" of the treaty signatories (at 4). Plaintiff is wrong on both counts.

The letter simply states that the United States should "provide relief in accordance with Article XXIV of the Convention." Dkt. 18-6. The letter offers no rationale for the stated position, and its statement that "[r]elief from double taxation [under the Treaty] is granted in accordance with domestic laws and the Convention" is equally consistent with the government's

interpretation of Article XXIV as it is with plaintiff's. The letter endorses neither plaintiff's interpretation of paragraph (1) of Article XXIV, nor his interpretation of paragraph (4). With respect to the issue whether relief under Article XXIV includes a credit against the NIIT, notwithstanding the contrary provisions of U.S. domestic law, it is silent. Despite plaintiff's protestations (at 5), the letter is fairly characterized as vague.

In any event, the principle that U.S. courts need not take a foreign government's interpretation of its own laws at face value applies equally to an interpretation of a treaty offered by a foreign official years after the treaty's execution. *See Animal Science Prods., Inc. v Hebei Welcome Pharm. Co., Ltd*., 585 U.S. 33, 43 (2018). "[T]he appropriate weight in each case will depend on the circumstances," and courts are "neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials." *Id.* Where a "foreign government makes conflicting statements," or "offers an account in the context of litigation," there "may be cause for caution in evaluating the foreign government's submission." *Id.*

Here, the Canadian letter was drafted almost forty years after the Treaty was signed, and it does not evidence the "shared expectations" of the United States and Canada regarding the meaning of Article XXIV. "Expectations" are forward-looking and examine the drafters' understandings when the Treaty was negotiated and signed. *See Air France Co.*, 470 U.S. at 399. Here, the best evidence of the parties' "expectations" is the 1981 technical explanation, which was drafted by the U.S. Treasury Department and reviewed and approved by the Canadian Department of Finance. *See* Tax Treaties, Hearing, at 117-179. Canada accepted the interpretation of Article XXIV expressed by Treasury when the Treaty was being negotiated, an interpretation that is fully consistent with defendant's position here.

– 15 –

**Appx958**

Plaintiff essentially argues that the Court may give deference to the United States'
interpretation of the Treaty here only if it aligns with Canada's current view. Plaintiff's
construction would mean that U.S. courts must yield to the views of the U.S. treaty partner in
any case where the treaty partner and the United States disagree. That is not the law, as *Iceland
Steamship Co. v. U.S. Dept. of the Army*, 201 F.3d 451, 460 (D.C. Cir. 2000), and *Air Canada v.
U.S. Department of Transportation*, 843 F.2d 1483, 1487 (D.C. Cir. 1989), make clear. In both
cases, the D.C. Circuit deferred to treaty interpretations made by the U.S. executive branch, even
though the U.S. treaty partners disagreed with them at the time of a later dispute.

*Snap-On Tools, Inc. v. United States*, 26 Cl. Ct. 1045 (1992), *aff'd without op.*, 26 F.3d
137 (Fed. Cir. 1994), provides no support for plaintiff's effort to downplay the technical
explanations here. In that case, there was no "evidence in the record . . . to support the notion that
the British government" was aware of the interpretation set forth in the technical explanation. *Id.*
at 1066. Here, in contrast, the 1981 technical explanation was reviewed and approved by Canada
and thus reflects the parties' shared expectations. The holding in *Snap-On Tools* was also based
on conflicts between the technical explanation and a Senate report prepared during the
ratification process, a circumstance not present here. *Id.* at 1072.

Subsequently, addressing the same treaty, the Federal Circuit in *Xerox Corp. v. United
States*, 41 F.3d 647, 655-56 (Fed. Cir. 1994), disregarded "the position taken by the Treasury" in
the technical explanation, where the Senate executive report had criticized it. At the same time,
though, the Federal Circuit recognized that "extrinsic material is often helpful in understanding
the treaty and its purposes." *Id.* at 652. Thus, courts construing tax treaties between the U.S. and
Canada have properly relied on technical explanations on numerous occasions. *See, e.g., United*

*States v. Stuart*, 489 U.S. 353, 368 n.8 (1989); *Great-West Life Assurance Co. v. United States*, 230 Ct. Cl. 477, 491 (1982); *Clayton v. United States*, 33 Fed. Cl. 628, 654-56 (1995).

### 2.     Plaintiff's invocation of a liberal-construction rule is misplaced.

Contending (at 10) that the "Canada Treaty should be liberally interpreted," plaintiff essentially asks the Court to put a thumb on the scale in his favor in this interpretive inquiry. But plaintiff fails to acknowledge the diminishing vitality of a liberal-construction canon in modern jurisprudence. Because "treaties establish restrictions or limitations on the exercise of sovereign rights," they "should be construed narrowly rather than broadly." *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 638-39 (5th Cir. 1994).

The Supreme Court has recognized that the "power of taxation," as "an incident of sovereignty," is of "vital importance," and is "essential to the very existence of government." *Providence Bank*, 29 U.S. at 544-45 (quoting *M'Culloch v. State of Maryland*, 17 U.S. 316 (1819). Because of the "tie between taxation and the fisc, the relinquishing of taxing jurisdiction is not something that a sovereign would likely do implicitly or lightly." *See* Rebecca M. Kysar, *Interpreting Tax Treaties*, 101 Iowa L. Rev. 1387, 1441 (2016). For that reason, a liberal-construction rule is particularly inappropriate where substantive tax questions are involved.

To the extent applicable, a liberal-interpretation canon would run counter to the rule requiring that tax credits be clearly expressed. *See Schumacher v. United States*, 931 F.2d 650, 652 (10th Cir. 1991); *United States v. McFerrin*, 570 F.3d 672, 675 (5th Cir. 2009). In applying both canons here, it would be necessary for the Court to make an "assessment about the two canons' relative strength." *Chickasaw Nation v. United States*, 534 U.S. 84, 94-95 (2001). In an analogous circumstance, the Supreme Court declined to apply a canon requiring a statute to be interpreted "liberally in favor of" Native tribes, where it conflicted with the canon requiring strict construction of tax exemption, which took precedence.

### 3.    The Court may not broaden the Treaty's terms to reduce double taxation.

Plaintiff repeatedly asks the Court to accept his interpretation of Article XXIV, because "the purpose of the Canada Treaty," or at least "one of [its] principal purposes," is "to avoid the evil of double taxation." (P. Reply at 2, 8.) But the reduction of double taxation is not the Treaty's only purpose; the Treaty is also intended "to prevent avoidance or evasion of the taxes of the two countries" and to "enable the countries to cooperate in preventing avoidance and evasion of taxes," among other things. S. Exec. Rep. No. 98-22, at 2. None of these policies is absolute, nor do they override the specific language that the negotiators drafted and the Senate ratified. As the Tax Court explained when holding that the U.S.-France and U.S.-Italy treaties did not authorize foreign tax credits against the NIIT, while a "general purpose" of tax treaties may be "to reduce double taxation," "the specific provisions of each treaty must be applied as written." *Toulouse*, 157 T.C. at 60.

Article XXIV(1) of the Treaty provides only for an allowance by the United States of foreign tax credits "[i]n accordance with the provisions and subject to the limitations of the law of the United States." (Dkt. 20-2 at 30.) By expressly conditioning foreign tax credits on the provisions and limitations of U.S. law, Article XXIV qualifies the double-taxation relief that it grants. Thus, as is the case for the U.S. tax treaties with France and Italy, while the Treaty here may "provide for general protection against double taxation," it does "not provide absolute protection. [Its] purpose is not to provide absolute protection." *Toulouse*, 157 T.C. at 60.

As noted above, the Code contains numerous conditions and limitations on the allowance of foreign tax credits whose effect is to deny taxpayers absolute relief from double taxation. If the general "purpose[] of the Canada Treaty . . . to avoid double taxation" had the effect claimed by plaintiff (at 1), then § 901(j) could never be enforced against a U.S. treaty partner, even though it is one of the "provisions" and "limitations" of U.S. law referenced in paragraph (1).

Nor could the United States have enforced § 59(a)(2) when it previously limited foreign tax credits to ninety percent of the alternative minimum tax, a provision that arguably ran counter to the broad tax-treaty purpose of reducing double taxation.[12]

For an additional reason, plaintiffs are wrong that the disallowance of foreign tax credits against the NIIT is somehow inconsistent with a purpose of avoiding double taxation. The Code does not prevent plaintiff from obtaining foreign tax credits for the creditable Canadian taxes that he paid; it merely disallows such credits against the NIIT. Plaintiff may still use his creditable Canadian taxes as a basis for claiming credits against U.S. taxes he owes under Chapter 1 of the Code and, because of the Code's generous carryover and carryback rules, he may make those claims in numerous additional tax years.[13] Thus, even if the decision by Congress not to allow foreign tax credits against the NIIT might affect the timing of plaintiff's tax-credit claims, it does not necessarily prevent him from ever claiming credits against Chapter 1 taxes.[14]

---

[12] The courts uniformly upheld that statutory foreign-tax-credit limitation, notwithstanding double-taxation provisions in applicable tax treaties. *See, e.g., Jamieson v. Commissioner*, 584 F.3d 1074, 1075 (D.C. Cir. 2009) (rejecting claim that general prohibition on double taxation in a treaty supplanted § 59(a)); *Kappus v. Commissioner*, 337 F.3d 1053, 1055 (D.C. Cir. 2003) (holding that § 59(a) was consistent with U.S.-Canada treaty, where foreign tax credit was "[i]n accordance with the provisions and subject to the limitations of the law of the United States"); *Pekar v. Commissioner*, 113 T.C. 158, 162 (1999) (acknowledging a treaty's general prohibition of double taxation, but applying "limits of law" under treaty's terms).

[13] Section 904(c) allows taxpayers to carry over credits in excess of the § 904 limitation for use first in the previous taxable year and then in the ten succeeding taxable years.

[14] The MAP provisions of Article XXVI further support the view that Article XXIV was not intended to resolve every instance of double taxation. The Treaty expressly allows the competent authorities to consult together "for the elimination of double taxation in cases not provided for in the convention." Treaty, Art. XXVI(3). Plaintiff invoked this MAP process but cut the process short by filing this suit. *See* Rev. Proc. 2015-40, § 6.05(1).

**CONCLUSION**

For the reasons explained above, the United States respectfully asks the Court to grant its cross-motion for summary judgment, and deny plaintiffs' motion for partial summary judgment, on the ground that neither the Code nor Article XXIV of the Treaty allows plaintiff to apply foreign tax credits to his liabilities for the NIIT.

Respectfully submitted,

May 22, 2024          *s/Jason Bergmann*
JASON BERGMANN
Attorney of Record
U.S. Department of Justice, Tax Division
Post Office Box 26
Washington, D.C. 20044
202-616-3425 (v)
202-514-9440 (f)
jason.bergmann@usdoj.gov

DAVID A. HUBBERT
 Deputy Assistant Attorney General
DAVID I. PINCUS
 Chief, Court of Federal Claims Section
MARY M. ABATE
 Assistant Chief

May 22, 2024          *s/Mary M. Abate*
 Of Counsel

Attorneys for Defendant

– 20 –

**Appx963**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————————

No. 23-766 T
(Judge Matthew J. Solomson)

PAUL BRUYEA,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

———————————

**JOINT STATUS REPORT**

———————————

Pursuant to the Court's December 5, 2024, Order (Dkt. 31) directing the parties to file a Joint Status Report regarding how this case should proceed, the parties submit this Joint Status Report.

The parties jointly propose that, consistent with the Court's December 5, 2024, Opinion, the Court should enter a judgment that includes the following language:

> IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiffs recover from the United States the following amount:
>
> For plaintiff's income-tax year ended December 31, 2015, an overpayment of income tax in the amount of $263,462.00, with statutory interest on such overpayment pursuant to section 6611 of the Internal Revenue Code.

This proposed language is without prejudice to the parties' rights to notice an appeal of any judgment, opinion, or order entered in the above-captioned case.

– 1 –

Appx1096

Respectfully submitted,

January 16, 2025                          *s/Stuart E. Horwich, by consent*
                                         STUART E. HORWICH
                                         Horwich Law LLC
                                         5th Floor
                                         20 Old Bailey
                                         London, EC4M 7AN
                                         United Kingdom
                                         Phone:   011 +44 208 057 8013
                                         Fax:  302 861 1411
                                         seh@horwichlaw.com
                                         Counsel for Plaintiff

January 16, 2025                          *s/Jason Bergmann*
                                         JASON BERGMANN
                                         Attorney of Record
                                         U.S. Department of Justice
                                         Tax Division
                                         Court of Federal Claims Section
                                         Post Office Box 26
                                         Washington, D.C. 20044
                                         202-616-3425 (v)
                                         202-514-9440 (f)
                                         jason.bergmann@usdoj.gov

                                         DAVID A. HUBBERT
                                          Deputy Assistant Attorney General
                                         DAVID I. PINCUS
                                          Chief, Court of Federal Claims Section
                                         MARY M. ABATE
                                          Assistant Chief

January 16, 2025                           *s/Mary M. Abate*
                                          Of Counsel

                                         Attorneys for Defendant

– 2 –

**Appx1097**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

—————————

No. 23-766
(Judge Matthew H. Solomson)

PAUL BRUYEA.,

Plaintiff,

v.

UNITED STATES,

Defendant.

————————————————————

**NOTICE OF APPEAL**

————————————————————

Notice is hereby given that the United States of America, defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Federal Circuit from the final judgment entered in this action on January 17, 2025.

Respectfully submitted,

March 17, 2025

*s/ Jason Bergmann*
JASON BERGMANN
Attorney of Record for Defendant
U.S. Department of Justice, Tax Division
Post Office Box 26
Washington, D.C. 20044
Tel: (202) 616-3425
Fax: (202) 514-9440
jason.bergmann@usdoj.gov

DAVID I. PINCUS
    Chief, Court of Federal Claims Section

March 17, 2025

*s/ David I. Pincus*
Of Counsel

**Appx1098**